**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |
|---|---|
| KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., and DONGBU INCHEON STEEL CO., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> NUCOR CORPORATION and STEEL DYNAMICS, INC., <br><br> Defendant-Intervenors. | **NON-CONFIDENTIAL** <br><br> Proprietary Information Removed from Pages 17, 25, 28, 31-32, 35 <br><br> Court No. 22-00047 |

**PLAINTIFFS KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., AND
<u>DONGBU INCHEON STEEL CO., LTD.'S OPENING BRIEF</u>**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

August 29, 2022

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Plaintiffs KG Dongbu Steel Co.,
Ltd., Dongbu Steel Co., Ltd. and Dongbu
Incheon Steel Co., Ltd.*

## <u>TABLE OF CONTENTS</u>

I.    RULE 56.2 STATEMENT ................................................................................ 1

II.   ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE
      ADMINISTRATIVE DETERMINATION ....................................................... 2

III.  STATEMENT OF FACTS ............................................................................... 2

IV.   SUMMARY OF ARGUMENT ...................................................................... 11

V.    STANDARD OF REVIEW ........................................................................... 13

VI.   ARGUMENT ................................................................................................ 14

      A.   Commerce's Determination That Dongbu's First Through Third D/E Swaps
           Provided A Countervailable Subsidy To Dongbu Was Not Supported By
           Substantial Evidence And Is Otherwise Not In Accordance With Law .............. 14

           1.   Commerce Failed To Provide A Reasonable Explanation For Ignoring Its
                Established Agency Practice .................................................................. 15

           2.   Dongbu Detrimentally Relied On Commerce's Past Practice And
                Unambiguous Statements Regarding That Practice When It Did Not
                Respond To The Change In Ownership Appendix ................................. 20

      B.   Even If Commerce's Explanation For Its Change In Practice Was Reasonable
           There Is No Substantial Evidence That Dongbu's First Through Third Equity
           Conversions Were Countervailable .................................................... 23

      C.   Record Evidence Demonstrates That The KG Consortium Acquired Control Of
           Dongbu In An Arm's-Length Transaction And At Fair Market Value And
           Therefore There Was No Pass Through Of Subsidies From Dongbu To KG
           Dongbu Steel ........................................................................................ 29

      D.   Commerce Incorrectly Calculated The Uncreditworthy Benchmark Rate And The
           Unequityworthy Discount Rates ........................................................... 36

           1.   Uncreditworthy Benchmark Rate ........................................................ 36

           2.   Unequityworthy Discount Rates ......................................................... 40

VII.  CONCLUSION ............................................................................................. 42

CERTIFICATE OF COMPLIANCE ......................................................................... 43

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Cinsa, S.A. de C.V. v. United States*,
966 F. Supp. 1230 (1997) ...................................................................................15

*Consol. Barings Co. v. United States*,
348 F.3d 997 (Fed. Cir. 2003) ............................................................................19

*CS Wind Vietnam Co. v. United States*,
832 F.3d 1367 (Fed. Cir. 2016)......................................................................34, 36

*Eregli Demir Ve Çelik Fabrikalari T.A.S. v. United States*,
415 F. Supp. 3d 1216 (Ct. Int'l Trade 2019) .........................................38, 39, 41

*Gerald Metals, Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997)..............................................................................34

*Guangzhou Jangho Curtain Wall Sys. Eng'g Co. v. United States*,
181 F. Supp. 3d 1265 (Ct. Int'l Trade 2016) ......................................................38

*Hynix Semiconductor Inc. v. United States*,
30 C.I.T. 288, 425 F. Supp. 2d 1287 (2006) .......................................................25

*Hyundai Steel Co. v. United States*,
415 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) ......................................................19

*Linyi Chengen Imp. and Exp. Co. v. United States*,
391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) ......................................................19

*M.M. & P. Mar. Advancement, Training, Educ. & Safety Program v. Dep't of Commerce*,
729 F.2d 748 (Fed. Cir. 1984)..............................................................................15

*Nucor Corp. v. United States*,
461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) ......................................................18

*Sao Ta Foods Joint Stock Co. v. United States*,
475 F. Supp. 3d. 1283 (Ct. Int'l Trade 2020) .....................................................23

*Save Domestic Oil, Inc. v. United States*,
357 F.3d 1278 (Fed. Cir. 2004)............................................................................15

*Shikoku Chems. Corp. v. United States*,
16 C.I.T. 382, 795 F. Supp. 417 (1992)..........................................................20, 23

*SKF USA, Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001)................................................................................19, 20

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504 (1994)...........................................................................................................38

*Torrington Co. v. United States*,
    156 F.3d 1361 (Fed. Cir. 1998).........................................................................................38

*United States Steel Corp. v. United States*,
    348 F. Supp. 3d 1248 (Ct. Int'l Trade 2018) ....................................................................20

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................................................14

19 U.S.C. § 1677(f)(5) ............................................................................................................30

**Regulations**

19 C.F.R. § 351.505 ....................................................................................................... *passim*

19 C.F.R. § 351.507 ....................................................................................................... *passim*

19 C.F.R. § 351.524 .........................................................................................................40, 41

**Other Authorities**

*Certain Corrosion-Resistant Steel Products From India, Italy, the Republic of Korea and the
    People's Republic of China: Countervailing Duty Order*, 81 Fed. Reg. 48,387 (Dep't
    Commerce July 25, 2016 ................................................................................................. 2-3

*Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Affirmative
    Countervailing Duty Determination, and Final Affirmative Critical Circumstances
    Determination, in Part*, 81 Fed. Reg. 35,310 (Dep't Commerce June 2, 2016)......................3

*Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and
    Partial Rescission of Countervailing Duty Administrative Review; 2015-2016,* 84 Fed. Reg.
    11,749 (Dep't Commerce Mar. 28, 2019).........................................................................3, 4

*Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and
    Partial Rescission of Countervailing Duty Administrative Review; 2017,* 85 Fed. Reg. 15,112
    (Dep't Commerce Mar. 17, 2020).............................................................................4, 9, 22

*Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and
    Partial Rescission of Countervailing Duty Administrative Review; 2018,* 86 Fed. Reg. 29,237
    (Dep't Commerce June 1, 2021).........................................................................5, 9, 14, 18

*Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review, Rescission of Review, In Part, and Intent to Rescind, In Part; 2015-16*, 83 Fed. Reg. 39,671 (Dep't Commerce Aug. 10, 2018) ...............3

*Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review, and Rescission of Review, In Part; 2017*, 84 Fed. Reg. 48,107 (Dep't Commerce Sept. 12, 2019) .................4

*Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2018*, 85 Fed. Reg. 74,692 (Dep't Commerce Nov. 23, 2020) ...................................................................................5, 22

*Certain Pasta From Italy:  Preliminary Results and Partial Rescission of the Eighth Countervailing Duty Administrative Review*, 70 Fed. Reg. 17,971 (Dep't Commerce Apr. 8, 2005) ...........................................................................30, 33

*Coated Free Sheet Paper from the Republic of Korea:  Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007) ........................................................................29

*Countervailing Duties*, 62 Fed. Reg. 8,818 (Dep't Commerce Feb. 26, 1997) ............................25

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ...................39, 41

Merriam-Webster Online Dictionary ...............................................................25

*Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act,* 68 Fed. Reg. 37,125 (Dep't Commerce 2003).......................................30, 35

*Small Diameter Circular Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from Italy*, 60 Fed. Reg. 31,992, (Dep't Commerce June 19, 1995).......................................18

Uruguay Round Agreements, Statement of Administrative Action, H.R. Rep. No. 103-316, vol.1 (1994) (Conf. Rep.).................................................................31

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., and DONGBU INCHEON STEEL CO., LTD., | |
| Plaintiffs, | **NON-CONFIDENTIAL** |
| v. | Proprietary Information Removed from Pages 17, 25, 28, 31-32, 35 |
| UNITED STATES, | |
| Defendant, | Court No. 22-00047 |
| and | |
| NUCOR CORPORATION and STEEL DYNAMICS, INC., | |
| Defendant-Intervenors. | |

**PLAINTIFFS KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., AND
DONGBU INCHEON STEEL CO., LTD.'S OPENING BRIEF**

In accordance with Rule 56.2 of the Rules of this Court, and the August 22, 2022 scheduling order, Plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd., and Dongbu Incheon Steel Co., Ltd (collectively, "Dongbu" or "Plaintiffs") file this brief in support of their Rule 56.2 motion for judgment upon the agency record. Amended Scheduling Order, *KG Dongbu Steel Co., Ltd., v. United States* (Ct. Int'l Trade August 22, 2022), ECF No. 32. As discussed below, the U.S. Department of Commerce's ("Commerce") *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law.

## I.    RULE 56.2 STATEMENT

The administrative determination under review is Commerce's *Final Results* in the countervailing duty ("CVD") administrative review of certain corrosion-resistant steel products

("CORE" or "subject merchandise") from the Republic of Korea, which covered entries of subject merchandise into the United States between January 1, 2019 and December 31, 2019. *See Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022) ("CORE 2019 Final Results"), PR 216, and accompanying Issues and Decision Memorandum ("CORE 2019 IDM"), PR 213.

## II.   ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE ADMINISTRATIVE DETERMINATION

1)   Whether Commerce's determination that the first through third debt/equity swaps ("D/E Swaps") provided a countervailable subsidy to Dongbu is unsupported by substantial evidence and not in accordance with law?

2)   Whether Commerce's determination that the benefits from Dongbu's D/E Swaps that Commerce first found countervailable in the CORE 2019 Preliminary Results passed through to KG Dongbu Steel despite the change in ownership that occurred during the 2019 POR, is unsupported by substantial evidence and not in accordance with law?

3)   Whether Commerce's calculation of the uncreditworthiness benchmark for purposes of measuring the benefit from Dongbu's restructured financing, and Commerce's calculation of the uncreditworthy discount rate for purposes of measuring the benefits from the D/E Swaps, is unsupported by substantial evidence and not in accordance with law?

