**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., DONGBU INCHEON STEEL CO., LTD.,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES,<br><br>　　　　　　Defendant,<br><br>　　and<br><br>NUCOR CORPORATION and STEEL DYNAMICS, INC.,<br><br>　　　　Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Court No. 22-00047<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER**

Upon consideration of the plaintiffs' Rule 56.2 motion for judgment on the agency record, defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that the plaintiffs' Rule 56.2 motion for judgment on the agency record is denied; and it is further

ORDERED that judgment shall issue for the United States.

Dated: _____                 _____
　　　　New York, New York                                    JUDGE

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., DONGBU INCHEON STEEL CO., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> NUCOR CORPORATION and STEEL DYNAMICS, INC., <br><br> Defendant-Intervenors. | Court No. 22-00047 <br> **PUBLIC VERSION** <br><br> Business Proprietary Information Removed from Pages 4, 11-14 |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' <br> MOTION FOR JUDGMENT UPON THE AGENCY RECORD

                                     BRIAM M. BOYNTON
                                     Principal Deputy Assistant Attorney General

                                     PATRICIA M. MCCARTHY
                                     Director

                                     CLAUDIA BURKE
                                     Assistant Director

OF COUNSEL:                          ELIZABETH SPECK
                                     Senior Trial Counsel
Ayat Mujais                          United States Department of Justice
Attorney                             Civil Division
U.S. Department of Commerce          Commercial Litigation Branch
Office of the Chief Counsel for      P.O. Box 480
Trade Enforcement & Compliance       Ben Franklin Station
Washington, D.C. 20230               Washington, D.C. 20044
                                     Tel: (202) 307-0369
                                     Fax: (202) 514-7965

December 2, 2022                     Attorneys for Defendant

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ....................................................................2

I.      Administrative Determination Under Review .................................................2

II.     Issues Presented For Review ............................................................................2

STATEMENT OF THE FACTS .................................................................................3

SUMMARY OF THE ARGUMENT ..........................................................................4

ARGUMENT ..............................................................................................................6

I.      Standard Of Review .........................................................................................6

II.     Commerce's Finding That The First Through Third Debt-To-Equity Swaps
        Provided A Countervailable Benefit To KG Dongbu Steel Is Supported By
        Substantial Evidence And In Accordance With Law .......................................7

        A.      Legal Framework ...................................................................................8

        B.      Commerce Reasonably Concluded That Private Investor Prices Were
                Not Significant And Thus Did Not Rely On Those Prices For Its Benefit
                Calculation .............................................................................................9

                1.      Record Evidence Supports Commerce's Conclusion That Private
                        Investor Prices Were Not Significant And Thus Not Reliable .................10

                2.      Commerce Reasonably Re-examined The Countervailability Of The
                        Three Debt-To-Equity Conversions .........................................14

III.    Commerce's Determination That The Benefits From Dongbu Steel's Debt-To-Equity
        Swaps Passed Through To KG Dongbu Steel Is Supported By Substantial Evidence
        And In Accordance With Law .........................................................................18

IV.     Commerce's Calculation Of The Uncreditworthy Benchmark And Uncreditworthy
        Discount Rate Is Supported By Substantial Evidence And In Accordance With Law ......22

        A.      Legal Framework .................................................................................22

        B.      Commerce Correctly Calculated The Uncreditworthy Discount Rate Used
                For Allocating The Benefits From Long-Term Loans, Bonds, And Equity
                Infusions ...............................................................................................23

CONCLUSION ..........................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                   **Page(s)**

*Atlantic Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984)..................................................................................... 7

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*,
   419 U.S. 281 (1974)...................................................................................................... 7

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
   975 F.3d 1318 (Fed. Cir. 2020)............................................................................. 12, 22

*Consolidated Edison Co. v. NLRB*,
   305 U.S. 197 (1938)................................................................................................. 5, 6

*Consolo v. Fed'l Maritime Comm'n*,
   383 U.S. 607 (1966)................................................................................................. 5, 6

*Elkem Metals Co. v. United States*,
   193 F. Supp. 2d 1314 (t. Int'l Trade 2002) ............................................................... 17

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996)...................................................................................... 6

*Goldlink Indus. Co. v. United States*,
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ............................................................... 7

*Mannesmannrohren–Werke AG v. United States,*
   120 F. Supp. 2d 1075 (Ct. Int'l Trade 2000) ............................................................. 24

*Matsuhita Elec. Indus. Co. v. United States*,
   750 F.2d 927 (Fed. Cir. 1984)................................................................................... 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)........................................................................................................ 7

*Nucor Corp v. United States*,
   494 F. Supp. 3d 1377 (Ct. Int'l Trade 2021) ...................................................... 5, 16

*Nucor Corp. v. United States*,
   461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) ......................................... 5, 15, 20, 21

*Pierce v. Underwood*,
   487 U.S. 552 (1988)...................................................................................................... 6

*Ranchers-Cattleman Action Legal Found. v. United States*,
　　74 F. Supp. 2d 1353 (Ct. Int'l Trade 1999) ............................................................ 16

*Rhone Poulenc, S.A. v. United* States,
　　592 F. Supp. 1318 (Ct. Int'l Trade 1984) ............................................................. 21

*Saarstahl AG v. United States*,
　　949 F. Supp. 863 (Ct. Int'l Trade 1996) .............................................................. 20

*SEC v. Chenery Corp.*,
　　332 U.S. 194 (1947) ............................................................................................. 7

*Shandong Huarong Gen. Corp. v. United States*,
　　159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) ........................................................... 7

*Shandong Huarong Mach. Co. v. United States*,
　　29 C.I.T. 484 (2005) .......................................................................................... 17

*Taiwan Semiconductor Indus. Ass'n v. United States*,
　　105 F. Supp. 2d 1363 (Ct. Int'l Trade 2000) ......................................................... 21

*United States  v. Chemical Foundation*,
　　272 U.S. 1 (1926) ............................................................................................... 21

*Uttam Galva Steels Ltd. v. United States*,
　　2022 WL 1419596 (Fed. Cir. May 5, 2022) .......................................................... 17

*Yama Ribbons & Bows Co. v. United States*,
　　865 F. Supp. 2d 1294 (Ct. Int'l Trade 2012) ................................................... 16, 24

**Statutes**

19 U.S.C. § 1677 .................................................................................................. 4, 8, 18

**Regulations**

19 C.F.R. § 351.507 ........................................................................................ 8, 9, 11, 22

19 C.F.R. § 351.524 ............................................................................................... 23, 24

**Exectutive Determinations**

*Antidumping or Countervailing Duty Order, Finding or Suspended Investigation; Opportunity Request Administrative Review*,
　　85 Fed. Reg. 39,531 (Dep't of Commerce July 1, 2020) ............................................3

*Certain Corrosion Resistant Steel Products from India, Italy, Republic of Korea and the People's Republic of China,*
   81 Fed. Reg. 48,387 (Dep't of Commerce July 25, 2016) ............................................................3

*Certain Corrosion-Resistant Steel Products from the Republic of Korea,*
   86 Fed. Reg. 37,740 (Dep't of Commerce July 16, 2021) ...........................................................3

*Certain Corrosion-Resistant Steel Products from the Republic of Korea,*
   84 Fed. Reg. 11,749 (Dept of Commerce Mar. 28, 2019) .........................................................15

*Certain Corrosion-Resistant Steel Products from the Republic of Korea,*
   87 Fed. Reg. 2,759 (Dep't of Commerce Jan. 19, 2022) ............................................................2

*Coated Free Sheet Paper from the Republic of Korea,*
   72 Fed. Reg. 60,639 (Dep't of Commerce Oct. 25, 2007) .........................................................14

*Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act,*
   68 Fed. Reg. 37,125 (Dep't Commerce 2003) .........................................................................18

### IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., DONGBU INCHEON STEEL CO., LTD.,<br><br>        Plaintiffs,<br><br>  v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>    and<br><br>NUCOR CORPORATION and STEEL DYNAMICS, INC.,<br><br>        Defendant-Intervenors. | Court No. 22-00047<br>**PUBLIC VERSION**<br><br>Business Proprietary Information Removed from Pages 4, 11-14 |

### DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the Court, defendant, the United States, respectfully responds to the motion for judgment upon the agency record filed by plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd., and Dongbu Incheon Steel Co., Ltd. (collectively Dongbu or plaintiffs).  Plaintiffs challenge the final results of the U.S. Department of Commerce's (Commerce) countervailing duty administrative review covering certain corrosion-resistant steel products (CORE) from Korea.  Specifically, plaintiffs challenge:  Commerce's determination that the first through third debt-to-equity swaps provided a countervailable subsidy to Dongbu; Commerce's determination that the benefits from Dongbu's debt to equity swaps passed through

to KG Dongbu Steel despite the change in ownership during the period of review; and

Commerce's calculation of the uncreditworthy benchmark and discount rate.

These claims are without merit.  Because Commerce's determination is supported by

substantial evidence and is otherwise in accordance with the law, the final results should be

sustained.  Accordingly, we respectfully request that the Court deny plaintiffs' motion and enter

judgment for the United States.

<u>**STATEMENT PURSUANT TO RULE 56.2**</u>

**I.**     <u>**Administrative Determination Under Review**</u>

The administrative determination under review is *Certain Corrosion-Resistant Steel*

*Products from the Republic of Korea*, 87 Fed. Reg. 2,759 (Dep't of Commerce Jan. 19, 2022)

(*Final Results*), P.R. 216, and accompanying Issues and Decision Memorandum (IDM), P.R.

213.  The period of review is January 1, 2019, through December 31, 2019.

**II.**    <u>**Issues Presented For Review**</u>

1.   Whether Commerce's determination that the first through third debt-to-equity swaps

provided a countervailable benefit to KG Dongbu Steel is supported by substantial evidence and

is otherwise in accordance with law.

2.   Whether Commerce's determination that the benefits from the debt-to-equity swap

passed through to KG Dongbu Steel despite the change in ownership is supported by substantial

evidence and is otherwise in accordance with law.

3.   Whether Commerce's calculations of the uncreditworthy benchmark and

uncreditworthy discount rate are supported by substantial evidence and are otherwise in

accordance with law.

## STATEMENT OF FACTS

On July 25, 2016, Commerce published the countervailing duty order for CORE from Korea. *Certain Corrosion Resistant Steel Products from India, Italy, Republic of Korea and the People's Republic of China*, 81 Fed. Reg. 48,387 (Dep't of Commerce July 25, 2016) (*CORE Order*). On July 1, 2020, Commerce published a notice of opportunity to request an administrative review. *Antidumping or Countervailing Duty Order, Finding or Suspended Investigation; Opportunity to Request Administrative Review*, 85 Fed. Reg. 39,531 (Dep't of Commerce July 1, 2020), P.R. 1. Commerce subsequently received timely requests for review of the *CORE Order* and initiated an administrative review on September 3, 2020. *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 86 Fed. Reg. 37,740 (Dep't of Commerce July 16, 2021) (*Preliminary Results*), P.R. 172, and accompanying Preliminary Decision Memorandum (PDM), P.R. 173. On October 6, 2020, Commerce selected KG Dongbu Steel Co., Ltd. (KG Dongbu Steel) and Hyundai Steel Company as mandatory respondents for this administrative review. *Id.* at 2.

Commerce published its preliminary results on July 12, 2021. *See* PDM, P.R. 173. In its preliminary results, unchanged in its final results, Commerce found that KG Dongbu and Dongbu Steel merged, leading to the creation of KG Dongbu Steel. PDM, P.R. 173 at 7 (citing KG Dongbu's Affiliated Companies Questionnaire Response (KG Dongbu ACR), Oct. 27, 2020, P.R. 34, C.R. 6 at 1 n.1). However, Commerce stated that KG Dongbu Steel failed to respond to the Change in Ownership Appendix, and, therefore, Commerce was not able to determine whether KG Dongbu's acquisition of Dongbu Steel extinguished any prior subsidies from Dongbu Steel (*i.e.,* the first through third debt-to-equity infusions). PDM, P.R. 173 at 7; IDM at 54 (citing Countervailing Duty Questionnaire, October 6, 2020, P.R. 22). As a result, Commerce

found that Dongbu Steel's subsidies passed through to KG Dongbu Steel.  IDM at 54 (citing Countervailing Duty Questionnaire, P.R. 22 at III-4 and Change in Ownership Appendix); *see also* KG Dongbu ACR, C.R. 6 at 12.

Beginning in 2012, Dongbu Steel struggled financially, and sought to improve its financial posture.  Equity Infusions Analysis Memo, dated July 13, 2021, P.R. 176, C.R. 259 at 1.  Due to its poor financial posture, Dongbu Steel had difficulty securing funding on commercial terms, such as loans; however, Dongbu Steel was able to acquire loans from the Korea Development Bank (KDB), a state-owned bank.  *Id.* at 2.  As a part of this loan process, the KDB agreed to refinance several of Dongbu Steel's bonds and entered into a [        █████ ] to secure repayment of the loans, as discussed at length below.  *Id.*  Dongbu Steel continued to receive loans from the KDB through 2014.  *Id.*  But Dongbu Steel was unable to repay these loans, and thus had to apply for a financial restructuring program through the Government of Korea, headed by the Creditor Bank Committee, which was made up of several state-owned banks, as laid out below.  *Id.* at 3.  Under this program, Dongbu Steel underwent four debt-to-equity conversions to improve its financial posture and enable it to repay the KDB. *Id.*

In its preliminary results of this review, unchanged in the final results, Commerce found that KG Dongbu Steel was unequityworthy, or a company that was unable to obtain loans from conventional commercial sources, at the time that it engaged in the first three debt-to-equity swaps, and that the entire amount of the equity infusions related to those three conversions constituted a benefit to KG Dongbu Steel pursuant to 19 U.S.C. § 1677(5)(E)(ii).  PDM at 11.  Further, as in prior administrative reviews, Commerce determined that KG Dongbu Steel was uncreditworthy because no new information had been submitted to cause Commerce to

reevaluate its creditworthy determination with respect to KG Dongbu Steel.  PDM at 11 (citing

KG Dongbu's Third Supplemental Questionnaire Response (KG Dongbu 3d Supp. QR), June 1,

2021, P.R. 155, C.R. 244, at Exh. B-43; KG Dongbu's Initial Questionnaire Response (KG

Dongbu IQR), Dec. 3, 2020, P.R. 74-78, C.R. 112-156 at Exh. 12-A, KG Dongbu's Financial

Statements ending Dec. 31, 2019, Independent Auditor's Report).  Thus, Commerce calculated

the benchmark pursuant to 19 C.F.R. § 351.505(a)(3)(iii).  *Id.*

## SUMMARY OF ARGUMENT

Commerce's conclusions in the final results are supported by substantial evidence and are

otherwise in accordance with law.  First, substantial evidence supports Commerce's conclusion

that private investor prices for the first three debt-to-equity swaps were unavailable to use as a

benchmark for the debt-to-equity conversions.  As Commerce explained in the final results, and

as it explained in more detail in the Equity Infusions Analysis Memo, Commerce could not rely

on the prices paid by the private creditors and private investors for purposes of determining a

benchmark because of the significant influence of Government of Korea (GOK)-controlled

entities, such as the KDB, in the debt restructuring process.  Dongbu primarily contends that

Commerce could not re-examine the countervailability of the prior debt-to-equity swaps because

of Commerce's "established practice" in prior reviews.  Dongbu Br. at 14-18.  But this argument

overlooks that in prior reviews the petitioner had not exhausted all arguments regarding the

countervailability of the first three debt-to-equity swaps.  And even setting that aside, Commerce

identified factors that prompted a re-examination of the record for these swaps, such as its re-

examination of the record following this Court's remand order in *Nucor Corporation v. United

States*, 461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) (*Nucor 2020*), which was ultimately

sustained in *Nucor Corp v. United States*, 494 F. Supp. 3d 1377 (Ct. Int'l Trade 2021) (*Nucor*

*2021*), and the participation of private investors independent from the creditors' committee in the fourth equity infusion during the 2019 period of review.

Also, although Dongbu may disagree with Commerce's conclusions regarding the role of the GOK-controlled financial institutions, Commerce satisfied its burden of identifying record evidence that support its conclusions. That Dongbu could review the evidence and reach an inconsistent conclusion does not establish that Commerce's determination is unsupported by substantial evidence. *Consolo v. Fed'l Maritime Comm'n*, 383 U.S. 607, 620 (1966); *see also Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

Commerce also reasonably concluded that Dongbu failed to rebut Commerce's baseline presumption that subsidies, existing prior to Dongbu Steel's change in ownership, passed through to KG Dongbu Steel. As Commerce explained in the final results, Dongbu failed to complete Commerce's Change-in-Ownership Appendix which might have provided the record necessary to rebut this presumption by demonstrating, for example, that the sale was at arm's length and for fair market value. In any event, contrary to Dongbu's arguments, Commerce identified substantial record evidence supporting that the acquisition was *not* made at arm's length and for fair market value. Again, the fact that Dongbu draws different conclusions from the record evidence, does not establish that Commerce's position is unsupported by substantial evidence. *Consolo*, 383 U.S. at 620.

Finally, Commerce correctly calculated the uncreditworthy discount rate used for allocating the benefits from long-term loans, bonds, and equity infusions. Specifically, in accordance with the uncreditworthy benchmark formula in 19 C.F.R. § 351.505(a)(3)(iii),

Commerce appropriately used a three-year interest rate as the long-term interest rate paid by a creditworthy company because it was the only long-term rate available on the record. Accordingly, the Court should sustain Commerce's determination in the final results.

## ARGUMENT

### I. Standard Of Review

In conducting its review, the Court "must sustain 'any determination, finding or conclusion {}' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  Substantial evidence "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 564-5 (1988). Rather, substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo*, 383 U.S. at 620; *see also Consol. Edison*, 305 U.S. at 229 ("{s}ubstantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").  Thus, "the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001); *accord Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556,1562 (Fed. Cir. 1984); *see also Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) ("{T}he Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the {C}ourt would justifiably have made a different choice had the matter been before it *de novo*.") (internal

quotes and citations omitted).

"The reviewing court {} may not supply a reasoned basis for the agency's action that the agency itself has not given."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).  However, the reviewing court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *State Farm*, 463 U.S. at 43 (quoting *Bowman Trans., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

## II.   Commerce's Finding That The First Through Third Debt-To-Equity Swaps Provided A Countervailable Benefit To KG Dongbu Steel Is Supported By Substantial Evidence And In Accordance With Law

During the 15-year average useful life period for the non-recurring subsidies at issue in this review, Dongbu Steel[1] had three debt-to-equity restructurings:  the first in February 2015, the second in May 2016, and the third in April 2018.  PDM at 15 (citing KG Dongbu IQR, C.R. 112-156 at 40-46).  In the current review, when analyzing the record, Commerce determined not to rely on private investor prices for these three debt-to-equity conversions because they were not significant within the meaning of 19 C.F.R. § 351.507(a)(2)(iii), as discussed in detail below. Because Commerce did not rely on these private investor prices, Commerce analyzed whether Dongbu Steel was equityworthy pursuant to 19 C.F.R. § 351.507(a)(3), and determined that Dongbu Steel was unequityworthy.  PDM at 16-17; IDM at 46-47; Equity Infusions Analysis Memo, C.R. 259 at 11.  Thus, Commerce found the benefit to be the entire amount of the debt-to-equity infusions (*i.e.,* the amount of the first, second, and third conversions) made by the GOK-owned or controlled financial institutions.  This finding is supported by substantial evidence, is in accordance with law, and should be sustained.  Dongbu does not argue that

---

[1]  The first, second, and third debt-to-equity conversions passed through to KG Dongbu Steel.  Thus, reference to the benefit from these equity conversions applies to KG Dongbu Steel.

Dongbu Steel was not unequityworthy.  Accordingly, should this Court agree with Commerce's determination that private investor prices were not available, this Court should sustain Commerce's determination as to its unequityworthy finding.

### A.  __Legal Framework__

Commerce determines that a countervailable subsidy exists in circumstances when an "authority" provides a "financial contribution," which results in a "benefit conferred" to the recipient, and that the subsidy is specific.  19 U.S.C. § 1677(5).  Section 1677(5)(E) of Title 19 provides the standard for determining the existence and amount of a benefit conferred through the provision of a subsidy.  For equity infusions, it states that a benefit is conferred "if the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made."  *Id.* at § 1677(5)(E)(i); *see also* 19 C.F.R. § 351.507(a)(1) (defining benefit for equity infusions).

Further, 19 C.F.R. § 351.507(a)(2)(i) states that the "Secretary will consider an equity infusion as being inconsistent with usual investment practice… if the price paid by the government for newly issued shares is greater than the price paid by private investors for the same (or similar form of) newly issued shares."  If the private investor purchases are not significant, Commerce will not use private investor prices.  19 C.F.R. § 351.507(a)(2)(i).  In those cases where the private investor prices are not available because they are not significant, pursuant to 19 C.F.R. § 351.507(a)(3), Commerce will "determine whether the firm funded by the government-provided equity was equityworthy or unequityworthy at the time of the equity infusion."  If Commerce determines that a firm was "unequityworthy," this will also constitute a determination that the equity infusion was inconsistent with the usual investment prices of

private investors, and Commerce will apply 19 C.F.R. § 351.507(a)(6) to measure the benefit attributable to the equity infusion.

To determine whether a company is equityworthy or unequityworthy, Commerce looks to 19 C.F.R. § 351.507(a)(4), which states that Commerce will find that a firm is equityworthy "if the Secretary determines that, from the perspective of a reasonable private investor examining the firm at the time the government-provided equity infusion was made, the firm showed an ability to generate a reasonable rate of return within a reasonable period of time."  Further, in "appropriate circumstances," Commerce may "focus its equityworthiness analysis on a project rather than the company as a whole."  19 C.F.R. § 351.507(a)(4).  The regulation further states that the Commerce may examine the following factors, including:  (1) "{o}bjective analyses of the future financial prospects of the recipient firm," (2) "{c}urrent and past indicators of the recipient firm's financial health," (3) "{r}ates of return on equity" for the three years prior to the infusion, and (4) "{e}quity investment in the firm by private investors."  *Id.*

### B. Commerce Reasonably Concluded That Private Investor Prices Were Not Significant And Thus Did Not Rely On Those Prices For Its Benefit Calculation

Section 351.507(a)(2)(iii) of Commerce's regulations states that Commerce will not rely on private investor prices for the calculation of a benefit through an equity infusion if the private investor purchases of newly issued shares are not "significant."  Here, after further analysis of the record facts, Commerce determined that the private investor prices for the first, second, and third debt-to-equity conversions were not significant and not reliable for use in calculating the benefit.  PDM at 16 (citing Equity Infusions Analysis Memo, C.R. 259 at 10-11).  Record evidence supports Commerce's conclusions.

1.  **Record Evidence Supports Commerce's Conclusion That Private Investor Prices Were Not Significant And Thus Not Reliable**

Commerce found that GOK-controlled entities, specifically the KDB, exercised significant influence over the first through third debt-to-equity conversions. IDM at 47 (citing Equity Infusions Analysis Memo, C.R. 259 at 10-11; KG Dongbu Prelim. Calc. Memo, July 13, 2021, P.R. 177, C.R. 260); *see also* KG Dongbu IQR, C.R. 112-156 at Exh. B-3 at Article 4 and Exhibit B-5; Government of Korea Initial Questionnaire Response (GOK IQR), Dec. 4, 2020, P.R. 79-85, C.R. 157-188 at Exh. Debt-Restructuring-3 (Minutes of 1st Dongbu Steel's Voluntary Creditors Association) at Comments of Third Agenda, and Exh. Debt Restructuring-6 at 8. The GOK-controlled financial institutions controlled the decisions of the creditors' committees or councils, and thus the private creditors had no decision-making control over these committees and had to comply with the terms set by the GOK-controlled financial institutions. Equity Infusions Analysis Memo, C.R. 259 at 11-12.

With respect to the first debt-to-equity conversion, at the time of the conversion, the GOK-owned banks, including KDB, owned [       ] percent of Dongbu Steel's shares, and [                                         ], with the rest owned or [          ] by private investors. *See* Equity Infusions Analysis Memo, C.R. 259 at 5-6 (citing KG Dongbu IQR, C.R. 112-156 at Exh. B-10 at Attachment 1); GOK IQR, C.R. 157-188 at Debt Restructuring-9. With respect to the second debt-to-equity conversion, of the shares subject to the conversion [                                              ], and [                            ]. Equity Infusions Analysis Memo, C.R. 259 at 6-7 (citing KG Dongbu IQR, C.R. 112-156 at 52 and Exh. B-17 at 7). Finally, at the time of the third restructuring, [                                              ]. Equity Infusions Analysis Memo, C.R. 259 at 7 (citing KG Dongbu IQR, C.R. 112-156 at 53).

11

In addition to holding a majority of the shares and [　　　　　], KDB also exercised

significant influence over the three debt restructurings.  Equity Infusions Memorandum Analysis

Memo, C.R. 259 at 11.  KDB and Dongbu Steel had entered into the [　　　　　　

　　　　　　　　　　　　　　　　　　　　], which allowed KDB to dictate how

Dongbu Steel would manage its assets and repay its creditors.  Equity Infusions Analysis Memo

at 11 (citing KG Dongbu IQR, C.R. 112-156 at Exh. B-3 at Article 4); *see also* Equity Infusions

Analysis Memo, C.R. 259 at 2 (citing KG Dongbu IQR, C.R. 112-156 at 22-24, 56 and Exh. B-2

at 2).  As Dongbu Steel went through these three debt restructurings, KDB dictated how Dongbu

Steel would use its assets and production to generate revenue, and thus how Dongbu Steel would

repay its creditors.  Equity Infusions Analysis Memo, C.R. 259 at 2; IDM at 48 (citing Equity

Infusions Analysis Memo, C.R. 259 at 11 and GOK IQR, C.R. 157-188 at Exh. Debt

Retructuring-3 and Exh. Debt Restructuring-6 at 8).  This, coupled with KDB and GOK-

controlled banks' majority [　　　　　], required that any private creditors had no alternative

but to accept the terms imposed on them.  Equity Infusions Analysis Memo, C.R. 259 at 11

(citing GOK IQR, C.R. 157-188 at Exh. Debt Restructuring-3 (Minutes of 1st Dongbu Steel's

Voluntary Creditors Association) at Contents of Third Agenda) and Debt Restructuring-6 at 8;

KG Dongbu IQR, C.R. 112-156 at Exh. B-5); IDM at 47.  Although private investors

participated in these conversions, because of this government influence, Commerce determined

that the participation of Dongbu Steel's private creditors was not significant.  IDM at 47; Equity

Infusions Analysis Memo, C.R. 259 at 9-11.  Therefore, pursuant to 19 C.F.R. § 351.507(a),

private investor prices were not available for the first through third debt-to-equity conversions,

and Commerce had to determine whether Dongbu Steel was equityworthy.  IDM at 50-51.

Dongbu argues that the equity infusions were consistent with the usual investment practice of private investors because both private and government financial institutions participated on the same terms and the private investor participation was significant. Dongbu Br. at 24. Dongbu also contends that record evidence demonstrates that the private financial institutions paid the same per share price as the GOK-controlled banks, and that the private financial institutions purchased a significant percentage of the shares of debt converted to equity. Dongbu Br. at 25-29. These arguments merely invite the Court to reweigh the evidence, which does not satisfy Dongbu's burden of proving that Commerce's determination is unsupported by substantial evidence. As the Federal Circuit explained in *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 975 F.3d 1318, 1333 (Fed. Cir. 2020), "'{t}hat {a party} can point to evidence of record which detracts from the evidence which supports the {agency's} determination is neither surprising nor persuasive." *Id.* (quoting *Matsuhita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984)).

In any event, there is no merit to Dongbu's claims. Although private investors paid the same per share price as the GOK-controlled banks, it is inaccurate to say that the private investors purchased a significant percentage of shares or that the private investors' participation was significant, or on the same terms as the GOK-controlled entities. As explained above, a comprehensive review of the totality of the evidence and relevant agreements between Dongbu Steel and KDB indicates that the GOK-controlled entities, specifically KDB, exercised significant influence over the debt-to-equity conversions through their majority [███████] during each restructuring, and that the GOK-controlled entities consistently held [█████] percent of the relevant shares. IDM at 47 (citing Equity Infusions Analysis Memo, C.R. 259 at 11). KDB alone controlled the largest share of debt, equity, and [████████]. IDM at 47.

Further, as Commerce explained, the private investors held a minority of the [ ▆▆▆▆▆▆ ] and a minority of Dongbu Steel's shares and were not in any position to vote to prevent the terms of the debt-to-equity conversions dictated by the GOK-controlled entities in any of the three restructurings.  IDM at 49.  Thus, the private investors had no decision-making control, and no significant participation in these restructurings because they had no choice but to comply with the GOK-controlled entities' terms.  *Id.* at 47.  Consequently, contrary to Dongbu's arguments, the private investors' participation in the first, second, and third debt-to-equity conversions was insignificant, as well as their purchase of shares.  *Id.* at 50.

Nor is there merit to Dongbu's position that "{a}ny of the creditors" had the option to "opt out" under the Corporate Restructuring Promotion Act (CRPA), or that Commerce's references to the high percentage of Dongbu's debt is "misleading and disingenuous" because Commerce should understand that voting rights are determined on the basis of "total outstanding debt and not secured debt."  Dongbu Br. at 26, 28-29.  As Commerce explained, GOK-owned banks controlled the restructuring.  IDM at 48-50 (citing Equity Infusions Analysis Memo, C.R. 259 at 11, which cites GOK IQR, C.R. 157-188 at Exhibit Debt Restructuring-3 and Exhibit Debt-Restructuring-6 at 8).  Specifically, in the first debt restructuring the government-owned banks controlled [ ▆▆▆ ] percent of the voting rights of the creditor's committee restructuring, in the second debt restructuring KDB's voting rights accounted for [ ▆▆▆ ] percent of [ ▆▆▆▆▆ ], and in the third debt restructuring the government-owned banks controlled [ ▆▆ ] percent of the voting rights of the creditor's committee.  Equity Infusions Analysis Memo, C.R. 259 at 6-8, 11-12 (citing Dongbu IQR, C.R. 112-156 at 53, Exh. B-17); GOK IQR, C.R. 157-188 at Exh. Debt Restructuring-9.  This GOK control would exist even if the private

14

investors opted out.  Also, contrary to Dongbu's assertions, Commerce considered *all* of the debt which determined the voting rights. *Id.*

Equally flawed is Dongbu's argument that Commerce's precedent, specifically *Coated Free Sheet Paper from the Republic of Korea*, 72 Fed. Reg. 60,639 (Dep't of Commerce Oct. 25, 2007 (final affirm. countervailing duty determ.), and accompanying IDM at 43 (*CFS Paper from Korea*) does not support the position that the GOK creditors' majority status on a creditors' committee renders private participation insignificant.  Dongbu Br. at 28-29.  Unlike in this review, in *CFS Paper from Korea*, Commerce did not find evidence of the GOK's influence over the decision-making ability of the Korean respondent's creditors' council at issue.  *CFS Paper from Korea*, 72 Fed. Reg. 60, 639, and accompanying IDM ad 43.  Conversely, here, Commerce found Dongbu Steel's creditors' council was dominated by GOK-controlled policy banks, which are considered authorities under section 19 U.S.C. § 1677(5)(B).  IDM at 50; Equity Infusions Analysis Memo, C.R. 259 at 4-12.[2]  Contrary to Dongbu's assertions, there is no basis on this record to find that the GOK controlled and private banks on the council acted in a "commercially reasonable" manner (*i.e.*, seeking to maximize interest income) on the restructured loans without comparing the terms of the renegotiated loans to those of a similar loan provided by a commercial bank.

---

[2]  The Equity Infusions Analysis Memo at pages 4-11 cites Donbgu IQR, C.R. 112-156 at 28-53, Exh. B-7 at 23, Exh. 10-A Exh. 12-A, Exh. B-10, Exh. B-11, Exh. B-17, Exh. B-22 Exh. B-29, and GOK IQR, C.R. 157-188 at 8, Exh. Debt Restructuring-3, Exh. Debt Restructuring-4, Exh. Debt Restructuring-6, Exh. Debt Restructuring-9; Nucor's Comments Regarding Creditworthiness and Equityworthiness, Jan. 1, 2021, P.R. 101, C.R. 200 at 2-11.

## 2. Commerce Reasonably Re-examined The Countervailability Of The Three Debt-To-Equity Conversions

Dongbu also wrongly asserts that, because Commerce defended its determination of the 2015-2016 CORE review in which it found that the private investor participation in the first and second debt-to-equity conversions was significant in *Nucor 2020*, 461 F. Supp. 3d at 1378, Commerce cannot re-examine that position in this review. Dongbu Br. at 18-19.[3]  Contrary to Dongbu's assertions, Commerce identified several factors explaining why it re-examined the record and why its thorough analysis in this review led it to reach different conclusions than it had in prior reviews.

Dongbu's claim that Commerce had an "established practice" ignores the history of the prior reviews.  As Dongbu appears to concede in footnote one of its brief, the majority of Commerce's argument in *Nucor* turned on the fact that the plaintiff, Nucor, failed to exhaust its administrative remedies with respect to whether the private investors' participation and share were significant.  *Nucor 2020*, 461 F. Supp. 3d at 1378.  Although in *Nucor 2020* Commerce discussed that it analyzes on a case-by-case basis whether participation by private investors is significant because the analysis is company and fact specific, Commerce did not conduct a fulsome analysis because of Nucor's failure to exhaust administrative remedies.  *Id.* Consequently, and contrary to Dongbu's assertions Commerce's reconsideration of the countervailability of the debt-to-equity conversions is reasonable because it is being done in the first instance.  *See generally id.*; Dongbu Br. at 18.

---

[3]  *Nucor 2020* concerned Commerce's administrative review for the time period 2015-2016, *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 84 Fed. Reg. 11,749 (Dept of Commerce Mar. 28, 2019) (final results and partial rescission of countervailing duty administrative review).

Further, Dongbu's reliance on *Nucor 2020* ignores the proceedings that occurred following the Court's remand in that case. Here, on page 47 and footnote 251 of the IDM and the accompanying text, Commerce referenced this Court's *Nucor 2021* opinion. In *Nucor 2020*, the Court remanded certain issues to Commerce, which Commerce addressed in *Nucor v. United States*, Final Results of Redetermination Pursuant to Court Remand, No. 19-0042, Sept. 30, 2020, ECF Nos. 88, 89 (*Nucor 2020 Remand Results*). The Court sustained the *Nucor 2020 Remand Results* in *Nucor 2021*, 494 F. Supp. 3d at 1377.

In the *Nucor 2020 Remand Results*, Commerce addressed whether Dongbu's loans could be used as benchmarks. *Nucor 2020 Remand Results* at 5-11. This process required Commerce to re-examine the entire debt restructuring and the role of Government of Korea and specifically the KDB in the debt restructuring. *Id.*; *see also Nucor 2021*, 494 F. Supp. 3d at 1380-81. This re-examination, which involved an analysis of the same creditor council that approved the restructurings of the debt-to-equity conversions, reasonably informed Commerce's analysis in this review. IDM at 47-48 and n.251. These facts, combined with the petitioners' failure to exhaust its administrative remedies in that proceeding, undercut Dongbu's assertion that Commerce has an "established practice." *See Ranchers-Cattleman Action Legal Found. v. United States*, 74 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 1999) ("An action . . . becomes 'agency practice' when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure.").

Unlike in *Nucor 2020*, in this segment Commerce performed a fulsome analysis of whether the private investors' participation and shares in the first through third debt-to-equity conversions were significant. In reconsidering the role that the KDB played in its control in the

debt restructurings, as discussed above, Commerce came to a different conclusion than in previous reviews (*i.e.,* is now finding that the private investors participation was not significant). Commerce is not barred from making new determinations or reconsidering previously submitted evidence so long as Commerce provides a reasonable explanation for doing so, as Commerce did here.  *See Yama Ribbons & Bows Co. v. United States*, 865 F. Supp. 2d 1294, 1298 (Ct. Int'l Trade 2012) ("Commerce must base its decisions on the record before it in each individual investigation."); *Shandong Huarong Mach. Co. v. United States*, 29 CIT 484, 491 (2005) ("{E}ach administrative review is a separate segment of proceedings with its own unique facts."); *Elkem Metals Co. v. United States*, 193 F. Supp. 2d 1314, 1320 (Ct. Int'l Trade 2002) (recognizing Commerce's inherent authority to reconsider prior positions).

There is also no merit to Dongbu's assertion that Commerce should not have re-examined the countervailability of the three debt-to-equity conversions because there was no new information on the record that would justify a reexamination.  Dongbu Br. at 14-15.  As Commerce explained, although Commerce ordinarily does not re-examine findings of financial contribution and specificity absent new evidence, Commerce must re-examine benefit in each successive administrative review because the purpose of these reviews is to determine the amount of any net countervailable subsidy.  IDM at 46.  Here, as explained above, the subsequent review of the record as addressed in *Nucor 2021* informed Commerce's analysis. IDM at 47 n.251.

Also, as Commerce explained in the IDM, private investors independent from the creditors' committee were involved in the fourth equity conversion.  IDM at 47.  This inclusion of private investors is a factual change from prior reviews that also led Commerce to reconsider the role the KDB played in its control in the debt restructurings, as discussed above.  *Id.*

18

Although Dongbu may disagree that the role of private investors was a significant change, Dongbu Br. at 16, Dongbu's subjective disagreement is not dispositive. *Uttam Galva Steels Ltd. v. United States*, No. 21-2119, 2022 WL 1419596, at *4 (Fed. Cir. May 5, 2022) (agreeing with the trial court that appellant failed to demonstrate that Commerce's determination was unsupported by substantial evidence because it could not demonstrate that the cited evidence "could lead Commerce to reach one and only one reasonable outcome on this administrative record").

As explained in detail in the Equity Infusions Analysis Memo, Commerce's comprehensive review of the totality of the evidence, including the underlying agreements and the ownership of Dongbu Steel, indicates that GOK-controlled entities, in particular the KDB, exercised significant influence over the debt restructurings which included the debt-to-equity conversions. Thus, Commerce reasonably re-examined the record and concluded that the participation of KG Dongbu's private creditors in the first, second, and third equity infusions was not significant.

III.   **Commerce's Determination That The Benefits From Dongbu Steel's Debt-To-Equity Swaps Passed Through To KG Dongbu Steel Is Supported By Substantial Evidence And In Accordance With Law**

Commerce also reasonably concluded that the benefits from Dongbu Steel's debt-to-equity swaps were not extinguished when the company was acquired by KG Dongbu Steel.

Pursuant to 19 U.S.C. § 1677(5)(F) and the *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125, 37,127 (Dep't Commerce 2003) (final modification), Commerce presumes that a non-recurring subsidy will benefit a recipient over the average useful life of the relevant assets, and Commerce allocates the subsidy over that period of time. A respondent may rebut this presumption if it

proves that a change in ownership occurred in which the former owner sold all or substantially

all of a company or its assets, and that the sale was at arm's-length and for fair market value. *Id.*

As explained in the *Notice of Final Modification*, "in analyzing whether the transaction

was for fair market value, the basic question is whether the full amount that the company or its

assets (including the value of any subsidy benefits) were actually worth under the prevailing

market conditions were paid, and paid through monetary or equivalent compensation." *Id.*

Commerce explained that " a primary consideration" in this analysis is "whether the government

failed to maximize its return on what it sold, indicating that the purchaser paid less for the

company or assets than it otherwise would have had the government acted in a manner consistent

with the normal sales practices of private, commercial sellers in that country." *Id.*

To make this determination, Commerce analyzes respondent's Change-in-Ownership Appendix,

which is submitted prior to the preliminary results. IDM at 54.

During the current review, in its initial questionnaire to KG Dongbu Steel, Commerce

included the below language:

> Commerce allocates the benefits received from certain types of subsidies over
> time (*e.g.*, *equity infusions*, non-recurring grants, debt forgiveness, import duty or
> value-added tax exemptions or reductions on capital equipment, *etc.*). *See* 19
> CFR 351.524 and subsection C of the "General Questions" section below for a
> complete explanation.
>
> Thus, in addition to investigating alleged subsidies that your company may have
> received during the POI, Commerce is also investigating alleged allocable, nonrecurring
> subsidies that your company may have received during the AUL period.
> Because of this, if your company obtained all or substantially all the assets of
> another company during the AUL period, and that company still exists as an
> ongoing entity, or its assets continue to operate as part of your company, we
> require a complete questionnaire response for such company. *If your company
> wishes to challenge Commerce's baseline presumption that non-recurring
> subsidies continue to benefit the recipient over the allocation period, please
> coordinate with your government to answer the questions in the **Change-in-
> Ownership Appendix**. If your company does not wish to challenge Commerce's
> baseline presumption that non-recurring subsidies continue to benefit the*

*recipient over the allocation period, please so state and you do <u>not</u> need to*
*provide a response to the **Change-in-Ownership Appendix***.

IDM at 55 (emphasis added) (citing Commerce Questionnaire, P.R. 22 at III-4); *see also* KG

Dongbu ACR, C.R. 6 at 12.

Although KG Dongbu acquired Dongbu Steel during the period of review, the now-

merged KG Dongbu Steel (made up of KG Dongbu and Dongbu Steel) did not provide a

response to the Change-in-Ownership Appendix.  IDM at 54.  Consequently, Commerce did not

analyze whether the acquisition of Dongbu Steel by KG Dongbu extinguished prior subsidies,

specifically the first, second, and third debt-to-equity conversions because KG Dongbu Steel had

the burden of challenging the baseline presumption that non-recurring subsidies continue to

benefit the recipient.  *Id.* at 54-55.  When KG Dongbu Steel did not challenge the baseline

presumption by responding to the Change-in-Ownership Appendix, Commerce continued its

baseline presumption that KG Dongbu continued to benefit from the debt-to-equity swaps.  *Id.* at

56.

Dongbu maintains that it did not respond to the Change-in-Ownership Appendix because

it relied on Commerce's prior determination that there was no countervailable benefit from the

debt-to-equity conversions, and, therefore, no non-recurring subsidies that could have passed

through to KG Dongbu Steel after the acquisition of Dongbu Steel.  Dongbu Br. at 20-22.  This

argument is unavailing.  Arguments regarding the countervailability of the first through third

debt-to-equity conversions have been raised in all prior reviews and is a significant issue.  IDM

at 54 (citing *Saarstahl AG v. United States*, 949 F. Supp. 863, 967 (Ct. Int'l Trade 1996)); *see*

*also, e.g.*, *Nucor 2020*, 461 F. Supp. 3d at 1378.  Consequently, KG Dongbu Steel was on notice

that Commerce could examine the countervailability of these issues, and further, as discussed

above, it had the burden of challenging the baseline presumption that non-recurring subsidies

continue to benefit the recipient. *Id.* at 54-55. It is not Commerce's responsibility to notify respondents that an issue may arise in an administrative review and ensure respondents respond to a Change-in-Ownership Appendix.

Nor is there merit to Dongbu's position that its change in ownership occurred at arm's length and for fair market value, thereby extinguishing alleged subsidies from the debt-to-equity swaps. Dongbu Br. at 24, 30-36. Contrary to Dongbu's assertions, Commerce's analysis was not "cursory," and the record supports Commerce's conclusion that KG Dongbu's acquisition of Dongbu Steel was *not* for fair market value. IDM at 56-57; Dongbu Br. at 34.

Although KG Dongbu bought Dongbu Steel through an open bidding process as the highest bidder, one of the conditions for KG Dongbu to acquire Dongbu Steel is that the KDB-led creditors' council would agree to extend existing loans and reduce the interest rates. IDM at 56-57 (citing GOK IQR, C.R. 157-158 at 16; Equity Infusions Analysis Memo, C.R. 259 at 8); *see also* Dongbu IQR , C.R. 112-156 at 35-39. Further, as a condition for the sale, the KDB-led creditors' council also agreed to another round of debt-to-equity conversions, as discussed at length above. *Id.* As indicated in the Equity Infusions Analysis Memo, the price per share paid by the creditors' council was higher than the price per share paid by KG Dongbu. IDM at 56-57; Equity Infusions Analysis Memo, C.R. 259 at 8; Dongbu IQR, C.R. 112-156 at 36-37. Therefore, Commerce reasonably concluded that the KDB-led creditors' council likely did not maximize its return when selling Dongbu Steel. *Id.* The record also demonstrates KDB and the creditors' council were trying to get Dongbu Steel out of the voluntary restructuring program. IDM at 57. Thus, because of these motivations, it is unlikely the KDB-led creditors' council acted in a manner consistent with the normal sales practices of private, commercial sellers in Korea, did not maximize its return, and therefore did not pay fair market value. *Id.*

Unsurprisingly, Dongbu claims that Commerce failed to consider record evidence because it did not discuss every piece of evidence that Dongbu claims is significant.  Dongbu Br. at 33-34.  Dongbu ignores that Commerce is presumed to have considered the issue and all the evidence in the record in making its decision.  *See, e.g., Taiwan Semiconductor Indus. Ass'n v. United States*, 105 F. Supp. 2d 1363, 1367, 1378 (Ct. Int'l Trade 2000); *Cf. Rhone Poulenc, S.A. v. United* States, 592 F. Supp. 1318, 1326 (Ct. Int'l Trade 1984) (citing *U.S. v. Chem. Found.*, 272 U.S. 1, 14-15 (1926)).  The absence of an explicit and comprehensive discussion on each and every piece of evidence does not satisfy the high burden to rebut that presumption, particularly in this review in which Commerce conducted a comprehensive analysis as set forth in the IDM and the Equity Infusions Analysis Memo.  Nor does Dongbu's discussion of evidence in support of its claim that Commerce should have reached a different conclusion establish that Commerce's decision is unsupported by substantial evidence.  Dongbu Br. at 33-36; *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 975 F.3d 1318, 1333 (Fed. Cir. 2020) ("That {a party} can point to evidence of record which detracts from the evidence which supports the {agency's} determination is neither surprising nor persuasive") (cleaned up).

## IV.    Commerce's Calculation Of The Uncreditworthy Benchmark And Uncreditworthy Discount Rate Is Supported By Substantial Evidence And In Accordance With Law

Similarly, Commerce correctly applied its regulations regarding the uncreditworthy discount rate and calculated that rate based upon the available record evidence.

### A.    Legal Framework

In accordance with 19 C.F.R. § 351.507(c), the benefit conferred by an equity infusion "shall be allocated over the same period as a non-recurring subsidy."  When Commerce finds that a company has received a government-provided long-term loan, and that company is

uncreditworthy, Commerce looks to 19 C.F.R. § 351.505(a)(3)(iii), which provides the

uncreditworthy benchmark formula, to calculate the benefit.

$$ib = [(1 - qn)(1 + if) n / (1 - pn)]1/n - 1,$$
where:

n = the term of the loan;

ib = the benchmark interest rate for uncreditworthy companies;

if = the long-term interest rate that would be paid by a creditworthy company;

pn = the probability of default by an uncreditworthy company within n years; and

qn = the probability of default by a creditworthy company within n years.

Further, 19 C.F.R. §§ 351.524(d)(1) and (d)(3)(ii) provide that, in the case of a firm

considered to be uncreditworthy, the Secretary will use as a discount rate the interest rate

described in 19 C.F.R. § 351.505(a)(3)(iii).

### B. Commerce Correctly Calculated The Uncreditworthy Discount Rate Used For Allocating The Benefits From Long-Term Loans, Bonds, And Equity Infusions

In the preliminary results, unchanged in the final results, Commerce found that KG

Dongbu Steel was uncreditworthy, and thus utilized the uncreditworthy benchmark formula in 19

C.F.R. § 351.505(a)(3)(iii). IDM at 58. Commerce used a three-year interest rate as the long-

term interest rate paid by a creditworthy company because it was the only rate on the record,

published by the Bank of Korea. *Id.*; 19 C.F.R. § 351.505(a)(3)(iii). No other long-term interest

rates were provided on the record by the parties. IDM at 58. And Commerce could not use a

six-year creditworthy interest rate, *i.e.,* the term of the loan at issue, because there was no

information regarding a six-year interest rate paid by a creditworthy company on the record. *Id.*

at 59.

Further, because Commerce found that KG Dongbu Steel was uncreditworthy, Commerce used a discount rate for uncreditworthy companies consistent with 19 C.F.R. § 351.524(d)(1) and (d)(3)(ii).  IDM at 59.  Commerce used as a discount rate the interest rate described in 19 C.F.R. § 351.505(a)(3)(iii), which as discussed above was a three-year creditworthy interest rate.  *Id.*

Dongbu contends that Commerce incorrectly used three-year default rates instead of six-year rates in the uncreditworthy benchmark rate calculation, ignoring the plain language of its regulations.  Dongbu Br. at 37-38.  Dongbu maintains that the default rates should be tied to the term of the loan.  *Id.*  And Dongbu further argues that Commerce incorrectly calculated the discount rates based on a three-year period because it incorrectly calculated the uncreditworthy benchmark interest rate, as discussed above.  Dongbu Br. at 40-41.  Contrary to Dongbu's assertions, term of the loan is irrelevant here because Commerce can rely only on information that is on the record.  It was Dongbu's burden to provide adequate rates on the record.  *See Yama Ribbons & Bows*, 865 F. Supp. 2d at 1298 ("Commerce must base its decisions on the record before it in each individual investigation."); *Mannesmannrohren–Werke AG v. United States,* 120 F. Supp. 2d 1075,1087 (Ct. Int'l Trade 2000) (explaining that it is not Commerce's burden to develop the record).  Here, there was no information regarding a six-year creditworthy interest rate on the record; therefore, Commerce could not use a six-year interest rate for the term of the loan in the uncreditworthy benchmark formula.  IDM at 58-59.  Further, because this was the only information on the record, Commerce is not ignoring the language of the regulations, but is instead adhering to the regulations to the best of its ability given the information provided on the record.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiff's motion, sustain

Commerce's *Final Results*, and enter judgment for the United States.

Respectfully submitted,

BRIAM M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/Claudia Burke
By:    CLAUDIA BURKE
Assistant Director

/s/ Elizabeth Speck
ELIZABETH SPECK
Senior Trial Counsel
United States Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-0369
Fax: (202) 514-7965

OF COUNSEL:

Ayat Mujais
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for
Trade Enforcement & Compliance
Washington, D.C. 20230

December 2, 2022                                   Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court and the

Court's scheduling order in that it contains 7,659 words, including text, footnotes, and headings.


/s/ Elizabeth Anne Speck