**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

KG DONGBU STEEL CO., LTD.,
DONGBU STEEL CO., LTD., and
DONGBU INCHEON STEEL CO., LTD.

        Plaintiffs,

    v.

UNITED STATES,

        Defendant,

   and

NUCOR CORPORATION and STEEL
DYNAMICS, INC.,

        Defendant-Intervenors.

**NON-CONFIDENTIAL**

Proprietary Information Removed from
Pages 9, 15, 16, and 18

Court No. 22-00047

**REPLY BRIEF OF PLAINTIFFS KG DONGBU STEEL CO., LTD., DONGBU STEEL
CO., LTD., AND DONGBU INCHEON STEEL CO., LTD. IN SUPPORT OF THEIR
<u>MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

December 27, 2022

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4116

*Counsel to Plaintiffs KG Dongbu Steel Co.,
Ltd., Dongbu Steel Co., Ltd. and Dongbu
Incheon Steel Co., Ltd.*

## <u>TABLE OF CONTENTS</u>

I.  ARGUMENT ................................................................................................ 2

    A.  Commerce's Change in its Established Agency Practice Without a Reasonable Explanation Was Contrary to Law......................................................................... 2

    B.  Commerce's Conclusion That the Private Investor Prices Were Not Significant and Thus Not Reliable is Not Supported by Substantial Evidence......................... 8

    C.  The Record Demonstrates That The KG Consortium Acquired Control Of Dongbu In An Arm's Length Transaction For Fair Market Value, And Thus Commerce Erred In Not Finding That Any Non-Recurring Subsidies Were Extinguished. ...................................................................................................... 12

        1.  Dongbu Was Justified In Not Responding To The CIO Appendix And Commerce's Claims To The Contrary Are Not Supported By Substantial Evidence................................................................................................. 12

        2.  The Record Contains Substantial Evidence Showing That Any Non-Recurring Subsidies Received By Dongbu Were Extinguished By Dongbu Steel's Sale of Substantially All of the Company and the KG Consortium's Acquisition of Control Thereof in an Arm's-Length Transaction for Fair Market Value. ........................................................ 13

    D.  Commerce Must Calculate the Uncreditworthy Benchmark Rate and The Unequityworthy Discount Rate According To the Plain Language Of The Regulations ....................................................................................................... 19

II.  CONCLUSION AND RELIEF REQUESTED ............................................. 23

CERTIFICATE OF COMPLIANCE............................................................... 24

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Gerald Metals, Inc. v. United States*,
  132 F.3d 716 (Fed. Cir. 1997)........................................................................14

*Itochu Building Prods. v. United States*,
  163 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) ...................................................5, 18

*Nucor Corp. v. U.S.*,
  461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) .......................................................2, 3

*Saha Thai Steel Pipe Public Co., Ltd. v. United States*,
  No. 21-00049, Slip Op. No. 22-134 (Ct. Int'l Trade Dec. 2, 2022)........................13

*Save Domestic Oil, Inc. v. United States*,
  357 F.3d 1278 (Fed. Cir. 2004).........................................................................8

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947)........................................................................................5

*United States Steel Corp. v. United States*,
  348 F. Supp. 3d 1248 (Ct. Int'l Trade 2018) .......................................................8

*Zhaoqing Tifo New Fibre Co. Ltd. v. United States*,
  60 F. Supp. 3d 1328 (Ct. Int'l Trade 2015) .......................................................13

**Other Authorities**

19 C.F.R. § 351.505(a)(3).....................................................................................19, 20

19 C.F.R. § 351.507(a)(1).....................................................................................10

19 C.F.R. § 351.507(a)(2).....................................................................................4, 11, 12

19 C.F.R. § 351.507(c)..........................................................................................20

19 C.F.R. § 351.524(d)(1)......................................................................................20

19 C.F.R. § 351.524(d)(2)......................................................................................20

*100- to 150-Seat Large Civil Aircraft from Canada:  Final Affirmative
  Countervailing Duty Determination*, 82 Fed. Reg. 61,252 (Dep't Commerce
  Dec. 27, 2017).............................................................................................21-22

*Bottom Mount Combination Refrigerator-Freezers From the Republic of Korea:*
*Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 17,410
(Dep't Commerce Mar. 26, 2012)......................................................................... 11-12

*Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Final*
*Results and Partial Rescission of Countervailing Duty Administrative Review;*
*2015-2016*, 84 Fed. Reg. 11,749 (Dep't Commerce March 28, 2019) .....................................6

*Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final*
*Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg.
15,112 (Dep't Commerce Mar. 17, 2020).......................................................................6

*Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Final*
*Results and Partial Rescission of Countervailing Duty Administrative Review;*
*2018*, 86 Fed. Reg. 29,237 (Dep't Commerce June 1, 2021) ....................................6

*Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative*
*Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Dep't Commerce
Oct. 25, 2007) ......................................................................................................9

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,365 (Dep't Commerce Nov. 25,
1998) ..................................................................................................................20

*Final Affirmative Countervailing Duty Determination: Dynamic Random Access*
*Memory Semiconductors from the Republic of Korea*, 68 Fed. Reg. 37,122
(Dep't Commerce June 23, 2003)......................................................................22

*Notice of Final Modification of Agency Practice Under Section 123 of the*
*Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125 (Dep't Commerce June
23, 2003) ...................................................................................................... 14-18

*Small Diameter Circular Seamless Carbon and Alloy Steel Standard, Line and*
*Pressure Pipe from Italy*, 60 Fed. Reg. 31,992 (Dep't Commerce June 19,
1995) ....................................................................................................................9

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |
|---|---|
| KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., and DONGBU INCHEON STEEL CO., LTD. <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> NUCOR CORPORATION and STEEL DYNAMICS, INC., <br><br> Defendant-Intervenors. | **NON-CONFIDENTIAL** <br><br> Proprietary Information Removed from Pages 9, 15, 16, and 18 <br><br><br> Court No. 22-00047 |

**REPLY BRIEF OF PLAINTIFFS KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., AND DONGBU INCHEON STEEL CO., LTD. IN SUPPORT OF THEIR MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

In accordance with Rule 56.2 of the Rules of this Court, and the August 22, 2022 scheduling order, Plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd., and Dongbu Incheon Steel Co., Ltd. (collectively "Dongbu") file this reply brief in opposition to the December 2, 2022 response brief filed by Defendant, the United States ("Def. Br."), and the December 2, 2022 response brief filed by Defendant-Intervenor Nucor Corporation ("Def.-Int. Br."). As discussed below, the arguments made by Defendant and Defendant-Intervenor are unpersuasive and should be rejected. This Court should grant Plaintiffs' Rule 56.2 Motion for Judgment On the Agency Record for the reasons discussed in their August 29, 2022 brief ("Pl.

Br."), and remand the case to the U.S. Department of Commerce ("Commerce") with instructions to correct the errors identified by the Court.

I.   **ARGUMENT**

   A.   **Commerce's Change in its Established Agency Practice Without a Reasonable Explanation Was Contrary to Law.**

   As discussed in Dongbu's Rule 56.2 brief, in the *Final Results* Commerce ignored its established agency practice of not reviewing the countervailability of a program in the absence of new information, and its consistent finding in all prior administrative reviews that no benefit was provided from Dongbu's first three debt-equity ("D/E") swaps, and instead found these D/E swaps to be countervailable even though there was no new factual information to support this abrupt change.  Pl. Br. at 14-20; PR 213 at 46-51.  Defendant and Defendant-Intervenor offer various explanations for why Commerce was justified in disregarding its established practice and prior decisions, none of which are persuasive.

   Defendant first argues that Dongbu "ignores the history of the prior reviews" when it claims that Commerce's determination in this case was contrary to its established practice.  Def. Br. at 16.  However, as demonstrated in Dongbu's opening brief, Commerce has considered arguments made by Nucor that the first three D/E swaps were countervailable and has rejected those arguments on the grounds that there was "significant" private investor participation on the same terms as the government creditors.  *See* Pl. Br. at 15-20.  Dongbu also pointed out that Commerce had defended that negative benefit determination before this Court in the *Nucor 2020* case.  *See* Pl. Br. at 18; *Nucor Corp. v. United States*, 461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020)("Nucor 2020").  Rather than directly addressing the consistent line of decisions from Commerce where it had found private investor participation significant and thus the first three D/E swaps were not countervailable, Defendant seeks to distract by focusing only on Dongbu's

citation to *Nucor 2020*.  Specifically, Defendant states that Dongbu "concedes" that "Commerce's argument in *Nucor* turned on the fact that the plaintiff, Nucor, failed to exhaust its administrative remedies with respect to whether the private investors' participation and share were significant." Def. Br. at 16.  Defendant is mistaken.

While this Court ultimately declined to address the merits of the issue of the countervailability of the D/E swaps because Nucor had not exhausted its administrative remedies, this does not change the fact that Commerce defended its decision that private investor participation was significant and thus there was no benefit from the D/E swaps.  Defendant's Memorandum In Opposition To Plaintiff's And Consolidated Plaintiffs' Rule 56.2 Motions For Judgment Upon The Agency Record at 19-22, *Nucor Corp. v. United States*, 461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) (No. 19-00042), ECF No. 60.  This fact was pointed out by Plaintiffs in order to refute Commerce's implication that it had never fully investigated the countervailability of Dongbu's D/E swaps (and that it was doing so in the first instance in this case).  *See* Pl. Br. at 18.  Commerce *had* examined the countervailability of the D/E swaps in three prior proceedings and in *Nucor 2020*, the Court notes specifically that Commerce did so in the underlying 2015-2016 review:  "Commerce addresses the significance of private investor participation when private investor prices are available…. Here, Commerce found that private investor prices were available and thus the significance of private investor participation was a relevant issue in Commerce's determination."  461 F. Supp. 3d at 1378.  For Defendant to now assert that Commerce never conducted a "fulsome analysis" before and that its "reconsideration of the countervailability of the debt-to equity conversions is reasonable because it is being done in the first instance," Def. Br. at 16, is not credible.

Defendant's reference to the fact that in the *Nucor 2020 Remand Results*, Commerce re-examined Dongbu's debt restructuring to address whether Dongbu's <u>loans</u> could be used as benchmarks, Def. Br. at 17, does not undercut Dongbu's argument that, in this case, Commerce ignored its standard practice over three reviews in which it found private investor participation significant for purposes of the D/E swaps.  The entire discussion in the *Nucor 2020 Remand Results* was related to whether the loans by the private commercial banks on the creditors committee constituted "comparable commercial loans" for purposes of 19 C.F.R. § 351.505(a)(2).  Final Results of Redetermination Pursuant to Court Remand at 5, 10, *Nucor v. United States*, No. 19-0042 (Ct. Int'l Trade Sept. 30, 2020) ECF Nos. 88, 89 ("*Nucor 2020 Remand Results*").  The remand did not reconsider whether private investor participation was "significant" under the separate regulation, 19 C.F.R. § 351.507(a)(2)(iii).  Commerce's reconsideration of the loan benchmark issue in the *Nucor 2020 Remand Results* thus does not reasonably explain Commerce's abandonment of its established agency practice of treating private investor participation as significant for purposes of the D/E swaps.  These are two different issues under two different regulatory standards.

Defendant next argues that the involvement of private investors independent from the creditors committee in the fourth D/E swap was a factual change from prior reviews justifying a reconsideration of the prior determinations and that Dongbu's "subjective disagreement" that this was a significant change is "not dispositive."  Def. Br. at 18-19.  But Defendant does not, nor did Commerce, explain how this "new" fact related to the fourth D/E swap is relevant to the earlier and separate 2015, 2016, or 2018 D/E swaps.  PR 213 at 46-51.  There is nothing "subjective" about Dongbu's disagreement.  The record shows that there was no change, significant or otherwise, to the facts surrounding the first three D/E swaps and all those facts were thoroughly

considered by Commerce when making its determination, in three separate reviews, that private investor participation was significant.  CR 81-156 (PR 74-78) at Exhibit B-8 (Attachment 2), Exhibit B-11 (Attachment 2), and Exhibit B-15 (Attachment 2); Pl. Br. at 16-19.  Defendant's reference to private investor participation in the fourth D/E swap is nothing but a red herring, and is not new and relevant information that justifies Commerce's abandonment of its prior practice.

In an attempt to fill the void left by Defendant in explaining the relevance of the private investor participation in the fourth D/E swap, Defendant-Intervenor engages in an extensive *post hoc* rationalization of Commerce's determination.  Def.-Int. Br. at 18.  Specifically, Defendant-Intervenor attempts to characterize the fourth D/E swap as merely part of a continuum of debt restructuring and argues that therefore the private investors actions in that swap "bear directly on the decisions of the non-government banks on the creditor committees" in the first three D/E swaps.  Def.-Int. Br. at 18.  This argument is not properly before the Court.  At no point did Commerce make this argument, or any of the arguments made by Defendant-Intervenor regarding the behavior of the KG Consortium in the fourth D/E swap, to support its change in practice.  PR 213 at 46-51.  The Court "may not accept 'post hoc rationalizations for agency action' and may only sustain the agency's decision 'on the same basis articulated in the order by the agency itself.'"  *Itochu Building Prods. Co., Inc. v. United States*, 163 F. Supp. 3d 1330, 1337-38 (Ct. Int'l Trade 2016); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  Moreover, even if considered, the facts of each D/E swap were addressed separately by Commerce in each prior review and Commerce made a separate and independent assessment of the countervailability of each.  *Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2015-2016*, 84 Fed. Reg. 11,749 (Dep't Commerce March 28, 2019) ("CORE 2015-2016 Final

Results") and accompanying Decision Memorandum at Comment 11 ("CORE 2015-2016 IDM"); *Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 15,112 (Dep't Commerce March 17, 2020) and accompanying Decision Memorandum at Comment 11 ("CORE 2017 IDM"); *Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 29,237 (Dep't Commerce June 1, 2021) and accompanying Decision Memorandum at Comment 7 ("CORE 2018 IDM").  The fourth D/E swap was thus not part of any "continuum" and private investor participation therein is not relevant new information that supports Commerce's abrupt change in consistent agency practice for the first three D/E swaps.

Defendant and Defendant-Intervenor argue that re-examination of the first three D/E swaps is justified because "although Commerce ordinarily does not re-examine findings of financial contribution and specificity absent new evidence, Commerce must re-examine benefit in each successive administrative review because the purpose of these reviews is to determine the amount of any net countervailable subsidy."  Def. Br. at 18; Def.-Int. Br. at 14.  This is highly misleading.  In the 2018 review, Commerce specifically stated that "while we are not making an unequityworthiness finding and *continue to find the equity infusions provided no benefit* to Dongbu for the instant administrative review, we may re-examine this issue for the next administrative review *if new record evidence requires such an examination*."  CORE 2018 IDM at 38 (emphasis added).  Commerce thus tied the possible re-examination of the benefit issue specifically to the presence of new record evidence—and there was no such new evidence here to warrant a re-examination.  Commerce even specifically explained that the benefit determinations in each segment of a proceeding "stand on their own and are made on a fact

specific basis." PR 213 at 46.  Here, the facts did not change and thus there was no basis for Commerce to make an entirely new benefit determination under its own stated practice.

Defendant's argument is also based on a false premise.  When first examining a new program, Commerce addresses whether an alleged subsidy is providing a financial contribution from the government, whether it is specific, and whether it provides a benefit to the respondent. However, once Commerce finds a program countervailable it rarely revisits the determination of a financial contribution or specificity but does have to collect new benefit information in each review period to determine the amount of the benefit received by the respondent during that period. *See, e.g.,* CR 81-156 (PR 74-78) at 15 (requesting benefit information only for the period of review for program previously found countervailable).  In this typical scenario, Commerce is revisiting the amount of the benefit received only.  In contrast, Commerce in this case determined in all prior reviews that private investor participation was significant and the D/E swaps were consistent with the usual investment practice of private investors and thus did not confer a benefit to Dongbu.  Unlike determining the *amount* of a benefit under a subsidy program which changes year to year, the benefit determination here was the equivalent of a non-countervailability determination.  It had nothing to do with the amount of benefit to be calculated for a particular time period.[1]

In sum, Commerce reversed its consistent practice of not re-examining the countervailability of a program, in this case Dongbu's first three D/E swaps, in the absence of

---

[1] Dongbu notes that when Commerce finds a non-recurring subsidy like the D/E swaps, it employs a declining-balance methodology that allocates at the time of its subsidy determination the whole subsidy amount received by calculating the benefit amount for each year of the AUL allocation period.  No new calculation is required for determining the benefit (*i.e.*, numerator) in each subsequent review.  In such reviews, the only necessary information to calculate the subsidy rate from the program is the sales value (*i.e.*, denominator).  CR 270-71 (PR 214) at Attachment 2 (Equity Infusions Tab).

new information and failed to provide a reasonable explanation for ignoring its practice.

Compounding this error is the fact that Commerce also ignored its consistent findings in all prior

reviews that private investor participation was significant and thus no benefit was provided in the

first three D/E swaps.  No new information justified this abrupt and unexplained change in

agency practice.  Dongbu detrimentally relied on Commerce's consistent practice when it did not

submit a Change-in-Ownership ("CIO") Appendix, which is only required to challenge

Commerce's presumption regarding non-recurring subsidies, none of which had been found as to

Dongbu at that point.  Pl. Br. at 20-23.  In order to act in accordance with law, Commerce must

follow its established practice or explain why it is reasonable to deviate from that practice.  *See*

*Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004); *United States*

*Steel Corp. v. United States*, 348 F. Supp. 3d 1248, 1260 (Ct. Int'l Trade 2018).  Commerce's

failure to do so here renders the *Final Results* not in accordance with law.

## B.      Commerce's Conclusion That the Private Investor Prices Were Not Significant and Thus Not Reliable is Not Supported by Substantial Evidence.

As discussed in Dongbu's opening brief, even if Commerce's change in its prior

consistent practice was reasonable, the conclusion that private investor participation was not

significant is not supported by substantial evidence.  Pl. Br. at 23-29.  Commerce's finding that

private investor participation was not significant is based primarily on the claim that the GOK

creditors exercised "significant influence" over the D/E swaps through the supermajority of

voting rights and share ownership they held during each restructuring.  Def. Br. at 13.  However,

there is no *per se* rule that a supermajority held by government creditors on the creditors

committee renders private investor participation insignificant.  *See, e.g., Coated Free Sheet*

*Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty*

*Determination*, 72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007) and accompanying

Decision Memorandum at Comment 7 ("*CFS Paper from Korea*"); *Final Affirmative Countervailing Duty Determination: Small Diameter Circular Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe From Italy*, 60 Fed. Reg. 31,992, 31,997 (Dep't Commerce June 19, 1995) ("*Seamless Pipe from Italy*").  In this case, private investor participation in the first three D/E swaps *was* significant under any reasonable definition of "significant."  Private creditors accounted for [      ] percent, [      ] percent, and [      ] percent of the first three D/E swaps, respectively.[2]  CR 81-156 (PR 74-78) at Exhibit B-8, Exhibit B-11, and Exhibit B-15.  Record evidence also demonstrates that the private creditors paid the same per share prices as the GOK-controlled policy banks.  CR 81-156 (PR 74-78) at 42-44.  Neither Defendant nor Defendant-Intervenor disputes any of this record evidence.

Furthermore, the private creditors had the option to sell their credits to the other creditors if they wished to opt-out of the voluntary restructuring or corporate workout program.  CR 157-88 (PR 81-85) at Exhibit Debt Restructuring-15 (Article 20).  Defendant responds that "GOK control would exist even if the private investors opted out."  Def. Br. at 15.  But that misses the point.  The fact that the private investors could opt-out demonstrates that they could still act in their own commercial interests and did not have to do whatever the GOK creditors dictated.  This is important, especially since there is no record evidence of actual intervention or attempts

---

[2] Defendant takes issue with Dongbu's statements regarding Commerce's use of only Dongbu's secured debt to calculate the percentage of debt ownership by GOK-owned banks, stating that "contrary to Dongbu's assertions, Commerce considered *all* of the debt which determined the voting rights."  Def't Br. at 15 (emphasis in original).  However, Commerce did use the percentages of secured debt to opportunistically overstate the role of the KDB in Dongbu's workout.  For example, in its Equity Infusion Memorandum, Commerce relied on the fact that the [                                                  ] to support its claim that the private creditors "had no alternative but to accept the terms imposed upon them" by the KDB.  CR 259 (PR 176) at 12 (emphasis added).  The [
                                                              ].  CR. 81-156 (PR 74-78) at 50-54.

by the GOK to dictate the decisions made by the private creditors.  *See* PR 213 at 47-50.  If the private creditors were being forced to do something that was not in their own interests, they could simply opt-out of the deal entirely.  The fact that they did not supports the argument that their participation was consistent with the usual investment practice of private investors.  *See* 19 C.F.R. § 351.507(a)(1).

Defendant also argues that certain documents on the record such as the Special Agreement for Corporate Bond Refinancing Issues ("Special Agreement") and the minutes of meetings of Dongbu's Voluntary Creditors Association demonstrate that the KDB was allowed to "dictate how Dongbu Steel would manage its assets and repay its creditors."  Def. Br. at 12.  However, Dongbu entered into the Special Agreement in December 2013, well before the structured workout of Dongbu's debt and the formation of the creditors' committee.  CR 81-156 (PR 74-78) at Exhibit B-3.  The KDB was Dongbu's largest creditor and the rights and obligations afforded to the KDB in that capacity carried over to its position on Dongbu's Voluntary Creditors Association.  CR 81-156 (PR 74-78) at 21-29, 60, Exhibit B-2, Exhibit B-5.  There is no evidence that the powers granted to the KDB as the largest creditor allowed it to bend the private creditors to its will in service of a carrying out some unspecified governmental policy with respect to Dongbu's restructuring efforts.

Defendant's attempts to distinguish *CFS Paper from Korea* are unavailing.  Specifically, Defendant argues that "unlike in this review, in *CFS Paper from Korea*, Commerce did not find evidence of the GOK's influence over the decision-making ability of the Korean respondent's creditors' council at issue."  Def. Br. at 15.  But this is merely an unsupported assertion.  Commerce's *Final Results* point to no actual evidence of undue influence by the GOK creditors on the creditors committee other than the fact they collectively constituted a supermajority.  PR

213 47-50.  *CFS Paper from Korea* stands for the proposition that even if government financial institutions on the creditors committee account for more than 75 percent of the voting rights, the participation of private creditors in the D/E swaps on the same terms can still serve as benchmark for finding no benefit.  Pl. Br. at 28-29; *CFS Paper from Korea* at Comment 7; *see also Seamless Pipe from Italy*, 60 Fed. Reg. at 31,997.  A supermajority of government entities on the creditors committee, without more, is not dispositive of whether private investor participation was significant under 19 C.F.R. § 351.507(a)(2)(iii).

Defendant-Intervenor's attempt to equate this case with *Refrigerators-Freezers from Korea* is similarly unavailing.  Defendant-Intervenor claims that "as in *Refrigerators-Freezers from Korea*," the non-government banks' participation in Dongbu's creditors committee "was not significant enough to prevent the government controlled supermajority from imposing the terms of the… debt-to-equity conversions."  Def.-Int. Br. at 21 (citing *Bottom Mount Combination Refrigerator-Freezers From the Republic of Korea:  Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 17,410 (Dep't Commerce Mar. 26, 2012) ("*Refrigerators-Freezers from Korea*") and accompanying Decision Memorandum at 104).  But what Defendant-Intervenor fails to mention is that Commerce itself distinguished *Refrigerator-Freezers from Korea* from the instant case in the 2017 review.  In finding no benefit from Dongbu's D/E swaps, Commerce held:

> The facts on the record of this review differ from the facts in *Refrigerators from Korea*.  In *Refrigerators from Korea*, less than half of the private creditors voted in favor of the debt-to-equity conversion, while in this case, all private investors agreed with the debt-to-equity swap rates and participated in the two separate debt-to-equity swaps.  Furthermore, the private investors accounted for a significant percentage of the shares and much higher than the private investors' shares in *Refrigerators from Korea*.

CORE 2017 IDM at Comment 11.

Finally, Defendant-Intervenor also quotes *Refrigerators-Freezers from Korea* to support its argument that the prices paid by the private creditors in the D/E swaps do not represent actual market prices that can be used as a benchmark.  Def. Int. Br. at 21-22.  However, the quote used by Defendant-Intervenor is inapposite because that discussion was part of the equityworthiness analysis that was done in that case <u>after</u> Commerce determined there was no significant private investor participation such that the purchase by private creditors could serve as benchmarks.  *See Refrigerators-Freezers from Korea* at 106 (discussing requirements for making an equityworthiness determination under 19 C.F.R. § 351.507(a)(4)).  Here, the issue is whether the private investor participation was "significant" under 19 C.F.R. § 351.507(a)(2)(iii) such that an equityworthiness analysis under § 351.507(a)(4) is unnecessary.

      **C.**    **The Record Demonstrates That The KG Consortium Acquired Control Of Dongbu In An Arm's Length Transaction For Fair Market Value, And Thus Commerce Erred In Not Finding That Any Non-Recurring Subsidies Were Extinguished.**

          **1.**    **Dongbu Was Justified In Not Responding To The CIO Appendix And Commerce's Claims To The Contrary Are Not Supported By Substantial Evidence.**

In the *Final Results*, Commerce determined that it could not conduct a "complete analysis" as to whether prior subsidies were extinguished because Dongbu did not respond to the CIO Appendix.  PR 213 at 54.  Defendant maintains that because the countervailability of the first three D/E swaps had been raised in prior reviews, Dongbu was "on notice" that it could be raised again and thus was required to submit the CIO Appendix.  Def. Br. at 21-22.  However, as Dongbu demonstrated, at the time Dongbu responded to questionnaires before Commerce, all of the subsidies Commerce had found in prior reviews with respect to Dongbu were from programs that provided *recurring* subsidies.  *Compare* CR 81-156 (PR 74-78) (dated Dec. 2, 2020); CR 253-54 (PR 167) (dated July 6, 2021); *with* CORE 2017 IDM (dated Mar. 17, 2020); CORE

2018 IDM (dated June 1, 2021); PR 173 (dated July 13, 2021).  Whether there were any programs that provided *non-recurring* benefits that may have passed through to Dongbu was simply not yet an issue at the time of its questionnaire response.  The CIO Appendix was thus not necessary at that time, and Dongbu was entitled to rely on Commerce's consistent practice and statements that it would not re-examine the D/E swaps absent new factual information, of which there was none.  Dongbu was not required to predict that Commerce would change its mind.  *See Saha Thai Steel Pipe Public Co., Ltd. v. United States*, No. 21-00049, Slip Op. No. 22-134 at 29-30 (Ct. Int'l Trade Dec. 2, 2022).

Similarly, Dongbu did not fail to exhaust its administrative remedies on this issue as suggested by Defendant-Intervenor.  Def.-Int. Br. at 27.  Dongbu argued before the agency, with supporting evidence, that any potential subsidies from first three D/E swaps were extinguished by the KG Consortium's acquisition of Dongbu, CR 263 (PR 195) at 26-31, and Commerce considered the argument, PR 213 at 54-57; *Zhaoqing Tifo New Fibre Co., Ltd. v. United States*, 60 F. Supp. 3d 1328, 1359 (Ct. Int'l Trade 2015).  There is thus no exhaustion problem here.

> **2.      The Record Contains Substantial Evidence Showing That Any Non-Recurring Subsidies Received By Dongbu Were Extinguished By Dongbu Steel's Sale of Substantially All of the Company and the KG Consortium's Acquisition of Control Thereof in an Arm's-Length Transaction for Fair Market Value.**

Regardless of whether Dongbu provided a CIO Appendix, there is ample evidence on the record to demonstrate that any prior subsidies were extinguished by Dongbu's sale of substantially all of the company and the KG Consortium's acquisition of control thereof in an arm's-length transaction for fair market value.  Commerce had a legal obligation to consider this evidence; it cannot dismiss it by simply stating Dongbu did not provide the CIO Appendix.  *See Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight").  The

record demonstrates that Dongbu sold substantially all the company in an arm's-length transaction for fair market value such that any alleged subsidies from the first three D/E swaps that occurred prior to the transaction were extinguished.

As explained in the *Final Modification*, when examining whether a transaction was for fair market value, Commerce considers whether the government conducted an objective analysis of the appropriate sales price, in an open bidding process with no artificial barriers to entry, where the highest bid was accepted without any discounts given for committed future investments from the buyer. *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125, 37,137 (Dep't Commerce June 23, 2003) ("*Final Modification*"). Here, the record demonstrates that the KG Consortium offered the highest bid in an open bidding process, CR 81-156 (PR 74-78) at 36-37, Exhibit B-19, Exhibit B-23, Exhibit B-26, and PricewaterhouseCoopers ("PWC") independently analyzed whether the creditors committee should accept the KG Consortium's bid, CR 81-156 (PR 74-78) at 38, Exhibit B-25, Exhibit B-29; *see also* Pl. Br. at 29-36. Commerce does not point to any discounts provided by the sellers in exchange for committed investments. Defendant and Defendant-Intervenor do not rebut these facts. Def. Br. at 22-23; Def.-Int. Br. at 27-29.

To the contrary, Defendant admits that the KG Consortium "bought Dongbu Steel through an open bidding process as the highest bidder." Def. Br. at 22. The only attacks on the acquisition price that Defendant and Defendant-Intervenor can muster is to point to the loan modifications and fourth D/E swap that occurred concurrently with the sale, which they claim are market distorting measures without which the KG Consortium allegedly would not have gone through with the transaction. Def. Br. at 22-23; Def.-Int Br. at 28. However, rather than

14

evidence of a failure to maximize value, these types of concurrent subsidies are normal and are expected to *raise* the transaction price.

In its *Final Modification*, Commerce specifically addressed the treatment of so-called "concurrent subsidies" that are provided as incentives to close the sale. Specifically, Commerce explained that it "would expect that potential investors would be willing to increase the value of their offer prices to reflect the additional value" that "concurrent subsidies are expected to contribute to the overall value of the company." *Final Modification*, 68 Fed. Reg. at 37,137. In doing so, Commerce recognized that concurrent subsidies "*increase* the value and, therefore, in a normally functioning market, *increase* the price the purchaser pays." *Id.* (emphasis added). Accordingly, Commerce explained that "there would be no reason to believe that a concurrent subsidy would lead a purchaser to paying less than fair market value." *Id.* Following the logic of the *Final Modification*, the loan extensions, interest rate reduction and the fourth D/E swap that Commerce raised in the *Final Results* do not evidence a failure by the creditors committee to maximize Dongbu's value in the acquisition. Instead, these so-called concurrent subsidies would be expected to have *increased* the sale price.

Here, there is absolutely no basis to conclude that the restructured loans and fourth D/E swap led to the KG Consortium paying less than fair market value for Dongbu. The Preliminary Bidding Guide requested that the bidder provide a purchase price for the acquisition of new shares as well as include any request, such as debt adjustment, that should be part of the transaction. CR 81-156 (PR 74-78) at 36, Exhibit B-20. In its preliminary bid, the KG Consortium submitted a definitive purchase price of KRW [          ] and noted that its price was conditioned on "a certain level of debt restructuring." CR 81-156 (PR 74-78) at 36, Exhibit B-23. Then, in its final bid, the KG Consortium submitted an increased price of KRW [

15

NON-CONFIDENTIAL

] as well as a proposed D/E swap, interest rate adjustment and maturity adjustment.  CR 81-156 (PR 74-78) at 37-38, Exhibit B-26.  Accordingly, the KG Consortium's final bid contemplated (1) its assessment of the current condition of Dongbu that was reflective of the amounts of the first three D/E swaps that publicly occurred well ahead of the announcement of the open bidding process, and (2) its request for an additional D/E swap, interest rate reduction, and the maturity extension upon which its bidding price was conditioned.  Nothing about the loan modifications and fourth D/E swap suggests that the creditors committee was accepting less value for Dongbu than it would otherwise receive in the absence of these incentives.  To the contrary, the increase in the final bid price from KRW [                    ] to KRW [                    ] shows that these incentives *increased* the price that the KG Consortium paid for Dongbu.[3]

It is important to note that these so-called market distorting measures provided by the creditors committee were provided in their role as the seller.  The *Final Modification* clarified that Commerce would be "concerned" with the "actions of government in its role 'as government,' and not the actions of the government in its role as the seller."  *Id.* at 37,127 n.5.  In other words, Commerce considers as "market-distorting measures" "only those actions which private sellers could not take even if they wished to do so."  *Id.*  That Defendant-Intervenor can point to the fourth D/E swap and loan modifications as alleged "significant financial incentives" that raised the transaction price does not demonstrate that the creditors committee acted "like a government" as opposed to a seller in the transaction.  Commerce's reliance on these concurrent

---

[3] Although Defendant and Defendant-Intervenor point out that the creditors committee paid a higher per-share price for new shares (KRW 25,000) than the KG Consortium did (KRW 5,000 per-share) as support for their argument that the creditors committee failed to maximize their return on the sale, this fact actually undercuts their argument.  *See* Def. Br. at 22; Def.-Int. Br. at 28.  The KG Consortium conditioned its bid on the fourth D/E swap, and the higher prices paid by the creditors in the swap thus represent measures that the creditors committee took to *increase* the market value of Dongbu and secure the successful sale of the company.

subsidies in the *Final Results* as the basis for concluding that KG Consortium's bid did not reflect fair, maximized market value is unreasonable and unsupported because these measures increased the transaction price.

Defendant-Intervenor takes issue with Dongbu's statement that the transaction "involved private, unrelated parties" given that the creditors committee included a majority of government owned financial institutions.  Def.-Int. Br. at 27-28.  Dongbu clarifies that the statement in its brief was intended to demonstrate that the transaction occurred between two unrelated parties acting in their own interest, Pl. Br. at 33, which is the definition of an arm's-length transaction, *Final Modification*, 38 Fed. Reg. at 37,127.[4]  The acquisition of Dongbu by the KG Consortium meets this definition because there is no question that the parties were unaffiliated.  CR 6 (PR 34) at Exhibit 1.  Also, Commerce found that there is no evidence "that either the GOK or GOK-owned policy banks exercised influence over the KG Consortium."  CR 259 (PR 176) at 13.  The investment by K-Growth in Cactus Special Situations No. 1 Co. Ltd. ("Cactus") that Defendant-Intervenor raises does not change these facts or suggest that Cactus did not negotiate the transaction in its own self-interest.  *See* Def.-Int. Br. at 28.[5]

Lastly, Defendant-Intervenor claims that the criteria for extinguishment are not met because the creditors committee did not sell "all or substantially all" of Dongbu and that the KDB retained significant influence over Dongbu.[6]  Def.-Int. Br. at 29.  Commerce, however,

---

[4] Dongbu acknowledges its characterization of the parties to the Dongbu sale as "private" and clarifies that this was inadvertent and the focus is on the fact that the parties were unrelated.

[5] This argument about Cactus is another *post-hoc* rationalization offered by Defendant-Intervenor.  *Itochu Building Prods. v. United States*, 163 F. Supp. 3d at 1337-38.

[6] The *Final Modification* requires that in the change of ownership, "the government sold its ownership of all or substantially all of a company or its assets, retaining no control."  *Final Modification* at 37,127.

NON-CONFIDENTIAL

never disputed that the creditors committee sold substantially all of Dongbu's shares to the KG Consortium or otherwise maintained any control, and thus this is yet another *post-hoc* argument that should not be considered.

Even if considered, the record shows that the creditors committee sold substantially all of Dongbu's shares and the KG Consortium assumed control of the company.  In connection with the sale of Dongbu, new shares were issued to the KG Consortium and the members of the creditors' committee (who swapped debt for equity); the new shares accounted for 96.15 percent of Dongbu's total shares.[7]  CR 81-156 (PR 74-78) at 39, 44, Exhibit B-30, Exhibit B-31.  Only 3.85 percent of the pre-acquisition shares thus remained.  As a result of the transaction, private companies held [          ] percent of Dongbu's shares.  CR 259 (PR 176) at 13 (noting that the GOK-related entities own merely [          ] percent after the transaction, the vast majority of which were new shares).  The transaction also resulted in the dissolution of the creditors committee and almost all of Dongbu's board members and managing directors being replaced.  CR 81-156 (PR 74-78) at 39, 62, Exhibit B-30 (Agenda Item No. 4); CR 6 (PR 34) at Exhibit 3.  The fact that some of the former members of the creditors committee, including some government entities such as the KDB, continued to hold a minority of shares after the sale does not alter the fact that substantially all of Dongbu's shares were sold and the KDB-led creditors committee retained no control after the transaction was complete.

---

[7] In connection with the sale, Dongbu issued 72,000,000 new shares to the KG Consortium and 24,200,000 news shares to creditors in the fourth D/E swap after converting their debt to equity.  At the end of 2019, Dongbu had 100,055,019 total shares outstanding. (24,200,000+72,000,000)/100,055,019=96.15 percent.  CR 81-156 (PR 74-78) at Exhibit 12-A n.20.

**D.      Commerce Must Calculate the Uncreditworthy Benchmark Rate and The Unequityworthy Discount Rate According To the Plain Language Of Its Regulations.**

In its opening brief, Dongbu argued that Commerce's use of a three-year term in the calculation of the uncreditworthy benchmark rate and the unequityworthy discount rate was contrary to the plain language of 19 C.F.R. § 351.505(a)(3)(iii), which provides that Commerce must use as variable "n" the actual term of Dongbu's loans and the average useful life ("AUL") allocation.  Pl. Br. at 36-41.  The record demonstrates that the applicable term for Dongbu's restructured loans is six years, CR 81-156 (PR 74-78) at 39, 45, and the AUL applicable to the equity infusion allocation is 15 years, CR 81-156 (PR 74-78) at 15.  Therefore, Commerce should have used six years as the term of the loan for the uncreditworthy benchmark calculation and 15 years as the AUL for the unequityworthy benchmark calculation.  CR 270-71 (PR 214) at Tab "UCW BM."  The use of the correct "n" variable would have resulted in Commerce using the Moody's default rate data for six- and 15-year time periods, respectively, in the uncreditworthy and unequityworthy benchmark calculations.

Defendant argues that the "term of the loan is irrelevant here because Commerce can rely only on information that is on the record."  Def. Br. at 25.  According to Defendant, because the record only had a three-year long term interest rate paid by a creditworthy company to use as variable "$i_f$" in the calculation, Commerce had to use a three-year term for the loan and AUL allocation to be consistent.  *Id.*  Defendant's argument is unpersuasive.

The regulation requires that Commerce will use the "term of the loan" for the uncreditworthy benchmark calculation, and the AUL allocation period for the unequityworthy benchmark calculation.  19 C.F.R. § 351.505(a)(3)(iii) states that if "a firm that received a government-provided *long-term loan* was uncreditworthy," then Commerce "will calculate the interest rate to be used in making the comparison… where: n = the *term of the loan*."  19 C.F.R.

§ 351.505(a)(3)(iii) (emphasis added).  When promulgating the regulation, Commerce stated that it "will use the average cumulative default rate for the number of years corresponding to the *length of the loan*" and that "using a default rate that is *directly linked to the term of the loan* is a better reflection of the risk associated with long-term lending to uncreditworthy borrowers." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,365 (Dep't Commerce Nov. 25, 1998) (emphasis added).  The regulation thus ties the variable "n" to the term of the loan and thus establishes the number of years for selecting the Moody's default rate data used in the uncreditworthy benchmark calculation.

The same is true for the unequityworthy benchmark calculation, except that Commerce uses the AUL for variable "n."  19 C.F.R. § 351.507(c) provides that "the benefit conferred by an equity infusion shall be allocated over the same time period as a non-recurring subsidy" and pursuant to 19 C.F.R. § 351.524(d)(2)(i) Commerce presumes "the allocation period for non-recurring subsidies to be the AUL."  The regulation directly states that when allocating the benefit for non-recurring subsidies, Commerce will apply its formula "where: n = the AUL," and the Moody's default rate data is derived for the "n" period.  19 C.F.R. § 351.524(d)(1).  Thus, Commerce should have used the 15-year AUL period as variable "n," and the Moody's default rate data for 15 years that was on the record.  CR 260-61(PR 177) at Attachment II.

Commerce's decision in *LCA from Canada* supports this interpretation.  *See 100- to 150-Seat Large Civil Aircraft From Canada:  Final Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 61,252 (Dep't Commerce Dec. 27, 2017) and accompanying Decision Memorandum at 55 ("*LCA from Canada*").  In *LCA from Canada*, the Government of Canada placed Canada-specific default rate data from Moody's on the record and the respondent, Bombardier, placed Standard and Poor's ("S&P") U.S. default data on the record.  *LCA from*

*Canada* at 55.  Bombardier argued that Commerce should have used the S&P U.S. data because it had default rate data for a fifteen-year time period, which matched the time period for program at issue, launch aid.  *Id.*  However, in its determination, Commerce used the Canada-specific Moody's data, although the data only went up to year five, because it determined the Moody's data from Canada was more specific to the program at issue.  *Id.*  Commerce explained that "when the *term of the loan or benefit allocation period* exceeds the term of the default data, Commerce's practice is to use the final year of the available data" for the default rates and thus it used the year-five data because it was closest to the fifteen-year term of the launch aid program. *Id.* (emphasis added).  Importantly, Commerce did not find that it had to use the term from the comparable long-term creditworthy interest rate (*i.e.*, the interest rate it used as variable "$i_f$") as the term of the loan (variable "n") in its uncreditworthy benchmark calculation.  *Id.*

*LCA from Canada* thus stands for the proposition that Commerce uses default rate data that, in addition to being comprehensive, is most specific to the respondent's actual loan terms and AUL when calculating uncreditworthy and unequityworthy benchmarks.  *Id.*; *see also Final Affirmative Countervailing Duty Determination: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 Fed. Reg. 37,122 (Dep't Commerce June 23, 2003) and accompanying Decision Memorandum at Comment 18 (finding that Commerce should use a three-year default rate because the loans at issue "have a three year term").

Defendant-Intervenor claims that *LCA from Canada* actually supports that Commerce modifies variable "n" "when confronted with limitations in the record."  Def.-Int. Br. at 30.  But the "limitation in the record" in *LCA from Canada* was that the Canada-specific Moody's data only had five years of data, not that the comparable interest rate on that record did not match the term of the respondent's loan.  *LCA from Canada* at 55.  Here, there is no dispute that Commerce

has on this record the Moody's default rate data for six- and 15-year time periods that it needs to properly calculate the uncreditworthy and unequityworthy benchmarks.  CR 260-61 (PR 177) at Attachment II.

The only real defense offered by Defendant and Defendant-Intervenor for ignoring the plain language of the regulation is that, because interest rates for six- and 15-year loans held by creditworthy companies in Korea are not on the record, the terms specific to Dongbu are allegedly "irrelevant."  Def. Br. at 25; Def.-Int. Br. at 30-31.  This argument is misplaced. Commerce was the one that *sua sponte* put the comparable three-year interest rates on the record in the first instance.  CR 260-61 (PR 177) at Attachment III.  Also, Commerce routinely uses the yield on three-year corporate bonds as the proxy long-term interest rate on comparable creditworthy loans for variable "$i_f$" regardless of the length of the actual loan.  PR 173 at 10. There was thus no missing information from the record, certainly not any information that Dongbu failed to provide.

In sum, Commerce may not disregard record information regarding the actual terms of Dongbu's loans and AUL period in search for alleged consistency that is not even contemplated by the plain language of the regulations.

## II.    <u>CONCLUSION AND RELIEF REQUESTED</u>

Based on the foregoing, Dongbu respectfully requests that this Court reject the arguments made by Defendant and Defendant-Intervenor and (i) hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law; (ii) remand the case to Commerce with instructions to correct the errors identified by the Court; and (iii) for such other and further relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4116

*Counsel to Plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd.*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the Standard

Chambers Procedures of the U.S. Court of International Trade in that it contains 6,985 words

including text, footnotes, and headings and excluding the table of contents, table of authorities

and counsel's signature block, according to the word count function of Microsoft Word 2016

used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills