C-580-879
Remand
Slip Op 23-98, Court No. 22-00047
POR:  01/01/2019 – 12/31/2019
~~Business Proprietary Document~~
E&C/OVIII:  TEAM
PUBLIC VERSION

***KG Dongbu Steel Co., Ltd. v. United States*,**
**Court No.  22-00047, Slip Op. 23-98 (CIT July 7, 2023)**
**Certain Corrosion-Resistant Steel Products from the Republic of Korea**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the Court of International Trade (Court or CIT)

in *Nucor Corporation v. United States*, Consol. Court No.  22-00047, Slip Op. 23-98 (July 7,

2023) (*Remand Opinion and Order*).  These final results of redetermination concern *Certain*

*Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results and Partial*

*Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 2759 (January 19, 2022)

(*AR 2019 Final Results*), and accompanying Issues and Decision Memorandum (IDM).  In the

*Remand Opinion and Order*, the Court ordered Commerce to reconsider or further explain:  (1)

its determination that the first through third debt-to-equity restructurings provided a

countervailable benefit; (2) its determination that the benefits from the debt-to-equity

restructurings passed through from Dongbu Steel Co., Ltd. (Dongbu Steel) to KG Dongbu Steel

Co., Ltd. (KG Dongbu Steel) despite the change in ownership; (3) whether Commerce's

calculations of the uncreditworthy benchmark rate are supported by substantial evidence; and (4)

whether Commerce's calculations of the unequityworthy discount rate are supported by

substantial evidence.

As discussed below, pursuant to the Court's *Remand Opinion and Order*, Commerce has further explained its rationale for determining that the first through third debt-to-equity restructurings provided a countervailable benefit, that a benefit passed through to the new ownership, and that the uncreditworthy benchmark rate and unequityworthy discount rate are supported by substantial evidence.

## II.   BACKGROUND

On September 3, 2020, Commerce initiated an administrative review of certain corrosion-resistant steel products (CORE) from the Republic of Korea (Korea) for 39 producers and exporters of subject merchandise for the period January 1, 2019, through December 31, 2019.[1] On October 6, 2020, Commerce selected KG Dongbu Steel and Hyundai Steel Company (Hyundai Steel) as the mandatory respondents in this administrative review.[2]

We issued the *Preliminary Results* of the administrative review on July 16, 2021, and preliminarily found that KG Dongbu Steel received a 10.52 percent subsidy rate.[3] On August 26, 2021, Nucor, KG Dongbu Steel, and Hyundai Steel all filed timely case briefs.[4] On August 26, 2021, Dongkuk Steel Mill Co., Ltd. (Dongkuk) filed a letter in lieu of a case brief.[5] On September 7, 2021, Nucor, Hyundai Steel, KG Dongbu Steel, and the Government of Korea (GOK) each timely filed rebuttal briefs.[6]

---

[1] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 54983 (September 3, 2020).
[2] *See* Memorandum, "Respondent Selection," dated October 6, 2020.
[3] *See Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86 FR 37740 (July 16, 2021) (*AR 2019 Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[4] *See* KG Dongbu Steel's Letter, "Dongbu's Case Brief," dated August 26, 2021; *see also* Hyundai Steel's Letter, "Hyundai Steel's Case Brief," dated August 26, 2021.
[5] *See* Dongkuk's Letter, "Letter in Lieu of Case Brief," dated August 26, 2021.
[6] *See* Nucor's Letters, "Nucor's Rebuttal Brief regarding KG Dongbu Steel," dated May 11, 2021; and "Nucor's Rebuttal Brief regarding Hyundai Steel," dated May 11, 2021; *see also* Hyundai Steel and KG Dongbu's Letter, "Respondents' Rebuttal Brief," dated September 7, 2021; and GOK's Letter, "GOK's Rebuttal Brief," dated September 7, 2021.

Commerce published its *AR 2019 Final Results* on January 19, 2022.  In the *AR 2019 Final Results*, Commerce calculated a 10.51 percent subsidy rate for KG Dongbu Steel, which was also assigned to the non-selected companies.  In Comment 7 of the IDM, Commerce addressed the parties' arguments regarding whether KG Dongbu Steel was equityworthy and whether the 2015-2018 debt-to-equity swaps should be countervailed.  Commerce continued to find that the entire amounts of the debt-to-equity infusions were made by GOK-owned or controlled financial institutions and that KG Dongbu Steel was not equityworthy at the time of these infusions.

In Comment 8 of the IDM, Commerce explained that it continued to find that benefits to Dongbu Steel would have passed through to KG Dongbu Steel when the ownership changed.  KG Dongbu Steel was given an opportunity to rebut Commerce's presumption that benefits would pass through to the new owners but declined to respond to the *Change-in-Ownership Appendix*.  Without a response to the questions in that appendix, we followed our standard practice and found that any benefit to Dongbu Steel would pass through to KG Dongbu Steel.

In Comment 9 of the IDM, Commerce explained that it continued to find that the use of three-year Korean won (KRW)-denominated AA-rate corporate bonds published by the Bank of Korea for the calculation of the uncreditworthy interest rate was appropriate for the long-term loans and bonds benefit calculation.  Commerce rejected the argument that we should use a six-year creditworthy interest rate because there was no six-year rate on the record.  The only six-year rate available is from the creditors committee, which we found to be GOK-owned or controlled.

In Comment 10 of the IDM, Commerce explained that it continued to find that the use of a discount rate for uncreditworthy companies, calculated using three-year KRW-denominated

AA-rate corporate bonds published by the Bank of Korea, was appropriate for the allocation of the benefit conferred by the fourth equity infusion.

## III.     REMAND OPINION AND ORDER

In the *Remand Opinion and Order*, the Court found that Commerce did not sufficiently explain or cite new information on the record of this review, in departing from Commerce's prior decisions in the preceding segments of this proceeding.[7]  Specifically, the Court noted that in the instant review, Commerce found that the first through third debt-to-equity restructurings provided a countervailable subsidy, although it reviewed the same debt-to-equity restructurings in prior reviews and found them not countervailable.[8]  The Court found that Commerce's departure from its prior practice was arbitrary and not in accordance with the law, because Commerce failed to provide an adequate explanation for its decision to deviate from its prior determinations.  The Court, therefore, ordered Commerce to reconsider or further explain its decision that the first through third debt-to-equity restructurings provided a countervailable subsidy to KG Dongbu Steel, finding that "the record evidence cited by Commerce as justification for its deviation from its past practice does not deal directly with the first through third debt-to-equity restructurings and is not a sufficient explanation to justify departing from its standard practice."[9]

Therefore, as ordered, Commerce is providing further explanation regarding its rationale for departing from its previous findings that the first three debt-to-equity restructurings provided no countervailable subsidy, and how the information found on the record in the instant administrative review supports a deviation from the prior determinations.

---

[7] *See Remand Opinion and Order* at 8.
[8] *Id.*
[9] *Id.* at 12.

Secondly, in the *Remand Opinion and Order*, the Court ordered Commerce to reconsider or further explain its decision regarding whether the debt-to-equity restructuring benefits "passed through" upon the change in ownership from Dongbu Steel to KG Dongbu Steel.[10]  The Court noted that, as the Court remanded Commerce's determination that the first through third debt-to-equity-restructurings provided a countervailable subsidy to Dongbu Steel, on remand, Commerce may reconsider the record with respect to whether KG Dongbu Steel received any countervailable subsidies.[11]  Therefore, the Court ordered Commerce to reconsider whether substantial evidence supports a determination that any change in ownership occurred at arm's length and for fair market value and extinguished any alleged subsidies from the first through third debt-to-equity restructurings to KG Dongbu Steel.[12]

Third, in the *Remand Opinion and Order*, the Court found that Commerce's application of the loan benchmark calculation formula for uncreditworthy companies and subsequent determination to use a three-year loan term was not supported by substantial evidence because Commerce should consider the potentially contrary evidence presented by KG Dongbu Steel, Dongbu Steel, and Dongbu Incheon Steel Co., Ltd. (collectively, Plaintiffs).[13]  The Court noted that, despite Commerce's assertion that there was no information on the record regarding any six-year interest rate, the Plaintiffs cited potentially contrary record evidence indicating that the "{r}epayment date of outstanding loans was extended from December 31, 2020, to December 31, 2025{.}"[14]  Thus, the Court ordered Commerce to reconsider record evidence and further substantiate the loan term used to calculate the uncreditworthy benchmark interest rate.

---

[10] *Id.* at 14-15.
[11] *Id.* at 15.
[12] *Id.*
[13] *Id.* at 17.
[14] *Id.* (citing KG Dongbu Steel's Letter, "Initial Questionnaire Response," dated December 2, 2020 (KG Dongbu Steel's IQR) at 45).

Specifically, regarding Commerce's determination to use the three-year interest rate on the record to calculate the benchmark interest rate to measure the countervailable loans and bonds, the Court observed that the record evidence indicates that the loan term might be closer to six years, and that Commerce should reconsider the record evidence.[15]

Lastly, in the *Remand Opinion and Order*, the Court noted that as it remanded Commerce to reconsider whether the record evidence establishes a loan term of six years or three years, the Court also remanded Commerce's calculation of discount rates in determining the amount of benefit in each year of the fifteen-year allocation period for the average useful life (AUL) of the relevant assets based on Commerce's reconsideration of the record evidence.[16]

Therefore, as ordered, we have addressed each of the above-described issues in our analysis below and provided further explanation regarding Commerce's analysis of the record evidence.

## IV.   REMANDED ISSUES

### A.   Commerce's Determination that the First Through Third Debt-to-Equity Restructurings Provide a Countervailable Subsidy

As requested by the Court, we further explain our determination that a countervailable subsidy was conferred to KG Dongbu Steel through the first to third debt-to-equity restructurings.[17]  First, we explain our rationale for departing from our previous finding that the first three debt-to-equity restructurings provided no countervailable benefit.  Our departure from the prior determination in this instance is consistent with Commerce's practice.  While it is true that Commerce's initial questionnaire indicates that in administrative reviews, absent new information, we do not usually re-evaluate prior determinations regarding the countervailability

---

[15] *Id.*
[16] *Id.* at 18.
[17] *Id.* at 8-13.

of a program, we clarify that this normally means that we do not revisit our prior financial

contribution and specificity determinations absent new information.  This is consistent with the

decisions of the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) in *Magnola*

*Metallurgy, Inc.*[18] and *PPG Industries, Inc.*,[19] in which the Federal Circuit affirmed that prior

decisions of specificity (whether negative or affirmative) need not be revisited in a later segment

of the same proceeding absent new evidence.  Consistent with this practice and the Federal

Circuit decisions, we stated in the *Preliminary Results* of this review that in the investigation and

prior administrative reviews, we had already determined that KG Dongbu Steel's debt

restructurings, including the debt-to-equity infusions, constituted financial contributions, were

specific, and, therefore, we were not revisiting these findings.[20]

However, for benefit, we normally require respondents to report benefit information for

the relevant period of review (POR) and re-evaluate the benefit information and recalculate the

benefits conferred for that POR.  The rationale behind our practice is that a government normally

does not change the structure of a subsidy program frequently.  However, the amount of benefit

conferred to a company could vary between PORs.[21]  This practice is consistent with section

751(a)(1)(A) of the Tariff Act of 1930, as amended (the Act), which states that a CVD

administrative review is conducted to "review and determine the *amount* of any net

countervailable subsidy" (emphasis added), not to review and determine whether any previously

found subsidies continue to exist.  Determining the "amount" of a subsidy fundamentally

involves an analysis of benefit under section 771(5)(E) of the Act.  This is evident by our

---

[18] *See Magnola Metallurgy, Inc. v. United States*, 508 F.3d 1349 (Fed. Cir. 2007) (*Magnola Metallurgy, Inc.*).
[19] *See PPG Industries, Inc. v. United States*, 978 F. 2d 1232 (Fed. Cir. 1992) (*PPG Industries, Inc.*).
[20] *See AR 2019 Preliminary Results* PDM at 13-14.
[21] *See Certain Hot-Rolled Carbon Steel Flat Products from India:  Final Results of Countervailing Duty Administrative Review*, July 26, 2010 (75 FR 43488), and accompanying IDM at Comment 5.

determination in this case.[22]  This is also evident by our questionnaires for each program.  As clearly stated in our initial questionnaire:

> "Please answer all questions in the *Standard Questions Appendix* and *Usage Appendix*.  If there were no changes to the program during the POR, please so state; you do not need to provide a response to the *Standard Questions Appendix* if there were no changes to the program."[23]

It is important to point out that we did not state that respondents did not need to respond to the *Usage Appendix*, which is where Commerce normally finds benefit information.  In the 2019 administrative review (AR 2019), we further asked for specific information about the debt-to-equity restructuring to allow Commerce to re-evaluate benefit.  In AR 2019, consistent with our practice, we did not re-evaluate the financial contribution and specificity already found to exist; rather, we re-evaluated benefit conferred by the debt-to-equity restructuring.[24]

When we re-evaluated the benefit conferred under the debt-to-equity restructuring, we realized that we had made a mistake in the prior review.  In AR 2019, given that there was a new, fourth debt-to-equity infusion, we had to re-evaluate the total benefit conferred under the four debt-to-equity infusions in order to calculate a single subsidy rate for the program.[25]  As part of the re-evaluation, we realized that our prior finding that no benefit was conferred by the first three debt-to-equity restructurings was inconsistent with 19 CFR 351.507.  As explained below, we evaluated the AR 2019 record and made our determination in accordance with 19 CFR 351.507.

---

[22] *See AR2019 Final Results* IDM at Comment 7.
[23] *See* Commerce's Letter, "Countervailing Duty Questionnaire," dated October 6, 2020 (Initial Questionnaire), at pdf page 28.
[24] *See AR 2019 Preliminary Results* PDM at 13-14, unchanged in *AR 2019 Final Results* IDM.
[25] Specifically, we note that the record in the instant review, unlike that in the prior reviews, indicates there were private investors independent from the creditors' committee involved in the fourth equity infusion during the 2019 POR.

Further, after the CIT affirmed our *Final Redetermination*[26] in *Nucor 2021*, in which we continued to find that Dongbu Steel's private bank loans would be inappropriate to use as a loan benchmark, as these loans were provided as part of a government loan program,[27] we determined that it would be inconsistent with our regulations and *Nucor 2021* if we use KG Dongbu Steel's private bank loans as a benchmark for the debt-to-equity infusions.  As explained extensively in our *Final Redetermination*, all of the creditor banks, including the private banks, were obligated to participate in the debt restructuring, which provided the GOK-owned and controlled banks with the ability to establish the financial terms of the debt restructurings, which include both the loan restructuring and debt-to-equity restructuring.[28]  We explained that the private banks which provided loans to Dongbu Steel were under significant government influence and, therefore, we could not rely on Dongbu Steel's private banks as a loan benchmark.[29]  Similarly, the record of this review shows that both the loan restructuring and the debt-to-equity infusions were approved by the same creditor banks and the terms of the loan restructuring and the debt-to-equity infusions were agreed to at the same time.[30]  It would be inconsistent for Commerce to find on the one hand that the GOK-controlled policy banks have significant influence over the loan portion of the debt restructuring, and on the other hand that the same banks did not have such influence over the debt-to-equity portion of the debt restructuring.  Therefore, we had to re-evaluate our prior determination of the benefit under the debt-to-equity infusions.

---

[26] *See Final Results of Redetermination Pursuant to Court Remand, Nucor Corporation v. United States*, 461 F.Supp.3d 1374, dated September 30, 2020 (*Final Redetermination*), available at https://access.trade.gov/Resources/remands/20-92.pdf.

[27] *See Nucor Corporation v. United States*, 494 F.Supp.3d 1377, 1381 (CIT 2021) (*Nucor 2021*).

[28] *See Final Redetermination* at 5-7.

[29] *Id.*

[30] *See* Memorandum, "Preliminary Analysis Memorandum – Equity Infusions," dated July 12, 2021 (Equity Infusions Analysis Memorandum), at 5.

Second, we explain that our determination is supported by substantial evidence. Commerce's regulation at 19 CFR 351.507(a) states that "{i}n the case of a government-provided equity infusion, a benefit exists to the extent that the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made."  Commerce considers an equity infusion to be inconsistent with usual investment practice if the price paid by the government for newly issued shares is greater than the price paid by private investors for the same (or similar form of) newly issued shares.[31]  Commerce does not consider private sector investor prices if Commerce concludes that private investor purchases of newly issued shares are not significant.[32]  As outlined in the Equity Infusions Analysis Memorandum, as well as the preliminary and final decision memoranda, a comprehensive review of the totality of the evidence, including the underlying Agreements and the ownership of Dongbu Steel, indicates that GOK-controlled policy banks, in particular the Korea Development Bank (KDB), exercised significant influence over the debt restructurings, which included the debt-to-equity conversions.[33]  Private creditors on the creditors councils did not evaluate the reasonableness of the rate of return on any equity they were considering investing in the company in each debt-to-equity conversion.[34]  Rather, they were considering how best to limit their losses.  However, as

---

[31] *See* 19 CFR 351.507(a)(2)(i).
[32] *Id.*; *see also* 19 CFR 351.507(a)(2)(iii).
[33] *See* Equity Infusions Analysis Memorandum at 1-21; *see also AR 2019 Preliminary Results* PDM at 15-18; and *AR 2019 Final Results* IDM at 42-51.
[34] *See* Equity Infusions Analysis Memorandum at 9-13.

affirmed by the Court in *British Steel Corp.*[35] and *Hynix Semiconductor, Inc.*,[36] Commerce's practice in analyzing the significance of private investor participation is to conduct the analysis from the perspective of an outside investor, and not an existing investor that is simply trying to minimize its losses.  Further, in terms of the percentage of shares held by GOK-controlled creditors compared to private creditors, our determination that the private participation was not significant is in line with our practice.[37]  Therefore, the participation of KG Dongbu Steel's private creditors in the first, second, and third equity infusions was not significant.  Accordingly, we cannot rely on the prices paid by the private creditors on the creditors councils for the purpose of determining a benchmark.

Section 351.507(a)(3) of Commerce's regulations states that "{i}f actual private investor prices are not available under paragraph (a)(2) of this section, the Secretary will determine whether the firm funded by the government-provided equity was equityworthy or unequityworthy at the time of the equity infusion.  If {Commerce} determines that the firm was equityworthy, {Commerce} will apply paragraph (a)(5) of this section to determine whether the equity infusion was inconsistent with the usual investment practice of private investors.  A determination by {Commerce} that the firm was unequityworthy will constitute a determination that the equity infusion was inconsistent with usual investment practice of private investors, and

---

[35] *See British Steel Corp. v. United States*, 632 F. Supp. 59, 65 (CIT 1986) (*British Steel Corp.*) (stating that "{s}imply put, it would be unrealistic to expect a private investor to supply operating funds to a loss-incurring firm merely to permit the firm to continue operations to minimize its losses" and that "it would not be commercially reasonable for an investor to provide funds for that purpose without adequate assurance of the future profitability of the enterprise and a return on his investment within a reasonable time").

[36] *See Hynix Semiconductor, Inc. v. United States*, 425 F. Supp. 2d 1287, 1313 (CIT 2006) (*Hynix Semiconductor*) (affirming Commerce's approach that "the existence and status of previous investments in a company are extraneous considerations when weighing new investment in the same company").

[37] *See Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea:  Final Affirmative Countervailing Duty Determination*, 77 FR 17410 (March 26, 2012) (*Refrigerators from Korea*), and accompanying IDM at Comment 26.

{Commerce} will apply paragraph (a)(6) of this section to measure the benefit attributable to the equity infusion."[38]

As explained in the Equity Infusions Analysis Memorandum, we continue to determine that KG Dongbu Steel was unequityworthy at the time of the first, second, and third debt-to-equity conversions.  Therefore, we continue to find the equity infusions were inconsistent with usual investment practice of private investors and the entire amount of the equity infusions relating to the first, second, and third debt-to-equity conversions to be the benefit.[39]

**B.    Commerce's Determination that the Benefits of the Debt-to-Equity Restructurings Provided a Countervailable Benefit during the POR**

As requested by the Court, we further explain our determination that countervailable subsidies "passed through" to KG Dongbu Steel after ownership of the company changed.[40]

In Commerce's initial questionnaire issued to the respondents on October 6, 2020, we explained that the respondents would need to answer certain questions if ownership of the company changed during the AUL period:

> When a company has been privatized or has changed ownership, in whole or part, during the AUL period, Commerce has a baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period. If a company wishes to challenge the baseline presumption, please coordinate with the company to answer the questions in the *Change-in-Ownership Appendix*.[41]

Included in the appendices of this questionnaire is the above-mentioned *Change-in-Ownership Appendix*, which affords the respondents an opportunity to provide us with the information necessary to determine whether any possible subsidies during the AUL period pass through to the new owners or were extinguished during the sale.  The *Change-in-Ownership Appendix*

---

[38] *See* 19 CFR 351.507(a)(3).
[39] *See AR 2019 Preliminary Results* PDM, unchanged in *AR 2019 Final Results* IDM.
[40] *See Remand Opinion and Order* at 14-15.
[41] *See* Initial Questionnaire at Section II, Change-in-Ownership Appendix.

implements section 771(5)(F) of the Act, as well as Commerce's *Final Modification*.[42]  Under

section 771(5)(F) of the Act, a change in ownership of all or part of a foreign enterprise "does

not by itself" require a determination by Commerce that a past countervailable subsidy received

by the enterprise no longer continues to be countervailable, even if the change in ownership is

accomplished through an arm's-length transaction.  Under the *Final Modification*, Commerce's

baseline presumption is that non-recurring subsidies can benefit the recipient over a period of

time (*i.e.*, allocation period) normally corresponding to the AUL of the recipient's assets.[43]

However, an interested party may rebut this baseline presumption by demonstrating that, during

the allocation period, a change in ownership of all or substantially all of a company or its assets

occurred, and that the sale was an arm's-length transaction for fair market value.[44]  Without a

response to the questions contained in the *Change-in-Ownership Appendix*, for the *AR 2019

Final Results*, we followed our practice to presume that any benefit to the company will also pass

through as a benefit to the new owners.

     Furthermore, in addition to soliciting this information in the questionnaire, Commerce

also asks respondents to state if they do not intend to rebut this presumption.  In section III part

D of Commerce's questionnaire, regarding any changes in ownership we state, "if your company

does not wish to challenge Commerce's baseline presumption that non-recurring subsidies

continue to benefit the recipient over the allocation period, please so state and you do not need to

provide a response to this appendix."[45]  In its initial affiliation questionnaire response dated

---

[42] *See Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 FR 37125 (June 23, 2003) (*Final Modification*).
[43] *Id.* at 37127.
[44] *Id.*  The *Final Modification* originally applied only to government privatizations.  However, Commerce extended the analysis in the *Final Modification* to private-to-private changes in ownership in *Certain Pasta from Italy:  Final Results of Seventh Countervailing Duty Administrative Review*, 69 FR 70657 (December 7, 2004), and accompanying IDM at 2-5.
[45] *Id*. at Section III, Part I, Question D.

October 27, 2020, KG Dongbu Steel declined to rebut Commerce's presumption.[46]  Specifically,

on pages 10 through 12, responding to Section III part D. of Commerce's questionnaire about

any changes in ownership, the company reported that:

> Dongbu had not been privatized, changed ownership, merged with another
> company, or devolved another company/companies from its corporate structure in
> whole or in part, during the AUL period… Dongbu does not wish to challenge the
> Department's baseline presumption and thus understands that no response to the
> Change-in-Ownership Appendix is required.[47]

KG Dongbu Steel explicitly declined to rebut Commerce's presumption that any possible

subsidies would have been extinguished.[48]  We note that once KG Dongbu Steel was selected as

a mandatory respondent in an administrative review, KG Dongbu Steel had the responsibility to

answer Commerce's questionnaires and supplemental questionnaires.  As stated above, our

questionnaire in this review had instructions indicating that KG Dongbu Steel could provide

information with respect to any changes in ownership.  KG Dongbu Steel had the burden to

challenge our baseline presumption, yet it chose not to do so.[49]  Based on KG Dongbu Steel's

response that it did not wish to challenge the baseline presumption, Commerce continued its

baseline presumption that non-recurring subsidies (*i.e.*, the debt-to-equity swaps prior to the

acquisition of Dongbu Steel) continue to benefit KG Dongbu Steel over the allocation period.

Therefore, consistent with our practice, we properly presumed that any non-recurring benefit

would pass through to the new owners.

---

[46] *See* KG Dongbu Steels's Letter, "Dongbu's Affiliated Companies Response," dated October 27, 2020 (KG Dongbu Steel's Affiliation Response), at 11-12.
[47] *Id.*
[48] *Id.*
[49] *See Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production should belong to the party in possession of the necessary information."); and *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("the burden of creating an adequate record lies with interested parties.") (internal quotation marks, alterations, and citation omitted).

14

**C.      Commerce's Calculations of the Uncreditworthy Benchmark**

As requested by the Court, we further explain our determination to use a three-year loan term interest rate to calculate the uncreditworthy benchmark rate.[50]

The Plaintiffs assert that KG Dongbu Steel's outstanding long-term loans and bonds were restructured during the POR, thus creating "new" loans and bonds with a term of six years.  The Plaintiffs argue, however, that Commerce's calculation of the benefit from the "new" loans that were restructured during the POR used an incorrect three-year loan term interest rate to measure the countervailable loans and bonds.

Under 19 CFR 351.507(c), the benefit conferred by an equity infusion shall be allocated over the same period as a non-recurring subsidy; 19 CFR 351.524(d) describes how Commerce should allocate a non-recurring subsidy and 19 CFR 351.351.524(d)(3) describes selection of a discount rate when allocating a non-recurring subsidy.  Specifically, 19 CFR 351.524(d)(3)(ii) contains an exception for uncreditworthy firms and states that Commerce will use as a discount rate the interest rate described in 19 CFR 351.505(a)(3)(iii), which is the formula for calculating the uncreditworthy interest rate.

The uncreditworthy interest rate formula has four variables:  (1) the term of the loan in question ($n$); (2) the long-term interest rate paid by a creditworthy company; (3) the probability of default of a creditworthy company in $n$ years; and (4) the probability of default of an uncreditworthy company in $n$ years.[51]

In *AR 2019 Final Results*, Commerce determined that while there were some private commercial banks involved in the debt restructuring of KG Dongbu Steel, the restructuring of

---

[50] *See Remand Opinion and Order* at 15-17.
[51] *See* 19 CFR 351.505(a)(3)(iii).

KG Dongbu Steel's debt was not overseen by those private banks.[52]  Instead, KG Dongbu Steel's

debt restructuring was controlled by the Creditor Bank Committee (CBC), which, in turn, was

controlled by GOK policy banks, such as the KDB.[53]  Therefore, Commerce determined that the

record of this case does not warrant any change from prior reviews.  Specifically, Commerce

found that the loans from private creditors on the CBC cannot be construed as "comparable

commercial loans," and thus, cannot be used as a commercial benchmark under section

771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(2), because the CBC is controlled by GOK-

controlled policy and special purpose banks.[54]  Therefore, Commerce used a three-year AA-rated

KRW interest rate, published by the Bank of Korea, as the long-term interest rate paid by a

creditworthy company because it was the only long-term interest rate available on the record.

No other long-term KRW interest rates were provided on the record by interested parties in this

review.

   The Plaintiffs cite allegedly contrary record evidence indicating that the "{r}epayment

date of outstanding loans was extended from December 31, 2020 to December 31, 2025."[55]  The

loan template that the Plaintiffs cite (*i.e.*, KG Dongbu Steel's IQR at Exhibit B-35), demonstrates

that the loans in question were provided by [                                        ], all of

which were member banks of the Dongbu Steel's Creditor Financial Institutions' Committee,

which took over the administration of Dongbu Steel's restructuring from the CBC, which in turn

---

[52] *See AR 2019 Preliminary Results* PDM at 14-15 (citing *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2015–2016*, 84 FR 11749 (March 28, 2019), and accompanying IDM)); *see also Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review*; 2017, 85 FR 15112 (March 17, 2020), and accompanying IDM at "Dongbu Debt Restructuring Program," unchanged in *AR 2019 Final Results*.
[53] *See AR 2019 Preliminary Results* PDM at 14-15, unchanged in *AR 2019 Final Results* IDM.
[54] *Id.*
[55] *See Remand Opinion and Order* at 17 (KG Dongbu Steel's IQR at 45).

was controlled by GOK policy banks.[56]  Therefore, we continue to find that there is no information on the record regarding a six-year interest rate for a comparable commercial loan. Moreover, we find that the loans from the alleged private banks to KG Dongbu Steel cannot constitute "comparable commercial loans" under 19 CFR 351.505(a)(2) due to the substantial government influence and the fact that they were part of a government program; therefore, these loans are unsuitable for purposes of the benchmark calculation.[57]

Therefore, with respect to the uncreditworthy interest rate formula, because there are no useable six-year loans available, Commerce continues to use three years for the term of the loan variable and the three-year creditworthy default and uncreditworthy default rates.  This is consistent with the *Preamble*, which states that using "a default rate that is directly linked to the term of the loan is a better reflection of the risk associated with the long-term lending to uncreditworthy borrowers."[58]  Thus, the calculation Commerce used is the correct calculation for a three-year uncreditworthy discount rate, based on the formula specified by 19 CFR 351.505(a)(3)(iii), and information available on the record.  For further discussion, *see* Issue 3 below.

### D.    Commerce's Calculations of the Unequityworthy Discount Rate

As requested by the Court, we further explain our calculation of the discount rate in determining the amount of the benefit in each year of the 15-year allocation period for the average useful life of the relevant assets based our reconsideration of the record evidence.[59]

---

[56] *See* KG Dongbu Steel's IQR at 31.
[57] *See Nucor 2021*, 494 F.Supp.3d at 1381 ("{t}he court concludes that Commerce determined properly that Dongbu's loans could not be used for calculating a benchmark interest rate because the loans provided under the government program were non-commercial.  The court notes that the relevant statute and regulations do not require Commerce to use every loan received by a company as a benchmark.").
[58] *See Countervailing Duties*, 63 FR 65348, 65365, (November 25, 1998) (*Preamble*).
[59] *See Remand Opinion and Order* at 18.

Section 351.507(c) of Commerce's regulations dictates that the benefit conferred by an equity infusion shall be allocated over the same period as a non-recurring subsidy.  Sections 351.524(d)(1) and (d)(3)(ii) of our regulations provide that, in the case of a firm considered to be uncreditworthy, Commerce will use as a discount rate the interest rate described in 19 CFR 351.505(a)(3)(iii), which is an exception for uncreditworthy company.  Therefore, as explained above, as Commerce continues to find that the use of an uncreditworthy benchmark rate, calculated using three-year KRW-denominated AA-rate corporate bonds published by Bank of Korea is supported by substantial evidence and is appropriate, we continue to find that the use of the same discount rate, calculated using three-year KRW-denominated AA-rate corporate bonds published by Bank of Korea, is appropriate for the allocation of the benefit conferred by the equity infusions.

## V.  SUMMARY AND ANALYSIS OF PLAINTIFFS' COMMENTS ON DRAFT REMAND RESULTS

Commerce released the Draft Remand Results to parties for comments on September 12, 2023.[60]  The Plaintiffs filed comments on the Draft Remand Results on September 19, 2023.[61] As explained below, we continue to reach the same conclusions that we reached in the Draft Remand Results.  We address each of the Plaintiffs' comments and provide our analysis in turn. No other interested parties commented on the Draft Remand Results.

**Issue 1:  Commerce's Determination that the First Through Third Debt-to-Equity Restructurings Provide a Countervailable Subsidy**

*Plaintiffs' Comments*

- The CIT instructed Commerce to reconsider or further explain its deviation from Commerce's established practice of not reviewing the countervailability of a program in the absence of new information, and from Commerce's consistent finding in all prior

---

[60] *See* Draft Remand Results.
[61] *See* Plaintiffs' Letter, "Dongbu's Comments on Draft Remand Redetermination" dated September 19, 2023 (Plaintiffs' Comments).

administrative reviews that no benefit was conferred to KG Dongbu Steel from the first three debt-to-equity swaps.[62]

- In the Draft Remand Results, Commerce fails to take the Court's remand instructions seriously, and did not point to any new information on the record. Instead, Commerce just expounds on previous arguments that have been considered and rejected.[63]

- First, for its questionnaire instructions that formed part of the basis for the Court's remand and which provide that "{a}bsent new information warranting a program reexamination, {Commerce} will not reevaluate prior determinations regarding the countervailability of programs," Commerce seeks to distance itself and states, that this practice of not re-examining prior subsidy decisions only applies to the financial contribution and specificity aspects, and not to the benefit aspect, and seeks to bolster that claim by citing two inapposite Federal Circuit decisions.[64]

- However, these cases broadly speaking stand for the proposition that Commerce does not have to revisit specificity determinations absent new evidence. This proposition is a far cry from saying that Commerce's practice of not reexamining the countervailability of a program absent new evidence is limited to financial contribution and specificity.

- The Court's finding in *PPG Industries, Inc.* undercuts Commerce's attempt to limit its non-reexamination practice to financial contribution and specificity. In that case, the Court stated that: "{a}dditionally, ITA has a longstanding administrative practice of not reinvestigating a program determined not to be countervailable unless the petitioner presents new evidence justifying reconsideration of a prior finding." No distinction is made between the particular elements of the non-countervailable determination.[65]

- Benefit is one of the three elements needed for a countervailable subsidy to exist. This formulation of Commerce's agency practice is also consistent with its questionnaire instructions that make no distinction about the basis for the previous non-countervailable determination.[66] Accordingly, Commerce's attempt to demonstrate that its established agency practice does not apply to benefit determinations is unpersuasive.[67]

- Commerce next attempts to explain why it needs to "re-evaluate the benefit information and recalculate the benefits conferred" in each separate administrative review. Commerce's explanation is inapposite to this case, because the need to recalculate the amount of benefit in each review is only necessary in cases where Commerce has previously found the program to be countervailable.[68]

- In this instant case, Commerce had consistently found that the first three debt-to-equity swaps did not provide a countervailable subsidy, therefore, there was no need to recalculate any benefit because there was none.[69]

---

[62] *Id.* at 2.
[63] *Id.*
[64] *Id.* at 3 (citing *PPG Industries, Inc.*, 978 F. 2d at 1242; and *Magnola Metallurgy, Inc.*, 508 F.3d 1232).
[65] *Id.*
[66] *Id.* at 4 (citing *Remand Opinion and Order* at 10).
[67] *Id.*
[68] *Id.*
[69] *Id.*

- Further, the concept of needing to recalculate a benefit amount for each review is inapplicable for this particular program.  Commerce determined in all prior reviews that the first three debt-to-equity restructurings did not confer a benefit to KG Dongbu Steel.[70]
- Unlike determining the amount of a benefit under a subsidy program that changes year to year, the benefit determination here was the equivalent of a non-countervailability determination.  It had nothing to do with the amount of benefit to be calculated for a particular time period.  Even if it did, when Commerce finds a non-recurring subsidy like the debt-to-equity restructurings in this case, it employs a declining-balance methodology that allocates at the time of its subsidy determination the whole subsidy amount received by calculating the benefit amount for each year of the average useful life allocation period.  No new calculation is required for determining the benefit (*i.e.*, numerator) in each subsequent review.  In such reviews, the only necessary information to calculate the subsidy rate from the program is the sales value (*i.e.*, denominator).
- Furthermore, in the immediately preceding segment of this review (*i.e.*, *AR 2018 Final Results*), Commerce specifically tied the possible re-examination of the benefit issue to the presence of new record evidence, and there was no such new evidence here to warrant a re-examination.[71]
- In the instant case, the facts did not change and thus there was no basis for Commerce to make an entirely new benefit determination under its own stated practice.  Although Commerce points out in a footnote that there was a factual change with the fourth debt-to-equity swap because unlike in prior reviews there were private creditors independent from the creditors' committee in the fourth equity infusion, this argument is just a rehash of Commerce's prior justification that was specifically found wanting by the Court.[72] The Court has already found that the record evidence cited by Commerce as justification for its deviation from its past practice does not deal directly with the first three debt-to-equity restructurings and is not a sufficient explanation to justify the departure from Commerce's standard practice.[73]
- Commerce tries to make something of the fact that its questionnaire instructions only instructed KG Dongbu Steel not to provide a response to the *Standard Questions Appendix* if there were no changes to the program but did not also say not to submit the *Usage Appendix*.[74]  Commerce's logic is that the *Usage Appendix* is relevant to benefit and so by not excusing KG Dongbu Steel from providing one even if there were no changes, Commerce was still reconsidering its benefit determination.  This is a thin reed to cling to as it ignores the fact that its main questionnaire instruction makes no such distinction between the elements of the subsidy determination,[75] and Commerce's logic requires an inference that this omission of a reference to the *Usage Appendix* means that Commerce was still reevaluating its benefit determination.[76]

---

[70] *Id.* (citing Draft Remand Results at 10).

[71] *Id.* at 5 (citing *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 FR 29237, 29238 (June 1, 2021) (*AR 2018 Final Results*), and accompanying IDM at 38 (emphasis added by the Plaintiffs).

[72] *Id.* at 7.

[73] *Id.*

[74] *Id.* at 6 (citing Draft Remand Results at 8).

[75] *Id.* (citing *Remand Opinion and Order* at 10).

[76] *Id.*

- Although Commerce has failed to explain why it was justified in re-evaluating its benefit determination even though there was no new evidence, it goes on to claim that upon reexamination of the benefit determination it realized it made a mistake in the prior review.  The alleged "mistake" is twofold:  Commerce first relies on the Court's finding in *Nucor 2021* to argue that KG Dongbu Steel's private bank loans are unusable for purposes of the benchmark because they were provided as a government loan program, thus were subject to government influence.  However, the Court has already rejected Commerce's reliance on *Nucor 2021* to bolster its determination to deviate from its prior determination and found that Commerce had "failed to provide an adequate explanation for its decision to deviate from its prior determinations."[77]
- The second problem is that the entire discussion in *Nucor 2021* was related to whether the "loans" provided by the private banks on the Creditors Committee constituted "comparable commercial loans" for purposes of 19 CFR 351.505(a)(2), not whether private investor participation was "significant" under 19 CFR 351.505(a)(2)(iii) for equity infusions.  Thus, Commerce's reconsideration of the loan benchmark issue in *Nucor 2021* does not reasonably explain Commerce's abandonment of its established practice of treating private investor participation as significant for purposes of the debt-to-equity swaps.
- Commerce next claims that its prior finding of no benefit was inconsistent with 19 CFR 351.507, because "Commerce's practice in analyzing the significance of private investor participation is to conduct the analysis from the perspective of an outside investor, and not an existing investor that is simply trying to minimize its losses."[78]  As support for this practice Commerce cites to *British Steel Corp.* and *Hynix Semiconductor, Inc.*  These cases are inapposite.
- In *British Steel Corp.*, Commerce was analyzing whether the British Government's equity infusion into British Steel Company was "inconsistent with commercial considerations" within the meaning of section 771(5) of the Act.  This was under the pre-URAA statute, and also was not specifically dealing with Commerce's practice with regard to whether private investor participation was "significant" under 19 CFR 351.507.[79]
- In *Hynix Semiconductor, Inc.*, Commerce had applied an "expected utility model" and used the results as the basis to reject the existence of a debt-to-equity conversion as evidence of equityworthiness.[80]  Again, that case did not deal with Commerce's practice with regard to whether private investor participation was "significant" under 19 CFR 351.507.
- Furthermore, even if these cases were on point, they do not establish any consistent agency "practice" for how Commerce evaluates whether private investor participation is significant under its regulations.
- Therefore, there is no legitimate basis for Commerce to claim that its use of existing private creditor participation was a "mistake" that justified its reconsideration of its decisions in all prior reviews that private investor participation was significant and thus there was no benefit from the first three debt-to-equity swaps.

---

[77] *Id.* at 8.
[78] *Id.* (citing Draft Remand Results at 11).
[79] *Id.* (citing *British Steel Corp.*, 632 F. Supp. at 65).
[80] *Id.* (citing *Hynix Semiconductor*, 425 F. Supp. 2d at 1313).

**Commerce's Position:**  Commerce disagrees with the Plaintiffs' contention that it failed to take the Court's remand instructions seriously and failed to point to any new information on the record, and that it merely repeated its prior justification that was specifically found wanting by the Court.

In the Draft Remand Results, we explained our rationale for departing from our previous findings that the first three debt-to-equity restructurings provided no benefit.[81]  We explained that we normally do not revisit our prior financial contribution and specificity determinations absent new information.  However, we normally require respondents to report information for the relevant POR and re-evaluate the benefit information and recalculate the benefits conferred in that POR.[82]  In AR 2019, given there was a new fourth debt-to-equity infusion, we had to re-evaluate the total benefit conferred under the four debt-to-equity infusions in order to calculate a single subsidy rate for the debt-to-equity infusion program.  As part of the reevaluation, we realized that our prior finding that no benefit was conferred by the first three debt-to-equity restructurings was inconsistent with our regulation, 19 CFR 351.507.[83]  Further, after the CIT affirmed our *Final Redetermination* in *Nucor 2021*, in which we continued to find that Dongbu Steel's private bank loans would be inappropriate to use as a loan benchmark because these loans were provided as part of a government loan program, we determined that it would be inconsistent with our regulations and *Nucor 2021*, if we use the Plaintiffs' private bank loans as a benchmark for the debt-to-equity infusions.  Therefore, contrary to the Plaintiffs' claims, because of these new circumstances, we re-evaluated the benefit conferred under the first three debt-to-equity infusions and found the debt-to-equity infusion program to be countervailable.

[81] *See* Draft Remand Results at 6-7.
[82] *Id.*
[83] *Id.* at 8.

We also disagree with the Plaintiffs' argument that the Court's finding in *PPG Industries, Inc.* undercuts Commerce's attempt to limit its non-reexamination practice to financial contribution and specificity.  In fact, it is exactly the opposite.  The case supports the fact that Commerce does not revisit its prior specificity findings, absent new information.  The case does not support that Commerce is not allowed to re-evaluate benefit information for each POR.  As explained in the Draft Remand Results, the amount of benefit conferred to a company could vary between PORs.[84]  This practice is consistent with section 751(a)(1)(A) of the Act, which states that a CVD administrative review is conducted to "review and determine the *amount* of any net countervailable subsidy," (emphasis added) not to review and determine whether any previously found subsidies continue to exist.  Determining the "amount" of a subsidy fundamentally involves an analysis of benefit under section 771(5)(E) of the Act.  Commerce's questionnaire, as explained in our draft remand results, follows our practice and this statutory requirement.

The Plaintiffs argued that there was no need to recalculate any benefit because there was none and the reevaluation of the amount of benefit in each review is only necessary in cases where Commerce has previously found the program to be countervailable.  We disagree with these arguments.  In AR 2019, we were required to calculate a single benefit rate for the entire debt-to-equity infusion program.  To simply state that Commerce does not need to recalculate any benefit when there was none ignores the fact that our benefit calculation for AR 2019 is a single rate which includes benefits conferred for all four of the equity infusions.  As part of calculating a single new rate, Commerce re-examined the benefits conferred under the three prior equity infusions, taking into consideration the regulation under 19 CFR 351.507 and *Nucor 2021*. As a result, we revised our prior findings.

---

[84] *Id.* at 7.

With respect to the Plaintiffs' argument on *Nucor 2021*, as explained in the Draft

Remand Results, all the creditor banks, including the private banks, were obligated to participate

in the debt restructuring, which provided the GOK-owned and controlled banks with the ability

to establish the financial terms of the debt restructurings, which include both the loan

restructuring and debt-to-equity restructuring.  We explained that the private banks which

provided loans to Dongbu Steel were under significant government influence and therefore, we

could not rely on Dongbu Steel's private banks as a loan benchmark.  Similarly, the record of

this review shows that both the loan restructuring and the debt-to-equity infusions were approved

by the same creditor banks and the terms of the loan restructuring and the debt-to-equity

infusions were agreed to at the same time.  It would be inconsistent for Commerce to find on the

one hand that the GOK-controlled policy banks have significant influence over the loan portion

of the debt restructuring, and on the other hand that the same banks did not have such influence

over the debt-to-equity portion of the debt restructuring.

With respect to whether our finding in the Draft Remand Results was consistent with our

practice under 19 CFR 351.507, we reiterate, contrary to the Plaintiffs' claim, that Commerce's

longstanding practice in determining whether private investment is "significant" is to consider

outside private investment, not the investment of existing shareholders.  This goes back at least

to 1986.  In *Stainless Steel Plate from the United Kingdom*, Commerce stated that "{w}hen

deciding whether to invest, a private investor will assess the current financial position of the firm

and consider its past performance {and} will look upon any past investments, including his own,

as sunk costs, irrelevant to his analysis of whether to make additional investments."[85]  Likewise,

in *Certain Fresh Atlantic Groundfish from Canada*, Commerce stated that the participation of a

---

[85] *See Stainless Steel Plate from the United Kingdom; Final Results of Countervailing Duty Administrative Review*,
51 FR 44656 (December 11, 1986) (*Stainless Steel Plate from the United Kingdom*).

private investor in an equity infusion was not "an appropriate gauge by which to measure the reasonableness of the government's infusion because at the time it seems that the one private investor's only chance for recouping the money it had already loaned to {the company at issue} was to help it reorganize."[86]  More recently, in *Refrigerators from Korea*, Commerce found that participation by existing private investors in an equity infusion was not an appropriate benchmark because "{t}here were no *new* equity infusions into the company…."[87]  As explained above, this practice was upheld in *British Steel Corp.* and *Hynix Semiconductor*.

Accordingly, we continue to find that Commerce properly revisited, and countervailed, the debt-to-equity restructurings at issue in this administrative review.

**Issue 2:  Commerce's Determination that the Benefits of the Debt-to-Equity Restructurings Provided a Countervailable Benefit during the POR**

- In the Draft Remand Results, Commerce did not adhere to the Court's directive to reconsider whether substantial evidence supports a determination that any change in ownership occurred at arm's length and for fair market value such that it extinguished any alleged subsidies from the first through third debt-to-equity restructurings to KG Dongbu Steel.[88]
- Instead, Commerce just repeats its position that KG Dongbu Steel's failure to submit the *Change-in-Ownership Appendix* was determinative in continuing Commerce's baseline presumption that non-recurring subsidies (*i.e.*, the debt-to-equity swaps prior to the acquisition of Dongbu Steel) continue to benefit KG Dongbu Steel over the allocation period.
- According to Commerce, without a response to the questions in the *Change-in-Ownership Appendix*, Commerce's practice is to presume that any benefits to the company will also pass through as a benefit to the new owners.[89]  The problem with this explanation is that it ignores the fact that at the time that Commerce issued this questionnaire, and at the time that KG Dongbu Steel responded to this questionnaire and all subsequent supplemental questionnaires, all of the subsidies Commerce had found in prior reviews with respect to the Plaintiffs were from programs that provided recurring

---

[86] *See Final Affirmative Countervailing Duty Determination; Certain Fresh Atlantic Groundfish from Canada*, 51 FR 10041, 10047 (March 24, 1986).
[87] *See Refrigerators from Korea* IDM at Comment 26.
[88] *See* Plaintiffs' Comments at 10.
[89] *Id.* at 11 (citing Draft Remand Results at 13).

subsidies.  In *AR 2017 Final Results* and the *AR 2018 Preliminary Results*,[90] Commerce had not found benefits from any programs where the benefit was calculated based on the allocation of a non-recurring subsidy received in the AUL period to current and future reviews.  Thus, even though the Dongbu Steel had been acquired by the KG Consortium, whether there were any programs that provided non-recurring benefits that may have passed through to KG Dongbu Steel was simply not yet an issue at the time of the questionnaire responses.[91]

- It was not until Commerce's finding in the *AR 2019 Preliminary Results* that the first through third debt-to-equity swaps were found to have conferred non-recurring benefits that the issue of whether benefits from these programs that preceded the acquisition of Dongbu Steel by the KG Consortium passed through to KG Dongbu Steel became ripe.

- Therefore, KG Dongbu Steel had no reason to submit the *Change-in-Ownership Appendix* to challenge Commerce's baseline presumption regarding non-recurring subsidies.

- Commerce next points to the question in its initial questionnaire that asks respondents to state if they do not intend to rebut the baseline presumption that non-recurring subsidies continue to benefit the recipient over the AUL period.  According to Commerce, because KG Dongbu Steel stated that it did not wish to challenge the baseline presumption and did not provide a response to the *Change-in-Ownership Appendix*, this refusal to provide a response to the *Change-in-Ownership Appendix* relieved Commerce of the obligation to consider the record evidence that showed that the alleged non-recurring subsidies from the first three debt-to-equity swaps were extinguished.

- Commerce's claim that it "properly presumed that any non-recurring benefit would pass through to the new owners"[92] because KG Dongbu Steel did not initially challenge the baseline presumption and submit a *Change-in-Ownership Appendix* elevates form over substance.

- The *Change-in-Ownership Appendix* is just a series of questions drafted by Commerce designed to elicit the information needed to conduct an analysis on whether any change in ownership occurred at arm's length and for fair market value that extinguished any non-recurring subsidy benefits.  This information can be provided in other formats, and Commerce cannot ignore the information on the record just because it is not provided for in the *Change-in-Ownership Appendix.*  This information is on the record, but it only became relevant after Commerce reversed its consistent practice of not finding the first three debt-to-equity swaps countervailable in the *Preliminary Results*.  The Plaintiffs were not required to predict that Commerce would change its mind.[93]

- In the *Final Modification*, Commerce listed four factors that it would analyze when determining whether the transaction price in an acquisition was arm's length and for fair market value.  These factors include:  (1) whether an objective analysis was performed in

---

[90] *Id.* (citing *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 15112, 15113 (March 17, 2020) (*AR 2017 Final Results*), and accompanying IDM at 5, and *Certain Corrosion-Resistant Steel Products from the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2018*, 85 FR 74692 (November 23, 2020) (*AR 2018 Preliminary Results*), and accompanying PDM.
[91] *Id.* at 12.
[92] *Id.* at 14 (citing Draft Remand Results at 14).
[93] *Id.* at 13.

determining the appropriate sales price; (2) whether any artificial barriers to entry were imposed on potential purchasers that could artificially suppress demand for, or the purchase of, the company; (3) whether the highest bid was accepted; and (4) whether there were committed investment requirements that could serve as a barrier to entry or distort the value that bidders were willing to pay.[94]

- Record evidence demonstrates that all of these elements are met.
- First, record evidence demonstrates that PricewaterhouseCoopers independently analyzed the acquisition proposal from the KG Consortium, including the [                    ] acquisition price in Scenario 3, and compared the proposal with alternative scenarios. Based on its analysis, PricewaterhouseCoopers concluded that the KG Consortium's proposal had the highest value to the Creditors Council of the available alternative scenarios and [                                        ].[95]  This was thus an objective analysis.
- Second, an investment attraction announcement for an open bidding process that provided equal access and free competition for all interested parties was published in a newspaper on January 7, 2019.[96]  Therefore, there were no artificial barriers to entry.
- Third, of the bids from [    ] potential investors who showed interest by signing confidentiality agreements and were allowed access of the Plaintiffs' confidential information, only the KG Consortium, which submitted [          ], submitted a final bid.  Therefore, it can be said that the highest bid was accepted in this bidding process.[97]
- Fourth, there were no committed investment requirements that could serve as a barrier to entry or distort the value that bidders were willing to pay.
- In consideration of the above-identified record evidence, in the Final Remand, Commerce should reverse its determination that any non-recurring benefits received by Dongbu Steel were passed through to KG Dongbu Steel.[98]

**Commerce's Position:**  Commerce disagrees with the Plaintiffs' arguments.  The Plaintiffs

argue that Commerce ignores the fact tha,t at the time that Commerce issued its Change-in-

Ownership questionnaire, KG Dongbu found there was no need to provide a Change-in-

Ownership response.  We disagree.  As explained in the Draft Remand Results, our

questionnaire was absolutely clear that Commerce has a baseline presumption that non-

recurring subsidies continue to benefit the recipient over the allocation period.[99]  It is KG

---

[94] *Id.* at 15 (citing *Final Modification*, 68 FR at 37127).
[95] *Id.* at 16 (citing KG Dongbu Steel's IQR at 40-41 and Exhibit B-29).
[96] *Id.* (citing KG Dongbu Steel's IQR at Exhibits B-19, 20, and 21).
[97] *Id.* (citing KG Dongbu Steel's IQR at Exhibits B-22, 23, and 24).
[98] *Id.* at 18.
[99] *See* Draft Remand Results at 13-14.

Dongbu's burden to challenge the baseline presumptions, not Commerce's.[100]  Dongbu explicitly stated in its response that:

> "Dongbu had not been privatized, changed ownership, merged with another company, or devolved another company/companies from its corporate structure in whole or in part, during the AUL period…. Dongbu does not wish to challenge the Department's baseline presumption and thus understands that no response to the Change-in-Ownership Appendix is required."[101]

These are clear statements.  These statements did not imply because Commerce found Dongbu's debt-to-equity infusions to confer no benefit, therefore, there was no baseline presumption to rebut.  KG Dongbu Steel had the responsibility to answer Commerce's questionnaires and supplemental questionnaires, and retains the burden to challenge our baseline presumption.[102]  However, KG Dongbu Steel chose not to challenge the baseline presumption.  Thus, when facing such clear statements, Commerce cannot interpret them to actually mean something different.  Accordingly, Plaintiff's arguments are without merit.

Further, KG Dongbu Steel was aware that the petitioners have been arguing for Commerce to countervail the debt-to-equity conversions since the first administrative review of this proceeding and that an acquisition had occurred and, therefore, that non-recurring subsidy pass-through could be an issue in this review.  Despite having this awareness, KG Dongbu Steel stated that "Dongbu does not wish to challenge the Department's baseline presumption and thus understands that no response to the *Change-in-Ownership Appendix* is required."[103]  Therefore,

---

[100] *Id.*

[101] *See* KG Dongbu Steel's Affiliation Response at 11-12.

[102] *See Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production should belong to the party in possession of the necessary information."); and *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("the burden of creating an adequate record lies with interested parties.") (internal quotation marks, alterations, and citation omitted).

[103] *Id.*

based on KG Dongbu Steel's response that it did not wish to challenge the baseline presumption, Commerce properly continued its baseline presumption that non-recurring subsidies (*i.e.*, the debt-to-equity swaps prior to the acquisition of Dongbu Steel) continue to benefit KG Dongbu Steel over the allocation period.

   With respect to the Plaintiffs' contention that the information already on the record suffices for Commerce to conclude that a change in ownership occurred at arm's length and for fair market value that extinguished any subsidies from the first through third debt-to-equity restructurings to KG Dongbu Steel.  As Commerce stated in *AR 2019 Final Results*, analyzing whether prior subsidies were extinguished requires extensive analysis based on a respondent's complete responses to the *Change-in-Ownership Appendix*.[104]  The Plaintiffs contend that the *Change-in-Ownership Appendix* is just a series of questions drafted by Commerce designed to elicit the information needed to conduct an analysis on whether any change in ownership occurred at arm's length and for fair market value. The Plaintiffs further contend that the information Commerce sought from KG Dongbu Steel with the *Change-in-Ownership Appendix* is already on the record.  The Plaintiffs then point to the *Final Modification*, and state that in *Final Modification*, Commerce listed four factors that it would analyze when determining whether the transaction price in an acquisition was arm's length and for fair market value, and then argues that the four factors that Commerce can consider are already on the record.  It is important to re-emphasize that Commerce's questionnaires are extremely clear.  Commerce

---

[104] *See Certain Uncoated Groundwood Paper from Canada:  Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 83 FR 2133 (January 16, 2018), and accompanying PDM at 57, unchanged in *Certain Uncoated Groundwood Paper from Canada:  Final Affirmative Countervailing Duty Determination*, 83 FR 39414 (August 9, 2018), and accompanying IDM.

relies on answers to the *Change-in-Ownership Appendix* to assess non-recurring subsidy pass-through.

Further, in *Final Modification*, Commerce specifically stated, "… in determining whether the evidence presented, including, *inter alia*, information on any comparable benchmark prices as well as information on the process through which the sale was made, demonstrates that the transaction price was fair market value, the following *non-exhaustive list* {emphasis added} of factors might be considered."[105]  Then Commerce provides four factors (*i.e.*, objective analysis, artificial barriers to entry, highest bid, and committed investment) that Commerce "might" consider in evaluating whether a transaction price was fair market value.  Commerce specifically stated that this is a non-exhaustive list of factors that might be considered.[106]  As stated in the Draft Remand Results, the *Change-in-Ownership Appendix* implements section 771(5)(F) of the Act as well as Commerce's *Final Modification*.[107]  The *Change-in-Ownership Appendix* is comprised of 18 questions and multiple sub-questions.  The 18 questions are sub-parts of three main sections of this questionnaire, namely, "General Questions," Sales Process," and "Post-Sales Effect on Company."  The "General Questions" section of this questionnaire requires the respondent company to provide an overview of the whole sales process, such as the information on the involvement in the sale of the assets or shares by any government, government officials, or agencies or institutions that are owned/controlled by the government.  It also requires the respondent company to discuss the purpose and expectation of the asset or share sale, and it also asks if the sale was a part of a larger change-in-ownership plan organized by the government or a corporate parent.  It also asks the respondent company to provide financial statements for the

---

[105] *See Final Modification*, 68 FR at 37127.
[106] *Id.*
[107] *See* Draft Remand Results at 12.

company whose assets or shares were sold for the two years prior to the sale, the year of the sale, and for two years after the sale.  It also asks if the company explicitly paid back any previously received government assistance prior to the change in ownership of the company.  The "Post-Sales Effect on Company" section asks the respondent company to describe the impact of the sale of share or assets on the legal and corporate structure of the business producing subject merchandise.  Contrary to the Plaintiffs' assertion that the information Commerce sought from KG Dongbu Steel with the *Change-in-Ownership Appendix* is already on the record, the answers to these and many other questions in the *Change-in-Ownership Appendix* are, in fact, not on the record.  Commerce requires a full response to this questionnaire in order to conduct a complete analysis of whether a change in ownership occurred at arm's length and for fair market value that extinguished any subsidy benefits.

Further, in the general instruction section of the *Change-in-Ownership Appendix*, which implements Commerce's *Final Modification*, Commerce specifically states,"{s}ome of the questions may require input from both the government as well as the respondent company. Therefore, the government and the respondent company should coordinate their responses to these questions.  However, be sure to clearly identify in the response to each of the change-in-ownership questions the party (*e.g.*, the government, the company) providing the response to that question."[108]  Therefore, in order for a respondent company to provide a complete response to the questions contained in the *Change-in-Ownership Appendix*, the government and the respondent company may have to coordinate their responses.  In short, the information Commerce seeks of the respondent company with the *Change-in-Ownership Appendix*, exceeds the four factors listed as non-exhaustive factors that Commerce might consider in analyzing

---

[108] *See* Initial Questionnaire at Section II; *Id.* at Section III, Change-in-Ownership Appendix at III-7.

whether the transaction price was at arm's length and for fair market value, provided in *Final*

*Modification*.

### Issue 3:  Commerce's Calculations of the Uncreditworthy Benchmark Rate and the Unequityworthy Discount Rate

- In the *Remand Opinion and Order*, the Court concluded that Commerce's application of a 3-year term loan variable for the formula for calculating the uncreditworthy benchmark and unequityworthy discount rate was not supported by substantial evidence.  The Court reasoned that the repayment date on KG Dongbu Steel's loans was extended to December 31, 2025, amounting in a six-year loan term, and that the AUL of the equity infusions was 15 years, which contradicted Commerce's assertion in *AR 2019 Final Results*.[109]

- In the Draft Remand Results, Commerce continued to use 3 years for the term of the loan variable in utilizing the formula for calculating the uncreditworthy benchmark and unequityworthy discount rate because there is allegedly no information on the record regarding a six-year interest rate for a comparable commercial loan, and the loans that KG Dongbu Steel received cannot constitute "comparable commercial loans" under 19 CFR 351.505(a)(2), due to alleged government influence and "the fact that they were part of a government program."[110]

- However, Commerce's redetermination to use 3 years for the term of the loan in variable *n*, and the length of time within which creditworthy and uncreditworthy companies may default for variables $p_n$ and $q_n$, is contrary to the evidence on the record and the plain language of its regulations.[111]

- Section 351.505(a)(3)(iii) of Commerce's regulations provides:
  If {Commerce} finds that a firm that received a government-provided long-term loan was uncreditworthy, as defined in paragraph (a)(4) of this section, the Secretary normally will calculate the interest rate to be used in making the comparison called for by paragraph (a)(1) of this section according to the following formula:

  $$ib=((1-qn)(1+if)n/(1-pn))1/n-1,$$

  where:
  n = the term of the loan;
  ib = the benchmark interest rate for uncreditworthy companies;
  if = the long-term interest rate that would be paid by a creditworthy company;
  pn = the probability of default by an uncreditworthy company within n years; and
  qn = the probability of default by a creditworthy company within n years.

- KG Dongbu Steel does not argue that Commerce used the incorrect interest rate for "the long-term interest rate that would be paid by a creditworthy company" as variable $i_f$.  Nor does KG Dongbu Steel argue that its own loans from private banks are "comparable commercial loans."[112]

---

[109] *See* Plaintiffs' Comments at 19 (citing Remand Opinion and Order at 17-18).
[110] *Id.* at 21.
[111] *Id.* at 19.
[112] *Id.* at 22.

- Rather, KG Dongbu Steel argues that, because the "term of the loan" for KG Dongbu Steel's "government provided long-term loan" is 6 years and the AUL period for the equity infusions is 15 years, Commerce should calculate the benchmark interest rate using 6 year and 15 year terms as the term of the loan for variable $n$ and it should use the probabilities of default by creditworthy and uncreditworthy companies within six and 15 years for variables $p_n$ and $q_n$.[113]
- Commerce has on the record (a) the 6 year term of KG Dongbu Steel's loans and the 15 year AUL period for variable $n$, (b) a long-term interest rate that would be paid by a creditworthy company (*i.e.*, the three-year AA-rated KRW interest rate published by the Bank of Korea) for variable $i_f$, and (c) the probability of default by creditworthy and uncreditworthy companies within six and 15 years for variables $p_n$ and $q_n$. Commerce does not require an interest rate from a six or 15 year long-term loan to "calculate the interest rate to be used in making the comparison" with KG Dongbu Steel's restructured loans pursuant to the plain language of 19 CFR 351.505(a)(3)(iii), or to calculate the discount rate that "{Commerce} will use" when allocating the equity infusions pursuant to 19 CFR 351.524(d)(3)(ii).
- Therefore, for the final remand results, Commerce should use six years for variable $p_n$, and 15 years for variable $q_n$ for its uncreditworthy benchmark rate, unequityworthy discount rate calculations.

**Commerce's Position:** Commerce disagrees with the Plaintiffs' contention that Commerce has incorrectly applied the uncreditworthy interest rate benchmark formula, and the unequityworthy discount rate formula.

The *Preamble* to Commerce's regulations clarifies Commerce's intention in providing a formula to calculate the benchmark interest rate for an uncreditworthy company.[114] The *Preamble* states, "{o}ur formula for calculating the benchmark interest rate for an uncreditworthy company is based upon the assumption that a lender's expected return on all loans should be equal. Under this assumption, the interest rate differential on loans charged to creditworthy and uncreditworthy companies is such that the lender's expected (total) return on a loan to an uncreditworthy company equals the expected (total) return on a loan to a creditworthy company, after accounting for differences in the risk of default." The *Preamble* further clarifies

---

[113] *Id.*
[114] *See Preamble* at 65347, 65365.

that "using a default rate that is directly linked to the term of the loan is a better reflection of the risk associated with the long-term lending to uncreditworthy borrowers.[115]

Therefore, the plain language of the *Preamble* dictates that Commerce use the term of the benchmark (in this case, 3 years, from the 3-year KRW AA-Corporate Bond Rate from Bank of Korea)[116] to identify both the probability of default by a creditworthy company, and the probability of default by an uncreditworthy company from the Moody's "Average Cumulative Issuer-Weighted Global Default Rates, 1920-2010"[117] table.  Otherwise, if Commerce used the probability of default by an uncreditworthy company within six years for variables $p_n$ and $q_n$ respectively, as the Plaintiffs suggests, the variables would not be on the same basis as the term of the baseline benchmark used for variable $i_f$ (*i.e.*, 3 years).  This would be contrary to Commerce's intention in providing a formula to calculate the benchmark interest rate for an uncreditworthy company, as set out in the *Preamble*.

Therefore, for both the probability of default by a creditworthy company and the probability of default by an uncreditworthy company, the probability of default within 3 years from the Moody's "Average Cumulative Issuer-Weighted Global Default Rates, 1920-2010"[118] table should be used, for consistency with the term of the benchmark used (*i.e.*, the 3-year KRW AA-Corporate Bond Rate from Bank of Korea), in calculating the benchmark interest rate for uncreditworthy companies.

Further, as stated in the Draft Remand Results, 19 CFR 351.507(c) dictates that the benefit conferred by an equity infusion shall be allocated over the same period as a non-recurring

---

[115] *Id.* at 65365.
[116] *See* Memorandum, "Preliminary Results Calculation for KG Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd.," dated July 12, 2021, at Attachment II.
[117] *Id.*
[118] *Id.*

subsidy.  Sections 351.524(d)(1) and (d)(3)(ii) of Commerce's regulations provide that, in the case of a firm considered to be uncreditworthy, Commerce will use as a discount rate the interest rate described in 19 CFR 351.505(a)(3)(iii), which is an exception for uncreditworthy company.[120]  Therefore, pursuant to 19 CFR 351.507(c), 351.524(d)(1) and (d)(3)(ii), to calculate the benefit for debt-to-equity infusions, we continue to use as a discount rate the same benchmark interest rate for uncreditworthy companies, calculated using the aforementioned probability of default rates.

## VI.      RESULTS OF FINAL REMAND REDETERMINATION

Consistent with the *Remand Opinion and Order*, we have re-examined and further substantiated our determination that the first through third debt-to-equity restructurings provided countervailable benefits, which passed through to KG Dongbu Steel because KG Dongbu Steel did not rebut the baseline presumption under our change-in-ownership methodology.  Further, we have reconsidered the record evidence and further substantiated the loan term used to calculate the uncreditworthy benchmark interest rate and the unequityworthy discount rate. Based on the forgoing explanations, we have made no changes to the *AR 2019 Final Results*.

10/5/2023

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[120] *See* Draft Remand Results at 17-18.