**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., and DONGBU INCHEON STEEL CO., LTD. <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> NUCOR CORPORATION and STEEL DYNAMICS, INC., <br><br> Defendant-Intervenors. | **NON-CONFIDENTIAL** <br><br> Proprietary Information Removed from Pages 15-17 <br><br> Court No. 22-00047 |

**PLAINTIFFS KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., AND DONGBU INCHEON STEEL CO., LTD.'S COMMENTS ON COMMERCE'S REDETERMINATION PURSUANT TO COURT REMAND**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Stephen Morrison

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4116

*Counsel to Plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd.*

November 20, 2023

## <u>TABLE OF CONTENTS</u>

I.    Commerce Has Not Adequately Explained Its Abrupt Change in Its Established Agency Practice With Respect to the First Through Third Debt-Equity Swaps ...........2

II.   Commerce's Determination That The Benefits from the First Three Debt-to-Equity Swaps Passed Through to KG Dongbu Is Unlawful....................................................10

    A.    Commerce's Rationale For Continuing to Find That The Benefits from the First Three Debt-to-Equity Swaps Passed Through to KG Dongbu Is Unpersuasive and Not Responsive to the Court's Decision .............................................................10

    B.    The Record Evidence Shows That Any Alleged Benefits Received by Dongbu Did Not Pass Through to KG Dongbu .................................................................14

III.  The Department Calculated the Uncreditworthy Benchmark Rate and the Unequityworthy Discount Rate Contrary to Evidence and the Plain Language of Its Regulations .................................................................................................................17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*British Steel Corp. v. United States*,
    632 F. Supp. 59 (Ct. Int'l Trade 1986) ................................................................8, 9

*CS Wind Vietnam Co. v. United States*,
    832 F.3d 1367 (Fed. Cir. 2016)...............................................................................13

*Hynix Semiconductor, Inc. v. United States*,
    425 F. Supp. 2d 1287 (Ct. Int'l Trade 2006) .......................................................8, 9

*Magnola Mettalurgy, Inc. v. United States*,
    508 F.3d 1349 (Fed. Cir. 2007)..................................................................................3

*Nucor Corp. v. United States*,
    461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) .......................................................7, 8

*PPG Industries, Inc. v. United States*,
    978 F.2d 1232 (Fed. Cir. 1992)..................................................................................3

*Saha Thai Steel Pipe Public Co., Ltd. v. United States*,
    605 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) ........................................................13

**Statutes**

19 U.S.C. § 1677.............................................................................................................9, 14

**Other Authorities**

19 C.F.R. § 351.505 ................................................................................................. *passim*

19 C.F.R. § 351.507 ................................................................................................. *passim*

19 C.F.R. § 351.524 .............................................................................................4, 17, 19, 21

*Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final
    Results and Partial Rescission of Countervailing Duty Administrative Review;
    2018*, 86 Fed. Reg. 29,237 (Dep't Commerce June 1, 2021) ...................................5

*Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final
    Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg.
    15,112 (Dep't Commerce March 17, 2020)............................................................11

*Certain Corrosion-Resistant Steel Products From the Republic of Korea:*
  *Preliminary Results of Countervailing Duty Administrative Review; 2018*,
  85 Fed. Reg. 74,692 (Dep't Commerce Nov. 23, 2020) ..........................................................11

*Certain Pasta From Italy: Preliminary Results and Partial Rescission of the*
  *Eighth Countervailing Duty Administrative Review*,
  70 Fed. Reg. 17,971 (Dep't Commerce Apr. 8, 2005) ...........................................................14

*Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative*
  *Countervailing Duty Determination*,
  72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007) ....................................................... 9-10

*Countervailing Duties*,
  63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) .........................................................21

*Notice of Final Modification of Agency Practice Under Section 123 of the*
  *Uruguay Round Agreements Act*,
  68 Fed. Reg. 37,125 (Dep't Commerce June 23, 2003) .................................................... 14-15

*Stainless Steel Plate from the United Kingtom; Final Results of Countervailing*
  *Duty Administrative Review*, 51 Fed. Reg. 44,656 (Dep't Commerce Dec. 11,
  1986) ...........................................................................................................................................9

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| KG DONGBU STEEL CO., LTD.,<br>DONGBU STEEL CO., LTD., and<br>DONGBU INCHEON STEEL CO., LTD.<br><br>    Plaintiffs,<br><br> v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br> and<br><br>NUCOR CORPORATION and STEEL<br>DYNAMICS, INC.,<br><br>    Defendant-Intervenors. | **NON-CONFIDENTIAL**<br><br>Proprietary Information Removed from<br>Pages 15-17<br><br>Court No. 22-00047 |

**PLAINTIFFS KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., AND
DONGBU INCHEON STEEL CO., LTD.'S COMMENTS ON COMMERCE'S
REDETERMINATION PURSUANT TO COURT REMAND**

   Plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd., and Dongbu Incheon Steel

Co., Ltd. (collectively "Dongbu") hereby submit comments on the U.S. Department of

Commerce's ("Commerce") October 5, 2023 Final Results of Redetermination Pursuant to Court

Remand, *KG Dongbu Steel Co. v. United States*, Ct. No. 22-00047 (Ct. Int'l Trade Oct. 5, 2023),

ECF No. 55, CRR 3, PRR 3 ("Final Remand").[1]  The underlying administrative determination at

issue is Ce*rtain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results*

---

[1] Citations to the administrative record shall be to the public or confidential record document number ("PR" or "CR") followed by the page or exhibit number. Citations to the remand administrative record shall be to the public or confidential remand record document number ("PRR" or "CRR") followed by the page or exhibit number.

*and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 2,759

(January 19, 2022) ("*Final Results*"), PR 216, and accompanying Issues and Decision

Memorandum ("*Final Results IDM*"), PR 213.

As discussed below, the Final Remand fails to comply with the Court's instructions and

is otherwise unsupported by substantial evidence and not in accordance with law.

### I.      Commerce Has Not Adequately Explained Its Abrupt Change in Its Established Agency Practice With Respect to the First Through Third Debt-Equity Swaps.

In its Rule 56.2 brief, KG Dongbu argued that in the *Final Results* Commerce ignored its

established agency practice as reflected in its own questionnaire instructions of not reviewing the

countervailability of a program in the absence of new information, and its consistent finding in

all prior administrative reviews that no benefit was provided from Dongbu's first three debt-to-

equity ("D/E") swaps.  This abrupt deviation from this established agency practice and resulting

determination that these three D/E swaps were countervailable, even though there was no new

factual information to support this change, was thus unlawful.  The Court agreed, and remanded

"Commerce's determination that the first through third debt-to-equity restructurings provided a

countervailable subsidy to KG Dongbu for reconsideration or further explanation."  *See KG*

*Dongbu Steel Co. v. United States*, Ct. No. 22-00047, Slip Op. 23-98 at 13 (July 7, 2023), ECF

No. 52 ("*Slip Op. 23-98*").  The Final Remand fails to take the Court's remand instructions

seriously, and instead just repeats previous arguments that have been considered and rejected.

The Final Remand first attempts to explain Commerce's "rationale for departing from our

previous finding that the first three debt-to-equity restructurings provided no countervailable

benefit."  Final Remand at 6.  With respect to its questionnaire instructions that formed part of

the basis for the Court's remand (*see* Slip Op. 23-98 at 10-11) and which provide that "{a}bsent

new information warranting a program reexamination, {Commerce} will not reevaluate prior

2

determinations regarding the countervailability of programs" (*id.* at 10) – Commerce seeks to distance itself.  More specifically, Commerce claims that this practice of not re-examining prior subsidy decisions only applies to the financial contribution and specificity aspects, and seeks to bolster that claim by citing two inapposite Federal Circuit decisions.  Final Remand at 7.  These cases stand for the proposition that Commerce does <u>not have to revisit *specificity*</u> determinations absent new evidence.  *See Magnola Mettalurgy, Inc. v. United States*, 508 F.3d 1349 (Fed. Cir. 2007); *PPG Industries, Inc. v. United States*, 978 F.2d 1232 (Fed. Cir. 1992).   This proposition is not the same thing as saying that Commerce's practice of not reexamining the countervailability of a program absent new evidence is limited to financial contribution and specificity.

Indeed, the *PPG* case actually undercuts Commerce's attempt to limit its non-examination practice to financial contribution and specificity.   In *PPG* the Court stated that: "{a}dditionally, ITA has a longstanding administrative practice of not reinvestigating a program determined <u>not to be countervailable</u> unless the petitioner presents new evidence justifying reconsideration of a prior finding."  *PPG Indus. v. United States*, 978 F.2d 1232, 1242 (Fed. Cir. 1992) (emphasis added).   No distinction is made between the particular elements of the non-countervailable determination.  Benefit is one of the three elements needed for a countervailable subsidy to exist.  This formulation of Commerce's agency practice is also consistent with its questionnaire instructions that make no distinction about the basis for the previous non-countervailable determination.  *See* Slip Op. 23-98 at 10 (citing the language from the questionnaire: "[a]bsent new information warranting a program reexamination, [ Commerce ] will not reevaluate prior determinations <u>regarding the countervailability of programs</u>.") (emphasis added).  Accordingly, Commerce's attempt to demonstrate that its established agency

practice does not apply to benefit determinations is unpersuasive.

Commerce next attempts to explain why it needs to "re-evaluate the benefit information and recalculate the benefits conferred" in each separate administrative review.  Final Remand at 7.  Commerce's explanation is inapposite to this case.   The need to recalculate the amount of benefit in each review is only necessary in cases where Commerce has previously found the program to be countervailable.  Only then is Commerce calculating a new benefit "amount" in each review.  However, in cases such as this one where Commerce had consistently found that the first three D/E swaps did <u>not</u> provide a countervailable subsidy there was no need to recalculate any benefit because there was none.

Moreover, the concept of needing to recalculate a benefit amount for each review is inapplicable for this particular program.  Commerce determined in all prior reviews that private investor participation was significant and the first three D/E swaps were consistent with the usual investment practice of private investors and thus did not confer a benefit to Dongbu.  *See* Slip Op. 23-98 at 10 (citing cases).  Unlike determining the *amount* of a benefit under a subsidy program that changes year to year, the benefit determination here was the equivalent of a non-countervailability determination.  It had nothing to do with the amount of benefit to be calculated for a particular time-period.   Even if it did, when Commerce finds a non-recurring subsidy like the D/E swaps in this case it employs a declining-balance methodology that allocates at the time of its subsidy determination the whole subsidy amount received by calculating the benefit amount for each year of the average useful life allocation period.  19 C.F.R. § 351.524(b) & (d).  No new calculation is required for determining the benefit (*i.e.*, numerator) in each subsequent review.  In such reviews, the only necessary information to calculate the subsidy rate from the program is the sales value (*i.e.*, denominator).

Furthermore, in the 2018 review Commerce specifically found that "while we are not making an unequityworthiness finding and *continue to find the equity infusions provided no benefit* to Dongbu for the instant administrative review, we may re-examine this issue for the next administrative review *if new record evidence requires such an examination*." *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 29,237 (Dep't Commerce June 1, 2021) ("CORE 2018 Final Results") and accompanying Issues and Decision Memorandum at 38 ("CORE 2018 IDM") (emphasis added).  Commerce thus tied the possible re-examination of the <u>benefit</u> issue specifically to the presence of new record evidence—and there was no such new evidence here to warrant a re-examination.  Commerce even specifically explained that the benefit determinations in each segment of a proceeding "stand on their own and are made on a fact specific basis."  PR 213 at 46.  Here, the facts did not change and thus there was no basis for Commerce to make an entirely new benefit determination under its own stated practice.

In a further attempt to wiggle out from its established practice Commerce tries to make something of the fact that its questionnaire instructions only instructed KG Dongbu not to provide a response to the Standard Questions Appendix if there were no changes to the program but did not also say not to submit the Usage Appendix.  Final Remand at 8.  Commerce's logic apparently being that the Usage Appendix is relevant to benefit and so by not excusing KG Dongbu from providing one even if there were no changes, Commerce was still reconsidering its benefit determination.   This is a thin reed to cling to as it ignores the fact that its main questionnaire instruction makes no such distinction between the elements of the subsidy determination, (Slip Op. 23-98 at 10) and Commerce's logic requires an inference that this

omission of a reference to the Usage Appendix means that Commerce was still reevaluating its benefit determination.

Commerce next tries to further justify its decision to reconsider its prior determinations that the first three D/E swaps were not countervailable by claiming that "given that there was a new fourth debt-to-equity infusion, we had to re-evaluate the total benefit conferred under the four debt-to-equity infusions in order to calculate a single subsidy rate for the program."   Final Remand at 8.  Commerce also points out in a footnote that there was a factual change with the fourth debt-to-equity swap because unlike in prior reviews there were private creditors independent from the creditors' committee in the fourth equity infusion.  *Id.* at fn. 25.  But this is just a rehash of Commerce's prior justification that was specifically found wanting by the Court. As the Court found:  "The Court notes that the record evidence cited by Commerce as justification for its deviation from its past practice does not deal directly with the first through third debt-to-equity restructurings and is not a sufficient explanation to justify departing from its standard practice."  Slip Op. 23-98 at 12.

Furthermore, Commerce's attempt to rely on the existence of the fourth D/E swap as the basis for why it had to reconsider the benefit element for the first three D/E swaps is unpersuasive.  More specifically, Commerce argues that it was required to calculate a benefit for the entire D/E swap program and its "benefit calculation for AR 2019 is a single rate which includes benefits conferred for all four of the equity infusions."  Final Remand at 23.  However, the fact that Commerce adds up the benefit amounts for each of the four D/E swaps in order to arrive at a total benefit from the D/E swap program does not change the fact that separate benefit amounts are calculated for each D/E swap.  *See* CR 271, Attachment 2, Tab "Equity Infusions" (showing separate calculations for each D/E swap).  Thus, Commerce did not need to revisit its

prior determination that there was no benefit from the first three D/E swaps just because it found that there was a benefit from the fourth D/E swap.

Although Commerce has utterly failed to explain <u>why</u> it was justified in re-evaluating its benefit determination even though there was no new evidence, it goes on to claim that upon reexamination of the benefit determination it realized it made a mistake in the prior review. Final Remand at 8. The alleged "mistake" is twofold. Commerce first cites to the *Nucor* litigation involving the first review of this CORE CVD order, and the fact that it continued to find that Dongbu's private bank loans would be inappropriate to use as a loan benchmark since they were provided as part of a government loan program and thus allegedly subject to government influence. *Id.* at 9-10. Based on this, Commerce argues that it would be inconsistent with its regulations and *Nucor 2021* to use "KG Dongbu Steel's private bank loans as a benchmark for the debt-to-equity infusions." *Id.* at 9. The problem with this explanation is that it was already given in the Final Results and in Defendant's briefing before this Court, yet the Court still found that Commerce had "failed to provide an adequate explanation for its decision to deviate from its prior determinations . . . ." Slip Op. 23-98 at 13. Simply repeating it makes it no more persuasive.

The second problem is that the entire discussion in the *Nucor 2021* decision was related to whether the <u>loans</u> by the private commercial banks on the creditors committee constituted "comparable commercial loans" for purposes of 19 C.F.R. § 351.505(a)(2). Final Results of Redetermination Pursuant to Court Remand at 5, 10, *Nucor Corp. v. United States*, No. 19-00042 (Ct. Int'l Trade Sept. 30, 2020), ECF Nos. 88, 89. The remand did not reconsider whether private investor participation was "significant" under the separate regulation, 19 C.F.R. § 351.507(a)(2)(iii), for equity infusions. Thus, even if it had not already been considered and

found inadequate by the Court, Commerce's reconsideration of the loan benchmark issue in *Nucor 2021* does not reasonably explain Commerce's abandonment of its established agency practice of treating private investor participation as significant for purposes of the D/E swaps. These are two different issues under two different regulatory standards.

Furthermore, in that same *Nucor* litigation, Commerce defended its decision that private investor participation was significant and thus there was no benefit from the first three D/E swaps. Def.'s Mem. In Opp'n to Pl.'s and Consolidated Pls.' Rule 56.2 Mot. For J. Upon the Agency R. at 19-22, *Nucor Corp. v. United States*, 461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) (No. 19-00042), ECF Nos. 59, 60. If the use of private investor participation for D/E swap purposes was really inconsistent with its own regulations and its continued rejection of private loans as the benchmark for the loan restructuring program, then how could Commerce staunchly defend its negative D/E swap decision in that litigation? The obvious conclusion is that it was not a "mistake" when Commerce defended its negative D/E swap decision in that litigation, and it is not a mistake now in this litigation. Rather, this alleged mistake is simply a pretext for Commerce to defend its abrupt change in agency practice.

Commerce next claims that its prior finding of no benefit was inconsistent with 19 C.F.R. § 351.507 because "Commerce's practice in analyzing the significance of private investor participation is to conduct the analysis from the perspective of an outside investor, and not an existing investor that is simply trying to minimize its losses." Final Remand at 11. As support for this "practice" Commerce cites to *British Steel Corp. v. United States*, 632 F. Supp. 59, 65 (Ct. Int'l Trade 1986) and *Hynix Semiconductor, Inc. v. United States*, 425 F. Supp. 2d 1287, 1313 (Ct. Int'l Trade 2006). These cases are inapposite. In *British Steel*, Commerce was analyzing whether the British Government's equity infusion into British Steel Company was

"inconsistent with commercial considerations" within the meaning of 19 U.S.C. § 1677(5). *See British Steel*, 632 F. Supp. at 61. This was under the pre-URAA statute, and also was not specifically dealing with Commerce's practice with regard to whether private investor participation was "significant" under 19 C.F.R. § 351.507. *Hynix* is also not on point. In that case, Commerce had applied an "expected utility model" and used the results as the basis to reject the existence of a debt-to-equity conversion as evidence of equityworthiness. *Hynix*, 425 F. Supp. 2d at 1313. Again, that case did not deal with Commerce's practice with regard to whether private investor participation was "significant" under 19 C.F.R. § 351.507.

Furthermore, even if these cases were on point they do not established any consistent agency "practice" for how Commerce evaluates whether private investor participation is significant under its regulations. Nor does Commerce's citation to *Stainless Steel Plate from the United Kingtom*, *Certain Fresh Atlantic Groundfish from Canada*, and *Refrigerators from Korea* establish the consistent agency practice it claims exists. Final Remand at 24-25 (citing *Stainless Steel Plate from the United Kingtom; Final Results of Countervailing Duty Administrative Review*, 51 Fed. Reg. 44,656 (Dep't Commerce Dec. 11, 1986); *Final Affirmative Countervailing Duty Determination; Certain Fresh Atlantic Groundfish from Canada*, 51 Fed. Reg. 10,041, 10,047 (Mar. 24, 1986); *Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 17,410 (Mar. 26, 2012), and accompanying IDM at Comment 26). Rather, this analysis is done on a case-by-case basis as evidenced by the fact that in *CFS Paper from Korea* Commerce found that private investor participation by existing creditors in the context of a voluntary restructuring like the one in this case was sufficient to demonstrate significant private investor participation under 19 C.F.R. § 351.507. *See Coated Free Sheet Paper from the Republic of Korea: Notice of Final*

*Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007), and accompanying Issues and Decision Memorandum at 47.  There is thus no legitimate basis for Commerce to claim that its use of existing private creditor participation was a "mistake" that justified its reconsideration of its decisions in all prior reviews that private investor participation was significant and thus there was no benefit from the first three D/E swaps.

II.     **Commerce's Determination That The Benefits from the First Three Debt-to-Equity Swaps Passed Through to KG Dongbu Is Unlawful**

A.     **Commerce's Rationale For Continuing to Find That The Benefits from the First Three Debt-to-Equity Swaps Passed Through to KG Dongbu Is Unpersuasive and Not Responsive to the Court's Decision**

In its Rule 56.2 brief, KG Dongbu argued that even if Commerce's change in practice was lawful the record evidence demonstrates that any non-recurring subsidies received by Dongbu were extinguished by the arm's length purchase for fair market value of its assets by the KG Consortium.  In remanding for further consideration, the Court stated that it "also remands this issue for Commerce to reconsider whether substantial evidence supports a determination that any change in ownership occurred at arm's length and for fair market value that extinguished any alleged subsidies from the first through third debt-to-equity restructurings to KG Dongbu." Slip Op. 23-98 at 15.  In the Final Remand, Commerce has ignored the Court's directive to reconsider the evidence on this issue.  Instead, Commerce just repeats its position that KG Dongbu's failure to submit the Change-in-Ownership Appendix ("CIO Appendix") was fatal.  Final Remand at 12-13.

Commerce first cites to its instructions in the initial questionnaire that request the submission of a CIO Appendix if the respondent wants to challenge the baseline presumption that *non-recurring* subsidies continue to benefit the recipient even after a change in ownership.

10

*Id.* at 12.  According to Commerce, without a response to the questions in the CIO Appendix,

"we followed our practice to presume that any benefits to the company will also pass through as

a benefit to the new owners."  *Id.* at 13.  The problem with this explanation is that it ignores the

fact that at the time that Commerce issued this questionnaire, and at the time that Dongbu

responded to this questionnaire and all subsequent supplemental questionnaires, all of the

subsidies it had found in prior reviews with respect to Dongbu were from programs that provided

*recurring* subsidies.  Specifically, in the final results of the CORE 2017 review and the

preliminary results of the CORE 2018 review, which were Commerce's most recent

determinations with respect to CORE from Dongbu prior to this 2019 review, Commerce had

only found measurable subsidies from the following recurring programs:

> CORE 2017 Review
> Dongbu's Debt Restructuring (loans)
>
> CORE 2018 Review
> Dongbu's Debt Restructuring (loans)
> KDB Short-Term Discounted Loans for Export Receivables.

*Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Final Results of*

*Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 15,112, 15,113 (Dep't

Commerce March 17, 2020) ("CORE 2017 Final Results") and accompanying Issues and

Decision Memorandum at 5-6; *Certain Corrosion-Resistant Steel Products From the Republic of*

*Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2018*, 85 Fed. Reg.

74,692 (Dep't Commerce Nov. 23, 2020), and accompanying Preliminary Decision

Memorandum at 12-16.

Commerce had not found benefits from any programs where the benefit was calculated

based on the allocation of a *non-recurring* subsidy received in the average useful life ("AUL")

period to current and future reviews.  Thus even though Dongbu had been acquired by the KG

Consortium (a change in ownership), whether there were any programs that provided non-recurring benefits that may have passed through to KG Dongbu was simply not yet an issue at the time of the questionnaire responses.  KG Dongbu thus had no reason to submit the CIO Appendix to challenge Commerce's baseline presumption regarding non-recurring subsidies.  It was not until Commerce's finding in the *Preliminary Results* of this 2019 review that the first three D/E swaps were found to have conferred non-recurring benefits that the issue of whether benefits from these programs that preceded the acquisition of Dongbu by the KG Consortium passed through to KG Dongbu became ripe.

Commerce next points to the question in its initial questionnaire that asks respondents to state if they do not intend to rebut the baseline presumption that non-recurring subsidies continue to benefit the recipient over the AUL period.  Final Remand at 13.  According to Commerce, since KG Dongbu stated that it did not wish to challenge the baseline presumption and did not provide a response to the CIO Appendix that was the end of the matter.  *Id.* at 13-14.  That is, Commerce is arguing that KG Dongbu's response relieved Commerce of the obligation to consider the record evidence that did exist that showed that the alleged non-recurring subsidies from the first three debt-to-equity swaps were extinguished.   Evidence that only became relevant after Commerce reversed its consistent practice of not treating the first three debt-to-equity swaps and found them countervailable in the *Preliminary Results*.  This line of argument is misplaced.

As discussed, there was no reason or need for KG Dongbu to rebut the baseline presumption regarding non-recurring subsidies at the time of the questionnaires because Commerce had never found in any prior review that KG Dongbu received non-recurring subsidies.   It would have been pointless for KG Dongbu to say that it was rebutting a

presumption that did not apply given that there had never been any non-recurring subsidies found to exist for KG Dongbu.  Nor was the CIO Appendix necessary at that time, and Dongbu was entitled to rely on Commerce's consistent practice and statements that it would not re-examine the D/E swaps absent new factual information, of which there was none.  Dongbu was not required to predict that Commerce would change its mind.  *See Saha Thai Steel Pipe Public Co., Ltd. v. United States*, 605 F. Supp. 3d 1348, 1365 (Ct. Int'l Trade 2022).

More importantly, Commerce cannot simply bury its head in the sand and ignore the vast amount of record information that relates to the change in ownership issue.   The CIO Appendix is just a series of questions drafted by Commerce designed to elicit the information needed to conduct this extinguishment analysis.  The same information can be provided in other formats and Commerce cannot ignore that information just because it is not provided in the CIO Appendix format or because there may information requested in the CIO Appendix that is not already on the record.  *See* Final Remand at 30-31 (listing information requested in the CIO Appendix that is allegedly not on the existing record).  Commerce's claim that it "properly presumed that any non-recurring benefit would pass through to the new owners" (Final Remand at 14) because KG Dongbu did not initially challenge the baseline presumption and submit a CIO Appendix elevates form over substance.  More importantly, this justification does not excuse Commerce from its legal obligation to take into account evidence that detracts from its determination.  *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) ("{T}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").  Thus, while telling Commerce you are rebutting the baseline presumption and submitting a response to the CIO Appendix may be sufficient to rebut Commerce's baseline

presumption, the appendix is not a necessary condition where the record reflects that an arm's-length transaction took place at fair market value.

Commerce's explanation also ignores the fact that KG Dongbu presented arguments based on the record evidence, and that Commerce considered those arguments in the *Final Results*. The Court required Commerce to reconsider this issue on remand and so Commerce cannot simply ignore the substantive issue on the grounds that KG Dongbu forfeited its right to challenge the baseline presumption by not submitting a CIO Appendix. As discussed below, the record evidence shows that any alleged benefits received by Dongbu did not pass through to KG Dongbu.

###    B.    The Record Evidence Shows That Any Alleged Benefits Received by Dongbu Did Not Pass Through to KG Dongbu

Pursuant to 19 U.S.C. § 1677(f)(5), Commerce presumes that a non-recurring subsidy will benefit a recipient over the AUL of the relevant assets and Commerce thus allocates the subsidy over that period of time ("allocation period"). *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125, 37,127 (Dep't Commerce June 23, 2003) (*"Final Modification"*). However, a respondent may rebut the presumption by demonstrating that a change in ownership occurred in which the former owner sold all or substantially all of a company or its assets, and that the sale was at arm's-length and for fair market value. *Id.* [2] In such situations, the subsidy is reflected in the fair market price of the arm's-length transaction and the pre-sale subsidy is "extinguished," or does not "pass

---

[2] While the *Notice of Final Modification* explicitly addresses full privatization, Commerce later determined to apply this methodology to private-to-private sales. *See, e.g., Certain Pasta From Italy:  Preliminary Results and Partial Rescission of the Eighth Countervailing Duty Administrative Review*, 70 Fed. Reg. 17,971, 17,972 n.2 (Dep't Commerce Apr. 8, 2005) ("*Pasta from Italy*").

through" to the new owner.  In the *Final Modification*, Commerce listed four factors that it would analyze when determining whether the transaction price in an acquisition was arm's-length and for fair market value.  These factors include: (1) whether an objective analysis was performed in determining the appropriate sales price; (2) whether any artificial barriers to entry were imposed on potential purchasers that could artificially suppress demand for, or the purchase of, the company; (3) whether the highest bid was accepted; and (4) whether there were committed investment requirements that could serve as a barrier to entry or distort the value that bidders were willing to pay.  *Final Modification*, 68 Fed. Reg. at 37,127.  Record evidence demonstrates that all of these elements are met.

First, regarding the objective analysis factor, PricewaterhouseCoopers independently analyzed the acquisition proposal from the KG Consortium, including the [                    ] acquisition price in Scenario 3, and compared the proposal with alternative scenarios that assumed the Creditors Council either made no changes to Dongbu's pre-acquisition structure or liquidated Dongbu.  CR 81-156 at Exhibit B-29.  Based on its analysis, PricewaterhouseCoopers concluded that the KG Consortium's proposal had the highest value to the Creditors Council of the available alternative scenarios and posed less risk than liquidating Dongbu.  *Id.* at 38-39; CR 157-188 at 9-10.  This was thus an objective analysis.

Second, there were no artificial barriers to entry.  An investment attraction announcement for an open bidding process that provided equal access and free competition for all interested parties was published in a newspaper on January 7, 2019.  CR 81-156 at 36, Exhibit B-19.  The purpose of the transaction was the acquisition by a third party of newly issued common stock that would result in the transfer of corporate management rights.  *Id.*  Potential investors that submitted the confidentiality agreement form and revealed an intention to bid received a

Preliminary Bidding Guide and a Teaser Memorandum containing private and confidential information of Dongbu to assist the recipient in making a decision on whether to pursue a further analysis of Dongbu and submit a preliminary bidding proposal. *Id.* at Exhibits B-20 and B-21.

Third, the highest bid was accepted in this bidding process. [      ] potential investors showed interest by signing confidentiality agreements and were allowed access of Dongbu's confidential information. *Id.* at 36, Exhibit B-22.  Dongbu's financial and business information was provided for their valuation and to determine a reasonable investment amount to take over Dongbu.  Because the financial information (*e.g.*, Teaser Memorandum) covered the period through September 2018, it fully reflected Dongbu's current financial condition after the first three D/E Swaps.

Following receipt of these materials, three potential investors submitted preliminary bids. The KG Consortium, which submitted [                              ] (*id.* at 36 and Exhibit B-24), offered a purchase price of KRW [                    ] for an ownership stake of [

              ](*id.* at Exhibit B-23, section 2 (Estimated Transaction Amount)).  After the co-financial advisors evaluated the proposed investment amounts, financial and business plans, and capacity to close the deal proposed in the preliminary bidding, all three potential investors were found to be qualified bidders and given an opportunity to participate in the final bidding process. *Id.* at Exhibit B-24.  However, only the KG Consortium submitted a final bid.  After being selected for the final bidding process, the KG Consortium appointed Ernst & Young, an independent accounting firm, to analyze Dongbu's financial situation and, based on the information provided, the KG Consortium prepared its business restructuring plan and submitted its final bidding proposal on March 4, 2019. *Id.* at 37, Exhibit B-25, Exhibit B-26.  On June 4,

2019, the creditors committee approved the M&A agreement for an investment amount of KRW

[            ].  *Id.* at 39, Exhibit B-30; CR 247-250 at Exhibits B-45 and B-46.

Following the approvals by the creditors committee, Dongbu's Board of Directors, and

the general shareholders' meeting, the new shares were issued to the KG Consortium and

members of the creditors committee.  CR 81-156 at 45-46.  After the KG Consortium paid in full

for the new shares the procedures for the workout program were concluded and the creditors

committee dissolved on September 6, 2019.  *Id.* at 39, Exhibit B-32; CR 202-206 at 2.  Thus,

with the implementation of these measures, the resulting new shares accounted for [      ]

percent of Dongbu's outstanding shares.  CR 81-156 at Exhibit 12-A (Dongbu Steel's 2019

Separate Financial Statements at Note 20(2)), *i.e.,* (24,200,000 + 72,000,000) / 100,055,019 =

96.15 percent).

Fourth, there were no committed investment requirements that could serve as a barrier to

entry or distort the value that bidders were willing to pay.

Commerce failure to consider this evidence that completely undercuts its determination

that any non-recurring benefits received by Dongbu were passed through to KG Dongbu Steel is

unlawful.

### III.    The Department Calculated the Uncreditworthy Benchmark Rate and the Unequityworthy Discount Rate Contrary to Evidence and the Plain Language of Its Regulations

In Slip Op. 23-98, the Court concluded that Commerce's application of the formula for

calculating the uncreditworthy benchmark rate and unequityworthy discount rate pursuant to 19

C.F.R. § 351.505(a)(3)(iii) and 19 C.F.R. § 351.524(d) was not supported by substantial

evidence.  Slip Op. 23-98 at 17-18.  The Court noted that the extension of the repayment date on

KG Dongbu's loans to December 31, 2025 and the 15 year average useful life ("AUL") of the

equity infusions contradicted Commerce's *Final Results*. *Id.* at 17.   In its Final Remand, Commerce continues to use 3 years for the term of the loan variable and the creditworthy and uncreditworthy default rates because there is allegedly no information on the record regarding a 6 year interest rate for a comparable commercial loan and the loans that KG Dongbu received cannot constitute "comparable commercial loans" pursuant to 19 C.F.R. § 351.505(a)(2).  Final Remand at 17.  Commerce also continues to use 3 years in the calculation of the discount rate for the equity infusions because it continues to find the use of the 3 year term for KG Dongbu's restructured loans is supported by substantial evidence. *Id.* at 17-18.

Commerce's redetermination to use 3 years for the term of the loan in variable $n$, and the length of time within which creditworthy and uncreditworthy companies may default for variables $p_n$ and $q_n$, is contrary to the plain language of its regulations.  19 C.F.R. § 351.505(a)(3)(iii) states:

> If the Secretary finds that a firm that received a *government-provided long-term loan* was uncreditworthy, as defined in paragraph (a)(4) of this section, the Secretary normally will calculate the interest rate to be used in making the comparison called for by paragraph (a)(1) of this section according to the following formula:
>
> $i_b = ((1-q_n)(1+i_f)^n/(1-p_n))^{1/n} - 1$,
>
> where:
> $n$ = *the term of the loan*;
> $i_b$ = the benchmark interest rate for uncreditworthy companies;
> $i_f$ = the long-term interest rate that would be paid by a creditworthy company;
> $p_n$ = the probability of default by an uncreditworthy company within $n$ years; and
> $q_n$ = the probability of default by a creditworthy company within $n$ years.

19 C.F.R. § 351.505(a)(3)(iii) (emphasis added).  The plain language of 19 C.F.R. § 351.505(a)(3)(iii) thus ties the "the term of the loan" for variable $n$ to the "government provided long term loan," here KG Dongbu's restructured loans, because subsection (iii) expressly states that, if "a firm that received *a government-provided long-term loan* was uncreditworthy," then

Commerce "will calculate the interest rate to be used in making the comparison… where: n = the term of *the loan*." 19 C.F.R. § 351.505(a)(3)(iii) (emphasis added).  The same is true for the unequityworthy benchmark calculation, except 19 C.F.R. § 351.507(c) and 19 C.F.R. § 351.524(d) provide that Commerce shall allocate the benefit, if any, over the AUL of the equity infusions.  *See e.g.*, 19 C.F.R. § 351.524(d) (expressing that "n = the AUL").  Commerce's redetermination to use the term of the 3 year AA-rated KRW interest rate published by the Bank of Korea rather than the 6 year term of KG Dongbu's restructured loans and the 15 year AUL allocation period, which are on the record, contradicts the plain language of 19 C.F.R. § 351.505(a)(3)(iii).

Commerce's redetermination that there is insufficient record information to calculate the benefit pursuant to the plain text of 19 C.F.R. § 351.505(a)(3)(iii) is unsupported by substantial evidence.  When the creditor's committee met and approved the restructuring of KG Dongbu's loans on June 4, 2019, the maturity date of the loans were extended until 2025.  CR 81-156 at 39.  The term of KG Dongbu's restructured loans is thus 6 years: from the 2019 extension until the loans mature in 2025.  The term of AUL allocation period for non-recurring subsidies is 15 years.  *Id.* at 15.  The probabilities of default ("default rates") by creditworthy and uncreditworthy companies on 6 year and 15 year loans are on the record.  CR 260 at Attachment II (Exhibit 33) (listing the probabilities of default by credit rating for terms up to 20 years).  The information necessary to calculate the uncreditworthy benchmark rate and unequityworthy discount rate pursuant to the plain language of 19 C.F.R. § 351.505(a)(3)(iii)—the 6 year term of KG Dongbu's restructured loans, the 15 year AUL of the equity infusions, and the probabilities of default by creditworthy and uncreditworthy companies for 6 and 15 year periods—is on the record, contrary to Commerce's characterizations in the Final Remand.

In the Final Remand, Commerce determined that there is no information on the record regarding a 6 year interest rate on for a comparable commercial loan, and that "the loans from the alleged private banks to KG Dongbu cannot constitute 'comparable commercial loans' under 19 C.F.R. §351.505(a)(2)" due to alleged government influence and "the fact that they were part of a government program." Final Remand at 16-17. However, KG Dongbu does not argue that Commerce used the incorrect interest rate for "the long-term interest rate that would be paid by a creditworthy company" as variable $i_f$. Nor does KG Dongbu argue that its own loans from private banks are "comparable commercial loans."

Rather, KG Dongbu argues that, because the "term of the loan" for KG Dongbu's "government provided long-term loan" is 6 years and the AUL period for the equity infusions is 15 years, the plain language of 19 C.F.R. § 351.505(a)(3)(iii) states that Commerce will calculate the benchmark interest rate using 6 year and 15 year terms as the term of the loan for variable $n$ and the probabilities of default by creditworthy and uncreditworthy companies within 6 and 15 years for variables $p_n$ and $q_n$. Commerce has on the record (a) the 6 year term of KG Dongbu's loans and the 15 year AUL period for variable $n$, (b) the long-term interest rate that would be paid by a creditworthy company (*i.e.*, the three-year AA-rated KRW interest rate published by the Bank of Korea) for variable $i_f$, and (c) the probability of default by creditworthy and uncreditworthy companies within 6 and 15 years for variables $p_n$ and $q_n$. Commerce does not require an interest rate from a 6 or 15 year long-term loan to "calculate the interest rate to be used in making the comparison" with KG Dongbu's restructured loans pursuant to the plain language of 19 C.F.R. § 351.505(a)(3)(iii), or to calculate the discount rate that "the Secretary will use" when allocating the equity infusions pursuant to 19 C.F.R. § 351.524(d)(3)(ii).

Commerce cites the *Preamble* to allegedly support using a 3 year term to calculate the benchmark interest rate for Dongbu's 6 year loans and discount rate for the 15 year AUL allocation period on its equity infusions (Final Remand at 33-34), but the *Preamble* language that Commerce cites actually supports Dongbu's argument. *See* Dongbu's Mot. for J. upon the Agency R. at 39, *KG Dongbu Steel Co. v. United States*, No. 22-00047 (Aug. 29, 2022), ECF No. 33-2. The *Preamble* states that "the interest rate differential on loans charged to creditworthy and uncreditworthy companies is such that the lender's expected (total) return on an uncreditworthy company equals the expected (total) return on a loan to a creditworthy company, *after accounting for differences in risk of default*." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,365-66 (Dep't Commerce Nov. 25, 1998) (emphasis added) ("*Preamble*"). The *Preamble* also states that "using a default rate that is directly linked to the term of the loan is a *better reflection of the risk* associated with long-term lending to uncreditworthy borrowers." *Preamble*, 63 Fed. Reg. at 65,365 (emphasis added). The *Preamble* thus states explicitly that the "probability of default" variables $p_n$ and $q_n$ are "directly linked to the *term of the loan*," not that they are linked to the "term of the benchmark," or variable $i_f$ (the long-term interest rate that would be paid by a creditworthy company) as Commerce suggests. Final Remand at 34. Indeed, the regulation states that variables $p_n$ and $q_n$ equal the "probability of default" by a creditworthy or uncreditworthy company "*within n years*," and that variable $n$ equals "the term of the loan." 19 C.F.R. § 351.505(a)(3)(iii) (emphasis added). The Final Remand is thus contrary to both the *Preamble* and the plain language of 19 C.F.R. § 351.505(a)(3)(iii), unsupported by substantial evidence, and fails to comply with the Court's remand order.

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court again remand

Commerce's decision with instructions to reconsider the *Final Results*, and for such other relief

that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Stephen Morrison

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4116

*Counsel to Plaintiffs KG Dongbu Steel Co.,*
*Ltd., Dongbu Steel Co., Ltd. and Dongbu*
*Incheon Steel Co., Ltd.*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 6,503 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills