**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |
|---|---|
| KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., DONGBU INCHEON STEEL CO., LTD.,<br><br>    Plaintiffs,<br><br>  v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>   and<br><br>NUCOR CORPORATION and STEEL DYNAMICS, INC.,<br><br>    Defendant-Intervenors. | Court No. 22-00047 |

**ORDER**

Upon consideration of the plaintiffs' comments regarding the Department of Commerce's (Commerce) remand redetermination, defendant's response thereto, and all other pertinent papers, it is hereby

ORDERED that Commerce's remand redetermination is sustained; and it is further

ORDERED that judgment shall issue for the United States.

Dated: _____

   New York, New York

            _____

               JUDGE

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| KG DONGBU STEEL CO., LTD<br>DONGBU STEEL CO., LTD., and<br>DONGBU INCHEON STEEL CO., LTD.<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNITED STATES,<br><br>*Defendant*,<br><br>and<br><br>NUCOR CORPORATION and STEEL<br>DYNAMICS, INC.,<br><br>*Defendant-Intervenors*. | Court No. 22-00047<br><br>**Public Version**<br>Business Proprietary Information<br>Removed from Pages 9-10 |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' COMMENTS ON COMMERCE'S REMAND REDETERMINATION

<table>
<tr><td></td><td>BRIAM M. BOYNTON<br>Principal Deputy Assistant Attorney General</td></tr>
<tr><td></td><td>PATRICIA M. MCCARTHY<br>Director</td></tr>
<tr><td></td><td>CLAUDIA BURKE<br>Assistant Director</td></tr>
<tr><td>OF COUNSEL:</td><td>ELIZABETH SPECK<br>Senior Trial Counsel</td></tr>
<tr><td>ASHLANDE GELIN<br>Attorney<br>U.S. Department of Commerce<br>Office of the Chief Counsel for<br>Trade Enforcement & Compliance<br>Washington, D.C. 20230</td><td>United States Department of Justice<br>Civil Division<br>Commercial Litigation Branch<br>P.O. Box 480<br>Ben Franklin Station<br>Washington, D.C. 20044<br>Tel: (202) 307-0369<br>Fax: (202) 514-7965</td></tr>
<tr><td>December 22, 2023</td><td>Attorneys for Defendant</td></tr>
</table>

## <u>TABLE OF CONTENTS</u>

BACKGROUND ...................................................................................................2

    I.    Commerce's Final Results And The Court's Remand Order .....................2

    II.   Commerce's Remand Redetermination ....................................................5

ARGUMENT .......................................................................................................6

    I.    Standard Of Review .................................................................................6

    II.   Commerce's Remand Redetermination Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law ...........................7

        A.   Commerce Provided The Required Additional Explanation Regarding Its Conclusion That The First Through Third Debt-To-Equity Restructurings Did Not Confer A Benefit .........................................................................7

        B.   Commerce's Determination That The Benefits From Dongbu Steel's Debt-To- Equity Swaps Passed Through To KG Dongbu Steel Is Supported By Substantial Evidence And In Accordance With Law ..................................16

        C.   On Remand Commerce's Further Explained Why Its Calculation Of The Uncreditworthy Benchmark And Uncreditworthy Discount Rate Is Supported By Substantial Evidence And In Accordance With Law ..................................21

CONCLUSION ..................................................................................................26

# **TABLE OF AUTHORITIES**

**Cases**                                                              **Page(s)**

*Boomerang Tube, LLC, TMK IP-SCO v. United States,*
    856 F.3d 908 (Fed. Cir. 2017) ............................................... 26

*British Steel Corp. v. United States,*
    632 F. Supp. 59 (Ct. Int'l Trade 1986) ............................... 14, 15

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938) ............................................................ 6, 16

*Consolo v. Fed. Maritime Comm'n,*
    383 U.S. 607 (1966) ............................................................ 7, 16

*Essar Steel Ltd. v. United States,*
    721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) ........................... 18

*FCC v. Fox Television Stations,*
    556 U.S. 502 (2009) ................................................................ 13

*Ferrostaal Metals Gmbh v. United States,*
    518 F. Supp. 3d 1357 (Ct. Int'l Trade 2021) ........................... 18

*Hynix Semiconductor, Inc. v. United States,*
    425 F. Supp. 2d 1287 (Ct. Int'l Trade 2006) ....................... 14, 15

*KG Dongbu Steel Co. v. United States,*
    648 F. Supp. 3d 1353 (Ct. Int'l Trade 2023) ................... *passim*

*MacLean-Fogg Co. v. United States,*
    100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ............................. 6

*Nucor Corp v. United States,*
    494 F. Supp. 3d 1377 (Ct. Int'l Trade 2021) ........................ 5, 7

*Nucor Corporation v. United States,*
    461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) ...................... 7, 20

*PPG Indus., Inc. v. United States,*
    746 F. Supp. 119 (Ct. Int'l Trade 1990) .................................. 12

*PPG Industries, Inc. v. United States,*
    978 F.2d 1232 (Fed. Cir. 1992) ............................................... 12

*QVD Food Co. v. United States,*
658 F.3d 1318 (Fed. Cir. 2011) ........................................................ 17

*Ranchers-Cattleman Action Legal Found. v. United States,*
74 F. Supp. 2d 1353 (Ct. Int'l Trade 1999) ............................... 13

*Saarstahl AG v. United States,*
949 F. Supp. 863 (Ct. Int'l Trade 1996) ...................................... 19

*Zenith Elecs. Corp. v. United States,*
988 F.2d 1573 (Fed. Cir. 1993) ........................................................ 17

**Statutes**

19 U.S.C. § 1516a(b) ........................................................................... 6

19 U.S.C. § 1675(a) ............................................................................. 12

19 U.S.C. § 1677(5) ............................................................................... 2

19 U.S.C. §1677(5)(E) ..................................................................... 2, 22

19 U.S.C. § 1677(5)(F) ................................................................... 16, 19

28 U.S.C. § 2637(d) ............................................................................. 26

**Regulations**

19 C.F.R. § 351.505 ............................................................................ 14

19 C.F.R. § 351.505(a) ................................................................. *passim*

19 C.F.R. § 351.507 ........................................................................ 8, 14

19 C.F.R. § 351.507(a) ................................................................. *passim*

19 C.F.R. § 351.507(c) ................................................................ 21, 25

19 C.F.R. § 351.524(d) ................................................................. *passim*

**Federal Register**

*Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea*,
   77 Fed. Reg. 17,410 (Dep't of Commerce March 26, 2012) ................................................... 15

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
   86 Fed. Reg. 37,740 (July 16, 2021) ........................................................................................ 2

*Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results and
   Partial Rescission of Countervailing Duty Administrative Review; 2019*,
   87 Fed. Reg. 2759 (Jan. 19, 2022) .......................................................................................... 2

*CFS Paper from the Republic of Korea*,
   72 Fed. Reg. 60,639 (Dep't of Commerce Oct. 25, 2007) ........................................................ 15

*Countervailing Duties*,
   63 Fed. Reg. 65348 (November 25, 1998) .................................................................. 23, 25, 26

*Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round
   Agreements Act*,
   68 Fed. Reg. 37,125 (Dep't Commerce 2003) ................................................................. 16, 18

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| KG DONGBU STEEL CO., LTD<br>DONGBU STEEL CO., LTD., and<br>DONGBU INCHEON STEEL CO., LTD.<br><br>*Plaintiffs,*<br><br>v.<br><br>THE UNITED STATES,<br><br>*Defendant,*<br><br>and<br><br>NUCOR CORPORATION and STEEL<br>DYNAMICS, INC.,<br><br>*Defendant-Intervenors.* | Court No. 22-00047<br><br>**Public Version**<br>Business Proprietary Information<br>Removed from Pages 9-10 |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' COMMENTS ON<br>COMMERCE'S REMAND REDETERMINATION**

Defendant, the United States, respectfully responds to comments filed by plaintiffs KG

Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd., and Dongbu Incheon Steel Co., Ltd.

(collectively KG Dongbu Steel or plaintiffs), ECF Nos. 60-61, concerning the Department of

Commerce's remand redetermination filed in accordance with this Court's remand order in *KG*

*Dongbu Steel Co. v. United States*, 648 F. Supp. 3d 1353 (Ct. Int'l Trade 2023) (Remand Order).

*See* Final Results of Redetermination Pursuant to Court Remand, Sept. 12, 2023 (Remand

Redetermination), ECF Nos. 55-56.  For the reasons explained below, we respectfully request

that the Court sustain Commerce's remand redetermination and enter final judgment for the

United States.

## BACKGROUND

### I.    Commerce's Final Results And The Court's Remand Order

On January 19, 2022, Commerce published its final results in the 2019 countervailing

duty administrative review covering certain corrosion-resistant steel products (CORE) from

Korea.  *See Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final*

*Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed.

Reg. 2,759 (Dep't of Commerce Jan. 19, 2022) (Final Results), P.R. 216, and accompanying

Issues and Decision Memorandum (IDM), P.R. 213.  The period of review is January 1, 2019

through December 31, 2019.  *Id*.; *see also Certain Corrosion-Resistant Steel Products from the*

*Republic of Korea*, 86 Fed. Reg. 37,740 (Dep't of Commerce July 16, 2021) (preliminary

results), P.R. 172, and accompanying Preliminary Decision Memorandum (PDM), P.R. 173.

As Commerce explained in the Final Results, during the 15-year average useful life

period for the non-recurring subsidies at issue in this review, KG Dongbu Steel (formerly

Dongbu Steel)[1] had three debt-to-equity restructurings: the first in February 2015, the second in

May 2016, and the third in April 2018.[2]  *See* PDM at 15; *see also* Equity Infusions Analysis

---

[1]  During its 4th debt restructuring, Dongbu Steel Co., Ltd. (Dongbu Steel) and its wholly owned subsidiary Dongbu Incheon Steel Co., Ltd. merged with KG Group, leading to the creation of KG Dongbu Steel.

[2]  Commerce determines that a countervailable subsidy exists in circumstances when an "authority" provides a "financial contribution," which results in a "benefit conferred" to the recipient, and that the resulting subsidy is specific.  19 U.S.C. § 1677(5).  Section 1677(5)(E) of Title 19 provides the standard for determining the existence and amount of a benefit conferred through the provision of a subsidy.  For equity infusions, it states that a benefit is conferred "if the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made."  *Id*. at § 1677(5)(E)(i); *see also* 19 C.F.R. § 351.507(a)(1) (defining benefit for equity infusions).

Memo, July 13, 2021, P.R. 176, C.R. 259.  When analyzing the record of the current review (AR 2019), Commerce determined not to rely on private investor prices for these three debt-to-equity conversions because the private investors were not significant within the meaning of 19 C.F.R. § 351.507(a)(2)(iii), and therefore unreliable.  Equity Infusions Analysis Memo, C.R. 259 at 11; *see* 19 C.F.R. § 351.507(a)(2)(iii) ("The Secretary will not use private investor prices under paragraph (a)(2)(i) of this section if the Secretary concludes that private investor purchases of newly issued shares are not significant.").  Commerce explained that it could not rely on the prices paid by the private creditors and private investors because of the significant influence of Government of Korea (GOK)-controlled entities, such as the Korean Development Bank (KDB), in the debt restructuring process.  Thus, pursuant to 19 C.F.R. § 351.507(a)(3), and after analyzing the record evidence, Commerce determined that KG Dongbu Steel was not equity worthy at the time of these conversions.  IDM at 46-47; Equity Infusions Analysis Memo, C.R. 259.  Accordingly, Commerce determined that a benefit was conferred in the entire amount of these debt to-equity infusions (*i.e.*, the amount of the first, second, and third conversions) through the GOK-owned or controlled financial institutions.

Commerce also explained that KG Dongbu Steel's debt-to equity conversions were not extinguished when the company was acquired by KG Group.  IDM at 54.  As Commerce explained, Dongbu failed to complete Commerce's Change-in-Ownership Appendix, which might have provided the record evidence necessary to rebut the presumption that subsidies existing prior to KG Dongbu Steel's change in ownership, passed through to the newly formed KG Dongbu Steel.  *Id*.  Thus, Commerce followed its standard practice and found that any benefit to KG Dongbu Steel (*e.g.*, the debt-to-equity infusions) would pass through to KG Dongbu Steel.  *Id*.

Finally, as in prior administrative reviews, Commerce determined that KG Dongbu Steel was uncreditworthy because no new information had been submitted to cause Commerce to reevaluate its creditworthiness determination for the company.  IDM at 41-42.  Thus, Commerce calculated an uncreditworthy benchmark rate pursuant to 19 C.F.R. § 351.505(a)(3)(iii).  *Id*.  In calculating the uncreditworthy benchmark rate, Commerce used a three-year AA-rated KRW interest rate, published by the Bank of Korea, as the long-term interest rate paid by a creditworthy company because it was the only long-term interest rate available on the record. IDM at 58.  Commerce explained that it could not use a six-year creditworthy interest rate, *i.e.*, the term of the loan at issue, because there was no information regarding a six-year interest rate paid by a creditworthy company on the record.  *Id*. at 59.  Further, because Commerce determined that KG Dongbu Steel was uncreditworthy, Commerce used a discount rate for uncreditworthy companies, consistent with 19 C.F.R. § 351.524(d)(1) and (d)(3)(ii), in allocating the equity infusions. IDM at 59.  Commerce used as a discount rate the benchmark interest rate described in 19 C.F.R. § 351.505(a)(3)(iii), which as discussed above was a three-year creditworthy interest rate. *Id*

In August 2022, plaintiffs challenged Commerce's Final Results.  *See* ECF Nos. 33-34. On July 7, 2023, the Court issued its remand order.  *See KG Dongbu Steel*, 648 F. Supp. 3d at 1355-1362.  In the remand opinion and order, the Court ordered Commerce to reconsider or further explain several aspects of its original determination.  With respect to Commerce's determination that the first through third debt-to-equity restructurings provided a countervailable benefit, the Court concluded that Commerce's determination marked a departure from Commerce's "standard practice regarding not reexamining the countervailability of Dongbu Steel's equity infusions" absent new evidence and that Commerce had failed to explain its

departure from this practice.  *Id.* at 1358.  Thus, the Court remanded the matter to Commerce for reconsideration or additional explanation.  *Id.* at 1359.  The Court also remanded for further explanation Commerce's determination that the benefits from the debt-to-equity restructurings passed through from Dongbu Steel Co., Ltd. (Dongbu Steel) to KG Dongbu Steel Co., Ltd. (KG Dongbu Steel).  *Id.* at 1360.

 Turning to whether substantial evidence supported Commerce's calculations of the uncreditworthy benchmark rate based upon a three-year interest rate, the Court concluded that Commerce had failed to address evidence that plaintiffs placed on the record that a six-year interest rate might be more appropriate.  *Id.*  Finally, the Court remanded for further consideration and explanation whether Commerce's calculations of the unequityworthy discount rate were supported by substantial evidence.  *Id.*

## II.   **Commerce's Remand Redetermination**

On October 5, 2023, Commerce issued its remand redetermination.  In its determination, Commerce further explained its rationale for determining that KG Dongbu Steel's (formerly Dongbu Steel) first through third debt-to-equity restructurings provided a countervailable benefit.  Remand Redetermination at 6-12.   Although Commerce acknowledged that its determination in this review regarding whether the first three debt-to-equity swaps conferred a benefit was a departure from its prior determination, Commerce explained that its determination was consistent with its practice of re-evaluating benefit in each administrative review.  *Id.* at 6-8.  Regardless, Commerce explained when re-evaluating benefit, it concluded that "{it} had made a mistake in the prior review" in which it had found that no benefit had been conferred by the first three debt-to-equity restructurings.  *Id.* at 8.  Also, Commerce explained that its decision in *Nucor Corp v. United States,* 494 F. Supp. 3d 1377 (Ct. Int'l Trade 2021) (*Nucor 2021*), in

which it had re-considered the role of the Government of Korea and KDB in the debt restructurings, had also informed its analysis in this review.  Remand Redetermination at 9.  Commerce then identified substantial evidence in the record supporting its conclusions.  *Id.* at 9-11.

Next, Commerce further explained the reasons for its conclusion that the countervailable subsidies "passed through" to KG Dongbu Steel after ownership of the company changed.  *Id.* at 12-14.  Specifically, Commerce explained that, because KG Dongbu Steel failed to complete the Change-in-Ownership Appendix, it had declined to rebut Commerce's presumption that it continued to benefit from the non-recurring subsidies over the allocation period.  *Id.*

Turning to whether Commerce had properly calculated the uncreditworthy benchmark rate, Commerce addressed the evidence identified by the Court regarding the six-year loan rate but concluded that it could not use that rate because the record evidence did not support that it was a "comparable commercial loan" for purposes of 19 C.F.R. § 351.505(a)(3)(iii).  Remand Redetermination at 15-17.  Finally, Commerce explained that, because Commerce calculated the appropriate uncreditworthy benchmark interest rate, Commerce was correct to use this same benchmark interest rate as the unequityworthy discount rate described in 19 C.F.R. § 351.524(d)(3), for purposes of allocating the benefit from the debt-to-equity infusions as described in 19 C.F.R. § 351.524(d)(1).  Remand Redetermination at 17-18.

## ARGUMENT

### I.   Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law."  *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct.

Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Even if it is possible to draw two inconsistent conclusions from the record evidence, this does not mean that Commerce's findings are unsupported by substantial evidence.  *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

## II.     Commerce's Remand Redetermination Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law

As explained below, we respectfully request that the Court sustain Commerce's Remand Redetermination because it is supported by substantial evidence and is in accordance with law.

### A.   Commerce Provided The Required Additional Explanation Regarding Its Conclusion That The First Through Third Debt-To-Equity Restructurings Did Not Confer A Benefit

First, as requested by the Court, Commerce further explained its determination that a countervailable subsidy was conferred to KG Dongbu Steel by the first through third debt-to-equity restructurings.  *See KG Dongbu Steel*, 648 F. Supp. 3d at 1357-1359; Remand Redetermination at 6-12, 22-25.  Although Commerce respectfully disagreed with the Court's conclusion that it had departed from its prior practice, it also explained that good cause supported its re-examination of benefit.  Remand Redetermination at 8.  Specifically, Commerce explained that it needed to correct a mistake that it had realized that it made in a prior review.  *Id.* Commerce also concluded that it was appropriate to incorporate information that it had considered from the prior administrative review (AR 2018) following the Court's remand order in *Nucor Corporation v. United States*, 461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) (*Nucor 2020*), which was ultimately sustained in *Nucor 2021*, 494 F. Supp. 3d 1377.  Remand Redetermination at 8-9.  KG Dongbu Steel disagrees that Commerce has a consistent practice of

7

re-examining benefit in each review but cites nothing supporting its position that Commerce: (1) is precluded from re-examining whether a benefit was conferred, (2) cannot correct a mistake that it made in prior reviews, or (3) cannot reconsider a prior benefit finding after it performs additional analysis pursuant to a Court-ordered remand.

When evaluating whether equity infusions confer a benefit, Commerce examines whether the infusion is "consistent with the usual investment practices" and compares whether the price paid by the government for newly issued shares is greater than the price that private investors paid. 19 C.F.R. § 351.507(a)(2)(i). Commerce will not use private investor prices if they are not significant. *Id.*; *see also id.* at §§ 351.507(a)(3), (a)(6) (explaining how Commerce will evaluate benefit if private investor prices are unavailable because they are not significant).

As Commerce explained in the Final Results and in its Remand Redetermination, although it had previously concluded that the first three debt-to-equity swaps did not confer a benefit, for the AR 2019 review, KG Dongbu Steel submitted its relevant new benefit information regarding the fourth debt-to-equity restructuring, which indicated that private banks had played a significant role in the fourth debt-to-equity restructuring. Specifically, the evidence showed that private banks had (1) participated in the three equity infusions at issue, (2) paid the same per share price as the government-controlled policy banks, and (3) purchased a significant percentage of the shares of debt that were converted to equity. *See generally* Equity Infusions Analysis Memo, C.R. 259. Thus, Commerce found that, pursuant to 19 C.F.R. § 351.507, the equity infusions in the fourth debt-to-equity conversion was consistent with usual investment practice of private investors.

In the Equity Infusions Analysis Memo, Commerce explained in detail why the 2019 review differed from the 2018 review and why it caused Commerce to reconsider its prior

findings regarding the role of government-controlled banks in the first three equity infusions. Put another way, because of the fourth equity infusion, Commerce conducted a more thorough analysis and determined that "its prior finding that no benefit was conferred by the first three debt-to-equity restructurings was inconsistent with 19 C.F.R. {§} 351.507." Remand Redetermination at 8; *see also id.* at 22. Specifically, Commerce identified record evidence supporting that in the first three debt-to-equity conversions, the GOK-controlled financial institutions controlled the decisions of the creditors' committees or councils, meaning that the private creditors had no decision-making control over these committees and had to comply with the terms set by the GOK-controlled financial institutions. Equity Infusions Analysis Memo, C.R. 259 at 11-12.

    As Commerce explained, with respect to the first debt-to-equity conversion, at the time of the conversion, the GOK-owned banks, including KDB, owned [       ] percent of Dongbu Steel's shares, and [                              ], with the rest owned or [       ] by private investors. *See* Equity Infusions Analysis Memo, C.R. 259 at 5-6 (citing KG Dongbu's Initial Questionnaire Response (KG Dongbu IQR), Dec. 3, 2020, P.R. 74-78, C.R. 112-156 at Exh. B-10 at Attachment 1); Government of Korea Initial Questionnaire Response (GOK IQR), Dec. 4, 2020, P.R. 79-85, C.R. 157-188 at Debt Restructuring-9. With respect to the second debt-to-equity conversion, of the shares subject to the conversion [        ], and [                          ]. Equity Infusions Analysis Memo, C.R. 259 at 6-7 (citing KG Dongbu IQR, C.R. 112-156 at 52 and Exh. B-17 at 7). And at the time of the third restructuring, [           ]. Equity Infusions Analysis Memo, C.R. 259 at 7 (citing KG Dongbu IQR, C.R. 112-156 at 53).

Commerce also identified evidence showing that KDB also exercised significant influence over the three debt restructurings.  Equity Infusions Memorandum Analysis Memo, C.R. 259 at 11.  KDB and Dongbu Steel had entered into the [███████████████████ ███████████████████████████████] which allowed KDB to dictate how Dongbu Steel would manage its assets and repay its creditors.  Equity Infusions Analysis Memo at 11 (citing KG Dongbu IQR, C.R. 112-156 at Exh. B-3 at Article 4); *see also* Equity Infusions Analysis Memo, C.R. 259 at 2 (citing KG Dongbu IQR, C.R. 112-156 at 22-24, 56 and Exh. B-2 at 2).  As Dongbu Steel went through these three debt restructurings, KDB dictated how Dongbu Steel would use its assets and production to generate revenue, and thus how Dongbu Steel would repay its creditors.  Equity Infusions Analysis Memo, C.R. 259 at 2; IDM at 48 (citing Equity Infusions Analysis Memo, C.R. 259 at 11 and GOK IQR, C.R. 157-188 at Exh. Debt Retructuring-3 and Exh. Debt Restructuring-6 at 8).  This, coupled with KDB and GOK-controlled banks' majority [███████████], required that any private creditors had no alternative but to accept the terms imposed on them.  Equity Infusions Analysis Memo, C.R. 259 at 11 (citing GOK IQR, C.R. 157-188 at Exh. Debt Restructuring-3 (Minutes of 1st Dongbu Steel's Voluntary Creditors Association) at Contents of Third Agenda) and Debt Restructuring-6 at 8; KG Dongbu IQR, C.R. 112-156 at Exh. B-5); IDM at 47.  Although private investors participated in these conversions, because of this government influence, Commerce determined that the participation of Dongbu Steel's private creditors was not significant.  IDM at 47; Equity Infusions Analysis Memo, C.R. 259 at 9-11.  Therefore, pursuant to 19 C.F.R. § 351.507(a), private investor prices were not available for the first through third debt-to-equity conversions, and Commerce had to determine whether Dongbu Steel was equityworthy.  IDM at 50-51.

Commerce's reconsideration was also guided by other "new circumstances," specifically the analysis that was ultimately sustained in *Nucor 2021* and which further informed Commerce's conclusion that private investor prices were not usable as benchmarks for the first three equity infusions.  Remand Redetermination at 9, 22.  In *Nucor 2021*, the Court sustained Commerce's remand redetermination, in which Commerce found that KG Dongbu Steel's private bank loans would be inappropriate to use as a loan benchmark, because these loans were provided as part of a government loan program.  *Nucor v. United States*, Final Results of Redetermination Pursuant to Court Remand, No. 19-0042, Sept. 30, 2020, ECF Nos. 88, 89 (*Nucor 2020 Remand Results*).  In the remand redetermination for *Nucor 2021*, Commerce concluded that all of the creditor banks, including the private banks, were obligated to participate in the debt restructuring, which provided the GOK-owned and controlled banks with the ability to establish the financial terms of the debt restructurings, which include both the loan restructuring and debt-to-equity restructuring.  *Id*.  Commerce further explained that the private banks, which provided loans to KG Dongbu Steel, were under significant government influence and, therefore, Commerce could not rely on KG Dongbu Steel's private banks as a loan benchmark.  *See* Remand Redetermination at 22-23.

Similarly, the record of this review shows that both the loan restructuring and the debt-to-equity infusions were approved by the same creditor banks and the terms of the loan restructuring, and the debt-to-equity infusions were agreed to at the same time.  *See* Equity Infusions Analysis Memo, C.R. 259 at 5.  Therefore, it would be inconsistent for Commerce to find, on the one hand, that the GOK-controlled policy banks have significant influence over the loan portion of the debt restructuring, and, on the other hand, that the same banks did not have such influence over the debt-to-equity portion of the debt restructuring.  *See* Remand

11

Redetermination at 9.  Thus, Commerce had to reevaluate its prior determination of the benefit under the debt-to-equity infusions.  *Id*.

Although KG Dongbu disagrees with Commerce's reasoning, it cites nothing that would preclude Commerce from re-examining benefit in a subsequent review, or from correcting an error when it realizes that its analysis in a prior proceeding was inconsistent with its regulations. Dongbu Cmts. at 3-4.  KG Dongbu criticizes Commerce's reliance upon *PPG Industries, Inc. v. United States*, 978 F.2d 1232 (Fed. Cir. 1992), but cites nothing from that case, or any other case, supporting its position that Commerce is not allowed to re-evaluate benefit for each period of review or any other aspect of its countervailability analysis.  Dongbu Cmts. at 3-4.  Indeed, in other cases, such as *PPG Indus., Inc. v. United States*, 746 F. Supp. 119, 134 (Ct. Int'l Trade 1990), this Court has explained that "Commerce has discretion in deciding whether to reinvestigate a program previously found not countervailable in a final agency determination; in reaching its decision Commerce is entitled to draw upon its own knowledge and expertise and facts capable of judicial notice."

As Commerce explained on remand, Commerce normally requires respondents to report benefit information because the benefit conferred to a company may vary from year to year. Remand Redetermination at 7; *see also* 19 U.S.C. § 1675(a)(1)(A) (requiring Commerce in a CVD review to "review and determine the *amount* of any net countervailable subsidy") (emphasis added).  Further, Commerce's questionnaires in AR 2019 asked KG Dongbu Steel for specific information about the debt to-equity restructuring to allow Commerce to re-evaluate benefit.  Remand Redetermination at 8 (citing Commerce Questionnaire, Oct. 6, 2020, P.R. 22 at III-4).  Thus, consistent with its practice, Commerce re-evaluated only whether there was a benefit conferred by the debt-to-equity restructuring, given the new period of review and new

usage information reported by KG Dongbu Steel.  PDM at 13-14, *unchanged in* IDM.  KG
Dongbu Steel cites various portions of Commerce's questionnaire but provides no precedential
support for its argument that Commerce may not re-evaluate any aspect of the countervailability
analysis based on new record evidence and new developments – here, the evidence submitted
from the fourth equity infusion and the recent events as described above regarding *Nucor 2021*.
Dongbu Cmts. at 5.

KG Dongbu Steel also wrongly asserts that "{t}he need to recalculate the amount of
benefit in each review is only necessary in cases where Commerce has previously found the
program to be countervailable." *See* Dongbu Cmts. at 4.  But this would invite Commerce to
ignore the record evidence of AR 2019.  In AR 2019, given that there was a new fourth debt-to-
equity infusion, Commerce had to re-evaluate the potential total benefit conferred under the four
debt-to-equity infusions in order to calculate a single subsidy rate for the program.  *See* Remand
Redetermination at 22.  To state that Commerce does not need to recalculate any benefit when
there was none in a previous review ignores that Commerce's benefit calculation for AR 2019 is
a single rate which includes benefits conferred for all four of the equity infusions over the
appropriate period of review.  *Id.*

Even assuming that Commerce acted contrary to its "practice," Commerce can depart
from a practice provided it articulates good reasons for doing so.  *See Ranchers-Cattleman
Action Legal Found. v. United States*, 74 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 1999); *see
generally FCC v. Fox Television Stations*, 556 U.S. 502, 514-15 (2009) (explaining that an
agency does not face a heightened burden when explaining a policy change).  As explained
above, Commerce explained that it had revisited benefit in order to "correct" a mistake and
because of additional analysis that had occurred as a result of judicial review of its prior review.

Again, KG Dongbu cites nothing supporting that Commerce must perpetuate mistakes made in prior reviews, particularly when Commerce concludes that its prior analysis is contrary to its regulations.

Also, by focusing solely on the fact that Commerce did not determine whether the private investor participation was "significant" under 19 C.F.R. § 351.507 for equity infusions, KG Dongbu Steel misconstrues Commerce's rationale for determining significant government influence over the debt-to equity portion of the debt restructuring program as a relevant factor in its analysis. Dongbu Cmts. at 7-8. Although Commerce's determination in *Nucor 2021* focused on determining whether the private commercial banks on the creditors committee constituted "comparable commercial loans" for purposes of 19 C.F.R. § 351.505, this does not alter that Commerce's analysis in the prior administrative reviews, which did not consider the government influence on equity infusions, was inconsistent with 19 C.F.R. § 351.507.

As explained above, Commerce also cited substantial record evidence supporting its conclusions. *See* Equity Infusions Analysis Memorandum at 1-21; *see also* PDM at 15-18; and IDM at 42-51. Importantly, KG Dongbu Steel does not appear to dispute Commerce's conclusion that the GOK-policy banks, particularly the KDB, exercised significant influence over the first three debt restructurings. Instead, it attacks Commerce's claim that its practice in analyzing the significance of private investor participation is to conduct the analysis from the perspective of an outside investor, and not an existing investor that is trying to minimize its losses. *See* Remand Redetermination at 10-11 (citing *British Steel Corp. v. United States*, 632 F.

14

Supp. 59, 65 (Ct. Int'l Trade 1986) and *Hynix Semiconductor, Inc. v. United States*, 425 F. Supp. 2d 1287, 1313 (Ct. Int'l Trade 2006)).

KG Dongbu Steel's efforts to distinguish *British Steel* and *Hynix* because the cases do not directly address 19 C.F.R. § 351.507 misses the point. *See* Dongbu Cmts. at 9. In *British Steel*, the Court explained "that continued investment in a failing company for any reason is inconsistent with commercial considerations….{and} conflicts with observed market behavior where frequently corporations reorganize around their profitable assets, rather than terminate all productive facilities." 632 F. Supp. at 65. This demonstrates that the poor financial prospects of the investigated company, based on a trend of consistently bad returns, were critical to the Court's support of Commerce's methodology. This is also supported by the Court's statement that "it would be unrealistic to expect a private investor to supply operating funds to a loss-incurring firm merely to permit the firm to continue operations to minimize its losses" and that "it would not be commercially reasonable for an investor to provide funds for that purpose without adequate assurance of the future profitability of the enterprise and a return on his investment within a reasonable time." *Id.* Similarly, in *Hynix*, the Court determined that the purchase of an additional equity stake in Hynix was inconsistent with the usual investment practice of private investors. 425 F. Supp. 2d at 1313.

Equally unpersuasive are KG Dongbu Steel's citations to various administrative proceedings in order to question whether Commerce has an established practice. Dongbu Cmts. at 9-10. For example, in *Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea*, 77 Fed. Reg. 17,410 (Dep't of Commerce March 26, 2012) (final determ.), and accompanying IDM at cmt. 26), Commerce similarly "evaluated whether the participation of private creditors establishes the equityworthiness of the company..." Similarly, KG Dongbu

15

cites to *CFS Paper from the Republic of Korea*, 72 Fed. Reg. 60,639 (Dep't of Commerce Oct. 25, 2007) (final CVD determ.), and accompanying IDM at 47, but in that case Commerce also evaluated whether "government and commercial creditors participated in the debt-for-equity swaps at the same time and on the same terms and that equity acquired by the commercial creditors represented a significant portion of the debt converted to equity."

In any event, Commerce has certainly satisfied its burden under the substantial evidence standard of review of identifying "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). That Dongbu could review the evidence and reach an inconsistent conclusion does not establish that Commerce's determination is unsupported by substantial evidence. *Consolo*, 383 U.S. at 620.

### B. Commerce's Determination That The Benefits From Dongbu Steel's Debt-To-Equity Swaps Passed Through To KG Dongbu Steel Is Supported By Substantial Evidence And In Accordance With Law

Commerce also complied with the Court's instructions to reconsider or further explain its decision that the debt-to-equity restructuring benefits "passed through" upon the change in ownership from Dongbu Steel to KG Dongbu Steel. *See KG Dongbu Steel*, 648 F. Supp. 3d at 1359-60. After reconsidering its prior determination, Commerce reasonably concluded that the benefits from Dongbu Steel's debt-to-equity swaps were not extinguished when KG Dongbu Steel acquired the company. Remand Redetermination at 12-4, 27-32.

Pursuant to 19 U.S.C. § 1677(5)(F) and the *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125, 37,127 (Dep't Commerce 2003) (final modification), Commerce presumes that a non-recurring subsidy will benefit a recipient over the average useful life (AUL) of the relevant assets, and Commerce allocates the subsidy over that period of time. A respondent rebuts this presumption if it proves that a change in ownership occurred in which the former owner sold all or substantially all of a

company or its assets, and that the sale was at arm's-length and for fair market value.  *Id.*  To make this determination, Commerce analyzes the respondent's responses to the questions in the Change-in-Ownership Appendix, which is submitted prior to the preliminary results.  IDM at 54.

In its initial questionnaire, Commerce explained that, to rebut Commerce's baseline presumption, respondents would need to answer certain questions if ownership of the company changed during the AUL period.  Commerce also asked the respondents to state if they did *not* intend to rebut this presumption.  IDM at 55 (emphasis added) (citing Commerce Questionnaire, P.R. 22 at III-4); *see also* KG Dongbu's Affiliated Companies Questionnaire Response (KG Dongbu Steel ACR), Oct. 27, 2020, P.R. 34, C.R. 6 at 12.

Despite that a change in ownership occurred from Dongbu Steel to KG Dongbu Steel, KG Dongbu Steel affirmatively stated that it "did not wish" to rebut Commerce's presumption and, thus, it did not respond to the Change-in-Ownership Appendix.  *See* KG Dongbu Steel ACR, C.R. 6 at 1 n.1, 11-12.  Consequently, Commerce presumed that any benefit to the company passed through as a benefit to the new owners.  *See* Remand Redetermination at 14, 28; *see also* IDM at 55.

Contrary to KG Dongbu Steel's assertions, Commerce did not ignore the information KG Dongbu Steel placed on the record, nor did Commerce state that KG Dongbu Steel forfeited its rights to challenge the baseline presumption.  *See* Dongbu Cmts. at 14; Remand Redetermination at 29-31.  As explained above, Commerce's questionnaire contained specific instructions indicating that KG Dongbu Steel could provide information with respect to any changes in ownership.  *Id*.  Thus, it was KG Dongbu Steel's burden to challenge Commerce's baseline presumption.  *See Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production should belong to the party in possession of the necessary

17

information.”); *see also QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)

(“the burden of creating an adequate record lies with interested parties.”) (internal quotation

marks, alterations, and citation omitted).

Nor is KG Dongbu Steel correct that Commerce was required to ascertain whether the

record included information should have been included in the Change-of-Ownership Appendix,

or whether it possessed record information that would allow it to analyze the four factors for

determining whether an acquisition was arm’s length and for fair market value identified in the

*Notice of Final Modification*.  *See* Dongbu’s Cmts. at 14-17.  As this Court explained in

*Ferrostaal Metals Gmbh v. United States,* 518 F. Supp. 3d 1357, 1376 (Ct. Int’l Trade 2021),

“{i}t is well established that it is Commerce, not the respondent, that determines what

information is to be provided…”  *See also Essar Steel Ltd. v. United States*, 721 F. Supp. 2d

1285, 1299 (Ct. Int’l Trade 2010) (“Regardless of whether {the respondent} deemed the license

information relevant, it nonetheless should have produced it in the event that Commerce reached

a different conclusion.”).  Here, Commerce was clear that to rebut its baseline presumption, KG

Dongbu needed to complete the Change-in-Ownership appendix, and KG Dongbu declined to do

so.  Commerce is not required to search for information that could and should have been

provided in the format that Commerce requested.

Also flawed is KG Dongbu Steel’s contention that the record already contained

information to satisfy the four-factor analysis set forth in the *Notice of Final Modification*.

Dongbu Cmts. at 14-15.  As Commerce explained in the Remand Redetermination, the *Notice of

Final Modification* contains four factors that Commerce “*might* consider in evaluating whether a

transaction price was for fair market value."  Remand Redetermination at 30 (emphasis added).
But Commerce also explained that the Change-in-Ownership Appendix implements 19 U.S.C.
§ 1677(5)(F).  Thus, to substantiate the claim that any and all subsidies were extinguised
following a change in ownership, it is incumbent upon the respondent to complete the Change-
in-Ownership Appendix, which consists of 18 questions and multiple sub-parts, and to provide
the supporting documentation.  Remand Redetermination at 30-31.

Further, contrary to KG Dongbu Steel's assertions, the answers to all the questions in the
Change-in-Ownership Appendix are not already on the record.  *See* Remand Redetermination at
29-31; Dongbu Cmts. at 15-17.  In the general instruction section of the Change-in-Ownership
Appendix, Commerce states that, because responding to some questions may require input from
both the government and the respondent company, the government and the respondent company
should coordinate their responses but that the questionnaire response should clearly indicate
which party is responding to the question.  *See* Initial Questionnaire, P.R. 22 at Section II; *id*. at
Section III, Change-in-Ownership Appendix at III-7.  This information was not already on the
record.

Further, contrary to KG Dongbu's assertions, that Commerce has not previously found
the debt-to-equity infusions to constitute a benefit did not excuse KG Dongbu Steel from
submitting a Change-in-Ownership Appendix.  *See* Dongbu Cmts. at 11-12.  As a mandatory
respondent, KG Dongbu Steel was responsible for answering Commerce's questionnaires and
supplemental questionnaires.  *See* Remand Redetermination at 14.  Further, arguments regarding
the countervailability of the first through third debt-to-equity conversions have been raised in all
prior reviews, which should have put KG Dongbu Steel on notice that it was a significant issue.
IDM at 54 (citing *Saarstahl AG v. United States*, 949 F. Supp. 863, 967 (Ct. Int'l Trade 1996));

*see also, e.g., Nucor Corp. v. United States*, 461 F. Supp. 3d at 1378, 1374.  And, as explained in the Remand Redetermination, the petitioners had been arguing for Commerce to countervail the debt-to-equity conversions since the first administrative review and also maintained that an acquisition had occurred.  Remand Redetermination at 28.  This should have made KG Dongbu Steel aware that non-recurring subsidy pass-through could be an issue in this review.  *Id.*

Although KG Dongbu Steel continues to assert that Commerce is ignoring a vast amount of record information that relates to the change in ownership issue, it fails to cite record evidence that would detract from the presumption that the subsidies that existed prior to its change in ownership pass through to KG Dongbu Steel.  Nor does KG Dongbu Steel cite any evidence demonstrating that it intended to challenge the presumption, as specifically required by Commerce's questionnaire.  *See* Dongbu Cmts. at 13.

Further, and contrary to KG Dongbu Steel's arguments, Commerce identified substantial record evidence supporting that the acquisition was not made at arm's length and for fair market value.  *See* IDM at 56-57; *see also* Equity Infusion Analysis Memo, C.. 259.  As Commerce explained in the Final Results, although KG Dongbu bought Dongbu Steel through an open bidding process as the highest bidder, the sale was conditioned on the KDB-led creditors' council's agreement to extend existing loans and reduce the interest rates.  IDM at 56-57 (citing GOK IQR, C.R. 157-158 at 16; Equity Infusions Analysis Memo, C.R. 259 at 8); *see also* Dongbu IQR, C.R. 112-156 at 35-39.  As a condition for the sale, the KDB-led creditors' council also agreed to another round of debt-to-equity conversions.  *Id.*  Commerce determined that the price per share paid by the creditors' council was higher than the price per share paid by KG Dongbu.  IDM at 56-57; Equity Infusions Analysis Memo, C.R. 259 at 8; Dongbu IQR, C.R. 112-156 at 36-37.  Thus, Commerce reasonably concluded that the KDB-led creditors' council

likely did not maximize its return when selling Dongbu Steel. *Id.* Commerce also explained that the record demonstrates that KDB and the creditors' council were trying to get Dongbu Steel out of the voluntary restructuring program. IDM at 57. Consequently, because of these motivations, it is unlikely the KDB-led creditors' council acted in a manner consistent with the normal sales practices of private, commercial sellers in Korea, did not maximize its return, and therefore did not pay fair market value. *Id.*

Finally, the Court remanded Commerce's pass-through analysis on the basis of whether the debt-to-equity infusions constituted a subsidy. *See KG Dongbu Steel*, 648 F. Supp. 3d at 1360. As discussed above, Commerce provided a reasonable explanation for its departure from past proceedings to determine that the first through third debt-to-equity restructurings were countervailable. *See* Remand Redetermination at 22-25. Therefore, consistent with Commerce's practice and the evidence on the record of this segment, Commerce reasonably presumed that any non-recurring benefit (*i.e.*, first through third debt-to-equity restructurings) passed through following the new ownership.

### C. On Remand Commerce's Further Explained Why Its Calculation Of The Uncreditworthy Benchmark And Uncreditworthy Discount Rate Is Supported By Substantial Evidence And In Accordance With Law

Commerce also complied with the Court's instruction to further explain its determination to use a three-year loan term interest rate to calculate the uncreditworthy benchmark rate and to address the potentially contrary evidence presented by plaintiffs. *KG Dongbu Steel*, 648 F. Supp. 3d at 1360. Remand Redetermination at 15-17, 33-35.

In accordance with 19 C.F.R. § 351.507(c), the benefit conferred by an equity infusion "shall be allocated over the same period as a non-recurring subsidy." When Commerce finds that a company has received a government-provided long-term loan, and that company is

*PUBLIC VERSION*

uncreditworthy, Commerce looks to 19 C.F.R. § 351.505(a)(3)(iii), which provides the

uncreditworthy benchmark formula, to calculate the benefit.  That formula contains several

variables.  As set forth in 19 C.F.R. §§ 351.524(d)(1) and (d)(3)(ii), if a firm is considered to be

uncreditworthy, the Secretary uses interest rate described in 19 C.F.R. § 351.505(a)(3)(iii) as the

discount rate.

In AR 2019, Commerce determined that while there were some private commercial banks

involved in the debt restructuring of KG Dongbu Steel, the restructuring of KG Dongbu Steel's

debt was not overseen by those private banks.  PDM at 14-15; IDM at 58.  Instead, KG Dongbu

Steel's debt restructuring was controlled by the Creditor Bank Committee (CBC), which was

controlled by GOK policy banks, such as the KDB.  *Id*.; *see also* Remand Redetermination at 33-

35.  As a result, Commerce concluded that the loans from private creditors on the CBC, which

are the rates that KG Dongbu contends that Commerce should have used, could not be construed

as "comparable commercial loans," and thus, could not be used as a commercial benchmark

under 19 U.S.C. §1677(5)(E)(ii) and 19 C.F.R. § 351.505(a)(2).  *Id*.  Consequently, Commerce

continued to use a three-year AA-rated KRW interest rate, published by the Bank of Korea, as

the long-term interest rate paid by a creditworthy company because it was the only useable long-

term interest rate available on the record.  *See* Remand Redetermination at 16.

Further, Commerce explained its calculation of the discount rate in determining the

amount of the benefit in each year of the 15-year allocation period for the AUL of the relevant

assets based its reconsideration of the record evidence.  Remand Redetermination at 33-35.

Because Commerce continued to find that the use of the uncreditworthy benchmark rate,

calculated using three-year KRW-denominated AA-rate corporate bonds published by Bank of

Korea, was supported by substantial evidence and appropriate, Commerce also continued to find

that the use of the discount rate, calculated using the three-year uncreditworthy benchmark rate, was appropriate for the allocation of the benefit conferred by the equity infusions.  Remand Redetermination at 16-17, 33-34.

KG Dongbu Steel's arguments that Commerce's analysis is flawed lack merit.  First, KG Dongbu Steel wrongly contends that 19 C.F.R. § 351.505(a)(3)(iii) actually ties the "term of the loan" to KG Dongbu Steel's restructured loans, "because subsection (iii) expressly states that, if 'a firm that received a government-provided long-term loan was uncreditworthy,' then Commerce 'will calculate the interest rate to be used in making the comparison…' where: n = the term of the loan."  *See* Dongbu Cmts at 18-19.  But this conclusory assertion does not establish that Commerce erred in its calculations.

In the Remand Redetermination, Commerce explained that the *Preamble* to Commerce's regulations states that Commerce's formula for calculating the benchmark interest rate for an uncreditworthy company "assum{es} that a lender's expected return on all loans should be equal."  *Countervailing Duties*, 63 Fed. Reg. 65348, 65365 (November 25, 1998) (*Preamble*).  In other words, under this assumption "the lender's expected (total) return on a loan to an uncreditworthy company equals the expected (total) return on a loan to a creditworthy company, after accounting for differences in the risk of default."  *Id.*

As Commerce explained, the *Preamble* dictates that Commerce use the term of the benchmark (in this case, three years, from the three-year KRW AA-Corporate Bond Rate from Bank of Korea) to identify both the probability of default by a creditworthy company, and the probability of default by an uncreditworthy company from the Moody's "Average Cumulative Issuer-Weighted Global Default Rates, 1920-2010" table.  *See* Remand Redetermination at 34-

35.  This is because the uncreditworthy interest rate formula has four variables: (1) the term of the loan in question (n); (2) the long-term interest rate paid by a creditworthy company (*if*); (3) the probability of default of a creditworthy company in n years (*pn*); and (4) the probability of default of an uncreditworthy company in n years (*qn*).  *Id*.  If Commerce used the probability of default by an uncreditworthy company within six years for variables *pn* and *qn* respectively, as KG Dongbu Steel suggests, the variables would not be on the same basis as the term of the baseline benchmark used for variable *if* (*i.e.*, three years).  *Id*.  This would be contrary to Commerce's intention in providing a formula to calculate the benchmark interest rate for an uncreditworthy company.

Therefore, for both the probability of default by a creditworthy company and the probability of default by an uncreditworthy company, the probability of default within three years from the Moody's "Average Cumulative Issuer-Weighted Global Default Rates, 1920-2010" table should be used, for consistency with the term of the benchmark used (*i.e.*, the three-year KRW AA-Corporate Bond Rate from Bank of Korea), in calculating the benchmark interest rate for uncreditworthy companies.  *Id*.

Nor is KG Dongbu Steel correct that there is contrary record evidence indicating that the repayment date of outstanding loans was extended from December 31, 2020 to December 31, 2025.  *See* Dongbu Cmts at 19-20.  As explained above, the loan template that plaintiffs cite (*i.e.*, KG Dongbu Steel's IQR at Exhibit B-35), demonstrates that the loans in question were provided by member banks of the KG Dongbu Steel's Creditor Financial Institutions' Committee, which took over the administration of KG Dongbu Steel's restructuring from the CBC, which in turn was controlled by GOK policy banks.  *See* Remand Redetermination at 34-35.  Moreover, Commerce found that the loans from the alleged private banks to KG Dongbu Steel cannot

24

constitute "comparable commercial loans" under 19 C.F.R. § 351.505(a)(2) because of the

substantial government influence and the fact that they were part of a government program;

therefore, these loans are unsuitable for purposes of the benchmark calculation. *Id*. Notably, in

raising these arguments, KG Dongbu concedes that it cannot argue "that its own loans from

private banks are "comparable commercial loans," when advocating for suitable data for

benchmark purposes. *See* Dongbu's Cmts at 20.

Further, because there were no useable six-year loans available, Commerce continued to

use three years for the term of the loan variable, the three-year creditworthy default, and

uncreditworthy default rates. *See* Remand Redetermination at 15-18, 33-34. This is consistent

with the *Preamble*, which states that using "a default rate that is directly linked to the term of the

loan is a better reflection of the risk associated with the long-term lending to uncreditworthy

borrowers." *See Preamble*, 63 Fed. Reg. at 65,365.

With respect to allocating the benefit, 19 C.F.R. § 351.507(c) requires that the benefit

conferred by an equity infusion shall be allocated over the same period as a non-recurring

subsidy.   If a firm is considered to be uncreditworthy, Commerce will use as a discount rate the

interest rate described in 19 C.F.R. § 351.505(a)(3)(iii), which is an exception for uncreditworthy

company. *See* 19 U.S.C. §§ 351.524(d)(1) and (d)(3)(ii). Here, Commerce used a three-year

uncreditworthy discount rate, based on the formula specified by 19 C.F.R. § 351.505(a)(3)(iii),

and the information available on the record. Therefore, Commerce reasonably continued to use

the same three-year uncreditworthy discount rate. Remand Redetermination at 34-35.

On remand, KG Dongbu Steel also impermissibly asserts a new argument concerning

Commerce's interpretation of the *Preamble*. *See* Dongbu Cmts at 21. KG Dongbu Steel claims

that "{t}he Preamble {} states explicitly that the 'probability of default' variables pn and qn are

'directly linked to the term of the loan,' not that they are linked to the 'term of the benchmark,' {} as Commerce suggests." *Id*; *see Preamble*, 63 Fed. Reg. at 65,365.  Because KG Dongbu Steel did not raise this argument in its case brief or during the remand proceedings, it has failed to exhaust its administrative remedies and cannot raise the argument before this Court.

Notably, Commerce has relied on the *Preamble* in further explaining its application of the loan benchmark calculation formula under 19 C.F.R. § 351.505(a)(3)(iii).  *See* Remand Redetermination at 15-18.  But Commerce has had no opportunity to address KG Dongbu Steel's recent arguments that the probability of default variables are directly linked to the term of the loan but not the long-term interest rate that would be paid by a creditworthy company.

Pursuant to 28 U.S.C. § 2637(d), parties are required to exhaust administrative remedies prior to bringing an action in this Court, except in limited circumstances not relevant here. *Boomerang Tube, LLC, TMK IP-SCO v. United States*, 856 F.3d 908, 912-13 (Fed. Cir. 2017). Especially important to the question of exhaustion is that Commerce has not changed its determination here, so KG Dongbu Steel's arguments could have and should have been raised during the administrative proceeding so that Commerce could address them in the context of the administrative review.  Because KG Dongbu Steel failed to exhaust its administrative remedies, and because no exceptions apply, the Court should not consider those arguments.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination and enter judgment in favor of the United States.

Respectfully submitted,

BRIAM M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/Claudia Burke by L. Misha Preheim
CLAUDIA BURKE
Assistant Director

OF COUNSEL:

/s/ Elizabeth Speck
ELIZABETH SPECK
Senior Trial Counsel
ASHLANDE GELIN                    United States Department of Justice
Attorney                          Civil Division
U.S. Department of Commerce       Commercial Litigation Branch
Office of the Chief Counsel for   P.O. Box 480
Trade Enforcement & Compliance    Ben Franklin Station
Washington, D.C. 20230            Washington, D.C. 20044
                                  Tel: (202) 307-0369
                                  Fax: (202) 514-7965

December 22, 2023                 Attorneys for Defendant

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court and the

Court's scheduling order in that it contains 7,930 words, including text, footnotes, and headings.

<u>/s/ Elizabeth Anne Speck</u>