NON-CONFIDENTIAL VERSION

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., and DONGBU INCHEON STEEL CO., LTD.,<br><br>                Plaintiffs,<br><br>    v.<br><br>UNITED STATES,<br><br>                Defendant,<br><br>    and,<br><br>NUCOR CORPORATION, and STEEL DYNAMICS, INC.,<br><br>                Defendant-Intervenors. | Before: Hon. Jennifer Choe-Groves,<br>          Judge<br><br>Court No. 22-00047<br><br><u>NON-CONFIDENTIAL VERSION</u><br><br>Business Proprietary Information Removed from Pages: 8-9 |

<u>COMMENTS IN SUPPORT OF REMAND REDETERMINATION</u>

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Defendant-Intervenor Nucor Corporation*

**Dated: December 22, 2023**

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ............................................................................................................. 1

II.  ARGUMENT ................................................................................................................... 1

   A.   Commerce's Reconsideration of the Benefit Conferred by the Debt-to-Equity Swap Portion of KG Dongbu's Debt Restructuring Program Is Lawful and Supported By Substantial Evidence ............................................ 1

        1.   Commerce Properly Reconsidered Its Prior Determinations, Regardless of New Evidence on the Record ......................................... 2

        2.   New Record Evidence Supported Commerce's Reconsideration of Its Prior Determinations ................................................................. 6

   B.   Commerce's Determination That Non-Recurring Subsidies Passed Through to KG Dongbu Was Lawful and Supported by the Record ........................... 9

   C.   Commerce Properly Calculated the Uncreditworthy Benchmark Rate and Unequityworthy Discount Rate ........................................................ 12

III. CONCLUSION ............................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bookman v. United States*,
    453 F.2d 1263 (Ct. Cl. 1972) ................................................................................................2

*NSK Ltd. V. United States*,
    20 CIT 361, 919 F. Supp. 442 (1996) ..................................................................................10

*Nucor v. United States*,
    461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) .........................................................................5

*Siemens Energy, Inc. v. United States*,
    992 F. Supp. 2d 1315 (Ct. Int'l Trade 2014) .........................................................................7

*Tokyo Kikai Seisakusho, Ltd. v. United States*,
    529 F.3d 1352 ....................................................................................................................2, 6

*Torrington Co. v. United States*,
    156 F.3d 1361 (Fed. Cir. 1998)............................................................................................11

*Universal Camera Corp. v. N.L.R.B.*,
    340 U.S. 474 (1951)...............................................................................................................6

**Statutes**

19 U.S.C. § 1675(a) .......................................................................................................................2

**Regulations**

19 C.F.R. § 351.213(a)...................................................................................................................2

19 C.F.R. § 351.505(a)(iii)...........................................................................................................12

19 C.F.R. § 351.505(a)(3)(iii)......................................................................................................13

19 C.F.R. § 351.507(a)...................................................................................................................3

19 C.F.R. § 351.507(a)(4)..............................................................................................................4

19 C.F.R. § 351.524(d)(iii)(2)......................................................................................................13

**Administrative Materials**

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 88 Fed. Reg. 29,850 (Dep't Commerce May 9, 2023) ............................................................3

I.  **INTRODUCTION**

On behalf of Defendant-Intervenor Nucor Corporation ("Nucor"), we respectfully submit the following comments in support of the U.S. Department of Commerce's ("Commerce") October 5, 2023 remand redetermination.  Redetermination Pursuant to Ct. Remand Order in *KG Dongbu Steel Co., Ltd. et al v. United States*, Court No. 22-00047 (Oct. 5, 2023), ECF No. 57 ("Remand Redeter.").  For the reasons discussed below, the Court should sustain Commerce's Remand Redetermination.  Plaintiff's arguments to the contrary are unpersuasive.  Pl. KG Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd., and Dongbu Incheon Steel Co., Ltd.'s Comments on Commerce's Redetermination Pursuant to Ct. Remand (Nov. 20, 2023), ECF No. 60 ("KG Dongbu Cmts").

II.  **ARGUMENT**

   A.  **Commerce's Reconsideration of the Benefit Conferred by the Debt-to-Equity Swap Portion of KG Dongbu's Debt Restructuring Program Is Lawful and Supported by Substantial Evidence**

In the Remand Redetermination, Commerce provided additional explanation and continued to find that the first three debt-to-equity swaps in Dongbu's debt restructuring program conferred a benefit in the amount of the equity infusion because (i) private investor prices were unavailable for benchmark purposes and (ii) Dongbu was not equityworthy at the time of the swaps.  KG Dongbu's argument that Commerce "fail{ed} to take the Court's remand instructions seriously" is unpersuasive.  The Remand Results are lawful and supported by substantial evidence, and the Court should sustain them.

1

### 1. Commerce Properly Reconsidered Its Prior Determinations, Regardless of New Evidence on the Record

Even if the record in the 2019 administrative review were identical in relevant part to those of prior reviews, which it was not, Commerce properly reconsidered its prior determinations regarding the first three debt-to-equity swaps. It is well established that agencies, including Commerce, have the inherent authority to reconsider prior determinations because "{t}he power to reconsider is inherent in the power to decide." *See, e.g.*, *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360-61 (Fed. Cir. 2008). This includes an agency's "power to correct its own errors or otherwise appropriately to modify its judgment, decree, or order." *Id.* (quoting *Bookman v. United States*, 453 F.2d 1263, 1265 (Ct. Cl. 1972)). *See also Bookman*, 453 F.2d at 1265 ("{R}econsideration is often the sole means of correcting errors of procedure or substance."). Commerce must only act in accordance with any statutorily prescribed procedures or limitations and must provide an adequate explanation for its determination. *Tokyo Kikai*, 529 F.3d at 1361. Here, it did both.

Even without its additional explanation of the new evidence justifying Commerce's reconsideration, the Remand Redetermination's treatment of the first three debt-to-equity swaps falls well within the limits of the agency's inherent authority to modify its previous determinations. First, Commerce acted within the statutorily prescribed procedures of a lawfully initiated administrative review, the very purpose of which is to review and modify as warranted the duty rates applicable to entries of the subject merchandise during the period of review ("POR"). *See* 19 U.S.C. § 1675(a); 19 C.F.R. § 351.213(a). Because the debt-to-equity swaps are non-recurring subsidies with benefit amounts potentially allocable to the POR, all of them remained relevant to the benefit amount during the POR even if the initial transactions occurred during previous review periods.

Second, Commerce provided sufficient additional explanation to justify its reconsideration of the benefit conferred by the first three debt-to-equity swaps, even if there were no new record evidence. Specifically, the Remand Redetermination emphasizes that the agency's prior determinations were inconsistent with the standards prescribed by Commerce's rules and practice:

> When we re-evaluated the benefit conferred under the debt-to-equity restructuring, we realized that we had made a mistake in the prior review. In AR 2019, given that there was a new, fourth debt-to-equity infusion, we had to re-evaluate the total benefit conferred under the four debt-to-equity infusions in order to calculate a single subsidy rate for the program. As part of the re-evaluation, we realized that our prior finding that no benefit was conferred by the first three debt-to-equity restructurings was inconsistent with 19 CFR 351.507. . . . {W}e evaluated the AR 2019 record and made our determination in accordance with 19 CFR 351.507.

Remand Redeter. at 8. The Remand Redetermination goes on to clarify that, under 19 C.F.R. § 351.507(a), "Commerce does not consider private sector investment prices if Commerce concludes that private investor purchases of newly issued shares are not significant," and that it conducts this "significance" analysis "from the perspective of an outside investor, and not an existing investor that is simply trying to minimize its losses." *Id.* at 10-11.

Commerce has recently proposed codifying this "long-standing practice in which the analysis of equity is conducted with respect to whether an outside private investor would make an equity investment in {a} firm under its usual investment practice, not whether a private investor who has already invested would continue to invest." *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 88 Fed. Reg. 29,850, 29,867 (Dep't Commerce May 9, 2023) (proposed rule). Under this standard, Commerce "is to determine whether a reasonable private investor, at the time the government-provided equity infusion was made, would invest in a firm based on the firm's ability to generate a reasonable rate of return within a reasonable time." *Id.* at 29,868. "{E}xisting creditors attempting to mitigate their losses from non-performing loans . . .

{are} not considering whether or not to purchase shares based on the projected rates of return." *Id.* As a result, the actions of such investors "are not relevant to the reasonable investor test used in {Commerce's} analysis of equityworthiness." *Id.* Because the non-government investors on Dongbu's creditors committees were pre-existing investors seeking to minimize losses rather than outside investors seeking to maximize returns – a fact that KG Dongbu has not contested – Commerce properly declined to consider them in its analysis and proceeded to analyze the equityworthiness factors set forth in 19 C.F.R. § 351.507(a)(4).

In addition to clearly explaining that Commerce's reconsideration of its prior benefit analyses was meant to conform the agency's prior determinations to the methodology required by agency rules and practice, the Remand Redetermination clarifies that reconsideration was necessary to correct arbitrariness issues. Specifically, the Remand Redetermination emphasizes that "{i}t would be inconsistent for Commerce to find on the one hand that the GOK-controlled policy banks have significant influence over the loan portion of the debt restructuring, and on the other hand that the same banks did not have such influence over the debt-to-equity portion of the debt restructuring." Remand Redeter. at 9. In other words, the same investors on the same creditors committees, which were controlled by the same government financial institutions, cannot simultaneously be acting under the influence of government actors and acting independently as actual private investors engaged in market-based transactions.

Contrary to KG Dongbu's suggestion, KG Dongbu Cmts at 2, 7, the Remand Redetermination's clear and explicit explanation that the agency reconsidered the first three debt-to-equity swaps in part to correct mistakes in its previous determinations is no mere repetition of the rationale provided in the Final Determination. Nowhere does Commerce's Final Determination state that the agency's prior determinations were inconsistent with its regulations

4

and established practice, and that reconsideration was necessary to correct this mistake. *See* Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the republic of Korea*, 87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022) (final results and partial rescission of countervailing duty admin. rev.; 2019) at 46-51, P.R. 213 ("Final Decision Memo"). Nor does KG Dongbu cite to any such explanation. *See* KG Dongbu Cmts at 7.[1] If KG Dongbu means to assert that this explanation was reasonably discernible in Commerce's Final Determination, the Court's opinion did not address it and remanded based only on a holding that Commerce's reference to new evidence about the fourth debt-to-equity swap was an insufficient explanation. *KG Dongbu Steel Co. v. United States*, Ct. No. 22-00047, slip op. 23-98 at 11-13 (Ct. Int'l Trade July 7, 2023), ECF No. 52.

Nor does Commerce's defense of its prior determinations in other appeals before this Court undermine its additional explanation. KG Dongbu Cmts at 8. As a preliminary matter, Commerce in *Nucor* defended its determination based on Nucor's purported failure to exhaust administrative remedies, and the Court sustained on that basis without reaching the merits. *Nucor Corp. v. United States*, 461 F. Supp. 3d 1374, 1378 (Ct. Int'l Trade 2020). The case is therefore of no value to the Court's consideration of Commerce's determination in the 2019 review, in which the agency actually considered the record based on the additional arguments that were presented to it. No party, moreover, has argued that Commerce knowingly or deliberately erred in its prior determinations. The point is that Commerce recognized, based on the arguments and evidence in

---

[1] KG Dongbu also asserts that Defendant made this argument in its Response Brief on appeal, but does not cite to the pages where the argument appears. KG Dongbu Cmts at 7. Even if KG Dongbu were correct, it would be irrelevant because the Court may not sustain a determination based on the arguments of appellate counsel. The agency itself has now clearly articulated the rationale in the Remand Redetermination, providing a basis on which the Court may sustain the determination.

this review, that its prior determinations were inconsistent with its regulations and practice and arbitrary based in part on this Court's holdings. *See* Remand Redeter. at 9.

Commerce therefore acted properly within the scope of its inherent authority to reconsider prior determinations. The Remand Redetermination clarifies that it did so in part because of mistakes in its previous determinations. *Id.* at 8. Reconsideration was therefore necessary for Commerce "to correct its own errors or otherwise appropriately to modify its judgment, decree, or order." *Tokyo Kikai*, 529 F.3d at 1360-61. Commerce's decision to reconsider the benefit conferred by the first three debt-to-equity swaps was thus lawful, whether or not the Court agrees that new evidence related directly to those transactions. As discussed below, however, the Remand Redetermination also adequately explains why new record information justified Commerce's reconsideration.

### 2. New Record Evidence Supported Commerce's Reconsideration of Its Prior Determinations

In addition to lawfully reconsidering its prior debt-to-equity swap determinations to bring them into compliance with agency rules and practice, Commerce properly reconsidered them based on new evidence on the record of this review. The Remand Redetermination makes clear that the circumstances surrounding the fourth debt-to-equity conversion required Commerce "to re-evaluate the total benefit conferred under the four debt-to-equity infusions in order to calculate a single subsidy rate for the program." Remand Redeter. at 8. *See also id.* at 22 ("{G}iven that there was a new fourth debt-to-equity infusion, we had to reevaluate the total benefit conferred under the four debt-to-equity infusions in order to calculate a single subsidy rate for the debt-to-equity infusion program.") In other words, Commerce did not treat each individual debt-to-equity swap as a separate, decontextualized subsidy program. Rather, from the outset, it treated the debt-to-equity swaps as part of a single subsidy program – *i.e.*, "Dongbu's Debt Restructuring" – that

6

required a benefit analysis based on information regarding the entire program. *See* Letter from Morris, Manning & Martin LLP to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Dongbu's Initial Questionnaire Response* (Dec. 2, 2020) at 20-63, C.R. 81-156, P.R. 74-78 ("KG Dongbu IQR") (soliciting information for the entirety of "Dongbu's Debt Restructuring" program, including all revised loan terms and all debt-to-equity swaps).

This is not only appropriate, but also required, under the standard of review. *See, e.g.*, *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 478, 488 (1951) (requiring substantial evidence "when viewed in the light that the record in its entirety furnishes" and not "when {evidence is} viewed in isolation"). The Remand Redetermination makes clear that Commerce viewed the fourth debt-to-equity swap, and in particular the involvement of "private investors independent from the creditors' committee" in that swap, to be significant as a factual matter with respect to the circumstances of the broader debt restructuring program. Remand Redeter. at 8 n.25. This factual finding is a reasonable one, and it is one to which the Court should defer. *See, e.g.*, *Siemens Energy, Inc. v. United States*, 992 F. Supp. 2d 1315, 1324-25 (Ct. Int'l Trade 2014), *aff'd*, 806 F.3d 1367 (Fed. Cir. 2015) ("{A}ssigning evidentiary weight falls exclusively within the authority of the {agency}," so "{t}he Court may not . . . displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.").

Commerce's consideration of the evidence was reasonable because the debt-to-equity swaps were not isolated, individual transactions that each occurred in its own vacuum. Each one was part of a broader, years-long program of debt relief and restructuring, led by the same core group of government-controlled financial institutions, with the same objective of preventing

Dongbu's liquidation.  *See generally* Memorandum from Dennis McClure, International Trade Compliance Analyst, AD/CVD Operations, Office VIII to The File through Irene Darzenta Tzafolias, Director, AD/CVD Operations, Office VIII and Robert Palmer, Program Manager, AD/CVD Operations, Office VIII, *Countervailing Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea*: *Preliminary Analysis Memorandum –Equity Infusions* (July 12, 2021) at 45-51, C.R. 259, P.R. 176 ("Equity Infusion Analysis Memo"); Final Decision Memo at 45-51.  Over the course of this restructuring period, and notwithstanding significant and ongoing support from government-owned or controlled financial institutions, (i) Dongbu's liquidation value and its value as a going concern consistently declined, Dongbu IQR at Exhibit B-7, Exhibit B-9, Exhibit B-14, Exhibit B-16, Exhibit B-29; (ii) it was nearly forced to de-list from the Korean Stock Exchange on multiple occasions due to poor financial performance, *id.* at 31-32; and (iii) it consistently failed to achieve performance metrics established by the creditor committees participating in the restructuring program.  *Id.* at [

]; Equity Infusion Analysis Memo at 12 (noting that "Dongbu Steel repeatedly failed to meet its required performance goals set in the restructuring agreements . . . .").

      When viewed in this context, the conduct of the outside private investor in the fourth debt-to-equity swap is meaningful evidence regarding the decisions of the creditor committee financial institutions, and it was not on the record of previous reviews.  Even after several rounds of debt restructuring, the KG Consortium refused to invest in Dongbu Steel <u>unless</u> an additional KRW 605 billion in liabilities was removed from Dongbu's balance sheets through debt-to-equity conversions, and <u>unless</u> maturities and interest rates on Dongbu's remaining debts were extended and reduced.  Dongbu IQR at 37-38.  The KG Consortium told the creditor committee that KG Dongbu's "[

]." *Id*. at Exhibit B-26 (emphasis added).

Even after years of government-led debt restructuring, in other words, the only potential outside private investor conditioned its investment on more than [

].  If an actual private investor would not invest in Dongbu Steel even after three rounds of significant debt reductions, it would not be reasonable to conclude that actual private investors would have invested in Dongbu Steel <u>before</u> those debt reductions occurred.  The KG Consortium's actions thus bear directly on the decisions of the non-government banks on the creditor committees throughout the restructuring process.

Commerce, as the finder of fact, determined that new evidence on the record regarding the fourth debt-to-equity swap was significant with respect to its analysis of the first three debt-to-equity swaps.  As a result, it reconsidered its prior determinations in light of that additional record evidence and found that private investor participation in the first three swaps was insignificant because the creditor committee banks were acting under significant government influence and because they were not outside private investors seeking to maximize returns on their investments.  Commerce's weighing of the evidence regarding the fourth debt-to-equity swap as significant with respect to the broader debt restructuring program was reasonable in light of the record as a whole, and the Remand Redetermination should be sustained.

  **B.** <u>**Commerce's Determination that Non-Recurring Subsidies Passed Through to KG Dongbu Was Lawful and Supported by the Record**</u>

Ct. No. 22-00047 NON-CONFIDENTIAL VERSION

The Remand Redetermination also adequately explains Commerce's application of the baseline presumption that non-recurring subsidies continue to benefit a firm during the average useful life ("AUL") period. KG Dongbu's arguments to the contrary are unpersuasive, and the Remand Redetermination should be sustained.

KG Dongbu suggests that the Remand Redetermination "ignore{s} the Court's directive to reconsider the evidence on this issue" and "just repeats its position that KG Dongbu's failure to submit the Change-in-Ownership Appendix ("CIO Appendix") was fatal." KG Dongbu Cmts at 10. This is untrue. The Remand Redetermination clearly explains that the evidence on the record was insufficient to rebut the baseline presumption. It emphasizes that "analyzing whether prior subsidies were extinguished requires extensive analysis based on a respondent's complete responses to the {CIO Appendix}" and that, contrary to KG Dongbu's assertions, the information solicited by the CIO Appendix "is, in fact, not on the record." Remand Redeter. at 29-31.

The problem, in other words, is not merely that KG Dongbu failed to respond to the CIO Appendix. It is that, because of KG Dongbu's failure to respond to the CIO Appendix, the information necessary to rebut the baseline presumption is not on the record. It is well established that Commerce determines what information is necessary and the manner in which it must be provided to adequately develop the record. Interested parties are not entitled to treat its questionnaires as "just a series of questions drafted by Commerce," KG Dongbu Cmts at 13, which they may ignore in favor of their own discretion to provide whatever information they deem sufficient in the form and manner of their choosing. *See, e.g.*, *NSK Ltd. v. United States*, 20 CIT 361, 367, 919 F.Supp. 442, 447 (1996) (respondent's "assertion that the information it submitted to Commerce provided a sufficient representation . . . misses the point that it is Commerce, not the respondent, that determines what information is to be provided for an administrative review.").

10

The Remand Redetermination also emphasizes that KG Dongbu did not merely fail to respond to the CIO Appendix. Rather, it explicitly conceded the issue by stating that it did not believe a relevant change in ownership had occurred and that it therefore did not wish to even attempt rebutting the baseline presumption. KG Dongbu reported that it "had not been privatized, changed ownership, merged with another company, or devolved another company/companies from its corporate structure in whole or in part, during the AUL period." KG Dongbu IQR at 12. Because no relevant change in ownership had occurred, KG Dongbu stated that it "does not wish to challenge the Department's baseline presumption and thus understands that no response to the Change-in-Ownership Appendix is required." *Id.* As the Remand Redetermination points out, this concession had nothing to do with the nature of the subsidies that Commerce had previously countervailed. Remand Redeter. at 28. It was based on KG Dongbu's own assertion that there had been no change in ownership that might suffice to rebut the baseline presumption.

The Remand Redetermination also reiterates that the decision to challenge the baseline presumption is not limited to subsidies that Commerce has already countervailed in prior segments. It applies equally to the determinations that Commerce might make in the current proceeding, including with respect to any newly alleged subsidies, such that KG Dongbu should have known that "non-recurring subsidy pass-through could be an issue in this review." *Id.* at 28-29. As explained above, Commerce has the inherent authority to revisit prior determinations, whether on the basis of new arguments or evidence, or simply to correct previous errors. Given this authority, Nucor presented both new evidence and new arguments in each prior review in an attempt to convince Commerce to change its treatment of the debt-to-equity swaps. *Id.* at 28. KG Dongbu was thus mistaken if it believed that no non-recurring subsidies, including but not limited to the debt-to-equity swaps, could be at issue in this review.

Because KG Dongbu reported that no relevant change in ownership had occurred and declined to respond to the CIO Appendix, Commerce properly determined that the record evidence did not support a finding that non-recurring subsidies were extinguished by the KG Consortium's investment in Dongbu.

### C. Commerce Properly Calculated the Uncreditworthy Benchmark Rate and Unequityworthy Discount Rate

In the Remand Redetermination, Commerce reexamined the record evidence and adequately explained its calculation of the uncreditworthy benchmark rate and unequityworthy discount rate. In circumstances such as this one, where Commerce is interpreting and applying its own regulations to address a highly technical calculation issue, the agency is entitled to substantial deference from reviewing courts. *See, e.g.*, *Torrington Co. v. United States*, 156 F.3d 1361, 1363-64 (Fed. Cir. 1998). The Remand Redetermination's application of Commerce's rule falls within the scope of this substantial deference, is supported by the record, and should be sustained.

In challenging the explanation provided in the Remand Redetermination, KG Dongbu relies heavily on the assertion that Commerce's rule explicitly requires the agency to use the term of the government loan being benchmarked for the $n$ variable in Commerce's formula, such that the agency has no discretion to use a different period for any reason. KG Dongbu Cmts at 18-19. This is incorrect. Commerce's rule provides that the agency "normally will calculate" the uncreditworthy benchmark interest rate pursuant to a formula in which $n$ equals "the term of the loan" and $p_n$ equals "the probability of default within $n$ years." 19 C.F.R. § 351.505(a)(iii) (emphasis added). The *CVD Preamble* clarifies that the word "normally" was included to provide Commerce some discretion to modify variables in the formula when doing so would increase the accuracy of the benchmark rate.

Commerce's reasons for doing so in this case are adequately explained and well within the limits of the substantial deference that the agency is due in interpreting and applying its own regulations. The Remand Redetermination explains that, given limitations in the long-term loan benchmark data available on the record, Commerce had to modify certain variables in the uncreditworthy benchmark formula to ensure that it complied with the purpose of regulation and calculated an accurate subsidy rate for this program. Specifically, the Remand Redetermination explains that the purpose of the rule is to effectuate the principle that a market-oriented lender should expect to receive the same overall returns on loans to both creditworthy and uncreditworthy companies. Remand Redeter. at 33-34. No such lender would charge a three-year interest rate on a six-year loan to an uncreditworthy company. As a result, using a six year loan term in the uncreditworthy benchmark formula when the only creditworthy interest rate is for three year loans "would be contrary to Commerce's intention in providing a formula to calculate the benchmark interest rate for an uncreditworthy company . . . ." *Id.* at 34.

KG Dongbu also misreads Commerce's rule regarding the uncreditworthy discount rate for non-recurring subsidies. It suggests that Commerce's rule requires the agency to calculate a separate interest rate to use as the discount rate, where the term *n* is equal to the AUL period, or 15 years in this case. KG Dongbu Cmts at 19. Commerce's rule, however, is clear that this is not the case. The rule provides that "{i}n the case of a firm considered by the Secretary to be uncreditworthy, the Secretary will use as a discount rate the interest rate described in" the uncreditworthy loan benchmark rule. 19 C.F.R. § 351.524(d)(iii)(2) (emphasis added). The rule refers explicitly to "the interest rate" itself, not the formula used to calculate the rate. And the word "normally" is omitted, meaning that Commerce has no discretion to choose a different rate. Having properly calculated the uncreditworthy benchmark interest rate pursuant to 19 C.F.R.

13

§ 351.505(a)(3)(iii), Commerce must use that rate as the discount rate for allocating non-recurring subsidies.

### III. CONCLUSION

For the reasons discussed herein, Nucor respectfully requests that the Court sustain Commerce's Remand Redetermination in full.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.

**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
(202) 719-7000

*Counsel to Defendant-Intervenor Nucor Corporation*

Dated: December 22, 2023

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(l), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Comments in Support of the Remand Results, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 4,523 words.

*/s/ Alan H. Price*
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Nucor Corporation
(Representative Of)

December 22, 2023
(Date)