## III.   STATEMENT OF FACTS

On July 25, 2016, Commerce published a CVD order on CORE from Korea with a subsidy rate for Dongbu Steel/Dongbu Incheon of 1.19 percent.  *Certain Corrosion-Resistant Steel Products From India, Italy, the Republic of Korea and the People's Republic of China: Countervailing Duty Order*, 81 Fed. Reg. 48,387, 48,388 (Dep't Commerce July 25, 2016)

("CVD Order").  Dongbu's subsidy rate, based on certain recurring subsidy programs used during the calendar year 2014 period of investigation, consisted almost entirely (*i.e.*, 1.13 percent) of benefits from the 2014 restructuring of Dongbu's outstanding long-term loans and bonds by its creditors committee under its corporate workout program.  *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Final Affirmative Countervailing Duty Determination, and Final Affirmative Critical Circumstances Determination, in Part,* 81 Fed. Reg. 35,310 (Dep't Commerce June 2, 2016) and accompanying Issues and Decision Memorandum at 7.

On March 28, 2019, Commerce published the final results of its first administrative review with subsidy rates for Dongbu Steel/Dongbu Incheon of 7.63 percent for the 2015 portion of the period of review ("POR") and 8.47 percent for the 2016 portion of the POR.  *Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2015-2016,* 84 Fed. Reg. 11,749, 11,750 (Dep't Commerce March 28, 2019) ("CORE 2015-2016 Final Results") and accompanying Issues and Decision Memorandum ("CORE 2015-2016 IDM"); *see also Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review, Rescission of Review, In Part, and Intent to Rescind, In Part; 2015-16,* 83 Fed. Reg. 39,671 (Dep't Commerce Aug. 10, 2018), and accompanying Preliminary Decision Memorandum ("CORE 2015-2016 PDM").  Dongbu's subsidy rates, based on certain recurring subsidy programs used during the 2015 and 2016 PORs, consisted almost entirely (*i.e.*, 7.62 percent and 8.45 percent, respectively) of benefits from the restructuring of Dongbu's outstanding long-term loans and bonds by its creditors committee under its corporate workout program.  CORE 2015-2016 IDM at 5.

In 2015 and again in 2016, Dongbu's creditors committee approved D/E Swaps by both government-controlled and private commercial banks as part of Dongbu's corporate workout program. CR 81-156 (PR 74-78). Despite Petitioners' objections and their claim that Dongbu was unequityworthy at the time of these transactions, Commerce found that these two D/E swaps were consistent with the usual investment practice of private investors and thus did not confer a benefit to Dongbu. CORE 2015-2016 IDM at 5 and 34.

On March 17, 2020, Commerce published the final results of its second administrative review with a subsidy rate for Dongbu Steel/Dongbu Incheon of 7.16 percent. *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 15,112, 15,113 (Dep't Commerce March 17, 2020) ("CORE 2017 Final Results") and accompanying Issues and Decision Memorandum ("CORE 2017 IDM"); *see also Certain Corrosion-Resistant Steel Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, and Rescission of Review, In Part; 2017*, 84 Fed. Reg. 48,107 (Dep't Commerce Sept. 12, 2019), and accompanying Preliminary Decision Memorandum at 12-15 ("CORE 2017 PDM"). Dongbu's subsidy rate again consisted entirely of recurring benefits from the prior restructuring of Dongbu's outstanding long-term loans and bonds. CORE 2017 IDM at 5-6. Again, despite Petitioners' objections and claim that Dongbu was unequityworthy, Commerce found that the 2015 and 2016 D/E Swaps were consistent with usual investment practice of private investors and did not confer a benefit to Dongbu. CORE 2017 IDM at 4-5 and 36-37.

On June 1, 2021, Commerce published the final results of its third (2018) administrative review with a subsidy rate for Dongbu Steel/Dongbu Incheon of 6.83 percent. *Certain*

*Corrosion-Resistant Steel Products From the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 29,237, 29,238 (Dep't Commerce June 1, 2021) ("CORE 2018 Final Results") and accompanying Issues and Decision Memorandum ("CORE 2018 IDM"); *see also Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2018*, 85 Fed. Reg. 74,692 (Dep't Commerce Nov. 23, 2020), and accompanying Preliminary Decision Memorandum at 4 ("CORE 2018 PDM").  Dongbu's subsidy rate consisted entirely of recurring benefits from the 2018 restructuring of Dongbu's outstanding long-term loans and bonds.  CORE 2018 IDM at 6.  Again, despite Petitioners' objections and claim that Dongbu was unequityworthy, Commerce found that the D/E Swaps (including a third D/E Swap that occurred in 2018) were consistent with usual investment practice of private investors and thus did not confer a benefit to Dongbu.  CORE 2018 IDM at 5-6, 37-38.

On September 3, 2020, Commerce initiated an administrative review of the CVD order on CORE from Korea covering calendar year 2019, which included Dongbu Steel/Dongbu Incheon.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 54,983, 54,990-91 (Dep't Commerce September 3, 2020), PR 9.  This is the review at issue in this appeal.

On October 6, 2020, Commerce issued its initial CVD questionnaire in which it notified the Government of Korea ("GOK") that it had selected Dongbu Steel/Dongbu Incheon as mandatory respondents in this review.  PR 22.  On page III-1 of Section III of the questionnaire, Commerce instructed that:

> Absent new information warranting a program reexamination, we will not reevaluate prior determinations regarding the countervailability of programs.  This

5

includes determinations that previously examined programs are or are not countervailable.

CR 81-156 (PR 74-78) (emphasis added).

On October 27, 2020, Dongbu submitted its Affiliated Companies Response ("ACR") to Commerce.  CR 6 (PR 34).  Dongbu reported that it would submit questionnaire responses for Dongbu Steel and Dongbu Incheon, as well as for KG Steel, which had become the major shareholder and parent company of Dongbu during the 2019 POR.  *Id.* at 1, 7.  Commerce's questionnaire also included a question about any change in ownership during the average useful life ("AUL") period (*i.e.*, 2005-2018) and whether the company wished to challenge Commerce's baseline presumption that *non-recurring* subsidies continue to benefit the recipient during the fifteen-year allocation period.  *Id.* at 12.  As discussed, Commerce had never previously found the existence of any non-recurring subsidies to Dongbu and thus Dongbu had no reason to challenge the baseline presumption regarding non-recurring subsidies at that time. Dongbu thus replied that:  (1) it had not changed ownership during the AUL period, (2) it did not wish to challenge Commerce's baseline presumption, and thus (3) it understood that no response to the Change-in-Ownership ("CIO") Appendix was required.  *Id.*

On December 2, 2020, Dongbu submitted its initial questionnaire response to Commerce. CR 81-156 (PR 74-78).  As in prior reviews, Commerce's questionnaire asked the exact same fifteen questions regarding Dongbu's debt restructuring, which included questions about the restructuring of its outstanding long-term loans and bonds and the D/E Swaps that occurred under its corporate workout program.  *Id.* at 20-63.  The heading to that section of the questionnaire stated:  "Commerce found the restructuring of debt and loans received by KG Dongbu Steel to be countervailable previously.  We do not intend to reevaluate the countervailability of this program."  *Id.* at 20.  As in the third (2018) administrative review,

6

Dongbu provided the same responses and accompanying exhibits with respect to the restructuring of its long-term loans and bonds, including the third restructuring in 2018, as well as the two 2015 and 2016 D/E Swaps and the third D/E Swap that occurred in 2018.  *Id.* at Exhibit B-1 to Exhibit B-6; CR 263 (PR 195) at 8, 12.

In that same response, Dongbu reported that the creditors committee had agreed in December 2018 to proceed with the business normalization process for Dongbu through a merger and acquisition ("M&A").  CR 81-156 (PR 74-78) at 35.  Dongbu provided a detailed explanation of this process stretching from the initial decision to proceed with an M&A transaction through to final approval of the transaction by the Dongbu general shareholders meeting, which resulted in the change in ownership of Dongbu during the 2019 POR.  *Id.* at 35-46, Exhibit B-16 to Exhibit B-34.

Early in 2019, the creditors committee selected financial advisors for the M&A transaction, and they decided to use an open bidding process as the means for executing the M&A.  *Id.* at 36.  A public notice announcing the bidding process stated that the purpose of the M&A transaction was the acquisition by a third party of newly issued common stock that would result in the transfer of corporate management rights.  *Id.*  Potential investors that submitted a confidentiality agreement received private and confidential information of Dongbu to assist them in determining whether to participate in the bidding process.  *Id.*  Among the potential investors that received the bidding materials, three submitted preliminary bids, including the KG Consortium.  *Id.*  These bids were reviewed by the financial advisors and all qualified for the final bidding process, but only the KG Consortium submitted a final bid.  *Id.* at 37.  Following counteroffers and negotiations between the financial advisors and the KG Consortium, the final investment amount bid by the KG Consortium was accepted.  *Id.* at 39.  In separate agreements,

the creditors committee agreed to a fourth D/E Swap and a fourth restructuring of Dongbu's outstanding long-term loans and bonds. *Id.* Finally, the creditors committee, Dongbu's board of directors, and its general shareholders each approved the entire package. *Id.*

After submission of Dongbu's initial questionnaire response, Commerce requested only very limited additional information related to the M&A transaction process and the final agreements that resulted in Dongbu's change-in-ownership. This information consisted of more details about one of the investors in the KG Consortium and a request for more complete translations of previously-submitted documents related to the approvals and agreements concerning the M&A, the fourth D/E Swap and the fourth debt restructuring. CR 202-06 (PR 107) at 8-11; CR 229 (PR 139) at 1-3; CR 247-50 (PR 158) at 1-2.

On July 16, 2021, Commerce published the *Preliminary Results* of the 2019 review with a preliminary subsidy rate for Dongbu Steel/Dongbu Incheon of 10.52 percent. *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86 Fed. Reg. 37,740 (Dep't Commerce July 11, 2021) ("CORE 2019 Preliminary Results"), PR 178, and accompanying Preliminary Decision Memorandum, PR 173. As part of the overall subsidy rate, Commerce calculated a 5.38 percent subsidy based on the 2019 restructuring of Dongbu's outstanding long-term loans and bonds by its creditors committee under its corporate workout program. *Id.* at 13-15.

Commerce, however, reversed its consistent findings in the first, second and third reviews that the first through third (2015, 2016, 2018) D/E Swaps were not countervailable. Instead, Commerce claimed that "{a}fter further analysis of the facts on the record of this immediate review, we have determined not to rely on the private investor prices for the first, second, and third equity infusions, because they were not 'significant' within the meaning of 19

8

C.F.R. § 351.507(a)(2)(ii)."  PR 173 at 16.  As discussed above, based on the exact same

evidence Commerce had previously found the private creditors in the D/E Swaps were

significant in all prior reviews.  *E.g.*, CORE 2018 IDM at 37-38.  Commerce did not identify any

new record evidence in this review that prompted, and was the basis of, Commerce's

reconsideration of its prior findings that these three D/E Swaps were not countervailable.  PR

173 at 15-18.  Thus, for the first time in the history of this CORE CVD proceeding, Commerce

determined that Dongbu had received a non-recurring subsidy and allocated the benefits over the

fifteen-year AUL period.

   Commerce did not address the effect of the change-in-ownership of Dongbu on any non-

recurring subsidies that Dongbu had received.  Instead, Commerce merely stated:  "KG Dongbu

Steel did not request that any of the existing subsidies be extinguished due to the change in

ownership."  *Id.* at 7.  As noted, Dongbu made the statement cited by Commerce in its

October 27, 2020 ACR when responding to a question about any change in ownership during the

AUL period, and not during the POR.  CR 6 (PR 34) at 12.  At that time, Commerce had not

found that Dongbu had received any non-recurring subsidies during the AUL period.  *E.g.*,

CORE 2017 IDM at 36-37.  However, Dongbu had provided detailed information regarding its

change in ownership during the POR.  CR 81-156 (PR 74-78) at 35-46.  Until Commerce found

for the first time in the CORE 2019 *Preliminary Results* that the 2015-2018 D/E Swaps provided

non-recurring subsidies during the AUL period, there had been no basis for Dongbu to raise the

issue of the extinguishment of existing, non-recurring subsidies due to the change in ownership.

   In the *Preliminary Results*, Commerce also found that Dongbu was uncreditworthy.  PR

173 at 15.  Commerce thus stated that in accordance with 19 C.F.R. § 351.505(a)(3)(iii) it

calculated an uncreditworthy benchmark, including historical default rates to determine the risk

premium.  *Id.*  This uncreditworthy benchmark was then used to calculate the benefit from

Dongbu's restructured long-term loans and bonds.  *Id.* at 10-11; CR 260-61 (PR 177) at 3.  When

applying the formula for calculating an uncreditworthy benchmark, Commerce used as the

creditworthy benchmark variable in the formula provided in 19 C.F.R. § 351.505(a)(3)(iii) the

three-year corporate bond rate from the Bank of Korea.  CR 260-61 (PR 177) at 3.  However, in

completing the calculation of its uncreditworthy benchmark, Commerce based the variables for

the default rates required by the formula on the three-year term of the creditworthy benchmark

instead of the actual six-year terms of the restructured loans.  *Id.* at Attachment IV, tab "UCW

BM."

In the *Preliminary Results*, Commerce also found that Dongbu was unequityworthy.  PR

173 at 18.  Thus, because Commerce had also found Dongbu to be uncreditworthy, Commerce

applied uncreditworthy discount rates to calculate the benefit from the government-provided

equity infusions, using the same formula and methodology as applied for calculating the

uncreditworthy benchmark.  *Id.*; CR 260-61 (PR 177) at 6-7.  However, in completing the

calculation of its uncreditworthy discount rates, Commerce again based the variables for the

default rates required by the formula on the three-year term of the creditworthy benchmark

instead of the fifteen-year AUL allocation period used for measuring the benefits from the

government-provided equity infusions as mandated by its regulations.  CR 260-61 (PR 177) at

Attachment IV, tab "UCW BM."

On August 26, 2021, Dongbu filed its case brief addressing errors in the *Preliminary*

*Results*.  CR 263 (PR 195).  Dongbu argued that:

(1) in finding that the first through third D/E Swaps provided a benefit to Dongbu,

Commerce violated its own clearly-articulated standard practice of not reexamining a

subsidy program previously found non-countervailable in the absence of any new

information on the record, *id.* at 5-13;

(2) Commerce improperly relied on a statement in Dongbu's ACR related to the AUL

period and found, without any examination of record evidence that the benefits from the

D/E Swaps that Commerce first found countervailable in the CORE 2019 *Preliminary*

*Results*, passed through to KG Dongbu Steel despite the change in ownership, *id.* at 21-

31; and

(3) Commerce ignored the explicit guidance in the *Preamble* to its regulations that the

choice of the applicable default rates in the formula in 19 C.F.R. § 351.505(a)(3)(iii)

should correspond to the length of the countervailable loan (or allocation period for a

non-recurring subsidy).  *Id.* at 51-56.  Thus, Commerce improperly calculated the

uncreditworthy benchmark for purposes of measuring the benefits from Dongbu's

restructured long-term loans and bonds.  Similarly, Commerce improperly calculated the

uncreditworthy discount rate for purposes of measuring the benefits from the D/E Swaps.

On January 19, 2022, Commerce published the *Final Results* of the 2019 administrative

review with a subsidy rate for Dongbu Steel/Dongbu Incheon of 10.51 percent.  PR 216; PR 213.

Commerce rejected Dongbu's arguments concerning the errors identified in Dongbu's case brief

and the final results with respect to these issues were unchanged from the *Preliminary Results*.

PR 213 at Comment 4 to Comment 10.  This appeal followed.

IV.   **SUMMARY OF ARGUMENT**

In the *Final Results*, Commerce ignored its well-established and clearly stated practice of

not reexamining a subsidy program in the absence of new information and found that the first

three of Dongbu's D/E Swaps were countervailable despite the absence of any new or conflicting

evidence.  This decision was contrary to the determinations made in three prior administrative

reviews, in which Commerce had carefully reviewed all record information and concluded that these three D/E Swaps provided no benefit to Dongbu because private investors had participated in the D/E Swaps and that participation was "significant" for purposes of 19 C.F.R. § 351.507(a)(2)(iii). The failure of Commerce to provide a reasonable explanation for its change in practice and its determination to treat similar situations differently renders that determination arbitrary and therefore not in accordance with law. Furthermore, even if its change in practice and inconsistent treatment of the first three D/E Swaps was reasonable, the record demonstrates that private investor participation was significant and thus these D/E swaps are not countervailable. Accordingly, Commerce's determination that these first three D/E Swaps were countervailable is unsupported by substantial evidence and otherwise not in accordance with law.

In addition, Dongbu relied on Commerce's consistent practice to its detriment when it did not submit a CIO Appendix with its questionnaire response in the underlying review. A CIO Appendix is required when a respondent has undergone a change in ownership during the POR and wishes to challenge Commerce's presumption that the benefit from existing non-recurring subsidies is not extinguished by the change in ownership. Dongbu underwent a change in ownership during the POR but did not complete a CIO Appendix, relying on the fact that Commerce had never found a non-recurring subsidy with respect to Dongbu and would not be reexamining its subsidy determinations without new information, of which there was none. However, Commerce abruptly changed its practice in the *Preliminary Results* and found that the D/E Swaps were in fact countervailable non-recurring subsidies and that Dongbu's failure to submit a CIO Appendix "prevented" Commerce from analyzing whether Dongbu's change in ownership extinguished the benefits it received from these subsidies. Commerce's unexplained

12

and abrupt change in practice thus had a detrimental impact on Dongbu who relied on the questionnaire instructions and prior practice as the basis for not responding to the CIO Appendix.

Despite Commerce's misleading claims, and Dongbu's decision to rely of Commerce's established practice when it decided not to submit the CIO Appendix, relevant information regarding the change in ownership is on the record.  This record evidence demonstrates that the benefits from any alleged subsidies from the D/E Swaps were extinguished by the fair market value paid by the KG Consortium in its purchase of Dongbu in an arm's-length transaction. Commerce's determination to ignore this evidence that contradicts its finding that the non-recurring subsidies were not extinguished is  not supported by substantial evidence and is otherwise not in accordance with law.

Lastly, Commerce incorrectly calculated the uncreditworthy benchmark rate used to measure the benefit for Dongbu's outstanding six-year loans and bonds by using three-year default rates instead of default rates based on the loans' terms as required by Commerce's regulations.  Commerce made a similar mistake by also using a three-year term to calculate the uncreditworthy discount rates used when allocating the non-recurring benefit it found for Dongbu's D/E Swaps, where the proper basis of the discount rates is the AUL period (here fifteen years).  Commerce's claims that the three-year period is "consistent" with the creditworthy benchmark interest rate and therefore should be used in its calculations in place of the loan term or the AUL period contradicts the express requirements of its own regulations, and is not in accordance with substantial evidence and otherwise not in accordance with law.

V.    **STANDARD OF REVIEW**

In reviewing a challenge to Commerce's determination in an administrative review, the Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported

by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C.

§ 1516a(b)(1)(B)(i).

**VI.    ARGUMENT**

    **A.    Commerce's Determination That Dongbu's First Through Third D/E Swaps Provided A Countervailable Subsidy To Dongbu Was Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law**

Commerce's standard practice is not to reexamine the countervailability of a program

unless there is new information on the record with respect to that program. This practice is so

well established that it is included as part of the instructions in Commerce's standard CVD

questionnaire that was issued to Dongbu in this administrative review. As stated therein:

> _Absent new information warranting a program reexamination_, we will not reevaluate prior determinations regarding the countervailability of programs. This includes determinations that previously examined programs are or are not countervailable.

PR 22-23 at Section II p. 1, Section III, p.1 (emphasis added). Commerce also explicitly stated

in the prior administrative review, covering the 2018 POR, that "{w}hile we are not making an

unequityworthiness finding and continue to find the equity infusions provided no benefit to

Dongbu for the instant administrative review, we may re-examine this issue for the next

administrative review _if new record evidence requires such an examination_." CORE 2018 IDM

at 38 (emphasis added). Commerce's decision to reconsider its previous findings that this

program provided no countervailable benefit to Dongbu and to find it countervailable in the

_Final Results_ despite there being no change in the underlying facts is directly contrary to

Commerce's own instructions in the questionnaire and its consistent practice.

Pursuant to its own statements, both in the previous review and in the questionnaire

issued in this review, the only reason for Commerce to re-examine the countervailability of the

prior D/E Swaps would be "new information." Yet, in the _Final Results_ Commerce cited no new

information or evidence regarding the first three D/E Swaps that would justify a reexamination of its prior findings that the first through third D/E Swaps did not confer a benefit to Dongbu. Instead, as discussed below the only "new" information referenced by Commerce was limited to the fourth D/E Swap in 2019, PR 213 at 47, which is unrelated to first three D/E Swaps that Commerce reexamined in this review.  Commerce has thus failed to meet its own clearly articulated standard for the necessary requirement of "new information" that would warrant reexamination of the first three D/E Swaps.

**1.    Commerce Failed To Provide A Reasonable Explanation For Ignoring Its Established Agency Practice**

Commerce must provide a reasonable explanation for departing from its established practice.  *See Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004) ("{I}f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom."); *M.M. & P. Mar. Advancement, Training, Educ. & Safety Program v. Dep't of Commerce*, 729 F.2d 748, 755 (Fed. Cir. 1984) ("An agency is obligated to follow precedent, and if it chooses to change, it must explain why."); *Cinsa, S.A. de C.V. v. United States*, 966 F. Supp. 1230, 1238 (1997) ("Commerce can reach different determinations in separate administrative reviews but it must employ the same methodology or give reasons for changing its practice.").  In the *Final Results*, Commerce failed to provide a reasonable explanation for ignoring its established agency practice, and its decision is thus unlawful.

First, Commerce states that its "benefit determination in each segment of a proceeding stand on their own and are made on a fact-specific basis."  PR 213 at 46.  While this is true, it does *not* mean that Commerce can make entirely different determinations from review to review *based on identical evidence*.  Plainly stated, if this is a "fact-specific" determination and the facts

15

are the exact same in each segment of a proceeding, then Commerce's determination should be the same as well.  In this case, the facts on the record regarding the first three D/E Swaps were also on the record in the CORE 2018 Review and, except for documents related to the third D/E Swap that occurred in 2018, were also on the record of the CORE 2015-2016 and 2017 Reviews. In each of those reviews, Commerce determined that Dongbu received no benefit from the first three D/E Swaps.  There are thus no <u>new</u> facts on the record of the underlying review related to whether the first three D/E Swaps provided a countervailable benefit, and by Commerce's own logic, the benefit determination should be the same as in all prior reviews.

Second, the only reason that Commerce identifies <u>anywhere</u> in the *Final Results* for ignoring its established practice is the statement that "unlike in the prior reviews, there were private investors independent from the creditors' committee involved in the <u>fourth</u> equity infusion during the 2019 POR."  PR 213 at 47 (emphasis added).  So what?  This information has no relevance to the 2015, 2016, or 2018 D/E Swaps.  The fact that there are private investors separate from the creditors' committee in the fourth D/E Swap has nothing to do with whether the private investors' contributions in the first three D/E Swaps were significant.  The fourth D/E Swap is a different transaction that Commerce properly analyzed separately, and it has no relevance to the first three D/E Swaps that came before it.  There is thus no new information regarding the first three D/E Swaps that provides, consistent with Commerce's own statements, the necessary precondition for its reexamination of the countervailability of the first through third D/E Swaps.

All of the information and exhibits cited by Commerce concerning the first three D/E Swaps were on the record and thoroughly reviewed in the previous reviews, and that information is not impacted by the facts surrounding the fourth D/E Swap.  That record evidence shows that

private creditors accounted for **[          ]** percent of the D/E Swap amounts in the 2015 D/E

Swaps, **[          ]** percent for the 2016 D/E Swaps, and **[          ]** percent for the 2018 D/E Swaps.

CR 81-156 (PR 74-78) at Exhibit B-8 (Attachment 2), Exhibit B-11 (Attachment 2), and Exhibit

B-15 (Attachment 2).  The very same information was on the record in the CORE 2015-2016,

2017, and 2018 reviews, and provided the basis for Commerce's finding in those reviews that

private investors' participation was *significant*.  Commerce has thus now "reinterpreted" that

exact same information in a diametrically opposite way to find that the very same private

investors and their large contributions to the D/E Swaps are no longer significant.

Finally, Commerce disingenuously implies that its change in practice is warranted

because this is the first time it is substantively examining the information with respect to the first

three D/E Swaps.  Specifically, Commerce states that "as explained in detail in the Equity

Infusions Memorandum, a comprehensive review of the totality of the evidence" demonstrates

that the participation of KG Dongbu's private creditors in the first, second and third D/E Swaps

was not significant.  PR 213 at 47, 50.  Commerce also cites its *Preliminary Results* where it

stated, "in previous reviews of CORE, we did not perform an analysis of KG Dongbu Steel's

equityworthiness.  Instead we determined that KG Dongbu Steel did not receive a benefit

because the share price was the same for GOK-controlled creditors as it was for the private

creditors."  *Id.* at 46-47.  This is revisionist history.

In each of the prior three reviews, the participation of the private investors in the first

three D/E Swaps as well as Dongbu's equityworthiness were raised by Petitioners and were

addressed by Commerce.  CR 263 (PR 195) at 9-12.  For example, in the most recent review,

Commerce stated:

> {C}onsistent with our findings in the underlying investigation and prior
> administrative reviews, the participating banks for the debt conversions included

both GOK-controlled policy banks (*i.e.*, KDB, KEXIM, Woori, IBK, and KoFC), and private commercial banks (*i.e.*, the Nonghyup Bank, Shihan Bank, Hana Bank, Korea Exchange Bank).  In addition, information on the instant record indicates that private commercial banks:  (1) participated in the three equity infusions at issue; (2) paid the same per share price as the government-controlled policy banks; and (3) purchased a significant percentage of the shares of debt that were converted to equity.  Because of the private commercial banks actively participated and paid the same price as government banks, we find that Dongbu's equity infusions are consistent with usual investment practice of private investors.

CORE 2018 IDM at 37-38 (citations omitted).

In an appeal of the CORE 2015-2016 Review before this Court, Commerce defended its determination that private investor participation in the first two D/E Swaps was significant and exceeded the 18.3 percent threshold that Commerce had found significant in another case, *Seamless Pipe from Italy*.  Defendant's Memorandum in Opposition to Plaintiff's and Consolidated Plaintiffs' Rule 56.2 Motions for Judgment Upon the Agency Record at 20, *Nucor Corp. v. United States*, No. 19-00042 (Dec. 19, 2019), ECF No. 60 (citing *Small Diameter Circular Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from Italy*, 60 Fed. Reg. 31,992, 31,994, 31,997 (Dep't Commerce June 19, 1995)).  This Court affirmed Commerce's finding that private investors were available and had found them significant.  *See Nucor Corp. v. United States*, 461 F. Supp. 3d 1374, 1378 (Ct. Int'l Trade 2020).[1]  Therefore, Commerce's implication that its change in practice and reconsideration of the countervailability of Dongbu's D/E Swaps is reasonable because it had never before fully investigated the program is demonstrably false.

Not only did Commerce fail to provide a reasonable explanation for ignoring its own questionnaire instructions, it also failed to provide a reasonable explanation for treating the same

---

[1] The basis for this Court's affirmance was that petitioner had not raised this issue at the agency level and thus had failed to exhaust its administrative remedies.  *See Nucor Corp.*, 461 F. Supp. 3d at 1378.

evidence regarding the D/E Swaps differently in this administrative review than it had in all previous reviews.  More specifically, Commerce failed to explain why the same record evidence in the prior three administrative reviews supported the conclusion that Dongbu received no countervailable benefit from the D/E Swaps, but the same evidence in the instant review now supports the opposite conclusion.  As the court has held "{i}f Commerce acted differently than it has consistently acted in similar circumstances without reasonable explanation, then Commerce's actions are arbitrary." *Hyundai Steel Company v. United States*, 415 F. Supp. 3d 1293, 1302 (Ct. Int'l Trade 2019) (citing *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003)); *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("An agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.").  An agency acts arbitrarily when it fails to "consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Linyi Chengen Imp. and Exp. Co. v. United States*, 391 F. Supp. 3d 1283, 1292 (Ct. Int'l Trade 2019).

In every previous review, Commerce thoroughly examined the <u>same</u> record evidence that is on the record of the underlying proceeding in this case with regard to the issue of private investor purchases and concluded that private investor participation was significant.  CR 263 (PR 195) at 9-12.  No equityworthiness analysis was thus necessary.[2]  Yet, in the *Final Results* Commerce made the opposite determination and found that those exact same purchases were no longer significant and thus an equityworthiness analysis was necessary even though the

---

[2] As discussed below, Commerce will only conduct an equityworthy analysis of the company if private investor prices are not significant and therefore not available.  19 C.F.R. § 351.507(a)(3)(i).

information on the record in the instant review and the claims made with respect to that information are exactly the same as in the prior reviews.  Commerce thus treated the exact same D/E Swaps differently without adequate explanation.  This was arbitrary and unlawful.  *See SKF USA, Inc. v. United States*, 263 F.3d at 1382 (Fed. Cir. 2001).

> **2.    Dongbu Detrimentally Relied On Commerce's Past Practice And Unambiguous Statements Regarding That Practice When It Did Not Respond To The Change In Ownership Appendix**

Commerce's disregard of its own established practice and its previous consistent determinations that there was no benefit from the D/E Swaps had a detrimental impact on Dongbu.  The harm is not theoretical.  As explained above, in order to act in accordance with law, Commerce must follow its established practice or explain why it is reasonable for it to deviate from its practice.  *United States Steel Corp. v. United States*, 348 F. Supp. 3d 1248, 1260 (Ct. Int'l Trade 2018).  It may not change its established practice where a party has detrimentally relied on such practice.  *See*, *e.g.*, *Shikoku Chemicals Corp. v. United States*, 16 C.I.T. 382, 386, 795 F.Supp. 417, 420 (1992) (holding that the plaintiff's reliance interest was sufficient to preclude Commerce from changing its methodology during the fifth and sixth reviews of the relevant antidumping duty order).

Here, Commerce changed its practice without a reasonable explanation, resulting in an erroneous finding of a non-recurring subsidy for the first time in the underlying administrative review.  Dongbu relied on Commerce's prior practice, and on its explicit statements regarding that practice, to its detriment.  Specifically, in the *Final Results*, Commerce determined that "because KG Dongbu failed to provide any response to our Change-in-Ownership Appendix, Commerce was prevented from conducting a complete analysis on whether the acquisition of Dongbu Steel {by KG Dongbu} extinguished prior subsidies."  PR 213 at 54.  Commerce's

20

determination not only demonstrates Dongbu's detrimental reliance but is also disingenuous, ignores the facts of record, and is not supported by substantial evidence.

Commerce's questionnaire in its CVD reviews, including this proceeding, states:

> Commerce allocates the benefits received from certain types of subsidies over time (e.g., equity infusions, non-recurring grants, debt forgiveness, import duty or value-added tax exemptions or reductions on capital equipment, *etc*). See 19 CFR {sic} 351.524…
>
> Thus in addition to investigating alleged subsidies that your company may have received during the POI {sic}, Commerce is also investigating <u>alleged allocable, *non-recurring* subsidies that your company may have received during the AUL period</u>.  Because of this if your company obtained all or substantially all the assets of another company during the AUL period, and that company still exists as an ongoing entity, or its assets continue to operate as part of your company, we require a complete questionnaire response for such company.  <u>If your company wishes to challenge Commerce's baseline presumption that *non-recurring* subsidies continue to benefit the recipient over the allocation period, please coordinate with your government to answer the questions in the Change-in-Ownership Appendix</u>.  If your company does not wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please so state and you do not need to provide a response to the Change-in-Ownership Appendix.

CR 81-156 (PR 74-78) (emphasis added).

At the time that Commerce issued this questionnaire, and at the time that Dongbu responded to this questionnaire and all subsequent supplemental questionnaires, all of the subsidies it had found in prior reviews with respect to Dongbu were from programs that provided *recurring* subsidies.  Specifically, in the final results of the CORE 2017 review and the preliminary results of the CORE 2018 review, which were Commerce's most recent determinations with respect to CORE from Dongbu, Commerce had only found measurable subsidies from the following recurring benefit programs:

CORE 2017 Review
Dongbu's Debt Restructuring (loans)

> CORE 2018 Review
> Dongbu's Debt Restructuring (loans)
> KDB Short-Term Discounted Loans for Export Receivables

CORE 2017 IDM at 5; CORE 2018 PDM at 12-16.

Commerce had not found benefits from any programs where the benefit was calculated based on the allocation of a *non-recurring* subsidy received in the AUL period to current and future reviews. Thus even though Dongbu had been acquired by the KG Consortium (a change in ownership), whether there were any programs that provided non-recurring benefits that may have passed through to KG Dongbu was simply not yet an issue at the time of the questionnaire response. KG Dongbu had no reason to submit the CIO Appendix to challenge Commerce's presumption regarding non-recurring subsidies. It was not until Commerce's finding in the *Preliminary Results* that the first through third D/E Swaps conferred benefits in the AUL period that the issue of whether benefits from these programs that preceded the acquisition of Dongbu by the KG Consortium passed through to KG Dongbu became ripe.

In the *Final Results* Commerce responded to this argument by stating that because "the debate over the countervailability of Dongbu Steel's equity infusions has been significant in all prior reviews KG Dongbu was on notice of the issue." PR 213 at 54. This is nonsense. Commerce had consistently found the equity infusions *not* to be countervailable and in fact explicitly stated that it did not intend to change that determination absent new evidence, of which Dongbu knew there was none. Therefore, if anything, Dongbu was "on notice" that the decision regarding the D/E Swaps would stay the same in this administrative review. Commerce's sudden reversal on the issue in the *Preliminary Results* is what made a response to the CIO Appendix necessary.

Thus, Commerce's statement that it "was prevented from conducting a complete analysis" because KG Dongbu failed to respond to the CIO Appendix, PR 213 at 54, is illogical and disingenuous because there was no reason based on any prior findings by Commerce for KG Dongbu Steel to provide such a response.  KG Dongbu reasonably relied on Commerce's statements regarding its consistent practice, and KG Dongbu was entitled to rely on Commerce's statements that it would not reexamine the D/E Swaps.  *See Shikoku Chems. Corp. v. United States*, 16 C.I.T. at 388-89, 795 F. Supp. at 421-22; *Sao Ta Foods Joint Stock Co. v. United States*, 475 F. Supp. 3d. 1283, 1291 (Ct. Int'l Trade 2020) (remanding Commerce's determination where the respondent relied on Commerce's consistent practice).  Dongbu's reliance on Commerce's questionnaire instructions and findings that this program was not countervailable in all prior reviews was used by Commerce to Dongbu's detriment because Commerce asserts that Dongbu's failure to provide a response to the CIO Appendix was the basis for its finding that non-recurring subsidies allegedly received by Dongbu Steel/Dongbu Incheon passed-through to KG Dongbu.

### B.    Even If Commerce's Explanation For Its Change In Practice Was Reasonable There Is No Substantial Evidence That Dongbu's First Through Third Equity Conversions Were Countervailable

Government-provided equity infusions such as Dongbu's D/E Swaps provide a countervailable benefit "to the extent that the investment decision is inconsistent with the usual investment practice of private investors." 19 C.F.R. § 351.507(a)(1).  In general, Commerce considers an equity infusion to be inconsistent with the usual investment practice of private investors if "the price paid by the government for newly issued shares is greater than the price paid by private investors for the same (or similar form of) newly issued shares."  19 C.F.R. § 351.507(a)(2)(i).  However, even if the price paid by government and private investors is the same (or the government price is not higher) Commerce will not use private investor prices if

"private investor purchases of newly issued shares are not significant." *Id*. at (a)(2)(iii).  If private investor prices are not available (because the purchases are not significant), Commerce will make a determination as to whether the firm receiving the equity infusion was equityworthy or unequityworthy at the time of the infusion.  *Id*. at (a)(3)(i).

Even if Commerce's determination to ignore its consistent and explicitly stated practice was reasonable, there is no basis to treat the first through third D/E Swaps as countervailable. The record shows that the D/E Swaps provided no countervailable benefit to Dongbu because the equity infusions were consistent with the usual investment practice of private investors.  Because both private and government financial institutions participated on the same terms, and the private investor participation was significant, Commerce should have used the private investor prices as the benchmark and concluded that the D/E Swaps were consistent with the usual investment practice of private investors and thus provided no benefit as per 19 C.F.R. § 351.507(a). Commerce's claim that private investor prices were not available and thus it had to proceed to examine whether Dongbu was equityworthy or unequityworthy at the time of the equity infusion is factually untenable.

First, the record evidence clearly demonstrates that the private financial institutions paid the same per share price as the GOK-controlled policy banks.  CR 81-156 (PR 74-78) at 42-44. All shares were priced at a same price for each D/E Swap: KRW 5,711, KRW 10,000, and KRW 15,000, respectively, for the first three D/E Swaps*. Id*. at 42-44.  This evidence fully supports a determination that the newly issued shares were valued identically for both private and government creditors.  *See* 19 C.F.R. § 351.507(a)(2)(i) (providing that an equity infusion will be found to be inconsistent with usual investment practice or private investors if price paid by the government is higher than price paid by private investor).

24

Second, the timing of the new share issuance was the same for both private and government financial institutions, thereby satisfying the regulatory requirement that Commerce "rely on sales of newly issued shares made reasonably concurrent with the newly issued shares purchased by the government."  19 C.F.R. § 351.507(a)(2)(ii).

Third, there was significant private sector participation because private commercial financial institutions purchased a significant percentage of the shares of debt converted to equity. "Significant" is defined as "of a noticeably or measurably large amount."  *Significant*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/significant (last visited August 24, 2022).  Accordingly, Commerce has consistently "rested its significance determination on the percent interest held by private investors," and the court has agreed with this interpretation of significance because the "analysis of percent interest appears to provide a controlled and predictable way for Commerce to evaluate the significance of equity investments across difference industries and investigations."  *E.g.*, *Hynix Semiconductor Inc. v. United States*, 30 C.I.T. 288, 317, 425 F. Supp. 2d 1287, 1312 (2006).  Indeed, Commerce created the significant investment standard in 19 C.F.R. § 351.507(a)(2)(iii) to preclude use of private investor benchmarks where the "the *volume* of a firm's traded shares are so low as to preclude the use of those shares as a benchmark."  *Countervailing Duties*, 62 Fed. Reg. 8,818, 8,832 (Dep't Commerce Feb. 26, 1997) (emphasis added).

Here, private creditors accounted for **[        ]** percent, **[        ]** percent, and **[        ]** percent of the first three D/E Swaps, respectively.  CR 81-156 (PR 74-78) at Exhibit B-8 (Attachment 2), Exhibit B-11 (Attachment 2), and Exhibit B-15 (Attachment 2).  Commerce has previously concluded that those very same percentages are significant and has found proportions as low as 18.3 percent to be significant.  Defendant's Memorandum in Opposition to Plaintiff's

and Consolidated Plaintiffs' Rule 56.2 Motions for Judgment Upon the Agency Record at 20,

*Nucor Corp. v. United States*, No. 19-00042 (Dec. 19, 2019), ECF No. 60 (again relying on the

relative proportion of private investors involved).  This evidence thus supports the regulatory

requirements of significant private investor participation.  *See* 19 C.F.R. § 351.507(a)(2)(iii).

Commerce's conclusion to the contrary in the Equity Infusions Analysis Memo appears

to be that when the government creditors have a supermajority on a creditors committee,

Commerce does not need to consider the participating private banks to be acting as actual private

investors, and thus their participation cannot serve as the benchmark for purposes of 19 C.F.R.

§ 351.507(a).  Specifically, Commerce asserts that the private creditors had no alternative but to

accept the terms imposed upon them by the KDB since the KDB along with other government-

owned policy banks owned a substantial majority of shares in Dongbu.  *See* CR 259 (PR 176) at

11-12; PR 213 at 47.  This is simply not true.  Any of the creditors – including the private

creditors – had the option of selling their credits to the other creditors if they wanted to opt out of

the voluntary restructuring or corporate workout program.  The Corporate Restructuring

Promotion Act ("CRPA") provides that any creditor financial institution can opt out if it does not

agree with any decision made by the creditors committee by requesting the other creditors to

purchase its credits.  CR 157-88 (PR 80-85) at Exhibit Debt Restructuring-15 (CRPA, Article

20).  Private creditors thus had an alternative, namely, they could opt out if they did not agree

with the terms approved by the creditors committee.

To be sure, at the time of Dongbu's decision in July 2014 to enter into a Voluntary

Restructuring Program, its creditors included a number of GOK-owned banks that held a

substantial majority of its outstanding debt, and the KDB was Dongbu's single largest creditor.

*See* CR 81-156 (PR 74-78) at Exhibit B-5, Attachment 1.  That situation did not change

materially during the course of the workout program.  *Id*. at 51-53.  It is common practice in Korea that a company's largest creditor is normally recognized as its "lead bank" or "main creditor bank" which, when necessary, may take the initiative in coordinating with the company's other creditors in addressing issues of importance to the company.  However, this does not imply any special authority or control of the lead bank over the other creditors.  Thus, the fact that the KDB was Dongbu's lead bank does not mean that the KDB, in particular, and other GOK-owned banks, collectively, dictated the terms of the various restructurings that have occurred under the workout program.

Instead, at each step during the workout program, all of the creditors – GOK-owned and private alike – agreed to the restructuring measures on the same terms.  *Id*. at 28-35.  These decisions were not motivated or influenced by the GOK, but were based on the commercial considerations of all creditors and the recommendations of an independent auditor.  *Id.*

Rather than proffering actual evidence of GOK influence or control of the decision-making of the creditors committee, Commerce simply plays a numbers game.  Specifically, Commerce points out that the percentage of voting rights, based on shares of outstanding debt that were held by the KDB and other GOK-owned banks was a substantial majority and asserts that the creditors committee was thus controlled by GOK policy banks, such as the KDB. According to Commerce, "the private creditors had no alternative but to accept the terms imposed by the KDB and other GOK-owned policy banks."  CR 259 (PR 176) at 11-12.  Yet Commerce cannot point to any actual evidence that Dongbu's creditors committee provided any preferences to Dongbu or that the GOK-controlled banks acted differently from Dongbu's private creditors.

Indeed, Commerce's references to the high percentage of Dongbu's <u>secured</u> debt owned by GOK-owned banks is misleading and disingenuous because Commerce knows well that voting rights are determined on the basis of total outstanding debt and not just secured debt. *Id.* at 6, 7; *See* CR 81-156 (PR 74-78) at Exhibit B-8 (Attachment 1), Exhibit B-11 (Attachment 1) and Exhibit B-15 (Attachment 1).  Moreover, the fact that the GOK-owned banks held a much higher percentage of Dongbu's <u>secured</u> debt than their percentage of Dongbu's total debt demonstrates nothing in terms of the alleged influence of the GOK-owned creditors in the decisions by the private creditors to convert debt to equity.  In fact, it supports the opposite conclusion because the D/E Swaps only included unsecured debt and resulted in conversion ratios of debt that were collectively higher for the private creditors than for the GOK-owned creditors in relation to the share of voting rights.[3]  CR 81-156 (PR 74-78) at Exhibit B-8 (Attachments 1 and 2), Exhibit B-11 (Attachments 1 and 2), and Exhibit B-15 (Attachments 1 and 2).  There is thus no evidence to support the conclusion that the decisions of the private creditors were subject to GOK control and were thus not commercial decisions.  To the contrary, the creditor banks' decisions regarding the D/E Swaps were made of their own accord, and the private creditor banks (notwithstanding the fact that some GOK-owned banks were included among the creditors) did not have the terms dictated to them by the GOK creditors.

In addition, Commerce precedent does not support the proposition that GOK creditors' majority status on a creditors committee renders private investor participation insignificant.  In

---

[3] For example, the KDB was Dongbu's largest creditor and held a substantial portion of Dongbu's secured debt.  Thus, the KDB's percentage shares of Dongbu's secured debt were [                                    ], respectively, for the first three D/E Swaps, and its shares of total credit were [                                    ], respectively, while its shares of the D/E Swaps were [                                    ], respectively.  CR 81-156 (PR 74-78) at 48, Exhibit B-8 (Attachments 1 and 2), Exhibit B-11 (Attachments 1 and 2), and Exhibit B-15 (Attachments 1 and 2).

*CFS Paper from Korea,* Commerce found in the context of a voluntary restructuring similar to the one here, that even though the government financial institutions on the creditors committee accounted for <u>more</u> than 75 percent of the voting rights, the debt-to-equity conversions and loans provided by the private creditors <u>could</u> serve as benchmarks.  *See Coated Free Sheet Paper from the Republic of Korea:  Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007), and accompanying Issues and Decision Memorandum at 43 ("*CFS Paper from Korea IDM*") (emphasis added).  Commerce's finding that there was no significant private investor participation for benchmark purposes was thus inconsistent with the principles discussed in *CFS Paper from Korea*.

Accordingly, Commerce's determination that private investor participation was not significant and that actual private investor prices were not available is not in accordance with substantial evidence and is otherwise not in accordance with law.

> **C.    Record Evidence Demonstrates That The KG Consortium Acquired Control Of Dongbu In An Arm's-Length Transaction And At Fair Market Value And Therefore There Was No Pass Through Of Subsidies From Dongbu To KG Dongbu Steel**

As argued above, Dongbu properly did not submit a response to Commerce's CIO Appendix with its initial questionnaire response because at that time Commerce had not found any non-recurring subsidies provided benefits to Dongbu.  However, record evidence demonstrates that Dongbu's change in ownership occurred at arm's length and for fair market value such that any alleged subsidies from the first through third D/E Swaps were extinguished.  Thus, even if the Court finds that Commerce's disregard of its prior practice is lawful, the record shows that any benefits associated with the D/E Swaps did not pass through to KG Dongbu Steel.  Rather, any alleged benefits were extinguished by the arm's-length purchase of Dongbu by the KG Consortium.

Pursuant to 19 U.S.C. § 1677(f)(5), Commerce presumes that a non-recurring subsidy will benefit a recipient over the AUL of the relevant assets and Commerce thus allocates the subsidy over that period of time ("allocation period").  *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125, 37,127 (Dep't Commerce 2003) (*"Final Modification"*).  However, a respondent may rebut the presumption by demonstrating that a change in ownership occurred in which the former owner sold all or substantially all of a company or its assets, and that the sale was at arm's-length and for fair market value.[4] *Id.*  In such situations, the subsidy is reflected in the fair market price of the arm's-length transaction and the pre-sale subsidy is "extinguished," or does not "pass through" to the new owner.  The value of a subsidy is reflected in the fair market value price of an arm's-length transaction if (1) the nature and value of the subsidy was fully transparent to all potential bidders, (2) the subsidies were bestowed prior to sale, and (3) no evidence demonstrates that the subsidy was not fully reflected in the transaction price.  *See Final Modification*, 68 Fed. Reg. at 37,137.

At the time of the public bidding process, the fact of the 2015, 2016, and 2018 D/E Swaps and their amounts was public information available in the financial press and Dongbu's audited financial statements.  CR 81-156 (PR 74-78) at Exhibit 12-A.  Thus, to any interested party considering possible participation in the bidding process for Dongbu, the amounts of these D/E Swaps and their impact on Dongbu's current financial condition would have necessarily

---

[4] While the *Notice of Final Modification* explicitly addresses full privatization, Commerce later determined to apply this methodology to private-to-private sales.  *See, e.g., Certain Pasta From Italy:  Preliminary Results and Partial Rescission of the Eighth Countervailing Duty Administrative Review*, 70 Fed. Reg. 17,971, 17,972 (Dep't Commerce Apr. 8, 2005) ("*Pasta from Italy*").

been incorporated into a bidder's analysis and calculation of an appropriate bid. *Id*. at Exhibit B-17, p.1.

In its questionnaire response, KG Dongbu Steel provided a detailed explanation and supporting documentation regarding the open bidding process through which the KG Consortium offered the highest price among the bidders and thus acquired control of Dongbu through a market price in an arm's-length transaction between the two unrelated parties. *Id.* at 35-40; Uruguay Round Agreements, Statement of Administrative Action, H.R. Rep. No. 103-316, vol.1 at 928 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4241 ("{T}he term 'arm's-length transaction' means a transaction negotiated between unrelated parties, each acting in its own interest.").

An investment attraction announcement for an open bidding process that provided equal access and free competition for all interested parties was published in a newspaper on January 7, 2019.  CR 81-156 (PR 74-78) at Exhibit B-19.  The purpose of the transaction was the acquisition by a third party of newly issued common stock that would result in the transfer of corporate management rights. *Id*. at Exhibit B-19.  Potential investors that submitted the confidentiality agreement form and revealed an intention to bid received a Preliminary Bidding Guide and a Teaser Memorandum containing private and confidential information of Dongbu to assist the recipient in making a decision on whether to pursue a further analysis of Dongbu and submit a preliminary bidding proposal. *Id*. at Exhibit B-20, Exhibit B-21.

[    ] potential investors showed interest by signing confidentiality agreements and were allowed access of Dongbu's confidential information. *Id*. at Exhibit B-22.  Dongbu's financial and business information was provided for their valuation and to determine a reasonable investment amount to take over Dongbu.  Because the financial information (*e.g.*, Teaser

NON-CONFIDENTIAL

Memorandum) covered the period through September 2018, it fully reflected Dongbu's current financial condition after the first through third D/E Swaps.

Following receipt of these materials, three potential investors submitted preliminary bids. The KG Consortium, which submitted [                              ], *id.* at 36 and Exhibit B-24, offered a purchase price of KRW [                  ] for an ownership stake of [

], *id.* at Exhibit B-23, p.4 (Estimated Transaction Amount).  After the co-financial advisors evaluated the proposed investment amounts, financial and business plans, and capacity to close the deal proposed in the preliminary bidding, all three potential investors were found to be qualified bidders and given an opportunity to participate in the final bidding process.  *Id.* at Exhibit B-24.  However, only the KG Consortium submitted a final bid.

After being selected for the final bidding process, the KG Consortium appointed Ernst & Young, an independent accounting firm, to analyze Dongbu's financial situation and, based on the information provided, the KG Consortium prepared its business restructuring plan and submitted its final bidding proposal on March 4, 2019.  *Id.* at Exhibit B-25, Exhibit B-26.  On June 4, 2019, the creditors committee approved the M&A agreement for an investment amount of KRW [                  ].  *Id.* at Exhibit B-30; CR 247-50 (PR 158) at Exhibit B-45, Exhibit B-46.

Following the approvals by the creditors committee, Dongbu's Board of Directors, and the general shareholders' meeting, the new shares were issued to the KG Consortium and members of the creditors committee.  CR 81-156 (PR 74-78) at 45-46.  After the KG Consortium paid in full for the new shares the procedures for the workout program were concluded and the creditors committee dissolved on September 6, 2019.  *Id.* at 39; CR 202 – 206 (PR 107) at 2.  Thus, with the implementation of these measures, the resulting new shares accounted for [     ] percent of Dongbu's outstanding shares.  CR 81-156 (PR 74-78) at 39.

Finally, in addition to the KG Consortium providing the highest bid in an open bidding process, the transaction involved private, unrelated parties that negotiated the final contract terms of an arm's-length price at fair market value.  *See Pasta from Italy*, 70 Fed. Reg. at 17,972 ("Where an arm's-length sale occurs between two purely private parties, we would normally expect the private seller to act in a manner consistent with the normal sales practices of private commercial sellers in that country.").  KG Steel was not related to Dongbu or its creditors.  The KG Consortium submitted a great deal of information to demonstrate their financial and management capability for a successful M&A, including the financing plan to raise the investment amount as well as its business plan.  *Id.* at Exhibit B-26.  The transaction was not facilitated via the intervention of any legal and fiscal incentives, and the KG Consortium did not ask for or receive any legal or fiscal incentives such as special tax benefits or government policy waivers.  Nor did the creditors committee impose any market distortive measures as demonstrated in the New Share Subscription Agreement, the Shareholders' Agreement, and the Scheme of Arrangement signed between the creditors committee and the KG Consortium.  CR 202-06 (PR 107) at 4; CR 247-250 (PR 158) at Exhibits B-46, B-47 and B-48.

Commerce failed to consider this evidence that completely undercuts its determination that any non-recurring benefits received by Dongbu were passed through to KG Dongbu Steel. As discussed, Commerce first tries to side-step the entire issue of extinguishment by saying that it "was prevented from conducting a complete analysis as to whether prior subsidies were extinguished by the acquisition" because Dongbu did not provide a response to the CIO Appendix.  PR 213 at 56.  But the CIO Appendix is just a series of questions drafted by Commerce designed to elicit the information needed to conduct this extinguishment analysis. The CIO Appendix is not the *sine qua non* for the extinguishment analysis.  The same

33

information can be provided in other formats and Commerce cannot ignore that information just because it is not provided for in the CIO Appendix format.  Commerce's claim that it was "prevented from conducting a complete analysis" on the acquisition of Dongbu the KG Consortium "because KG Dongbu failed to provide any response to our Change-in-Ownership Appendix" (PR 213 at 54) is not true and elevates form over substance.  More importantly, this justification does not excuse Commerce from its legal obligation to take into account evidence that detracts from its determination.  *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) ("{T}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'')).  Thus, while the response to the CIO Appendix may be sufficient to rebut Commerce's baseline presumption, the appendix is not a necessary condition where the record reflects that an arm's-length transaction took place at fair market value.

Commerce's discussion of the actual record evidence on extinguishment is cursory. Specifically, Commerce claims in the *Final Results* that the creditors committee failed to maximize its return in the transaction, PR 213 at 56-57, but none of facts noted by Commerce negate the three elements required to show that the benefit from the D/E Swaps was reflected in the fair market value price of an arm's-length transaction.  Critically, the *Final Results* fail to acknowledge that the KG Consortium's bid was the highest among those bidding for Dongbu, and that the KG Consortium's final bid "was too high to compete with."  CR 81-156 (PR 74-78) at 36-37.  Thus, this fact alone contradicts the determination that the creditors committee failed to maximize its return in the transaction price for the M&A.

To support its determination, Commerce claims that the creditors committee agreed to restructure existing loans at a reduced interest rate, that PricewaterhouseCoopers's ("PWC")

NON-CONFIDENTIAL

evaluation focused on creditor recovery, and that the share price of the new D/E Swap was higher than the share price paid by the KG Consortium.  PR 213 at 56-57.  None of these factors demonstrate that the creditors committee acted in a manner contrary to "normal sales practices of private commercial sellers" with respect to its evaluation and acceptance of the highest bid for new shares from the KG Consortium or that the KG Consortium paid less for Dongbu than it would have paid but for the government involvement.  *Final Modification*, 68 Fed. Reg. at 37,127.  The reduced interest rate on the extended loans and the restructuring terms and conditions were separate from and negotiated after the KG Consortium made its final bid for the new shares.  CR 81-156 (PR 74-78) at 37, 45; CR 157-88 (PR 80-85) at 9.  As to PWC, it evaluated possible alternatives in comparison to the KG Consortium's bid *to maximize the company value* as well as the debt recovery ratio, and considered "the risk of failing to sell Dongbu Steel for a better deal" in its possible scenarios.  *Id.* at 38, Exhibit B-29; CR 157-88 (PR 80-85) at 10.  Based on PWC's evaluation, the value for accepting the KG Consortium's proposal "was the highest" among the alternatives.  CR 81-156 (PR 74-78) at 38.  Notably, PWC was evaluating whether to accept the KG Consortium's bid at the price that had already been proposed and the price did not change as a result of the PWC evaluation.  *Id*. at 37 (noting the final bid and the ultimate contract terms included the investment amount of KRW [

]).  Accordingly, the creditors committee accepted the highest bid through a bidding process with no artificial barriers to entry or unusual inducements, and conducted an objective analysis of the proposed sales price.  *See Final Modification*, 68 Fed. Reg. at 37,127.  No evidence demonstrates that first three D/E Swaps were not fully reflected in the transaction price.

In every respect, the acquisition of Dongbu by the KG Consortium represents an arm's-length transaction at fair market value.  The record thus demonstrates that alleged subsidies from

the first through third D/E Swaps were extinguished and no benefit passed through to KG

Dongbu from Dongbu.  Commerce's conclusion to the contrary is thus unsupported by

substantial evidence and is otherwise not in accordance with law.  At a minimum, Commerce's

decision is unsupported by substantial evidence since it relied on the absence of CIO Appendix

as the primary basis for finding that non-recurring subsidies allegedly received by Dongbu

passed through to KG Dongbu Steel and did not properly consider this wealth of contradictory

evidence.  *CS Wind Vietnam Co.*, 832 F.3d at 1373.

### D.    Commerce Incorrectly Calculated The Uncreditworthy Benchmark Rate And The Unequityworthy Discount Rates

In the *Final Results*, Commerce found that Dongbu was uncreditworthy in 2019 and

calculated the benefit from Dongbu's restructured long-term loans and bonds using an

uncreditworthy benchmark rate.  PR 213 at 6.  Similarly, Commerce found that the government

equity infusions received by Dongbu were non-recurring subsidies that were allocable over the

AUL period and calculated the benefit using unequityworthy discount rates.  *See* PR 213 at 6

(citing PR 173 at 11-12).  However, in doing so, Commerce incorrectly applied the formula for

calculating the uncreditworthy benchmark rate and the unequityworthy discount rates.  These

errors render the *Final Results* unsupported by substantial evidence and otherwise not in

accordance with law.

### 1.    Uncreditworthy Benchmark Rate

During the POR, Dongbu's outstanding long-term loans and bonds were restructured with

revised interest rates and an extension of the maturity date until December 31, 2025.  CR 81-156

(PR 74-78) at 45 and Exhibit B-35.  Thus, they became "new" loans under Commerce's practice

with a term of six years (2019 to 2025).  In calculating the benefit from these new loans,

Commerce calculated the uncreditworthy benchmark interest rate used to measure the benefit of

these countervailable loans and bonds, based on a three-year period. *See* CR 270-71 (PR 214) at

Attachment 2, tabs "UCW BM", "LT(2019)", and "Bonds(2019)."  This determination was

unsupported by substantial evidence and was otherwise not in accordance with law.

     Commerce's regulations provide that in the case of a government-provided loan, a benefit

exists to the extent that the amount a firm pays on the government-provided loan is less than the

amount the firm would pay on a comparable commercial loan(s) that the firm could actually

obtain on the market. *See* 19 C.F.R. § 351.505(a)(1).  In making this comparison, Commerce

will normally will rely on effective interest rates. *See id*.  However, the regulations provide an

exception for uncreditworthy companies in 19 C.F.R. § 351.505(a)(3)(iii).  In the *Final Results*,

Commerce determined that Dongbu was uncredityworthy and therefore used the formula

provided in 19 C.F.R. § 351.505(a)(3)(iii) to calculate the uncreditworthy benchmark interest

rate for 2019 (to ascertain the benefit received from Dongbu's government-provided long term

loans and bonds):

$$i_b = [(1 - q_n)(1 + i_f)\, n\, / (1 - p_n)]^{1/n} - 1,$$

where:
$n$ = the term of the loan;
$i_b$ = the benchmark interest rate for uncreditworthy companies;
$i_f$ = the long-term interest rate that would be paid by a creditworthy company;
$p_n$ = the probability of default by an uncreditworthy company within n years; and
$q_n$ = the probability of default by a creditworthy company within n years.

     Based on that formula, Commerce selected a long-term creditworthy interest rate

(variable "$i_f$") for 2019 based on the national average yield on three-year, KRW-denominated

AA-rated corporate bonds published by the Bank of Korea.  CR 270-71 (PR 214) at Attachment

2, tab "UCW BM."  However, even though the term of the loan (variable "$n$") was *six years*, for

the default rates of creditworthy and uncreditworthy companies (variables "$q_n$" and "$p_n$",

respectively), Commerce incorrectly used the *three-year* default rates from Moody's Investors

Service, "Corporate Default and Recovery Rates, 1920-2010" (February 28, 2011). PR 213 at 58;

CR 270-71 (PR 214) at Attachment 2, tab "KRW, UCW BM."

In the *Final Results*, Commerce's explanation for using a three-year instead of a six-year

default rates was that:

> Commerce used a three-year AA-rated KRW interest rate as the long-term interest
> rate paid by a creditworthy company because it was the only long-term interest rate
> on the record.  This three-year AA-interest rate is published by the Bank of Korea.
> No other long-term KRW interest rates were provided on the record by parties in
> this review.  *Therefore, to be consistent Commerce used three years for the term of
> the loan variable and the three-year creditworthy default and uncreditworthy
> default rates*.

PR 213 at 58 (emphasis added).

This explanation cannot reasonably justify Commerce ignoring the plain language of its

own regulations.  As the court has held, Commerce's determinations must be in accordance with

the plain language of its regulations.  *See*, *e.g.*, *Eregli Demir Ve Çelik Fabrikalari T.A.S. v.

United States*, 415 F. Supp. 3d 1216, 1230 (Ct. Int'l Trade 2019) ("Commerce's determination in

the remand proceeding is inconsistent with the plain language of the regulation and, thus, merits

no deference."); *Guangzhou Jangho Curtain Wall Sys. Eng'g Co. v. United States*, 181 F. Supp.

3d 1265, 1280 (Ct. Int'l Trade 2016) ("Commerce's *per se* restriction of its scope ruling to a

particular interested party rather than to a particular product is contrary to the plain language of

the regulation."); *see also Torrington Co. v. United States*, 156 F.3d 1361, 1364 (Fed. Cir. 1998)

(citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("We must give substantial

deference to an agency's interpretations of its own regulations. . . . The agency's interpretation

must be given controlling weight unless it is plainly erroneous or inconsistent with the

regulation.")).

The formula in Commerce's regulations is clear.  It specifies that "n" equals "the term of the loan."  There is no basis to substitute the actual term of the loan, which as the record demonstrates is six years, for any other term in the service of purported "consistency." Furthermore, the *Preamble* to Commerce's regulations specifies the selection of the default rates used in calculating an uncreditworthy benchmark and provides that Commerce:

> . . . will use *the average cumulate default rate for the number of years corresponding to the length of the loan*, as reported in Moody's study of historical corporate bond default rates.  In other words, we would use a five-year default rate for a five-year loan, as so forth.  We believe that using a default rate that is directly linked to the term of the loan is a better reflection of the risk associated with long-term lending to uncreditworthy borrowers.

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,365 (Dep't Commerce Nov. 25, 1998)

("*Preamble*").  As the *Preamble* correctly notes, the default rate is a measurement of risk and the level of risk of default can only be properly calculated using the actual term of the loan at issue, which is on the record (six years).  There is no basis to throw out an actual data point in favor of a three-year term that does not reflect the term of the loan.  Commerce's approach, while perhaps internally consistent with the term of the long-term creditworthy interest rate is directly contradictory to the plain language of Commerce's own regulations and the *Preamble* with respect to the appropriate period for the applicable default rates.

Therefore, since the term of the restructured long-term loans and bonds is six years, the "n" variable (number of years) for the default rates in the formula for calculating the uncreditworthy benchmark must match the six-year term of these loans and bonds.  Accordingly, Commerce's decision to ignore the plain requirements of its regulation renders its decision unlawful.  *See*, *Eregli Demir Ve Çelik Fabrikalari T.A.S.*, 415 F. Supp. 3d at 1230.  The Court should thus direct Commerce to revise the calculation of the uncreditworthy benchmark rate by

using the six-year default rates from Moody's Investors Service for the "$q_n$" and "$p_n$" variables, as set out in the regulations.

### 2.   Unequityworthy Discount Rates

Once Commerce determines that a company receives a benefit through an equity infusion and that firm is unequityworthy, it will calculate the amount of the benefit as equal to the amount of the equity infusion.  19 C.F.R. § 351.507(a)(4) and (6).  In turn, Commerce's regulations at 19 C.F.R. § 351.507(c) dictate that Commerce will then allocate the benefit amount conferred by an equity infusion (a non-recurring subsidy) over the same time period as the non-recurring subsidy, in accordance with 19 C.F.R. § 351.524(d).  19 C.F.R. § 351.524(d)(1) sets out the formula to be used for allocating non-recurring benefits over time:

$$Ak=y/n+[y-(y/n)(k-1)]d1+dAk=y/n+[y-(y/n)(k-1)]d1+d$$

Where:
$Ak$ = the amount of the benefit allocated to year k,
$y$ = the face value of the subsidy,
$n$ = the AUL (see paragraph (d)(2) of this section),
$d$ = the discount rate (see paragraph (d)(3) of this section), and
$k$ = the year of allocation, where the year of receipt = 1 and $1 \leq k \leq n$.

19 C.F.R. § 351.524(d)(3)(ii) sets out an exception for selection of the discount rate for uncreditworthy firms (such as Dongbu, pursuant to Commerce's determination).  For uncreditworthy firms, Commerce "will use as a discount rate the interest rate described in § 351.505(a)(3)(iii)," *i.e.*, using the same formula for the calculation of the uncreditworthy benchmark interest rate described above.  19 C.F.R. § 351.524(d)(3)(ii).

Since the AUL period for the subject merchandise is fifteen years, Commerce allocated the amounts of the 2015, 2016, 2018 and 2019 government equity infusions on that basis pursuant to 19 C.F.R. § 351.507(c) and 19 C.F.R. § 351.524(b) and (d)(1).  But, in determining the amount of the benefit in each year of the fifteen-year allocation periods, Commerce

incorrectly calculated the discount rates ("d" in Commerce's equation) based on a three-year period, because it used the incorrectly calculated uncreditworthy benchmark interest rate for long-term loans and bonds discussed above.  CR 270-71 (PR 214) at Attachment 2, tab "UCW BM" "and "Equity Infusions."

        As discussed above with respect to the uncreditworthy benchmark interest rate, Commerce's regulation and *Preamble* are clear that the default rates should be tied to the term of the loan or, in the case of an equity benefit, to the same period as a non-recurring subsidy, *i.e.*, the fifteen-year AUL period.  *See* 19 C.F.R. § 351.524(d)(2); 19 C.F.R. § 351.507(c) ("The benefit conferred by an equity infusion shall be allocated over the same time period as a non-recurring subsidy.").  Thus, the "n" variable (number of years) in the formula for calculating the unequityworthy discount rates should match the fifteen-year allocation period, just as the "n" variable for calculating an uncreditworthy benchmark interest rate must match the term of the uncreditworthy loan.  Commerce's failure to follow the plain language of its own regulations is thus unlawful.  *See*, *Eregli Demir Ve Çelik Fabrikalari T.A.S.*, 415 F. Supp. 3d at 1230.  The Court should thus direct Commerce to revise the calculation of the unequityworthy discount rates by using the fifteen-year default rates for the "$q_n$" and "$p_n$" variables as set out in the regulations.

## VII.   <u>CONCLUSION</u>

Based on the foregoing, Plaintiffs respectfully request this Court hold Commerce's *Final Results* unsupported by substantial evidence and otherwise not in accordance with law for the reasons set forth above.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd.*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 12,556 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills