**THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HONORABLE JENNIFER CHOE-GROVES, JUDGE**

KG DONGBU STEEL CO., LTD.,
DONGBU STEEL CO., LTD., and
DONGBU INCHEON STEEL CO., LTD.,

        Plaintiffs,

    v.

UNITED STATES,

        Defendant,

    and

NUCOR CORPORATION and STEEL
DYNAMICS, INC.,

        Defendant-Intervenors.

**NON-CONFIDENTIAL**

Proprietary Information Removed From
Tabs 2-6, 8-9, 11 and 13

Court No. 22-00047

**REMAND JOINT APPENDIX**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Stephen A. Morrison
Ryan R. Migeed

January 23, 2024

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Avenue, N.W.
Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiffs KG Dongbu Steel Co.,
Ltd., Dongbu Steel Co., Ltd. and Dongbu
Incheon Steel Co., Ltd.*

**TABLE OF CONTENTS**[1]

| Tab | Record Document Number[2] | Description | Pages/Exhibits Cited |
|---|---|---|---|
| 1 | PR Doc. 22 | Letter from Kathleen Marksberry, Program Manager, AD/CVD Operations, Office VIII to Jinman Roo, Embassy of the Republic of Korea Pertaining to the Government of Korea, "Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Countervailing Duty Questionnaire" (Oct. 6, 2020). | Section II, Section III, Change-in-Ownership Appendix |
| 2 | CR Doc. 6<br>PR Doc. 34 | Response from Morris, Manning, & Martin, LLP to Sec'y Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Dongbu's Affiliated Companies Response" (Oct. 27, 2020). | Pages 1, 11-12 |
| 3 | CR Doc. 81-156<br>PR Doc. 74-78 | Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Dongbu's Initial Questionnaire Response," (Dec. 2, 2020). | Pages 12-63, Ex 12-A, Ex B-1 to Ex B-36 |
| 4 | CR Doc. 157-188<br>PR Doc. 80-85 | Letter from Yoon & Yang, LLP to Sec'y Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: GOK's Initial Questionnaire Response," (Dec. 4, 2020). | Pages 15-16, Ex Debt Restructuring-3, Debt Restructuring-6, Debt Restructuring-9 |

---

[1] In accordance with Chambers Procedures 2(C)(3), the parties to this proceeding have provided in this appendix all documents in their entirety if the document contains less than 10 pages. In addition, for those documents which are over 10 pages, the parties have provided additional pages to provide context to those pages cited. Finally, in accordance with Chambers Procedures 2(C)(4), the Table of Contents includes hyperlinks to the applicable record documents contained in this appendix, and this appendix is searchable.

[2] Documents contained in the administrative record are identified by the name and date of the documents, followed by the confidential record number ("CR"), the public record number ("PR"), the confidential remand record number ("CRR"), or the public remand record number ("PRR") assigned to these documents in the administrative record indices filed by the Defendant the United States with the Court on April 26, 2022 and on October 18, 2023. *See* Administrative Record Index, *KG Dongbu Steel Co. v. United States*, Court No. 22-00047 (April 26, 2022), ECF No. 27; *See* Administrative Remand Record Index, *KG Dongbu Steel Co. v. United States*, Court No. 22-00047 (Oct. 18, 2023), ECF No. 59.

| 5 | CR Doc. 202-206<br>PR Doc. 107 | Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Dongbu's First Supplemental Questionnaire Response," (Jan. 19, 2021). | Page 2 |
|---|---|---|---|
| 6 | CR Doc. 247-250<br>PR Doc. 158 | Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Dongbu's Fourth Supplemental Questionnaire Response," (June 23, 2021). | Ex B-45<br>Ex B-46 |
| 7 | PR Doc. 173 | Memorandum from James Maeder, Deputy Assistant Secretary for AD/CVD Operations to Christian Marsh, Acting Assistant Secretary for Enforcement and Compliance, "Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review; 2019: Certain Corrosion-Resistant Steel Products from the Republic of Korea" (July 12, 2021). | All |
| 8 | CR Doc. 259<br>PR Doc. 176 | Memorandum from Denis McClure, International Trade Compliance Analyst, AD/CVD Operations, Office VIII to The File through Irene Darzenta Tzafolias, Director,AD/CVD Operations, Office VIII, "Countervailing Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Preliminary Analysis Memorandum – Equity Infusions" (July 21, 2021). | All |
| 9 | CR Doc. 260<br>PR Doc. 177 | Memorandum from Dennis McClure, Int'l Trade Compliance Analyst, Office VIII, AD/CVD Operations to Robert Palmer, Program Manager, Office VIII, AD/CVD Operations, "Countervailing Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Preliminary Results Calculation for KG Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd. (collectively, Dongbu)," (July 12, 2021). | Attachment II |
| 10 | PR Doc. 213 | Memorandum from James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations to Lisa W. Wang, Assistant Secretary for Enforcement and Compliance, "Issues and Decision Memorandum for the Final Results and Partial Rescission of the 2019 Administrative Review of the Countervailing Duty Order on Certain Corrosion Resistant Steel Products from the Republic of Korea," (Jan. 12, 2022). | All |

| 11 | CR Doc. 270-271 PR Doc. 214 | Memorandum from Josh Simonidis, Int'l Trade Compliance Analyst, AD/CVD Operations, Office VIII, to Bob Palmer, Program Manager, AD/CVD Operations, Office VIII, "Countervailing Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results Calculations for KG Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd.," (Jan. 12, 2022). | Attachment II |
| --- | --- | --- | --- |
| 12 | PR Doc. 216 | *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022). | All |
| 13 | CRR Doc. 3 PRR Doc. 3 | Final Results of Redetermination Pursuant to Court Remand, *KG Dongbu Steel Co., Ltd. v. United States*, Court No. 22-00047, Slip Op. 23-98 (Court Int'l Trade Oct. 5, 2023). | All |

**Tab 1**

**PR Doc. 22**

**Letter from Kathleen Marksberry, Program Manager, AD/CVD Operations, Office VIII to Jinman Roo, Embassy of the Republic of Korea Pertaining to the Government of Korea, "Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Countervailing Duty Questionnaire" (Oct. 6, 2020).**

Barcode:4037654-01 C-580-879 REV - Admin Review 1/1/19 - 12...

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-580-879
Administrative Review
POR: 01/01/2019 – 12/31/2019
**Public Document**
E&C/OVIII: JS

October 6, 2020

Jinman Ro
Embassy of the Republic of Korea
2450 Massachusetts Avenue, NW
Washington, DC 20008

Re:    Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic
       of Korea:  Countervailing Duty Questionnaire

Dear Mr. Ro:

The U.S. Department of Commerce (Commerce) is conducting the administrative review of the
countervailing duty order on corrosion-resistant steel products (CORE) from the Republic of
Korea (Korea).[1]  As part of our review, we are requesting that your government and certain
companies provide answers to the enclosed questionnaire.  We have selected the following
companies as respondents in this administrative review:  Hyundai Steel Company and KG
Dongbu Steel Co., Ltd. (formerly Dongbu Steel Co., Ltd.)/Dongbu Incheon Steel Co., Ltd.[2]
Please note that your government is responsible for forwarding copies of this cover letter and
questionnaire to these respondent companies.

Commerce is inquiring into each subsidy program previously examined in the investigation or
prior review, except for programs already determined to be terminated or not countervailable.
Commerce will also examine any programs discovered during the course of this administrative
review.  Commerce has taken no position on whether these programs provide subsidies in this
case, and our request for information on these programs does not imply that we will necessarily
find them to provide countervailable subsidies.  Our decisions on those questions will be made
on the basis of information received during this proceeding (including information from you) in
light of the applicable provisions of U.S. law.

If the government or respondent company has information demonstrating that a respondent
company had no exports, sales, or entries of subject merchandise to the United States during the
period of review (01/01/2019 to 12/31/2019), then you may submit that information, along with
supporting documentation, to Commerce instead of submitting a questionnaire response with
regard to that company.

---

[1] On July 25, 2016, Commerce published in the *Federal Register* the countervailing duty order on CORE from
Korea. *See Certain Corrosion-Resistant Steel Products from India, Italy, Republic of Korea and the People's
Republic of China: Countervailing Duty Order*, 81 FR 48387 (July 25, 2016).
[2] *See* Memorandum, "Administrative Review of the Countervailing Duty Order on Certain Corrosion-Resistant Steel
Products from the Republic of Korea: Respondent Selection Review," dated October 6, 2020.

INTERNATIONAL
T R A D E
ADMINISTRATION

# SECTION II

## QUESTIONNAIRE FOR THE GOVERNMENT OF THE REPUBLIC OF KOREA

This questionnaire requests information about certain subsidy programs alleged to be provided to producers/exporters of subject merchandise. The subsidy programs under examination in this questionnaire include all programs Commerce previously examined in the investigation or prior completed review of this order, except those subsidy programs found to be terminated or not countervailable. As such, this questionnaire addresses all subsidy programs found previously to be used (by the company respondents identified below and any other previously examined producers/exporters), subsidy programs previously found to be not used, and subsidy programs which did not provide countervailable benefits. Commerce will also examine any other potentially countervailable programs discovered during the course of this administrative review.

Absent new information warranting a program reexamination, we will not reevaluate prior determinations regarding the countervailability of programs. Thus, as noted below, if you think that determinations regarding the countervailability of programs should be revisited, it is incumbent upon you to provide the new information which you claim warrants such a reexamination.

Likewise, for non-recurring subsidies previously found to be used by the companies under examination, we will not reexamine the benefit amount attributable to this POR from previously examined subsidy disbursements, absent new information. Instead, we will calculate the subsidy rate from such previously examined disbursements by reliance on the benefit amount attributable to this POR as determined in the calculation memoranda of the investigation or prior review. Such memoranda will be placed on the record of this review by Commerce as necessary.

In addition to providing information related to subsidies received by the company respondent(s) identified in this questionnaire, you are responsible for providing the information requested below for certain companies affiliated with the named respondents, companies involved in their sales of subject merchandise, and former owners. (Please *see* Section III below for additional information.) All references to the company respondent(s), company under investigation, company under review, companies under examination, etc. in this section are references to the companies named below as well as all other companies required to respond to Section III of this questionnaire. Therefore, when providing answers to the questions below, you must provide information regarding all such companies. Please clearly separate your responses for each company.

Commerce allocates the benefits received from certain types of subsidies over time. Thus, although the POR is a recent period, we are reviewing alleged subsidies received over a time period corresponding to the AUL of fixed assets. In this administrative review, Commerce plans to use a 15-year AUL, which corresponds to the AUL used in the investigation.

Unless the government or the companies choose to demonstrate that a company-specific or alternative country-wide average useful life (AUL) of renewable physical assets differs from the AUL of renewable physical assets for the industry concerned as listed in the U.S. Internal Revenue Service's Depreciation Range System (IRS tables), Commerce will use the AUL set forth by the IRS tables for this industry as the allocation period for non-recurring subsidies. *See* 19 CFR 351.524(d)(2). In the case of the subject merchandise, the AUL for the industry is set at 15 years.

When a company has been privatized or has changed ownership, in whole or part, during the AUL period, Commerce has a baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period. If a company wishes to challenge the baseline presumption, please coordinate with the company to answer the questions in the ***Change-in-Ownership Appendix***.

For any program which had multiple funding sources or which was administered by different levels of government, please provide information as to the roles played by each administrating authority. If a question requires information from other authorities (*e.g.*, state or local governments), please forward questions to the correct source. <u>It is the responsibility of your government to ensure that full and complete responses to questions on regional/local programs are obtained from the appropriate regional/local authority</u>.

We note that the companies are instructed to provide you with the name(s) of any "cross-owned" companies which they must include in their questionnaire responses. Please ensure that you provide a complete response for these "cross-owned" companies use of all programs as well.

For each subsidy program, you must state if a company or any of its "cross-owned" companies subject to this review did or did not apply for, use, or benefit from that program during the POR. **<u>Please ensure that you provide a full and complete response to all programs under "PROGRAMS NOT USED OR PROVIDED NO MEASUREABLE BENEFITS," including any other subsidies that may be reported.</u>**

If your government claims that any of these programs has been terminated, please submit the legislation, law, decree, etc., which ended the program. Please state and document whether your government has replaced the program with any successor program. Further, please explain whether there are any residual benefits that are still offered pursuant to the program.

## I.    <u>PRODUCERS/EXPORTERS SUBJECT TO REVIEW</u>

Commerce has selected the below listed companies as mandatory company respondents in this administrative review:

- **KG Dongbu Steel Co., Ltd. (formerly Dongbu Steel Co., Ltd.)/Dongbu Incheon Steel Co. Ltd. (KG Dongbu)**

- **Hyundai Steel Company (Hyundai Steel)**

## II.    PROGRAM-SPECIFIC QUESTIONS

## PREVIOUSLY FOUND TO BE COUNTERVAILABLE

## A.  LOANS AND CREDIT

### 1.  Korea Export-Import (KEXIM) Bank Import Financing

Commerce found the above program to be countervailable previously.  We do not intend to reevaluate the countervailability of this program.  However, if there were any changes to the program during the review period, or if the government replaced the program with a successor program, then please answer all questions in the ***Standard Questions Appendix***.  If there were no changes to the program during the POR, please so state; you do not need to provide a response to the ***Standard Questions Appendix*** if there were no changes to the program.

If any of the companies under review applied for, received, or accrued assistance under the program during the POR, please so state and respond to the ***Usage Appendix*** separately for each company.

### 2.  Korea Development Bank (KDB) and Industrial Base Fund (IBF) Short-Term Discounted Loans for Export Receivables

Commerce found the above program to be countervailable previously.  We do not intend to reevaluate the countervailability of this program.  However, if there were any changes to the program during the review period, or if the government replaced the program with a successor program, then please answer all questions in the ***Standard Questions Appendix***.  If there were no changes to the program during the POR, please so state; you do not need to provide a response to the ***Standard Questions Appendix*** if there were no changes to the program.

If any of the companies under review applied for, received, or accrued assistance under the program during the POR, please so state and respond to the ***Usage Appendix*** separately for each company.

## B.  KG DONGBU'S DEBT RESTRUCTURING

Commerce found the restructuring of debt and loans received by KG Dongbu to be countervailable previously.  We do not intend to reevaluate the countervailability of this program.

Pease answer all questions in the ***Standard Questions Appendix*** and ***Usage Appendix***.  If there were no changes to the program during the POR, please so state; you do not need to provide a response to the ***Standard Questions Appendix*** if there were no changes to the program.

In addition, please respond to the following questions with respect to the conversion of debt-to-equity that took place in 2015, after the POI:

1. Please provide a general description of the debt restructuring for KG Dongbu including the time table for the debt restructuring, the purpose of the debt restructuring, the names of and number of the creditors involved in the debt restructuring, the law under which the restructuring is undertaken, the terms of the restructuring, a description of the Creditors Associations, and the types and amount of debt that were restructured, including any additional infusions of cash or loans to KG Dongbu and an explanation as to whether the restructuring involved any conversion of debt into equity.

2. Provide a complete copy of the Agreement for the Creditors Co-management Program between KG Dongbu and the Creditors' Associations, with complete translation.

3. Please explain the type of assistance provided to KG Dongbu under the debt restructuring such as gains from debt-to-equity swaps, loans, import L/C (Usance), benefits related to debentures, etc.

4. For the dates and amounts for each type of assistance provide under the debt restructuring.

5. Please provide the exact amount of debt, both secured and unsecured, held directly by or by a GOK-owned or controlled entity:
   a. Before the KG Dongbu debt-to-equity conversions in 2014
   b. After the KG Dongbu 2014 debt-to-equity conversions.

6. For any debt–equity conversion please explain whether any objective analysis was made by the government, KDB or KEXIM prior to the debt-to-equity conversion. If yes, please provide the complete analysis study done before the conversion, with full translation.

7. According to petitioner, KDB is the main creditor of the KG Dongbu Group and leads the Creditors' Association.[5] Please describe the Creditors' Association including when it was formed. Identify all members of the association and any ownership stakes of the GOK in each member. Please also identify which members are GOK agencies or GOK-owned entities.

8. Please explain under which law the Creditors' Association was created. Provide translated sections of the law regarding the responsibilities and powers granted to the Creditors' Association, how decisions are made on the Association, and any reporting requirements to the GOK or any GOK-controlled entity.

9. Please provide a description of the responsibilities and powers granted to the Creditors' Association, how decisions of the Association are made, (i.e., does the amount of debt owned equal to voting power) and any reporting requirements to the GOK or any GOK controlled entity.

10. Please provide a copy of the agreement entered into for the "Creditors Co-management Program" with the Creditors' Association and KG Dongbu.[6]

11. Provide copies of all laws and regulations governing the restructuring of KG Dongbu.

12. Did other companies go through similar restructuring during the POI and the prior three years?
    a. If so, explain whether these restructurings were made pursuant to any GOK program and provide documentation regarding eligibility for these programs.

---

[5] *See* Petition, Volume V at 54.
[6] *Id.*

    b.   Please also explain whether any other restructurings involved a Creditors Association or a Special Task Force and what their responsibilities were.

## C.  INCOME TAX PROGRAMS

Commerce found the following listed programs to be countervailable previously.  We do not intend to reevaluate the countervailability of the programs.  However, if there were changes to any of the programs affecting the respondents' income tax returns filed during the POR, or if the government replaced a program with a successor program, then please answer all questions in the ***Standard Questions Appendix***.  If there were no changes to a program affecting income tax returns filed during the POR, please so state for each program; you do not need to provide a response to the ***Standard Questions Appendix*** if there were no changes to a program.

If any of the companies under review applied for, received, or accrued assistance under a program listed below during POR, please so state and respond to the ***Income Tax Appendix*** separately for each program for each company.

1.  **RSTA Article 25(2):  Tax Deductions for Investments in Energy Economizing Facilities**
2.  **RSTA Article 25(3):  Tax Credit for Investment in Environmental and Safety Facilities**
3.  **RSTA Article 26:  GOK Facilities Investment Support**
4.  **RSTA Article 10(1)(3):  Tax Credit for Research and Human Resource Development Expenses**

## D.  OTHER TAX PROGRAMS

If any of the companies under review applied for, received, or accrued assistance under a program listed below during POR, please so state and respond to the ***Standard Questions Appendix and the Usage Appendix*** separately for each program for each company.

1.  **RSLTA Article 78:  Local Tax Exemptions on Land Outside Metropolitan Areas**
2.  **RSLTA Article 57-2:  Tax Exemption for Acquisition of Property through Corporate Merger**

## E.  ENERGY SAVINGS PROGRAMS

If any of the companies under review applied for, received, or accrued assistance under the program listed below during POR, please so state and respond to the ***Standard Questions Appendix and the Usage Appendix*** for each company.

1. **Electricity Discounts under Trading of Demand Response Resources (DRR) Program**

## F.  RESEARCH & DEVELOPMENT GRANTS PROVIDED UNDER THE INDUSTRIAL TECHNOLOGY INNOVATION PROMOTION ACT (ITIPA)

If any of the companies under review applied for, received, or accrued assistance under this program listed below during POR, please so state and respond to the ***Standard Questions Appendix, Grant Appendix, and Allocation Appendix*** program for each company.

## G.  MODAL SHIFT PROGRAM

If any of the companies under review applied for, received, or accrued assistance under this program listed below during POR, please so state and respond to the ***Standard Questions Appendix, Grant Appendix, and Allocation Appendix*** for each company.

## H.  SUNCHEON HARBOR PORT USAGE FEE EXEMPTIONS

If any of the companies under review applied for, received, or accrued assistance under this program listed below during POR, please so state and respond to the ***Standard Questions Appendix, Usage or other appropriate Appendix*** for each company.

## I.  PROGRAMS NOT USED OR PROVIDING NO MEASURABLE BENEFITS

Commerce has not yet made a countervailable determination with regards to the following listed programs because, generally, the programs were found not used or the programs provided no measurable, countervailable benefit previously.

Because Commerce has not made a determination on the countervailability of the programs, it is necessary to continue to review the programs.  Therefore, if a company respondent (including any responding cross-owned affiliated companies) applied for or received benefits under any of the programs identified below during the POR, or during the preceding 14 years for a non-recurring subsidy, please answer all questions in the ***Standard Questions Appendix***, as well as any other applicable appendices of this section, separately for each program/company.  If no respondent company used a program during the stated time period, please so state; you need not provide a response to any appendix.

1. KEXIM Short-Term Export Credits
2. KEXIM Export Factoring
3. KEXIM Export Loan Guarantees
4. KEXIM Loan Guarantees for Domestic Facility Loans
5. KEXIM Trade Bill Rediscounting Program
6. KEXIM Overseas Investment Credit Program
7. KDB and IBK Short-Term Discounted Loans for Export Receivables
8. Loans under the Industrial Base Fund

9. K-SURE Export Credit Guarantees
10. K-SURE Short-Term Export Credit Insurance
11. Seoul Guarantee Insurance
12. Long-Terms Loans from KORES and KNOC
13. Clean Coal Subsidies
14. GOK Subsidies for "Green Technology R&D" and its Commercialization
15. Support for SME "Green Partnerships"
16. Grants from the Korea Agency for Infrastructure Technology Advancement
17. Tax Deduction under RSTA Article 10(1)(1)
18. RSTA Article 10(1)(2)
19. RSTA Article 11
20. RSTA 104(14)
21. RSLTA Articles 19, 31, 46, 84, LTA 109, 112, and 137
22. Tax Reductions and Exemptions in Free Economic Zones
23. Grants and Financial Support in Free Economic Zones
24. Exemptions and Reductions of Lease fees in Free Economic Zones
25. Energy Savings Programs
       Electricity Savings for Designated Period Program
       Electricity Savings through the Bidding Process Program
       Electricity Savings upon an Emergent Reduction Program
       Electricity Savings through General Management Program
       Management of the Electricity Load Factor Program
26. Sharing of Working Opportunities/Employment Creating Incentives
27. Fast-Track Restructuring Program
28. VAT Exemptions on Imported Goods
29. GOK Infrastructure Investment at Incheon North Harbor
30. Port Usage Rights at the Port of Incheon
31. Incentives for Usage of Gwangyang Port
32. Incentives for Usage of Yeongil Harbor in Pohang City
33. Incentives for Natural Gas Facilities
34. Power Business Law Subsidies
35. Provision of Liquefied Natural Gas (LNG) for LTAR
36. The GOK's Purchases of Electricity for MTAR
37. Machinery & Equipment (KANIST R&D) Project
38. Grant for Purchase of Electrical Vehicle
39. Incentives for Compounding and Prescription Cost Reduction
40. Subsidies for Construction and Operation of Workplace Nursery
41. Subsidies for Hyundai Steel Red Angels Women's Football Club
42. Subsidies for Pohang Art Festival
43. Reduction for Sewerage Usage Fee
44. Land Purchase at Asan Bay
45. Daewoo International Corporation Debt Work Out
46. Special Accounts for Energy and Resources (SAER) Loans
47. Other Transactions with Government Entities
48. Hyundai Steel's Acquisition of Suncheon Land
49. KG Dongbu's Exemptions from Payment of Harbor Fees

50. Upstream Subsidy for Electricity

## J.  OTHER PROGRAMS

Has the government, or entities owned in whole or in part by the government, directly or indirectly, provided to the producers or exporters of the subject merchandise under review any other non-recurring benefits over the 15-year AUL (i.e., the POR and preceding fourteen years), or recurring benefits during POR?  Please coordinate with the respondent companies to determine if they are reporting usage of any subsidy programs not previously examined.  For each such program, please answer all questions in the ***Standard Questions Appendix*** and any other applicable appendices to this section separately for each program.  If the government has not provided any other benefits, then please so state.

## SECTION II
## Standard Questions Appendix

A.   Provide a description of the program, including the purpose of the program.

B.   Provide the date the program was established and explain how it was enacted, *e.g.*, by law, decree, regulation, etc.   For programs under investigation that were not enacted pursuant to a legal instrument, indicate for how many years the program has been in operation.   For example, for programs involving the provision of inputs for less than adequate remuneration not enacted pursuant to a legal instrument, please indicate how many years the input has been provided and/or sold by the government, government-controlled entities such as state-owned enterprises, or other enterprises alleged to be "authorities" under section 771(5)(B) of the Act.

C.   Provide the name and address of each of the government agencies or authorities responsible for administering the program.  Please be specific in identifying the level of government that has the authority to approve the assistance, and the level of government responsible for administering the distribution of assistance.

D.   Please indicate which of the companies under investigation (including all cross-owned companies and any trading companies exporting subject merchandise into the United States) applied for, accrued, or received benefits under the program during the POR.

Please note that if this program has been terminated but there are residual benefits or a replacement program has been put into place (*see* 19 CFR 351.524), and the companies under investigation are still receiving, claiming or using assistance under the program or if they have applied for, received, claimed, accrued or used assistance under the replacement program, you must respond to all of the remaining questions for residual assistance or replacement programs.

E.   Provide translated copies of the laws and regulations relating to the program and any internal or external reports pertaining to the program that were applicable during the POR.

F.   Identify and explain the types of records maintained by the relevant government or governments (*e.g.*, accounting records, company-specific files, databases, budget authorizations, *etc*.) regarding the program.

G.   Please identify all instances in which assistance under the program was provided to any mandatory respondent (including all responding cross-owned companies and any trading company) during the POR.

H.   Please explain whether the assistance under the program was provided to the mandatory respondent(s) pursuant to a statute, regulation, decree or other legal measure/instrument that establishes the conditions and guidelines governing the operation of the program, such as eligibility criteria, amounts, <u>etc</u>.

I.      To the extent they are different from the entity (entities) identified in response to Question C, above, please provide the name(s) of the entity (entities) that provided each instance of assistance under the program to the mandatory respondent(s) described in response to under Question G, above.

J.      Please specify if the entity (entities) listed in response to Question I, above, is a national, state or local government entity, e.g., a government ministry, department, agency, office, etc.

K.      If the assistance under the program was provided by an entity other than a national, state or local government entity, please respond to the following questions:

  1.      What is the legal status of the entity (entities), e.g., is it a separately incorporated entity and/or a government corporation, government lending institution, commercial entity?

  2.      Please explain how the entity (entities) was established and whether the entity operates pursuant to statutes, decrees, and/or regulations. Please explain the relevant statute, decrees and regulations under which the entity was established and operates.

  3.      What is the legal basis that governs the entity's provision of assistance under the program?  Please provide translated copies of the relevant legal measures.

  4.      Has the entity (entities) listed above received any direct or indirect funding or support from a government entity?  Please specify if the government provided any such direct or indirect funding for the purpose of providing assistance under this program.

  5.      Did the entity (entities) listed above provide assistance under the program pursuant to specific guidelines and/or criteria under this program?  Please describe those guidelines and/or criteria.

  6.      Please provide the ownership structure of each such entity and specify the amount of any direct or indirect government ownership during the POR (and for each year in which the assistance was provided).

  7.      Please provide the translated annual report(s) during the POR (and for each year in which the assistance was provided) for each such entity.

  8.      What are the core activities and functions of each entity that provided the assistance under the program?

  9.      Explain why the assistance under this program was provided by this entity (entities) rather than directly by the government.

L.    Describe the application process for assistance under the program and provide a blank copy of the application form (translated, if necessary).  After an application is submitted, please describe the procedures by which an application is analyzed and eventually approved or rejected.  Please provide for each company under investigation a copy of at least one completed application and approval package (and provide translations of headings and any summaries and of the exact reason(s) for the application and the exact reason(s) for approving the assistance).

M.    Please answer the following questions regarding eligibility for and actual use of the assistance provided under this program.

    1.    Describe the criteria governing the eligibility for and receipt of any assistance under this program.  Please also describe the criteria for determining the amount of the assistance provided.  Provide a copy of any law, regulation or other official document detailing these criteria.  As part of your response, please also address the following questions:

        (a)    Is the actual export performance or export potential of an applicant or recipient taken into account in any way in determining eligibility for or receipt of any assistance under this program?  Please explain.  If eligibility for, or actual use of, this program is contingent upon export performance, whether solely or as one of several other conditions, you need not respond to the remaining questions under section M.

        (b)    Is the use of domestic goods or the creation of domestic value added by an applicant or recipient taken into account in any way in determining eligibility for or receipt of any assistance under this program?  Please explain.  If eligibility for this program is contingent upon the use of domestic over imported goods, you need not respond to the remaining questions under section M.

        (c)    Is eligibility for the subsidy limited to enterprises or industries located within designated geographical regions within the jurisdiction that authorized the program?  If so, please provide the criteria for eligibility and you need not respond to the remaining questions under section M.

        (d)    Is the industry or sector in which the applicant or recipient operates taken into account in any way, either under the law or through discretion exercised by the government agency or authority administering the program, in determining eligibility for or receipt of any assistance under this program?  Please explain, and identify those industries or sectors that are eligible or otherwise receive special consideration for eligibility.  If eligibility is limited, by law or in fact, to any enterprise or group of enterprises, or to any industry or group of industries, you need not respond to the remaining questions under section M.

(e) With respect to the eligibility criteria and your administration of this program, please address the following, and provide documentation, if possible, to support your explanation:

    i. If the eligibility criteria, as listed in the applicable law, regulation or other official documents are met, will an applicant always and automatically receive assistance, or is final approval by the government agency or authority which administers the program necessary?

    ii. Is the amount of the assistance provided determined solely by established criteria found in the law, regulation or other official document, or is the amount ultimately determined by the government agency or authority which administers the program? If established by criteria, please provide all of the criteria.

    iii. If the government agency or authority has any discretion that goes beyond the criteria laid out in the law, regulation or other official document, please explain the nature and extent of that discretion.

    iv. Explain how the companies under investigation who have applied for, claimed, received, accrued or used assistance under this program have met the eligibility criteria.

(f) Is eligibility for the subsidy limited to small and medium-sized enterprises? If so, please define and document how the term "small and medium-sized enterprises" is defined under the program and on what basis the company(ies) being examined met the definition. If the program is not contingent on firms being small and medium-sized enterprises, then so state and skip this question.

2.    Please provide the following information, in table form, regarding the number of recipient companies and industries and the amount of assistance approved under this program for the year in which any mandatory respondent company was approved for assistance, as well as each of the preceding three years (e.g., if a respondent was approved for assistance in 2010 and 2011, provide this information, by year, for 2007 through 2011). If this information is not available on the basis of year of approval, then provide the information based on the year of bestowal.

(a) The amount of assistance approved for each mandatory respondent company, including all cross-owned companies and trading companies that sell the subject merchandise to the United States.

(b) The total amount of assistance approved for all companies under the program.

(c) The total amount of assistance approved for each of the largest 50 recipients under the program and include the industry designation for each of these recipients.  Note that at this time, you do not need to provide the name of the recipient, you just need to provide the individual amount of assistance approved.

(d) The total number of companies that were approved for assistance under this program.

(e) The total number of companies operating or established in the jurisdiction of the granting authority of the investigated program.

(f) The total number of corporate/business income tax filers within the jurisdiction of the granting authority of the investigated program.

(g) Provide a complete listing of the industries that operate in the jurisdiction of the granting authority of the investigated program.    In identifying these industries, please use whatever resource or classification scheme your government normally relies upon to define industries and to classify companies within an industry.  Please provide the relevant classification guidelines, and please ensure the list provided reflects consistent levels of industrial classification.

(h) The total amount of assistance approved for the industry in which the mandatory respondent companies operate, as well as the totals for every other industry in which companies were approved for assistance under this program. In identifying the industries, please use whatever resource or classification scheme your government normally relies upon to define industries and to classify companies within an industry.  Please provide the relevant classification guidelines, and please ensure the list provided reflects consistent levels of industrial classification.  Please clearly identify the industry in which the companies under investigation are classified.

(i) The total number of companies that applied for, but were denied, assistance under this program. Be sure that your response to question provides a complete discussion of the circumstances in which applications for assistance are denied.

(j) If you have additional information that you believe demonstrates that this program is broadly available and widely used throughout the economy, please provide such information and a narrative description of your contention.

N.    Commerce has determined that economic activities in the Republic of Korea are diverse on a national and regional basis for purposes of any potential *de facto* specificity analysis

Barcode:4037654-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

of the programs under examination.[7]  If your government would like to contest this determination, on either a national or regional basis, please provide a detailed narrative explanation and supporting evidence to substantiate your claim with respect to the jurisdiction of the granting authority for each relevant program.  At a minimum, this information should include the number of establishments within the following sectors: agriculture, forestry, animal husbandry and fishery; mining; manufacturing; production and supply of electricity, heat, gas, and water; construction; wholesale and retail trades; transport, storage and post; hotel and catering services; information transmission, software and information technology; financial intermediation; real estate; leasing and business services; scientific research and technical services; management of water conservancy, environment and public facilities; services to households, repair and other services; education; health and social services; culture, sports and entertainment; and public management, social security and social organizations.

O.    Describe any anticipated changes in the program.  Provide documentation substantiating your answer.  If the program is being terminated, state the last date that a company could apply for or claim benefits under the program.  When is the last date that a company could receive benefits under the program?  If the program has been terminated and replaced by a similar type of program, please provide a discussion of the replacement program to include the purpose of the program and the date it was established.

---

[7] *See* Memorandum, "The Extent of Diversification of Economic Activities in the Republic of Korea (South Korea) for the Purpose of Determining Specificity of a Domestic Subsidy for Countervailing Duty (CVD) Purposes," dated September 13, 2018.

Barcode:4037654-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

## SECTION II
## Usage Appendix

If any of the companies under review applied for, received, or accrued assistance under the program, please respond to the following questions.

A.    Please indicate which of the companies under examination (including all cross-owned affiliated companies and any trading companies exporting subject merchandise into the United States) applied for, received, or accrued assistance under the program in POR (and preceding 14 years if a non-recurring subsidy).

B.    Provide the name and address of each of the government agencies or authorities responsible for administering the program. Please specifically and separately identify the level of government that has the authority to approve the assistance and the level of government responsible for administering the distribution of assistance.

C.    Identify and explain the types of records maintained by the relevant agencies (*e.g.*, accounting records, company-specific files, databases, budget authorizations) regarding the program.

D.    Describe the application process for assistance under the program and provide a blank copy of the application form (translated, if necessary). After an application is submitted, please describe the procedures by which an application is analyzed and eventually approved or rejected. Please provide for each company under examination that applied for, received, or accrued assistance a copy of at least one completed application and approval package. Provide translations of headings and all sections discussing the basis of the application and the precise reasons for approval.

E.    Provide details of the assistance including amounts of funding, dates of approval and disbursement, and whether the disbursement was in a lump sum or multiple installments. If the amount of approval differs from the amount disbursed, please explain the difference.

F.    Explain whether the subsidy is exceptional in the sense that the recipient cannot expect to receive additional assistance under the same program on an ongoing basis from year to year.

G.    Explain whether the disbursement required or received the government's express authorization or approval for this specific recipient (*i.e.*, receipt of benefits is not automatic).

H.    Explain whether the subsidy was provided for, or tied to, the capital structure or capital assets of the recipient firm.

Barcode:4037654-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# SECTION II
## Allocation Appendix

Respondents should be aware that, pursuant to 19 CFR 351.524, Commerce allocates the benefits received from certain types of subsidies over time. Although the POR is a recent period, we are investigating alleged subsidies received over a time period corresponding to the industry's AUL of productive assets. According to 19 CFR 351.524(d)(2)(i), Commerce will presume that the industry's AUL corresponds to the AUL of renewable physical assets for the industry concerned, as listed in the IRS Tables. In the case of the CORE industry, the AUL is set at **fifteen (15)** years.

According to 19 CFR 351.524(d)(2), parties to the review may choose to argue that the IRS Tables do not reasonably reflect the AUL for the industry in question. To do so, parties must demonstrate that the AUL applicable to the industry producing the subject merchandise in Korea differs by one year or more from the AUL in the IRS Tables. If any of the parties under review choose to pursue an AUL other than that identified in the IRS Tables, you will be required to provide information for the corresponding number of years.

Pursuant to 19 CFR 351.524(a) through (c), each program, other than loan programs, will normally be treated as either recurring or non-recurring. The Secretary will normally treat the following types of subsidies as providing recurring benefits: direct tax exemptions and deductions; exemptions and excessive rebates of indirect taxes or import duties; provision of electricity, water, and other utilities; freight subsidies; export promotion assistance; early retirement payments; worker assistance; worker training; wage subsidies; and upstream subsidies. The Secretary will normally treat the following types of subsidies as providing non-recurring benefits: equity infusions, grants, plant closure assistance, debt forgiveness, coverage of operating losses, debt-to-equity conversions, provision of non-general infrastructure, and provision of plant and equipment.

If a particular form of assistance is not on one of the non-binding illustrative lists, or if you wish to claim that a particular form of assistance on the recurring list should be treated as non-recurring or that a particular form of assistance on the non-recurring list should be treated as recurring, please address the following criteria.

A.    Whether the subsidy exceptional in the sense that the recipient cannot expect to receive additional assistance under the same program from year to year on an ongoing basis;

B.    Whether the subsidy required or received the government's express authorization or approval (*i.e.*, receipt of benefits is not automatic); or

C.    Whether the subsidy was provided for, or tied to, the capital structure or capital assets of the recipient firm. (For a definition of capital structure and capital assets, *see* the preamble of the CVD regulations (63 FR at 65393).)

Barcode:4037654-01 C-580-879 ARP - Admin Review 1/1/19 - 12/31/19

*Section II - Allocation Appendix*

After considering the above criteria, please provide information for each non-loan program for either the POR or AUL period, as appropriate.

Filed By: Joshua Simonidis, Filed Date: 1076/20 3:24 PM, Submission Status: Approved

## SECTION II
## Grant Appendix

Questions A and B relate to whether grants under this program are "recurring" or "non-recurring." For further explanation on recurring and non-recurring grants, *see* the Allocation Appendix, above, and 19 CFR 351.524(c).

A.    Does this program provide ongoing support to participants, *i.e.*, is the receipt of benefits predictable or is the program designed to provide on-time assistance to participants?

B.    Is a formal application and/or specific government approval required each time benefits are received or is the receipt of benefits automatic after initial authorization for the benefits?

Based on the answers to questions A and B, please provide the following information in <u>chart form</u> for each producer/exporter of the subject merchandise for either the POR or for each year during the AUL period.

A.    The amount of the grant approved by the government.

B.    The date of government authorization/approval.

C.    The amount actually disbursed.

D.    The date(s) the grant was disbursed. Please indicate whether the grant was paid in a lump sum or in multiple disbursements.

**SECTION II**
**Income Tax Program Appendix**

If any of the respondent companies under review used this program to take deductions from taxable income, to receive credit towards taxes payable, to take exemptions from taxes owed, to reduce the tax rate, to defer payment of taxes, to carry forward losses from previous tax years, to use accelerated depreciation, or to benefit from other tax advantages on any tax return *filed during the POR*, please respond to the following questions.

1.     Explain whether assistance is a deduction from taxable income, a credit towards taxes payable, an exemption from taxes owed, a reduction in the tax rate, a deferral of taxes, a loss carry-forward from previous tax years, accelerated depreciation, or other tax benefit.

2.     How do companies using this program calculate the tax benefit they claim?  Please be specific and provide a sample calculation using a blank tax form.

3.     If the company carried forward a loss from prior years and used that loss to offset taxes due on the tax return filed during the POR, demonstrate that this loss was not generated by use of any countervailable tax program.

4.     If the program involves a deferral of taxes owed, please provide the amount and length of the deferral and the details of any interest charged on the deferral.

5.     If the tax assistance results in negative income for tax purposes (*e.g.*, accelerated depreciation), is the company able to carry forward this loss?

6.     For a program that provides a reduction in the tax rate or an exemption from taxes payable, please report the tax rate that was paid under the program and the tax rate that would have applied in absence of the program.

## SECTION II
## Loan Benchmark and Loan Guarantee Appendix

A.    SHORT TERM LOANS

If short-term loans (*i.e.*, one year or less) were provided under this program and principal or interest was repaid, accrued, and/or waived during the POR on those loans, answer the following questions.  If the short-term financing being investigated was provided in foreign currency or the interest rate was based on or tied to a foreign currency, please provide the cost of commercial borrowing in that foreign currency and the charges associated with commercial borrowing in that currency in response to questions 2 and 3, below.

1.    Please describe the types of institutions (*e.g.*, banks, leasing firms, brokers, insurance companies) that provide short-term commercial credit in your country.  In addition, please explain the role of the government in controlling/directing these institutions and their lending policies.  For each type of institution, specify whether loans are provided in domestic currency, in foreign currency, or in both domestic and foreign currency.

2.    Please provide the predominant national average short-term interest rate in your country, including copies of the source material, for the POR and the previous twelve months.  If a predominate national average does not exist, please provide the interest rate in your country for the POR and the previous twelve months for each type of short-term financing and the weight each of these represent as a percentage of the total outstanding short-term loans.

3.    Specify other charges or practices that lenders use in normal commercial transactions, such as commitment fees, compensating balances, loan origination fees, taxes, commissions, loan discounting, adjusted payment schedules, guarantees, or the direct or indirect requirement that all or a significant portion of a company's business be channeled through a particular lending institution.  To what extent do these additional charges and practices add to the cost of normal commercial financing?  Specify the amount of each additional charge.

4.    In all cases, state whether the applicable rate is for loans provided by publicly-owned or controlled institutions or for loans provided by privately held institutions and whether such rate is subject to any government-mandating ceiling or cap.

5.    Provide the date and amount of any forgiveness or assumption of any principal or interest payments on the loans under review during the POR.

B.    LONG-TERM LOANS

If long-term loans (*i.e.*, longer than one year) were provided under this program and principal or interest was outstanding during the POR, answer the following questions. If the long-term financing being investigated was provided in foreign currency or if the rate is based on or tied to a foreign currency rate, please provide the cost of commercial borrowing in that foreign currency and the charges associated with commercial borrowing in that currency.

1. Please describe the types of institutions (*e.g.*, banks, leasing firms, brokers, insurance companies) that provide long-term commercial credit in your country. For each type of institution, specify whether loans are provided in domestic currency, in foreign currency, or in both domestic and foreign currency.

2. Please provide the following information, including copies of the source material, for each year in which a long-term loan that had outstanding principal or interest during the POR was approved under this program.

   a. If the loan has a fixed interest rate, please provide the long-term fixed interest rate(s) available from private commercial lenders to most firms in your country at the time the government loan was approved. If such figures are not available, please provide the long-term variable interest rate(s) available from private commercial lenders to most firms during the same period. If such figures are not available, please list each type of short-term financing available in your country at the time the loan was approved, state the percentage of the total amount of short-term financing each type represented, and provide the corresponding monthly average interest rates for each type in the POR.

   b. If the loan has a variable interest rate, please provide the long-term variable interest rate(s) available from private commercial lenders to most firms in your country at the time the government loan was approved. Also, provide the interest rate(s) during the POR of long-term variable rate loans from private commercial lenders. If a long-term variable interest rate from commercial lenders is not available, please provide the long-term fixed interest rate(s) available from private commercial lenders. If this figure is not available, please list each type of short-term financing available in the country in question at the time the loan was approved, state the percentage of the total amount of short-term financing each type represented, and provide the corresponding monthly average interest rates for each type during the POR.

   c. In all cases, state whether the applicable rate is for loans provided by publicly-owned or controlled institutions or for loans provided by privately held institutions and whether such rate is subject to any government-mandated ceiling or cap.

   d. Provide the yields on industrial bonds, as documented by the central bank of your country.

3. Specify other charges or practices that lenders use in normal commercial transactions, such as commitment fees, loan guarantee fees, compensating balances, loan origination

fees, taxes, commissions, loan discounting, adjusted payment schedules, or the direct or indirect requirement that all or a significant portion of a company's business be channeled through a particular lending institution. To what extent do these additional charges and practices add to the cost of normal commercial financing? Specify the amount of each additional charge and indicate whether such charges are included in the rates you have provided.

4. If principal or interest on any loan provided under this program was forgiven or assumed during the POR or during a prior period corresponding to the industry's AUL, please provide the dates and amounts of each forgiveness or assumption.

C.    LOAN GUARANTEES

1. For any short-term loans with outstanding principal or interest during the POR that were guaranteed or insured under the guarantee and insurance programs under review, please provide the information requested in questions 2, 3, and 5 under section A, "Short-term Loans," above. For any long-term loans with outstanding principal or interest during the POR that were guaranteed or insured, please provide the information requested in questions 1 and 2 under section B, "Long-term Loans," above.

2. Under what criteria were the guarantees provided?

3. What are the charges for the guarantees?

4. To whom do commercial banks or other private financial institutions offer guarantees and what rates do they charge?

5. How do the interest rates charged by the commercial banks differ based on whether or not a loan is guaranteed by a third party?

## SECTION II
## Change-in-Ownership Appendix

If there were any changes in ownership during the Average Useful Life (AUL), answer the applicable questions below <u>for each change in ownership</u>.  Note that some of these questions may not be applicable to every change in ownership.  In addition, some of the questions may require input from both the government as well as the respondent company.  Therefore, the government and the respondent company should coordinate their responses to these questions.  <u>However, be sure to clearly identify in the response to each of the change-in-ownership questions the party (<em>e.g.</em>, the government, the company) providing the response to that question</u>.

### <u>General Questions</u>

1.  If the seller of the assets or shares is a public or government agency or entity, what is the name and purpose of the agency?  To whom does the agency report?  Explain in detail the nature of this relationship.

2.  Describe any involvement in the sale of the assets or shares by any government, government officials, or agencies or institutions that are owned/controlled by the government.

    A.  Discuss, for example, any participation in any meetings related to the transaction; any actual or promised funds, loans or debt forgiveness, guarantees, or waivers of rights or laws, credits to the bid price or anything else of value, provided (or required) in connection with the transaction(s).

    B.  Provide specific dates and amounts for each such promised funding, loans or debt forgiveness, guarantees, or waivers of rights or laws, credits to the bid price or anything else of value that was provided in connection with the transaction(s).

3.  Explain the purpose and expectations of the asset or share sale (<em>e.g.</em>, to raise financing, to unload an unprofitable business segment).

    A.  Was the sale part of a larger change-in-ownership plan organized by the government or a corporate parent?  Provide a detailed explanation of any such plan.

    B.  If the plan was implemented, reviewed or ratified by any government entity, provide copies of all laws or decisions ratifying or approving the implementation of the plan.

4.  Were any steps (<em>e.g.</em>, assumption/write-off of debt, renegotiation of liabilities or restructuring) taken prior to or concurrent with the sale of the assets or shares?  If so, explain in detail.

5.  How was the company valued for purposes of the sale?  Provide any appraisal or valuation studies (not just the executive summary but the entire study) performed prior to the sale.

In determining the value of the company, were financial statements prepared? If so, provide the financial statement and any accompanying notes.

6.  Provide financial statements for the company whose assets or shares were sold for the two years prior to the sale, the year of the sale, and for two years after the sale. (Be sure to specify the extent to which the operations of the business in question are consolidated within larger corporate financial reporting. Specify the level of consolidation reflected in the financial statements provided.) If the change in ownership was announced more than two years prior to the sale, provide financial statements also for two years prior to the announcement and all subsequent years leading up to the sale.

7.  At the time of the sale, were any of the parties to the transaction aware of the possibility that production of the company could be subject to countervailing duties in the United States? If so, did this play any role in the transactions, *e.g.*, consideration paid, structure of the company, or terms of the contact for sale? If so, explain and provide documentation.

8.  Did the company explicitly pay back any previously received government assistance prior to the change in ownership of the company? Did the company repay subsidies given under specific programs, or did the company repay a general amount? Provide the details of any repayments along with supporting documentation of the repayment.

## **Sales Process**

If the part of all of the assets or shares of the company were sold through a bidding process, answer the questions in section 9, "Bid Process," below. If part or all of the company was sold through a stock offering, answer the questions in section 10, "Sale of Shares," below. If part or all of the company's assets were sold, answer the questions in section 11, "Sale of Assets," below.

9.  Bid Process

    A.  Describe in detail the structure of the bid process. Discuss why you adopted this particular bid structure.

    B.  Selection of the winning bid.

        (1) Explain in detail the bid selection criteria and how the winning bid was selected. Were these factors ranked in terms of importance? If so, provide the ranking.

        (2) Were any factors other than purchase price (*e.g.*, maintenance of employment and production levels, guarantees by the buyer to keep the company in operation, or the company's impact on the economy) considered when selecting the winning bid?

        (3) Provide a copy of the bid contract and supporting documentation under which the company was sold.

C.  Aside from the purchase price, were there any conditions of sale placed on the buyer, such as investment commitments or employment and production guarantees?

    (1)  If so, describe these conditions of sale in detail.  What was the reason for requiring these conditions of sale?

    (2)  How were the bidding parties' commitments to these conditions of sale valued or quantified when evaluating the bids?

    (3)  Was the winner of the bidding process free to close the company and liquidate the assets after the company was sold?

D.  Has the buyer met all of the terms and conditions of the bid contract?  If not, explain why.  What options are available to ensure that the buyer has complied with all of the terms of the purchase agreement?

10.  <u>Sale of Shares</u>

A.  Indicate the percentage and the total number of shares (all classes of stock) sold and the price per share as well as the number and percentage of any shares that remained with the seller.

    (1)  Identify separately each government-owned (either directly or indirectly) entity that purchased any of the shares sold, along with the number and percentage of shares purchased by each of those entities.  Explain why shares were sold to these government-owned entities.

B.  Was this a sale of the company's existing shares or of newly issued shares?

C.  How were potential investors in the stock offering selected?  Were there any limitations on when certain investors could sell their shares in the company?  If so, did all shareholders face the same selling restrictions?

D.  Did the purchase of particular shares (*e.g.*, "golden shares") bestow special rights or privileges on any private or government-affiliated investor?[1]  If so, detail all special rights and privileges attendant to such shares.

E.  Provide any sales contract governing the sale of shares.

  (1) Do the terms of the sale of shares require anything other than cash from the buyer, such as

---

[1] A golden share is often characterized as a share which has voting rights capable of exercising a veto over specified or significant changes to the constitution or articles of association of a company.

investment commitments, debt assumption, worker training commitments, employment guarantees, *etc.*?  If so, describe the conditions required and reasons for the conditions.

(2)  Have all buyers met all of terms and conditions of the stock sale?  If not, explain why.  What options are available to ensure that buyers have complied with all of the terms of the purchase agreement?

11.  <u>Sale of Assets</u>

A.  Provide a copy of the sales contract and supporting documentation under which the assets of the company were sold.

B.  Do the terms of the sales contract require anything other than cash from the buyer, such as investment commitments, debt assumption, worker training commitments, employment guarantees, *etc.*?  If so, describe the conditions required and reasons for the conditions.  Support this explanation with specific citations to relevant portions of the sales contract.

C.  Did any liabilities transfer with the assets sold?  If so, quantify amount of liabilities and explain why they were transferred.  Support this explanation with specific citations to relevant portions of any sales contract.

D.  Has the buyer met all of the terms and conditions of the sales contract?  If not, explain why.  What options are available to ensure that the buyer has complied with all of the terms of the purchase agreement?

E.  Were any previously provided subsidies tied, in any way, to the particular assets sold?

<u>Post-Sales Effect on Company</u>

12.  Explain whether and how any of the proceeds of the sale of assets or shares were reinvested in the company.  For example, where the proceeds used to cover the general financing requirements of the company, or were the proceeds used for expansion of a particular facility or product line?

13.  Describe the impact of the sale of shares or assets on the legal and corporate structure of the business producing subject merchandise.  Also, describe the legal status of the business before and after the sale.  Also, describe in detail the nature of the sale, *e.g.*, whether the sale was an acquisition of the firm by another firm or an equal merging of two companies.  Provide all formal documents that describe the sale of the company.

14.  Detail any instances in which the sale of the shares or assets resulted in any fundamental change in the general business operations of the company.

A. Compare and contrast the main business and product segments of the company's operations after the sale with those before the sale. Detail any ways in which the operations are fundamentally different. Were parts (*e.g.*, production lines, subsidiaries, sales divisions) of the company shut down or ceded to other parts of the buyer's operations? Explain the extent to which these changes are consistent with the original goals and expectations of the sale (citing, as appropriate, to provisions in the sales contract or any pre-sale documents).

B. Identify the legal and trade names of the company and its main product lines before and after the sale. Explain the reasons for any changes.

C. Indicate whether any of the company's suppliers changed as a result of the sale.

D. Identify what impact, if any, the sale had on the company's customer base. Also, describe how the sale affected the company's U.S. sales operations.

E. Support this narrative with specific citations to the company's financial statements or other source documentation on the record.

15. Detail any instances in which the sale of the shares or assets resulted in any fundamental change in the production facilities of the company.

A. Identify any production facilities that were acquired or disposed of as a result of the sale. Provide all documentation pertaining to the acquisition or disposal of any assets (*e.g.*, contracts, sales agreements).

B. Identify any and all changes in the product lines and production capacity at any of the company's facilities producing the subject merchandise that may have occurred as a result of the sale.

16. Detail any instances in which the sale of shares or assets resulted in any fundamental change in the financial structure of the company.

A. Indicate what portion of the assets of the company was transferred as a result of this sale. In cases where the assets sold where those of a parent of affiliated company, explain how the sale impacted the business producing subject merchandise.

B. Provide a detailed explanation of any instances where the purchaser of the shares or assets did not become legally responsible for the existing and potential liabilities of the company. Support this explanation with specific citations to any relevant portions of the sales contract.

17. Detail any instances in which the sale of shares or assets resulted in any fundamental change in the level and composition of the personnel of the company.

A.  Identify the total number by category (*e.g.*, management, production workers, sales personnel) of any employees whose jobs were created or terminated as a result of the sale.  Tie these numbers to any employment figures reported in the company's financial statements.

B.  Explain how, under the terms of the sale, any existing employment agreements or union contracts were treated.  Support this explanation with specific citations to any relevant portions of the sales contract and the union contracts.

C.  Detail the extent to which the composition and the responsibilities of the Board of Directors of the company changed as a result of the sale.

18.  If the transaction was a partial change in ownership (only some portion of the shares or assets of the company were sold), explain to what extent the sale affected control and direction of the company's finances and productive operations.

*SECTION II*
*ATTACHMENT A*

**CERTIFICATE OF SERVICE**


I, _____, hereby certify that a copy of the
   (name of certifying official)

foregoing submission on behalf of _____,
                          (company name)

dated _____, was served by first class mail or by hand delivery (circle the method used) on the following parties:


(Business Proprietary Version)

On Behalf of

Name and address


(Public Version)

On Behalf of

Name and address


_____
(signature of certifying official)

**SECTION II**
**ATTACHMENT B**

**Certifications**

**§ 351.303 Filing, document identification, format, translation, service, and certification of documents.**
      * * * * *
(g) *Certifications.*  Each submission containing factual information must include the following certification from the person identified in paragraph (g)(1) of this section and, in addition, if the person has legal counsel or another representative, the certification in paragraph (g)(2) of this section.  The certifying party must maintain the original signed certification for a period of five years from the date of filing the submission to which the certification pertains.  The original signed certification must be available for inspection by U.S. Department of Commerce officials.  Copies of the certifications must be included in the submission filed at Commerce.

(1) For the person(s) officially responsible for presentation of the factual information:

      (ii) **GOVERNMENT CERTIFICATION\***

I, **(PRINTED NAME AND TITLE)**, currently employed by the government of **(COUNTRY)**, certify that I prepared or otherwise supervised the preparation of the attached submission of **(IDENTIFY THE SPECIFIC SUBMISSION BY TITLE) due on (DATE) OR filed on (DATE)** pursuant to the **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {THE (ANTIDUMPING OR COUNTERVAILING) DUTY ADMINISTRATIVE REVIEW OF (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (DATES OF PERIOD OF REVIEW) (ADMINISTRATIVE OR NEW SHIPPER) REVIEW UNDER THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (SUNSET REVIEW OR CHANGED CIRCUMSTANCE REVIEW OR SCOPE RULING OR CIRCUMVENTION INQUIRY) OF THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)})**.  I certify that the public information and any business proprietary information of the government of **(COUNTRY)** contained in this submission is accurate and complete to the best of my knowledge.  I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce.  In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification.  I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

**Signature:** _____
**Date:** _____

\*For multiple person certifications, all persons should be listed in the first sentence of the certification and all persons should sign and date the certification.  In addition, singular pronouns and possessive adjectives should be changed accordingly, *e.g.*, "I" should be changed to "we" and "my knowledge" should be changed to "our knowledge."
(2) For the legal counsel or other representative:

## REPRESENTATIVE CERTIFICATION\*\*

I, **(PRINTED NAME)**, with **(LAW FIRM or OTHER FIRM)**, **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {COUNSEL TO} or {REPRESENTATIVE OF})** **(COMPANY NAME, OR GOVERNMENT OF COUNTRY, OR NAME OF ANOTHER PARTY)**, certify that I have read the attached submission of **(IDENTIFY THE SPECIFIC SUBMISSION BY TITLE) due on (DATE) OR filed on (DATE)** pursuant to the **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }:  {THE (ANTIDUMPING OR COUNTERVAILING DUTY) ADMINISTRATIVE REVIEW OF (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (DATES OF PERIOD OF REVIEW) (ADMINISTRATIVE OR NEW SHIPPER) REVIEW UNDER THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (SUNSET REVIEW OR CHANGED CIRCUMSTANCE REVIEW OR SCOPE RULING OR CIRCUMVENTION INQUIRY) OF THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)})**.  In my capacity as **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {COUNSEL} or {ADVISER, PREPARER, OR REVIEWER})** of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge.  I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.  In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification.  I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

**Signature:** _____
**Date:** _____

\*\*For multiple representative certifications, all representatives and their firms should be listed in the first sentence of the certification and all representatives should sign and date the certification.  In addition, singular pronouns and possessive adjectives should be changed accordingly, *e.g.*, "I" should be changed to "we" and "my knowledge" should be changed to "our knowledge."

## SECTION III

## QUESTIONNAIRE FOR PRODUCERS/EXPORTERS UNDER REVIEW

Commerce is inquiring into each subsidy program previously examined, with the exception of programs already determined to be terminated or not countervailable and programs based on allegations specific to companies other than those under review.  As such, this questionnaire addresses all subsidy programs found previously to be used (by the company respondents identified below and any other previously examined producers/exporters), subsidy programs previously found to be not used, and subsidy programs which did not provide measurable countervailable benefits.  Commerce will also examine any other potentially countervailable programs discovered during the course of this administrative review.

Your government may contend that certain programs listed below are not countervailable.  For these programs, you must still respond fully to the questions below.

Absent new information warranting a program reexamination, we will not reevaluate prior determinations regarding the countervailability of programs.  This includes determinations that previously examined programs are or are not countervailable.

In addition, for non-recurring subsidies (e.g., equity infusions, non-recurring grants, debt forgiveness, etc.) and long-term loans, you must provide information if these programs were used by the producer of subject merchandise or by the former parent company prior to any change in ownership.

For general questionnaire instructions and a table of acronyms and abbreviations used in this questionnaire, please review *Section I* of this questionnaire.

Commerce has standardized the appendices to *Section II* and *Section III* of this questionnaire; one or more of the appendices may not be applicable to the circumstances of this review.  You should only respond to the questions in a specific appendix if it is identified under a specific question below.

## I.    PRODUCERS/EXPORTERS SUBJECT TO REVIEW

Commerce has selected the below-listed companies as mandatory company respondents in this administrative review (hereinafter, respondent).

- **KG Dongbu Steel Co., Ltd. (formerly Dongbu Steel Co., Ltd.)/Dongbu Incheon Steel Co. Ltd. (KG Dongbu)**

- **Hyundai Steel Company (Hyundai Steel)**

**Other Producers/Exporters Subject to Review**

As the producer and/or exporter named above, you are subject to this review because of a request made by yourself or another party, or because Commerce selected your company for review. In addition to providing a response to this questionnaire regarding your own company, we require responses from certain affiliated companies or companies involved in your sales of subject merchandise, as explained below in sections A through D. A failure on the part of any such companies to provide a response to this questionnaire may adversely affect your own results in this review. For the remainder of this questionnaire, the terms respondent(s), company respondent(s), "you," or "your company," refer not just to the company named in the review request (and at the top of this section), but to all companies required to complete this questionnaire. Please provide separate answers under each question and separate spreadsheets for each of these companies.

**Identification of the companies that you must include in your response is necessary early in this administrative review. Therefore, within 14 days of the date of this questionnaire, please submit to Commerce a list of the companies that you intend to include as part of your questionnaire response under the criteria in sections A through D below. Also within 14 days of the date of this questionnaire, please respond to questions C.1 and C.2 under the "Affiliated Companies" section below.**

Unless specified differently, your answers to the requests below should cover your company's situation during the POR.

We also instruct you to provide a list of those companies for which you are responding as soon as possible so that the government can include these companies in its response to this questionnaire.

The companies that must submit a complete response are the following:

A.    Producers Supplying Exporters

If your company exported subject merchandise produced by other companies in your country during the POR, then you must submit complete questionnaire responses for all producers that supply your company.

B.    Export Trading Companies

If your company sells the subject merchandise to an export trading company which then exports the subject merchandise to the United States, then you must submit complete questionnaire responses for all such trading companies.

C.    Affiliated Companies

Affiliation is defined in section 771(33)(A)-(G) of the Act. Affiliation can be indicated by a number of factors, including: (1) personal family groupings, (2) corporate groupings, (3) shared

III-2

board members or executive officers, (4) employer and employee relationships among owners, board members, or executive officers of multiple parties, (5) one party's ownership or control of stock with voting privileges in another, (6) franchise and joint venture agreements, (7) close supplier relationships, and (8) other indicia of control by one party over another, directly, or indirectly through third parties. "Control" exists where one party is legally or operationally in a position to exercise restraint or direction over another party.

Please provide the following information about your company's affiliated companies:

1.  The identity of all companies with which your company is affiliated within the meaning of section 771(33) of the Act, including the full name and mailing address of each company.

2.  Describe in detail the nature of the relationship between your company and those companies listed in response to the prior question. Specify for example, whether the companies share a board of directors, or whether members of each company's board sit on the board(s) of the other company(ies), and how the voting rights are distributed among board members; specify if, and how, officers of one company are directly involved in overseeing the operations of another company. Specify whether an affiliated company supplies inputs into your company's production process.

You must provide complete responses for certain "cross-owned" affiliated companies.

Cross-ownership exists between two companies where one company can use or direct the individual assets of another company in essentially the same ways it can use its own assets. Normally, such a relationship exists between two companies where one company holds, directly or indirectly, a majority voting interest in the other. In addition, if two companies are both cross-owned by a third party, the two companies themselves would be considered cross-owned (for example, cross-ownership exists between two companies owned by the same parent).

You must provide a underline complete questionnaire response for those affiliates where "cross-ownership" exists, and underline one of the following situations exists:

•   the cross-owned company produces the subject merchandise; underline or

•   the cross-owned company is a holding company or a parent company (with its own operations) of your company;[1] underline or

•   the cross-owned company supplies an input product to you for production of the

_____

[1] Your response must cover all cross-owned parent companies and holding companies, not only companies that directly held a controlling stake in your company during or prior to the POR. For example, if your company was a direct subsidiary of one cross-owned company, and that company was a direct subsidiary of another cross-owned company, then you must respond on behalf of both the cross-owned parent and the cross-owned "grandparent" companies. By direct subsidiary, we are referring to a company that is directly owned by another company. An indirect subsidiary, by contrast, has an intermediate owner between itself and the ultimate owner.

III-3

downstream product produced by the respondent; <u>or</u>

- the cross-owned company has received a subsidy and transferred it to your company.

D.     <u>Former Owners / Changes in Ownership</u>[2]

Commerce allocates the benefits thereof from certain types of subsidies over time (*e.g.*, equity infusions, non-recurring grants, debt forgiveness, import duty or value-added tax exemptions or reductions on capital equipment, *etc.*).  *See* 19 CFR 351.524 and subsection C of the "General Questions" section below for a complete explanation.

Thus, in addition to investigating alleged subsidies that your company may have received during the POI, Commerce is also investigating alleged allocable, non-recurring subsidies that your company may have received during the AUL period.  Because of this, if your company obtained all or substantially all the assets of another company during the AUL period, and that company still exists as an ongoing entity, or its assets continue to operate as part of your company, we require a complete questionnaire response for such company.  If your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please coordinate with your government to answer the questions in the ***Change-in-Ownership Appendix***.  If your company does <u>not</u> wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please so state and you do <u>not</u> need to provide a response to the ***Change-in-Ownership Appendix***.

Finally, if your company has been privatized, changed ownership, merged with another company, or devolved another company/ies from your company's corporate structure  in whole or in part, during the AUL period and your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please coordinate with your government to answer the questions in the ***Change-in-Ownership Appendix***.  If your company does <u>not</u> wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please so state and you do <u>not</u> need to provide a response to this appendix.

---

[2] All cross-owned affiliates meeting the conditions under sub section C during the POI and AUL and are required to submit a complete questionnaire response should also provide a response to this section with regard to any former owners and changes in ownership.

**GENERAL QUESTIONS**

A.    Please submit the final calculation memorandum, including Microsoft Excel attachments, from the most recently completed segment of this proceeding for your company.

B.    Please provide the following information for your company, as well as for any other producer or exporter subject to this review, as defined above, that is involved in the manufacture, production or exportation of subject merchandise.

1. The addresses of the company's headquarters, plant, and export facilities.

2. A description of the company.  Please include in your response:

    a. the date the company was formed;

    b. a history of the company's ownership;

    c. the products the company produces and/or sells;

    d. names of your owners, board members, and upper management, along with a description of their positions with other companies; and

3. Using diagrams and/or flow charts, describe the process by which your company produces the subject merchandise.  If different steps of the production process occur in different production units, divisions, or affiliated companies, please identify those production units, divisions, or affiliated companies.

4. Does your company (including cross-owned affiliates) export subject merchandise produced by other companies in your country?  If so, please identify the name and address of each such supplier of subject merchandise.

5. Please provide your company's complete audited financial statements for the last three fiscal years.  (Please provide the financial statements in English, if available.  If they are not available in English, provide translations of the income statement, the balance sheet, the cash flow statement, the statement of change in equity, all notes thereto, and the auditor's opinion.)  These should be the official financial statements filed with your government.  If there is no such filing requirement, the financial statements should be those presented to banks or independent third parties.  The financial statements should include the complete set of statements, *e.g.*, income statement, balance sheet, cash flow statement, statement of change in equity, all notes thereto, and the auditor's opinion.  If you do not prepare audited financial statements, please provide whatever unaudited financial statements that are prepared for your board of directors, your shareholders, and for the government.

Filed By: Joshua Simonidis, Filed Date: 10/6/20 3:24 PM, Submission Status: Approved

6. Please provide complete, translated tax returns **filed during the POR** (preferably a copy of the tax return stamped by the government). Include all schedules and attachments included with your return. In addition, please provide any amendments to your return.

7. Please provide your most up-to-date business registration documents filed with government authorities. If your business registration documents do not indicate the names of your company's owners during the POR, please provide additional documentation that does. If the documents identify corporate owners which own more than 10 percent of your company, please identify the owners of your company's corporate owners.

8. Provide the HTSUS subheadings or your country's tariff schedule numbers under which you export the subject merchandise.

C. Please provide the following information for your company **for the POR**. Do not include the volume and value of merchandise produced outside your country or returned merchandise. Separately report the value of services sold by your company, if any. **In addition, separately report the value of sales by each cross-owned company, as well as the value of sales between your company and the cross-owned company.**

For years prior to the POR, please report sales information for the years of approval and receipt of non-recurring subsidies you report. *See, e.g.,* ***Grant and Allocation Appendix***. Please report sales information for all responding cross-owned companies during these years, not only sales information for the recipient of the subsidy.

If the actual values recorded in your accounting records are booked on a basis other than f.o.b., please describe any adjustments that were made to derive the f.o.b. values. In addition, if your sales are inclusive of VAT or other indirect taxes, please ensure that such taxes are removed from your sales figures.

1. Total Sales

   The quantity and f.o.b. value of total sales (both subject and non-subject merchandise) to all markets (domestic and foreign). Please report the sales value on an f.o.b. (port) basis with respect to export sales and/or on an f.o.b. (factory) basis for domestic sales. Provide a worksheet reconciling the total reported sales value to your financial statements.

2. Sales of Subject Merchandise

   The quantity and f.o.b. value of the subject merchandise sold to all markets (domestic and foreign). Please report the sales value on an f.o.b. (port) basis with respect to export sales and/or on an f.o.b. (factory) basis for domestic sales.

III-6

3.      Total Exports

The total quantity and f.o.b. (port) value of export sales (both subject and non-subject merchandise) to all markets.

4.      Total Exports to the United States

The total quantity and f.o.b. (port) value of export sales (both subject and non-subject merchandise) to the United States.

5.      Exports of Subject Merchandise

The total quantity and f.o.b. (port) value of the subject merchandise exported to all markets (including the United States).

6.      Exports to the United States of Subject Merchandise

The total quantity and f.o.b. (port) value of the subject merchandise exported to the United States.

7.      Exports of Subject Merchandise Produced by Unaffiliated Companies

The total quantity and f.o.b. (port) value of the subject merchandise exported to all markets.  If any sales were to the United States, please also separately report.

**Regarding 1 – 7 above:**  Please explain how the sales of subject merchandise are recorded in your company's financial records.  Are your company's sales consolidated with those of other companies in the financial report of a parent, holding company, or group of companies?  If so, please explain how, and provide copies of the consolidated financial statements.

D.      As established in 19 CFR 351.524(d)(2), the allocation period for non-recurring[3] subsidies is defined by the AUL of renewable physical assets for the industry concerned, as listed in the U.S. Internal Revenue Service's Depreciation Range System (IRS tables). The AUL listed in the IRS tables that applies to this review is 15 years.

## II.      PROGRAM-SPECIFIC QUESTIONS

## PROGRAMS PREVIOUSLY FOUND TO BE COUNTERVAILABLE

## A.      LOANS AND CREDIT

Report all financing to your company that was outstanding at any point during the POR,

---

[3] For definitions of **recurring** and **non-recurring** benefits, *see **Grant and Allocation Appendix***; *see also* 19 CFR 351.524(c).

Filed By: Joshua Simonidis, Filed Date: 10/6/20 3:24 PM, Submission Status: Approved

regardless of whether you consider the financing to have been provided under the below programs. Submit the information requested in the ***Loan Template*** as an attachment to your response and in electronic format using Microsoft Excel.

Ensure that you report all forms of financing outstanding during the POR, not only traditional loans. This includes, but is not limited to, interest expenses on bank promissory notes, invoice discounting, and factoring of accounts receivable. If your company did not make interest payments on the financing during the POR (*e.g.*, factoring of accounts receivable), then identify the specific terms of the financing (*e.g.*, the discount rate associated with the factoring).

1.    **Korea Export-Import (KEXIM) Bank Import Financing**

2.    **Korea Development Bank (KDB) and Industrial Base Fund (IBF) Short-Term Discounted Loans for Export Receivables**

## B. KG DONGBU'S DEBT RESTRUCTURING

Commerce found the restructuring of debt and loans received by KG Dongbu to be countervailable previously. We do not intend to reevaluate the countervailability of this program.

Please also respond to all questions in the ***Standard Questions Appendix*** and the ***Usage Appendix*** as it applies to the program. Submit the information requested in the ***Loan Template*** as an attachment to your response and in electronic format using Microsoft Excel.

In addition, with respect to KG Dongbu's Debt Restructuring, please provide the following information:

1.    Please submit translated, audited financial statements for KG Dongbu for 2012-2014. Include the complete set of statements, *e.g.*, income statement, balance sheet, all notes, and the auditor's opinion, as well as translations of any statements in the annual reports by corporate officers concerning debt-to-equity swaps and various loans.
2.    Please provide a copy, with translation of the agreement KG Dongbu entered into for the "Creditors Co-management Program" with the Creditors' Association.[4]
3.    Please provide a general description of your company's debt restructuring including the time table for the debt restructuring, the purpose of the debt restructuring, the names of and number of the creditors involved in the debt restructuring, the law under which the restructuring is undertaken, the terms of the restructuring, a description of the Creditors Associations, and the types and amount of debt that were restructured, including any additional infusions of cash or loans, and an explanation as to whether the restructuring involved any conversion of debt into equity.
4.    Please explain the type of assistance provided to your company under the debt restructuring such as gains from debt-to-equity swaps, loans, import L/C (Usance), benefits related to debentures, etc.

---

[4] *See* Petition, Volume V at 54.

III-8

5. For the dates and amounts for each type of assistance provide under the debt restructuring.

6. Please provide the exact amount of debt, both secured and unsecured, held directly by or by a GOK-owned or controlled entity:

   a. Before the debt-to-equity conversions in 2014
   b. After the 2014 debt-to-equity conversions.

7. According to petitioners, on December 22, 2014, KG Dongbu's financial liabilities to the Creditors' Association and other creditors due for debt-to-equity swap were finalized, resulting in significant gains from debt adjustment.[5] If the debt-to-equity swaps were preapproved by a shareholders'' vote, creditors' council, or any other board or committee, please identify the date and party that approved the swaps. Please identify any members of the committee who are officials of the GOK or of GOK-owned entities.

8. How much of KG Dongbu's outstanding debt was converted to equity? Please identify all creditors who became shareholders as a result of the debt-to-equity swap, the amount of debt each creditor converted, whether the debt was secured or unsecured, and the number of shares held by each creditor before and after the swap.

9. Please explain whether the debt was converted for shares at face value or at the secondary market price at which the GOK purchased it.

10. Did these conversions involve KG Dongbu's existing shares or the issuance of new shares? Please explain whether any creditors were not selected or did not elect to participate in the debt-to-equity conversion. Did all creditors participate and convert at the same rates? If not, please provide the rates they converted at and explain why.

11. According to petitioners, KG Dongbu received financial support from the Creditors Association in the form of various loans. Describe the types of loans received and the terms of repayment.

12. According to petitioner, KDB is the main creditor of the KG Dongbu Group and leads the Creditors' Association.[6] Please describe the Creditors' Association including when it was formed. Identify all members of the association and any ownership stakes of the GOK in each member. Please also identify which members are GOK agencies or GOK-owned entities.

13. Please explain under which law the Creditors' Association was created. Provide translated sections of the law regarding the responsibilities and powers granted to the Creditors' Association, how decisions are made on the Association, and any reporting requirements to the GOK or any GOK-controlled entity.

14. Please provide a description of the responsibilities and powers granted to the Creditors' Association, how decisions of the Association are made, (i.e., does the amount of debt owned equal to voting power) and any reporting requirements to the GOK or any GOK controlled entity.

15. Provide copies of all laws and regulations governing the restructuring of your company.

## C. INCOME TAX PROGRAMS

---

[5] *Id.*
[6] *See* Petition, Volume V at 54.

For each of the below programs, please respond to all questions in the ***Income Tax Programs Appendix*** included in Section III**.**

    1.    **RSTA Article 25(2):  Tax Deductions for Investments in Energy Economizing Facilities**

    2.    **RSTA 25(3):  Tax Credit for Investment in Environmental and Safety Facilities**

    3.    **RSTA Article 26:  GOK Facilities Investment Support**

    4.    **RSTA Article 10(1)(3):  Tax Credit for Research and Human Resource Development Expenses**

## D.  OTHER TAX PROGRAMS

Please respond to all questions in the ***Usage Appendix*** included in Section III.

    1.    **RSLTA Article 78:  Acquisition and Property Tax Benefits to Companies Located in Industrial Complexes**

    2.    **RSLTA 57-2:  Tax Exemption for Acquisition of Property through Corporate Merger**

## E.  ENERGY SAVINGS PROGRAMS

Please respond to the ***Standard Questions Appendix and the Usage Appendix*** in Section III.

    1.    **Electricity Discounts under Trading of Demand Response Resources (DRR) Program**

## F.  RESEARCH & DEVELOPMENT GRANTS PROVIDED UNDER THE INDUSTRIAL TECHNOLOGY INNOVATION PROMOTION ACT (ITIPA)

Please respond to the ***Standard Questions Appendix, Grant Appendix, and Allocation Appendix*** in Section III.

## G.  MODAL SHIFT PROGRAM

Please respond to the ***Standard Questions Appendix, Grant Appendix, and Allocation Appendix*** in Section III.

## H.  SUNCHEON HARBOR PORT USAGE FEE EXEMPTIONS

Please respond to the ***Standard Questions Appendix, Usage or other appropriate Appendix*** in Section III.

## I.  PROGRAMS NOT USED OR PROVIDING NO MEASURABLE BENEFITS

Commerce has not yet made a countervailable determination with regard to the following listed programs, because either the programs were found not used or provided no measurable, countervailable benefit during the investigation.   Further, Commerce has not reached a final determination on the programs in the ongoing administrative review.

Because Commerce has not made a determination on the countervailability of the programs, it is necessary to continue to review the programs.  Therefore, if your company applied for or received benefits under any of the recurring subsidy programs identified below during the POR, please answer all questions in the ***Standard Questions Appendix and any other applicable appendices*** of this section, separately for each program/company.   If no respondent company used a program during the stated time period, please so state; you need not provide a response to the appendices for the program.

1.  KEXIM Short-Term Export Credits
2.  KEXIM Export Factoring
3.  KEXIM Export Loan Guarantees
4.  KEXIM Loan Guarantees for Domestic Facility Loans
5.  KEXIM Trade Bill Rediscounting Program
6.  KEXIM Overseas Investment Credit Program
7.  KDB and IBK Short-Term Discounted Loans for Export Receivables
8.  Loans under the Industrial Base Fund
9.  K-SURE Export Credit Guarantees
10. K-SURE Short-Term Export Credit Insurance
11. Seoul Guarantee Insurance
12. Long-Terms Loans from KORES and KNOC
13. Clean Coal Subsidies
14. GOK Subsidies for "Green Technology R&D" and its Commercialization
15. Support for SME "Green Partnerships"
16. Grants from the Korea Agency for Infrastructure Technology Advancement
17. Tax Deduction under RSTA Article 10(1)(1)
18. RSTA Article 10(1)(2)
19. RSTA Article 11
20. RSTA 104(14)
21. RSLTA Articles 19, 31, 46, 84, LTA 109, 112, and 137
22. Tax Reductions and Exemptions in Free Economic Zones
23. Grants and Financial Support in Free Economic Zones
24. Exemptions and Reductions of Lease fees in Free Economic Zones
25. Energy Savings Programs
    Electricity Savings for Designated Period Program
    Electricity Savings through the Bidding Process Program
    Electricity Savings upon an Emergent Reduction Program
    Electricity Savings through General Management Program
    Management of the Electricity Load Factor Program
26. Sharing of Working Opportunities/Employment Creating Incentives

27. Fast-Track Restructuring Program
28. VAT Exemptions on Imported Goods
29. GOK Infrastructure Investment at Incheon North Harbor
30. Port Usage Rights at the Port of Incheon
31. Incentives for Usage of Gwangyang Port
32. Incentives for Usage of Yeongil Harbor in Pohang City
33. Incentives for Natural Gas Facilities
34. Power Business Law Subsidies
35. Provision of Liquefied Natural Gas (LNG) for LTAR
36. The GOK's Purchases of Electricity for MTAR
37. Machinery & Equipment (KANIST R&D) Project
38. Grant for Purchase of Electrical Vehicle
39. Incentives for Compounding and Prescription Cost Reduction
40. Subsidies for Construction and Operation of Workplace Nursery
41. Subsidies for Hyundai Steel Red Angels Women's Football Club
42. Subsidies for Pohang Art Festival
43. Reduction for Sewerage Usage Fee
44. Land Purchase at Asan Bay
45. Daewoo International Corporation Debt Work Out
46. Special Accounts for Energy and Resources (SAER) Loans
47. Other Transactions with Government Entities
48. Hyundai Steel's Acquisition of Suncheon Land
49. KG Dongbu's Exemptions from Payment of Harbor Fees
50. Upstream Subsidy on Electricity


## J.    **OTHER PROGRAMS**

Did your government (or entities owned directly, in whole or in part, by your government or any provincial or local government) provide, directly or indirectly, any other forms of assistance to your company during the POR and the prior AUL-period?  If so, please describe such assistance in detail, including the amounts, date of receipt, purpose and terms, and answer all questions in the appropriate appendices.

Filed By: Joshua Simonidis, Filed Date: 10/6/20 3:24 PM, Submission Status: Approved

Barcode:4037654-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

## SECTION III
## Standard Questions Appendix

A.    Specify the eligibility criteria your company had to meet in order to receive benefits under this program.  State whether eligibility was or is currently contingent on one or more of the following criteria:  1) whether or not your company exports or has increased its exports, 2) the use of domestic rather than imported inputs, 3) the industry to which your company belongs, or 4) the region in which your company is located.

B.    Describe in detail the application and approval process that your company undertook to receive benefits through the program.

C.    Specify the criteria your company met to receive the particular amount of assistance provided.  Did the application or approval specify the merchandise for which this assistance was to be provided?  If so, provide details of which merchandise was specified in the application and/or approval documents.

D.    What records does your company keep regarding each of the benefits received under this program?  Provide your company's executed application forms and other application documents with respect to this program.  Provide copies of the documentation sent to your company upon approval of the benefit, including but not limited to:  approval letter, contract, claim form, etc.

E.    Specify how many years your company has received benefits under this program.  What was the first year that your company applied for and received benefits?  For programs under investigation that were not enacted pursuant to a legal instrument, indicate for how many years your company has participated in the program.  For example, for programs involving the provision of inputs for less than adequate remuneration not enacted pursuant to a legal instrument, please indicate how many years your company has purchased the relevant inputs from the government, government-controlled entities such as state-owned enterprises, or other enterprises alleged to be "authorities" under section 771(5)(B) of the Act.

F.    Indicate where benefits under this program can be found in your accounting system (i.e., specify the ledgers or journals) and financial statements.  If you have to file anything with the government to continue receiving benefits under this program, provide a complete translated set of your most recent submissions made during, or before, the POR.

G.    Has the program been terminated?  If so, please explain.  When is the last date that your company could *apply for or claim* benefits under the program?  When is the last date that your company could *receive* benefits under the program?

## SECTION III
## Usage Appendix

A.    State whether you applied for, received, or accrued assistance under the program at any time during the POR.

   If you applied for, received, or accrued assistance under the program during the POR, please respond to the following questions.

B.    Provide details including amounts of funding, dates of approval and disbursement, and whether the disbursement was a lump sum or multiple installments.  If the amount of approval differs from the amount disbursed, please indicate the difference.

C.    Describe the records your company keeps regarding assistance received under this program.

D.    Indicate where assistance under this program can be found in your accounting system (*i.e.*, specify the ledgers or journals), tax returns, and/or financial statements.

E.    Provide a translated copy of your application for assistance and the approval document you received.  If you were required to file additional documents (*e.g.*, certifications of export levels over the prior year, certification of FIE status) with the relevant administrative authorities in order to receive the disbursements made in the POR, provide these additional documents as well.

F.    Does your company receive assistance under this program on an ongoing basis from year to year, or is the program exceptional in the sense that it provides one-time assistance?

G.    Have you filed a separate application each time you have received assistance under this program?  Has assistance received been contingent upon expressed government authorization or approval?  Please explain.

H.    Is assistance under this program provided for or tied to the capital structure or capital assets of your company?

I.    If benefits received under this program are non-recurring, you should report the following information for each subsidy received during the POR, as well as the preceding number of years corresponding to the AUL period:  Your company's total or export sales (depending on whether the program is a domestic or an export subsidy) in the year in which the assistance was approved.

Barcode:4037654-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

## SECTION III
## Average Useful Life Appendix

Respondents should be aware that, pursuant to section 351.524 of its regulations, Commerce allocates the benefits received from certain types of subsidies over time. Although the POR is a recent period, we are investigating alleged subsidies received over a time period corresponding to the industry's AUL. According to section 351.524(d)(2)(i) of Commerce's regulations, Commerce will presume that the industry's AUL corresponds to the average useful life of renewable physical assets for the industry concerned as listed in the U.S. Internal Revenue Service's Depreciation Range System (IRS tables). In the case of this review, the AUL is 15 years. Therefore, with respect to subject merchandise, we are reviewing alleged subsidies received during the POR and the preceding 14 years.

According to 19 CFR 351.524(d)(2), parties to the review may choose to argue that the IRS tables do not reasonably reflect the company-specific AUL or the country-wide AUL for the industry in question. To do so, parties must demonstrate that the company-specific AUL applicable to the respondent companies or country-wide AUL applicable to the industry producing subject merchandise in your country differs by one year or more from the AUL in the IRS tables. If any of the parties under review chooses to pursue an AUL other than that identified in the IRS tables, you will be required to provide information for the corresponding number of years.

In table format, enter the beginning and ending gross book values of depreciable productive assets for each of the past ten years. (Do not include non-depreciable assets, such as land or construction in progress. Please seek to exclude the gross book value of any fully depreciated productive assets which are no longer in service.)

A.    Enter, as separate items in the table, each year's regular depreciation expense and any special charges to depreciation expense or revaluations and write-downs of productive assets.

B.    Explain how the numbers in the table reconcile to your financial statements.

C.    Explain your company's accounting policies concerning depreciation of productive assets. State whether straight-line or accelerated depreciation is used, and what conventions are applied.

D.    Explain whether your company maintains salvage value for productive assets; how salvage value is treated for depreciation purposes; and, if applicable, beginning and ending salvage value balances for each year in the table.

E.    If your company is claiming that the IRS tables do not reasonably reflect your company-specific AUL, please:

1.    Provide a worksheet which shows the calculation of your company's AUL. To calculate the AUL using the raw data listed above:

Filed By: Joshua Simonidis, Filed Date: 10/6/20 3:24 PM, Submission Status: Approved

      a.      Sum the average annual balances of productive assets for all years (A).

      b.      Sum the depreciation expenses for each year (D).

      c.      Divide the sum of the productive assets amounts (A) by the sum of depreciation expenses (D) to arrive at the AUL.  AUL = A/D.

2.      Demonstrate that this rate differs significantly from the rate established in the IRS tables (*i.e.,* by at least one year).

F.      If your company is claiming that the IRS tables do not reasonably reflect the country-wide AUL for this industry, please:

1.      Contact your government to ensure that it will submit the country-wide rate.

2.      Demonstrate that this rate differs significantly from the rate established in the IRS tables (*i.e.*, by at least one year).

### SECTION III
### Grant and Allocation Appendix

Questions A and B relate to whether the subsidy is "recurring" or "non-recurring."  For a further explanation of recurring and non-recurring, *see* 19 CFR 351.524(c).

A.      Does your company receive the subsidy on an ongoing basis under this program?

B.      Have you filed a separate application each time you have received benefits?  Please explain.  Has each disbursement been contingent upon separate government approval?  Please explain.

C.      Are subsidies under this program provided for or tied to the capital structure or capital assets of your company?  (For a definition of capital structure and capital assets, *see* the preamble of the CVD regulations (63 FR at 65393).)

If the subsidy is non-recurring, you should report the following information for each subsidy received during the AUL.  If the subsidy is recurring, then you need only provide this information with respect to subsidies received during the the POR.  The information should be provided in *chart form*:

D.      the amount of all subsidies authorized and the amount received (state whether the subsidy was received in a lump sum or in multiple disbursements);

E.      date of the approval of the subsidy and the date(s) it was received;

F.      total or export f.o.b. sales (depending on whether the program is a domestic or export subsidy) in the year in which the subsidy was approved; and

G.      total or export f.o.b. sales (depending on whether the program is a domestic or export subsidy) in the year in which the subsidy was received.

III-5

## SECTION III
## Income Tax Programs Appendix

If your company used this program to take deductions from taxable income, credit toward taxes payable, exemptions from taxes owed, accelerated depreciation or other tax benefits on the tax returns ***filed during the POR*** (the tax period covered by this tax return does not have to correspond with the period of review), please answer the following questions:

A.  Explain whether the assistance is a deduction from taxable income, an exemption from taxes, a credit toward taxes payable, accelerated depreciation, a deferral of taxes owed, or other tax benefit.

B.  Indicate the amount of the tax savings derived from the use of this program.  Provide a detailed calculation of the assistance and all source materials.  Show the amount of tax (or the amount of loss incurred) that would have been due absent this benefit.  **Indicate where in the tax return this assistance is shown.**  For tax deferrals, please indicate the amount of tax owed and the length of the deferral period.

C.  If your company was in a tax loss position for the tax year to which the return applies, please explain the effect of this assistance on your company's tax position.

D.  Will you carry forward any loss to future years?  Does the loss represent accrued losses from earlier years?  Please explain.

E.  Indicate where in your company's financial statements tax information is represented.  Are accrued tax losses carried as assets in the financial statements?  Please explain.

F.  If you carried forward a loss from prior years and used that loss to offset taxes due on the tax returns filed in the POR, demonstrate that loss was not generated by use of any countervailable tax program.

III-6

Barcode:4037654-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

### SECTION III
### Change-in-Ownership Appendix

If there were any changes in ownership during the Average Useful Life (AUL), answer the applicable questions below for each change in ownership.  Note that some of these questions may not be applicable to every change in ownership.  In addition, some of the questions may require input from both the government as well as the respondent company.  Therefore, the government and the respondent company should coordinate their responses to these questions. However, be sure to clearly identify in the response to each of the change-in-ownership questions the party (*e.g.*, the government, the company) providing the response to that question.

**General Questions**

1.  If the seller of the assets or shares is a public or government agency or entity, what is the name and purpose of the agency?  To whom does the agency report?  Explain in detail the nature of this relationship.

2.  Describe any involvement in the sale of the assets or shares by any government, government officials, or agencies or institutions that are owned/controlled by the government.

    A.  Discuss, for example, any participation in any meetings related to the transaction; any actual or promised funds, loans or debt forgiveness, guarantees, or waivers of rights or laws, credits to the bid price or anything else of value, provided (or required) in connection with the transaction(s).

    B.  Provide specific dates and amounts for each such promised funding, loans or debt forgiveness, guarantees, or waivers of rights or laws, credits to the bid price or anything else of value that was provided in connection with the transaction(s).

3.  Explain the purpose and expectations of the asset or share sale (*e.g.*, to raise financing, to unload an unprofitable business segment).

    A.  Was the sale part of a larger change-in-ownership plan organized by the government or a corporate parent?  Provide a detailed explanation of any such plan.

    B.  If the plan was implemented, reviewed or ratified by any government entity, provide copies of all laws or decisions ratifying or approving the implementation of the plan.

4.  Were any steps (*e.g.*, assumption/write-off of debt, renegotiation of liabilities or restructuring) taken prior to or concurrent with the sale of the assets or shares?  If so, explain in detail.

5.  How was the company valued for purposes of the sale?  Provide any appraisal or valuation studies (not just the executive summary but the entire study) performed prior to the sale.

Filed By: Joshua Simonidis, Filed Date: 10/6/20 3:24 PM, Submission Status: Approved

In determining the value of the company, were financial statements prepared? If so, provide the financial statement and any accompanying notes.

6. Provide financial statements for the company whose assets or shares were sold for the two years prior to the sale, the year of the sale, and for two years after the sale. (Be sure to specify the extent to which the operations of the business in question are consolidated within larger corporate financial reporting. Specify the level of consolidation reflected in the financial statements provided.) If the change in ownership was announced more than two years prior to the sale, provide financial statements also for two years prior to the announcement and all subsequent years leading up to the sale.

7. At the time of the sale, were any of the parties to the transaction aware of the possibility that production of the company could be subject to countervailing duties in the United States? If so, did this play any role in the transactions, *e.g.*, consideration paid, structure of the company, or terms of the contact for sale? If so, explain and provide documentation.

8. Did the company explicitly pay back any previously received government assistance prior to the change in ownership of the company? Did the company repay subsidies given under specific programs, or did the company repay a general amount? Provide the details of any repayments along with supporting documentation of the repayment.

## **Sales Process**

If the part of all of the assets or shares of the company were sold through a bidding process, answer the questions in section 9, "Bid Process," below. If part or all of the company was sold through a stock offering, answer the questions in section 10, "Sale of Shares," below. If part or all of the company's assets were sold, answer the questions in section 11, "Sale of Assets," below.

9. Bid Process

A. Describe in detail the structure of the bid process. Discuss why you adopted this particular bid structure.

B. Selection of the winning bid.

(1) Explain in detail the bid selection criteria and how the winning bid was selected. Were these factors ranked in terms of importance? If so, provide the ranking.

(2) Were any factors other than purchase price (*e.g.*, maintenance of employment and production levels, guarantees by the buyer to keep the company in operation, or the company's impact on the economy) considered when selecting the winning bid?

(3) Provide a copy of the bid contract and supporting documentation under which the company was sold.

III-8

C.  Aside from the purchase price, were there any conditions of sale placed on the buyer, such as investment commitments or employment and production guarantees?

    (1)  If so, describe these conditions of sale in detail.  What was the reason for requiring these conditions of sale?

    (2)  How were the bidding parties' commitments to these conditions of sale valued or quantified when evaluating the bids?

    (3)  Was the winner of the bidding process free to close the company and liquidate the assets after the company was sold?

D.  Has the buyer met all of the terms and conditions of the bid contract?  If not, explain why.  What options are available to ensure that the buyer has complied with all of the terms of the purchase agreement?

10.  <u>Sale of Shares</u>

A.  Indicate the percentage and the total number of shares (all classes of stock) sold and the price per share as well as the number and percentage of any shares that remained with the seller.

    (1)  Identify separately each government-owned (either directly or indirectly) entity that purchased any of the shares sold, along with the number and percentage of shares purchased by each of those entities.  Explain why shares were sold to these government-owned entities.

B.  Was this a sale of the company's existing shares or of newly issued shares?

C.  How were potential investors in the stock offering selected?  Were there any limitations on when certain investors could sell their shares in the company?  If so, did all shareholders face the same selling restrictions?

D.  Did the purchase of particular shares (*e.g.*, "golden shares") bestow special rights or privileges on any private or government-affiliated investor?[1]  If so, detail all special rights and privileges attendant to such shares.

F.  Provide any sales contract governing the sale of shares.

  (2) Do the terms of the sale of shares require anything other than cash from the buyer, such as

---

[1] A golden share is often characterized as a share which has voting rights capable of exercising a veto over specified or significant changes to the constitution or articles of association of a company.

III-9

investment commitments, debt assumption, worker training commitments, employment guarantees, *etc.*?  If so, describe the conditions required and reasons for the conditions.

    (2)  Have all buyers met all of terms and conditions of the stock sale?  If not, explain why.  What options are available to ensure that buyers have complied with all of the terms of the purchase agreement?

11.   <u>Sale of Assets</u>

    A.  Provide a copy of the sales contract and supporting documentation under which the assets of the company were sold.

    B.  Do the terms of the sales contract require anything other than cash from the buyer, such as investment commitments, debt assumption, worker training commitments, employment guarantees, *etc.*?  If so, describe the conditions required and reasons for the conditions.  Support this explanation with specific citations to relevant portions of the sales contract.

    C.  Did any liabilities transfer with the assets sold?  If so, quantify amount of liabilities and explain why they were transferred.  Support this explanation with specific citations to relevant portions of any sales contract.

    D.  Has the buyer met all of the terms and conditions of the sales contract?  If not, explain why.  What options are available to ensure that the buyer has complied with all of the terms of the purchase agreement?

    E.  Were any previously provided subsidies tied, in any way, to the particular assets sold?

<u>Post-Sales Effect on Company</u>

12.   Explain whether and how any of the proceeds of the sale of assets or shares were reinvested in the company.  For example, where the proceeds used to cover the general financing requirements of the company, or were the proceeds used for expansion of a particular facility or product line?

13.   Describe the impact of the sale of shares or assets on the legal and corporate structure of the business producing subject merchandise.  Also, describe the legal status of the business before and after the sale.  Also, describe in detail the nature of the sale, *e.g.*, whether the sale was an acquisition of the firm by another firm or an equal merging of two companies.  Provide all formal documents that describe the sale of the company.

14.   Detail any instances in which the sale of the shares or assets resulted in any fundamental change in the general business operations of the company.

III-10

A.  Compare and contrast the main business and product segments of the company's operations after the sale with those before the sale.  Detail any ways in which the operations are fundamentally different.  Were parts (*e.g.*, production lines, subsidiaries, sales divisions) of the company shut down or ceded to other parts of the buyer's operations?  Explain the extent to which these changes are consistent with the original goals and expectations of the sale (citing, as appropriate, to provisions in the sales contract or any pre-sale documents).

B.  Identify the legal and trade names of the company and its main product lines before and after the sale.  Explain the reasons for any changes.

C.  Indicate whether any of the company's suppliers changed as a result of the sale.

D.  Identify what impact, if any, the sale had on the company's customer base.  Also, describe how the sale affected the company's U.S. sales operations.

E.  Support this narrative with specific citations to the company's financial statements or other source documentation on the record.

15.  Detail any instances in which the sale of the shares or assets resulted in any fundamental change in the production facilities of the company.

A.  Identify any production facilities that were acquired or disposed of as a result of the sale.  Provide all documentation pertaining to the acquisition or disposal of any assets (*e.g.*, contracts, sales agreements).

B.  Identify any and all changes in the product lines and production capacity at any of the company's facilities producing the subject merchandise that may have occurred as a result of the sale.

16.  Detail any instances in which the sale of shares or assets resulted in any fundamental change in the financial structure of the company.

A.  Indicate what portion of the assets of the company was transferred as a result of this sale.  In cases where the assets sold where those of a parent of affiliated company, explain how the sale impacted the business producing subject merchandise.

B.  Provide a detailed explanation of any instances where the purchaser of the shares or assets did not become legally responsible for the existing and potential liabilities of the company.  Support this explanation with specific citations to any relevant portions of the sales contract.

17.  Detail any instances in which the sale of shares or assets resulted in any fundamental change in the level and composition of the personnel of the company.

III-11

A.  Identify the total number by category (*e.g.*, management, production workers, sales personnel) of any employees whose jobs were created or terminated as a result of the sale.  Tie these numbers to any employment figures reported in the company's financial statements.

B.  Explain how, under the terms of the sale, any existing employment agreements or union contracts were treated.  Support this explanation with specific citations to any relevant portions of the sales contract and the union contracts.

C.  Detail the extent to which the composition and the responsibilities of the Board of Directors of the company changed as a result of the sale.

18.  If the transaction was a partial change in ownership (only some portion of the shares or assets of the company were sold), explain to what extent the sale affected control and direction of the company's finances and productive operations.

III-12

**Tab 2**

**CR Doc 6**
**PR Doc. 34**

**Response from Morris, Manning, & Martin, LLP to Sec'y Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Dongbu's Affiliated Companies Response" (Oct. 27, 2020).**

Donald B. Cameron, Jr.
202-216-4811
dcameron@mmmlaw.com

R. Will Planert
202-216-4819
wplanert@mmmlaw.com

Mary S. Hodgins
202-216-4111
mhodgins@mmmlaw.com



MORRIS,
MANNING &
MARTIN, LLP

Julie C. Mendoza
202-216-4817
jmendoza@mmmlaw.com

Brady W. Mills
202-216-4116
bmills@mmmlaw.com

October 28, 2020

**PUBLIC VERSION**
Case No.:  C-580-879
Total Pages:  224
Admin. Review:  (§751) 1/1/2019 –12/31/2019
AD/CVD Operations, Office No. VIII
Proprietary Information Removed from Narrative Pages 3,
4, 8, and 9, and from Exhibits 1, 3, and 7
**Document May Be Released Under APO**

**VIA ELECTRONIC FILING**

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Attn:  Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

Attn:   Kathleen Marksberry
        Joshua Simonidis
        Dennis McClure

Re:     **Certain Corrosion-Resistant Steel Products from the Republic of Korea,
        Case No. C-580-879:  Dongbu's Affiliated Companies Response**

Dear Mr. Secretary:

On behalf of KG Dongbu Steel Co., Ltd. (formerly Dongbu Steel Co., Ltd.) and Dongbu

Incheon Steel Co., Ltd. (collectively, "Dongbu"), we hereby respond to the Affiliated Companies

Section of the U.S. Department of Commerce's ("Department") October 6, 2020 Initial

## QUESTIONNAIRE RESPONSE OF

## DONGBU STEEL/DONGBU INCHEON

This submission is filed on behalf of KG Dongbu Steel Co., Ltd. (formerly Dongbu Steel Co., Ltd. ("Dongbu Steel") and Dongbu Incheon Steel Co., Ltd. ("Dongbu Incheon") (collectively "Dongbu")[1] in response to the U.S. Department of Commerce's ("Department") October 6, 2020, questionnaire in the administrative review of the countervailing duty order on certain corrosion-resistant steel products ("CORE" or "subject merchandise") from Korea. The period of review ("POR") is January 1, 2019 to December 31, 2019.

As discussed more fully below, at this time Dongbu plans to include Dongbu Steel, Dongbu Incheon, and KG Steel as part of its questionnaire response. Dongbu Steel and Dongbu Incheon are producers of subject merchandise and KG Steel is the parent company of Dongbu. However, if after reviewing this response the Department determines that it requires any additional information or responses Dongbu will act to the best of its ability to provide further information upon request.

**Commerce is inquiring into each subsidy program previously examined, with the exception of programs already determined to be terminated or not countervailable and programs based on allegations specific to companies other than those under review. As such, this questionnaire addresses all subsidy programs found previously to be used (by the company respondents identified below and any other previously examined producers/exporters), subsidy programs previously found to be not used, and subsidy programs which did not provide measurable countervailable benefits. Commerce will also examine any other potentially countervailable programs discovered during the course of this administrative review.**

---

[1] On September 1, 2019, KG Steel Co., Ltd. ("KG Steel") became the major shareholder of Dongbu Steel. As a result, Dongbu Steel also became a member of the KG Group. On March 2, 2020, Dongbu Steel merged with its wholly-owned subsidiary, Dongbu Incheon. At Dongbu Steel's March 27, 2020 general shareholders' meeting, a name change for the newly-merged Dongbu Steel to KG Dongbu Steel Co., Ltd. was approved. For purposes of this response, we refer to the respondent company generally as Dongbu, and the separate responding entities as Dongbu Steel and Dongbu Incheon, because they are the names under which the companies operated during the POR.

1

affiliated and cross-owned with Dongbu Steel, as Dongbu Steel owned 100 percent of its shares during the POR.

- Dongbu Steel also purchased various services from some companies in the KG Group during the POR:  KG ETS, KG Zeroin, KG Eduone, KG Sunning Life, and Edaily.  In terms of share ownership, none of these companies are affiliated with Dongbu, as they owned none of Dongbu's shares in the POR and Dongbu owned none of their shares.  Details of these related party purchases are provided in **Exhibit 7**.  *See also* Note 35(2) of Dongbu's 2019 consolidated financial statements (*see* **Exhibit 5**).

  Transfer of Subsidies

- Dongbu Steel and Dongbu Incheon are not aware of any cross-owned companies that received subsidies and transferred them to Dongbu Steel or Dongbu Incheon.

**D.      Former Owners / Changes in Ownership[6]**

**Commerce allocates the benefits received from certain types of subsidies over time (*e.g.*, equity infusions, non-recurring grants, debt forgiveness, import duty or value-added tax exemptions or reductions on capital equipment, *etc.*).  *See* 19 CFR 351.524 and subsection C of the "General Questions" section below for a complete explanation.**

**Thus, in addition to investigating alleged subsidies that your company may have received during the POI, Commerce is also investigating alleged allocable, non-recurring subsidies that your company may have received during the AUL period.  Because of this, if your company obtained all or substantially all the assets of another company during the AUL period, and that company still exists as an ongoing entity, or its assets continue to operate as part of your company, we require a complete questionnaire response for such company. If your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please coordinate with your government to answer the questions in the *Change-in-Ownership Appendix*.  If your company does not wish to challenge Commerce's baseline presumption that non-recurring**

---

[6]  All cross-owned affiliates meeting the conditions under subsection C during the POI and AUL and are required to submit a complete questionnaire response should also provide a response to this section with regard to any former owners and changes in ownership.

10

**subsidies continue to benefit the recipient over the allocation period, please so state and you do not need to provide a response to the *Change-in-Ownership Appendix*.**

**ANSWER:**    Dongbu reviewed its historical records and found no indication that it obtained all or substantially all of the assets of another company during the average useful life ("AUL") period that still exists as an ongoing entity, or whose assets continue to operate as part of Dongbu.  The most relevant transaction during the AUL period was that Dongbu Incheon was incorporated in May 2014, after Dongbu's Incheon Works was spun off from Dongbu Steel.  Thus, while Dongbu Incheon is 100 percent owned by Dongbu Steel, this was not the result of the acquisition of the assets of another company.  As discussed, Dongbu Incheon is already submitting a complete questionnaire response so this transaction implicates no additional reporting obligations.

Furthermore, Dongbu does not believe that it was cross-owned with another company during the AUL period that also met any of the conditions listed above in Question C.2 and, thus, is not including a response for any cross-owned affiliates during the AUL period.  In reaching this conclusion, Dongbu reviewed its list of affiliated companies during the AUL period and determined that none of its Korean affiliates whose share ownership approached 50 percent were:  (1) producers of subject merchandise; (2) parent or holding companies of Dongbu; (3) input producers that supplied inputs used by Dongbu in the production of the downstream product; or (4) received and transferred subsidies to Dongbu.

**Finally, if your company has been privatized, changed ownership, merged with another company, or devolved another company/ies from your company's corporate structure in whole or in part, during the AUL period and your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please coordinate with your government to answer the questions in the *Change-in- Ownership Appendix*. If your company does not wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please so state and you do not need to provide a response to this appendix.**

    **ANSWER:**    Dongbu had not been privatized, changed ownership, merged with another company, or devolved another company/companies from its corporate structure in whole or in part, during the AUL period. The only exception is for Dongbu Incheon, which, as discussed, was spun off from Dongbu Steel in 2014 and is already submitting a complete response.[7] Dongbu does not wish to challenge the Department's baseline presumption and thus understands that no response to the Change-in-Ownership Appendix is required.

---

[7] As mentioned in footnote 1, Dongbu was acquired by the KG Group in September 2019 and is now known as KG Dongbu Steel Co., Ltd. However, despite this change in ownership during the POR, it implicates no additional reporting obligations in this review because none of the companies in the KG Group meet any of the four criteria of cross-ownership in Question I.C.2. that would require providing a complete questionnaire response.

12

**Tab 3**

**CR Doc. 81-156**
**PR Doc. 74-78**

**Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Dongbu's Initial Questionnaire Response," (Dec. 2, 2020).**

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19



**Donald B. Cameron, Jr.**
202-216-4811
dcameron@mmmlaw.com

**R. Will Planert**
202-216-4819
wplanert@mmmlaw.com

**Mary S. Hodgins**
202-216-4111
mhodgins@mmmlaw.com

**Julie C. Mendoza**
202-216-4817
jmendoza@mmmlaw.com

**Brady W. Mills**
202-216-4116
bmills@mmmlaw.com

December 3, 2020

**PUBLIC VERSION**
Case No.:  C-580-879
Total Pages:  1,106
Admin. Review:  (§751) 1/1/2019 –12/31/2019
AD/CVD Operations, Office No. VIII
Proprietary Information Removed from Narrative Pages 7,
18, 21-24, 27-31, 33, 35-38, 41, 47-54, 56, 58, 67, 69, 71,
72, 77-79, 83, and 86-91, and from Exhibits 8 – 10-A, 11-
B, 12-B – A-7, B-2 – B-17, B-20 – E-1, E-3 – I-6, I-8, I-9,
I-11 – I-13, and I-15 – J-3
**Document May Be Released Under APO**

**VIA ELECTRONIC FILING**

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Attn:  Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

Attn:  Kathleen Marksberry
       Joshua Simonidis
       Dennis McClure

Re:  **Certain Corrosion-Resistant Steel Products from the Republic of Korea,
     Case No. C-580-879:  Dongbu's Initial Questionnaire Response**

Dear Mr. Secretary:

On behalf of KG Dongbu Steel Co., Ltd. (formerly Dongbu Steel Co., Ltd.) and Dongbu

Incheon Steel Co., Ltd. (collectively, "Dongbu"), we hereby respond to Section III of the U.S.

Filed By: bmills@mmmlaw.com, Filed Date: 12/3/20 1:29PM, Submission Status: Approved

| | GL COIL | Al-Zn alloy galvanized steel sheet in coil | 7210.61.0000 |
|---|---|---|---|
| | GL SHEET | Al-Zn alloy galvanized steel sheet | 7210.61.0000 |
| | ALCOT COIL | Aluminized steel sheet in coil | 7210.69.0000 |
| | ALCOT SHEET | Aluminized steel sheet | 7210.69.0000 |
| Pre-painted GI | PREPAINTED GI COIL | Pre-painted galvanized steel sheet in coil | 7210.70.0000 |
| | PREPAINTED GI SHEET | Pre-painted galvanized steel sheet | 7210.70.0000 |

**DONGBU INCHEON'S ANSWER:**    The Korean tariff schedule numbers under

which Dongbu Incheon exports the subject merchandise are as follows:

| CLASS | PRODUCT | DESCRIPTION | CODE |
|---|---|---|---|
| Un-painted GI | GI COIL | Galvanized steel sheet in coil | 7210.49.0000 |
| | GI SHEET | Galvanized steel sheet | 7210.49.0000 |
| | GA COIL | Galvanized steel sheet in coil | 7210.49.0000 |
| | GA SHEET | Galvanized steel sheet | 7210.49.0000 |
| | GL COIL | Al-Zn alloy galvanized steel sheet in coil | 7210.61.0000 |
| | GL SHEET | Al-Zn alloy galvanized steel sheet | 7212.61.0000 |
| | ALCOT COIL | Aluminized steel sheet in coil | 7210.69.0000 |
| | ALCOT SHEET | Aluminized steel sheet | 7210.69.0000 |
| Pre-painted GI | PREPAINTED GI COIL | Pre-painted galvanized steel sheet in coil | 7210.70.0000 |
| | PREPAINTED GI SHEET | Pre-painted galvanized steel sheet | 7210.70.0000 |

**KG STEEL'S ANSWER:**    As noted above, KG Steel does not produce or export

subject merchandise.

C.    **Please provide the following information for your company for the POR.  Do not include the volume and value of merchandise produced outside your country or returned merchandise.  Separately report the value of services sold by your company, if any.  In addition, separately report the value of sales by each cross-owned company, as well as the value of sales between your company and the cross-owned company.**

**For years prior to the POR, please report sales information for the years of approval and receipt of non-recurring subsidies you report.  *See, e.g.*, *Grant and Allocation Appendix*.  Please report sales information for all responding cross-owned**

12

companies during these years, not only sales information for the recipient of the subsidy.

If the actual values recorded in your accounting records are booked on a basis other than f.o.b., please describe any adjustments that were made to derive the f.o.b. values. In addition, if your sales are inclusive of VAT or other indirect taxes, please ensure that such taxes are removed from your sales figures.

1.    **Total Sales**

The quantity and f.o.b. value of total sales (both subject and non-subject merchandise) to all markets (domestic and foreign). Please report the sales value on an f.o.b. (port) basis with respect to export sales and/or on an f.o.b. (factory) basis for domestic sales. Provide a worksheet reconciling the total reported sales value to your financial statements.

2.    **Sales of Subject Merchandise**

The quantity and f.o.b. value of the subject merchandise sold to all markets (domestic and foreign). Please report the sales value on an f.o.b. (port) basis with respect to export sales and/or on an f.o.b. (factory) basis for domestic sales.

3.    **Total Exports**

The total quantity and f.o.b. (port) value of export sales (both subject and nonsubject merchandise) to all markets.

4.    **Total Exports to the United States**

The total quantity and f.o.b. (port) value of export sales (both subject and nonsubject merchandise) to the United States.

5.    **Exports of Subject Merchandise**

The total quantity and f.o.b. (port) value of the subject merchandise exported to all markets (including the United States).

6.    **Exports to the United States of Subject Merchandise**

The total quantity and f.o.b. (port) value of the subject merchandise exported to the United States.

7.    **Exports of Subject Merchandise Produced by Unaffiliated Companies**

The total quantity and f.o.b. (port) value of the subject merchandise exported to all markets. If any sales were to the United States, please also separately report.

13

**Regarding 1 – 7 above:  Please explain how the sales of subject merchandise are recorded in your company's financial records.  Are your company's sales consolidated with those of other companies in the financial report of a parent, holding company, or group of companies?  If so, please explain how, and provide copies of the consolidated financial statements.**

**DONGBU STEEL'S ANSWER:**    The relevant statistics requested in Questions 1-7 above for Dongbu Steel's 2019 sales are provided in **Exhibit 15-A**.  Dongbu Steel does not normally record its export sales on an FOB basis.  However, Dongbu Steel has adjusted the book value of its C&F or CIF export sales values (by excluding ocean freight and marine insurance) in order to eliminate the differences between book value and FOB value and to report FOB value for purposes of this response.  For domestic sales, Dongbu Steel has adjusted the book value to eliminate inland freight charges to derive FOB values.  As explained in Dongbu's ACR and reiterated again in response to Question 4 above, Dongbu Steel did not export any subject merchandise to the United States produced by unaffiliated companies during the POR.  Dongbu Steel also provides its total FOB sales values for each year of the AUL period calculated on the same basis in **Exhibit 16-A**.

**DONGBU INCHEON'S ANSWER:**    The relevant statistics requested in Questions 1-7 above for Dongbu Incheon's 2019 sales are provided in **Exhibit 15-B**.  Dongbu Incheon does not normally record its export sales on an FOB basis.  However, Dongbu Incheon has adjusted the book value of its C&F or CIF export sales values (by excluding ocean freight and marine insurance) in order to eliminate the differences between book value and FOB value and to report FOB value for purposes of this response.  For domestic sales, Dongbu Incheon has adjusted the book value to eliminate inland freight charges to derive FOB values.  As explained in Dongbu's ACR, Dongbu Incheon did not export any subject merchandise produced by unaffiliated companies during the POR.  Dongbu Incheon also provides its total FOB sales values for each year of the AUL period calculated on the same basis in **Exhibit 16-B**.

14

Dongbu Incheon's sales are consolidated with those of Dongbu Steel.  A copy of Dongbu Steel's 2019 audited consolidated financial statements is provided in Exhibit 5 of Dongbu's ACR.

**KG STEEL'S ANSWER:**     KG Steel did not have any sales revenue during the POR. *See* **Exhibit 12-C**.

**D.**     **As established in 19 CFR 351.524(d)(2), the allocation period for non-recurring[5] subsidies is defined by the AUL of renewable physical assets for the industry concerned, as listed in the U.S. Internal Revenue Service's Depreciation Range System (IRS tables).  The AUL listed in the IRS tables that applies to this review is 15 years.**

**ANSWER:**     Dongbu Steel, Dongbu Incheon and KG Steel do not intend to oppose the use of the 15-year AUL from the IRS tables.

**II.     PROGRAM-SPECIFIC QUESTIONS**

**ANSWER:**     As demonstrated in response to the General Questions above and the exhibits provided, KG Steel is only an investment company with no sales or production operations and thus there is no basis for KG Steel to respond to the program-specific questions below as it received no benefits from the Government o Korea ("GOK").  Accordingly, Dongbu's responses to the program-specific questions will only address Dongbu Steel's and Dongbu Incheon's use of these programs, or the lack thereof.

**PROGRAMS PREVIOUSLY FOUND TO BE COUNTERVAILABLE**

**A.     LOANS AND CREDIT**

**Report all financing to your company that was outstanding at any point during the POR, regardless of whether you consider the financing to have been provided under the below programs.  Submit the information requested in the *Loan Template* as an attachment to your response and in electronic format using Microsoft Excel.**

---

[5]  For definitions of **recurring** and **non-recurring** benefits, *see **Grant and Allocation Appendix***; *see also* 19 CFR 351.524(c).

15

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**Ensure that you report all forms of financing outstanding during the POR, not only traditional loans. This includes, but is not limited to, interest expenses on bank promissory notes, invoice discounting, and factoring of accounts receivable. If your company did not make interest payments on the financing during the POR (*e.g.*, factoring of accounts receivable), then identify the specific terms of the financing (*e.g.*, the discount rate associated with the factoring).**

**ANSWER:**    At the outset, Dongbu notes that it has provided separate lists of all the financial institutions from which Dongbu Steel and Dongbu Incheon had any form of financing that was outstanding during the POR. *See* **Exhibit A-1**.

Dongbu also notes that the Department's question requests reporting of "all forms of financing." Dongbu interprets this question as requesting the reporting of all forms of financing from government policy banks and government financial institutions. In addition to the questions below, Dongbu Steel has also separately provided its financing from all financial institutions that are related to the debt restructuring program in **Exhibit B-35**, discussed below.

Except for benchmark purposes, Dongbu is not reporting financing that was received from other financial institutions as it understands that these are outside the scope of this review.[6] If Dongbu's understanding is not correct, then it stands ready to report financing from other financial institutions as well.

1. **Korea Export-Import (KEXIM) Bank Import Financing**

**DONGBU STEEL'S ANSWER:**    Although Dongbu Steel did not have import financing from KEXIM for which KEXIM charged interest, Dongbu Steel had arrangements involving KEXIM in some shipper's usance and banker's usance transactions. With shipper's usance transactions, Dongbu Steel opens a letter of credit ("L/C") with KEXIM when purchasing imports of raw materials and pays KEXIM an L/C opening commission for this service. KEXIM

---

[6] *See Countervailing Duty Administrative Review on Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 74 Fed. Reg. 2,512 (Dep't Commerce Jan. 15, 2009) and accompanying Issues and Decision Memorandum at 12.

16

then sends notification of the L/C to the usance financing bank, usually overseas international banks, and to the exporter's foreign bank. The exporter's foreign bank makes payment of the invoice amount to the exporter upon presentation of its shipping documents for the raw material. At the due date, Dongbu Steel pays the invoice amount plus interest to KEXIM, which then forwards this amount to the exporter's bank. KEXIM provides no financing but rather it acts as a payment guarantor and intermediate bank for this transaction. Loan templates with: (1) a complete list of all of Dongbu Steel's shipper's usance loans that were outstanding during the POR, (2) a list of with the subset of Dongbu Steel's KEXIM shipper's usance loans, and (3) a list with the subset of Dongbu Steel's shipper's usance loans with other banks with calculations of the relevant benchmarks are provided in **Exhibit A-2**. These templates are also being submitted in Excel with this response.

With banker's usance transactions, Dongbu Steel opens a L/C with KEXIM when purchasing imports of raw materials. KEXIM makes payment of the invoice amount to the exporter upon presentation of its shipping documents for the raw material. At the due date, Dongbu Steel pays the invoice amount plus interest to KEXIM. So, banker's usance is a loan to Dongbu Steel and shipper's usance is an account payable. Loan templates with: (1) a complete list of all of Dongbu Steel's banker's usance loans that were outstanding during the POR, (2) a list of with the subset of Dongbu Steel's KEXIM banker's usance loans, and (3) a list with the subset of Dongbu Steel's banker's usance loans with other banks with calculations of the relevant benchmarks are provided in **Exhibit A-3**. These templates are also being submitted in Excel with this response.

As noted in Section B below regarding Dongbu's Debt Restructuring, KEXIM was one of Dongbu Steel's creditors that converted debt to equity on August 30, 2019. KEXIM's

17

contribution to this debt-to-equity swap consisted of KEXIM taking over the debt and making payment to the exporter's bank on **[        ]** shipper's usance and **[        ]** banker's usance transactions without Dongbu Steel having to make payment to KEXIM.  There were also shipper' usance and banker's usance transactions with **[            ]** and **[                ]**, respectively, where a portion of the balance was converted to equity.  These transactions are highlighted in the full list of the shipper's usance and banker' usance transactions in **Exhibits A-2** and **A-3**, respectively.

 **DONGBU INCHEON'S ANSWER:** Dongbu Incheon has a short-term line of credit with KEXIM that **[                            ]** and had outstanding loans during the POR.  A loan template with Dongbu Incheon's KEXIM import financing that was outstanding during the POR is provided in **Exhibit A-4**.  This template is also being submitted in Excel with this response.

 Dongbu Incheon also had banker's usance loans with KEXIM related to purchases of imports of raw materials.  Loan templates with:  (1) a complete list of all of Dongbu Incheon's banker's usance loans that were outstanding during the POR, (2) a list of with the subset of Dongbu Incheon's KEXIM banker's usance loans, and (3) a list with the subset of Dongbu Incheon's banker's usance loans with other banks with calculations of the relevant benchmarks are provided in **Exhibit A-5**.  These templates are also being submitted in Excel with this response.

  2. **Korea Development Bank (KDB) and Industrial Base Fund (IBF) Short-Term Discounted Loans for Export Receivables**

 **DONGBU STEEL'S ANSWER:** Dongbu Steel received documents against acceptance ("D/A") financing from the KDB during the POR.  A complete list of Dongbu Steel's short-term D/A financing from the KDB is provided in **Exhibit A-6**.  Dongbu Steel is also

18

providing its short-term D/A financing from non-KDB commercial banks that can be used as a company-specific benchmark. *See* **Exhibit A-6**. These data are also being submitted in Microsoft Excel with this response. Dongbu Steel also notes that in the investigation, the Department determined that subsidies on D/A financing from government policy banks are tied to sales of subject merchandise to the United States in accordance with 19 C.F.R. § 351.525(b)(4) and (5).[7] Consistent with its determination in the investigation, the Department should determine that only Dongbu Steel's D/A financing from the KDB for exports of the subject merchandise to the United States are countervailable in this investigation.

Although not export financing under the program under review, Dongbu Steel also notes that it had shipper's usance and banker's usance transactions with the KDB during the POR. Loan templates for these transactions are provided **Exhibit A-2** and **A-3**, respectively. In addition, Dongbu Steel had L/C financing from the KDB during the POR. A list of the L/C financing from the KDB as well as from other commercial banks is provided in **Exhibit A-7** for the Department's reference. These data are also being submitted in Microsoft Excel with this response. These loans are generally available and should not be treated as a countervailable program in this review.

**DONGBU INCHEON'S ANSWER:**    Not applicable. Dongbu Incheon did not receive D/A financing from the KDB or IBF during the POR. These questions are thus not applicable.

---

[7] *See Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Preliminary Affirmative Determination*, 80 Fed. Reg. 68,842 (Dep't Commerce Nov. 6, 2015), and accompanying Issues and Decision Memorandum ("*CORE Preliminary IDM*") at 12; *see also Coated Free Sheet Paper from the Republic of Korea:  Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007), and accompanying Issues and Decision Memorandum ("*CFS Final IDM*") at 18.

19

**B.    DONGBU'S DEBT RESTRUCTURING**

**Commerce found the restructuring of debt and loans received by Dongbu to be countervailable previously.  We do not intend to reevaluate the countervailability of this program.**

**Please also respond to all questions in the *Standard Questions Appendix* and the *Usage Appendix* as it applies to the program.  Submit the information requested in the *Loan Template* as an attachment to your response and in electronic format using Microsoft Excel.**

**ANSWER:**    Dongbu provides responses to the Standard Questions Appendix and the

Usage Appendix in **Exhibit B-1**.

**In addition, with respect to Dongbu's Debt Restructuring, please provide the following information:**

    **1.    Please submit translated, audited financial statements for Dongbu for 2012-2014.  Include the complete set of statements, *e.g.*, income statement, balance sheet, all notes, and the auditor's opinion, as well as translations of any statements in the annual reports by corporate officers concerning debt-to-equity swaps and various loans.**

    **ANSWER:**    Dongbu Steel's 2012-2014 audited financial statements are provided in

**Exhibit 12-A**.

    **2.    Please provide a copy, with translation of the agreement Dongbu entered into for the "Creditors Co-management Program" with the Creditors' Association.[8]**

    **ANSWER:**    A translated copy of Dongbu Steel's agreement entered with the Creditors'

Co-Management Program with the Creditors' Association is provided in **Exhibit B-2**.

---

[8] *See* Petition, Volume V at 54.

**3.**    **Please provide a general description of your company's debt restructuring including the time table for the debt restructuring, the purpose of the debt restructuring, the names of and number of the creditors involved in the debt restructuring, the law under which the restructuring is undertaken, the terms of the restructuring, a description of the Creditors Associations, and the types and amount of debt that were restructured, including any additional infusions of cash or loans, and an explanation as to whether the restructuring involved any conversion of debt into equity.**

<u>**ANSWER:**</u>    Along with the global economy, most advanced economies slowed in 2012 due to the prolonged Eurozone sovereign debt crisis and the spread of its effects to emerging market economies including China.  Due to the sluggish external demand and the worsening of investment sentiment amid greater economic uncertainty, the downside risk to Korean economic growth increased.  Under this worsening economic situation, various domestic industries such as the construction, shipbuilding, shipping and manufacturing sectors faced the hardest impact from the downturn of the economy.

Since Dongbu Steel operates in the construction and steel manufacturing areas that were impacted by the worsening economic conditions, it also faced liquidity problems and successfully issued corporate bonds as follows to raise funds:

(Unit:  Million KRW)

| Type of Bond | Issuance Date | Amount | Interest Rate | Maturity | Remarks |
|---|---|---|---|---|---|
| PB (185th) | Feb. 8, 2013 | 30,000 | 8.7% | Feb. 8, 2014 | |
| PB (187th) | May 10, 2013 | 40,000 | 8.7% | May 10, 2014 | |
| BW (188th) | Sep. 9, 2013 | 30,000 | 5.0% | Mar. 9, 2018 | 7.0% at maturity |
| PB (189th) | Oct. 16, 2013 | 40,000 | 9.5% | Oct. 16,2015 | |

Source:  Dongbu Steel's 2013 and 2014 audited financial statements at Note 20 (**Exhibit 12-A**).

In addition, Dongbu Steel sold **[            ]** common shares of Dongbu Life Insurance Co., Ltd. and raised KRW **[            ]** million on **[            ]** to improve its financial structure.

However, interest rates went up, and the issuance of bonds for companies having a credit rating lower than "A" became very difficult because of increasing credit risk.  Therefore, on

21

September 16, 2013, Dongbu Steel decided to spin-off its Dangjin Port Management Division

and establish a new company – Dongbu Dangjin Port Terminal Co., Ltd. ("DDPT") – to enhance

management efficiency and induce capital for improvement of its financial structure.

Meanwhile, Dongbu Steel's credit rating was continuously downgraded as follows:

| Date | Credit Rating | Credit Evaluation Company |
|---|---|---|
| April 6, 2012 | BBB  Stable | Korea Ratings (A subsidiary of FITCH RATINGS) |
| April 29, 2013 | BBB  Negative | |
| November 15, 2013 | BBB (-) Stable | |
| April 30, 2014 | BBB (-) Negative | |

(Note) Credit rating "BBB" denotes good ability to repay principal and interest, but possibility exists of deterioration in economic conditions and environment reducing this ability going forward.

Even though Dongbu Steel successfully raised KRW 40 billion by issuance of the 189th

unsecured public bonds on October 16, 2013, it was uncertain whether unfavorable financial

market conditions would change and that its sale of DDPT would be completed in the near

future.  Therefore, Dongbu Steel applied for KRW [          ] billion in bridge loans to pay off

matured outstanding debts and obtain operating funds.  To secure repayment of the bridge loans,

Dongbu Steel made a commitment to sell the following assets to improve its financial structure:

- Dangjin Port (DDPT)
- Incheon Plant
- Stocks of its affiliated companies (Dongbu Hitek, Dongbu Metal, Dongbu Life Insurance, Dongbu Securities, Dongbu Capital, Dongbu Specialty Steel)

On November 17, 2013, a Board of Directors' meeting of Dongbu Steel approved a

proposal to sell [          ] of DDPT's shares at KRW [          ] billion.  The estimated sales amount

was determined based on the valuation amount by Hanmi Accounting Corporation, an

independent accounting firm.  In addition, Dongbu Steel sold its remaining [          ] shares

of Dongbu Life Insurance Co., Ltd. to Dongbu Insurance Co., Ltd. for KRW [          ] million

on [          ].

22

On [                    ], Dongbu Steel received the bridge loan of KRW [        ] billion at a commercial interest rate of [          ] with a maturity date of [                    ]. The repayment was to be made from the proceeds received from the sale of shares of DDPT. On the same day, Dongbu Steel and the KDB entered into a Special Agreement for Corporate Bond Refinancing Issuance. *See* **Exhibit B-3**. Under this Agreement, corporate bonds having maturity dates from December 2013 to August 2014, were refinanced as follows.

(Unit: Million Won)

| Due Date | Initial Balance | Refinancing | Rollover by Dongbu | Repaid by Dongbu |
|----------|-----------------|-------------|--------------------|------------------|
| Nov. 2013 | 5,000 | | | 5,000 |
| Dec. 2013 | 115,000 | 84,000 | | 31,000 |
| Feb. 2014 | 110,000 | 72,000 | 20,000 | 18,000 |
| Apr. 2014 | 160,000 | 48,000 | | 112,000 |
| May 2014 | 71,000 | 56,800 | | 14,200 |
| July 2014 | 70,000 | 56,000 | | 14,000 |
| Aug. 2014 | 40,000 | 32,000 | | 8,000 |
| **Total** | **571,000** | **348,800** | **20,000** | **202,200** |

(Note) Corporate bond refinancing programs were refinanced as follows:

- Dongbu Steel had to repay 20% of the principal bond amount.
- KDB and the Finance and Investor Association took over the remaining 80% and transferred for risk sharing as follows:
  - Corporate Bond Stabilization Fund: 10%
  - Dongbu Steel's creditor banks: 30%
  - Korea Credit Guarantee Fund: 60% (Primary CBO)

On March 12, 2014, Dongbu Steel determined to spin off its Incheon Plant and establish Dongbu Incheon to induce capital for improvement of its financial structure. Dongbu Steel also appointed its Corporate M&A Division as a financial advisor to sell DDPT and Dongbu Incheon.

On April 25, 2014, Dongbu Steel received a bridge loan of KRW [          ] million at a commercial interest rate of [        ] with a maturity date of [              ], to pay off a put option on the 184th BWs (*i.e.*, bonds with stock purchase warrants). The repayment was to be made from the proceeds received from the sale of shares of Dongbu Incheon.

23

On May 2, 2014, Dongbu Steel issued 10,000,000 common shares by public offering at KRW 2,955 per share.  On May 27, 2014, to speed up its sales of DDPT, Dongbu Steel reduced its offer price and changed the deal structure from a sale of [            ] of DDPT's shares at KRW [         ] billion to a sale of [                                    ] and issuance of convertible bonds for the remaining [                        ].  In addition, the KDB tried to sell Dongbu Incheon and DDPT as a package deal to POSCO.

On June 16, 2014, Dongbu Steel received an operating bridge loan of KRW [          ] million at a commercial interest rate of [        ] with a maturity date of [              ].  The repayment was to be made from the proceeds received from the sale of shares of Dongbu Incheon.

On June 17, 2014, Dongbu Steel purchased [            ] shares of preferred stock of Dongbu Specialty Steel Co., Ltd. ("DSS") from minority shareholders at KRW [        ] million to make it a 100% owned subsidiary and then resold all shares (14,400,000 common shares and 5,600,000 preferred shares) to [                                        ] at KRW [                      ].  DSS was sold to Hyundai Steel at KRW [          ] million and Dongbu Steel received KRW [                                                        ].  The proceeds were used to pay off the bridge loans of KRW [        ] billion received on [        ].

However, on June 24, 2014, POSCO announced that it was withdrawing its purchase offer after analysis of its due diligence and valuation result.  Because POSCO gave up its sales negotiation of the package deal and Dongbu Steel could not find other potential buyers of Dongbu Incheon and DDPT, Dongbu Steel announced the failure of DDPT sales plan on

24

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

June 27, 2014. Because of the deal failure, Dongbu Steel had no other option but to choose and apply for one of the following financial restructuring programs.

| | **Voluntary Restructuring** | **Corporate Workout** | **Corporate Reorganization** |
|---|---|---|---|
| Legal Basis of System | Voluntary Creditor Banks Committee Agreement | Corporate Restructuring Promotion Act | Corporate Reorganization Act |
| Supervisor of proceeding | Creditor Banks | Financial institution creditors | Court |
| Petitioner | Company or creditor banks who signed the Voluntary Creditor Banks Committee Agreement ("CBCA") | Company or financial institution creditor prescribed under Corporate Restructuring Promotion Act ("CRPA") | The company, one or more creditors whose claims against the company are not less than one-tenth of the company's paid-in capital, or shareholders who hold not less than one-tenth of the company's paid-in capital. |
| Time for approval of Plan | Generally 3-4 months until the workout plan is entered into between the creditors and the debtor after the start of the workout proceeding. | Generally 3-4 months until the workout plan is entered into between the creditors and the debtor after the start of the workout proceeding. | Generally 6-9 months until the reorganization plan is adopted and approved after filing. |
| Management | The creditors usually request the incumbent management to resign from their positions if the creditors believe that the company is being mismanaged. | The creditors usually request the incumbent management to resign from their positions if the creditors believe that the company is being mismanaged. | The incumbent management is replaced by the receiver appointed by the court. The receiver has the authority to manage the company and dispose of the company's property. The receiver is subject to the court's supervision. |
| Parties Interested | Normalization Plan applies only to the banks who signed the CBCA. | Workout applies only to the financial institutions listed in CRPA. | All of the creditors are subject to the corporate reorganization procedure. |
| Debt Rescheduling Method | Debt rescheduling is determined by the agreement executed by the company and the creditor banks. Usually, debt rescheduling includes extension of payment term, reduction of interest rates, debt-for-equity swaps and extinguishing the company's capital. | Debt rescheduling is determined by the agreement executed by the company and the financial institution creditors. Usually, debt rescheduling includes extension of payment term, reduction of interest rates, debt-for-equity swaps and extinguishing the company's capital. | Debt rescheduling is decided by the Corporate Reorganization Plan adopted by the creditors' resolution at the meeting of creditors and the subsequent approval by the court. Usually, debt rescheduling includes extension of payment term, reduction of interest rates, debt-for-equity swaps and extinguishing the company's capital. |
| Costs | The costs for the inspector must be paid by the company. | The costs for the inspector must be paid by the company. | The costs for the receiver and the inspector must be paid by the company to the court in advance when the preservation order is issued. |

Filed By: bmills@mmmlaw.com, Filed Date: 12/3/20 12:37 PM, Submission Status: Approved

| Declaration of Insolvency | Since the creditor banks that hold the checks and promissory notes issued by the company are prevented from exercising their rights during voluntary restructuring proceedings under the CBCA, the company is not declared insolvent during the workout procedure. | Since the financial institutions that hold the checks and promissory notes issued by the company are prevented from exercising their rights during workout proceedings, the company is not declared insolvent (*boodo,* in Korean) during the workout procedure. | Before or after the petition for the corporate reorganization is filed, the company is usually declared insolvent because the checks or promissory notes issued by the company will not be honored. As a result, the company is prohibited from using the banking system and the representative director who issued the dishonored checks is subject to penal liability under the Wrongful Check Control Law. |

As shown above, all of the above programs are implemented to minimize the loss to creditors through debt restructuring and self-restructuring. Because Dongbu Steel was not insolvent and experienced temporary liquidity problems which could be solved by the sale of DDPT and Dongbu Incheon, it decided not to apply for the court reorganization program which is similar to Chapter 11 of the United States Bankruptcy Act.

Rather, Dongbu Steel applied for the voluntary corporate restructuring program, because it issued public bonds which had covenants not to apply for a workout program or court reorganization program. If Dongbu Steel violated the covenants, public bond holders could exercise their call options for early repayment before the maturity date. Furthermore, Dongbu Steel had loans from a limited number of banks and loans from other financial institutions that were relatively small.

Therefore, on June 30, 2014, Dongbu Steel applied for a Corporate Voluntary Restructuring Program under the Creditor Banks' Committee Agreement ("CBCA") as shown in **Exhibit B-4**, instead of a workout program.

On July 7, 2014, the 1st Dongbu Steel's Creditor Banks' Committee ("DSCBC") was held and the following was approved (*see* **Exhibit B-5**):

1)      Establishment and participation of Dongbu Steel Creditor Banks Committee ("DSCBC"), which included the following creditor banks:

Korea Development Bank ("KDB")
Korea Finance Corporation ("KoFC")
NH Bank ("NH")
Korea Export-Import Bank ("KEXIM")
Shinhan Bank ("Shinhan")
Hana Bank ("Hana")
Woori Bank ("Woori")
Korea Exchange Bank ("KEB")
Industrial Bank of Korea ("IBK")

2)    Suspension of exercise of creditors' right.
3)    Appointment of a consulting firm to prepare a business normalization plan.
4)    Excluding from the restructuring assets-backed commercial paper ("ABCP")
5)    Supporting refinancing of corporate bonds.

On July 21, 2014, the 2nd DSCBC meeting was held and approved KRW 160 billion of

emergency operating loans at an interest rate of 6.5% with maturity of October 6, 2014 (*see*

**Exhibit B-6**).

On September 30, 2014, PriceWaterhouseCoopers ("PWC"), an accounting firm,

submitted an Investigation Report on Assets and Liabilities and Feasibility Review Report of

Business Normalization Plan ("PWC report") as provided in **Exhibit B-7**.  As explained above,

DDPT and Dongbu Incheon were already spun off and Dongbu Steel's remaining business was

the Dangjin plant.  PWC analyzed its business performance by the HR business and the Non-HR

business as follows:

(Unit:  KRW Million)

| Description | HR Business | | | | Non-HR Business | | | |
|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014(H) | 2011 | 2012 | 2013 | 2014(H) |
| Sales | [ | | | | | | | |
| Cost of Sales | | | | | | | | |
| Gross Profit | | | | | | | | |
| SG&A | | | | | | | | |
| Operating Profit | | | | | | | | |
| Gross Profit Ratio | | | | | | | | |
| Oper. Profit Ratio | | | | | | | | ] |

27

As shown above, PWC's analysis showed that Dongbu Steel's hot-rolled business caused the main problems aggravating its overall profitability.  Therefore, PWC proposed two scenarios for its feasibility study of the business normalization plan by scenario – (1) Continuing HR business, and (2) Shut down of HR business.  Then, PWC calculated liquidation and going-concern values by scenario as follows:

1)  Liquidation Value:  KRW **[          ]** billion.
2)  Going-Concern Value
    -  Scenario 1 (Continuation of Hot Rolling Business):  KRW **[          ]** billion.
    -  Scenario 2 (Shut-down of Hot Rolling Business):  KRW **[          ]** billion.

On September 30, 2014, because the going-concern value under Scenario (2) was significantly higher than the liquidation value, the creditor banks of DBCBC held the 3[nd] DSCBC Meeting and approved the following (*see* **Exhibit B-8**):

1)  Confirmation of credit amount and voting rights thereon based on PWC Report.

2)  Debt Restructuring

    A.  Existing loans

        (1)  Extension of repayment of loan amount until December 31, 2018.
        (2)  Reduction of interest rate (secured loans:  3%, unsecured loans:  1%)
        (3)  Continuing credit line loan (bank overdraft, B2B, purchase loan, L/C, D/A)
        (4)  Financial derivatives (early settlement)
        (5)  Guarantee obligation claims (extension of payment until December 31, 2018)

    B.  Debt-to-equity conversion

        (1)  Write-off existing shares (major shareholders and their related parties:  100 to 1; other shareholders:  4 to 1)
        (2)  Debt-to-equity conversion amount:  KRW 53 billion at par (KRW 5,000/share)
        (3)  Restriction of sales for new shares until December 31, 2018.

3)  New loans

    (1)  Total new loans:  General loan KRW 500 billion; Import Usance U$ 100 million.

28

    (2)    Interest rate:
          General loan:  5%
          L/C usance commission per quarter (open:  0.2%, underwriting:  0.3%)

    (3)    Maturity date:  December 31, 2018.

    (4)    Acquisition of Joint Collateral having appraisal value of KRW 834.5 billion.

    (5)    Provision of preferred repayment rights for new loans provided during the restructuring period.

4)    Other matters.

On October 22, 2014, Dongbu Steel entered into an Agreement for Compliance of Business Normalization Plan with the KDB and DSCBC as provided in **Exhibit B-2**.  This Agreement includes the following:

1)    Agenda approved by the $3^{nd}$ DSCBC meeting
2)    Business Target
3)    Self-restructuring Plan
4)    Operational Regulation of Management Evaluation Committee
5)    Evaluation Opinion by Grade and its Follow-up Plan
6)    Fund Management Contract
7)    Operational Regulation of Management Recommendation Committee
8)    Operational Regulation of Outside Directors
9)    Agreement between Management and Labor Union

On November 25, 2014, the Board of Directors Meeting of Dongbu Steel decided to shut-down its hot-rolling mill according to the normalization plan.

On January 7, 2015, the Shareholders' Meeting of Dongbu Steel approved the write-off of its existing shares.  On February 3, 2015, Dongbu Steel sold the remaining [                    ] shares of Dongbu Life Insurance Co., Ltd. to Dongbu Insurance Co., Ltd. for KRW [          ] million.  On February 16, 2015, Dongbu Steel increased its capital by KRW 53 billion by a debt-to-equity conversion.

Following the debt-to-equity conversion, Dongbu Steel performed a comparison analysis between the forecasted income statement prepared by PWC and the actual income statement for the year ended at December 31, 2014 as follows:

29

Public Version

(Unit:  Billion KRW)

| Account Name | Forecasted (*) | Actual (**) | Difference |
|---|---|---|---|
| Sales | [ | | |
| Cost of Sales | | | |
| Gross Profit | | | |
| SG&A Expenses | | | |
| Operating Profit | | | ] |

(*) Refers to PWC Report provided in **Exhibit B-7**.
(**) Refers to Dongbu Steel's 2014 audited financial statements provided in **Exhibit 12-A**.

As shown above, the forecasted gross profit decreased by KRW [        ] billion because sales revenue decreased by KRW [        ] billion and production costs increased by KRW [        ] billion mainly due to the slow steel economy.  Furthermore, SG&A expenses increased by KRW [        ] billion due to loss compensation obligations arising from the violation of long-term contracts caused by the shut-down of the Hot Rolled Steel Business.  Because of the shutdown of HR mill, Dongbu Steel violated the following long term contracts:

- Financing Lease Agreement for Industrial Water Treatment Facilities

  Dongbu Steel entered into a long-term financing agreement with [                                                ].  Due to the shutdown of HR mill, Dongbu Steel agreed to increase its financial lease amount from KRW [        ] billion to KRW [        ] billion.

- Long-term Purchase Agreement

  Dongbu Steel entered a long-term purchase agreement for compressed air with [                    ] who built compressed air production facilities within Dongbu's HR Plant.  Due to the shutdown, [                                        ] loss compensation arbitration with the International Chamber of Commerce on [                    ].

Because of the unexpected short-fall of operating profit, Dongbu Steel appointed PWC to evaluate its financial status and cash flow.  According to PWC's Report on Investigation of Financial Status and Review of Projected Cash Flow provided in **Exhibit B-9**, Dongbu Steel's liquidation value and going-concern value were evaluated and calculated as follows.

30

Public Version

- Liquidation value:    KRW **[          ]** Billion
- Going-Concern Value:  KRW **[          ]** Billion

Because the going-concern value was significantly higher than the liquidation value, even though steel market conditions had not improved to the expected level and the HR shutdown expenses were increased, Dongbu Steel and DBCBC decided to change from the Corporate Voluntary Restructuring Program under the Creditor Banks' Committee Agreement ("CBCA") to the Corporate Workout Program under Corporate Restructuring Promotion Act ("CRPA").

On October 19, 2015, a meeting of the 1st Dongbu Steel's Creditor Financial Institutions' Committee ("DSCFIC") was held and the following was approved (*see* **Exhibit B-10**) and entered into a Succession Agreement of the Agreement for Compliance of Business Normalization Plan with the KDB and DSCBC as provided in **Exhibit B-10**:

1)   Establishment and participation of Dongbu Steel Financial Institutions' Committee ("DSCFIC"), which included the following creditor banks:

Korea Development Bank ("KDB")
NH Bank ("NH")
Korea Export-Import Bank ("KEXIM")
Shinhan Bank ("Shinhan")
Hana Bank ("Hana")
Woori Bank ("Woori")
Korea Credit Guarantee Fund ("KODIT") – Newly added
Corporate Bond Stabilization Fund ("CBSF") – Newly added
The K Savings Bank ("KSAVING") – Newly added

2)   Takeover of Business Normalization Plan.

DSCFIC agreed to comply with the resolutions made by the 1st, 2nd, and 3rd DBCBC meetings.

DSCFIC agreed to enter into a Succession Agreement of the Agreement for Compliance of Business Normalization Plan with the KDB and DSCBC.

On March 14, 2016, because of the short-fall in gross profit, increase in HR mill shutdown expenses and excessive financing expenses, Dongbu Steel realized an erosion of over 50% in paid-in capital during two consecutive years, which would cause the de-listing of

31

Dongbu Steel's shares from the Korea Stock Exchange. Furthermore, because market interest rates had decreased in the domestic financing market, the 5% interest rate on new loans provided under Corporate Voluntary Restructuring Program was not favorable for rapid normalization. Therefore, the 2nd DSCFIC meeting (*see* **Exhibit B-11**) approved the following:

1)     Debt-to-equity conversion

    (1)    Write-off existing shares (4 old shares to 1 new share)
    (2)    Debt-to-equity conversion amount: KRW 200 billion at KRW 10,000 per share
    (3)    Restriction of sales for new shares until December 31, 2018.

2)     Interest rate reduction of new general loans from 5% to 3%.

On March 28, 2016, because Seoul Guarantee Insurance Corporation ("SGIC") reported compliance guarantee payment claim, the 3rd DSCFIC Meeting was held and approved the following (*see* **Exhibit B-12**):

1)     Recalculation of voting rights.

     SGIC became a member of DBCFIC and was given its voting right.

2)     Guarantee period and fee adjustment.

     Payment guarantee period will be rolled over and will be treated as general loan, in case SGIC paid guarantee because of payment default.

     Guarantee fee shall be 0.5% per annum, unless contract guarantee fee is lower than 0.5% per annum.

3)     Approval for agenda of the 34th General Shareholders' Meeting.

On March 30, 2016, the Shareholders' Meeting of Dongbu Steel approved the write-off of its existing shares to comply with the restructuring plan approved by the 2nd DSCFIC meeting.

On May 9, 2016, Dongbu Steel increased its capital by KRW 200 billion by a debt-to-equity conversion to comply with the restructuring plan approved by the 2nd DSCFIC meeting.

On August 22, 2016, because sales of Dongbu Steel's common shares acquired in the debt-to-equity swaps on February 16, 2015 and May 9, 2016 were restricted until December 31,

Filed By: bmills@mmmlaw.com, Filed Date: 12/3/20 12:37 PM, Submission Status: Approved

2018, the trade volume of Dongbu Steel's shares on the Korea Stock Exchange had decreased significantly.  Therefore, to increase the trade volume for share price stabilization, the DSCFIC held the 4th DBCFIC Meeting and approved the following (*see* **Exhibit B-13**):

1)     Removal of restriction of sales for 2,650,000 shares which were issued by the debt-to-equity swap of KRW 53 billion in February 16, 2015.

2)     Sales of the shares shall be made on a consolidated negotiation basis by block sales rather than individual sales.

From September 20, 2016, KDB, NHB and other banks in DSCFIC started to sell their Dongbu Steel's shares on Korea Stock Exchange.

On November 12, 2017, the BOD Meeting of Dongbu Steel approved the disposition of 3,452,905 shares of Dongbu Securities at KRW 13.6 billion to comply with self-restructuring under the Business Normalization Plan.

In addition, Article 12 of the Agreement for Compliance of Business Normalization Plan (*see* **Exhibit B-10**) requires the KDB, a principal bank of the DBCFIC, to periodically evaluate and inspect whether to continue the work-out of Dongbu Steel and the possibility for normalization of management.  For this purpose, PWC, an accounting firm, was appointed to inspect the compliance of Business Normalization Plan and to assess the possibility of Dongbu Steel's business normalization.  According to PWC's December 2017 Compliance Review Report of Business Normalization Plan of Dongbu Steel ("Review Report") provided in **Exhibit B-14**, the going-concern value of the company (KRW **[**

**]**).  Accordingly, a **[**

**]** recovery ratio for liquidation.

However, because of the failure of the sale of hot-rolled steel facilities, Dongbu Steel was expected to face designation of administrative issue, where at least 50 percent of the capital stock

33

was impaired as of the end of 2017, and the de-listing of Dongbu Steel's shares from the Korea Stock Exchange in 2018, where at least 50 percent of the capital stock was impaired during two consecutive years.  In order to prevent the company from weakening its operating power through the prevention of designation of administrative issue and maintaining listing, and to improve the M&A opportunity by improving its financial structure, it was deemed necessary to convert debt to equity.

Accordingly, the DSCFIC held the 5th DBCFIC Meeting on December 28, 2017 and approved the following:

- Shares held by DBCFIC and Dongbu Steel (treasury stocks):  write-off of 2 existing shares for 1 new share.

- Debt-to-equity swap of 200 billion KRW (total amount of financial liabilities subject to debt-to-equity swap)

- Total amount of allotment for debt-to-equity swap divided proportionally according to the creditors' existing unsecured debt amounts (calculated based on November 30, 2017)

- Date and method for debt-to-equity swap:

  o Conversion price of 15 thousand KRW per share

  o For the debt to be converted to equity, exemption of the interest accrued after Voting Rights and Restructuring Resolution made on December 28, 2017;

  o Applicable financial liabilities, debentures, unsecured bonds, refunding bonds, and L/C (Usance).

See **Exhibit B-15**; *see also* **Exhibit 12-A** (Dongbu Steel's 2018 unconsolidated financial statements at Note 38 for the amount of financial liabilities due for debt-to-equity swap).

On March 28, 2018, the Shareholders' Meeting of Dongbu Steel approved the write-off of its existing shares to comply with the restructuring plan approved by the 5th DSCFIC meeting and the issuance of new stocks took place on April 3, 2018.

34

Because of the upcoming maturity date and termination date of the extension period for repayment of the restructured loans of December 31, 2018, the KDB appointed PWC to evaluate and inspect whether Dongbu Steel could meet the workout graduation requirement by the maturity date.  According to PWC's December 2018 Feasibility Review Report on Continuation of Workout Program and Compliance of Business Normalization Plan of Dongbu Steel ("Feasibility Report") provided in **Exhibit B-16**, Dongbu Steel could not meet the workout graduation requirement, but the going-concern value of the company (KRW [

]).  Thus, a

[                                                                                                    ]

recovery ratio for liquidation.

Therefore, the DSCFIC held the 6th DBCFIC Meeting on December 20, 2018 and approved the following:

1) Confirmation of credit amount and voting rights thereon based on credit amount as of November 30, 2018.

2) Extension of loan maturity until December 31, 2020, with no other changes to the terms of the loans.

3) Amendment of the Agreement for Compliance of Business Normalization Plan with the KDB and DSCFIC.

The Minutes of the 6th DBCFIC Meeting and Amended Agreement are provided in **Exhibit B-17**.

According to Article 3 of the Amended Agreement (**Exhibit B-17**), the DBCFIC and Dongbu Steel agreed to proceed with the business normalization process through a merger and acquisition ("M&A").  The terms and conditions of the M&A were subject to the final approval of the DBCFIC.  To proceed with the M&A, it was necessary for the KDB, a main creditor bank, and Dongbu to appoint financial advisory companies.  In this regard, the KDB and Dongbu Steel

35

appointed Credit Suisse Securities (Europe) Limited, Seoul Branch, and the KDB M&A

Consulting Team as a co-financial advisors on January 4, 2019.

It should be noted that KDB M&A Consulting Team provides financial advisory and

M&A services to domestic and overseas companies, while also arranging financing for corporate

clients to enable them to secure necessary funding and improve their capital structures.  Also, the

KDB provides M&A advisory services to companies within its restructuring portfolio.  To

remove any conflict of interest, Articles 44 and 45 of the Financial Investment Services and

Capital Markets Act, as provided in **Exhibit B-18**, should be strictly applied.

The co-financial advisors decided to use an open bidding process and issued a public

notice announcement for the attraction of investment on January 7, 2019 as provided in **Exhibit

B-19**.  For the potential investors that submitted the confidentiality agreement, a preliminary

bidding guide (**Exhibit B-20**) and a teaser memorandum (**Exhibit B-21**) containing private and

confidential information of Dongbu were provided to assist the recipient in making a decision on

whether to pursue a further analysis of Dongbu in connection with the transaction.

In the response to the invitation, **[      ]** potential investors signed and submitted the

confidentiality agreements as listed in **Exhibit B-22**.  Among them, the following three

companies submitted preliminary bids to the co-financial advisors.

| Investor Name | Investment Amount | Initial Bidding Proposal |
|---|---|---|
| KG Consortium | More than KRW **[      ]** billion | **Exhibit B-23** |
| **[** | **]** | |
| **[** | **]** | |

The co-financial advisors evaluated the proposed investment amount, financial and

business plans, and capacity to close the deal proposed in the preliminary bidding and decided to

give an opportunity to participate in the final bidding process to all three preliminary bidders as

36

provided in **Exhibit B-24**.  Then, the KG Consortium appointed Ernst & Young, an independent accounting firm, to perform the financial due diligence to analyze the financial situation as shown in **Exhibit B-25**.

Based on the financial and legal due diligence and the feasibility study, the KG Consortium prepared its business restructuring plan which included the shutdown of the Incheon Plant and concentration on the Dangjin Plant.  Then, the KG Consortium submitted its final bidding proposal based on the following terms on March 4, 2019 as shown in **Exhibit B-26**.

- Investment amount by acquisition of newly issued shares:  KRW **[        ]** Billion.

- Minimum shareholding ratio after debt-to-equity conversion and issuance of new shares:  **[        ]**

- Minimum debt-to-equity conversion:  KRW **[        ]** Billion.

- Reduction of interest rate and extension of maturity of outstanding debts.

The other two companies gave up and did not submit final bidding proposals because the preliminary KG bid investment amount was too high to compete with.  Accordingly, the KDB and the KG Consortium negotiated the above terms as follows.

| Description | Final Bidding Proposal (Exhibit B-26) | Co-Financial Advisors Reply (Exhibit B-27) | KG Consortium Counteroffer (Exhibit B-28) | Contract Terms |
|---|---|---|---|---|
| Investment Amount | [ | | | ] |
| Shareholding Ratio | [ | | | ] |
| Debt-Equity Conversion | [ | | ] | KRW 605 billion |
| Interest Rate Reduction | [ | | ] | 2.0% |
| Extension of maturity | [ | | ] | Dec. 31, 2025 |

37

| Restriction of stock sales<br>-   KG Group<br>-   Cactus PE | [ | | | ] |
|---|---|---|---|---|

To evaluate whether the above investment proposal was the best way to maximize the company value and recovery ratio of the outstanding debt of Dongbu, the KDB appointed PWC to evaluate the possible alternatives as provided in **Exhibit B-29**.[9]

| Description | Valuation Amount |
|---|---|
| (Scenario 1)<br>•   Maintaining current structure without M&A<br>•   Debt-Equity Conversion of [                    ] (Note) | [                    ] |
| (Scenario 2)<br>•   Maintaining current structure without M&A<br>•   Shutdown of Incheon Plant and relocation to Dangjin Plant by additional financing of [               ] by DBCFIC<br>•   Debt-Equity Conversion of [            ] (Note) | [                    ] |
| (Scenario 3)<br>•   Debt-Equity Conversion of [                    ]<br>•   Issuance of new shares of [            ] and repayment of loans of [            ] | [                    ] |
| (Scenario 4)<br>•   Liquidation | [                    ] |

(Note) Dongbu Steel was expected to face designation of administrative issue, where at least 50 percent of the capital stock was impaired as of the end of 2019, and the de-listing of Dongbu Steel's shares from the Korea Stock Exchange in 2020, where at least 50 percent of the capital stock was impaired during two consecutive years.  In order to prevent the company from weakening its operating power through the prevention of designation of administrative issue and maintaining listing, debt-to-equity conversion of [     ] is needed.

As shown above, the going-concern value (Scenario 3) was the highest among the four alternatives and the DBCFIC could receive early repayment of [                    ], and remove the uncertainty of management risk and the need for additional financing to Dongbu.  Based on

---

[9]  Although the PWC Report on PDF page 3 indicates that it is a draft and not a final report, the draft became the final report as there were no revisions.

Filed By: bmills@mmmlaw.com, Filed Date: 12/3/20 12:37 PM, Submission Status: Approved

the above, the DSCFIC held the 7th DBCFIC Meeting on June 4, 2019 and approved the

following:

1) Confirmation of the credit amount and voting rights thereon based on the credit amount as of February 28, 2019.

2) Approval of the M&A Investment Agreement of KRW 360 billion from the KG Consortium.

3) Restructuring of outstanding debts:

- Debt-to-equity conversion of KRW 605 billion
- Extension of maturity until December 31, 2025.
- Interest rate on outstanding loans (secured and unsecured):  2% per annum
- Early repayment of KRW 120 billion from new loans provided by the approval of the 3rd DSCBC Meeting by December 31. 2019.
- Cancellation of unused new loans of KRW 50 billion.

4) Graduation from the CRPA program by the DBCFIC.

The Minutes of the 7th DBCFIC Meeting and the Amended Agreement are provided in

**Exhibit B-30**.  As shown in the 4th agenda item, any dissenting creditors may exercise their opt-

out option and sell their credits to other assenting creditors at the liquidation value of secured and

unsecured loans as calculated by PWC report in **Exhibit B-29**.  However, no creditors chose the

opt-out option but instead approved the four agenda items on June 4, 2019 as shown in **Exhibit**

**B-31**.

Because the KG Consortium fully paid its investment amount and registered the capital

increase to Dongbu's court register, the KDB officially notified Dongbu Steel's graduation from

the CRPA program by DBCFIC on September 6, 2019 as provided in **Exhibit B-32**.

Furthermore, because the financial situation of Dongbu Steel was improved significantly

by the fresh capital investment from the KG Consortium, Dongbu Steel and each creditor bank

amended their loan agreements on September 6, 2019 for the outstanding loans to adjust the

interest rate and to extend the maturity date, with the amended terms becoming effective from September 7, 2019.

**4.      Please explain the type of assistance provided to your company under the debt restructuring such as gains from debt-to-equity swaps, loans, import L/C (Usance), benefits related to debentures, etc.**

<u>**ANSWER:**</u>    As fully explained above, Dongbu Steel received debt restructuring assistance under the CBCA and CRPA program**s** that are subject to this review.  However, Dongbu Steel notes that the Department determined in the first review that the 2015 and 2016 debt-to-equity swaps did not provide countervailable assistance and should reach the same conclusion in this review.  The 2019 debt-to-equity swap, which also occurred under the CRPA, followed the same procedures and should result in a similar finding by the Department that it did not provide countervailable assistance.

As discussed above, because the DSCFIC took over duties and responsibilities agreed by the resolutions approved by the DSCBC, the type of debt restructuring in the CRPA program was the same as that of CBCA program.  Furthermore, it should be noted that no additional new loans were provided to Dongbu Steel because of the change of the programs from the CBCA to the CRPA.

As explained above, because the KG Consortium fully paid its investment amount and registered the capital increase to Dongbu's court register, the KDB officially notified the graduation from the CRPA workout program by the DBCFIC on September 6, 2019 as provided in **Exhibit B-32**.

**5.      For the dates and amounts for each type of assistance provide under the debt restructuring.**

<u>**ANSWER:**</u>    The date and amounts for each type of assistance provided under the debt restructuring subject to this review is as follows:

40

**1st Debt Restructuring**

1)   Interest rate reduction

Reduced interest rate (3% for secured loans and 1% for unsecured loans) shall be applied for loans from creditor banks from the DSCBC from July 1, 2014.  In the case of refinanced corporate bonds from the creditor banks, reduced interest rate shall be applied from notification date of the approval of the 3rd DSCBC meeting.

For commissions for L/C opening and underwriting and D/A, mutually agreed commission rate shall be applied but those commissions cannot exceed 0.2% for L/C opening, 0.3% for L/C underwriting and 3 Month Libor+2.6% for D/A financing from notification date of the approval of the 3rd DSCBC meeting.

2)   Additional loans

(Unit:  Million KRW; thousand U.S. dollars)

| Creditor Banks | Total | General Loan | | LC (Usance) | Payment Date | |
|---|---|---|---|---|---|---|
| | | 2nd Meeting | 3rd Meeting | 3rd Meeting | 29-Jul-14 | 24-Oct-14 |
| [ | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | ] |
| **Total** | **660,000** | **160,000** | **500,000** | **100,000** | **160,000** | **200,000** |

As shown above, for additional loans approved by the 2nd DSCBC meeting, KRW 160 billion of new loans was provided to Dongbu Steel on July 29, 2014 (July 25 in the case of the KDB).  However, for additional general loans and L/C (usance) credit approved by the 3rd DSCBC meeting, KRW 200 billion was provided in 2014 and a credit ceiling of L/C (usance) of US $100 million was given to Dongbu Steel.  Of the remaining KRW 300 billion of general loans approved at 3rd DSCBC meeting, KRW 250 billion was provided in 2015. The remaining unused loan commitment of KRW 50 billion for general loans was cancelled under the terms of the 4th debt restructuring.

41

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

For the new general loans, the mutually agreed interest rate would be applied until the notification date of the approval of the 3rd DSCBC meeting and the 5% interest rate were applied thereafter.  In addition, for the L/C opening and underwriting commission for the new L/C (usance) credit ceiling, the commission rate shall not exceed 0.2% for L/C opening and 0.3% per quarter for L/C underwriting.

3)  Debt-to-Equity Conversion

Upon approval of the debt-to-equity conversion by the 3rd DSCBC meeting, Dongbu Steel performed the following in accordance with the Commercial Code:

(1)  On November 25, 2014, the BOD meeting of Dongbu Steel determined the write-off of existing shares and called for a shareholders meeting to receive approval.

(2)  On January 7, 2015, an extraordinary shareholders meeting approved the write-off of shares as follows.

- Major shareholders and their related parties:  100 existing shares to 1 new share.
- Other shareholders:  4 existing shares to 1 new share.

(3)  On February 12, 2015, the BOD meeting of Dongbu Steel determined to issue 10,600,000 new common shares at par value (KRW 5,000 per share).

However, the issuance price was changed from KRW 5,000 to KRW 5,711 based on the market price traded on the Korea Stock Exchange and the write-off ratio as follows:

(A)  Market price in Korea Stock Exchange on the agreement date for Compliance of Business Normalization Plan (October 22, 2014):
    ⇨ KRW 1,865 per share.
(B)  Number of common shares before write off = 60,649,364 shares.
(C)  Number of common shares after write off = 9,400,488 shares.
(D)  Number of newly issued shares = 10,600,000 shares.
(E)  Issuance price of new shares (A) x (B) / (C+D) = KRW 5,711 per share.

Filed By: bmills@mmmlaw.com, Filed Date: 12/3/20 12:37 PM, Submission Status: Approved

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**2nd Debt Restructuring**

As fully discussed above, after the CBCA program was changed to CRPA program to include non-bank financial institutions, the following financial assistance in addition to the above was provided.

1)    Interest rate reduction.

Interest rate for new loans already provided in the CBCA was reduced from 5% to 3% from March 14, 2016 according to the approval of the 2nd DSCFIC Meeting.

2)    Debt-to-equity conversion.

Upon approval of the debt-to-equity conversion by the 2nd DSCFIC Meeting, Dongbu performed the following in accordance with the Commercial Code:

(1)    On March 15, 2016, the BOD meeting of Dongbu Steel determined the write-off of existing shares from 4 to 1 share and called for a general shareholders meeting to receive approval.

(2)    On March 30, 2016, a general shareholders' meeting approved the write-off of 4 old existing shares to 1 new share.

(3)    On May 9, 2016, the BOD meeting of Dongbu Steel determined to issue 20,000,000 new common shares at par value (KRW 10,000 per share).

The issuance price was determined based on market price traded in Korea Stock Exchange as follows:

(A)    Average market price in Korea Stock Exchange before the 2nd DSCFIC Meeting = KRW 2,500 per share.

(B)    Write-off ratio of existing shares:  4 existing shares to 1 new share.

(C)    Issuance price of new shares (A) x (B) = KRW 10,000 per share.

**3rd Debt Restructuring**

In addition, as explained above, the 5th DSCFIC Meeting held on December 28, 2017 approved the extension of the due date for repayment of loans, a 2 for 1 write-off of existing shares, and a debt-to-equity conversion of KRW 200 billion.  Upon approval of the debt-to-

43

equity conversion by the 5th DSCFIC Meeting, Dongbu performed the following in accordance with the Commercial Code:

(1)    On December 28, 2017, the BOD meeting of Dongbu Steel determined the write-off of 2 existing shares for 1 new share, the conversion of KRW 200 billion of Dongbu's debt to equity, and called for a general shareholders meeting to receive approval.

(2)    On February 27, 2018, a general shareholders' meeting approved the write-off of 2 old existing shares to 1 new share and the issuance of new common shares based on a debt-to-equity swap.

(3)    On April 3, 2018, Dongbu Steel issued 13,333,333 new common shares at par value (KRW 15,000 per share).

(4)    Extension of the due date for repayment of loans from December 31, 2018 to December 31, 2020.

The issuance price was determined based on market price traded in Korea Stock Exchange as follows:

(A)    Closing Market price in Korea Stock Exchange on December 27, 2017 one day before the 5nd DSCFIC Meeting = KRW 7,350 per share.

(B)    Write-off ratio of existing shares:  2 existing shares to 1 new share.

(C)    Issuance price of new shares (A) x (B) = KRW 15,000 per share.

### 4th Debt Restructuring

First of all, it should be noted that the 4th debt restructuring had one major difference from the prior debt restructurings.  With the 4th debt restructuring, not only was there a debt-to-equity swap and revisions of the terms of the outstanding debt as occurred in the prior debt restructurings, the 4th debt restructuring occurred in conjunction with an M&A transaction that transpired through an open bidding process to induce substantial new capital investment from private companies and which significantly changed the ownership structure of Dongbu Steel.

As explained above, the DBCFIC provided the first three phases of debt restructuring to maximize its recovery of outstanding debts because the going-concern value after debt

44

restructuring was significantly higher than the liquidation value.  However, the DBCFIC realized that financial improvement was slower than expected because of management inefficiency and conservative management caused by the involvement of the DBCFIC.  To improve the management efficiency and reduce business uncertainty, the DBCFIC and Dongbu agreed to induce capital investment by the transfer of majority ownership of Dongbu to private investors through an open bidding process.

Therefore, the 4th debt restructuring was made as part of a public bidding procedure and negotiation with private bidders to induce capital investment as explained in the response to Question 3 above.  Thus, all restructuring terms and conditions were made as pre-conditions to receiving the capital investment of KRW 360 billion from the KG Consortium.  In this regard, the following debt restructuring was made.

1)  Interest rate reduction

- Interest rate of secured and unsecured loans from the DBCFIC was reduced from 3% to 2% per annum.  In addition, for the L/C opening and underwriting fee rate for L/C (usance) credit and payment guarantee fee is 0.5% per annum.

2)  Extension of maturity date

- Repayment date of outstanding loans was extended from December 31, 2020 to December 31, 2025 with the early repayment of KRW 120 billion of the new loans and the cancellation of the unused loan commitment of KRW 50 billion of new loans.

3)  Debt-to-equity conversion

Upon approval of the debt-to-equity conversion by the 7th DSCFIC Meeting, Dongbu performed the following in accordance with the Commercial Code:

(1)  On June 12, 2019, the Board of Directors meeting of Dongbu Steel determined a write-off of existing shares from 8.5 shares to 1 share for shares held by the DSCFIC members and from 3 shares to 1 share for shares held by other minority shareholders including treasury stock and called for a general shareholders meeting to receive approval.

Initially, Dongbu Steel planned to issue 121 million new shares at KRW 5,000 per share to the DSCFIC members in a debt-to-equity conversion of KRW 605

45

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

billion.  Then, to meet the shareholding ratio requirement (72%) of the KG Consortium after its investment, Dongbu Steel would execute a 5 to 1 reverse split of the 121 million newly issued shares.

Instead of the two-step process, the BOD Meeting of Dongbu Steel approved the issuance of 24.2 million shares to the DBCFIC at KRW 25,000 per share and 72 million shares to the KG Consortium as a short cut to minimize the legal processing time.

The translated Minutes of BOD is provided in **Exhibit B-33**.

(2)     On July 30, 2019, a general shareholders' meeting approved the write-off existing shares as shown in **Exhibit B-34**.

(3)     On August 28, 2019, the Board of Directors meeting of Dongbu Steel determined to issue 72,000,000 new common shares at a par value (KRW 5,000 per share) to the KG Consortium.

As a result of the above, shareholding ratios of Dongbu Steel's shareholders changed as

follows.

| Shareholder | Before | New Shares | After | Ratio (%) |
|---|---|---|---|---|
| KG Consortium | 0 | 72,000,000 | 72,000,000 | 72.0% |
| DBCFIC | 2,874,000 | 24,200,000 | 27,074,000 | 27.1% |
| Other Minorities | 988,000 | 0 | 988,000 | 0.9% |
| **Total** | **3,862,000** | **96,200,000** | **100,062,000** | **100.0%** |

To secure the shareholding ratio of 72.0% by issuance of 72,000,000 shares at par value

(KRW 5,000), the DBCFIC had to issue 24,200,000 shares at KRW 25,000 per share by debt-to-

equity conversion of KRW 605 billion.

**6.     Please provide the exact amount of debt, both secured and unsecured, held directly by or by a GOK-owned or controlled entity:**

**a.  Before the debt-to-equity conversions in 2014**
**b.  After the 2014 debt-to-equity conversions.**

**ANSWER:**     As fully explained in the response to Question 5 above, there have been

four debt-to-equity conversions.  For these debt-to-equity conversions, the amount converted by

46

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

each creditor financial institution was determined based on the ratio of its unsecured loans

outstanding on the resolution date of the DSCBC or DSCFIC Meetings as follows:

1.    KRW 53 Billion Conversion in February 2015.

(Unit: Million KRW)

| Bank Name | Main Credits (A) | Credits Excluded from D/E Swap | | | Credits Subject to D/E Swap | D/E Swap Allocation Ratio (%) | D/E Swap Amount |
|---|---|---|---|---|---|---|---|
| | | Secured | Refinancing | Total (B) | | | |
| [ | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | ] |
| **Total** | **1,950,461** | **1,004,037** | **83,800** | **1,087,837** | **862,624** | **100.00%** | **53,000** |

(Note) KDB and KoFC were merged on January 1, 2015.

2.    KRW 200 Billion Conversion on May 9, 2016.

(Unit: Million KRW)

| Creditor Financial Institutiuon | Total Credit | Credits excluded from D/E SWAP | | | | Credit subject to D/E SWAP | D/E SWAP Allocation Ratio(%) | D/E SWAP Amount |
|---|---|---|---|---|---|---|---|---|
| | | Secured Loans | Refinancing | New loans | Total | | | |
| [ | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | ] |
| **Total** | 2,664,581 | 860,165 | 348,727 | 676,405 | 1,885,297 | 779,284 | 100.00% | 200,000 |

Filed By: bmills@mmmlaw.com, Filed Date: 12/3/20 12:37 PM, Submission Status: Approved

3)     KRW 200 Billion Conversion on April 3, 2018.

(Unit:  Million KRW)

| Bank Name | Main Credits (A) | Credits Excluded from D/E Swap | | | Credits Subject to D/E Swap | D/E Swap Allocation Ratio (%) | D/E Swap Amount |
|---|---|---|---|---|---|---|---|
| | | Secured | Refinancing | Total (B) | | | |
| [ | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | ] |
| **Total** | **2,338,548** | **666,802** | **906,380** | **1,573,182** | **716,199** | **100.00%** | **200,000** |

(*) WHB represents [                                    ], a private entity that became a Dongbu Steel creditor by the acquisition of convertible bonds owned by Woori Bank.

Among the above various creditor financial institutions involved in the 2018 debt-to-equity swap, KDB, KEXIM, and KODIT, are majority owned by government-owned or controlled entities.

4)     KRW 605 Billion Conversion on August 31, 2019.

(Unit:  Million KRW)

| Bank Name | Main Credits (A) | Credits Excluded from D/E Swap | | | Credits Subject to D/E Swap | D/E Swap Allocation Ratio (%) | D/E Swap Amount |
|---|---|---|---|---|---|---|---|
| | | Secured | Performance Guarantee | Total (B) | | | |
| [ | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

48

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | ] |
| **Total** | **2,142,633** | **746,017** | **12,869** | **758,886** | **1,383,747** | **100.00%** | **605,000** |

In addition, the amounts of debt converted to equity are identified by financial institution in the long-term loan and bond templates provided in **Exhibit B-35** as well as in **Exhibits A-2** and **A-3**.  A summary chart of the debt converted to equity in the 4th debt restructuring is provided in **Exhibit B-36**.

Dongbu Steel has prepared loan charts for its restructured loans that were outstanding during the POR in **Exhibit B-35**, which consists of three files:  long-term KRW loans, long-term KRW bonds, and an overdraft line of credit.  Prior to the 4th debt restructuring, these loans and bonds had a maturity date of December 31, 2020 based on the loan terms established by the 3rd debt restructuring.  For the loan and bond balances that were not converted to equity, the maturity date was extended until December 31, 2025 and interest rates were adjusted to 2 percent under the terms of the 4th debt restructuring.  As indicted in these loan charts, the interest payments subject to the revised terms are identified by the new date of maturity and the revised interest rate which became effective on September 7, 2019 according to the amended loan agreements between Dongbu Steel and each creditor bank on September 6, 2019.

In addition, for the outstanding balances of the long-term loans and bonds, interest payments were exempted between June 4 and August 30, 2019.  However, in some instances, interest for this period was initially paid and subsequently refunded.  The long-term loan and bond charts identify the amounts of refunds received, as well as the net interest paid for all loans during this period whether it was paid and refunded or exempted at the time interest payments overlapping that period were made.

      **7.**      **According to petitioners, on December 22, 2014, Dongbu's financial liabilities to the Creditors' Association and other creditors due for debt-to-equity swap**

49

were finalized, resulting in significant gains from debt adjustment.[10]  If the debt-to-equity swaps were preapproved by a shareholders'' vote, creditors' council, or any other board or committee, please identify the date and party that approved the swaps.  Please identify any members of the committee who are officials of the GOK or of GOK-owned entities.

**ANSWER:**    As fully explained in the response to Question 5 above, the board of directors and shareholders meeting of Dongbu Steel and DSCBC were involved in the approval process of debt-to-equity swap.

### KRW 53 Billion Conversion in February 2015

1)    Members of Dongbu Steel's BOD

| November 25, 2014 | | February 12, 2015 | |
|---|---|---|---|
| **Name** | **Position** | **Name** | **Position** |
| [ | President | [ | President |
| | Outside Director | | Outside Director |
| | Outside Director | | Outside Director |
| | Outside Director | | Outside Director |
| | Outside Director | | Outside Director |
| ] | Outside Director | ] | Outside Director |

2)    List of major shareholders as of January 7, 2015

| Name of Shareholder | Number of Shares | Ratio (%) | Relationship |
|---|---|---|---|
| Namho Kim | 4,670,338 | 7.39% | Kim's family |
| [ | | | |
| | | | ] |
| Dongbu CNI | 7,100,785 | 11.23% | Dongbu Group company |
| Dongbu Corporation Co., Ltd. | 4,499,552 | 7.12% | Dongbu Group company |
| [ | | | |
| | | | ] |
| Minority shareholders | 38,072,995 | 60.23% | |
| **Total** | **63,214,714** | **100.00%** | |

---

[10]  *Id.*

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

3)    List of creditor banks of DSCBC

| Name of Bank | Voting Rights | Name of Main Shareholders (5% or more) |
|---|---|---|
| [ | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | ] |
| **Total** | **100.00%** | |

(Note) KDB and KoFC were merged on January 1, 2015.

## KRW 200 Billion Conversion in May 9, 2016

1)    Members of Dongbu Steel's BOD

| March 15, 2016 | | May 9, 2016 | |
|---|---|---|---|
| Name | Position | Name | Position |
| [ | President | [ | President |
| | Vice President | | Vice President |
| | Outside Director | | Outside Director |
| | Outside Director | | Outside Director |
| | Outside Director | | Outside Director |
| ] | Outside Director | ] | Outside Director |

2)    List of major shareholders as of March 30, 2016

| Name of Shareholder | Number of Shares | Ratio (%) | Relationship |
|---|---|---|---|
| KDB | 9,511,959 | 37.81% | DSCFIC |
| NH Bank | 3,763,429 | 14.96% | DSCFIC |
| KEXIM | 3,757,440 | 14.93% | DSCFIC |
| Shinhan Bank | 2,395,740 | 9.52% | DSCFIC |
| Hana Bank | 2,093,809 | 8.32% | DSCFIC |
| [ | | | ] |
| Other Minorities | 3,123,756 | 12.42% | |
| **Total** | **25,160,456** | **100.00%** | |

Filed By: bmills@mmmlaw.com, Filed Date: 12/3/20 12:37 PM, Submission Status: Approved

3)    List of creditor banks of DSCBC as of March 14, 2016

| Name of Bank | Voting Right | Name of Main Shareholders (5% or more) |
|---|---|---|
| [ | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | ] |
| **Total** | **100.00%** | |

(Note) KDB and KoFC were merged on January 1, 2015.

## KRW 200 Billion Conversion in April 3, 2018

1)    Members of Dongbu Steel's BOD

| December 28, 2017 | | April 3, 2018 | |
|---|---|---|---|
| Name | Position | Name | Position |
| [ | President | [ | President |
| | Vice President | | Vice President |
| | Outside Director | | Outside Director |
| | Outside Director | | Outside Director |
| | Outside Director | | Outside Director |
| ] | Outside Director | ] | Outside Director |

2)    List of major shareholders as of December 31, 2017

| Name of Shareholder | Number of Shares | Ratio (%) | Relationship |
|---|---|---|---|
| KDB | 9,330,034 | 37.08% | DSCFIC |
| NH Bank | 3,697,937 | 14.70% | DSCFIC |
| KEXIM | 3,721,282 | 14.79% | DSCFIC |
| Shinhan Bank | 2,359,582 | 9.38% | DSCFIC |
| Hana Bank | 2,061,860 | 8.19% | DSCFIC |
| Other Minorities | 3,989,762 | 15.86% | |
| **Total** | **25,160,457** | **100.00%** | |

52

3)    List of creditor banks of DSCBC as of April 3, 2018

| Name of Bank | Voting Right | Name of Main Shareholders (5% or more) |
|---|---|---|
| [ | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | ] |
| **Total** | **100.00%** | |

**KRW 200 Billion Conversion in August 30,2019.**

1)    Members of Dongbu Steel's BOD

| June 12, 2019 | | August 30, 2019 | |
|---|---|---|---|
| **Name** | **Position** | **Name** | **Position** |
| [ | President | [ | President |
| | Vice President | | Vice President |
| | Outside Director | | Outside Director |
| | Outside Director | | Outside Director |
| | Outside Director | | Outside Director |
| ] | Outside Director | ] | Outside Director |

2)    List of major shareholders as of March 31, 2019

| Name of Shareholder | Number of Shares | Ratio (%) | Relationship |
|---|---|---|---|
| KDB | 10,728,950 | 39.17% | DSCFIC |
| NH Bank | 4,080,701 | 14.90% | DSCFIC |
| KEXIM | 3,719,308 | 13.58% | DSCFIC |
| Shinhan Bank | 2,330,391 | 8.51% | DSCFIC |
| Hana Bank | 2,340,797 | 8.55% | DSCFIC |
| Other Minority Shareholders | 4,190,433 | 15.29% | |
| **Total** | **27,390,580** | **100.00%** | |

53

3)    List of creditor banks of DSCBC as of March 31, 2019.

| Name of Bank | Voting Right | Name of Main Shareholders (5% or more) |
|---|---|---|
| [ | | |
| | ____ | ____ |
| | ____ | ____ |
| | ____ | ____ |
| | ____ | ____ |
| | ____ | ____ |
| | ____ | ____ |
| | ____ | ____ |
| | ____ | ____ |
| | ____ | |
| | ____ | ] |
| **Total** | **100.00%** | |

As shown above, there were no officials of the GOK or entities owned by the GOK on Dongbu Steel's BOD and no GOK shareholders of Dongbu Steel. However, among the above various creditor financial institutions at the time of the 2019 debt-to-equity conversion the KDB, KEXIM, KODIT, and CBSF were majority owned by government-owned or controlled entities. NH Bank, Shinhan Bank, Hana Bank, Woori Bank, and K-Saving are majority privately-owned financial institutions. Finally, since several of Dongbu Steel's creditors that converted debt to equity are private entities (*e.g.*, [                                        ]), the amount of their debt converted to equity should not be considered a countervailable benefit.

8.    **How much of KG Dongbu's outstanding debt was converted to equity? Please identify all creditors who became shareholders as a result of the debt-to-equity swap, the amount of debt each creditor converted, whether the debt was secured or unsecured, and the number of shares held by each creditor before and after the swap.**

**ANSWER:**    As explained in the response to Questions 3 and 5 above, during the AUL period the 3rd DSCBC meeting approved the 2015 KRW 53 billion, the 2nd DSCFIC approved the 2016 KRW 200 billion debt-to-equity swaps, and the 5th DBCFIC approved the 2018 KRW 200 billion debt-to-equity swaps. Furthermore, the 7th DBCFIC Meeting held on June 4, 2019

54

approved the write-off of existing shares and the debt-to-equity conversion of KRW 605 billion, which was executed during the POR.  The swap amounts were allocated based on each creditor's unsecured loan amount as a percentage of the total unsecured loan amount, excluding the refinancing amount for corporate bonds and additional loans minus the secured loan amounts. For the calculation of debt-to-equity swap amount, please refer to the response to Question 6 above.

It should be noted that the creditor financial institutions of the DSCBC and the DSCFIC did not own any shares of Dongbu Steel before the first debt-equity swap.  Consequently, the number of shares held by each creditor bank after the swaps was solely the result of the debt-to-equity swaps.

**9.    Please explain whether the debt was converted for shares at face value or at the secondary market price at which the GOK purchased it.**

**ANSWER:**    As fully explained in the response to Question 5 above regarding the first debt-to-equity swap, the 3rd meeting of the DSCBC approved the issuance price of new shares at a par value (KRW 5,000 per share), and to reflect the market value on the Korea Stock Exchange, the issuance price was adjusted to KRW 5,712 per share after consideration of the market price on October 22, 2014 and the write-off ratio of existing shares.  For the second debt-to-equity swap, the 2nd meeting of the DSCFIC determined the issuance price of KRW 10,000 per share based on market value traded on the Korea Stock Exchange after adjustment for the write-off ratio for existing shares.  For the third debt-to-equity swap, the 5th meeting of the DSCFIC approved an issuance price of KRW 15,000 per share based on market value traded on the Korea Stock Exchange after adjustment for the write-off ratio for existing shares.

However, for the 4th debt-to-equity swap, which occurred during the POR, the 7th meeting of the DSCFIC approved a final issuance price of KRW 25,000 per share for the 24.2 million

55

new shares issued as a result of the DBCFIC members debt-to-equity conversions and the issuance of 72,000,000 shares at par value (KRW 5,000) to meet a shareholding ratio of 72.0 percent for the KG Consortium, because this ratio was a pre-condition to induce the capital investment of KRW 360 billion from the KG Consortium as fully explained in the response to Question 5.

**10.     Did these conversions involve Dongbu's existing shares or the issuance of new shares?  Please explain whether any creditors were not selected or did not elect to participate in the debt-to-equity conversion.  Did all creditors participate and convert at the same rates?  If not, please provide the rates they converted at and explain why.**

<u>**ANSWER:**</u>     As explained above, the AUL debt-to-equity conversions and the 2019 debt-to-equity conversion were made by the following two-step process:

1)     Write-off of existing shares

2)     Issuance of new shares

All creditor banks of the DSCBC and all creditor financial institutions of the DSCFIC participated in the debt-to-equity swap and converted at the same rate.

**11.     According to petitioners, Dongbu received financial support from the Creditors Association in the form of various loans. Describe the types of loans received and the terms of repayment.**

<u>**ANSWER:**</u>     As fully explained in the response to Question 3 above, Dongbu Steel received bridge loans from the KDB at a commercial interest rate to fill the timing difference until receiving the payment from the disposition of its assets as follows:

(Unit:  Million KRW)

| Date of Loan | Loan Amount | Interest rate | Due Date | Remarks |
|---|---|---|---|---|
| [ | | | | |
| | | | | ] |
| **Total** | [      ] | | | |

56

Because POSCO chose not to purchase DDPT and Dongbu Incheon after its due diligence and valuation process, Dongbu Steel applied for a self-restructuring program under the CBCA as explained above.  Under the restructuring program under the CBCA, the 2nd Meeting of the DSCBC approved new general loans of KRW 160 billion at an interest rate of 6.5% that was provided to Dongbu Steel on July 29, 2014.  However, for additional general loans and L/C (usance) credit approved by the 3rd DSCBC meeting, KRW 200 billion at 5% interest rate was provided in 2014 and a credit ceiling of L/C (usance) of US$100 million at 0.2% commission rate per quarter for L/C opening (0.3% per quarter for LC underwriting) were given to Dongbu Steel.  Of the remaining KRW 300 billion of general loans approved at 3rd DSCBC meeting, KRW 250 billion was provided in 2015, and under the terms of the 4th debt restructuring remaining unused loan commitment of KRW 50 billion for new loans was cancelled.

In addition, Dongbu Steel received corporate bond rollover services as fully explained in the response to Question 3 above.  The comparison table of repaid bonds and newly-issued bonds for refinancing is provided as follows:

(Unit: Million KRW)

| Repaid Corporate Bonds | | | | Refinancing | | | KDB Subscription | | KOFIA (*) | | | | Total Amount |
| | | | | SN | Issuing Date | Int Rate | KoDIT | Creditor Banks | Creditor Banks | CBSF (**) | | | |
| SN | Amount | Int. Rate | Maturity Dat | | | | | | | Amount | Int Rate | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

(*) Korea Financial Investment Association ("KOFIA") is the sole self-regulatory organization of the Korea financial industry. KOFIA is incorporated as a membership organization in accordance with the Financial Investment Service and Capital Markets Act, and has no government ownership.

(**) Corporate Bond Stabilization Fund ("CBSF") was established by fund of KRW 320 billion contributed from Korea Stock Exchange ("KSE"), Korea Securities Depository ("KSD"), Korea Securities Finance Corp. ("KSFC") and five securities companies (KDB Daewoo, Hyundai, Woori, Samsung and Mirae Assets) to stabilize corporate bond market. CBSF takes over 10% of corporate bond refinancing amount as a form of mezzanine securities of which creditors right sits between stocks and bonds such as convertible bonds, BWs, EBs and RCPS. The five securities contributed 50 percent of the funds to the CBSF, and the other 50 percent was contributed by the KSE, KSD, and KSFC.

Out of KRW 436,013 million of corporate bonds, 20% of principal amount (KRW 87,213 million) was paid in cash by Dongbu Steel from its own cash and the remaining 80% (KRW 348,800 million) was refinanced by using the corporate bond rollover program. First, 75% of the newly-issued bonds were subscribed by the KDB and the remaining 25% were subscribed by KOFIA. Then, KDB allocated 80% of its share to the Korea Credit Guarantee Fund ("KoDIT") and the remaining 20% to the creditor banks of Dongbu Steel. KOFIA allocated 60% of its share to the creditor banks of Dongbu Steel and the remaining 40% to

58

CBSF.  In sum, 60% of refinancing amount was taken over by KoDIT, 30% by the creditor banks of Dongbu Steel, and the remaining 10% by CBSF.  For bonds taken over by CBSF, Dongbu Steel issued convertible bonds.

Terms of repayment are two years from the issuance date, and the interest rates are determined by average market interest rate by each credit rating announced by the following three major credit rating companies.

- Korea Asset Pricing Co., Ltd.

- Korea Invertors Service Co., Ltd. (A subsidiary of Moody's)

- National Information & Credit Evaluation Inc. ("NICE")

Because Dongbu Steel applied for the Corporate Voluntary Restructuring Program under the CBCA as explained above, its market interest rates were significantly increased.  Consequently, Dongbu Steel's corporate bond rollover was made according to commercial considerations and does not confer any preferential treatment.  However, as a result of the debt restructuring determinations at the 3rd DSCBC meeting and the 1st DSCFIC meeting, the interest rates were reduced on many of these bonds that are subject to this review.  There was no revision of the interest rates resulting from the 5th DSCFIC meeting, only an extension of the due dates of the loans to December 31, 2020.

As fully explained in the response to Question 3 above, the 7th DSCFIC approved the M&A investment of KRW 360 billion.  To secure the investment, the DSCFIC agreed to accept the pre-conditions proposed by KG Consortium.  In this regard, the interest rate was reduced from 3% to 2% and the maturity dates of outstanding loans were extended from December 31, 2020 to December 31, 2025.  Furthermore, early repayment of KRW 120 billion of the new loans was made on December 31, 2019.

59

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

12.    According to petitioner, KDB is the main creditor of the Dongbu Group and leads the Creditors' Association.[11]  Please describe the Creditors' Association including when it was formed.  Identify all members of the association and any ownership stakes of the GOK in each member.  Please also identify which members are GOK agencies or GOK-owned entities.

**ANSWER:**    The KDB was the main creditor bank of Dongbu Steel because its outstanding credit to Dongbu Steel was the largest among Dongbu Steel's other creditor financial institutions.  As explained in the response to Question 3 above, the DSCBC was formed on July 7, 2014, and the DSCFIC succeeded the DSCBC on October 19, 2015.  Please refer to the response to Question 7 above for the list of members and their ownership information at the time of each of the four debt-to-equity swaps that are subject to this review.

13.    Please explain under which law the Creditors' Association was created. Provide translated sections of the law regarding the responsibilities and powers granted to the Creditors' Association, how decisions are made on the Association, and any reporting requirements to the GOK or any GOK-controlled entity.

**ANSWER:**    As explained above, Dongbu Steel's restructuring was changed from the CBCA program to the CRPA program.  Because the signatories of the CBSA are commercial banks, the governing regulation of the CBSA is the Regulation on Supervision of Banking Business ("the Regulation").

Article 78 (3) of the Regulation prescribes:  "A bank shall operate an internal system for sound credit review and ex post facto management of credit extension so that the changes of credit risk may be evaluated and managed appropriately after extending the credit."  Article 48 (2) of the Detailed Regulations on Supervision of Banking Business ("Detailed Regulation") prescribes as follows:

---

[11]  *See* Petition, Volume V at 54.

60

"(2)    The internal system for the ex post facto management of loans under Article 68 (3) of the Regulation shall include the following.

1.    Constant monitoring of changes in the credit status of borrowers.

2.    Regular adjustment of credit ratings of borrowers via a credit rating system and appropriate measures for the adjusted ratings.

3.    Management of borrowers showing signs of abnormality through the operation of an early warning system.

4.    Determination of whether or not to be enterprises showing signs of insolvency (referring to enterprises deemed difficult to repay borrowings from banks without funds provided by other entities or without other borrowings) through the constant rating of the corporate credit risk and ex post facto measures thereof.

5.    Operation of a credit supervision system for inspecting and correcting the appropriateness of the performance of credit review and ex post facto management affairs.

6.    Guidance for the improvement of business management (workout) of enterprises whose credit rating is below the normal rating.

7.    Reorganization of insolvent enterprises whose rehabilitation is impossible."

As shown above, the Regulation and the Detailed Regulation require a bank to implement its own internal system to enhance the soundness of its credits extended to borrowers.  In case many banks are creditors for enterprises showing signs of insolvency, it would be necessary to establish common rules for the determination under Article 48(2)4 above.  For this purpose, Creditor Bank Committee Operation Agreement ("CBOA") was established as follows.

1)    Signatory creditor banks (Article 2.2)

Commercial Banks approved by Banking Act (including banking business division of National Agricultural Cooperative Federation and National Fishery Cooperative Federation)

Specialized banks (KDB, KEXIM, IBK), Korea Credit Guarantee Fund ("KoDIT"), Korea Technology Finance Corporation ("KIBO"), Korea Trade Insurance Corporation ("KSURE")

61

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

Small & Medium Business Corporation ("SBC")

Korea Asset Management Corporation ("KAMCO")

2)    CBC's Responsibilities (Article 14)

1. Matters related to credit risk evaluation and corporate restructuring method
2. Decision on initiation or continuation/discontinuation of creditor bank management.
3. Decision or extension of suspension period of exercising creditors' right.
4. Entering special agreement for compliance of business normalization plan.
5. Review, evaluation and follow-up of compliance performance of special agreement.
6. Preparation of supporting plan for credit restructuring and additional new loan.
7. Suspension or termination of creditor bank management.
8. Other important matters related to creditor bank management.

3)    CBC's Decision Making.

CBC shall determine matters by agreement of creditors having 75% or higher of credit amount granted to enterprise.  In case one creditor has 75% or higher of credit amount, decision shall be made by agreement by the largest creditor and 40% of creditors in number.

4)    Reporting Requirement to the GOK.

Because CBCA was voluntarily entered by the signatory financial institutions, there is no reporting requirement for matters determined by the CBC to the GOK.

However, for the CRPA program, all creditor financial institutions ("CFIC") prescribed in Article 2(1), such as banks, security companies, savings banks and investment & trust companies, etc., are included in the operation of the CRPA program.  Therefore, the governing law of the CRPA program is Corporate Restructuring Promotion Act as explained in the response to Question 3 above.  It should be noted that roles and responsibilities and decision-making processes of CFIC is similar to those of CBC as described above.

Furthermore, as fully explained in the response to Question 3 above, the CRPA workout program of Dongbu Steel was terminated on September 6, 2019, because the KG Consortium made a capital investment of KRW 360 billion.

62

14. **Please provide a description of the responsibilities and powers granted to the Creditors' Association, how decisions of the Association are made, (i.e., does the amount of debt owned equal to voting power) and any reporting requirements to the GOK or any GOK controlled entity.**

**ANSWER:**    Please refer to the response to Question 13 above.

15. **Provide copies of all laws and regulations governing the restructuring of your company.**

**ANSWER:**    Copies of all the relevant laws and regulations governing Dongbu Steel's restructuring that are subject to this review are provided in the GOK's response.

## C.    INCOME TAX PROGRAMS

**For each of the below programs, please respond to all questions in the *Income Tax Programs Appendix* included in Section III.**

1. **RSTA Article 25(2):  Tax Deductions for Investments in Energy Economizing Facilities**

**DONGBU STEEL'S ANSWER:**    As shown in Dongbu Steel's tax return in **Exhibit 13-A**, Dongbu Steel's taxable income for 2018 was negative, so it did not claim any tax credits or exemptions during the POR.  The tax benefits accumulated were thus carried forward to future years.

**DONGBU INCHEON'S ANSWER:**    As shown in Dongbu Incheon's tax return in **Exhibit 13-B**, Dongbu Steel's taxable income for 2018 was negative so it did not claim any tax credits or exemptions on its tax return filed in 2019.

2. **RSTA 25(3):  Tax Credit for Investment in Environmental and Safety Facilities**

**DONGBU STEEL'S ANSWER:**    As shown in Dongbu Steel's tax return in **Exhibit 13-A**, Dongbu Steel's taxable income for 2018 was negative, so it did not claim any tax credits or exemptions during the POR.  The tax benefits accumulated were thus carried forward to future years.

63

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit 10-A

# Dongbu Steel's Ten Largest Shareholders from 2005 to 2019

Public Version
Ranged Data

## Top Ten Shareholders of Dongbu Steel from 2005 to 2019

(As of December 31, 2019)

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|--------------------------|
| 1 | KG Steel Co. Ltd. | 40,000,000 | 39.98% |
| 2 | Cactus Private Equity | 32,000,000 | 31.98% |
| 3 | Korea Development Bank (KDB) | 13,284,908 | 13.28% |
| 4 | [ | | ] |
| 5 | [ | | ] |
| 6 | [ | | ] |
| 7 | [ | 1,562,072 | ] |
| 8 | [ | | ] |
| 9 | [ | | ] |
| 10 | [ | 605,691 | ] |

(As of December 31, 2018)

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|--------------------------|
| 1 | Korea Development Bank (KDB) | 10,728,950 | 39.17% |
| 2 | NongHyup Bank (NH) | 4,080,701 | 14.90% |
| 3 | Export-Import Bank of Korea (KEXIM) | 3,719,308 | 13.58% |
| 4 | Hana Bank | 2,340,797 | 8.55% |
| 5 | Shinhan Bank | 2,330,391 | 8.51% |
| 8 | [ | | ] |
| 6 | [ | | ] |
| 7 | [ | 258,723 | ] |
| 9 | [ | | ] |
| 10 | [ | | ] |

(As of December 31, 2017)

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|--------------------------|
| 1 | The Korea Development Bank | 9,330,034 | 37.08% |
| 2 | The Export-Import Bank of Korea | 3,721,282 | 14.79% |
| 3 | NH | 3,697,937 | 14.70% |
| 4 | Shinhan Bank | 2,359,582 | 9.38% |
| 5 | Hana Bank | 2,061,860 | 8.19% |
| 6 | [ | | ] |
| 7 | [ | | ] |
| 8 | [ | 266,916 | ] |
| 9 | [ | | ] |
| 10 | [ | | ] |

(As of December 31, 2016)

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|--------------------------|
| 1 | The Korea Development Bank | 9,511,959 | 37.81% |
| 2 | NH | 3,763,429 | 14.96% |
| 3 | The Export-Import Bank of Korea | 3,757,440 | 14.93% |
| 4 | Shinhan Bank | 2,395,740 | 9.52% |
| 5 | Hana Bank | 2,093,809 | 8.32% |
| 6 | [ | | ] |
| 7 | [ | | ] |
| 8 | [ | | ] |
| 9 | [ | 10,414 | ] |
| 10 | [ | | ] |

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**(As of December 31, 2015)**

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|-------------------------|
| 1 | The Korea Development Bank | 5,362,600 | 25.98% |
| 2 | NH | 1,931,400 | 9.36% |
| 3 | The Export-Import Bank of Korea | 1,066,400 | 5.17% |
| 4 | Shinhan Bank | 1,066,400 | 5.17% |
| 5 | [ | | ] |
| 6 | [ | | ] |
| 7 | [ | | ] |
| 8 | [ | 66,747 | ] |
| 9 | [ | | ] |
| 10 | [ | | ] |

**(As of December 31, 2014)**

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|-------------------------|
| 1 | Dongbu CNI | 7,100,785 | 11.23% |
| 2 | Nam-Ho Kim | 4,670,338 | 7.39% |
| 3 | Dongbu Corporation Co., Ltd. | 4,499,552 | 7.12% |
| 4 | [ | | ] |
| 5 | [ | | ] |
| 6 | [ | | ] |
| 7 | [ | | ] |
| 8 | [ | | ] |
| 9 | [ | 170,835 | ] |
| 10 | [ | | ] |

**(As of December 31, 2013)**

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|-------------------------|
| 1 | Dongbu CNI | 7,100,785 | 13.34% |
| 2 | Nam-Ho Kim | 4,670,338 | 8.78% |
| 3 | Dongbu Corporation Co., Ltd. | 4,499,552 | 8.46% |
| 4 | [ | | ] |
| 5 | [ | | ] |
| 6 | [ | | ] |
| 7 | [ | 1,077,300 | ] |
| 8 | [ | | ] |
| 9 | [ | 474,840 | ] |
| 10 | [ | | ] |

**(As of December 31, 2012)**

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|-------------------------|
| 1 | Dongbu CNI | 7,100,785 | 13.34% |
| 2 | Nam-Ho Kim | 4,670,338 | 8.78% |
| 3 | Dongbu Corporation Co., Ltd. | 4,499,552 | 8.46% |
| 4 | [ | | ] |
| 5 | [ | | ] |
| 6 | [ | | ] |
| 7 | [ | 1,202,040 | ] |
| 8 | [ | | ] |
| 9 | [ | | ] |
| 10 | [ | | ] |

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**(As of December 31, 2011)**

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|--------------------------|
| 1 | Dongbu CNI | 7,100,785 | 13.34% |
| 2 | Nam-Ho Kim | 4,670,338 | 8.78% |
| 3 | Dongbu Corporation Co., Ltd. | 4,499,552 | 8.46% |
| 4 | [ | | ] |
| 5 | [ | | ] |
| 6 | [ | 1,906,233 | ] |
| 7 | [ | | ] |
| 8 | [ | | ] |
| 9 | [ | | ] |
| 10 | [ | | ] |

**(As of December 31, 2010)**

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|--------------------------|
| 1 | Dongbu CNI | 6,791,785 | 13.41% |
| 2 | Nam-Ho Kim | 4,670,097 | 9.22% |
| 3 | Dongbu Corporation Co., Ltd. | 4,499,552 | 8.89% |
| 4 | Dongbu Insurance Co., Ltd. | 2,835,949 | 5.60% |
| 5 | Joon-Ki Kim | 2,552,071 | 5.04% |
| 6 | [ | | ] |
| 7 | [ | | ] |
| 8 | [ | | ] |
| 9 | [ | 861,134 | ] |
| 10 | [ | | ] |

**(As of December 31, 2009)**

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|--------------------------|
| 1 | Dongbu Fine Chemical Co., Ltd. | 6,791,785 | 13.41% |
| 2 | Korea Development Bank | 4,670,097 | 9.22% |
| 3 | Dongbu Corporation., Ltd. | 4,499,552 | 8.89% |
| 4 | Nam-Ho, Kim | 2,552,071 | 5.04% |
| 5 | Dongbu Fire & Marine Insurance., Ltd. | 2,835,949 | 5.60% |
| 6 | [ | | ] |
| 7 | [ | 1,179,360 | ] |
| 8 | [ | | ] |
| 9 | [ | | ] |
| 10 | [ | | ] |

**(As of December 31, 2008)**

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|--------------------------|
| 1 | Dongbu Fine Chemical Co., Ltd. | 4,000,000 | 14.10% |
| 2 | Korea Development Bank | 2,867,390 | 10.11% |
| 3 | Dongbu Corporation., Ltd. | 2,773,162 | 9.78% |
| 4 | Nam-Ho, Kim | 2,188,863 | 7.72% |
| 5 | Dongbu Fire & Marine Insurance., Ltd. | 1,747,851 | 6.16% |
| 6 | Joon-Ki, Kim | 1,572,891 | 5.55% |
| 7 | [ | | ] |
| 8 | [ | | ] |
| 9 | [ | 778,423 | ] |
| 10 | [ | | ] |

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**(As of December 31, 2007)**

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|-------------------------|
| 1 | Dongbu Fine Chemical Co., Ltd. | 4,000,000 | 14.66% |
| 2 | Korea Development Bank | 3,000,000 | 10.99% |
| 3 | Dongbu Corporation., Ltd. | 2,773,162 | 10.16% |
| 4 | Nam-Ho, Kim | 2,188,863 | 8.02% |
| 5 | Dongbu Fire & Marine Insurance., Ltd. | 1,747,851 | 6.41% |
| 6 | Joon-Ki, Kim | 1,572,891 | 5.76% |
| 7 | [ | | ] |
| 8 | [ | | ] |
| 9 | [ | | ] |
| 10 | [ | 505,835 | ] |

**(As of December 31, 2006)**

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|-------------------------|
| 1 | Dongbu Fine Chemical Co., Ltd. | 4,000,000 | 14.66% |
| 2 | Korea Development Bank | 3,000,000 | 11.00% |
| 3 | Dongbu Corporation., Ltd. | 2,773,162 | 10.16% |
| 4 | Nam-Ho, Kim | 2,188,864 | 8.02% |
| 5 | Dongbu Fire & Marine Insurance., Ltd. | 1,747,851 | 6.41% |
| 6 | Joon-Ki, Kim | 1,572,891 | 5.77% |
| 7 | [ | | ] |
| 8 | [ | | ] |
| 9 | [ | 793,538 | ] |
| 10 | [ | | ] |

**(As of December 31, 2005)**

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|-------------------------|-------------------------|
| 1 | Dongbu Fine Chemical Co., Ltd. | 4,000,000 | 13.40% |
| 2 | Korea Development Bank | 3,000,000 | 10.05% |
| 3 | Dongbu Corporation., Ltd. | 2,773,162 | 9.29% |
| 4 | Dongbu Fire & Marine Insurance., Ltd. | 1,747,851 | 5.86% |
| 5 | Nam-Ho, Kim | 1,728,260 | 5.79% |
| 6 | Joon-Ki, Kim | 1,572,891 | 5.27% |
| 7 | [ | | ] |
| 8 | [ | 869,336 | ] |
| 9 | [ | | ] |
| 10 | [ | | ] |

# Exhibit 10-B

# Dongbu Incheon's Shareholder List

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

## Shareholders of Dongbu Incheon Steel

**(As of December 31, 2019)**

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP (Based on outstanding shares) |
|---|---|---|---|
| 1 | Dongbu Steel Co., Ltd | 20,000,000 | 100% |

*Dongbu Incheon Steel has been wholly owned by Dongbu Steel since 2014*

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit 10-C

# KG Steel's Shareholder List

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

## Shareholder List of KG Steel

**(As of December 31, 2019)**

| NO | NAME OF SHAREHOLDER | NUMBER OF SHARES OWENED | PERCENTAGE OF OWNERSHIP |
|----|---------------------|------------------------:|------------------------:|
| 1 | KG ETS Co., Ltd. | 39,200 | 48.88% |
| 2 | KG Chemical Co., Ltd. | 15,600 | 19.45% |
| 3 | KG Inicis Co., Ltd. | 11,200 | 13.97% |
| 4 | KG Zeroin Co., Ltd. | 8,400 | 10.47% |
| 5 | KG Co., Ltd. | 5,800 | 7.23% |

Barcode:4060964-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit 12-A

# Dongbu Steel's 2012, 2013, 2014, 2016, 2017, 2018 and 2019 Unconsolidated Financial Statements

# DONGBU STEEL CO., LTD.

## Separate Financial Statements

**December 31, 2019**

(With Independent Auditors' Report Thereon)

# Contents

Independent Auditors' Report

(Attachment) Financial statement

Separate Statements of Financial Position

Separate Statements of Comprehensive Income

Separate Statements of Changes in Equity

Separate Statements of Cash Flows

Notes to the Separate Financial Statements

Reference

Report on the Internal Accounting Control System Report on external audit

Overview of External Audit

**Independent Auditors' Report**
Based on a report originally issued in Korean

The Board of Directors and Shareholders
Dongbu Steel Co., Ltd.:

*Qualified audit opinion*
We have audited the accompanying separate financial statements of Dongbu Steel Co., Ltd. ("the Company"), which comprise the separate statements of financial position as of December 31, 2019, and December 31, 2018, the separate statements of comprehensive loss, changes in equity and cash flows for the years then ended, and notes, comprising a summary of significant accounting policies and other explanatory information.

In our opinion, the separate financial statements present fairly, in all material respects, the separate financial position of the Company as of December 31, 2019, and December 31, 2018, and its separate financial performance and its separate cash flows for the years then ended in accordance with Korean International Financial Reporting Standards.

We have audited the internal accounting control system of the company as of December 31, 2019 based on "Concept of Design and Operation of Internal Accounting Control System" in accordance with the accounting and auditing standards, and presented our adverse opinion on the audit report on March 19, 2020.

*Basis for Opinion*
We conducted our audits in accordance with Korean Standards on Auditing (KSAs). Our responsibilities under those standards are further described in the *Auditors' Responsibilities* section of our report. We are independent of the Company in accordance with the ethical requirements that are relevant to our audit of the financial statements in the Republic of Korea, and we have fulfilled our other ethical responsibilities in accordance with these requirements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

*Audit for major materials*
The core audit is based on our professional judgment and is most significant in the audit of the financial statements. These matters have been addressed in the formation of our opinion from the perspective of an audit of the entire financial statements and we do not provide separate opinions on these matters.

(1) Capital impairment of cash-generating units

Since the Company operates within process industry, the proportion of property, plant and equipment is at 37% of the total assets of the Company, with a significant carrying amount of 752,092 million won. With the continuing indication for impairment in the major cash-generating units, the management conducts impairment tests at the end of every reporting period and if the recoverable amount of the cash-generating unit falls short of the carrying amount, the management recognizes impairment losses by reducing the carrying amount, as explained in Note 4(10).

Also, the net fair value of the recoverable amount of the associated cash-generating unit is calculated using complex assumptions and judgments from every approaches.

We have selected the impairment test on the cash-generating units of plate segment of Dangjin Factory as our key audit matter, in consideration of the complexity of the assumptions used by the management, necessity of judgments, and importance of the carrying amount of property, plant and equipment.

We have conducted audit procedure including below. We have put our attention to the assessment of net fair value, as the recoverable amount of the cash-generating unit is determined at net fair value. We have included a valuation expert in the audit department when we were conducting the following audit procedures.
· Assessment of the appropriateness of the valuation method used by the management to estimate the recoverable amount
· Assessment of the eligibility and objectivity of the expert appointed by the management to assess the recoverable amount
· Accuracy check on the valuation model used by the Company and document review for the data samples
· Assessment of the appropriateness of the calculation of carrying amount for comparison, including the

distribution of common assets
- Evaluation of the appropriateness and completeness of the disclosure related to the capital impairment
- Assessment of the rationality behind the major assumptions used to estimate the net fair value
  - Comparison with observable market data and similar transaction cases
  - In case of cost model approach, assessment of the consistency in comparison with estimates on repurchase cost and remaining useful lives, business plan approved by the management including judgment and adjustment of obsolescence, estimation by the independent external assessment institutions, macroeconomic circumstances and market situation, etc.

(2) Impairment of investment in subsidiaries

The management conducts impairment tests the end of every reporting period by estimating the recoverable amount of the major investment in subsidiaries with continuing indication of impairment, and as stated in Note 4(10), recognizes impairment loss by reducing the carrying amount if the recoverable amount of the major investment in subsidiaries falls short of the carrying amount. Also, as stated in Note 9, the recognized accumulated impairment loss on the investment in Dongbu Dangjin Port Operation is at 121,117 million won, and the carrying amount of the investment as of December 31, 2019 is significant at 799,952 million won.

To calculate the recoverable amount of the investment in subsidiaries, we have selected impairment test on the investment in Dongbu Incheon Steel and Dongbu Dangjin Port Operation as our key audit matter, in consideration of the complexity of the assumptions used by the management, necessity of judgments, accumulated incurred impairment loss amount, and importance of the carrying amount of investment in subsidiaries.

We have conducted audit procedure including below. We have put our attention to the assessment of net fair value, as the recoverable amount of the investment in subsidiaries is determined at net fair value. We have included a valuation expert in the audit department when we were conducting the following audit procedures.
- Assessment of the appropriateness of the valuation method used by the management to estimate the recoverable amount
- Assessment of the eligibility and objectivity of the expert appointed by the management to assess the recoverable amount
- Accuracy check on the valuation model used by the Company and document review for the data samples
- valuation of the appropriateness and completeness of the disclosure related to the capital impairment
- Assessment of the rationality behind the major assumptions used to estimate the net fair value
  - Comparison with observable market data and similar transaction cases
  - In case of cost model approach, assessment of the consistency in comparison with estimates on repurchase cost and remaining useful lives, business plan approved by the management including judgment and adjustment of obsolescence, estimation by the independent external assessment institutions, macroeconomic circumstances and market situation, etc.
  - In case of profit approach, assessment of consistency of estimated future cash flow in comparison with the past performance, macroeconomic circumstances and market situations. Assessment of the appropriateness of the major assumptions used in the valuation model such as discount rate or growth rate, and sensitivity analysis

***Management and Governing Body's Responsibility for the Separate Financial Statements***
Management is responsible for the preparation and fair presentation of these separate financial statements in accordance with Korean International Financial Reporting Standards, and for such internal control as management determines is necessary to enable the preparation of separate financial statements that are free from material misstatement, whether due to fraud or error.

When preparing the financial statements, the Company is responsible for evaluating the ability of the Company to continue as a going concern and, if applicable, disclosing information about the company. And, unless management has the intention of liquidating or discontinuing the business, it is also responsible for the use of the continuing business assumptions of accounting.

The governing body is responsible for monitoring the company's financial reporting procedures.

***Auditors' Responsibility***
Our purpose is to issue an audit report that includes our opinion, with reasonable assurance as to whether the entity's financial statements are free from material misstatement, whether due to fraud or error. Rational assurance

means a high level of assurance, but does not guarantee that audits performed in accordance with audit standards will always find significant signs of distortion. A distortion indication may arise from negation or error, and if the distortion indication is reasonably expected to affect individually or collectively the user's economic decision based on financial statements, the indication of distortion is considered significant.

As part of audits in accordance with auditing standards, we conduct professional judgments throughout the audit process and maintain professional skepticism. Also,

· We identify and evaluate the risk of material misstatement of financial statements resulting from fraud or error and design and conduct audit procedures to counter such risks. We obtain sufficient and appropriate audit evidence as the basis for our audit opinion. Because denial can involve interventions, forgery, intentional omissions, misrepresentation, or internal control disruption, the risk of not being able to detect significant distortions due to negation is greater than the risk of error.
· We understand internal controls related to auditing to design audit procedures that are appropriate for the situation. However, this is not intended to express opinion on the effectiveness of internal controls.
· We evaluate the appropriateness of the accounting policies applied by the management and the rationality of the related announcements and the accounting estimates derived by the management in order to prepare the financial statements.
· We conclude that there is significant uncertainty about the ability of the entity to continue as a going concern based on the appropriateness of the entity's continuing accounting used by the management and the audit evidence obtained. If we conclude that significant uncertainties exist, we are required to draw attention to the audit report for the relevant disclosures in the financial statements, and to change the opinion if these disclosures are inappropriate. Our conclusions are based on the audit evidence we have obtained by the audit report date, but future events or circumstances could lead to the continuation of our company as a going concern.
· We assess the overall presentation, structure and content of financial statements, including disclosures, and assess whether transactions and events on which the financial statements are based are presented in a fair presentation of financial statements.

We communicate with the governing body about significant audit findings, such as planned audit scope and timing, and significant internal control weaknesses identified during audits.

We also provide the governing body with a statement that it will comply with the independence related ethical requirements, communicate all relevant relations and other matters deemed relevant to our independence issues and, where appropriate, the relevant institutional safeguards with the governing body.

We determine the most significant items in our financial statements audit as the key audits among the matters communicated with the governing body. It is reasonable to expect that the negative consequences of the disclosure of such information in the audit report would reasonably be expected to exceed the public benefit of the communication,

10, Gukjegeumyung-ro, Yeongdeungpo-gu, Seoul, Korea
Anjin LLC
CEO Hong, Jong-Sung
March 19, 2020

This report is effective as of March 19, 2020 the audit report date. Certain subsequent events or circumstances, which may occur between the audit report date and the time of reading this report, could have a material impact on the accompanying separate financial statements and notes thereto. Accordingly, the readers of the audit report should understand that the above audit report has not been updated to reflect the impact of such subsequent events or circumstances, if any.

# (Attached) Financial Statement

**Dongbu Steel Co., Ltd.**

38th Period

From Jan 1st, 2019

To Dec 31st, 2019

37th Period

From Jan 1st, 2018

To Dec 31st, 2018

"Attached financial statement is presented by the company"

Dongbu Steel Co., Ltd. CEO Lee, Se-Cheol

Headquarter :(Address) 7 th floor, Seoul Square, 416, Hangang daero, Jung gu, Seoul

(Tel) 02)3450 8114

**Statement of Financial Position**

For the 38th period ended December 31, 2019 and the 37th period ended December 31, 2018

(Korean won in units)

| Account | Note | 38th period | | 37th period | |
|---|---|---|---|---|---|
| Assets | | | | | |
| I. Non-current assets | | | 1,583,385,098,870 | | 1,567,804,176,352 |
| Property, plant and equipment | 5,8 | 752,092,134,310 | | 786,799,192,495 | |
| Intangible assets | 6 | 2,718,556,519 | | 3,974,191,830 | |
| Right-of-use assets | 7 | 11,393,470,517 | | - | |
| Investment in subsidiaries | 9,10 | 799,951,905,228 | | 757,338,041,157 | |
| Investment in associates | 10 | 5,148,671,382 | | 5,148,671,382 | |
| Financial assets measured at fair value through profit or loss | 8,30,36 | 2,054,763,960 | | 2,166,561,993 | |
| Long-term trade receivables | 12,30,36,37 | 648,463,846 | | 610,463,846 | |
| Other receivables | 14,30,36,37 | 9,342,318,408 | | 9,315,553,649 | |
| Other financial assets | 15,18,30,36 | 34,814,700 | | 2,451,500,000 | |
| II. Current assets | | | 462,526,269,217 | | 540,817,852,611 |
| Assets held for sale | 19 | - | | 2,286,706,800 | |
| Inventories | 8,16,34 | 169,812,719,304 | | 183,849,186,257 | |
| Prepaid expenses | 34 | 3,068,287,546 | | 5,950,114,576 | |
| Trade receivables | 12,24,30,36,37 | 242,912,362,586 | | 274,401,980,758 | |
| Contract assets | 13 | 3,625,608,045 | | 13,439,841,753 | |
| Other receivables | 14,30,36 | 4,436,783,544 | | 612,108,552 | |
| Other current assets | 15,17,36 | 15,909,779,493 | | 21,962,986,994 | |
| Derivatives | 30,36 | 6,003,048,869 | | 5,464,000,000 | |
| Corporate tax assets | | 579,792,405 | | 374,125,671 | |
| Cash and cash equivalents | 17,30,36 | 16,177,887,425 | | 32,476,801,250 | |
| Total assets | | | 2,045,911,368,087 | | 2,108,622,028,963 |
| Equity | | | | | |
| I. Share capital | 1,20 | | 555,311,410,000 | | 191,967,900,000 |
| II. Share premium | 20 | | 1,255,313,784,599 | | 700,212,317,289 |
| III. Accumulated deficit | 20 | | (908,619,340,576) | | (877,119,431,938) |
| IV. Other equity items | 20 | | 40,748,098 | | 142,010,520 |
| Total equity | | | 902,046,602,121 | | 15,202,795,871 |
| Liabilities | | | | | |
| I. Non-current liabilities | | | 797,875,675,246 | | 1,460,323,466,411 |
| Long-term borrowing | 8,24,30,32,36 | 565,252,008,730 | | 1,141,505,361,217 | |
| Bond payables | 8,23,30,32,36 | 107,701,060,398 | | 206,883,305,965 | |
| Defined benefit liabilities | 25,34 | 23,930,292,808 | | 26,197,461,257 | |
| Other non-current liabilities | 25 | 1,991,772,179 | | 1,775,193,677 | |
| Lease liabilities | 7,30,32 | 15,038,396,836 | | - | |
| Deferred tax liabilities | | 83,962,144,295 | | 83,962,144,295 | |
| II. Current liabilities | | | 345,989,090,720 | | 633,095,766,681 |
| Current portion of long-term borrowings | 8,24,30,32,36 | 1,061,271,960 | | 2,608,541,473 | |
| Short-term borrowings | 8,24,30,32,36 | 139,323,778,847 | | 133,443,340,802 | |
| Advance receipts | | 4,946,807,262 | | 1,211,371,995 | |
| Trade payables | 8,24,30 | 175,729,453,827 | | 477,862,113,161 | |
| Contract liabilities | 13 | 4,770,350,679 | | 2,347,585,217 | |
| Other payables | 25,34 | 3,830,214,562 | | 3,400,190,724 | |
| Accrued expenses | 25,26,30,36 | 8,083,582,390 | | 8,472,622,998 | |
| Other current liabilities | 26 | 3,091,187,351 | | 3,750,000,311 | |
| Lease liabilities | 7,30,32 | 5,152,443,842 | | - | |
| Total liabilities | | | 1,143,864,765,966 | | 2,093,419,233,092 |
| Total equity and liabilities | | | 2,045,911,368,087 | | 2,108,622,028,963 |

**Statement of comprehensive income**
For the 38th period ended December 31, 2019 and the 37th period ended December 31, 2018
(Korean won in units)

| Account | Note | 38th period | 37th period |
|---|---|---|---|
| I. Income and loss | | | |
| Sales | 34,38 | 1,688,470,941,497 | 1,750,903,867,403 |
| Cost of sales | 26,34 | (1,593,631,131,770) | (1,682,033,190,575) |
| Gross profit | | 94,839,809,727 | 68,870,676,828 |
| Selling, general and administrative expenses | 26,27,34 | (74,376,531,102) | (73,829,798,597) |
| Operating income | | 20,463,278,625 | (4,959,121,769) |
| Finance income | 29,30,34 | 77,174,203,488 | 157,246,217,535 |
| Finance expenses | 29,30,34 | (126,394,903,496) | (151,107,705,544) |
| Other non-operating income | 31 | 3,169,548,302 | 2,170,063,434 |
| Other non-operating expenses | 31 | (5,069,623,078) | (13,573,388,561) |
| Gain related to investments in subsidiaries and associates | 9 | - | 5,150,000,000 |
| Loss related to investments in subsidiaries and associates | 9 | - | (58,134,964,719) |
| Net loss before income tax | | (30,657,496,159) | (63,208,899,624) |
| Income tax expense | | 203,863,820 | 854,356,160 |
| Net loss | | (30,861,359,979) | (64,063,255,784) |
| II. Other comprehensive income(loss) | | | |
| Items that will not be reclassified subsequently to profit or loss | | | |
| Remeasurements of defined benefit liability (asset), net of tax | | (638,548,659) | (2,676,041,196) |
| Other comprehensive profit or loss for the year, net of tax | | (638,548,659) | (2,676,041,196) |
| III. Total comprehensive profit or loss for the year | | (31,499,908,638) | (66,739,296,980) |
| IV. Loss per share | | | |
| Basic and diluted loss per common share (in won) | 22 | (857) | (18,936) |
| Basic and diluted loss per preferred share (in won) | 22 | (857) | (18,936) |

**Statement of changes in equity**

For the 38th period ended December 31, 2019 and the 37th period ended December 31, 2018

(Korean won in units)

| Account | Capital | Share premium | Retained earnings (losses) | Other equity items | Total |
|---|---|---|---|---|---|
| Balance at January 1, 2018 | 180,802,285,000 | 683,898,554,366 | (818,515,246,266) | 85,918,433 | 46,271,511,533 |
| Effect of change in accounting standards | - | - | 8,135,111,308 | - | 8,135,111,308 |
| Amount after changes | 180,802,285,000 | 683,898,554,366 | (810,380,134,958) | 85,918,433 | 54,406,622,841 |
| Total comprehensive income(loss) for the year: | | | | | |
| Loss for the year | - | - | (64,063,255,784) | - | (64,063,255,784) |
| Remeasurement of defined benefit liability (asset), net of tax | | | (2,676,041,196) | | (2,676,041,196) |
| Transactions with owners and other, recognized directly in equity | | | | | |
| Capital reduction without refund | (55,501,050,000) | 55,444,957,913 | - | 56,092,087 | - |
| Debt-for-equity swap | 66,666,665,000 | (39,131,194,990) | - | - | 27,535,470,010 |
| Balance at December 31, 2018 | 191,967,900,000 | 700,212,317,289 | (877,119,431,938) | 142,010,520 | 15,202,795,871 |
| Balance at January 1, 2019 | 191,967,900,000 | 700,212,317,289 | (877,119,431,938) | 142,010,520 | 15,202,795,871 |
| Total comprehensive income(loss) for the year: | | | | | |
| Loss for the year | - | - | (30,861,359,979) | - | (30,861,359,979) |
| Remeasurement of defined benefit liability (asset), net of tax | - | - | (638,548,659) | - | (638,548,659) |
| Transactions with owners and other, recognized directly in equity | | | | | |
| Capital reduction without refund | (117,656,490,000) | 117,617,078,861 | | 37,411,139 | (2,000,000) |
| Paid-in capital increase | 360,000,000,000 | (8,448,588,750) | | - | 351,551,411,250 |
| Debt-for-equity swap | 121,000,000,000 | 445,932,977,199 | - | - | 566,932,977,199 |
| Acquisition of treasury shares | - | - | - | (138,673,561) | (138,673,561) |
| Balance at December 31, 2019 | 555,311,410,000 | 1,255,313,784,599 | (908,619,340,576) | 40,748,098 | 902,046,602,121 |

**Statement of cash flow**

For the 38th period ended December 31, 2019 and the 37th period ended December 31, 2018

(Korean won in units)

| Accounts | 38th period | | 37th period | |
|---|---|---|---|---|
| I. Cash flow from operating activities | | (163,380,632,541) | | (5,818,807,481) |
| 1. Cash flow from operating activities (Note25) | (164,316,618,364) | | (6,093,436,839) | |
| (1) Loss for the year | (30,861,359,979) | | (64,063,255,784) | |
| (2) Adjustments | 88,143,021,280 | | 100,739,873,413 | |
| (3) Change in assets and liabilities | (221,598,279,665) | | (42,770,054,468) | |
| 2. Interest received | 1,141,652,557 | | 328,906,254 | |
| 3. Income tax paid | (205,666,734) | | (54,276,896) | |
| II. Cash flows from investing activities | | (60,322,068,116) | | (9,965,788,784) |
| Proceeds from sale of property, plant and equipment | 110,893,000 | | 86,244,849 | |
| Disposal of financial assets measured at fair value through profit or loss | - | | 2,996,000,000 | |
| Disposal of financial assets(non-current) measured at amortized cost | - | | 250,000,000 | |
| Decrease in other financial assets(non-current) | 2,430,000,000 | | - | |
| Decrease in other receivables(current) | (3,531,000,000) | | 1,077,209,091 | |
| Dividends in subsidiaries | 4,000,000 | | 5,154,000,000 | |
| Acquisition of subsidiaries | (42,472,864,071) | | - | |
| Decrease(Increase)in non-current portion of other receivables | 33,324,355 | | 746,815,348 | |
| Disposal of assets held for sale | 2,058,036,120 | | - | |
| Acquisition of property, plant and equipment | (18,938,476,153) | | (18,813,335,016) | |
| Acquisition of financial assets measured at fair value through profit or loss | (2,666,667) | | - | |
| Increase in other financial assets(non-current) | (13,314,700) | | (264,000,000) | |
| Increase in other receivables(non-current) | - | | (1,198,723,056) | |
| III. Cash flows from financing activities | | 207,403,786,832 | | (18,864,498,190) |
| Proceeds from long-term borrowings | - | | 32,666,627,042 | |
| Repayment of current portion of long-term borrowings (including advanced redemption) | (772,427,700) | | (35,671,080,421) | |
| Repayment of current portion of bond payables | (5,571,300,000) | | (1,724,177,862) | |
| Proceeds from short-term borrowings | 10,137,055,152 | | 41,814,610,209 | |
| Advanced repayment of longterm borrowings | (103,343,392,500) | | - | |
| Redemption of lease liabilities | (2,196,363,656) | | - | |
| Interest paid | (41,616,748,403) | | (55,605,947,168) | |
| Paid-in capital increase | 360,000,000,000 | | - | |
| Share issue costs | (9,094,362,500) | | (344,529,990) | |
| Acquisition of treasury shares | (138,673,561) | | - | |
| IV. Net changes in cash and cash equivalents | | (16,298,913,825) | | (34,649,094,455) |
| V. Cash and cash equivalents at the beginning of the year | | 32,476,801,250 | | 67,125,895,705 |
| VI. Cash and cash equivalents at the end of the year | | 16,177,887,425 | | 32,476,801,250 |

## Notes

Dongbu Steel Co., Ltd.
38th period: as at Dec 31st, 2019
37th period: as at Dec 31st, 2018

**1. Description of the Company**

Dongbu Steel Co., Ltd. (the "Company") was established on October 27, 1982 and is engaged in the manufacture of iron and steel products. The Company was listed on the Korea Stock Exchange as of February 3, 1986. The head office is located at Hangang-daero 416, Jung-gu, Seoul. The Company produces its products in factories located in Dangjin, Chungcheongnam-do. Meanwhile, the Company newly established Dongbu Incheon Steel Co., Ltd. through a corporate spin-off on May 1, 2014.

On October 22, 2014, the Company entered into an agreement for the normalization of business with the Creditors' Committee due to the deterioration of the financial structure and the recession in the steel industry. Thereafter, the Company converted the existing agreement into a new work-out agreement on October 19, 2015 in accordance with the Corporate Restructuring Promotion Act. On September 6, 2019, the joint management procedure by Creditor Financial Institutions was terminated, as the closing requirements are met.

As described in Note 20, through a capital reduction without refund, a conversion of investment, and a paid-in capital increase, as of December 31, 2019, the company has paid in capital at 555,311 million won (common stock at 500,044 million won, preferred stock at 55,267 million won). Through the capital increase, the largest shareholder of the Company has changed from Korean Development Bank to KG Steel Co., Ltd., with 39.98% share of total issued stock as of December 31, 2019.

**2. Basis of Preparation**

The separate financial statements have been prepared in accordance with Korean International Financial Reporting Standards ("K-IFRS"), as prescribed in the *Act on External Audits of Corporations in the Republic of Korea*.

These financial statements are separate financial statements prepared in accordance with K-IFRS No.1027, 'Separate Financial Statements' presented by a parent, an investor in an associate or a venture in a jointly controlled entity, in which the investments are accounted for on the basis of the direct equity interest rather than on the basis of the reported results and net assets of the investees.

The separate financial statements were authorized for issue by the Board of Directors on March 10, 2020, which will be submitted for approval to the shareholders' meeting to be held on March 27, 2020.

(1) Measurement Standard
The company's financial statements are based on historical cost except for the defined benefit obligation that subtracts the fair value of the plan assets from the present value of the defined benefit obligation.
• Financial instruments measured at fair value through profit or loss
• Derivatives measured at fair value
• Present value of defined benefit liabilities less the fair value of the plan assets

(2) Functional and Presentation currency
The Company's financial statements are presented in the functional currency of the primary economic environment in which each entity operates. The company's financial statements are presented in Korean won as the functional currency.

(3) Estimation and Judgment
In preparing the financial statements, K-IFRS requires management to make estimates based on the best judgment about the application of accounting policies or matters affecting the reported amounts of assets and liabilities. If estimates and assumptions that are based on management's best judgment at the end of the reporting period differ from the actual environment, the estimates may result differently.

The Management's estimates and the basic assumptions about the estimates are constantly being reviewed. Changes in accounting estimates are recognized for the period during which they have been made and for the future periods the changes may influence.

1) Uncertainty of assumptions and estimates
Information about the uncertainty of assumptions that have significant risk of material adjustment within the next reporting period is included in the following notes.
• Note 5, 6, 7, 9: Impairment test - Key assumptions for estimating recoverable amount, including recoverability of tangible and intangible assets, right-of-use assets, and investment in subsidiaries
• Note 25: Measurement of defined benefit obligation - Main actuarial assumptions
• Note 32: Recognition of deferred tax assets - Use of tax loss and tax credits
• Note 34: Contingent liabilities - - Assumptions on possible outflow of resources and the amounts

2) Fair value Measurement
The company's accounting policies and disclosures require fair value measurements of multiple financial and non-financial assets and liabilities. The fair value assessment policies and procedures established by the Company include the operation of the valuation department responsible for reviewing all significant fair value measurements, including fair values that are classified as Level 3, and the results are reported directly to financial officers.

The valuation department reviews significant input variables and valuation adjustments that are not routinely observable. When using third party information such as broker prices or valuation institutions for the fair value measurement, the valuation of the department shall include judgments on level classification within the fair value hierarchy, whether the valuation meets the requirements set out in K-IFRS, etc. The Company reports significant valuation issues to the audit committee.

When measuring the fair value of an asset or liability, the company uses inputs that are observable in the market to the greatest extent possible. Fair value is classified within the fair value hierarchy based on input variables used in the valuation techniques as follows:

- Level 1: Notification price of an active market with access to the same asset or liability at the measurement date
- Level 2: Input variables that can be directly or indirectly observable for an asset or liability, other than the notification price of Level 1
- Level 3: Non-observable inputs to assets or liabilities

When various input variables used to measure the fair value of an asset or liability are classified at different levels within the fair value hierarchy, the Company uses the same level of inputs as the lowest input variable in the fair value hierarchy. Any movement between levels shall be recognized at the end of the reporting period.

Detailed information on the assumptions used in measuring fair values is included in Notes 36.


**3. Changes in accounting policies**

The significant accounting policies applied by the Company in the preparation of its financial statements in accordance with K IFRS are described below. The Company adopts the same accounting policies for the current and prior year's financial statements, except for the application of the revised standard that is effective for the first time since January 1, 2019.

The Company adopted the following new standards and amendments to the Standard, including the resulting amendments to other standards, with January 1, 2019 as the initial date of adoption. The following accounting policies are reflected in the annual financial statements for the year ended December 31, 2019.

(1) K-IFRS No. 1116 "Lease"

The Company has adopted K-IFRS No. 1116 for the fiscal year beginning on and after January 1, 2019.

K-IFRS No. 1116 includes new or amended requirements related to lease accounting. This standard does not distinguish financial lease and operating lease for lessee, and significantly changed the accounting for lessee to recognize right-of-use assets and lease liability at the commencement date of all leases except for short-term lease

and lease for which the underlying asset is of low value when recognition exemption is applied. Accounting requirements for lessors has not changed significantly. Details on the new requirements are presented in Note 4 (9) Leases. The impact of K-IFRS No. 1116 to the financial statements of the Company is as follows.

The Company applied K-IFRS No. 1116 by using the retrospective correction method as follows.
- The cumulative effect of initially applying this standard as an adjustment to opening of the retained earnings (or other components of equity, as appropriate) at the date of initial application.
- Restatement of the comparative information in accordance with K-IFRS No. 1017 and K-IFRS No. 2104 is unnecessary.

① Impact of the new definition of lease

The company has decided not to determine whether a contract is a lease or a contract contains lease component at initial application, as a practical expedient set out in K-IFRS No. 1116. Therefore, the definition of lease under K-IFRS No. 1017 and K-IFRS No. 2104 applies to the lease concluded or changed on or before January 1, 2019.

Changes in the definition of lease are mainly associated with the concept of control. K-IFRS No. 1116 determines if a contract contains a lease component based on whether the contract gives right to control the use of an identified asset for a period of time in exchange for consideration. On the other hand, the main focus of K-IFRS No. 1017 and 2104 was 'risk and consideration.

The Company applies the definition of lease and related policies set out in K-IFRS No. 1116 to all leases concluded or changed on or after January 1, 2019.

② Impact of lease accounting for lessee

(i) Lease that was previously classified as an operating lease

The accounting of leases that were previously classified as operating leases under K-IFRS No. 1017 (not presented in the statement of financial position) has changed.

The Company accounts for all leases, except for cases under practical expedient for short-term leases and leases for which the underlying asset is of low value, as follows.

- The amount initially measured at the present value of the future lease payment is recognized as a right-or-use asset or a lease liability. However, in accordance with Paragraph C8(2)(b) of K-IFRS No. 1116, right-of-use assets are adjusted by the amount of any prepaid or accrued lease payments relating to that lease recognized in the statement of financial position immediately before the date of initial application.
- Amortization of right-of-use assets and interest on the lease liabilities are recognized in the statement of comprehensive income.
- The principal portion of lease liability in cash payment and the interest portion of lease liability in cash payment shall be stated separately in the statement of cash flows.

Any lease incentive (e.g. lease payment exemption period) shall be recognized as a part of the measurement of right-of-use assets and lease liabilities, whereas it was recognized deducted from lease expenses on a straight-line basis under K-IFRS No. 1017.

The Company determined to recognize lease payments for short-term leases(with lease term of 12 months or less) and leases for which the underlying asset is of low value on straight-line basis.

The Company has applied retrospective correction to leases that were previously classified as operating leases under K-IFRS No. 1017, using the practical expedient as follows:

- The Company applies a single discount rate to a portfolio of leases with reasonably similar characteristics.
- The Company may adjust the right-of-use assets of the date of initial application to the extent of provision amount of onerous leases recognized immediately before the date of initial application.
- The Company has decided not to recognize any right-of-use asset and lease liability for a lease terminating within 12 months of the date of initial application.
- The Company may exclude initial direct costs from the measurement of the right-of-use asset at the date of initial

application.
- The Company may use hindsight, such as in determining the lease term if the contract contains options to extend or terminate the lease.

(ii) Lease that was previously classified as a financial lease

Except for the case where the Company chooses to apply recognition exemption to leases for which the underlying asset is of low value, for the leases that were previously classified as financial leases under K-IFRS No. 1017, the carrying amount of lease assets and lease liabilities measured in accordance with K-IFRS No. 1017 immediately before the date of initial application shall be reclassified as right-of-use assets and lease liabilities without any adjustment.

As of January 1, 2019 and onwards, K-IFRS No. 1116 shall be applied to the accounting of the right-of-use assets and lease liabilities.

③  Impact of lease accounting for lessor

K-IFRS No. 1116 does not change substantially how a lessor accounts for leases. Accordingly, a lessor will continue to classify leases as either finance leases or operating leases applying K-IFRS No. 1116, and account for those two types of leases differently.

K-IFRS No. 1116 requires a lessor to disclose additional information about how it manages the risks related to its residual interest in assets subject to leases.

An intermediate lessor shall account for a head lease and a sublease as two separate contracts. In classifying a sublease, an intermediate lessor shall classify the sublease as either a financial lease or operating lease, based on the right-of-use asset from the head lease, rather than the underlying lease asset(as under K-IFRS No. 1017).

In accordance with the changes, the Company reclassifies a specific operating sublease commitment as a financial lease, and accounted for the sublease as a new financial lease concluded at the date of initial application. The loss allowance for expected credit loss shall be recognized for financial lease receivables in accordance with K-IFRS No. 1109.

④  Financial impact of the initial application of K-IFRS No. 1116

As of January 1, 2019, the weighted average of the lessee's incremental borrowing rate of interest as recognized in the statement of financial position is 5.42%~11.06%.

The following table represents the relationship between the amount of operating lease under K-IFRS No. 1017 as of December 31, 2018, discounted using the incremental borrowing rate of interest, and the lease liability recognized in the statement of financial position at the date of initial application.

|  | (million Korean won in units) |
|---|---|
|  | **Amount** |
| Operating lease commitment as of December 31, 2018 | 8,831 |
| Short-term leases and  leases for which the underlying asset is of low value | (2,262) |
| Discount on the present value | (1,114) |
| Financial lease liabilities recognized under K-IFRS No. 1017 as of December 31, 2018 | 16,495 |
| Lease liabilities as of January 1, 2019 | 21,950 |

The Company has recognized right-of-use assets at 13,570 million won and lease liabilities at 21,950 million won at the date or transition to K-IFRS No. 1116.

(2) K-IFRS No. 1109 "Financial Instruments"

The amendments clarify that in assessing prepayment features if they meet the requirements of the contractual cash flows to be solely payments of principal and interest(SPPI criterion), the party exercising the option shall either pay or receive reasonable compensation for early termination, regardless of the event or circumstance that causes the early termination of the contract. In other words, prepayment features with negative compensation are not automatically disqualification cause for SPPI criterion.

(3) K-IFRS No. 1028 "Investment in Associates and Joint Ventures"

The amendments clarify that an entity applies K-IFRS No. 1109(including impairment policies) to long-term interests in an associate or joint venture to which the equity method is not applied but that, in substance, form part of the net investment in the associate or joint venture. The Company applies K-IFRS No. 1109 before K-IFRS No. 1028 for those long-term interests. When applying K-IFRS No. 1109 to long-term interests, the Company does not take account of adjustments to the carrying amount in accordance with K-IFRS No. 1028(adjustments to the carrying amount of long-term interests arising from the distribution of the investee's losses or the assessment of impairment).

(4) K-IFRS annual improvements 2015-2017

The annual improvements include parts of amendments of K-IFRS No. 1012 "Income Taxes", K-IFRS No. 1023 "Borrowing Costs", K-IFRS No. 1103 "Business Combinations", and K-IFRS No. 1111 "Joint Arrangements".

① K-IFRS No. 1012 "Income Taxes"
The amendments clarify that an entity would recognize any income tax consequences in profit or loss, other comprehensive income or equity depending on where the entity had originally recognized the transactions or events that generated distributable profits. The amendments apply regardless of whether different tax rates were applied for distributed and undistributed profits.

② K-IFRS No. 1023 "Borrowing Costs"
The amendments clarify that if any specific borrowing remains outstanding after the related asset is ready for its intended use or sale, that borrowing becomes part of the funds that an entity borrows generally when calculating the capitalization rate on general borrowings.

③ K-IFRS No. 1103 "Business Combinations"
The amendments clarify that when an entity obtains control of a business that is a joint operation, the entity applies the requirements for a business combination achieved in stages, including remeasuring its previously held interest in the joint operation at fair value. Previously held interests subject to remeasurement shall include unrecognized assets, liabilities, and goodwill associated with the joint operation.

④ K-IFRS No. 1111 "Joint Arrangements"
A party to joint operation, meaning a party that participates in, but does not have joint control of, a joint operation, can obtain joint control of the business. The amendments clarify that in this case, the entity does not remeasure its previously held interest in the joint operation.

(5) K-IFRS No. 1019 "Employee Benefits" (amended)

The amendments clarify that the past service cost (or of the gain or loss on settlement) is calculated by measuring the defined benefit liability (asset) using updated assumptions and comparing benefits offered and plan assets before and after the plan amendment (or curtailment or settlement) to remeasure its net defined benefit liability(asset) but ignoring the effect of the asset ceiling (that may arise when the defined benefit plan is in a surplus position). The amendments also clarify that any change in the effect of the asset ceiling after the plan amendment(or curtailment or settlement) shall be determined after recognizing the past service cost (or of the gain or loss on settlement), and the change in that effect shall be recognized in other comprehensive income.

Paragraphs regarding the measurement of current service cost and net interest of net defined benefit liability(asset) are also amended. The Company is required to use the updated actuarial assumptions to determine current service cost and net interest for the remainder of the annual reporting period after a plan amendment, curtailment or settlement. For the net interest, Paragraph 99 of the amendments states that net interest for the remainder of the period after the plan amendment, curtailment or settlement is calculated using the discount rate used to remeasure the net defined benefit liability (asset), taking into account the effect of contributions and benefit payments on the net defined benefit liability (asset).

(6) K-IFRS No. 1115 "Revenue from Contracts with Customers" (amended)

The main focus of the amendments is preventing the volume of disclosures from decreasing even with the

application of K-IFRS No. 1115, by narrowing down the meaning of 'contract' to 'individual contract', which was originally mentioned in Paragraph 129.1 of K-IFRS No. 1115 in accordance with 'additional disclosure for contracts with input measure on the basis of cost incurred'. K-IFRS No. 1115 does not separate the types of contracts, therefore the service contracts that previously did not meet the requirements under Paragraph 45.1 of the previous income standards, K-IFRS No. 1011, may now fall under Paragraph 129.1 of K-IFRS No. 1115, and the amendments clarify that the volume of disclosures under the new paragraph may significantly expand, compared to the previous standards for income.

(7) K-IFRS No. 2123 "Uncertainty over Income Tax Treatments" (issued)

The interpretations clarify the accounting for uncertainties in income taxes, and address the following issues:

① An entity is required to use judgement to determine whether each tax treatment should be considered independently or whether some tax treatments should be considered together.
② An entity has to consider whether it is probable that the relevant authority will accept each tax treatment, or group of tax treatments, that it used or plans to use in its income tax filing, and determine the taxable profit(tax loss), tax bases, unused tax losses, unused tax credits and tax rates as follows:
- If the entity concludes that it is probable that a particular tax treatment is accepted, the entity has to determine the items above consistently with the tax treatment included in its income tax filings.
- If the entity concludes that it is not probable that a particular tax treatment is accepted, the entity has to use the most likely amount or the expected value of the tax treatment when determining the items above. The decision should be based on which method provides better predictions of the resolution of the uncertainty.

The Company expects that the issued and amended standards will not have significant impact on the Company's financial statements, with the exception of K-IFRS No. 1116 "Leases".


**4. Significant Accounting Policies**

Significant accounting policies applied by the company in the preparation of its financial statements in accordance with K-IFRS are described below. The financial statements of the current and comparative periods presented are based on the same accounting policy, except for the changes in accounting policy explained in Note 3.

(1) Investments in subsidiaries and affiliates in separate financial statements

The Company's financial statements are separate financial statements pursuant to K-IFRS No. 1027. The Company has accounted for its investment in subsidiaries and associates using the cost method under K-IFRS No. 1027. Dividends received from subsidiaries are recognized in profit or loss when the right to receive dividends is established.

(2) Cash and cash equivalents

The company classifies its investments with maturities of three months or less from the date of acquisition as cash and cash equivalents. Equity instruments are excluded from cash and cash equivalents, however, if the instrument is substantially a cash asset with a fixed redemption date and the period between acquisition date and redemption date is considered as short-term, such as preferred stock, the instrument shall be included in cash assets.

(3) Non derivative financial assets

The Company measures financial assets at their fair value at initial recognition and adds to the fair value of any transaction costs that are directly attributable to the acquisition of that financial asset or the issuance of that financial liability, unless the financial asset is measured at fair value through profit or loss. Gains or losses on disposal of property, plant and equipment are determined using the moving average method. A composite contract that includes an embedded derivative considers the entire composite contract when determining whether contractual cash flows consist solely of principal and interest.

1) Financial assets measured at amortized cost
Assets that hold financial assets under a business model that is intended to be held to receive contractual cash flows and whose contractual cash flows consist solely of principal and interest are measured at amortized cost.

With the exception of impairment loss(gain), interest income, and gain on foreign currency exchange, any gain or loss on financial assets carried at amortized cost is recognized in other comprehensive income. When derecognizing a financial asset, the recognized accumulated other comprehensive income shall be reclassified from equity to profit or loss. Interest income on financial assets recognized under the effective interest rate method is included in 'financial income'.

2) Financial assets measured at fair value through other comprehensive income
Financial assets held under a business model that achieves the objective through both receipt of contractual cash flows and sale of financial assets and whose contractual cash flows consist of only principal payments are measured at fair value through other comprehensive income. Gains and losses on financial assets measured at fair value through other comprehensive income, other than impairment losses (reversals) and interest income and foreign exchange gains and losses, are recognized in other comprehensive income (loss). When the Company derecognizes a financial asset, it reclassifies recognized cumulative amount of other comprehensive gain or loss from equity to profit or loss. Interest income on financial assets recognized under the effective interest rate method is included in 'financial income'. Foreign exchange gains and losses are recognized in 'other non-operating income or other non-operating expenses' and impairment losses are presented as 'other non-operating expenses'.

3) Financial assets measured at fair value through profit or loss
Debt instruments other than financial assets measured at amortized cost or financial assets measured at fair value through other comprehensive income shall be measured at fair value through profit or loss. Any gain or loss on debt instruments measured at fair value through profit or loss on which the hedging relationship is not applied shall be recognized in profit or loss in the period in which it is incurred and shall be reported as 'financial income or expense' in the income statement in the period as incurred.

4) Removal of financial assets
Financial assets are removed when the contractual rights to cash flows from financial assets are derecognized, the rights to cash flows from financial assets are transferred, and most of the risks and rewards of ownership of financial assets are transferred. If the entity does not retain nor transfer most of the risks and rewards of ownership of the financial asset and does not control its financial assets, the assets shall be removed. If the Company neither transfers nor retains substantially all the risks and rewards of ownership of a transferred asset, and retains control of the transferred asset, the entity continues to recognize the transferred asset to the extent of its continuing involvement. In this case, the entity also recognizes an associated liability.

(4) Inventory assets

The unit cost is determined using periodic average method (specific identification for the cost of goods-in-transit) and the acquisition cost includes cost of purchase, cost of conversion, and other costs incurred.

Inventories are stated at the lower of cost and net realizable value. Any valuation loss by reduction to net realizable value or loss from inventory shrinkages shall be recognized as expenses for the period in which the reduction or shrinkage is incurred, and any reversal of valuation loss due to an increase in net realizable value shall be deducted from cost of sales of the inventory that is recognized as expense.

(5) Financial Derivatives

Derivatives are recognized at fair value at the inception of the derivative contract and subsequently remeasured to fair value. Changes in the fair value of derivatives that do not qualify for hedge accounting are recognized in the income statement as 'other non-revenue (expense)' or 'financial income (expense)' depending on the nature of the transaction.

(6) Property, plant and equipment (Tangible assets)

Property, plant and equipment are initially measured at cost. The cost of a property, plant and equipment includes costs that are directly attributable to the location and condition necessary to operate the asset in an intended manner by management, and estimated costs to dismantle, remove, or recover the asset. However, land or machinery shall be measured at fair value at the date of transition in accordance with K-IFRS 1101, "First time Adoption of K-IFRS".

The carrying amount of property, plant and equipment other than land or machinery is at cost less accumulated

depreciation and accumulated impairment losses.

Land is not depreciated. Other property, plant and equipment are stated at cost less accumulated depreciation and amortized cost using the straight line that best reflects the expected consumption pattern of future economic benefits over the economic useful lives presented below depreciation method.

If a part of the cost that consists an item of property, plant and equipment is significant compared to the total cost of property, plant and equipment for the year, the part shall be depreciated separately from the asset.

The gain or loss on disposal is the difference between the proceeds and the carrying amount and shall be recognized in profit of loss.

The Company applies the following useful lives for the depreciation of property, plant and equipment:

|  | Estimated useful lives(years) |
| --- | --- |
| Buildings | 30 ～ 60 |
| Structures | 20 ～ 60 |
| Machinery | 20 ～ 23 |
| Vehicles | 5 ～ 7 |
| Tools and equipment | 5 ～ 7 |
| Furniture and fixtures | 5 ～ 7 |

The Company reviews the residual value, useful life and depreciation method of an asset at the end of each reporting period and if a change is deemed appropriate, it is accounted for as a change in accounting estimates.

(7) Intangible assets

Intangible assets are measured at cost at initial recognition. The cost less subsequent accumulated depreciation and accumulated impairment losses is recognized as the carrying amount.

Intangible assets are amortized using the straight-line method over their useful lives, with the residual value being zero (0) after the date of availability. However, as there is no foreseeable limit to the estimated useful life of certain intangible assets (membership rights), the useful life of the intangible assets is considered to be infinite and shall not be amortized.

The Company's estimation on the useful lives of the intangible assets is as follows.

|  | Estimated useful lives(years) |
| --- | --- |
| Industrial property right | 5 ～ 10 |
| Right to use port facilities | 84 |
| Right to use other facilities | 10 ～ 20 |
| Software | 5 |
| Development expenditure | 5 |

At the end of each accounting period, the amortization period and method for intangible assets with finite useful lives are reviewed. Intangible assets with infinite useful life are reviewed whether infinite judgment is appropriate, and if it is deemed necessary to change it, it is accounted for as a change in accounting estimates. In addition, the Company conducts impairment tests for membership with infinite useful life at the end of each reporting period of when any indication of impairment is found.

1) Research and Development
Expenditure for the research stage of a research or internal project is recognized as an expense as incurred. Expenditure at the development stage that is able to demonstrate the technical feasibility of completing the asset, the intent and ability of the entity to complete or use or sell the asset, the availability of the necessary resources, the future economic benefits of the intangible asset is recognized as an intangible asset when it can be reliably measured. Other development expenditures are recognized as expenses as incurred.

2) Subsequent expenditure

Subsequent expenditure is capitalized only when the future economic benefits of the related assets increase, and other expenditures, including internally generated goodwill and trade names, are expensed as incurred.

(8) Borrowing cost

Borrowing costs directly attributable to the acquisition, construction or production of qualifying assets are capitalized as part of the cost of those assets. Other borrowing costs are recognized as an expense in the period in which they are incurred. A qualifying asset is an asset that requires a significant period of time before it can be used or sold for its intended use. Financial assets and inventories that are manufactured or otherwise produced in a short period of time do not qualify as qualifying assets and are not qualifying assets even if they are available for sale or are available for sale at the time of acquisition.

The amount borrowed specifically for the purpose of acquiring qualifying assets is determined as the amount of borrowing costs that can be capitalized, less any investment income arising from the temporary operation of the borrowings from the borrowing costs actually incurred from the borrowings during the reporting period, Capitalized borrowing costs are determined by applying the capitalized interest rate to the expenditures related to the assets only when borrowing funds for general purposes and using them for the acquisition of qualifying assets. The capitalization rate is calculated by weighted average cost of borrowings received during the period (excluding borrowings for specific purposes to obtain qualifying assets). Borrowing costs capitalized during the reporting period cannot exceed actual borrowing costs during the period.

(9) Leases

At arrangement date, the Company assesses whether the contract is, or contains, a lease. When the Company is a lessee, the Company shall recognize all right-of-use assets and lease liabilities except for short-term leases(with less than 12 months of lease term) and leases for which the underlying asset is of low value. The Company recognizes lease payments for short-term leases and leases for which the underlying asset is of low value on a straight-line basis over the lease term, unless another systematic basis is more representative of the time pattern of the user's benefit.

Lease liability is initially measured at the present value of the lease payments discounted using the interest rate implicit in the lease. If the interest rate implicit in the lease is hard to be determined, the lessee's incremental borrowing rate shall be used.

Lease payments for the measurement of a lease liability contains the following:
- Fixed payments(including in-substance fixed payments), less any lease incentives payable
- Variable lease payments that depend on an index or a rate, initially measured at the index or a rate at the commencement date.
- Lease payments expected to be paid by the lessee for any residual value guarantees
- Exercise price of a purchase option if the lease user is reasonably certain to exercise that option and payments of penalties for terminating the lease, if the lease term reflects the lease user exercising an option to terminate the lease.

The Company states lease liabilities separately from other liabilities in the statement of financial position.

Lease liability is subsequently measured using effective interest method, by increasing the carrying amount to reflect interests on the lease liability, and reducing the carrying amount to reflect the lease payments made.

The Company shall remeasure the lease liability and adjust the associated right-of-use asset if:
- There is any change in the lease term, or a change in the situation giving rise to the change of assessment on exercising the purchase option, or other significant event occurred. In these cases, the lease liability is remeasured using the modified discount rate.
- There is a change in index or rate or a change in the amount expected to be payable under a residual value guarantee. In these cases, the lease liability is remeasured at the changed lease payment using the unmodified discount rate. However, if there is a change in lease payments due to a change in the variable interest rate, the modified discount rate that reflects the change shall be used.
- There is a change in the lease contract and the change is not accounted for as a separate lease. In this case, the

lease liability is remeasured based on the lease term, by discounting the changed lease payments using revised discount rate at the effective date of the modification.

The initial right-of-use asset consists of the initial measurement of lease liability and lease payments made before commencement date, less any lease incentives received, and the amount less initial direct costs paid by the lessee. The right-of-use asset is subsequently measured at cost less any accumulated depreciation and any accumulated impairment losses.

When the Company dismantles or removes the underlying asset as required in the lease condition, or restores the underlying asset or the site on which the underlying asset is located, the estimated costs are recognized and measured in accordance with K-IFRS No. 1037. The costs are recognized as a part of the cost of a related right-of-use asset, unless those costs are incurred to produce inventories.

At the termination of a lease, if the ownership of an underlying asset is transferred to the lessee or the expectation that the lessee will exercise a purchase option is reflected in the cost of a right-of-use asset, the lessee depreciates the right-of-use asset from the commencement date to the termination date of the useful life of the underlying asset. For other cases, the depreciation is calculated at the earlier of the termination date of the useful life of the right-of-use asset and the termination date of the lease.

The Company states right-of-use assets separately from other assets in the statement of financial position.

K-IFRS No. 1036 is applied to determine if a right-of-use asset is impaired. The accounting for an identified impairment loss is demonstrated in the accounting policy of 'property, plant and equipment'.

Measurement of right-of-use assets and lease liabilities does not contain variable lease payments (except for variable lease payments that depend on an index or a rate), and the lease payments are recognized in profit or loss of the period in which an event or a condition that caused the lease payments has occurred.

As a practical expedient, a lessee may choose to account for a lease and associated non-lease components as a single lease component rather than separately, depending on the type of underlying assets. The Company has not adopted such practical expedient. In a contract that contains a lease component and one or more additional lease component or non-lease component, the lessee allocates the contract consideration to each lease component on the basis of its stand-alone price and the aggregate stand-alone prices of the non-lease components.

(10) Impairment of non-financial assets

At the end of each reporting period, all non-financial assets other than assets, inventories and deferred tax assets arising from employee benefits, costs incurred to enter into or settle a contract with contract assets recognized in revenue from contractual arrangements with customers and whether there is any indication of impairment of assets. If any such indication exists, the recoverable amount of the asset is estimated. Intangible assets with infinite useful lives are tested for impairment annually by comparing the recoverable amount with the carrying amount, irrespective of the indication of asset impairment.

The recoverable amount is the estimated recoverable amount of an individual asset or, if the recoverable amount of an individual asset cannot be estimated, for each cash generating unit to which the asset belongs. The recoverable amount is determined by the greater of the value in use and the net book value. The value in use is determined by discounting the future cash flows expected to be generated in the asset or cash generating unit with an appropriate discount rate that reflects the current market's assessment of the time value of the money and the unique risk of the unadjusted asset in estimating future cash flows.

If the recoverable amount of an asset or cash generating unit is less than its carrying amount, the carrying amount of the asset is reduced and recognized immediately in profit or loss.

At the end of each reporting period, the Company reviews assets other than goodwill whether there is any indication that the impairment loss recognized in prior periods is no longer present or has decreased and reverses the assets only if the estimates used to determine the recoverable amount after the recognition of impairment loss has changed. Increased carrying amount due to the reversal cannot exceed the balance after depreciation or amortization of the carrying amount before the recognition of impairment loss.

(11) Non-derivative financial liabilities

The Company classifies financial liabilities as financial liabilities at fair value and financial liabilities measured at amortized cost in accordance with the definition of the contractual substance and the definition of financial liability, and recognize thereafter in the statement of financial position when the Company becomes a party to the contract.

1) Financial liabilities measured at fair value through profit or loss
If a financial liability is classified as held for trading or derivative financial instrument, or if it is designated as financial liability at fair value through profit or loss at initial recognition, it shall be classified as a financial liability measured at fair value through profit or loss.
Financial liabilities measured at fair value through profit or loss are measured at fair value after initial recognition, and any change in fair value is recognized in profit or loss. Transaction costs incurred in connection with the initial recognition are recognized in profit or loss as incurred.

2) Financial liabilities measured at amortized cost
Non-derivative financial liabilities that are not classified as fair value through profit or loss are classified as financial liabilities at amortized cost. Financial liabilities at amortized cost are measured initially at fair value, less net of transaction costs directly attributable to the issue. Measurement of amortization cost financial liabilities are subsequently measured at amortized cost using the effective interest method. Interest expenses are recognized using the effective interest method.

3) Derecognition of financial liabilities
The Company only eliminates financial liabilities when the contractual obligation of the financial liability is fulfilled, canceled or expires. The company recognizes new financial liabilities as fair value based on new contracts and removes existing liabilities when the contractual terms of the financial liabilities change and the cash flows change substantially. When a financial liability is derecognized, the difference between the carrying amount and the consideration paid (including any transferred non cash assets or liabilities assumed) is recognized in profit or loss.

(12) Employee benefits

1) Short-term employee benefits
Short-term employee benefits payable within twelve months after the end of the reporting period in which the employees provide the related service are recognized in profit or loss when the service is provided. Short-term employee benefits are measured at undiscounted amounts.

2) Long-term employee benefits
Other long-term employee benefits that are not to be paid within 12 months after the end of the reporting period in which the employees provided the related services are discounted to their present value based on the future benefits received in exchange for services rendered during the current and prior periods. Changes in remeasurement are recognized in profit or loss in the period in which they arise.

3) Retirement benefit: defined contribution plan
When an employee provides service for a certain period of time in relation to the defined contribution plan, the contribution to be made to the defined contribution plan in exchange for the service is recognized in profit or loss except for the case of being included in the cost of the asset. The contribution to be paid is recognized as a liability (accrued expenses) after deducting the contribution already paid. In addition, if contributions already paid exceed the contributions to be paid for services rendered prior to the end of the reporting period, the excess contributions will be recognized as an asset (prepaid expenses) due to a decrease in future payments or a refund of cash.

4) Retirement benefits: defined benefit plans
Defined benefit obligations related to defined benefit plans at the end of the reporting period are recognized at the present value of defined benefit obligations by deducting the fair value of the extinguished assets.

Defined benefit liabilities are calculated on a predictive unit based basis annually. If the net present value of the defined benefit obligation is less than the fair value of the plan assets, then the present value of the economic benefits available in a manner that reduces the future contributions to the system in the future.

The remeasurement of net defined benefit liability is the change in the asset recognition ceiling effect excluding the amount included in the net interest income of plan assets and net revenues of plan assets excluding the actuarial gains and losses, net included in net defined benefit liabilities and are immediately recognized in other comprehensive income. The Company determines net interest on defined benefit liabilities (assets) by multiplying net defined benefit liabilities (assets) by the discount rate determined at the beginning of the annual reporting period and are included in the net periodic pay liability (assets) And other factors. Net interest expense and other expenses related to defined benefit plans are recognized in profit or loss.

When an amendment or reduction of the system occurs, the gain or loss resulting from the change or decrease in the benefits to the past service is immediately recognized in profit or loss. The Company recognizes gains or losses on settlement when the settlement of defined benefit plans occurs.

5) Termination benefits
The Company recognizes the cost of dismissal benefits on the earliest day when it can no longer withdraw its offer of dismissal benefits and recognizes the cost of restructuring that accompanies dismissal disbursements. If the disbursement date of the dismissal benefit comes after 12 months, it is discounted to the present value.

(13) Provisions

Provisions are the present obligation (legal or constructive obligation) that arises as a result of past events, and it is highly probable that resources with economic benefits will be released to fulfill the obligation, and the amount required to fulfill the obligation is reliable Are recognized when it can be estimated.

The amount recognized as a provision is the best estimate of the expenditure required to fulfill current obligations at the end of the reporting period, taking into account the unavoidable risks and uncertainties of the related events and circumstances. If the effect of time value of money is material, the provision is measured at the present value of the expenditure expected to be required to settle the obligation.

The Company recognizes the reimbursement amount and records it as separate assets only when it is probable that the reimbursement will be received if it is expected that the third party will repay part or all of the expenditure required to settle the provision.

The balance of provisions is reviewed at the end of each reporting period and adjusted to reflect the best estimate at the end of the reporting period. If the likelihood of an outflow of resources embodying economic benefits to fulfill an obligation is no longer high, the related provision is reversed.

Restructuring liabilities are recognized when the Company has approved a specific and formal restructuring plan, initiated the implementation of the restructuring plan, or announced the main content of the restructuring plan, and it is reasonably expected for the influenced party to carry out the restructuring process.

Provisions are only used for expenditures related to initial recognition.

(14) GHG emission right

GHG emission rights and emission liabilities in accordance with the enforcement of the "Act on the Allocation and Transactions of GHG Emissions Rights" as of 2015 are accounted for as follows.

1) GHG emission right
The greenhouse gas emission right consists of the right assigned by the government and emission right for purchase. Amortization is charged to the cost of the acquisition over the cost of the acquisition. The right directly refers to the cost of acquisition and other normally incurred costs are added up to the cost.

The emission right associated with the Company's intention to perform obligations is classified as intangible assets and the gains on short term trading is classified as current assets. Emission rights classified as intangible assets are initially recognized at cost less accumulated impairment losses and are carried at cost. Emission rights for short term trading gains are measured at fair value at the end of each reporting period. Changes in the fair value are recognized in profit or loss.

The greenhouse gas emission rights are derecognized when it is no longer possible to expect future economic

benefits as the right is submitted to the government or it is no longer available to be sold or used.

2) Emission liabilities

Emissions liabilities are the present obligations to release greenhouse gas emissions to submit the emission right to the government. The emission liability is recognized when resources are likely to be leaked to fulfill the obligation and when the amount for the performance can be reliably estimated. The emission liability is measured as the sum of the carrying amount of the emission rights held for the applicable fiscal year to be submitted to the government and the expected expenditure in fulfilling the obligation for emissions exceeding the amount of the held rights. Emission liabilities are derecognized when submitted to the government.

(15) Foreign currency

Transactions in foreign currencies other than the functional currency of the Company are presented using the exchange rates prevailing at the dates of the transactions. At the end of each reporting period, monetary items denominated in foreign currencies are translated at the closing rate at the end of the reporting period. Non-monetary items that are measured at fair value are translated at the exchange rates prevailing at the dates when the fair value is determined, and non-monetary items measured at historical cost are translated at the exchange rates prevailing at the dates of the transactions.

Foreign exchange differences arising at the settlement of monetary items and exchange differences arising from the translation of monetary items, except for differences arising from the translation of the net investment in foreign operations or the financial liabilities designated as cash flow hedges, are all recognized in profit or loss. If gains or losses on non-monetary items are recognized in other comprehensive income, the effects of changes in foreign exchange rates are recognized in other comprehensive income. When the gain or loss is recognized in profit or loss, changes in foreign exchange rates are recognized in profit or loss.

(16) Revenue from contracts with customers

The goods sold by the Company consist mainly of steel products in the steel sector.

In the case of domestic transactions, revenue is recognized when the product or product is delivered to the customer and the control is transferred as the customer takes over. Invoices are usually issued on the last day of each month and the sales are generally made based on payment terms of 45 to 90 days from the time of invoice issuance.

In the case of exports, revenue is recognized at the time control is transferred to the customer in accordance with the "International Rules for Interpretation of Trade Terms (Incoterms)". The invoice will be issued based on the date of shipment (B/ L DATE) and transactions are made in accordance with multiple methods, such as non-cancellable letter of credit (L/ C) for order-made products, document against acceptance (D/A), document against payment (D/P), and telegraphic transfer (T/ T).

The Company offers a certain percentage of discounts if the customer prepays according to the contractual terms of payment, and revenue is recognized by including variable consideration in the transaction price. Variable consideration can be included in the transaction price only to the extent that it is highly probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the period for discount is passed.

2) Transportation service

For transportation services included in the company's product sales contracts, revenue is recognized over the period in which the services are rendered and the amount of revenue is determined by examining the degree to which the service has been completed so far. The billing date and billing terms for the service charge are the same as the billing date and payment terms for the goods.

3) PEB product manufacturing and installation service

In the case of a contract for which PEB product creation and installation services are performed in our steel business, the customer controls the asset as it is created. This is because the Company can build or design to meet the requirements of our customers, and if the contract is terminated by the customer, the Company can claim the compensation by adding the appropriate profit to the input cost. Accordingly, when the Company can reliably estimate the outcome of a contract for the production and installation of PEB products, contract revenue and contract costs are recognized as revenue and expense, respectively, based on the progress of the contract activity

as of the end of the reporting period. Proceeds from contracting activities are measured at the rate of cumulative contract costs incurred for the work performed, excluding contract costs incurred that do not reflect the progress stage, divided by the estimated total contract costs.

If the outcome of the contract cannot be reliably estimated, the revenue is recognized only to the extent of the contract costs that are highly probable of recoverability. If the total contract cost is likely to exceed the total contract revenue, respectively. However, in the case of product manufacturing and installation service contracts that are deemed to have no claim for payment, revenue is recognized at the time of delivery to the final customer.

(17) Paid-in capital

Common stock is classified as equity. Incremental costs directly attributable to equity transactions are recognized as a deduction from equity, net of tax effects.

Preferred stock is classified as equity if it does not have to be repaid or is repaid only at the option of the Company and if payment of dividends is determined at the discretion of the Company. Dividends are recognized when the shareholders' meeting approves the dividends. Preferred stocks that are eligible for reimbursement of a defined or determinable amount on or after a certain date are classified as liabilities. The related dividends are recognized as interest expenses in profit or loss at the time of occurrence as interest.

When the Company repurchases its own equity instruments, these equity instruments are deducted directly from equity as a subject of treasury stock. Any gain or loss on the purchase or sale of, or the issue or cancellation of, an equity instrument is not recognized in profit or loss. When other companies in the Company acquire and hold treasury stock, the consideration paid or received is recognized directly in equity.

(18) Financial revenues and expenses

The company's financial income and financial expenses include the following items:
- Interest income
- Interest expenses
- Dividend income
- Foreign exchange gains / losses on financial assets and financial liabilities
- Net profit or loss on financial assets measured at fair value through profit or loss
- Net profit or loss on disposal of debt instruments measured at fair value through other comprehensive income

Interest income or expense is recognized using the effective interest method. Dividend income is recognized when the Company's right to receive dividends is established. The effective interest rate is the interest rate that exactly matches the present value of the future cash payments or receivables estimated with the expected life of the financial instrument to the total carrying amount of the financial asset or the amortize d cost of the financial liability.

When calculating interest income or interest expense, the effective interest rate applies to the total carrying amount of the asset (if the credit of the asset is not impaired) or the amortized cost of the liability. However, interest income on a subsequent impaired financial asset subsequent to initial recognition is calculated by applying the effective interest rate to the amortized cost of the financial asset. If the asset is no longer viewed as impaired, interest income is calculated by applying an effective interest rate to the total carrying amount.

(19) Income tax

Income tax expense consists of current tax and deferred tax and is recognized in profit or loss, except for the tax amount arising from transaction, events, or business combinations directly recognized in other comprehensive income or equity.

When the Company determines that the interest and penalties are corporate tax, K-IFRS No. 1012, 'Income tax' is applied. When the Company decides that the interest and penalties are not corporate tax, K-IFRS No. 1037 'Provisions, contingent liabilities, contingent assets' shall be applied.

1) Current corporate tax
Current tax is calculated based on taxable income for the year. Taxable income differs from profit or loss in the

statement of comprehensive income because taxable income does not include profit or loss taxable to, or deductible from, other income tax period, or non-taxable items or items with unacceptable losses in the net income before income tax expense in the statement of comprehensive income. Income tax payable relating to the Company's current income tax is calculated using tax rates enacted or substantively enacted.

2) Deferred corporate tax
The measurement of deferred tax liabilities and deferred tax assets reflects the tax consequences that would follow from the manner in which the company expects to recover or settle the carrying amount of its assets and liabilities at the end of the reporting period. Deferred tax liabilities are recognized for all taxable temporary differences associated with investment in subsidiaries and affiliated companies, except where the Company can control the extinguishing period or where it is probable that the temporary difference will not reverse in the foreseeable future. Deferred income tax assets are recognized to the extent that it is probable that the temporary difference will reverse in the foreseeable future, and it is probable that taxable profit will be available against which the temporary difference can be utilized. Deferred tax is not recognized if the deferred tax liability arises from goodwill at initial recognition or if the initial recognition of other assets and liabilities arises from a transaction that is not from a business combination and affects neither the taxable profit nor the accounting profit.

The carrying amount of deferred income tax assets is reviewed at the end of each reporting period and the carrying amount of the deferred income tax asset is reduced when there is no longer sufficient taxable income to arise to cover the benefits of the deferred income tax asset.

Deferred income tax assets and liabilities are measured using tax rates that are expected to be applied to the periods in which the asset is realized or the liability is settled, based on tax legislation enacted or substantively enacted at the end of the reporting period.

Deferred income tax assets and liabilities are offset against income taxes levied by the same taxation authority and only when the Company has a legally enforceable right to set off the recognized amount with the intention to settle the current tax liabilities and assets on a net basis. Any additional income tax arising from the dividend allocation is recognized at the recognition of liabilities associated with the dividend.


(20) Profit and loss per share

The Company calculates basic and diluted earnings per common shares for continuing operations and profit or loss, and presents them in the statement of comprehensive income. Basic EPS is calculated by dividing net profit attributable to ordinary shareholders by the weighted average number of ordinary shares outstanding during the reporting period. Diluted EPS is calculated by adjusting the profit or loss and the weighted average number of common shares attributable to common stock to reflect the effect of dilutive potential ordinary shares, including convertible bond payables and warrants.

(21) Non-current assets held for sale

If the carrying amount of a non-current asset or disposal group is expected to be recovered principally through a sale transaction, rather than through continuing use, it is classified as held for sale. These conditions are considered to be met only when the asset (or disposal group) is ready to be sold immediately and is highly likely to be sold. The carrying amount of an asset (or disposal group) is measured initially at the lower of its carrying amount and fair value less costs to sell. The impairment loss is recognized immediately in profit or loss if the fair value of the asset is impaired and the impairment loss is recognized in profit or loss if the fair value less costs can be reliably estimated. If the non-current asset is classified as held for sale or is part of a disposal group classified as held for sale, the asset is not amortized.

(22) Bond payable and debt adjustment

When the Company issues equity securities to a creditor to repay its debts(debt-to-equity swap), the difference between the fair value of equity securities and the carrying amount of debts is recognized as a gain on debt adjustment. When the conversion is not carried out immediately, the adjustable debts are accounted for as other capital surplus, and the difference between the fair value of the shares to be issued as a result of the conversion and the carrying amount of the reconciliated liability is recognized in gain on debt adjustment. If the conditions of the financial liabilities are changed but not eliminated, the difference between the fair value and the carrying

amount of the liability is recognized as an adjustment to the liability. The gain or loss is calculated by discounting the difference between the contractual cash flow and the changed cash flow using the original effective interest rate. The fair value of the liability is measured by reasonably estimating the interest rate for normal transactions in the active market, considering the collateral provided to the creditor.

(23) Operating Segments

In accordance with K-IFRS No. 1108, "Operating Segments", the Company makes disclosures related to its operating segments in the financial statements.

(24) Amendment standard

Amendments and interpretations that have been announced but did not come to effective as of January 1, 2019 are as follows.

1) Amendment to K-IFRS No. 1103 "Business Combinations" - Definition of a business

The amendments clarify that a business may generally have outputs, but not necessary, for an acquired set of activities and assets to meet the requirements of the definition of a business. For the acquired set of activities and assets to be considered a business, an integrated set of activities and assets must include, at a minimum, an input and a substantive process that together significantly contribute to the ability to create output. The amendments also add guidance to assess whether an acquired process is substantive and add illustrative examples.

The amendments introduce an optional concentration test to permit a simplified assessment of whether an acquired set of activities and assets is not a business. The concentration test is met if substantially all of the fair value of the gross assets acquired is concentrated in a single identifiable asset or group of similar identifiable assets, therefore not a business.

The amendments are effective for annual reporting periods beginning on or after January 1, 2020 and apply prospectively. Earlier application is permitted.

2) Reference to the *Conceptual Framework* in K-IFRS (amendments)

The IASB has announced the revised *Conceptual Framework for Financial Reporting*, as well as the *Conceptual Framework(2018)* issued in December 21, 2018. The document includes amendments to K-IFRS No. 1102, No. 1103, No. 1106, No. 1114, No. 1001, No. 1008, No. 1034, No. 1037, No. 1038, No. 2112, No. 2119, No.2120, No. 2122, No. 2032.

Not all statements related to those references and quotations of the amendments refers the *Conceptual Framework(2018)*. The revision was made to clarify the referenced 'conceptual framework' is indicating whether *Framework for the Preparation and Presentation of Financial Statements(2007)*, *Conceptual Framework(2010)*, or the newly amended *Conceptual Framework(2018)*, and to clarify that in some other statements, the definition on K-IFRS is not modified to the new definition described in *Conceptual Framework(2018)*.

If there is any change due to the amendments, the amendments are effective for annual reporting periods beginning on or after January 1, 2020 and apply prospectively. Earlier application is permitted.

The Company made a judgment that the amendments will not make significant impact on the financial statements.


**5. Property, plant and equipment (Tangible assets)**

(1) The carrying amount of property, plant and equipment at the end of the current and previous years is as follows.

| | | | | | | | (million Korean won in units) |
|---|---|---|---|---|---|---|---|
| Item | 38th period | | | | 37th period | | |
| | Acquisition value | Accumulated depreciation | Accumulated amount of impairment losses | Carrying amount | Acquisition value | Accumulated depreciation | Accumulated amount of impairment losses | Carrying amount |
| Land | 448,212 | - | - | 448,212 | 448,144 | - | - | 448,144 |
| Buildings | 362,978 | (140,651) | (145,351) | 76,976 | 362,798 | (134,720) | (145,351) | 82,727 |
| Structures | 163,863 | (59,035) | (80,714) | 24,114 | 181,562 | (68,454) | (80,714) | 32,394 |
| Machinery | 2,474,813 | (1,306,848) | (973,960) | 194,005 | 2,494,160 | (1,302,714) | (973,959) | 217,487 |
| Vehicles | 1,666 | (1,572) | (62) | 32 | 1,681 | (1,562) | (62) | 57 |
| Equipment | 58,798 | (52,393) | (5,576) | 829 | 65,754 | (59,359) | (5,576) | 819 |
| Furniture and fixtures | 2,009 | (1,249) | (101) | 659 | 7,869 | (7,517) | (101) | 251 |
| Assets in construction | 32,151 | - | (24,886) | 7,265 | 29,806 | - | (24,886) | 4,920 |
| Total | 3,544,490 | (1,561,748) | (1,230,650) | 752,092 | 3,591,774 | (1,574,326) | (1,230,649) | 786,799 |

(2) Increase and decrease in the items of property, plant and equipment during the current and previous years is as follows.

### 1) 38th period

| | | | | | | | (million Korean won in units) |
|---|---|---|---|---|---|---|---|
| Item | Beginning book value | Acquisition value | Disposal value (*1) | Depreciation | Impairment loss | Replacement (*2) | Other increase or decrease | Ending book value |
| Land | 448,144 | - | - | - | - | - | 68 | 448,212 |
| Buildings | 82,727 | - | - | (5,945) | (1) | - | 193 | 76,976 |
| Structures | 32,394 | - | (284) | (2,349) | - | (5,647) | - | 24,114 |
| Machinery | 217,487 | - | (737) | (35,101) | - | (2,468) | 14,824 | 194,005 |
| Vehicles | 57 | - | - | (25) | - | - | - | 32 |
| Equipment | 819 | - | (2) | (180) | - | - | 192 | 829 |
| Furniture and fixtures | 251 | - | (3) | (100) | - | - | 511 | 659 |
| Assets in construction | 4,920 | 18,938 | - | - | - | - | (16,593) | 7,265 |
| Total | 786,799 | 18,938 | (1,025) | (43,700) | (1) | (8,115) | (805) | 752,092 |

(*1) During the year ended December 31, 2019, the Company disposed items of property, plant and equipment, and recognized the resulting gains on the disposal at 58 million won and losses at 972 million won in other non-operating profit income and expenses.
(*2) During the year ended December 31, 2019, the Company replaced the structures and machinery at the value of 8,115 million won to right-of-use assets in accordance with the adoption of K-IFRS No. 1116.

### 2) 37th period

| | | | | | (million Korean won in units) |
|---|---|---|---|---|---|
| Item | Beginning book value | Acquisition value | Disposal(*) | Depreciation | Other increase or decrease | Ending book value |
| Land | 448,144 | - | - | - | - | 448,144 |
| Building | 88,182 | - | - | (5,934) | 479 | 82,727 |

| | | | | | (million Korean won in units) | |
|---|---|---|---|---|---|---|
| Item | Beginning book value | Acquisition value | Disposal(*) | Depreciation | Other increase or decrease | Ending book value |
| Structures | 35,235 | - | - | (2,879) | 38 | 32,394 |
| Machinery | 237,940 | - | (1,260) | (35,107) | 15,914 | 217,487 |
| Vehicles | 81 | - | - | (25) | 1 | 57 |
| Equipment | 329 | - | - | (115) | 605 | 819 |
| Furniture and fixtures | 389 | - | - | (140) | 2 | 251 |
| Assets in construction | 3,877 | 18,813 | - | - | (17,770) | 4,920 |
| Total | 814,177 | 18,813 | (1,260) | (44,200) | (731) | 786,799 |

(*) During the year ended December 31, 2018, the Company disposed of items of property, plant and equipment and recognized gain at 36 million won in other non-operating income and loss at 1,305 million won in other non-operating expenses.


## 6. Intangible assets

(1) The carrying amount of intangible assets as of December 31, 2019 and 2018 is as follows.

| | | | | | | | (million Korean won in units) | |
|---|---|---|---|---|---|---|---|---|
| | 38th period | | | | 37th period | | | |
| Item | Acquisition value | Accumulated amortization | Accumulated amount of impairment losses | Carrying amount | Acquisition value | Accumulated amortization | Accumulated amount of impairment losses | Carrying amount |
| Industrial property right | 17 | (13) | - | 4 | 206 | (176) | - | 30 |
| Development expenditure | - | - | - | - | 6,649 | (5,101) | (1,548) | - |
| Software | 20,222 | (18,474) | - | 1,748 | 28,739 | (27,208) | (100) | 1,431 |
| Right to use port | 14,086 | (12,017) | (1,529) | 540 | 14,086 | (11,998) | - | 2,088 |
| Membership | 654 | - | (227) | 427 | 653 | - | (228) | 425 |
| Other intangible assets | - | - | - | - | 115 | (115) | - | - |
| Total | 34,979 | (30,504) | (1,756) | 2,719 | 50,448 | (44,598) | (1,876) | 3,974 |

(2) Increase and decrease in intangible assets during the current and previous years is as follows.

1) 38th period

| | | | | | | | (million Korean won in units) |
|---|---|---|---|---|---|---|---|
| Item | Beginning book value | Acquisition cost | Disposal | Depreciation | Impairment loss(*) | Other increase and decrease | Ending book value |
| Industrial property right | 30 | - | (15) | (11) | - | - | 4 |
| Software | 1,431 | - | (25) | (461) | - | 803 | 1,748 |
| Right to use port | 2,088 | - | - | (19) | (1,529) | - | 540 |
| Membership | 425 | - | - | - | - | 2 | 427 |
| Total | 3,974 | - | (40) | (491) | (1,529) | 805 | 2,719 |

(*) During the year ended December 31, 2019, the Company recognized impairment loss on the right to use port at 1,529 million won, in respect of recoverable amount, in other non-operating expenses.

2) 37th period

| | | | | | | | (million Korean won in units) |
| Item | Beginning book value | Acquisition cost | Disposal | Depreciation | Impairment loss | Other increase and decrease | Ending book value |
|---|---|---|---|---|---|---|---|
| Industrial property right | 41 | - | - | (11) | - | - | 30 |
| Software | 1,187 | - | - | (437) | - | 681 | 1,431 |
| Right to use port | 2,122 | - | - | (34) | - | - | 2,088 |
| Membership | 425 | - | - | - | - | - | 425 |
| Total | 3,775 | - | - | (482) | - | 681 | 3,974 |

(3) Research and development expenditure during the current and previous years is as follows.

| | | (million Korean won in units) |
| Item | 38th period | 37th period |
|---|---|---|
| Test and development expenses (Selling and administrative expenses) | 1,415 | 1,298 |
| Research development expenses (Cost of sales) | 15 | - |
| Total | 1,430 | 1,298 |

## 7. Leases

(1) As of the end of the year ended December 31, 2019, the right-of-use assets are as follows.

| | | | (million Korean won in units) |
| Item | Acquisition cost | Accumulated depreciation | Carrying amount |
|---|---|---|---|
| Buildings | 4,079 | (923) | 3,156 |
| Structures | 5,647 | (526) | 5,121 |
| Machinery | 2,468 | (731) | 1,737 |
| Vehicles | 236 | (61) | 175 |
| Furniture and fixtures | 1,575 | (371) | 1,204 |
| Total | 14,005 | (2,612) | 11,393 |

(2) Changes in the carrying amount of right-of-use assets are as follows.

| | | | | | | (million Korean won in units) |
| Item | Beginning carrying amount | Increase | Decrease | Replacement | Depreciation | Ending carrying amount |
|---|---|---|---|---|---|---|
| Buildings | - | 4,079 | - | - | (923) | 3,156 |
| Structures | - | - | - | 5,647 | (526) | 5,121 |
| Machinery | - | - | - | 2,468 | (731) | 1,737 |
| Vehicles | - | 244 | (8) | - | (61) | 175 |
| Furniture and fixtures | - | 1,575 | - | - | (371) | 1,204 |
| Total | - | 5,898 | (8) | 8,115 | (2,612) | 11,393 |

(3) Lease liabilities(or financial lease liabilities for the 37th period) at the end of the year ended December 31, 2019 and 2018 are as follows.

| | | (million Korean won in units) |
|---|---|---|
| | 38th period | 37th period (*) |
| A year or less | 5,421 | 3,570 |
| Between one year and 5 years | 18,693 | 14,278 |
| More than 5 years | 1,784 | 5,354 |
| Subtotal | 25,898 | 23,202 |
| Adjustment : present value assessment | (5,712) | (6,708) |
| Adjustment : currency fluctuation | 4 | - |
| Total | 20,190 | 16,494 |

(*) Present value of the lease payment at the end of 2018 is classified as long-term borrowings and current portion of long-term borrowings.

(4) Current and non-current lease liabilities for the years ended December 31, 2019 and 2018 is as follows.

| | | (million Korean won in units) |
|---|---|---|
| Classification | 38th period | 37th period |
| Current liabilities | 5,152 | 1,836 |
| Non-current liabilities | 15,038 | 14,658 |
| Total | 20,190 | 16,494 |

(5) The amounts recognized in profit or loss are as follows.

| | (million Korean won in units) |
|---|---|
| Classification | 38th period |
| Depreciation on right-of-use assets | 2,612 |
| Interest expenses for lease liabilities | 2,157 |
| Expenses related to short-term leases | 2,047 |
| Expenses related to leases for which the underlying asset is of low value | 212 |

(6) The lease commitment amount for the short-term leases the Company currently is committed to is at 98 million won, and the cash outflow due to leases for the year ended December 31, 2019 is at 6,612 million won.


## 8. Collateralized assets

As of December 31, 2019, the assets provided as collateral for the Company's debts are as follows. Collateral details with related parties other than the financial institutions are stated in Note 31.

| | | | | | (million Korean won in units) |
|---|---|---|---|---|---|
| Pledged asset | Carrying amount | Pledged amount | Borrowing power | Borrowings, etc.(*) | Borrower |
| Investment in subsidiaries and associates, Financial assets measured at fair value through profit or loss, Treasury stock | 754,663 | 129,415 | 1,109,155 | 708,537 | KDB, etc. |
| Site in Eumseong, Chungcheongbuk-do | 19,625 | 34,000 | | | |

| | | | | | (million Korean won in units) |
|---|---|---|---|---|---|
| Pledged asset | Carrying amount | Pledged amount | Borrowing power | Borrowings, etc.(*) | Borrower |
| Dangjin cold rolling factory (land, building, machinery, etc.) | 601,048 | 1,359,841 | | | |
| Dangjin cold rolling factory (company housing) | | 12,896 | 3,210 | 3,210 | Kookmin Bank |
| Dangjin hot rolling factory (land, building, machinery, etc.) | 116,618 | 960,000 | 245,365 | 245,365 | KDB, etc. |
| Dangjin hot rolling factory (Inventories) | - | 301,028 | 64,173 | 30,724 | KEXIM |
| Deposit at financial institutions | 13 | 13 | - | - | Woori Bank |
| Total | 1,491,967 | 2,797,193 | 1,421,903 | 987,836 | |

(*) Trade payables (Shipper's Usance) are included.


## 9. Investment in subsidiaries

(1) Details of investment in subsidiaries at December 31, 2019 and 2018 are as follows.

| | | | | | (million Korean won in units) | |
|---|---|---|---|---|---|---|
| | | | 38th period | | 37th period | |
| Subsidiary | Location | Main business | Share ratio (%) | Carrying amount | Share ratio (%) | Carrying amount |
| Dongbu Incheon Steel (*1) | Korea | Manufacture and sale of steel products | 100.00 | 545,135 | 100.00 | 545,135 |
| Dongbu Dangjin Port Operation (*1) | Korea | Port facility operation | 100.00 | 206,430 | 100.00 | 206,430 |
| Dongbu USA | USA | Sale of steel products | 100.00 | 5,773 | 100.00 | 5,773 |
| Dongbu Singapore | Singapore | Sale of steel products | 100.00 | - | 100.00 | - |
| Dongbu Thai Steel(*2) | Thailand | Manufacture and sale of steel products | 28.94 | - | 28.94 | - |
| DB Private Real Estate Investment Trust No.9(*3) | Korea | Real estate | 99.67 | 42,615 | - | - |
| Total | | | | 799,952 | | 757,338 |

(*1) The Company received dividends of ₩ 1,300 million and ₩ 3,850 million, respectively, from Dongbu Incheon Steel Co., Ltd. and Dongbu Dangjin Port Operation Co., and recognized the dividends as gains on the investment in the subsidiaries. The Company has assessed the recoverable amount of the shares of Dongbu Incheon Steel Co., Ltd. and Dongbu Dangjin Port Operation Co., and recognized impairment at 53,081 million won during the year ended December 31, 2018 and the accumulated impairment loss at December 31, 2019 is at 121,117 million won.

(*2) The Company assessed the recoverable amount on the investment shares in Dongbu Thai Steel, and recognized impairment loss of 5,054 milion won as losses on the investment in subsidiaries. Dongbu Thai Steel is classified as a subsidiary because its share percentage added up with Dongbu Singapore and Dongbu Incheon Steel, on which the company possesses 100% of the shares, is at 90.35%.

(*3) During the year ended December 31, 2019, he Company has acquired 42,049,842,658 shares of profit-making securities of DB Private Real Estate Investment Trust No.9 from Dongbu Incheon Steel, a subsidiary, at 42,473 million won. DB Private Real Estate Investment Trust No.9 is classified as a subsidiary as the Company has control over the subsidiary's activities, is significantly exposed to the fluctuation margins, and has an ability to use power to influence the revenue.

(2) The summarized financial information of the subsidiaries is as follows.

| | | | | | | (million Korean won in units) |
|---|---|---|---|---|---|---|
| | Dongbu Incheon Steel | Dongbu Dangjin Port Operation | Dongbu USA | Dongbu Singapore | Dongbu Thai Steel | DB Private Real Estate Investment Trust No.9 |
| Total assets | 842,236 | 225,064 | 95,588 | 1,926 | 31,606 | 62,960 |

| | | | | | (million Korean won in units) |
|---|---|---|---|---|---|
| | Dongbu Incheon Steel | Dongbu Dangjin Port Operation | Dongbu USA | Dongbu Singapore | Dongbu Thai Steel | DB Private Real Estate Investment Trust No.9 |
| Total liabilities | 304,361 | 13,970 | 85,649 | 31,179 | 38,169 | 25,915 |
| Sales | 776,814 | 21,933 | 274,815 | - | 75,654 | 3,674 |
| Operating income(loss) | 4,731 | 5,969 | 1,321 | (107) | (2,638) | 3,148 |
| Net profit(loss) | (6,034) | 4,695 | 1,018 | (2,129) | (2,341) | 2,269 |

The date of the financial statements used to prepare the information on the subsidiaries above is at December 31, 2019.

## 10. Investment in associated companies

(1) Details on investment in associates at December 31, 2019 and 2018 is as follows.

| | | | 38th period | | 37th period | |
|---|---|---|---|---|---|---|
| Subsidiary | Location | Main business | Share ratio (%) | Carrying amount | Share ratio (%) | Carrying amount |
| Dongbu Steel Structures | Korea | Installation construction of steel material | 42.86 | 2,910 | 42.86 | 2,910 |
| Dongbu Japan (*) | Japan | Sale of steel material | 82.02 | 2,030 | 82.02 | 2,030 |
| Dongbu India (*) | India | Marketing service | 99.99 | 209 | 99.99 | 209 |
| Total | | | | 5,149 | | 5,149 |

*(million Korean won in units)*

 (*)  Dongbu Japan and Dongbu India are excluded from subsidiaries and classified associates as they are considered to be less significant to the Company.

(2) The summary of financial information of the associated companies is as follows.

| | | | (million Korean won in units) |
|---|---|---|---|
| | Dongbu Steel Structure | Dongbu Japan | Dongbu India |
| Total assets | 10,944 | 2,990 | 295 |
| Total liabilities | 1,074 | 230 | 21 |
| Sales | - | 920 | 355 |
| Operating income(loss) | (4) | 58 | 33 |
| Net profit(loss) | (33) | 19 | 33 |

## 11. Financial assets measured at fair value through profit or loss

(1) Financial assets measured at fair value through profit or loss at December 31, 2019 and 2018 are as follows.

| | | | | | (million Korean won in units) |
|---|---|---|---|---|---|
| | | 38th period | | | 37th period |
| | | Share percentage(%) | Acquisition cost | Carrying amount | Carrying amount |
| Unlisted stocks, etc. | DB Metal | 0.37 | 3,370 | 164 | 164 |
| | DB Private Real Estate Investment Trust No.9(*1) | - | - | - | 138 |
| | Korea Specialty Contractor Financial Cooperative | 0.004 | 183 | 186 | 184 |
| | Machinery Financial Cooperative | 0.71 | 1,665 | 1,665 | 1,641 |

| | | | 38th period | | | 37th period |
|---|---|---|---|---|---|---|
| | | Share percentage(%) | Acquisition cost | Carrying amount | | Carrying amount |
| | Korea Management Association Consulting | 0.50 | 20 | 20 | | 20 |
| | SNMNEWS | 2.67 | 20 | 20 | | 20 |
| | Miju Steel(*2) | 0.97 | 158 | - | | - |
| Total | | | 5,416 | 2,055 | | 2,167 |
| Current assets | | | - | - | | - |
| Non-current assets | | | 5,416 | 2,055 | | 2,167 |

(million Korean won in units)

(*1)   During the year ended December 31, 2019, he Company has acquired additional 42,049,842,658 shares of profit-making securities of DB Private Real Estate Investment Trust No.9 from Dongbu Incheon Steel, a subsidiary, at 42,473 million won. DB Private Real Estate Investment Trust No.9 is classified as a subsidiary as the Company has control over the subsidiary's activities, is significantly exposed to the fluctuation margins, and has an ability to use power to influence the revenue.

(*2)   In accordance with the revitalization plan of Mizuho Steel Mill Co., Ltd., the Company received 17,269 shares after capital reduction without refund (90%) and reverse stock split(50:1) on the previously held stocks and cash settlement bonds. The Company assessed the recoverable amount of shares of Miju Steel and recognized 158 million won of losses in financial assets measured at fair value through profit or loss in financial expenses for the year ended December 31, 2018.

(2) The Company measured the right arising from disposal entrustment contract with DB Private Real Estate Investment Trust No.9 at fair value and recognized it as current derivative financial assets as follows.

(million Korean won in units)

| Item | Account | 38th period | 37th period |
|---|---|---|---|
| Embedded derivative | Derivative assets | 6,003 | 5,464 |

## 12. Trade receivables

(1) Trade receivables are stated at net amount less loss allowance in the statement of financial position. Trade receivables before deduction and loss allowance at December 31, 2019 and 2018 are as follows.

(million Korean won in units)

| Account | 38th period | | | 37th period | | |
|---|---|---|---|---|---|---|
| | Total carrying amount | Loss allowance | Net carrying amount | Total carrying amount | Loss allowance | Net carrying amount |
| Trade receivables | 249,366 | (6,453) | 242,913 | 278,876 | (4,474) | 274,402 |
| Long-term trade receivables | 3,331 | (2,683) | 648 | 12,623 | (12,013) | 610 |
| Total | 252,697 | (9,136) | 243,561 | 291,499 | (16,487) | 275,012 |

(2) Details of trade receivables that do not meet the requirements for derecognition of financial assets as of December 31, 2019 and 2018 are as follows.

(million Korean won in units)

| | Account name | 38th period | 37th period |
|---|---|---|---|
| Export receivables(*) | Trade receivables | 67,603 | 89,777 |
| | Short-term borrowings | 67,603 | 89,777 |

(*)   The amount not paid by the importer, among the amount of the export receivable (D/A) discounted before maturity and the L/C Nego amount.

## 13. Contract assets and contract liabilities

(1) The Company's PEB structure manufacturing and installation service and the performance obligation for the transportation service of the export products are carried out over the service period. The services incomplete as of December 2019 and 2018 are as follows.

| | | | | (million Korean won in units) |
|---|---|---|---|---|
| Performance obligations | Classification | Account name | 38th period | 37th period |
| PEB product manufacturing and installation service | Unclaimed amount of cumulative revenue | Contract assets | 3,772 | 18,152 |
| | Unclaimed amount of cumulative revenue | (Loss allowance) | (146) | (4,712) |
| | Overcharged amount | Contract liabilities | 2,942 | 293 |
| Export Product Transportation Service | Advance payment for the incomplete shipping service fee | Contract liabilities | 1,828 | 2,055 |
| Total | | Contract assets | 3,626 | 13,440 |
| | | Contract liabilities | 4,770 | 2,348 |

Both the contract assets and the contract liabilities are expected to be realized within a year.

(2) At December 31, 2019, effect of the change in the current year on the estimates regarding the operating segments associated with the contracts that recognize revenue over time using a cost-based input method is as follows.

| | | | | | | | (million Korean won in units) |
|---|---|---|---|---|---|---|---|
| Operating segment | Change in estimated total contract revenue | Changes in total contract costs | Effect on profit and loss | Effect on net profit or loss | Effect on future profit or loss | Effect on future profit or loss | Provision for construction loss |
| Steel segment(PEB) | (426) | 4,634 | (5,060) | (5,012) | (48) | (5,012) | 1,243 |

## 14. Other notes and accounts receivables

Notes and accounts receivable at December 31, 2019 and 2018 are as follows.

| | | | | | | (million Korean won in units) |
|---|---|---|---|---|---|---|
| | 38th period | | | 37th period | | |
| | Total carrying amount | Loss allowance | Net carrying amount | Total carrying amount | Loss allowance | Net carrying amount |
| Current: | | | | | | |
| Loans (*1) | 3,473 | - | 3,473 | - | - | - |
| Accounts receivables(*2) | 9,912 | (9,154) | 758 | 9,035 | (8,865) | 170 |
| Accrued income(*3) | 5,055 | (4,969) | 86 | 4,204 | (3,882) | 322 |
| Deposit | 120 | - | 120 | 120 | - | 120 |
| Subtotal | 18,560 | (14,123) | 4,437 | 13,359 | (12,747) | 612 |
| Non-current: | | | | | | |
| Loans (*1,3) | 23,404 | (21,666) | 1,738 | 23,817 | (22,138) | 1,679 |
| Deposit | 7,604 | - | 7,604 | 7,637 | - | 7,637 |
| Subtotal | 31,008 | (21,666) | 9,342 | 31,454 | (22,138) | 9,316 |
| Total | 49,568 | (35,789) | 13,779 | 44,813 | (34,885) | 9,928 |

(*1)  The Company loaned 3,604 million won to Dongbu Thai Steel, a subsidiary, during the year ended December 31, 2019, and extended the maturity of 2,304 million won of loan to Dongbu Singapore, a subsidiary, to January 15, 2021, during the year ended December 31, 2018.

(*2)  During the year ended December 31, 2018, the Company partially recollected 1,079 million won from Dongbu Vietnam Steel, a subsidiary of Dongbu Singapore. During the year ended December 31, 2019, the Company determined the recoverability of the receivable from Dongbu Vietnam Steel and recognized 302 million won of other doubtful debts expenses as other non-operating expenses.

(*3)  The Company determined recoverability of the receivable from Dongbu Singapore, a subsidiary, and recognized other doubtful debts expenses at 1,087 million won for the year ended December 31, 2019. For the year ended December 31, 2018, the Company recognized other doubtful debts expenses at 10,266 million won and 1,040 million won each for the loans and accrued income as other non-operating expenses.

## 15. Other financial assets and other current assets

(1) Other financial assets as of December 31, 2019 and 2018 are as follows.

| | | (million Korean won in units) |
|---|---|---|
| | 38th period | 37th period |
| Long-term financial instruments | 35 | 2,452 |

(2) Other current assets as of December 31, 2019 and 2018 are as follows.

| | | (million Korean won in units) |
|---|---|---|
| | 38th period | 37th period |
| Prepaid additional tax | 15,910 | 21,963 |

## 16. Inventories

Inventories as of December 31, 2019 and 2018 are as follows.

| | | (million Korean won in units) |
|---|---|---|
| | 38th period | 37th period |
| Goods | 56,697 | 52,087 |
| Products | - | 354 |
| By-products | 166 | 122 |
| Semi-finished product | 28,445 | 31,822 |
| Raw material | 47,891 | 47,374 |
| Stored goods | 60,463 | 63,305 |
| Goods in transit | 7,417 | 21,509 |
| Other inventory assets(*1) | - | 3,966 |
| Allowance for valuation(*2) | (31,266) | (36,690) |
| Total | 169,813 | 183,849 |

(*1)  Accumulated other costs recognized in contracts that do not have the right to request payment at December 31, 2018 are recognized as other inventory assets.

(*2)  (*2) As of December 31, 2019 and 2018, the Company accounted for the carrying amount exceeding the net realizable value of the inventories associated with hot rolled coils, with low change or selling due to the lack of use or external market due to the suspension of Dangjin hot rolled factory, as valuation allowance at 29,740 million won, and the valuation loss and reversal of the associated inventory items are recognized as costs of sale.

**17. Cash and cash equivalents**

Cash and cash equivalents as of December 31, 2019 and 2018 are as follows.

| | | (million Korean won in units) |
|---|---|---|
| | 38th period | 37th period |
| Checking account and ordinary account | 16,178 | 32,477 |

**18. Financial instruments restricted for use**

Financial instruments restricted for use as of December 31, 2019 and 2018 are as follows. Matters relating to investment securities other than deposit among financial instruments restricted for use are described in Note 7.

| | | | (million Korean won in units) |
|---|---|---|---|
| | 38th period | 37th period | Restriction |
| Other current financial assets (Short-term financial instruments) | 13 | - | Foreign currency deposit (USD) related to Export Credit and Guarantee Corporation |
| Other non-current financial assets (Long-term financial instruments) | 22 | 22 | Current account opening deposit |
| Total | 35 | 22 | |

**19. Assets held for sale**

Assets held for sale of December 31, 2019 and 2018 are as follows.

| | | (million Korean won in units) |
|---|---|---|
| | 38th period | 37th period |
| Assets held for sale(*) | - | 2,287 |

(*) Shares of Dongbu World classified as assets held for sale in the previous year were sold during the current year ended December 31, 2019.

**20. Equity**

(1) Equity as of December 31, 2019 and 2018 are as follows. Equity as of December 31, 2019 is not the same with the total face value of the issued shares due to the repayment by the redemption preference interest incentive method in 2003 and 2005.

| | | | | (million Korean won in units) |
|---|---|---|---|---|
| | 38th period | | 37th period | |
| | Common stock | Preferred stock | Common stock | Preferred stock |
| Authorized stock | 220,000,000 shares | 30,000,000 shares | 220,000,000 shares | 30,000,000 shares |
| Issued stock | 100,008,897 shares | 53,385 shares | 27,233,424 shares | 160,156 shares |
| Price per share | 5,000won | 5,000won | 5,000won | 5,000won |
| Capital | 500,044 | 55,267 | 136,167 | 55,801 |

(2) Changes in the issued shares of common stock (including old preferred stock) during the current and previous period are as follows.

| | | | | | | (million Korean won in units) |
|---|---|---|---|---|---|---|
| | 38th period | | | 37th period | | |
| | Shares issued(*1) | Treasury stock | Outstanding shares | Shares issued(*1) | Treasury stock | Outstanding shares |
| Beginning shares issued | 27,393,580 | (4,959) | 27,388,621 | 25,160,457 | (9,918) | 25,150,539 |
| Capital reduction without refund(*2) | (23,531,298) | (2,304) | (23,533,602) | (11,100,210) | 4,959 | (11,095,251) |
| Investment conversion(*3) | 24,200,000 | - | 24,200,000 | 13,333,333 | - | 13,333,333 |
| Paid-in capital increase(*4) | 72,000,000 | | 72,000,000 | - | - | - |
| Ending shares issued | 100,062,282 | (7,263) | 100,055,019 | 27,393,580 | (4,959) | 27,388,621 |

(*1) Old preferred stock (160,334 shares for the previous period and 53,385 shares for the current period) that meets the definition of common stock in accordance with K-IFRS No. 1033, is included in common stock in the disclosure.

(*2) During the year ended December 31, 2019, the Company conducted a differential capital reduction without refund at 8.5:1 for the stock held by Creditor Financial Institution Committee and the treasury stock(common stock and preferred stock), and at 3:1 for the stock held by common shareholders and treasury stock and the treasury stock(common stock and preferred stock), in accordance with the resolution of the Creditor Financial Institution Committee, and the treasury shares increased due to the acquisition of fraction stock.
During the year ended December 31, 2018, the Company conducted capital reduction without refund at 2:1 for the stock held by Creditor Financial Institution Committee and the treasury stock(common stock and preferred stock) in accordance with the resolution of the Creditor Financial Institution Committee.

(*3) During the year ended December 31, 2019, the Company conducted debt-to-equity swap on the bonds held by Creditor Financial Institution Committee of 605,000 million won to 24,200,000 shares of common stock in accordance with the resolution of the Creditor Financial Institution Committee. As a result, the capital of the Company increased by 121,000 million won, share premium increased by 446,577 million won, and 644 million won was spent to issue the stock.
During the year ended December 31, 2018, the Company conducted debt-to-equity swap on the bonds held by Creditor Financial Institution Committee of 200,000 million won to 13,333,333 shares of common stock in accordance with the resolution of the Creditor Financial Institution Committee. As a result, the capital of the Company increased by 66,667 million won, share premium increased by 39,131 million won, trade payable was reduced by 27,880 million won, and 345 million won was spent to issue the stock.

(*4) During the year ended December 31, 2019, the Company conducted paid-in capital increase through the third-party allotment by attracting new investors. As a result, 72,000,000 shares of common stock was issued and the capital increased by 360,000 million won and 8,449 million won of issuing expense was spent.

(3) Share premium as of December 31, 2019 and 2018 are as follows.

| | | (million Korean won in units) |
|---|---|---|
| | 38th period | 37th period |
| Share premium(*1) | 754,600 | 317,115 |
| Marginal profits from capital reduction(*2) | 494,555 | 376,938 |
| Other share premium | 6,159 | 6,159 |
| Total | 1,255,314 | 700,212 |

(*1) During the year ended December 31, 2019, the Company's capital increased by 121,000 million won due to debt-to-equity swap, and the difference of 445,933million won between 548,632 million won of borrowings and bond payables (face value 586,055 million won) and 18,945 million won of account payable, less 644 million won of stock issuing expense, is accounted for as share premium.
During the year ended December 31, 2018, the Company's capital increased by 66,667 million won due to debt-to-equity swap, and the difference of 132,988 million won between expected payable of the conversion at 172,120 million won and 27,880 million won of account payable, less 345 million won of stock issuing expense, is accounted for as share premium.

(*2)  Capital reduced due to capital reduction without refund (including treasury stock) in the current and previous year is replaced with marginal profits.

(4) Other equity items as of December 31, 2019 and 2018 are as follows.

| | (million Korean won in units) | |
|---|---|---|
| | 38th period | 37th period |
| Treasury stock(*) | (157) | (56) |
| Profits from treasury stock disposal | 198 | 198 |
| Total | 41 | 142 |

(*)   3,118 shares of common stock, 119 shares of preferred stock reduced due to capital reduction(3:1) during the current year, and 4,992 shares of common stock and 619 shares of preferred stock increased due to the acquisition of fraction stock.

## 21. Deficiencies

(1) Deficiencies as of December 31, 2019 and 2018 are as follows.

| | (million Korean won in units) | |
|---|---|---|
| | 38th period | 37th period |
| Unappropriated deficits | (908,619) | (877,119) |

(2) Changes in deficits as of December 31, 2019 and 2018 are as follows.

| | (million Korean won in units) | |
|---|---|---|
| | 38th period | 37th period |
| Beginning amount | (877,119) | (818,515) |
| Effect of changes in accounting standards | - | 8,135 |
| Net loss | (30,861) | (64,063) |
| Actuarial gains(losses) | (639) | (2,676) |
| Ending amount | (908,619) | (877,119) |

(3) Statement of deficits as of December 31, 2019 and 2018 are as follows.

| | (million Korean won in units) | | | |
|---|---|---|---|---|
| | 38th period | | 37th period | |
| Accounts | Estimated disposal date: March 27, 2020 | | Confirmed disposal date: March 29, 2019 | |
| I. Unappropriated deficits | | (908,619) | | (877,119) |
| Unappropriated deficits deferred from the previous period | (877,119) | | (818,515) | |
| Effect of changes in accounting standards (Note 39) | - | | 8,135 | |
| Net loss | (30,861) | | (64,063) | |
| Actuarial losses | (639) | | (2,676) | |
| II. Transferred amount, including voluntary reserve, etc. | | 908,619 | | - |
| Transfer of share premium(*) | 908,619 | | | |
| III. Retained earnings disposal | | - | | - |
| IV. Unappropriated deficit carried forward | | - | | (877,119) |

(\*)   Share premium of 908,619 million won is expected to be transferred to retained earnings, in accordance with the resolution expected to be made at the general meeting of shareholders on March 27, 2020.

## 22. Profit or loss per share

(1) Net profit or loss per share as of December 31, 2019 and 2018 are as follows.

| | Common stock | | Preferred stock | |
|---|---|---|---|---|
| | | | | (Korean won in units) |
| | 38th period | 37th period | 38th period | 37th period |
| Net loss | (30,815,803,773) | (63,056,646,134) | (45,556,206) | (1,006,609,650) |
| Weighted average number of ordinary shares outstanding during the period (*) | 35,958,598 | 3,330,018 | 53,159 | 53,159 |
| Loss per common share | (857) | (18,936) | (857) | (18,936) |

(\*)   Profit per share is separately disclosed as it matches the definition of common stock in accordance with K-IFRS No. 1033 "Profit per Share".

(2) Ordinary shares outstanding during the period
Calculation basis of the weighted average of ordinary shares outstanding during the period as of December 31, 2019 and 2018(Effects of capital reduction during 2019 is regarded as 2019 and beginning of the reporting period of 2018) are as follows.

| | Common stock | | Preferred stock | |
|---|---|---|---|---|
| | | | | (shares in units) |
| | 38th period | 37th period | 38th period | 37th period |
| Beginning issued common stock | 27,228,643 | 3,491,993 | 159,978 | 159,978 |
| Capital reduction without refund | (23,423,917) | (1,550,367) | (106,819) | (106,819) |
| Paid-in capital increase / Debt-to-equity swap | 32,154,520 | 1,388,393 | - | - |
| Acquisition of treasury stock | (648) | - | - | - |
| Ending weighted average number of ordinary shares outstanding during the period | 35,958,598 | 3,330,019 | 53,159 | 53,159 |

## 23. Bond payable

(1) Bond payable issued by the Company as of December 31, 2019 and 2018 are as follows.

| Type | Maturity date | Interest rate(%) | 38th period | 37th period |
|---|---|---|---|---|
| | | | | (million Korean won in units) |
| 179Private placement bond(*1),(*2),(*3) | - | - | - | 5,357 |
| 190-1Private placement bond(*2),(*3) | - | - | - | 24,000 |
| 190-1Private placement bond(*2),(*3) | - | - | - | 1,100 |
| 190-2Private placement bond(*2),(*3) | - | - | - | 2,100 |
| 190-3Private placement convertible bond(*2),(*3) | - | - | - | 4,000 |
| 191-1Private placement bond(*2),(*3) | - | - | - | 4,800 |
| 191-1Private placement bond(*2),(*3) | - | - | - | 200 |
| 191-2Private placement bond(*2),(*3) | - | - | - | 400 |

| | | | (million Korean won in units) | |
| Type | Maturity date | Interest rate(%) | 38th period | 37th period |
|---|---|---|---|---|
| 191-3Private placement convertible bond(*2),(*3) | - | - | - | 800 |
| 192Private placement bond(*1),(*2),(*3) | - | - | - | 5,357 |
| 193-1Private placement bond(*2),(*3) | - | - | - | 21,600 |
| 193-1Private placement bond(*2),(*3) | - | - | - | 900 |
| 193-2Private placement bond(*2),(*3) | - | - | - | 2,000 |
| 193-3Private placement convertible bond(*2),(*3) | - | - | - | 3,600 |
| 195-1Private placement bond(*2),(*3) | - | - | - | 14,400 |
| 195-2Private placement bond(*2),(*3) | - | - | - | 1,900 |
| 195-3Private placement convertible bond(*2),(*3) | - | - | - | 2,400 |
| 196-1Private placement bond(*2),(*3),(*4) | 2025-12-31 | 2.00 | 18,020 | 28,800 |
| 196-2Private placement bond(*2),(*3) | - | - | - | 3,900 |
| 196-3Private placement convertible bond(*2),(*3) | 2025-12-31 | 2.00 | 2,787 | 4,800 |
| 197-1Private placement bond(*2),(*3) | 2025-12-31 | 2.00 | 28,800 | 28,800 |
| 197-1Private placement bond(*2),(*3) | - | - | - | 1,300 |
| 197-2Private placement bond(*2),(*3) | - | - | - | 2,500 |
| 197-3Private placement convertible bond(*2),(*3) | 2025-12-31 | 2.00 | 4,800 | 4,800 |
| 198-1Private placement bond(*2),(*3) | 2025-12-31 | 2.00 | 14,400 | 14,400 |
| 198-1Private placement bond(*2),(*3) | - | - | - | 700 |
| 198-2Private placement bond(*2),(*3) | - | - | - | 1,300 |
| 198-3Private placement convertible bond(*2),(*3) | 2025-12-31 | 2.00 | 2,400 | 2,400 |
| 199-1Private placement bond(*2),(*3) | 2025-12-31 | 2.00 | 14,900 | 14,900 |
| 199-1Private placement bond(*2),(*3) | - | - | - | 700 |
| 199-2Private placement bond(*2),(*3) | - | - | - | 1,400 |
| 199-3Private placement convertible bond(*2),(*3) | 2025-12-31 | 2.00 | 2,500 | 2,500 |
| 200-1Private placement bond(*2),(*3) | 2025-12-31 | 2.00 | 3,851 | 3,851 |
| 200-1Private placement bond(*2),(*3) | 2025-12-31 | 2.00 | 16,118 | 16,118 |
| 200-1Private placement bond(*2),(*3) | 2025-12-31 | 2.00 | 553 | 1,100 |
| 200-2Private placement bond(*2),(*3) | 2025-12-31 | 2.00 | 2,320 | 2,320 |
| 200-3Private placement convertible bond(*2),(*3) | 2025-12-31 | 2.00 | 639 | 639 |
| 200-3Private placement convertible bond(*2),(*3) | 2025-12-31 | 2.00 | 2,689 | 2,690 |
| 201-1Private placement bond(*2),(*3) | 2025-12-31 | 2.00 | 1,540 | 1,540 |
| 201-1Private placement bond(*2),(*3) | 2025-12-31 | 2.00 | 6,447 | 6,447 |
| 201-2Private placement bond(*2),(*3) | 2025-12-31 | 2.00 | 1,514 | 1,514 |
| 201-3Private placement convertible bond(*2),(*3) | 2025-12-31 | 2.00 | 259 | 259 |
| 201-3Private placement convertible bond(*2),(*3),(*4) | 2025-12-31 | 2.00 | 277 | 1,073 |
| Discount on bonds payable | | | (17,113) | (38,782) |
| Total | | | 107,701 | 206,883 |

(*1) As stated in Note 38, the convertible treasury bond at 4,152 million won was converted to equity due to debt-to-equity swap resolution by the Creditor Financial Institution Committee("the Committee").

(*2)  As stated in Note 38, the bonds of 115,280 million won held by the Committee was converted to equity due to debt-to-equity swap resolution for the improvement of financial structure and attracting new investment by the Creditor Financial Institution Committee.

(*3)  As stated in Note 38, the Committee postponed the repayment up to December 31, 2025 and adjusted the interest rate at 2% for the residual treasury stock other than convertible stock as a debt readjustment.

(*4)  As stated in Note 38, the residual treasury stock of 5,571 million won was repaid to the shareholders as a new stock acquisition payment before December 31, 2019.

(2) Balance after present value discount

As stated in Note 38, due to changes in the condition of debts for the remaining bond payables after conversion, the difference between the nominal value and the present value of the Company's corporate bond payables as of December 31, 2019 has become important, and the balance after present value discount is as follows.

| | | | | | (million Korean won in units) |
|---|---|---|---|---|---|
| Borrower | Interest rate(%) | Period | Face value | Balance (*) | Present value |
| Trust guarantee funds, etc | 2.00 | 2019.09.06~2025.12.31 | 124,814 | 17,113 | 107,701 |

(*)  As debt adjustments are considered a substantial change, the present value discount rate is calculated using 4.72% discount rate at the time of the change.

## 24. Long-term / short-term borrowings

(1) Short-term borrowings as of December 31, 2019 and 2018 are as follows.

| | | | | (million Korean won in units) |
|---|---|---|---|---|
| Borrower | Type | Interest rate(%) | 38th period | 37th period |
| KDB | Overdraft | 2.00 | 5,318 | - |
| KDB, etc. | Usance borrowing | 2.14 ~ 2.76 | 66,403 | 43,666 |
| KDB, etc. | Export bond secured loan(*) | 4.51 ~ 4.70 | 67,603 | 89,777 |
| Total | | | 139,324 | 133,443 |

(*)  The Company's trade receivables are partially transferred to financial institutions. However, there is no significant change in the substance of the risks and rewards, including the obligation to request redemption after transfer, therefore do not meet the derecognition requirement of financial assets, therefore are separately accounted for as trade receivables and short-term borrowings. (refer to Note 12)

(2) Long-term borrowings as of December 31, 2019 and 2018 are as follows.

① Long-term borrowings

| | | | | (million Korean won in units) |
|---|---|---|---|---|
| Borrower | Type | Interest rate(%) | 38th period | 37th period |
| KDB | Facility fund(*2),(*3) | 2.00 | - | 2,389 |
| NH Bank | Syndicate loan(*1),(*2),(*3),(*5) | 2.00 | 190,829 | 363,042 |
| | | | - | 16,829 |
| Shinhan Bank | | | 19,403 | 55,866 |
| Hana Bank | | | 21,427 | 37,227 |
| WHB Securitization | | | 13,705 | 20,132 |
| Hana Bank | Purchase fund loan(*2),(*3) | 2.00 | 12,906 | 16,333 |
| KDB, etc. | General fund loan(*5) | 2.00 | 312,991 | 319,292 |
| | Urgent fund loan(*2),(*3),(*5) | 2.00 | 81,314 | 392,574 |
| Kookmin Bank | Housing loan | 2.30 | 3,210 | 3,982 |

| | | | | (million Korean won in units) |
| Borrower | Type | Interest rate(%) | 38th period | 37th period |
|---|---|---|---|---|
| Veolia Water Resource Development Co., Ltd. | Lease borrowing(*4) | 11.00 | - | 16,495 |
| Balance after present value discount | | | (89,472) | (100,047) |
| Total | | | 566,313 | 1,144,114 |
| Current portion of long-term borrowings | | | (1,061) | (2,609) |
| Total after deduction | | | 565,252 | 1,141,505 |

(*1)  As stated in Note 37, Syndicated Loan , which is scheduled to be invested through the resolution of the Board of Creditors' Financial Institutions, has been converted to capital during the previous year.

(*2)  As stated in Note 37, 467,765 million won of long-term borrowing held by the Committee was converted to equity due to the resolution of debt-to-equity swap during the current year.

(*3)  As stated in Note 37, the Committee postponed the repayment up to December 31, 2025 and adjusted the interest rate at 2% for the residual treasury stock other than convertible stock as a debt readjustment.

(*4)  The borrowing is replaced with lease liabilities during the current year in accordance with K-IFRS No. 1116.

(*5)  As stated in Note 37, the borrowing of 108,915 million won was repaid to the shareholders as a new stock acquisition payment before December 31, 2019.


② Balance after present value discount

As stated in Note 38, due to changes in the condition of debts for the remaining bond payables after conversion, the difference between the nominal value and the present value of the Company's corporate bond payables as of December 31, 2019 has become important, and the balance after present value discount is as follows.

| | | | | | (million Korean won in units) |
| Borrower | Interest rate(%) | Period | Face value | Balance (*) | Present value |
|---|---|---|---|---|---|
| KDB, etc. | 2.00 | 2019.09.06~2025.12.31 | 652,576 | 89,472 | 563,104 |

(*)  As debt adjustments are considered a substantial change, the present value discount rate is calculated using 4.72% discount rate at the time of the change.

Interest expenses without cash leak that are recognized as non-operating expenses as a result of the present value assessment of the financial liability during the current and the previous year are at 48,819million won and 74,725million won each.


## 25. Employee benefits

(1) Defined benefit liabilities and other liabilities associated with employee benefits of the Company as of December 31, 2019 and 2018 are as follows.

① Defined benefit liabilities

| | | (million Korean won in units) |
|---|---|---|
| | 38th period | 37th period |
| Present value of defined benefit liabilities | 59,988 | 54,375 |
| Fair value of plan assets | (36,036) | (28,151) |
| Fair value of the national pension conversion | (22) | (27) |
| Total | 23,930 | 26,197 |

② Other liabilities associated with employee benefits

| | 38th period | 37th period |
|---|---|---|
| | | (million Korean won in units) |
| Paid leave | 2,861 | 2,684 |
| Defined contribution liabilities | 78 | 90 |
| Long-term employee benefits | 1,374 | 1,158 |

(2) Changes in defined benefit liabilities as of December 31, 2019 and 2018 are as follows.

| | 38th period | 37th period |
|---|---|---|
| | | (million Korean won in units) |
| Beginning balance | 54,375 | 47,343 |
| Current working cost | 4,925 | 4,495 |
| Interest cost | 1,723 | 1,720 |
| Re-measurement of net defined benefit liability | 352 | 2,883 |
| Allowance for retirement benefit | (2,812) | (1,800) |
| Other increase and decrease amount | 1,425 | (266) |
| Ending balance | 59,988 | 54,375 |

(3) Changes in the fair value of plan assets as of December 31, 2019 and 2018 are as follows.

| | 38th period | 37th period |
|---|---|---|
| | | (million Korean won in units) |
| Beginning balance | 28,151 | 25,149 |
| Expected income of plan assets | 909 | 936 |
| Remeasurement factor of plan assets | (490) | (647) |
| Contribution | 8,000 | 4,000 |
| Allowance for retirement benefit | (1,939) | (1,176) |
| Other increase and decrease amount | 1,405 | (111) |
| Ending balance | 36,036 | 28,151 |

(4) As of December 31, 2019 and 2018, the entirety of plan assets consists of fixed deposits.

(5) Employee benefits are recognized in profit or loss for the years ended December 31, 2019 and 2018 as follows.

| | 38th period | 37th period |
|---|---|---|
| | | (million Korean won in units) |
| Current service cost | 4,925 | 4,495 |
| Interest cost | 1,723 | 1,721 |
| Interest income | (909) | (936) |
| Defined contribution retirement benefits | 146 | 132 |
| Total | 5,885 | 5,412 |

The above gains and losses are recognized in the statement of comprehensive income as follows.

| | 38th period | 37th period |
|---|---|---|
| | | (million Korean won in units) |
| Cost of sales | 4,048 | 3,744 |

| | 38th period | 37th period |
|---|---|---|
| | *(million Korean won in units)* | |
| Selling and administrative expenses | 1,837 | 1,667 |
| Total | 5,885 | 5,412 |

(6) Remeasurement of defined benefit plan recognized as other comprehensive income during the year ended 2019 and 2018 is as follows.

| | 38th period | 37th period |
|---|---|---|
| | *(million Korean won in units)* | |
| Beginning balance | (12,230) | (9,554) |
| Current recognized amount | (639) | (2,676) |
| Ending balance | (12,869) | (12,230) |

(7) Actuarial assumptions
The principal actuarial assumptions as of December 31, 2019 and 2018 are as follows.

| | 38th period | 37th period |
|---|---|---|
| Discount rate(*) | 2.78% | 3.23% |
| Future wage growth rate(including inflation rate) | 4.00% | 4.00% |

(*) The discount rate is determined by taking into consideration of the yield of corporate bond payables (AA0) as of the end of the current period and the estimated payment period of defined benefit obligations.

(8) As of December 31, 2019, the sensitivity analysis based on changes in major actuarial assumptions is as follows.

① Discount rate

| | Changes in discount rate | Discount rate(%) | Ending carrying amount | Changed amount |
|---|---|---|---|---|
| | | | | *(million Korean won in units)* |
| Defined benefit liability | 1% increase | 3.78% | 53,833 | (6,155) |
| | - | 2.78% | 59,988 | - |
| | 1% decrease | 1.78% | 67,226 | 7,238 |

② Wage growth rate

| | Changes in growth rate | Growth rate(%) | Ending carrying amount | Changed amount |
|---|---|---|---|---|
| | | | | *(million Korean won in units)* |
| Defined benefit liability | 1% increase | 5.00% | 67,064 | 7,076 |
| | - | 4.00% | 59,988 | - |
| | 1% decrease | 3.00% | 53,842 | (6,146) |

(9) The Company has participated in defined contribution retirement benefit plans for certain employees, and severance benefits accrued during the years ended December 31, 2019 and 2018 amounted to 146 million won and 132 million won, respectively.

## 26. Other current liabilities

Other current liabilities as of December 31, 2019 and 2018 are as follows.

| | 38th period | 37th period |
|---|---|---|
| | | (million Korean won in units) |
| Import deposit | 1,421 | 1,309 |
| Deposit payable | 1,433 | 956 |
| Prepaid income | 20 | 25 |
| Provisions for construction losses | 187 | 1,430 |
| Dividend payable | 30 | 30 |
| Total | 3,091 | 3,750 |

## 27. Expense classification by category

Cost of sales and selling and administrative expenses incurred during the years ended December 31, 2019 and 2018 are as follows.

| | 38th period | 37th period |
|---|---|---|
| | | (million Korean won in units) |
| Changes in inventory assets and purchase of goods | 3,039 | 96 |
| Drawdown of raw material | 1,260,698 | 1,366,943 |
| Employee benefits | 51,044 | 49,446 |
| Depreciation, and amortization of intangible assets and right-of-use assets | 47,232 | 44,682 |
| Logistics | 56,437 | 52,712 |
| Packing expenses | 16,785 | 16,238 |
| Outsourced processing fee | 106,956 | 96,605 |
| Repairing expenses | 17,899 | 18,190 |
| Water and electricity fee | 77,471 | 76,316 |
| Other expenses | 30,447 | 34,635 |
| Total | 1,668,008 | 1,755,863 |

## 28. Selling and administrative expenses

Selling and administrative expenses as of December 31, 2019 and 2018 are as follows.

| | 38th period | 37th period |
|---|---|---|
| | | (million Korean won in units) |
| Employee payroll | 11,800 | 11,041 |
| Retirement benefits | 1,837 | 1,667 |
| Employee welfare | 2,286 | 2,346 |
| Transportation | 1,268 | 1,260 |
| Rent | 5,871 | 7,226 |
| Depreciation | 306 | 319 |
| Entertainment | 684 | 809 |
| Test development expenses | 1,415 | 1,298 |
| Certification and audit fee | 3,933 | 2,573 |
| Commission fee | 6,194 | 6,589 |
| Amortization of intangible assets | 295 | 315 |
| Amortization of right-of-use assets | 1,345 | - |

| | (million Korean won in units) | |
|---|---|---|
| | 38th period | 37th period |
| Logistics | 29,428 | 28,780 |
| Sales fee | 4,216 | 1,670 |
| Bad debt expenses(reversal) | (1,100) | 3,785 |
| Other expenses | 4,599 | 4,152 |
| Total | 74,377 | 73,830 |

## 29. Financial income and financial expenses

Net financial income and financial expenses recognized during the year ended December 31, 2019 and 2018 are as follows.

| | (million Korean won in units) | |
|---|---|---|
| | 38th period | 37th period |
| I. Financial income | | |
| Interest income | 1,993 | 1,431 |
| Debt adjustment income | 57,923 | 138,829 |
| Dividend revenue | 4 | 53 |
| Gain on valuation of derivatives | 539 | 5,464 |
| Gain on exchange | 12,024 | 7,847 |
| Gain from currency translation | 4,665 | 3,622 |
| Gain on valuation of financial assets measured at fair value through profit or loss | 26 | - |
| Subtotal | 77,174 | 157,246 |
| II. Financial expenses | | |
| Interest expenses | 92,269 | 128,959 |
| Loss on disposal of financial instruments measured at fair value through profit or loss | 11 | 336 |
| Loss on valuation of financial instruments measured at fair value through profit or loss | - | 403 |
| Loss on bond retirement | 3,925 | - |
| Loss on exchange | 29,538 | 20,923 |
| Loss from currency translation | 652 | 487 |
| Subtotal | 126,395 | 151,108 |
| III. Net financial income(loss)(I-II) | (49,221) | 6,138 |

## 30. Classification of financial instruments by category and its profit and loss

(1) The carrying amount of financial instruments by category as of December 31, 2019 and 2018 are as follows.

① 38th period

| | (million Korean won in units) | | |
|---|---|---|---|
| | Assets | | Liabilities |
| | Financial assets measured at amortized cost | Financial assets measured at fair value through profit or loss | Financial liabilities measured at amortized cost |
| Trade receivable | 243,919 | - | - |
| Other notes and accounts receivable | 13,779 | - | - |

| | Assets | | Liabilities |
| | | | (million Korean won in units) |
|---|---|---|---|
| | Financial assets measured at amortized cost | Financial assets measured at fair value through profit or loss | Financial liabilities measured at amortized cost |
| Other financial assets | 35 | - | - |
| Derivative financial assets | - | 6,003 | - |
| Cash and cash equivalents | 16,178 | - | - |
| Financial assets measured at fair value through profit or loss | - | 2,055 | - |
| Bond payables | - | - | 107,701 |
| Borrowings | - | - | 705,637 |
| Trade payables | - | - | 175,729 |
| Accrued expenses | - | - | 4,927 |
| Lease liabilities | - | - | 20,191 |
| Total | 273,553 | 8,058 | 1,014,185 |

② 37th period

| | Assets | | Liabilities |
| | | | (million Korean won in units) |
|---|---|---|---|
| | Financial assets measured at amortized cost | Financial assets measured at fair value through profit or loss | Financial liabilities measured at amortized cost |
| Trade receivable | 275,012 | - | - |
| Other notes and accounts receivable | 9,928 | - | - |
| Other financial assets | 2,452 | - | - |
| Derivative financial assets | - | 5,464 | - |
| Cash and cash equivalents | 32,477 | - | - |
| Financial assets measured at fair value through profit or loss | - | 2,167 | - |
| Bond payables | - | - | 206,883 |
| Borrowings | - | - | 1,277,557 |
| Trade payables | - | - | 477,862 |
| Accrued expenses | - | - | 5,621 |
| Total | 319,869 | 7,631 | 1,967,923 |

(2) Financial income and expenses for the years ended December 31, 2019 and 2018 are as follows.

① 38th period

| | Assets | | Liabilities | |
| | | | | (million Korean won in units) |
|---|---|---|---|---|
| | Financial assets measured at amortized cost | Financial assets measured at fair value through profit or loss | Financial liabilities measured at amortized cost | Total |
| Profit or loss: | | | | |
| Interest income | 1,993 | - | - | 1,993 |
| Debt adjustment income | - | - | 57,923 | 57,923 |
| Dividend revenue | - | 4 | - | 4 |
| Gain on valuation of financial assets measured at fair value through profit or loss | - | 26 | - | 26 |

| | Assets | | Liabilities | |
|---|---|---|---|---|
| | Financial assets measured at amortized cost | Financial assets measured at fair value through profit or loss | Financial liabilities measured at amortized cost | Total |
| Gain on valuation of derivatives | - | 539 | - | 539 |
| Gain on exchange | 8,649 | - | 3,375 | 12,024 |
| Gain on currency translation | 1,315 | - | 3,350 | 4,665 |
| Interest expenses | - | - | (96,194) | (96,194) |
| Loss on disposal of financial instruments measured at fair value through profit or loss | - | (11) | - | (11) |
| Loss on exchange | (5,107) | - | (24,431) | (29,538) |
| Loss on currency translation | (646) | - | (6) | (652) |
| Total | 6,204 | 558 | (55,983) | (49,221) |
| Financial income | 11,957 | 569 | 64,648 | 77,174 |
| Financial expenses | (5,753) | (11) | (120,631) | (126,395) |

(million Korean won in units)

(*)  Impairment loss on financial assets measured at amortized cost related to trade receivables and other receivables is disclosed in Note 31.

② 37th period

(million Korean won in units)

| | Assets | | Liabilities | |
|---|---|---|---|---|
| | Financial assets measured at amortized cost | Financial assets measured at fair value through profit or loss | Financial liabilities measured at amortized cost | Total |
| Profit or loss: | | | | |
| Interest income | 1,391 | 39 | - | 1,430 |
| Debt adjustment income | - | - | 138,829 | 138,829 |
| Dividend revenue | - | 53 | - | 53 |
| Gain on valuation of derivatives | - | 5,464 | - | 5,464 |
| Gain on exchange | 5,530 | - | 2,318 | 7,848 |
| Gain on currency translation | 1,307 | - | 2,315 | 3,622 |
| Interest expenses | - | - | (128,959) | (128,959) |
| Loss on disposal of financial instruments measured at fair value through profit or loss | - | (336) | - | (336) |
| Loss on valuation of financial instruments measured at fair value through profit or loss | - | (403) | - | (403) |
| Loss on exchange | (4,081) | - | (16,842) | (20,923) |
| Loss on currency translation | (214) | - | (273) | (487) |
| Total | 3,933 | 4,817 | (2,612) | 6,138 |
| Financial income | 8,228 | 5,556 | 143,462 | 157,246 |
| Financial expenses | (4,295) | (739) | (146,074) | (151,108) |

## 31. Other non-operating income and expenses

Other non-operating income and expenses for the years ended December 31, 2019 and 2018 are as follows.

| | | (million Korean won in units) |
|---|---|---|
| | 38th period | 37th period |
| I. Other non-operating income | | |
| Gains on disposal of property, plant and equipment | 58 | 36 |
| Reversal of other loss allowance | 67 | 1,084 |
| Miscellaneous profit | 3,045 | 1,050 |
| Subtotal | 3,170 | 2,170 |
| II. Other non-operating expenses | | |
| Other bed debt expenses | 2,115 | 11,734 |
| Loss on disposal of property, plant and equipment | 972 | 1,209 |
| Loss on disposal of intangible assets | 39 | - |
| Impairment loss on property, plant and equipment | 1 | - |
| Impairment loss on intangible assets | 1,529 | - |
| Provisions transferred | - | 618 |
| Miscellaneous loss | 414 | 12 |
| Subtotal | 5,070 | 13,573 |
| III. Net other operating income(I-II) | (1,900) | (11,403) |

## 32. Income tax expenses

(1) Income tax expenses for the years ended December 31, 2019 and 2018 are as follows.

| | | (million Korean won in units) |
|---|---|---|
| Income tax items | 38th period | 37th period |
| Levied tax | - | - |
| Changes in deferred income tax due to temporary differences | - | - |
| Income tax reflected directly to capital | 204 | 854 |
| Income tax expenses | 204 | 854 |

(2) Current income tax and deferred income tax associated with items recognized in equity for the years ended December 31, 2019 and 2018 are as follows.

| | | (million Korean won in units) |
|---|---|---|
| Income tax items | 38th period | 37th period |
| Current tax: | | |
| Remeasurement of defined benefit plan | (204) | (854) |
| Income tax reflected directly to capital | (204) | (854) |

Income tax related to remeasurement of defined benefit plan is recognized in other comprehensive profit or loss, etc.

(3) The relationship between income tax expenses and accounting profit or loss for the years ended December 31, 2019 and 2018 is as follows.

| | | (million Korean won in units) |
|---|---|---|
| | 38th period | 37th period |
| Net loss before income tax | (30,657) | (63,209) |
| Applied tax rates | 24.2% | 24.2% |

| | 38th period | 37th period |
|---|---|---|
| | | (million Korean won in units) |
| Levied tax under applied tax rate | (7,419) | (15,297) |
| Adjustments: | | |
| Non-deductible expenses | 3,518 | 537 |
| Changes in feasibility of deferred tax assets | (608) | 15,464 |
| Deferred tax adjustment in the previous period | 4,713 | 150 |
| Income tax expenses | 204 | 854 |
| Effective tax rates | (*) | (*) |

(*)  Effective tax rate is not calculated due to net loss before tax.

(4) As of December 31, 2019, the income tax effect of temporary differences is calculated by applying the future tax rate of 24.2% for the reporting period in which the temporary difference will be extinguished.

(5) Changes in deferred income tax assets (liabilities) for the years ended December 31, 2019 and 2018 are as follows.

① 38th period

| | Beginning balance | Reflecting profit or loss | Reflecting other comprehensive income | Ending balance |
|---|---|---|---|---|
| | | | | (million Korean won in units) |
| Valuation on equity method | (2,187) | - | - | (2,187) |
| Defined benefit liabilities | 13,152 | 1,225 | - | 14,377 |
| Plan assets | (6,813) | (1,908) | - | (8,721) |
| Interest on construction | (571) | 46 | - | (525) |
| Advanced depreciation provision | (293) | - | - | (293) |
| Depreciation | 27,692 | 1,851 | - | 29,543 |
| Revaluation of assets | (122,314) | - | - | (122,314) |
| Impairment loss | 226,623 | (19,194) | - | 207,429 |
| Impairment loss(subsidiaries) | 35,937 | - | - | 35,937 |
| Balance after present value discount | (33,597) | (3,169) | - | (36,766) |
| Provision on restructuring | 495 | (300) | - | 195 |
| Net loss carried forward | 137,003 | 30,894 | - | 167,897 |
| Net loss carried forward | 291 | (139) | - | 152 |
| Others | 28,811 | (9,914) | - | 18,897 |
| Subtotal | 304,229 | (608) | - | 303,621 |
| Unrecognized deferred income tax assets | (388,191) | 608 | - | (387,583) |
| Total | (83,962) | - | - | (83,962) |

② 37th period

| | Beginning balance | Reflecting profit or loss | Reflecting other comprehensive income | Ending balance |
|---|---|---|---|---|
| | | | | (million Korean won in units) |
| Valuation on equity method | (2,187) | - | - | (2,187) |
| Defined benefit liabilities | 11,349 | 1,803 | - | 13,152 |
| Plan assets | (6,086) | (727) | - | (6,813) |
| Interest on construction | (618) | 47 | - | (571) |

| | Beginning balance | Reflecting profit or loss | Reflecting other comprehensive income | Ending balance |
|---|---|---|---|---|
| | | | | (million Korean won in units) |
| Advanced depreciation provision | (293) | - | - | (293) |
| Depreciation | 33,767 | (6,075) | - | 27,692 |
| Revaluation of assets | (122,314) | - | - | (122,314) |
| Impairment loss | 246,858 | (20,235) | - | 226,623 |
| Impairment loss(subsidiaries) | 21,868 | 14,069 | | 35,937 |
| Balance after present value discount | (14,354) | (19,243) | - | (33,597) |
| Provision on restructuring | - | 495 | - | 495 |
| Net loss carried forward | 91,078 | 45,925 | - | 137,003 |
| Net loss carried forward | 442 | (151) | - | 291 |
| Others | 29,255 | (444) | - | 28,811 |
| Subtotal | 288,765 | 15,464 | - | 304,229 |
| Unrecognized deferred income tax assets | (372,727) | (15,464) | - | (388,191) |
| Total | (83,962) | - | - | (83,962) |

(6) Deferred income tax assets and liabilities, current income tax assets and liabilities before offset based on the total amount are as follows.

| | 38th period | 37th period |
|---|---|---|
| | | (million Korean won in units) |
| Deferred income tax assets | 96,409 | 101,139 |
| Deferred income tax liabilities | (180,371) | (185,101) |
| Current income tax assets | 580 | 374 |

(7) Feasibility of deferred tax assets is affected by the expected period of the deductible temporary difference and future taxable income that will occur before the maturity date of the deficit. As of December 31, 2019 , the Company did not recognize deferred income tax assets exceeding deferred income tax liabilities because it is not probable that the temporary differences and carryforward losses will be used. The resulting amounts and maturities of the unrecognized temporary difference are as follows.

| | Retained amount | Extinction |
|---|---|---|
| | | (million Korean won in units) |
| Temporary difference | 907,165 | - |
| Tax credit carried forward | 61 | 2020 |
| | 48 | 2021 |
| | 36 | 2022 |
| | 23 | 2023 |
| Subtotal | 168 | |
| Loss carried forward | 49,489 | 2022 |
| | 74,189 | 2023 |
| | 73,160 | 2025 |
| | 21,001 | 2026 |
| | 145,917 | 2027 |
| | 183,473 | 2028 |
| | 146,561 | 2029 |

| | Retained amount | Extinction |
|---|---|---|
| | | (million Korean won in units) |
| Subtotal | 693,790 | |

## 33. Statement of cash flows

(1) Cash flows generated(used) from operation for the years ended December 31, 2019 and 2018 are as follows.

| | 38th period | 37th period |
|---|---|---|
| | | (million Korean won in units) |
| 1. Net loss | (30,861) | (64,063) |
| 2. Adjustments: | | |
| Retirement benefits | 5,885 | 5,411 |
| Long-term employee benefits | 113 | 412 |
| Bad debt expenses(gains) | (1,100) | 3,785 |
| Other bad debt expenses(Reversal) | 2,048 | 10,650 |
| Depreciation | 43,700 | 44,200 |
| Amortization expenses of intangible assets | 491 | 482 |
| Amortization expenses of right-of-use assets | 2,612 | - |
| Interest expenses | 92,269 | 128,959 |
| Loss on valuation of financial assets measured at fair value through profit or loss | - | 403 |
| Loss on disposal of financial assets measured at fair value through profit or loss | 11 | 336 |
| Loss related to investment in subsidiaries and associates | - | 58,135 |
| Loss on currency translation | 652 | 487 |
| Loss on debt retirement | 3,925 | - |
| Loss on disposal of property, plant and equipment | 972 | 1,209 |
| Impairment loss on disposal of property, plant and equipment | 1 | - |
| Loss on disposal of intangible assets | 39 | - |
| Impairment loss on disposal of intangible assets | 1,529 | - |
| Miscellaneous loss | - | 2 |
| Gain on disposal of property, plant and equipment | (58) | (36) |
| Interest income | (1,993) | (1,431) |
| Dividend income | (4) | (5,203) |
| Gain on currency translation | (4,665) | (3,622) |
| Gain on valuation of derivatives | (539) | (5,464) |
| Gain on valuation of financial assets measured at fair value through profit or loss | (26) | - |
| Income tax expenses | 204 | 854 |
| Debt adjustment income | (57,923) | (138,829) |
| Subtotal | 88,143 | 100,740 |
| 3. changes in assets and liabilities from operation: | | |
| Decrease in trade receivable(increase) | 29,935 | (17,139) |
| Decrease in contract assets | 12,066 | - |
| Decrease in prepaid expenses | 271 | 475 |
| Decrease in inventories (increase) | 14,036 | (16,120) |
| Decrease in long-term accounts receivable | 4 | 59 |

| | 38th period | 37th period |
|---|---|---|
| | | (million Korean won in units) |
| Decrease in other current notes and accounts receivable(increase) | 885 | (22) |
| Decrease in other current assets(increase) | 6,053 | (6,671) |
| Increase in trade payables (decrease) | (281,088) | 52,084 |
| Increase in contract liabilities | 2,423 | 2,038 |
| Increase in other payables(decrease) | 433 | (54,744) |
| Increase in advance payment | 3,964 | 472 |
| Increase in accrued expenses(decrease) | 388 | (605) |
| Increase in other current liabilities(decrease) | (659) | 1,795 |
| Increase in other non-current liabilities | 104 | 518 |
| Retirement pension payment | (2,812) | (1,800) |
| Retirement pension payment(defined contribution) | (161) | (131) |
| Decrease in plan assets | (7,466) | (2,824) |
| Decrease in convertible national pension | 5 | - |
| Transfer amount of defined benefit liabilities | 21 | (155) |
| Subtotal | (221,598) | (42,770) |
| 4.  Total (1+2+3) | (164,317) | (6,093) |

(2) Transactions involving major financing activities that do not involve the use of cash and cash equivalents during the year ended December 31, 2019 include capital reduction without refund, debt-to-equity swap, and debt adjustments described in Note 20 and Note 38.

(3) Changes in liabilities from financing activities for the year ended December 31, 2019 are as follows.

| | Long-term borrowing | Bond payables | Short-term borrowing | Lease liabilities | Total |
|---|---|---|---|---|---|
| | | | | | (million Korean won in units) |
| Beginning balance | 1,144,114 | 206,883 | 133,443 | - | 1,484,440 |
| Effect of changes in accounting standards (Note 3) | (16,495) | - | - | 21,950 | 5,455 |
| Changes in cash flow from financing | (104,116) | (5,571) | 10,137 | (2,196) | (101,746) |
| Effect of changes in exchange rate | - | - | (1,062) | 3 | (1,059) |
| Other changes related to liability: | | | | | |
| Debt-to-equity swap | (443,013) | (102,608) | (3,194) | - | (548,815) |
| Accrual amount of balance after present value discount | (53,393) | (4,530) | - | - | (57,923) |
| Amortization amount of balance after present value discount | 39,216 | 13,527 | - | - | 48,819 |
| Increase in lease liabilities | - | - | - | 434 | 434 |
| Ending balance | 566,313 | 107,701 | 139,324 | 20,191 | 829,605 |

## 34. Contingent liabilities and commitments

(1) As of December 31, 2019, the Company has entered into contracts such as a bank overdraft agreement, general borrowing, and export Usance, etc., with financial institutions such as the Korea Development Bank, etc. As of December 31, 2019, the total committed amount is 915,258 million won and 450,264 thousand USD.

(2) As of December 31, 2019, the Company has been provided with guarantees of up to 6,662 million won and 12,869 million won and 2,043 million won, respectively, from the Machinery Financial Cooperative, Seoul Guarantee Insurance and Korea Specialty Contractor Financial Cooperative.

(3) As of December 31, 2019, the Company has entered into a contract for the disposition of the trust with the trust service provider and the investment trust management company in connection with DB Private Real Estate Investment Trust No. 9. The contract includes the obligation to pay the shortfall when the asset is not sold or the sale price is below the reference price by the end of the mandate.

## 35. Related parties

(1) Parent company of the Company is KG Steel Co., Ltd. and the ultimate parent company is KG Chemical Corporation

The related parties as of December 31, 2019 are as follows.

| Category | Company |
|---|---|
| Ultimate parent company(*1) | KG Chemical Corporation |
| Parent company(*1) | KG Steel Co., Ltd. |
| Subsidiaries and associates of the ultimate parent company(*1) | KG Corp, KG INICIS Co., Ltd., KG Mobilians Co., Ltd., KG Eco Technology Service Co., Ltd., KG Eduone Co, Ltd., Sunning Life Co. Ltd., KG Allat Corporation, KG Enerchem Co., Ltd., KFC Korea Co., Ltd., EDAILY Co., Ltd., Edaily C&B Co., Ltd., Corporation KG F&B, Srook, KG RUS LLC, KG NETWORKS, KG ZEROIN Co., Ltd., Cactus Innovation Growth, LB Professional investment type Private Real Estate Investment Trust No.9 |
| Companies with significant influence | Cactus Special Situations No.1 Co., Ltd.(*1),(*3) |
| | Debt-to-equity shareholders(KDB, etc.) (*4) |
| Subsidiaries | Dongbu Incheon Steel, Dongbu Dangjin Port Operation, Dongbu USA, Dongbu Singapore, Dongbu Thai Steel, DB Private Real Estate Investment Trust No.9 |
| Associated companies | Dongbu Steel Structure, Dongbu Japan, Dongbu India, |
| Others(*5) | Sunhyun Foundation (*1),(*2) |
| | Zhangjiagang Dongbu High Technology Metal Co., Ltd., Dongbu Vietnam Steel |

(*1)  During the year ended December 31, 2019, KG Steel has become the largest shareholder of the Company, with 39.98% shares of the total issued shares. Transactions with the companies under KG Chemical Corporation below only include the transactions made after the change.

(*2)  Sunhyun Foundation is a company that the major management members of the ultimate parent company exercise significant influence.

(*3)  The second largest shareholder of the Company is Cactus Special Situations No.1 Co., Ltd., holding 31.98% of the total issued shares.

(*4)  The third largest shareholders of the Company are the shareholders related to the debt-to-equity swap, holding 27.06% of the total issued shares. Shareholders are Creditor Financial Institutions of the former Creditor Financial Institutions Committee except for TheK Bank, including KDB, NH Bank, KEXIM, Hana Bank, Shinhan Bank, Credit Guarantee Fund, WHB Securitization, Woori Bank, Corporate Bond Stabilization Fund, and Seoul Guarantee Insurance. These shareholders are included as related parties as they hold significant influence over the Company's major management decisions, such as appointment of directors, etc.,

(*5)  Zhangjiagang Dongbu High Technology Metal Co., Ltd. is a joint venture with Dongbu Singapore, a subsidiary to the Company, holding 50% shares of the company. Dongbu Vietnam Steel is a subsidiary owned 100% by Dongbu Singapore, a subsidiary to the Company.

(2) Details of transactions with related parties for the years ended December 31, 2019 and 2018 are as follows.

① 38th period

| Related party classification | Company | Sales, etc. | | Purchase, etc. | | | | (million Korean won in units) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Sales | Others | Inventory purchases | Incidental purchase expenses | Services | Others |
| Companies with significant influence | Creditors' Committee(*1) | - | 63 | - | - | 5,913 | 28,118 |
| | Debt-to-equity shareholders(*2) | - | 92 | - | - | 575 | 8,227 |
| Subsidiaries and associates of the ultimate parent company | KG Eco Technology Service Co., Ltd. | 3,013 | - | - | - | 72 | - |
| | KG ZEROIN Co., Ltd. | - | - | - | - | - | 103 |
| | KG EDUONE Co., Ltd. | - | - | - | - | 17 | - |
| | FLC Ltd. | - | - | - | - | 8 | - |
| | EDAILY Co., Ltd. | - | - | - | - | 1 | 209 |
| Subsidiaries | Dongbu Singapore | - | 1,191 | - | - | - | - |
| | Dongbu USA | 200,537 | - | 33 | - | - | 358 |
| | Dongbu Thai Steel | 31,054 | 87 | - | - | - | 29 |
| | Dongbu Incheon Steel | 79,407 | 922 | 423 | - | 36,670 | 205 |
| | Dongbu Dangjin Port Operation | - | 265 | - | 8,596 | - | 3,266 |
| | DB Private Real Estate Investment Trust No.9 | - | - | - | - | - | 2,488 |
| Associates | Dongbu Japan | 42 | - | - | - | 256 | 610 |
| | Dongbu India | - | - | - | - | 355 | - |
| | Total | 314,053 | 2,620 | 456 | 8,596 | 43,867 | 43,613 |

(*1)  Transactions with the Committee are stated until September 6, 2019.

(*2)  Transactions with the debt-to-equity shareholders are stated from September 7, 2019.

② 37th period

| Related party classification | Company | Sales, etc. | | Purchase, etc. | | | | (million Korean won in units) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Sales | Others | Inventory purchases | Incidental purchase expenses | Services | Others |
| Companies with significant influence | Creditors' Committee | - | 130 | - | - | 293 | 49,270 |
| Subsidiaries | Dongbu Singapore | - | 1,137 | - | - | - | - |
| | Dongbu USA | 167,505 | - | 2 | - | - | 247 |
| | Dongbu Thai Steel | 8,662 | - | - | - | - | - |
| | Dongbu Incheon Steel | 76,421 | 1,652 | 472 | - | 33,377 | 239 |
| | Dongbu Dangjin Port Operation | 302 | 4,133 | - | 8,731 | - | 5,155 |
| Associates | Dongbu Japan | 30 | - | - | - | 240 | 503 |
| | Dongbu India | - | - | - | - | 344 | - |
| Others | Zhangjiagang Dongbu High Technology Metal Co., Ltd. | 10,823 | - | - | - | - | 14 |
| | DB Private Real Estate Investment Trust No.9 | - | - | - | - | - | 3,773 |
| | Total | 263,743 | 7,052 | 474 | 8,731 | 34,254 | 59,201 |

(3) Money transactions with related parties for the years ended December 31, 2019 and 2018, are as follows.

① 38th period

| | | | | | | | (million Korean won in units) |
|---|---|---|---|---|---|---|---|
| Related party classification | Company | Investment | Loan provided | borrowing | repayment | Deb-to-equity swap | Paid-in capital increase | Acquisition of stocks |
| Parent Company | KG Steel | - | - | - | - | | 200,000 | - |
| Companies with significant influence | Cactus Special Situations No.1 Co., Ltd. | - | - | - | - | - | 160,000 | - |
| | Creditors' Committee(*1) | - | - | 393,603 | 233,153 | 605,000 | - | - |
| | Debt-to-equity shareholders(*2) | - | - | 142,739 | 403,029 | - | - | - |
| Subsidiaries | Dongbu Thai Steel | - | 3,531 | - | - | - | - | - |
| | Dongbu Incheon Steel | - | - | - | - | - | - | 42,473 |
| Others | DB Private Real Estate Investment Trust No.9 | 3 | - | - | - | - | - | - |
| Total | | 3 | 3,531 | 536,342 | 636,182 | 605,000 | 360,000 | 42,473 |

(*1) Transactions with the Committee are stated until September 6, 2019.

(*2) Transactions with the debt-to-equity shareholders are stated from September 7, 2019.

② 37th period

| | | | | | (million Korean won in units) |
|---|---|---|---|---|---|
| Related party classification | Company | Borrowing | Repayment | Deb-to-equity swap | Recollection of acquired debt (*) |
| Companies with significant influence | Creditors' Committee | 378,681 | 338,101 | 200,000 | - |
| Others | Dongbu Vietnam Steel | - | - | - | 1,079 |
| Total | | 378,681 | 338,101 | 200,000 | 1,079 |

(*)  During the year ended December 31, 2018, the Company received partial demand for HD Bank's payment guarantees from Dongbu Vietnam Steel.

(4) Assets and liabilities associated with related parties as of December 31, 2019 and 2018 are as follows.

① 38th period

| | | | | | | (million Korean won in units) |
|---|---|---|---|---|---|---|
| Related party classification | Company | Receivables, etc. | | Payables, etc. | | |
| | | Trade receivable | Others | Trade payable | Borrowings | Others |
| Companies with significant influence | Debt-to-equity shareholders | - | 47,986 | - | 916,714 | 1,043 |
| Subsidiaries and associates of the ultimate parent company | KG Eco Technology Service Co., Ltd. | 3,013 | - | 79 | - | - |
| | KG ZEROIN Co., Ltd. | - | 10 | 30 | - | - |
| | EDAILY Co., Ltd. | - | - | 3 | - | - |
| Subsidiaries | Dongbu Singapore | - | 27,893 | - | - | - |
| | Dongbu USA | 4,372 | - | - | - | - |
| | Dongbu Thai Steel | 19,320 | 3,560 | - | - | - |
| | Dongbu Incheon Steel | 10,963 | 671 | 6,592 | - | 14 |
| | Dongbu Dangjin Port Operation | - | 25 | 4,656 | - | 4 |
| | DB Private Real Estate Investment Trust No.9 | - | 7,011 | - | - | - |

| | | Receivables, etc. | | Payables, etc. | | (million Korean won in units) |
|---|---|---|---|---|---|---|
| Related party classification | Company | Trade receivable | Others | Trade payable | Borrowings | Others |
| Associates | Dongbu Japan | - | - | 76 | - | - |
| Others | Zhangjiagang Dongbu High Technology Metal Co., Ltd. | 6,615 | - | - | - | - |
| | Dongbu Vietnam Steel (*) | - | 8,818 | - | - | - |
| Total | | 44,283 | 95,974 | 11,436 | 916,714 | 1,061 |

(*) As of December 31, 2019, other receivables of Dongbu Singapore and Dongbu Vietnam Steel are stated at the amount before loss allowance, which are estimated at 26,154 million won and 8,818million won, respectively. Trade receivables of Dongbu Thai Steel is stated at the amount before loss allowance, which is estimated at 5,743 million won.

② 37th period

| | | Receivables, etc. | | Payables, etc. | | (million Korean won in units) |
|---|---|---|---|---|---|---|
| Related party classification | Company | Trade receivable | Others | Trade payable | Borrowings | Others |
| Companies with significant influence | Creditors' Committee | - | 59,222 | - | 1,602,793 | 1,816 |
| Subsidiaries | Dongbu Singapore | - | 26,020 | - | - | - |
| | Dongbu USA | 73,305 | - | 130 | - | - |
| | Dongbu Thai Steel | 6,160 | - | - | - | - |
| | Dongbu Incheon Steel | 8,612 | 45 | 6,487 | - | 14 |
| | Dongbu Dangjin Port Operation | - | 43 | 5,607 | - | 4 |
| Associates | Dongbu Japan | - | - | 61 | - | - |
| | Dongbu India | - | - | - | - | - |
| Others | Zhangjiagang Dongbu High Technology Metal Co., Ltd. | 6,990 | - | - | - | - |
| | DB Private Real Estate Investment Trust No.9 | - | 7,011 | - | - | - |
| | Dongbu Vietnam Steel (*) | - | 8,515 | - | - | - |
| Total | | 95,067 | 100,856 | 12,285 | 1,602,793 | 1,834 |

(*) As of December 31, 2018, other receivables of Dongbu Singapore and Dongbu Vietnam Steel are stated at the amount before loss allowance, which are estimated at 23,341million won and 8,515 million won, respectively. Trade receivables of Dongbu Thai Steel is stated at the amount before loss allowance, which is estimated at 4,032 million won.

(5) As of December 31, 2019, the Company has the defined benefit type pension plan operated by KDB, etc., at the amount of 32,330 million won.

(6) Guarantees provided for related companies as of December 31, 2019 are as follows.

| | | | | (million Korean won, thousand US dollar in units) | |
|---|---|---|---|---|---|
| Related party classification | Beneficiary | Guaranteed amount | Borrowing amount | Type of guarantee | Financial institutions |
| Subsidiary | Dongbu USA | USD 10,000 | - | Asset based loans (ABL) | Hanmi Bank |

(7) Assets pledged as collateral provided by related companies as of December 31, 2019 are as follows.

| | | | | | | (million Korean won in units) |
|---|---|---|---|---|---|---|
| Relationship | Provider | Type of Guarantee | Guaranteed amount | Borrowing amount | Grounds for collateral | Financial Institutions |
| Subsidiary | Dongbu Incheon Steel | Property, plant and equipment | 600,000 | - | Comprehensive collateral | Debt-to-equity shareholders |
| | Dongbu Dangjin Port Operation | Port and hinterland | 570,000 | | Borrowing collateral | |
| | | | 322,400 | 40,539 | | |

The Company is provided with payment guarantee related to borrowings by the former CEO (Kim, Jun-Ki).

(8) The Company provides short-term employee benefits, severance benefits to directors and executives. Executive compensation of the Company for each of the following categories for the years ended December 31, 2019 and 2018 are as follows.

| | | (million Korean won in units) |
|---|---|---|
| | 38th period | 37th period |
| short-term employee benefits | 492 | 514 |
| severance benefits | 28 | 31 |
| Total | 520 | 545 |

## 36. Financial risk management

The Company is exposed to various financial risks, such as market risk (foreign exchange risk and interest rate risk), credit risk and liquidity risk. The Company monitors and forecasts the risk factors and operates risk management policies.

(1) Credit risk
Credit risk is the risk of financial loss to the Company if a customer or a counterparty to a financial instrument fails to meet its contractual obligations. Credit risk happens mainly in trade receivables or investments in the counterparty.

To control the default risk, the Company has established a credit policy to make transactions with qualifying counterparties with a certain level of credit rating and to secure sufficient collateral. The Company also regularly assesses the financial credit ratings of customers by taking into accounts of the counterparty's financial conditions and financial history to set the credit limits for each counterparty.

The Company establishes an allowance for impairment that represents its estimate of incurred losses in respect of trade receivables and investments. The main components of this allowance are a specific loss component that relates to individually significant exposures, and a collective loss component established for companies of similar assets in respect of losses that have been incurred but not yet identified. The collective loss allowance is determined based on historical data of payment statistics for similar financial assets.

(2) Liquidity risk
Liquidity risk is the risk that the Company will encounter difficulty in meeting the obligations associated with its financial liabilities that are settled by delivering cash or another financial asset.

(3) Market risk
Market risk is the risk that changes in market prices, such as foreign exchange rates, interest rates and equity prices will affect the Company's income or the value of its holdings of financial instruments. The objective of market risk management is to manage and control market risk exposures within acceptable parameters, while optimizing the return.

① Foreign exchange risk
The Company is exposed to foreign exchange risk on sales, purchases and borrowings that are denominated in a currency other than the respective functional currencies of the Company. The currencies in which these transactions primarily are denominated are USD, EUR and JPY. In order to minimize financial risk from currency fluctuations and conduct stable business activities, the Company assesses and manages the foreign exchange risk

continuously in accordance with the Company's internal regulations on exchange and transactions. If needed, the Company enters into derivative transactions with financial institutions as a hedging strategy, and speculative transactions are strictly restricted.

② Interest rate risk

The Company's deposits and borrowings are exposed to interest rate risk. The Company monitors that the market interest rate and market status to minimize interest expense. Based on this, the Company reviews whether to sign up for deposit products and seek for other ways to borrow. The Company's management monitors the level of interest rates and maintains a balanced portfolio of borrowings at variable rates and fixed rates.

(4) Capital management

The purpose of capital management of the Company is to maintain the ability to continue as going concern and to maximize the benefit of shareholders by minimizing capital financing expenditures. The management of the Company periodically reviews the capital structure and carries through a financial plan to borrow short term and long term funds in order to improve and maintain optimal capital structure.


## 37. Financial instrument risk

(1) Credit risk

① Exposure to credit risk

The carrying amount of financial assets represents the maximum credit exposure. The maximum exposure of financial assets as of December 31, 2019 and 2018 are as follows.

|  |  | (million Korean won in units) |
|---|---|---|
|  | 38th period | 37th period |
| Long-term trade receivables | 648 | 610 |
| Non-current other receivables | 9,342 | 9,316 |
| Non-current other financial assets | 35 | 2,452 |
| Trade receivables | 242,912 | 274,402 |
| Contract assets | 3,626 | 13,440 |
| Current other receivables | 4,437 | 612 |
| Cash and cash equivalents | 16,178 | 32,477 |
| Total | 277,178 | 333,309 |

The Company requires collateral and other credit reinforcements of high risk counterparties. Major collaterals held by the Company are real estates, movable assets, etc. The maximum credit exposures as of December 31, 2019 are 255,475 million won.

② Expected loss of trade receivables (including contract assets)

The carrying amount of trade receivables as of December 31, 2019 and 2018 is as follows.

|  |  |  |  |  |  | (million Korean won in units) |
|---|---|---|---|---|---|---|
|  | 38th period | | | 37th period | | |
|  | Trade receivables | Expected loss rate | Loss allowance | Trade receivables | Expected loss rate | Loss allowance for bad debt |
| Not past due | 242,457 | 2.6% | (6,279) | 285,121 | 3.1% | (8,734) |
| 0-30 days past due | 5,895 | 2.3% | (137) | 6,231 | 3.0% | (186) |
| 31-120 days past due | 4,532 | 3.1% | (142) | 4,530 | 3.1% | (140) |
| 121-365 days past due | 192 | 16.7% | (32) | 677 | 3.1% | (21) |
| 365 days past due or more | 3,393 | 79.3% | (2,692) | 13,092 | 92.6% | (12,118) |

| | 38th period | | | 37th period | | |
|---|---|---|---|---|---|---|
| | Trade receivables | Expected loss rate | Loss allowance | Trade receivables | Expected loss rate | Loss allowance for bad debt |
| Total | 256,469 | 3.6% | (9,282) | 309,651 | 5.5% | (21,199) |

(million Korean won in units)

③ Changes in the loss allowance for trade receivables, etc., for the years ended December 31, 2019 and 2018 are as follows.

| | 38th period | 37th period |
|---|---|---|
| Beginning balance | 21,199 | 28,695 |
| Effect of changes in accounting standards | - | (2,327) |
| Write-off | (11,189) | (8,974) |
| Loss recognition | 2,428 | 5,559 |
| Impairment gain | (3,156) | (1,754) |
| Ending balance | 9,282 | 21,199 |

(million Korean won in units)

④ Changes in the loss allowance for financial assets measured at amortized cost as other receivables for the years ended December 31, 2019 and 2018 are as follows.

| | 38th period | 37th period |
|---|---|---|
| Beginning balance | 34,885 | 24,515 |
| Write-off | (1,212) | (229) |
| Loss recognition | 2,116 | 11,683 |
| Impairment gain | - | (1,084) |
| Ending balance | 35,789 | 34,885 |

(million Korean won in units)

⑤ Financial assets past due but not impaired
There are no financial assets that are past due but not impaired as of December 31, 2019 except for the financial assets that are adjusted to reflect the reduced due to the collateral and other credit enhancement.

(2) Liquidity risk
The annual repayment plan of financial liabilities as of December 31, 2019 is as follows. The table includes paid interest amount, and is represents the contractual face cash flows not discounted by present value. The payment plan includes refinancing, loans based on the credit limit of borrowings, extension on trade payables, etc.

① 38th period

| | Carrying amount | Contractual cash flow | Within 6 months | 6-12 months | 1-2 years | 2-3 years | 3-5 years | 5 years or after |
|---|---|---|---|---|---|---|---|---|
| Bond payables | 107,701 | 139,766 | 1,223 | 1,248 | 2,496 | 2,496 | 4,993 | 127,310 |
| Borrowings | 705,637 | 872,043 | 147,079 | 7,149 | 13,993 | 13,398 | 25,214 | 665,210 |
| Trade payables | 175,729 | 175,729 | 175,729 | - | - | - | - | - |
| Accrued expenses | 4,927 | 4,927 | 4,927 | - | - | - | - | - |
| Lease liabilities | 20,191 | 25,900 | 2,629 | 2,793 | 5,366 | 5,301 | 8,026 | 1,785 |
| Total | 1,014,185 | 1,218,365 | 331,587 | 11,190 | 21,855 | 21,195 | 38,233 | 794,305 |

(million Korean won in units)

As of December 31, 2019, the maximum amount of the liquidity risk the Company has due to financial guarantee contracts is at 11,578 million won (borrowing limit 10,000 USD, no amount realized).

② 37th period

| | | | | | | | | (million Korean won in units) |
|---|---|---|---|---|---|---|---|---|
| | Carrying amount | Contractual cash flow | Within 6 months | 6-12 months | 1-2 years | 2-3 years | 3-5 years | 5 years or after |
| Bond payables | 206,883 | 250,985 | 1,038 | 1,362 | 248,585 | - | - | - |
| Borrowings | 1,277,557 | 1,457,151 | 151,775 | 21,892 | 1,265,232 | 4,962 | 7,936 | 5,354 |
| Trade payables | 477,862 | 477,862 | 477,862 | - | - | - | - | - |
| Accrued expenses | 5,621 | 5,621 | 5,621 | - | - | - | - | - |
| Total | 1,967,923 | 2,191,619 | 636,296 | 23,254 | 1,513,817 | 4,962 | 7,936 | 5,354 |

As of December 31, 2018, the maximum amount of the liquidity risk the Company has due to financial guarantee contracts is at 11,181 million won (no borrowing limit, no amount realized).

(3) Foreign currency risk

① The Company is exposed to exchange rate fluctuation risk since it undertakes transactions denominated in foreign currencies. Exposure to foreign currency risk as of December 31, 2019 and 2018 is as follows.

| | (Foreign currency units: thousand USD, thousand EUR, thousand JPY, thousand CNY, thousand THB) | | | |
|---|---|---|---|---|
| Currency | 38th period | | 37th period | |
| | Assets | Liabilities | Assets | Liabilities |
| USD | 131,697 | 176,011 | 150,952 | 396,495 |
| EUR | - | 20 | - | 147 |
| JPY | 287,663 | 11,299 | 430,072 | 10,253 |
| CNY | 500 | 688 | - | - |
| THB | - | 1,816 | - | - |

②If the foreign currencies (USD, EUR, JPY, CNY) have changed against Korean won, the Company's equity and profit or loss may have increased(decreased). The Company's sensitivity to a 10% increase and decrease in the exchange rate, as the effect of foreign currency translation to net profit before income tax, as of December 31, 2019 and 2018, is as follows.

| | | | (million Korean won in units) | |
|---|---|---|---|---|
| Currency | 38th period | | 37th period | |
| | 10% increase | 10% decrease | 10% increase | 10% decrease |
| USD | (5,131) | 5,131 | (27,454) | 27,454 |
| EUR | (3) | 3 | (19) | 19 |
| JPY | 294 | (294) | 425 | (425) |
| CNY | (3) | 3 | - | - |
| THB | (7) | 7 | - | - |
| Total | (4,850) | 4,850 | (27,048) | 27,048 |

(4) Interest rate risk

① The carrying amount of interest-bearing financial liabilities of the Company as of December 31, 2019 and 2018 is as follows. There are no financial liabilities associated with the variable interest rate.

| | | (million Korean won in units) |
|---|---|---|
| | 38th period | 37th period |
| Fixed interest rate financial assets | 813,338 | 1,484,441 |

The Company does not account for any fixed rate financial instruments as financial instruments measured at fair value through profit or loss, and does not designate derivatives (interest rate swaps) as hedging instruments under a fair value hedge accounting model. Therefore, changes in interest rates at the reporting date will not affect profit or loss.

(5) Fair value
① The Company determined the fair value based on the following methods.

*Current assets and liabilities*
As the maturity of current assets and liabilities other than the above is short, their fair value approximates their carrying amounts.

*Trade and other receivables*
The fair value of trade and other receivables is determined as the present value of estimated future cash flows discounted at the current market interest rate. The fair value is calculated for the disclosures in the notes. In addition, the fair value of current receivables is close to their carrying amounts.

*Equity and debt investments*
The fair value of financial assets measured at fair value through profit or loss traded within the market is measured at the closing bid price quoted at the end of the reporting period. Meanwhile, the fair value of unquoted investments is calculated using the valuation results from an external pricing service. However, non-marketable equity and debt instruments, which do not have significant difference between the acquisition cost and the fair value, are measured at the best estimates on the fair value.

*Derivatives*
Financial assets including derivatives are measured at fair value after initial recognition. However, derivatives associated with an equity instrument that is hard to measure the reliable fait value, lacking market price disclosed in the active market, and settled at the delivery of that equity instrument, are measured at cost.

*Non-derivative financial liabilities*
The fair value for the purpose of disclosure of the financial liabilities measured at amortized cost is calculated based on the present value of the cash flow from the principal and interest discounted at the market interest rate at the end of the reporting period.

② The carrying amount and the fair value of financial assets and liabilities classified by category as of December 31, 2019 and 2018 are as follows.

| | | | | (million Korean won in units) |
|---|---|---|---|---|
| | 38th period | | 37th period | |
| | Carrying amount | Fair value | Carrying amount | Fair value |
| Financial assets measured at amortized cost: | | | | |
| Trade accounts and notes receivables | 257,339 | 257,339 | 284,940 | 284,940 |
| Other financial assets | 35 | 35 | 2,452 | 2,452 |
| Cash and cash equivalents | 16,178 | 16,178 | 32,477 | 32,477 |
| Subtotal | 273,552 | 273,552 | 319,869 | 319,869 |
| Financial assets measured at fair value through profit or loss: | | | | |
| Financial assets measured at fair value through profit or loss (*) | 2,055 | 2,055 | 2,167 | 2,167 |
| Derivative assets | 6,003 | 6,003 | 5,464 | 5,464 |
| Subtotal | 8,058 | 8,058 | 7,631 | 7,631 |

| | (million Korean won in units) | | | |
|---|---|---|---|---|
| | 38th period | | 37th period | |
| | Carrying amount | Fair value | Carrying amount | Fair value |
| Total | 281,610 | 281,610 | 322,036 | 322,036 |
| Financial liabilities measured at amortized cost: | | | | |
| Bond payables | 107,701 | 107,701 | 206,883 | 214,110 |
| Borrowings | 705,637 | 705,637 | 1,277,557 | 1,277,557 |
| Lease liabilities | 20,190 | 20,190 | - | - |
| Trade and other payables | 180,656 | 180,656 | 483,483 | 483,483 |
| Total | 1,014,184 | 1,014,184 | 1,967,923 | 1,975,150 |

(*)  For financial assets measured at fair value through profit or loss of 2,055 million won and 2,167million won, respectively, the costs are best estimates of fair value, due to a lack of latest information.

③  Interest rate used in determining the fair value

The Company has determined fair values of bond payables and long-term borrowings through average interest rate from multiple financial institutions. The interest rate applied as of December 31, 2019 and 2018 are as follows.

| | 38th period | 37th period |
|---|---|---|
| Bond payables | 4.72% | 5.00% ~ 10.29% |

④  Fair value hierarchy
In order to determine and disclose the fair value of financial instruments, the Company used a fair value hierarchy that reflects the significance of the input variables used in fair value measurement. The levels of fair value hierarchy are as follows.

| Levels | Significance of the inputs |
|---|---|
| Level 1 | Inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities |
| Level 2 | Inputs that are observable for the asset or liability, either directly or indirectly |
| Level 3 | Inputs that are unobservable for the asset or liability, either directly or indirectly |

⑤  Fair value measurement classified by fair value hierarchy as of December 31, 2019 and 2018 are as follows:

| | (million Korean won in units) | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| 38th period | | | | |
| Financial assets measured at fair value through profit or loss | - | - | 2,055 | 2,055 |
| Derivative assets | - | - | 6,003 | 6,003 |
| Total | - | - | 8,058 | 8,058 |
| 37th period | | | | |
| Financial assets measured at fair value through profit or loss | - | - | 2,167 | 2,167 |
| Derivative assets | - | - | 5,464 | 5,464 |
| Total | - | - | 7,631 | 7,631 |

(6) Capital risk management
The purpose of capital management of the Company is to maintain the ability to continue as going concern and to maximize the benefit of shareholders by minimizing capital financing expenditures. The management of the Company periodically reviews the capital structure and carries through a financial plan to borrow short term and long term funds in order to improve and maintain optimal capital structure.

## 38. Debt-to-equity swap and debt adjustments

(1) The Creditor Financial Institution Committee made a resolution on the additional debt-to-equity swap and debt adjustments on June 4, 2019 in 'Debt adjustment, etc.', and the debt-to-equity swap and debt adjustments were made on August 31, 2019 and September 6, 2019, respectively, as summarized below.

1) Debt-to-equity swap

| Agenda | Resolution |
|---|---|
| Debt-to-equity swap of the bonds | 1. Conversion amount : 605 billion won<br>2. Conversion distribution amount : Proportionate distribution based on the share proportion of unsecured bonds    (Calculation base date: December 31, 2018)<br>3. Period and method of conversion<br>① Period of conversion : The conversion will be executed on the completion date of the capital reduction without refund, so that the effects can be combined. The actual execution date shall be announced by the main creditor bank.<br>② Conversion price : 25,000won per share, Converted to common stock(Face value 5,000won)<br>③ Interest for the distribution amount will be exempted after the base date of the resolution on this agenda.<br>④ Bonds for conversion shall be determined among unsecured bonds and at the disposal of each institution, however, loans with limit shall be excluded from conversion if possible. |

① Conversion scale by financial institution

(million Korean won in units)

| Financial institution name | Main bond(A) | Excluded bond(B) | | | Bond for conversion(A-B) | Contribution proportion(%) | Conversion contribution amount |
|---|---|---|---|---|---|---|---|
| | | Secured bond | Performance type guarantee | Subtotal | | | |
| KDB | 1,362,305 | 674,854 | - | 674,854 | 687,451 | 49.68% | 300,567 |
| NH Bank | 166,351 | 11,407 | - | 11,407 | 154,944 | 11.20% | 67,744 |
| KEXIM | 116,400 | 6,266 | - | 6,266 | 110,134 | 7.96% | 48,153 |
| Hana Bank | 120,879 | 23,840 | - | 23,840 | 97,039 | 7.01% | 42,427 |
| Shinhan Bank | 97,518 | 14,121 | - | 14,121 | 83,397 | 6.03% | 36,463 |
| Woori Bank | 1,991 | 71 | - | 71 | 1,920 | 0.14% | 839 |
| Credit Guarantee Fund | 190,371 | 3,920 | - | 3,920 | 186,451 | 13.47% | 81,520 |
| WHB Securitization | 37,689 | 4,585 | - | 4,585 | 33,104 | 2.39% | 14,474 |
| Corporate Bond Stabilization Fund | 29,960 | 653 | - | 653 | 29,307 | 2.12% | 12,813 |
| Seoul Guarantee Isurance | 12,869 | - | 12,869 | 12,869 | - | 0.00% | - |
| The-K Bank | 6,300 | 6,300 | - | 6,300 | - | 0.00% | - |
| Total | 2,142,633 | 746,017 | 12,869 | 758,886 | 1,383,747 | 100.00% | 605,000 |

② Conversion liabilities

(million Korean won in units)

| Category | Type | Borrower | Amount |
|---|---|---|---|
| Corporate bond | 179Private placement bond | Credit Guarantee Fund | 5,358 |
| | 190-1Private placement bond | Credit Guarantee Fund, etc. | 25,100 |
| | 190-2Private placement bond | Hana Bank, etc. | 2,100 |
| | 190-3Private placement convertible bond | Corporate Bond Stabilization Fund | 4,000 |
| | 191-1Private placement bond | Credit Guarantee Fund, etc. | 5,000 |

| | | | (million Korean won in units) |
|---|---|---|---|
| Category | Type | Borrower | Amount |
| | 191-2Private placement bond | Hana Bank, etc. | 400 |
| | 191-3Private placement convertible bond | Corporate Bond Stabilization Fund | 800 |
| | 192Private placement bond | Credit Guarantee Fund | 5,358 |
| | 193-1Private placement bond | Credit Guarantee Fund, etc. | 22,500 |
| | 193-2Private placement bond | Hana Bank, etc. | 2,000 |
| | 193-3Private placement convertible bond | Corporate Bond Stabilization Fund | 3,600 |
| | 195-1Private placement bond | Credit Guarantee Fund | 14,400 |
| | 195-2Private placement bond | Hana Bank, etc. | 1,900 |
| | 195-3Private placement convertible bond | Corporate Bond Stabilization Fund | 2,400 |
| | 196-1Private placement bond | Credit Guarantee Fund | 6,005 |
| | 196-2Private placement bond | Hana Bank, etc. | 3,900 |
| | 196-3Private placement convertible bond | Corporate Bond Stabilization Fund | 2,013 |
| | 197-1Private placement bond | WHB Securitization | 1,300 |
| | 197-2Private placement bond | Hana Bank, etc. | 2,500 |
| | 198-1Private placement bond | WHB Securitization | 700 |
| | 198-2Private placement bond | Hana Bank | 1,300 |
| | 199-1Private placement bond | Hana Bank | 700 |
| | 199-2Private placement bond | Hana Bank, etc. | 1,400 |
| | 200-1Private placement bond | WHB Securitization | 546 |
| Subtotal | | | 115,280 |
| Borrowing | Banker's Usance | KEXIM, etc. | 3,010 |
| | Purchase fund loan | Hana Bank | 3,427 |
| | Urgent fund loan | KDB, etc. | 214,229 |
| | Facility fund loan | KDB | 2,389 |
| | Syndicate Loan | KDB, etc. | 247,720 |
| Subtotal | | | 470,775 |
| Trade payables | Shipper's Usance | KEXIM, etc. | 18,945 |
| Subtotal | | | 18,945 |
| Total | | | 605,000 |

Due to the additional debt-to-equity swap during the year ended December 31, 2019, the Company's liability of 605,000 million won, less expenses related to issuing stocks at 644 million won and the balance of the convertible bond after present value discount as of conversion date at 37,423 million won, is replaced with 121,000 million won of capital and 445,933 million won of share premium. The Company considered the conversion as the act of shareholders, and therefore did not recognize the debt adjustment income.

2) Debt adjustment

| Agenda | Resolution |
|---|---|
| Maturity extension for the remaining liabilities and interest rate adjustment | 1. Maturity extension for the remaining liabilities after conversion and adjustment of interest rate<br> The maturity date for the remaining liabilities and interest rate are adjusted as below.<br>① Maturity<br> - December 31, 2025<br>② Interest rate adjustment<br> - Applied interest rate : 2.0% per year |
| | * Other matters<br> 120 billion won among new stock acquisition amount paid regarding attracting investment shall be repaid during the joint management period before December 31, 2019 . |

(2) On December 28, 2017, the Creditor Financial Institution Committee made resolution on the additional debt-to-equity swap and debt adjustment for financial structure improvement at the meeting 'Voting rights and bond readjustment'. Major resolutions are as follows.

| Agenda | Resolution |
|---|---|
| Debt-to-equity swap of bonds | 1. Conversion amount 200 billion won<br>2. Conversion distribution amount : Proportionate distribution based on the share proportion of unsecured bonds<br> (Calculation base date : November 30, 2017)<br>3. Period and method of conversion<br>① Period of conversion: The conversion will be made after the completion (effective basis) of the 2:1 capital reduction without refund on the shares held by the Committee and treasury stocks(common stock and preferred stock). The actual execution date shall be announced by the main creditor bank<br>② Conversion price: 15,000won per share, converted to common stock(Face value 5,000won)<br>③ Interest for the distribution amount will be exempted after the base date of the resolution on this agenda.<br>④ Convertible bonds can be general unsecured bonds, corporate bonds refinancing bonds, and L/C advance bonds, etc. |

① Conversion scale by financial institution

(million Korean won in units)

| Financial institution name | Main bond(A) | Excluded bonds(B) | | | | Bond for conversion(A-B) | Contribution proportion(%) | Conversion contribution amount |
|---|---|---|---|---|---|---|---|---|
| | | Secured bond | Rapid acquisition bond | New fund | Subtotal | | | |
| KDB | 1,453,202 | 631,119 | 59,800 | 436,558 | 1,127,477 | 325,725 | 45.48% | 90,959 |
| NH Bank | 197,182 | 5,694 | 8,900 | 62,711 | 77,305 | 119,877 | 16.74% | 33,476 |
| KEXIM | 142,698 | 436 | - | 42,424 | 42,860 | 99,838 | 13.94% | 27,880 |
| Hana Bank | 140,408 | 18,246 | 15,437 | 36,367 | 70,050 | 70,358 | 9.82% | 19,648 |
| Shinhan Bank | 114,798 | 8,278 | 6,200 | 38,515 | 52,993 | 61,805 | 8.63% | 17,259 |
| Woori Bank | 1,939 | - | - | 1,939 | 1,939 | - | 0.00% | - |
| Credit Guarantee Fund | 194,754 | - | 179,887 | - | 179,887 | 14,867 | 2.08% | 4,152 |
| WHB Securitization | 44,400 | 3,029 | 9,200 | 8,442 | 20,671 | 23,729 | 3.31% | 6,626 |
| Corporate Bond Stabilization Fund | 29,998 | - | 29,998 | - | 29,998 | - | 0.00% | - |
| The-K Bank | 6,300 | 6,300 | - | - | 6,300 | - | 0.00% | - |

| | | Excluded bonds(B) | | | | Bond for conversion(A-B) | Contribution proportion(%) | Conversion contribution amount |
| Financial institution name | Main bond(A) | Secured bond | Rapid acquisition bond | New fund | Subtotal | | | (million Korean won in units) |
|---|---|---|---|---|---|---|---|---|
| Total | 2,325,679 | 673,102 | 309,422 | 626,956 | 1,609,480 | 716,199 | 100.00% | 200,000 |

② Conversion liabilities

| | | | (million Korean won in units) |
|---|---|---|---|
| Category | Type | Borrower | Amount |
| Corporate bond | 179Private placement bond | Credit Guarantee Fund | 2,076 |
| | 192Private placement bond | | 2,076 |
| Subtotal | | | 4,152 |
| Borrowing | Syndicate Loan | KDB, etc. | 167,968 |
| Trade payable | Usance Advance (*) | KEXIM | 27,880 |
| Subtotal | | | 195,848 |
| Total | | | 200,000 |

(*)  As of the end of 2017, Usance advance of 27,880 millon won of KEXIM is not recognized as a convertible liability as it does not meet the recognition requirements, for example, the subject of the bond cannot be specified, it is subject to foreign currency risk, etc. Usance advance 27,880 was converted to equity as the requirements of conversion was confirmed during the year ended December 31, 2018.

Due to the additional debt-to-equity swap during the year ended December 31, 2018, the Company's liability of 200,000 million won, less expenses related to issuing stocks at 345 million won, is replaced with 66,667 million won of capital and 132,988 million won of share premium. The Company considered the conversion as the act of the shareholders, therefore did not recognize the debt adjustment income.

## 39. Sales

Sales for the years ended December 31, 2019 and 2018 are as follows.

| | | (million Korean won in units) |
|---|---|---|
| Sales | 38th period | 37th period |
| Cold rolled steel, GI Steel, Tin Plates, etc. | 1,609,007 | 1,678,912 |
| Export goods transportation service | 26,315 | 23,306 |
| Sales of construction | 50,546 | 46,379 |
| Others | 2,603 | 2,307 |
| Total | 1,688,471 | 1,750,904 |

## 40. Subsequent events

(1) On December 27, 2019, the Company made a resolution for a small-scale merger with Dongbu Incheon Steel, a subsidiary 100% owned by the Company. The resolution was approved by the Board of Directors on January 29, 2020, with the approval as a replacement to the general meeting of shareholders, and the merger was completed with March 1, 2020 as the merger date. Dongbu Incheon Steel, an extinction company, was merged into Dongbu Steel, the surviving company, therefore new stock was not issued as the Company holds 100% of the interest. The Company has borrowed 45,000 million won on February 21, 2020 for the repayment of borrowings from financial institutions of the former Dongbu Incheon Steel.

(2) The Company has exempted the liability as of January 1, 2020 on the loans and unpaid interest loaned to Dongbu Singapore, a subsidiary 100% owned by the Company, as a result of the Board of Directors' resolution on March 10, 2020. The Company's total receivable from Dongbu Singapore is 31,161 million won (after merger).

The Company exempted the repayment obligation of Dongbu Singapore of bonds at the value of 29,325 million won, after reimbursement of investment stock(1,835 million won) owned by Dongbu Singapore. The Exemption was carried out as a means to conduct a settlement of Dongbu Singapore.

This page intentionally left blank.

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-1

# Standard Questions and Usage Appendices:  Debt Restructuring

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

### Dongbu's Debt Restructuring

#### *Standard Questions Appendix*

A.    Specify the eligibility criteria your company had to meet in order to receive benefits under this program.  State whether eligibility was or is currently contingent on one or more of the following criteria:  1) whether or not your company exports or has increased its exports, 2) the use of domestic rather than imported inputs, 3) the industry to which your company belongs, or 4) the region in which your company is located.

**ANSWER:**    Eligibility for voluntary debt restructuring was not limited based on any of the four eligibility criteria listed above.  As fully explained in the response to Question 3 in Section B of the narrative response, Dongbu Steel realized huge losses from its electric arc furnace and hot rolled production plant (HR Division) because its investment cost significantly exceeded its budget, and the global economy including Korea was in a severe slowdown. Therefore, Dongbu Steel tried a self-restructuring plan to get over its liquidity problems by the disposition of various assets.  But its plan was not successful, and so it applied for a voluntary corporate restructuring program under the CBCA.  Because the going-concern value was significantly higher than the liquidation value based on the PWC Report, the DSCBC approved Dongbu Steel's Business Normalization Plan.

B.    Describe in detail the application and approval process that your company undertook to receive benefits through the program.

**ANSWER:**    Please refer to Question 3 of Section B in the narrative response.

C.    Specify the criteria your company met to receive the particular amount of assistance provided.  Did the application or approval specify the merchandise for which this assistance was to be provided?  If so, provide details of which merchandise was specified in the application and/or approval documents.

**ANSWER:**    As demonstrated by four PWC reports, the restructuring plans were prepared by an independent accounting firm in order to maximize the recovery ratio of the loans by the creditor banks in the DSCBC under the CBCA and later the Dongbu Steel Creditor

Filed By: bmills@mmmlaw.com, Filed Date: 12/3/20 12:37 PM, Submission Status: Approved

Financial Institutions' Committee ("DSCFIC") under the CRPA.  The goal of the restructuring plans was to ensure the recovery of Dongbu Steel and its ability to repay its loans.  It was not tied to any specific merchandise.

**D.    What records does your company keep regarding each of the benefits received under this program?  Provide your company's executed application forms and other application documents with respect to this program.  Provide copies of the documentation sent to your company upon approval of the benefit, including but not limited to: approval letter, contract, claim form, etc.**

    **ANSWER:**    Please refer to Dongbu Steel's response to questions in Section B of the narrative response to this questionnaire.

**E.    Specify how many years your company has received benefits under this program. What was the first year that your company applied for and received benefits?  For programs under investigation that were not enacted pursuant to a legal instrument, indicate for how many years your company has participated in the program.  For example, for programs involving the provision of inputs for less than adequate remuneration not enacted pursuant to a legal instrument, please indicate how many years your company has purchased the relevant inputs from the government, government-controlled entities such as state-owned enterprises, or other enterprises alleged to be "authorities" under section 771(5)(B) of the Act.**

    **ANSWER:**    Dongbu Steel understands that this question is relevant to the statutory requirement that when analyzing *de facto* specificity the Department must take into account, *inter alia*, the "length of time during which the subsidy program has been in operation."  Section 771(5A)(D)(iii) of the Tariff Act of 1930, *as amended*.  To Dongbu Steel's knowledge, nothing in the statute requires the Department to analyze how long a particular respondent used a subsidy program.  Rather, the requirement is based on the length of operation of the program itself. Dongbu Steel thus refers the Department to the Government of Korea's response to this question in its Standard Questions Appendix for the program wide information.

2

**F.**    **Indicate where benefits under this program can be found in your accounting system (i.e., specify the ledgers or journals) and financial statements.  If you have to file anything with the government to continue receiving benefits under this program, provide a complete translated set of your most recent submissions made during, or before, the POR.**

      **ANSWER:**    The benefits from this program can be found in the short-term and long

term borrowings and interest expense accounting ledgers.  For the application documents, please

refer to the responses in Section B of the narrative response to this questionnaire.

**G.**    **Has the program been terminated?  If so, please explain.  When is the last date that your company could *apply for or claim* benefits under the program?  When is the last date that your company could *receive* benefits under the program?**

      **ANSWER:**    No, the program has not been terminated.

Filed By: bmills@mmmlaw.com, Filed Date: 12/3/20 12:37 PM, Submission Status: Approved

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

### Dongbu's Debt Restructuring

### *Usage Appendix*

**A.    State whether you applied for, received, or accrued assistance under the program at any time during the POR.**

   **If you applied for, received, or accrued assistance under the program during the POR, please respond to the following questions.**

   **ANSWER:**    Dongbu Steel received interest rate reductions as agreed to by its creditors prior to and during the POR.  In addition, although the Department has repeatedly determined that they did not constitute countervailable assistance, Dongbu Steel also notes that it participated in debt-to-equity swaps as agreed to by its creditors in 2015, 2016, 2018 and also again in 2019.

**B.    Provide details including amounts of funding, dates of approval and disbursement, and whether the disbursement was a lump sum or multiple installments.  If the amount of approval differs from the amount disbursed, please indicate the difference.**

   **ANSWER:**    The details of Dongbu Steel's restructured loans are provided in **Exhibit B-35**.  Details regarding the debt-to-equity swaps are provided in response to Question 5 in Section B of the narrative response.

**C.    Describe the records your company keeps regarding assistance received under this program.**

   **ANSWER:**    Dongbu Steel maintains files of long-term loans and equity ownership in its financial records and accounts.

**D.    Indicate where assistance under this program can be found in your accounting system (*i.e.*, specify the ledgers or journals), tax returns, and/or financial statements.**

   **ANSWER:**    Dongbu Steel's long-term loans and equity ownership are maintained in its financial records and accounting system.  The debt restructuring was also described and reported in Dongbu Steel's 2019 separate financial statements at Note 38.  *See* **Exhibit 12-A**.

4

E.     **Provide a translated copy of your application for assistance and the approval document you received.  If you were required to file additional documents (*e.g.*, certifications of export levels over the prior year, certification of FIE status) with the relevant administrative authorities in order to receive the disbursements made in the POR, provide these additional documents as well.**

     **ANSWER:**   Dongbu Steel did not apply for the assistance provided.  Instead, Dongbu

Steel entered into a voluntary restructuring agreement with its creditors, and, after the

recommendations of the PWC reports for each of the restructurings, Dongbu Steel's creditors

determined that its long-term loans should be restructured and some of the debt should be

converted to equity.  *See* responses to Questions 3 and 5 in Section B of the narrative response.

F.     **Does your company receive assistance under this program on an ongoing basis from year to year, or is the program exceptional in the sense that it provides one-time assistance?**

     **ANSWER:**   No.  Each of the debt restructurings and debt-to-equity conversions were

separate events.

G.     **Have you filed a separate application each time you have received assistance under this program?  Has assistance received been contingent upon expressed government authorization or approval?  Please explain.**

     **ANSWER:**   No.  As discussed above, the assistance was provided after

recommendations were made in the PWC reports and were approved by Dongbu Steel's

creditors.  No expressed government approval was involved.

H.     **Is assistance under this program provided for or tied to the capital structure or capital assets of your company?**

     **ANSWER:**   Yes.

I.     **If benefits received under this program are non-recurring, you should report the following information for each subsidy received during the POR, as well as the preceding number of years corresponding to the AUL period:  Your company's total or export sales (depending on whether the program is a domestic or an export subsidy) in the year in which the assistance was approved.**

     **ANSWER:**   *See* **Exhibits 15-A** and **16-A**.

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-2

# Creditors' Co-Management Program Agreement with Creditor's Association

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-3

# Special Agreement for Corporate Bond Refinancing Issuance

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-4

# Corporate Voluntary Restructuring Program under the Creditor Banks' Committee Agreement ("CBCA")

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-5

# 1st Meeting of Dongbu Steel's Creditor Banks' Committee ("DSCBC")

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-6

# 2nd Meeting of DSCBC

**This exhibit is not susceptible to public summarization.**

# Exhibit B-7

# Investigation Report on Assets and Liabilities and Feasibility Review Report of Business Normalization Plan ("PWC Report")

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-8

# 3rd Meeting of DSCBC

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-9

# Investigation Report of Financial Status and Review of Projected Cash Flow

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-10

# Succession Agreement of the Agreement for Compliance of Business Normalization Plan and 1st Meeting of Dongbu Steel's Creditor Financial Institutions' Committee ("DSCFIC")

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-11

# 2nd Meeting of DSCFIC

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-12

# 3rd Meeting of DSCFIC

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-13

# 4th Meeting of DSCFIC

**This exhibit is not susceptible to public summarization.**

# Exhibit B-14

# Compliance Review Report of Business Normalization Plan of Dongbu Steel

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-15

# 5th Meeting of DSCFIC

**This exhibit is not susceptible to public summarization.**

# Exhibit B-16

# Feasibility Review Report on Continuation of Workout Program and Compliance of Business Normalization Plan of Dongbu Steel

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-17

# Amended Agreement for Compliance of Business Normalization Plan and 6th Meeting of DSCFIC

**This exhibit is not susceptible to public summarization.**

# Exhibit B-18

# Articles 44 and 45 of Financial Investment Services and Capital Markets Act

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Financial Investment Services and Capital Markets Act

## Article 44 (Control of Conflicts of Interest)

① A financial investment business entity shall identify and assess the likelihood of conflicts of interest, which may arise between the financial investment business entity and any investor, or between a specific investor and another investor in relation to the financial investment business in which it engages, to prevent such conflicts of interest, and it shall control such conflicts properly in accordance with the method and procedure prescribed by the internal control standards established under Article 24 of the Act on Corporate Governance of Financial Companies (hereinafter referred to as "internal control standards"). <Amended by Act No. 13453, Jul. 31, 2015>

② Where conflicts of interest are deemed to likely to occur through an identification and assessment under paragraph (1), a financial investment business entity shall notify the relevant investors thereof in advance, and shall commence trading or any other transactions, after reducing the likelihood of the conflicts of interest in accordance with the method and procedure prescribed by internal control standards to the level that it will not undermine the protection of the investors.

③ No financial investment business entity shall commence any trading or transactions, if it is deemed impracticable to reduce the likelihood of conflicts of interest under paragraph (2).

## Article 45 (Suspending Exchanges of Information)

① No financial investment business entity shall engage in any of the following activities, if conflicts of interest are very likely to occur between the different types of the financial investment business in which it engages (including the management of its proprietary property; hereafter the same shall apply in this Article) in cases prescribed by Presidential Decree:

1. Furnishing information related to the trading of financial investment instruments or other information specified by Presidential Decree;
2. Permitting any of its executive officers (excluding the representative director, an auditor, or a member of the audit committee who is not an outside director) or employees to hold offices concurrently;
3. Using an office space or an electronic computer system jointly in a manner specified by Presidential Decree;
4. Other activities specified by Presidential Decree as likely to cause conflicts of interest.

② No financial investment business entity shall engage in any of the following activities, where conflicts of interest are very likely to occur between the financial investment business entity and its affiliated company, or with any other company prescribed by Presidential Decree, in connection with the financial investment business in which it engages, in cases prescribed by Presidential Decree:

1. Furnishing information related to the trading of financial investment instruments or other information specified by Presidential Decree;
2. Permitting any of its executive officers (excluding non-standing auditors) or employees to concurrently hold offices or dispatching any of its executive officers and/or employees to work for the company;
3. Using an office space or an electronic computer system jointly in a manner specified by Presidential Decree;
4. Other activities specified by Presidential Decree as likely to cause conflicts of interest.

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# 자본시장과 금융투자업에 관한 법률 (약칭: 자본시장법)

제44조(이해상충의 관리) ① 금융투자업자는 금융투자업의 영위와 관련하여 금융투자업자와 투자자 간, 특정 투자자와 다른 투자자 간의 이해상충을 방지하기 위하여 이해상충이 발생할 가능성을 파악·평가하고,「금융회사의 지배구조에 관한 법률」제24조에 따른 내부통제기준(이하 "내부통제기준"이라 한다)이 정하는 방법 및 절차에 따라 이를 적절히 관리하여야 한다.  <개정 2015. 7. 31.>

   ② 금융투자업자는 제1항에 따라 이해상충이 발생할 가능성을 파악·평가한 결과 이해상충이 발생할 가능성이 있다고 인정되는 경우에는 그 사실을 미리 해당 투자자에게 알려야 하며, 그 이해상충이 발생할 가능성을 내부통제기준이 정하는 방법 및 절차에 따라 투자자 보호에 문제가 없는 수준으로 낮춘 후 매매, 그 밖의 거래를 하여야 한다.

   ③ 금융투자업자는 제2항에 따라 그 이해상충이 발생할 가능성을 낮추는 것이 곤란하다고 판단되는 경우에는 매매, 그 밖의 거래를 하여서는 아니 된다.


제45조(정보교류의 차단) ① 금융투자업자는 그 영위하는 금융투자업(고유재산 운용업무를 포함한다. 이하 이 조에서 같다) 간에 이해상충이 발생할 가능성이 큰 경우로서 대통령령으로 정하는 경우에는 다음 각 호의 어느 하나에 해당하는 행위를 하여서는 아니 된다.

   1. 금융투자상품의 매매에 관한 정보, 그 밖에 대통령령으로 정하는 정보를 제공하는 행위

   2. 임원(대표이사, 감사 및 사외이사가 아닌 감사위원회의 위원을 제외한다) 및 직원을 겸직하게 하는 행위

   3. 사무공간 또는 전산설비를 대통령령으로 정하는 방법으로 공동으로 이용하는 행위

   4. 그 밖에 이해상충이 발생할 가능성이 있는 행위로서 대통령령으로 정하는 행위

   ② 금융투자업자는 금융투자업의 영위와 관련하여 계열회사, 그 밖에 대통령령으로 정하는 회사와 이해상충이 발생할 가능성이 큰 경우로서 대통령령으로 정하는 경우에는 다음 각 호의 어느 하나에 해당하는 행위를 하여서는 아니 된다.

   1. 금융투자상품의 매매에 관한 정보, 그 밖에 대통령령으로 정하는 정보를 제공하는 행위

   2. 임원(비상근감사를 제외한다) 및 직원을 겸직하게 하거나 파견하여 근무하게 하는 행위

   3. 사무공간 또는 전산설비를 대통령령으로 정하는 방법으로 공동으로 이용하는 행위

   4. 그 밖에 이해상충이 발생할 가능성이 있는 행위로서 대통령령으로 정하는 행위

# Exhibit B-19

# Dongbu Steel Co., Ltd. Investment Attraction Announcement

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

## Dongbu Steel Co., Ltd. Investment Attraction Announcement

**1. Overview of Investment Attraction**

    **(1) Purpose of Transaction:** Acquisition of common stocks issued by Dongbu Steel Co., Ltd. (hereinafter referred to as "Company" through a paid-in-capital increase method allocated to a third party and transfer of corporate management rights (hereinafter referred to as "the transaction")

    **(2) Transaction Method:** Open Bidding

    **(3) Joint Advisory Company:** Credit Suisse Securities– Seoul Branch and KDB M&A Consulting Office

**2. Schedule**

    **(1) Preliminary Bidding Procedure**

        ① Provide Confidentiality Agreement Form for potential investors who have revealed their intention to bid - Receipt of Confidentiality Agreement Form – Distribution of Teaser Memorandum and Preliminary Bidding Guide – Receipt and review of Preliminary Bidding Proposal and related documents (hereinafter 'Preliminary Bidding Proposal, etc.") – Notification of final qualified bidders

        ② Procedures after the notification of the final qualified bidders will be provided step by step only to the potential investors selected as final qualified bidders through a separate Final Bidding Guide,

    **(2) Filing method of the Confidentiality Agreement Form**

        ① Application Deadline: 4:00 p.m. on Friday, January 18, 2019 (Based on Korean Standard Time)

        ② Application Location: 13th floor, 109 Sogong-ro, Jung-gu, Seoul, Credit Suisse Securities Seoul Branch

        ③ Documents to be submitted: 1 copy of each of the original sealed copy of the Confidentiality Agreement Form and related documents

        ④ Others: Please receive Confidentiality Agreement Form directly from the Joint Advisory Company

    **(3) Filling method of the Preliminary Bidding Proposal**

        ① Application Deadline: 4:00 p.m. on Monday, January 21, 2019 (Based on the Korean Standard Time)

        ② Application Location: 13th floor, 109 Sogong-ro, Jung-gu, Seoul, Credit Suisse Securities Seoul Branch

        ③ Document to be submitted: 1 original copy and 3 copies of Preliminary Bidding Proposal, etc.

        ④ Others: Please refer to the separate Preliminary Bidding Guide for details on preparation and application of the Preliminary Bidding Proposal

**3. Other Matters**

        ① For details on this transaction, refer to the Investment Attraction Guide posted on the website of Dongbu Steel Co., Ltd. (www.dongbusteel.com)

        ② All documents related to this transaction, including Confidentiality Agreement Forms and Preliminary Bidding Proposals, are valid only if they are received within the deadline. All documents received cannot be canceled, withdrawn, recovered, exchanged or changed.

        ③ All decisions regarding this transaction, including the provision or distribution of Confidentiality Agreement Form, Teaser Memorandum, Preliminary Bidding Guide, and additional reception of Preliminary Bidding Proposals, belong to the exclusive authority of the company and the Joint Advisory Company. The above procedures and information may

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

be canceled or changed depending on the circumstances of the company, and potential investors cannot raise any objection to the transaction procedure and its results.

④ Announcement of the investment attraction related to this transaction, the distribution of the investment attraction guide and the preliminary bidding guide, and the request for the submission of the preliminary bidding proposal is not an offer or solicitation of an offer under the "Financial Investment Services and Capital Markets Act" and the enforcement decree of the same Act.

## 4. Contact Information

Please contact Credit Suisse Securities Seoul Branch (T:02-3707-3746) or KDB M&A Consulting Office (T: 02-787-7254) for any information related to the transaction.

January 7, 2019

**Dongbu Steel Co., Ltd.**
**Joint Advisory Credit Suisse Securities Seoul Branch and KDB M&A Consulting Office**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# 동부제철 주식회사 투자유치 공고

1. **투자유치 개요**
   (1) **거래목적**: 동부제철 주식회사(이하 "회사")가 제3자 배정 유상증자 방식으로 발행하는
        보통주식 인수 및 경영권 이전(이하 "본건 거래")
   (2) **거래방식**: 공개경쟁입찰
   (3) **공동자문사**: 크레디트스위스증권 서울지점 및 한국산업은행 M&A컨설팅실

2. **진행일정**
   (1) **예비입찰 절차**
   ① 입찰 의향을 밝힌 잠재투자자를 대상으로 비밀유지확약서 양식 제공→비밀유지확약서 접수
   →투자요약설명서(Teaser Memorandum) 및 예비입찰안내서 배포→예비입찰제안서 및
   관련 부속서류(이하 "예비입찰제안서 등") 접수 및 심사→최종입찰적격자 통지
   ② 최종입찰적격자 통지 이후의 절차에 대해서는 최종입찰적격자로 선정된 잠재투자자에 한
   하여 별도의 최종입찰안내서 등을 통해 단계적으로 제공 예정

   (2) **비밀유지확약서 접수방법**
   ① 접수기한: 2019년 1월 18일 금요일 오후 4시까지(대한민국 표준시간 기준)
   ② 접수장소: 서울특별시 중구 소공로 109 소공한화빌딩 13층 크레디트스위스증권 서울지점
   ③ 제출서류: 비밀유지확약서 날인본 원본 및 관련 부속서류 각 1부
   ④ 기타: 비밀유지확약서 양식은 공동자문사로부터 직접 수령

   (3) **예비입찰제안서 접수방법**
   ① 접수기한: 2019년 1월 21일 월요일 오후 4시까지(대한민국 표준시간 기준)
   ② 접수장소: 서울특별시 중구 소공로 109 소공한화빌딩 13층 크레디트스위스증권 서울지점
   ③ 제출서류: 예비입찰제안서 등 원본 1부 및 사본 3부
   ④ 기타: 예비입찰제안서 작성 및 접수와 관련된 상세내용은 별도의 예비입찰안내서 참고

3. **기타사항**
   ① 본건 거래 관련 상세 사항은 동부제철 주식회사 홈페이지(www.dongbusteel.com)에 게재되는
   투자유치 안내서 참고
   ② 비밀유지확약서, 예비입찰제안서 등을 포함하여 본건 거래와 관련된 모든 서류는 접수기한
   내에 접수된 것에 한하여 유효하며, 접수된 제반 서류는 취소, 철회, 회수, 교환 또는 변경
   할 수 없음
   ③ 비밀유지확약서 또는 투자요약설명서(Teaser Memorandum) 및 예비입찰안내서의
   제공이나 배포 여부, 예비입찰제안서 등의 추가접수를 포함하여 본건 거래에 관한 모든
   의사결정은 회사 및 공동자문사의 고유권한에 속하고, 상기 절차 및 내용은 회사의 사정에
   따라 취소 또는 변경될 수 있으며, 잠재투자자는 본건 거래 절차 및 그 결과에 대하여
   어떠한 이의도 제기할 수 없음
   ④ 본건 거래 관련 투자유치 공고, 투자유치 안내서, 예비입찰안내서의 배포 및 예비입찰제안서 등의
   제출 요청은「자본시장과 금융투자업에 관한 법률」및 동법 시행령상의 청약이나 청약의 권유가
   아님

4. **문의처**
   본건 거래 관련 사항은 크레디트스위스증권 서울지점(T:02-3707-3746) 또는 한국산업은행
   M&A컨설팅실(T:02-787-7254)로 문의하시기 바랍니다.

2019년 1월 7일

### 동부제철 주식회사
**공동자문사 크레디트스위스증권 서울지점 및 한국산업은행 M&A컨설팅실**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-20

# Preliminary Bidding Guide

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-21

# Teaser Memorandum for Investment Opportunity

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-22

# List of Potential Investors

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-23

# Preliminary Bidding Proposal of the KG Consortium

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-24

# Evaluation Results on Preliminary Bidding Proposals

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-25

# Ernst & Young Financial Due Diligence Report

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-26

# KG Consortium Final Bidding Proposal

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-27

# Co-Financial Advisors Reply to KG Consortium Final Bidding Proposal

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-28

# KG Consortium's Counteroffer to Co-Financial Advisors Reply

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-29

# PWC Report on Termination of Joint Management

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-30

# Minutes of the 7th DBCFIC Meeting and the Amended Agreement

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-31

# Notification of 7th DBCFIC Results of Resolutions

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-32

# Notice of Termination of Workout Program

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-33

# Minutes of June 12, 2019 Board of Directors Meeting

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-34

# Minutes of July 30, 2019 General Shareholders Meeting

**This exhibit is not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-35

# Loan Templates:  Restructured Loans

**Dongbu's Long-Term KRW Loans During the POR**

Filed By: bmill1s@mmmlaw.com, Filed Date: 12/3/20 12:37 PM, Submission Status: Approved

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

| SQ | Loan Type | Lender Name | Date of Loan Agreement | Date of Loan Receipt | Initial Loan Amount (Principal in KRW) | Initial Loan Amount (Principal in Original Currency) | Currency of Loan | Date of Maturity | Fixed or Variable Rate Loan | Interest Rate Specified in the Loan Agreement | 12/31/2018 Outstanding | Date of Principal Payments/ Date of Conversion to Equity | Amount of Principal Payment (KRW) | Amount Converted into Equity (KRW) | Date of Interest Payment | Total Number of Days Original Interest Payment Covers | Amount of Interest Paid (KRW) | Amount of Interest Refunded (KRW) | Total Number of Days Revised Interest Payment Covers | Net Amount of Interest Paid (KRW) | 12/31/2019 Outstanding | Principal Balance to Which Each Interest Payment Applies |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 [ | | | | | | | | | | | | | | | | | | | | 14,136,164 | | |
| 2 | | | | | | | | | | | 3,663,423,918 | | 57,080,554 | | | | | | | | | |
| 3 | | | | | 15,761,920,000 | | | | | | | | | | | | | | | | | 3,460,425,365 |
| 4 | | | | | | 20,090,880,000 | | | | | | | | | | | | | | | | 20,300,160,000 |
| 5 | | | | | | | | | | | | | | 21,555,840,000 | | | 41,592,249 | | | | | |
| 6 | | | | | | | | | | | | | | | | | | | 27,597,207 | | | |
| 7 | | | | | | | | | | | | | | | | | | | | | | 15,831,142,411 | ] |

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**These pages are not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**This page intentionally left blank.**

# Dongbu's Outstanding Bonds During the POR

Filed By: jhmill1@mwmmlaw.com, Filed Date: 12/3/20 12:37 PM, Submission Status: Approved

Barcode:4061022-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

| Source | Type | Purpose | Agreed Amount | Date of Agreement | Date of Maturity | Coupon Rate (%) | 12/31/18 Outstanding | Date of Principal Payments/ Date of Conversion to Equity | Amount of Principal Payment (KRW) | Amount Converted into Equity (KRW) | Date of Interest Payment | Total Number of Days Original Interest Payment Covers | Amount of Interest Paid (KRW) | Amount of Interest Refunded (KRW) | Total Number of Days Revised Interest Payment Covers | Net Amount of Interest Paid (KRW) | 12/31/19 Outstanding | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | 1,729,000,000 | | | | | | | | | | | |
| | | | | | | | | | | | | | 3,246,465 | | | | | |
| | | | 3,348,000,000 | | | | | | | | | | | | | | | |
| | | | | | | | | | | 5,036,050,000 | | | | | | | | |
| | | | | | | | 2,204,446,057 | | | | | | | | | 5,558,590 | | |
| | | | | | | | | | | | | | 2,638,267 | | | | | |
| | | | 17,640,000,000 | | | | | | | | | | | | | 37,080,000 | | |
| | | | | | | | | | | 927,000,000 | | | | | | | | |
| | | | | | | | | | | | | | | | | | | 22,680,000,000 |
| | | | | | | | 742,000,000 | | | | | | | 369,369 | | | | |
| 14 | | | | | | | | | | | | | | | | | | |

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**These pages are not susceptible to public summarization.**

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**This page intentionally left blank.**

Filed By: bmills@mmmlaw.com, Filed Date: 12/3/20 12:37 PM, Submission Status: Approved

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

## Dongbu's Short-Term KRW Loans During the POR

| SQ | Loan Type | Lender Name | Date of Loan Agreement | Date of Loan Receipt | Initial Loan Amount (Principal in KRW) | Initial Loan Amount (Principal in Original Currency) | Currency of Loan | Date of Maturity | Life of Loan | Fixed or Variable Rate Loan | Interest Rate Specified in the Loan Agreement | 12/31/2018 Outstanding | Date of Principal Payment | Amount of Principal Payment (KRW) | Date of Interest Payment | Amount of Interest Paid (KRW) | 12/31/2019 Outstanding | Principal Balance to Which Each Interest Payment Applies | Total Number of Days Each Interest Payment Covers |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | [ | | | | 109,200,000,000 | | | | | | | | | | | 69,231,143 | | 10,269,954,995 | |
| | | | | | | | | | | | | | | | | 21,790,071 | | | |
| | | | | | | | | | | | | | | | | 40,197,134 | 5,530,449,645 | | ] |

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-36

# Debt-to-Equity Conversion Summary

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

## Summary of Dongbu Steel's Debt Converted into Equity

| Loan Type | Lender Name | Converted into Equity (KRW) |
|---|---|---|
| Emergency Fund | [ | ] |
| Emergency Fund | [ | ] |
| Emergency Fund | [ | ] |
| Emergency Fund | [ | ] |
| Emergency Fund | [ | ] |
| Emergency Fund | [ | 12,542,036,230 ] |
| Emergency Fund | [ | ] |
| Emergency Fund | [ | ] |
| Facility Fund | [ | ] |
| Facility Fund | [ | ] |
| Emergency Fund | [ | ] |
| Emergency Fund | [ | ] |
| Emergency Fund | [ | ] |
| Emergency Fund | [ | 9,720,950,000 ] |
| Emergency Fund | [ | ] |
| Syndicated Loan | [ | ] |
| Syndicated Loan | [ | ] |
| Syndicated Loan | [ | 110,950,813,569 ] |
| Syndicated Loan | [ | ] |
| Syndicated Loan | [ | ] |
| Syndicated Loan | [ | ] |
| Syndicated Loan | [ | ] |
| Syndicated Loan | [ | 6,500,517,500 ] |
| Syndicated Loan | [ | ] |
| Syndicated Loan | [ | ] |
| General | [ | ] |
| **Subtotal -- Long Term Loans** | | **467,764,777,105** |

| Bond | [ | ] |
|---|---|---|
| Bond | [ | ] |
| Bond | [ | ] |
| Bond | [ | 1,209,000,000 ] |
| Bond | [ | ] |
| Bond | [ | ] |
| Bond | [ | ] |
| Bond | [ | 24,960,000,000 ] |
| Bond | [ | ] |
| Bond | [ | ] |
| Bond | [ | 22,032,000,000 ] |

Barcode:4061022-04 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

| Loan Type | Lender Name | Converted into Equity (KRW) | |
|---|---|---|---|
| Bond | [ | | ] |
| Bond | [ | | ] |
| Bond | [ | | ] |
| Bond | [ | 651,000,000 | ] |
| Bond | [ | | ] |
| Bond | [ | | ] |
| Bond | [ | | ] |
| Bond | [ | | ] |
| Bond | [ | 368,000,000 | ] |
| Bond | [ | | ] |
| Bond | [ | | ] |
| Bond | [ | | ] |
| Bond | [ | | ] |
| Bond | [ | 4,200,000,000 | ] |
| Bond | [ | | ] |
| Bond | [ | | ] |
| **Subtotal -- Long-Term Bonds** | | **115,280,000,000** | |

| Loan Type | Lender Name | Converted into Equity (KRW) | |
|---|---|---|---|
| Shipper's Usance | [ | | ] |
| Shipper's Usance | [ | | ] |
| Shipper's Usance | [ | | ] |
| Shipper's Usance | [ | 3,196,085,141 | ] |
| Shipper's Usance | [ | | ] |
| Shipper's Usance | [ | | ] |
| Shipper's Usance | [ | 1,265,491,323 | ] |
| Shipper's Usance | [ | | ] |
| Shipper's Usance | [ | | ] |
| Shipper's Usance | [ | | ] |
| **Subtotal -- Shipper's Usance** | | **18,945,222,895** | |

| Loan Type | Lender Name | Converted into Equity (KRW) | |
|---|---|---|---|
| Banker's Usance | [ | | ] |
| Banker's Usance | [ | | ] |
| **Subtotal -- Banker's Usance** | | **3,010,000,000** | |

| | |
|---|---|
| **Total -- Debt-to-Equity Conversion** | **605,000,000,000** |

**Tab 4**

**CR Doc 157-188**
**PR Doc. 80-85**

**Letter from Yoon & Yang, LLP to Sec'y Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: GOK's Initial Questionnaire Response," (Dec. 4, 2020).**

Barcode:4062131-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19



YOON & YANG
법무법인(유) 화우

19th fl., ASEM Tower, 517 Yeongdong-daero
Gangnam-gu, Seoul 06164, Korea
TEL. 82-2-6003-7000  FAX. 82-2-6003-7800
www.yoonyang.com

December 7, 2020

**PUBLIC VERSION**
Case No.:  C-580-879
Total Pages:  2,132
Admin. Review:  (§751) (01/01/2019 – 12/31/2019)
AD/CVD Operations, Office No. VIII
Proprietary Information Removed from Narrative Pages 3,
4, 7-14, 18-20, 22-35, 38-43, 45, and 46, the Exhibit List,
Appendices 1, 2, 8 – 11, 20, 21, 23 – 29, and from Exhibits
KEXIM-2, KDB-2, Debt Restructuring-1, Debt
Restructuring-3 – Debt Restructuring-9, Debt
Restructuring-11 – Debt Restructuring-14, DRR-2, DRR-5,
ITIPA-3, MODAL-2, MODAL-3, KAIA-2, KAIA-3, ER-3,
LED-3, PPP-2 NGF-2, NGF-3, SEWER-4, SEWER-5,
ASSAN-1, ESS-3, K-WATER-3, DAPA-3, and ICTIPA-2
**Document May Be Released Under APO**

<u>**VIA ELECTRONIC FILING**</u>

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Attn:  Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

Attn:   Kathleen Marksberry
        Joshua Simonidis
        Dennis McClure

Re:     **Certain Corrosion-Resistant Steel Products from the Republic of Korea,
        Case No. C-580-879:  GOK's Initial Questionnaire Response**

Dear Mr. Secretary:

On behalf of the Government of the Republic of Korea ("GOK"), we hereby submit the

GOK's response to Section II of the U.S. Department of Commerce's ("Department") October 6,

2020 Initial Questionnaire in the abovementioned administrative review.  This filing contains

2. **Korea Development Bank (KDB) and Industrial Base Fund (IBF) Short-Term Discounted Loans for Export Receivables**

**Commerce found the above program to be countervailable previously. We do not intend to reevaluate the countervailability of this program. However, if there were any changes to the program during the review period, or if the government replaced the program with a successor program, then please answer all questions in the *Standard Questions Appendix*. If there were no changes to the program during the POR, please so state; you do not need to provide a response to the *Standard Questions Appendix* if there were no changes to the program.**

**If any of the companies under review applied for, received, or accrued assistance under the program during the POR, please so state and respond to the *Usage Appendix* separately for each company.**

**If any of the companies under review applied for, received, or accrued assistance under the program, please respond to the following questions.**

<u>**ANSWER:**</u>  Industrial Base Fund Loans were terminated over 18 years ago through the revision of the Industrial Development Act deleting the legal basis of these loans, Article 30 of the Industrial Development Act, which came into effect on March 1, 2002.

For KDB Short-Term Discounted Loans for Export Receivables, there were no changes to this program during the POR.  [                                                          ] used this program during the POR.  The GOK provides the responses to the *Usage Appendix* for the company as **Appendix-2** in this submission.

**B. KG DONGBU'S DEBT RESTRUCTURING**

**Commerce found the restructuring of debt and loans received by KG Dongbu to be countervailable previously.  We do not intend to reevaluate the countervailability of this program.**

<u>**GOK's note:**</u>  KG Group (http://kgfamily.co.kr/eng/) invested in Dongbu in 2019, and Dongbu's Creditors Association terminated the application of debt restructuring.  When Dongbu accepted KG's investments, it changed its name to KG Dongbu.  The GOK uses either Dongbu or KG Dongbu in its response as appropriate.

**Please answer all questions in the** *Standard Questions Appendix* **and** *Usage Appendix*. **If there were no changes to the program during the POR, please so state; you do not need to provide a response to the** *Standard Questions Appendix* **if there were no changes to the program.**

<u>**ANSWER:**</u>  The GOK provides the responses to the *Standard Questions Appendix* for this program as **Appendix-3**.

**In addition, please respond to the following questions with respect to the conversion of debt-to-equity that took place in 2015, after the POI:**

1. **Please provide a general description of the debt restructuring for KG Dongbu including the time table for the debt restructuring, the purpose of the debt restructuring, the names of and number of the creditors involved in the debt restructuring, the law under which the restructuring is undertaken, the terms of the restructuring, a description of the Creditors Associations, and the types and amount of debt that were restructured, including any additional infusions of cash or loans to KG Dongbu and an explanation as to whether the restructuring involved any conversion of debt into equity.**

   <u>**ANSWER:**</u>  Dongbu went through a corporate restructuring (or debt restructuring) to improve its financial status under the Voluntary Debt Restructuring program executed by Dongbu Steel's Creditors Association established under the Creditors Association Agreement signed between the creditors and Dongbu (**Exhibit Debt Restructuring-1**).  The Voluntary Debt Restructuring program is one of the corporate rehabilitation programs in Korea that the creditors who provided loans to financially unstable company utilize to maximize debt collection.  That is, if the company facing financial difficulty liquidates, creditors can only collect very a limited amount of their loans, but there are financially unsound companies from which creditors may collect more debts if they first assist the company to rehabilitate and then make the company pay back the debt with the profits accrued through its conduct of business.  As is evident, the purpose of the Voluntary Debt Restructuring program is to maximize the debt collection of the creditors and ultimately maintain a sound national financial system.  This program is applied to companies that have on-going value in excess of the liquidation value.  If the on-going value is less than the liquidation value of the target company, creditors will just let the company liquidate and not apply this program.

   In order to check whether the company is facing financial difficulties, Korean commercial banks evaluate companies' financial status to which they have provided

loans of more than KRW 3 billion (Article 8 of the Operating Agreement of Creditor Banks Councils, **Exhibit Debt Restructuring-2**), and put them under one of the following four categories (Article 11 of the same Agreement):

> Category 1: Companies with sound financial conditions
>
> Category 2: Companies with weak financial conditions that may become bad
>
> Category 3: Companies with bad financial conditions but possible to recover
>
> Category 4: Companies with bad financial conditions that may not recover

The Debt Restructuring program is applied to companies that fall under category 3, and the primary bank, which is the bank that provided loans the most to the company, shall call for a meeting among the creditors to initiate the supervision on the company's financial conditions.  The primary bank may request the company falling under category 3 to engage an outside third-party expert to conduct a financial due diligence and evaluate its value (*see* Article 7 of the Corporate Restructuring Promotion Act).

Under the Voluntary Debt Restructuring program, the company facing financial difficulties must submit its plan to recover its financial conditions to the primary bank, and the creditors generally provide the company with (i) maturity date extensions for the loans provided in the past, (ii) additional loans, and/or (iii) conversion of their loans into equities.  Such actions are undertaken by creditors on a voluntary basis, and the GOK does not interfere with their decisions.

Meanwhile, members of the Creditors Association may sell their shares to anyone in the market and opt out from the association at any time.  For example, in the case of Dongbu, Industrial Bank of Korea ("IBK") was initially a member of the Creditors Association, but it sold its shares in the market and left the association.  Also, if a creditor does not agree to any of the decisions that the Creditors Association makes, such creditor may exercise its appraisal right under the law and sell its shares to other members of the association that supports the decision (Article 22 of the Operating Agreement of Creditor Banks Councils, Article 20 of the Corporate Restructuring Promotion Act).  With regard to Dongbu's Creditors Association's decision, commercial banks, such as Shihan bank and Hana bank (or KEBHana Bank), neither sold their credits nor exercised their appraisal rights.  On the other hand, Industrial Bank of Korea sold its credits and opted out from Dongbu's Creditors Association. This fact that commercial banks who are the market players with the goal of maximizing their profits did not opt out from the Creditors Association or exercise their appraisal rights supports that the Creditors Association's decision was made in

accordance with market principles and was a decision that the economic market participants could accept.

This program is not operated or supported by the GOK or GOK-controlled entities. It is true that special banks, such as the Korea Development Bank (which is established in accordance with the Korea Development Bank Act), participated as members of the Creditors Association, but such banks participated in this program to maximize debt collection and not as a GOK-controlled entities with a purpose to support the failing company, Dongbu. In short, the GOK does not have any influence over the operation of this program.

Dongbu Creditors Association is composed of creditors that provided loans to Dongbu, and their successors (Creditors Association Agreement, Article 3). The members of the Creditors Association were [


] when it was first composed, however, the members changed as some of the banks, *e.g.*, IBK, sold their credits in the market to third parties.

Resolutions at the Creditors Association are passed by affirmative votes of creditors that hold three quarters or more of the outstanding credits (Creditors Association Agreement, Article 6). Since [

], just like other creditors, possessed voting rights proportionate to the credits it had against Dongbu. [       ], just like other creditors, participated in this program to maximize its debt collection.

The following is the time table for Dongbu's Voluntary Debt Restructuring:

[

Public Version

8

Public Version

Barcode:4062131-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Filed By: bmills@mmmlaw.com, Filed Date: 12/7/20 11:30 AM, Submission Status: Approved

2. **Provide a complete copy of the Agreement for the Creditors Co-management Program between KG Dongbu and the Creditors' Associations, with complete translation.**

   **ANSWER:**  A copy of the Creditors Association Agreement between Dongbu and the creditors and the Agreement for Business Recovery Plan, including its succession agreement, are provided as **Exhibits Debt Restructuring-1**, **Debt Restructuring-7**, and **Debt Restructuring-14**.

3. **Please explain the type of assistance provided to KG Dongbu under the debt restructuring such as gains from debt-to-equity swaps, loans, import L/C (Usance), benefits related to debentures, etc.**

   **ANSWER:**  Please refer to the GOK's response to question 1 above.  Please note that no assistance was provided to Dongbu against market principles.  Actions made by creditors were all taken to maximize the collection of their loans provided to Dongbu.

4. **For the dates and amounts for each type of assistance provide under the debt restructuring.**

   **ANSWER:**  Please refer to the GOK's response to question 1 above for the actions taken by creditors for the debt restructuring.

5. **Please provide the exact amount of debt, both secured and unsecured, held directly by or by a GOK-owned or controlled entity:**

   a.  **Before the KG Dongbu debt-to-equity conversions in 2014**

      **ANSWER:**  Please *see* below.

*(Unit: Million KRW)*

| Bank | Secured Loans | Unsecured Loans | Surety Credit | Total |
|------|---------------|-----------------|---------------|-------|
| [    |               |                 |               |       |
|      |               |                 |               |       |
|      |               |                 |               |       |
|      |               |                 |               |       |
|      |               |                 |               |       |
|      |               |                 |               |       |
|      |               |                 |               |       |
|      |               |                 |               |       |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | *]* |

*GOK owned banks (including banks of which majority of its shares are owned by GOK) or banks established under the law.\**

**b.  After the KG Dongbu 2014 debt-to-equity conversions.**

<u>**ANSWER:**</u>  There were **[      ]** debt-to-equity conversions executed.  The converted loan amount for each creditor was determined based on the ratio of the unsecured loans outstanding on the resolution date of the Creditors Association, which was as follows.

*1) [                                                            ]*

*(Unit: Million KRW)*

| Bank | Secured Loans | Unsecured Loans | Credits Subject to Debt-Equity Conversion | Surety Credit | Total |
|---|---|---|---|---|---|
| *[* | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | *]* |

*GOK owned banks (including banks of which majority of its shares are owned by GOK) or banks established under the law.\**

2) *[                            ]*

*(Unit: Million KRW)*

| Bank | Secured Loans | Unsecured Loans | Credits Subject to Debt-Equity Conversion | Surety Credit | Total |
|------|---------------|-----------------|-------------------------------------------|---------------|-------|
| *[   |               |                 |                                           |               |       |
|      |               |                 |                                           |               |       |
|      |               |                 |                                           |               |       |
|      |               |                 |                                           |               |       |
|      |               |                 |                                           |               |       |
|      |               |                 |                                           |               |       |
|      |               |                 |                                           |               |       |
|      |               |                 |                                           |               | *]*   |

*GOK owned banks (including banks of which majority of its shares are owned by GOK) or banks established under the law.\**

3) *[                            ]*

*(Unit: Million KRW)*

| Bank | Secured Loans | Unsecured Loans | Credits Subject to Debt-Equity Conversion | Debt-Equity Conversion Amount |
|------|---------------|-----------------|-------------------------------------------|-------------------------------|
| *[   |               |                 |                                           |                               |
|      |               |                 |                                           |                               |
|      |               |                 |                                           |                               |
|      |               |                 |                                           |                               |
|      |               |                 |                                           |                               |
|      |               |                 |                                           |                               |
|      |               |                 |                                           |                               |
|      |               |                 |                                           |                               | *]*   |

*GOK owned banks (including banks of which majority of its shares are owned by GOK) or banks established under the law.\**

6. **For any debt-to–equity conversion please explain whether any objective analysis was made by the government, KDB or KEXIM prior to the debt-to-equity**

conversion.  If yes, please provide the complete analysis study done before the conversion, with full translation.

**ANSWER:**  For the 2015 conversion, Dongbu's Creditors Association obtained an outside expert, PWC, for the analysis on July 7, 2014 (**Exhibit Debt Restructuring-4**).  For the 2016 conversion, Dongbu's Creditors Association obtained the analysis conducted by the PWC on October 2015 (**Exhibit Debt Restructuring-8**).  For the 2019 conversion, Dongbu's Creditors Association obtained the analysis conducted by the PWC in May of 2019 (**Exhibit Debt Restructuring-12**).  The GOK notes that it has provided the relevant portions of the translations, and the GOK also refers the Department to Dongbu's Initial Questionnaire Response at Exhibits B-7, B-9, and B-29, respectively, for the complete translations.

7. **According to petitioner, KDB is the main creditor of the KG Dongbu Group and leads the Creditors' Association.  Please describe the Creditors' Association including when it was formed. Identify all members of the association and any ownership stakes of the GOK in each member. Please also identify which members are GOK agencies or GOK-owned entities.**

   **ANSWER:** [      ] was the primary bank for Dongbu's debt restructuring because its outstanding credits was the largest.  The creditors association was first formed in June of 2014, but its members changed.  Please *see* the GOK's response to question 5 for all of its members and the GOK's ownership for the members.

8. **Please explain under which law the Creditors' Association was created. Provide translated sections of the law regarding the responsibilities and powers granted to the Creditors' Association, how decisions are made on the Association, and any reporting requirements to the GOK or any GOK-controlled entity.**

   **ANSWER:**  Dongbu's creditors formed an association twice for the debt restructuring: when the creditors decided to pursue debt restructuring (i) on a voluntary basis and (ii) under the Corporate Restructuring Promotion Act.

   For (i) above, the Creditors Association was established under the voluntary agreement concluded between Dongbu and the creditors, the Creditors Association Agreement (**Exhibit Debt Restructuring-1**).  If the Creditors Association Agreement does not contain the basis for the action to be taken by the Creditors Association, such actions shall be based upon the Operating Agreement of Creditor Banks Councils and the Corporate Restructuring Promotion Act (**Exhibits Debt Restructuring-2 and**

**Debt Restructuring-15**).  Article 5 of the Creditors Association Agreement stipulates the Association's responsibilities and powers, and Article 6 provides the basis for the Association's decision making.  The Creditors Association does not have any obligation to make a report to the GOK or any GOK controlled entity.

For (ii) above, Creditors Association was established under the Corporate Restructuring Promotion Act (**Exhibit Debt Restructuring-15**).  Article 17 of the Act stipulates the Association's responsibilities and powers, and Article 18 provides the basis for the Association's decision making.  The Association does not have any obligation to report to the GOK or any GOK controlled entity.

9.  **Please provide a description of the responsibilities and powers granted to the Creditors' Association, how decisions of the Association are made, (i.e., does the amount of debt owned equal to voting power) and any reporting requirements to the GOK or any GOK controlled entity.**

   **ANSWER:**  Please see the GOK's answer to question 8.

10.  **Please provide a copy of the agreement entered into for the "Creditors Co-management Program" with the Creditors' Association and KG Dongbu.**

   **ANSWER:**  It is the GOK's understanding that the "Creditors Co-management Program" refers to the voluntary debt restructuring program operated by the creditors. The GOK provides a copy of the Creditors Associations Agreement entered into for the voluntary debt restructuring program between the creditors and Dongbu as **Exhibit Debt Restructuring-1**.

11.  **Provide copies of all laws and regulations governing the restructuring of KG Dongbu.**

   **ANSWER:**  The GOK provides copies of laws and regulations governing the debt restructuring of Dongbu as **Exhibits Debt Restructuring-2** and **Debt Restructuring-15**.

12. **Did other companies go through similar restructuring during the POI and the prior three years?**

   a. **If so, explain whether these restructurings were made pursuant to any GOK program and provide documentation regarding eligibility for these programs.**

   **ANSWER:**  There were 25 companies that went through similar restructurings as Dongbu's from 2011 to 2016.  A list of companies is as follows:

| YYYY | Company Name | Main Creditor |
|------|--------------|---------------|
| 2015 | SAJO DONGA ONE CORPORATION | Korea Development Bank |
| 2015 | Dongbu Steel | Korea Development Bank |
| 2015 | SFA semicon Co., Ltd. | Korea Development Bank |
| 2015 | POSCO PLANTEC | Korea Development Bank |
| 2015 | WOOJEON CO., LTD | Shinhan Bank |
| 2015 | DB Metal Co., Ltd. | KEB HANA BANK |
| 2014 | seha corporation | Korea Development Bank |
| 2014 | PanTech | Korea Development Bank |
| 2014 | Keangnam Enterprises Co.,Ltd | Shinhan Bank |
| 2014 | Hanjin P&C | Industrial Bank of Korea |
| 2013 | POSTEK | Woori Bank |
| 2013 | OSUNGLST CO., LTD | Korea Development Bank |
| 2013 | DREAMLINE Co.,Ltd. | Korea Development Bank |
| 2013 | SSANGYONG E&C | Woori Bank |
| 2013 | KPM Tech Co., Ltd. | Industrial Bank of Korea |
| 2012 | DAIYANG METAL CO., LTD. | Standard Chartered Bank Korea Ltd. |
| 2012 | KGP | Shinhan Bank |
| 2012 | GMP | Korea Development Bank |
| 2012 | CAMUS E&C | KB Kookmin Bank |
| 2012 | Oriental Precision & Engineering Co., Ltd. | Korea Development Bank |
| 2012 | PSM, Inc. | Korea Development Bank |
| 2011 | Kore Development Corporation Co. Ltd. | Nonghyup |
| 2011 | Sinil Industrial Co., Ltd | KB Kookmin Bank |
| 2011 | Kukje Machinery Co., Ltd. | Korea Development Bank |
| 2011 | ChinHung | Woori Bank |

   Korean commercial banks evaluate the financial status of the companies to which they have provided loans of more than KRW 3 billion (Article 8 of the Operating Agreement of Creditor Banks Councils, **Exhibit Debt Restructuring-2**), and put them under the following four categories (Article 11 of the Operating Agreement of Creditor Banks Councils):

Category 1: Companies with sound financial conditions
Category 2: Companies with weak financial conditions that may become bad
Category 3: Companies with bad financial conditions but possible to recover
Category 4: Companies with bad financial conditions that may not recover

The Debt Restructuring program is applied to companies that fall under category 3.

**b. Please also explain whether any other restructurings involved a Creditors Association or a Special Task Force and what their responsibilities were.**

**<u>ANSWER</u>:** All debt restructuring programs for companies facing financial difficulties involve a Creditors Association, the members of which are the creditors that have extended loans to the company facing financial difficulties. Their responsibilities are the same and are stipulated in the Operating Agreement of Creditor Banks Councils (**Exhibit Debt Restructuring-2**) and Corporate Restructuring Promotion Act (**Exhibit Debt Restructuring-15**). Please see the GOK's response to question 8 for more details.

## C. INCOME TAX PROGRAMS

**Commerce found the following listed programs to be countervailable previously. We do not intend to reevaluate the countervailability of the programs. However, if there were changes to any of the programs affecting the respondents' income tax returns filed during the POR, or if the government replaced a program with a successor program, then please answer all questions in the *Standard Questions Appendix*. If there were no changes to a program affecting income tax returns filed during the POR, please so state for each program; you do not need to provide a response to the *Standard Questions Appendix* if there were no changes to a program.**

**If any of the companies under review applied for, received, or accrued assistance under a program listed below during POR, please so state and respond to the *Income Tax Appendix* separately for each program for each company.**

Barcode:4062131-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit Debt Restructuring-3

Minutes of 1st Dongbu Steel's Voluntary Creditors Association

Barcode:4062131-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**BUSINESS PROPRIETARY INFORMATION
NOT CAPABLE OF PUBLIC SUMMARY**

Barcode:4062131-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit Debt Restructuring-6

Minutes of 3rd Dongbu Steel's Voluntary Creditors
Association

**BUSINESS PROPRIETARY INFORMATION
NOT CAPABLE OF PUBLIC SUMMARY**

Barcode:4062131-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit Debt Restructuring-9

Minutes of Dongbu Steel's Creditors Association under the CRPA

**BUSINESS PROPRIETARY INFORMATION
NOT CAPABLE OF PUBLIC SUMMARY**

**Tab 5**

**CR Doc. 202-206**
**PR Doc. 107**

**Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Dongbu's First Supplemental Questionnaire Response,"**
**(Jan. 19, 2021).**

Barcode:4077220-01 C-580-879 R... ...min Review 1/1/19 - 12/31/19



Donald B. Cameron, Jr.
202-216-4811
dcameron@mmmlaw.com

R. Will Planert
202-216-4819
wplanert@mmmlaw.com

Mary S. Hodgins
202-216-4111
mhodgins@mmmlaw.com

Julie C. Mendoza
202-216-4817
jmendoza@mmmlaw.com

Brady W. Mills
202-216-4116
bmills@mmmlaw.com

**MORRIS, MANNING & MARTIN, LLP**

January 20, 2021

**PUBLIC VERSION**
Case No.: C-580-879
Total Pages:  42
Admin. Review:  (§751) 1/1/2019 – 12/31/2019
AD/CVD Operations, Office No. VIII
Proprietary Information Removed from Narrative Pages 1,
3-5, and 8-12, and from Exhibits 37 – 39 and 41
<u>**Document May Be Released Under APO**</u>

<u>**VIA ELECTRONIC FILING**</u>

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Attn:  Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

Attn:   Robert Palmer
        Dennis McClure
        Joshua Simonidis

Re:   <u>**Certain Corrosion-Resistant Steel Products from the Republic of Korea,
      Case No. C-580-879:  Dongbu's First Supplemental Questionnaire
      Response**</u>

Dear Mr. Secretary:

On behalf of KG Dongbu Steel Co., Ltd. (formerly Dongbu Steel Co., Ltd.) and Dongbu

Incheon Steel Co., Ltd. (collectively, "Dongbu"), we hereby provide Dongbu's response to the

U.S. Department of Commerce's ("Department") January 5, 2021 First Supplemental

Questionnaire in the above referenced countervailing duty administrative review.  This filing

Filed By: bmills@mmmlaw.com, Filed Date: 1/20/21 1:28 PM, Submission Status: Approved

Barcode:4077220-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**Countervailing Duty Administrative Review Certain Corrosion-Resistant Steel
Products from the Republic of Korea, C-580-879**

**First Supplemental Questionnaire
KG Dongbu Steel Co., Ltd. (Dongbu Steel)/
Dongbu Incheon Steel Co., Ltd. (Dongbu Incheon) (collectively, Dongbu)**

<u>**Data Submission**</u>

1.      **For the following sales quantity and value exhibits submitted to Commerce in your initial questionnaire response, please submit public ranged data for all relevant values of the business proprietary version data:**

   a)      **Exhibit 15-A:  Dongbu Steel's Quantity and Value Chart**
   b)      **Exhibit 15-B:  Dongbu Incheon's Quantity and Value Chart**

   <u>**ANSWER:**</u>      In the public versions of Exhibits 15-A and 15-B, Dongbu submitted

public ranged data for various randomly-selected values in accordance with the Department's

accepted practice.  This public ranged data also included the FOB value of exports of subject

merchandise to the United States in order for the Department to calculate the "all others" rate for

the non-selected companies, which Dongbu understands are the relevant values the Department

expects.

<u>**Dongbu Incheon's Loans**</u>

2.      **On page 67 of your initial questionnaire response (IQR), you state that Dongbu Incheon used D/A short-term financing from [                                              ]. However, on page 19 of your IQR, you state that Dongbu Incheon did not receive any D/A financing from the Korean Development Bank (KDB) or IBF during the period of review.  Please clarify your response.  If Dongbu Incheon did use D/A short-term financing from KDB, please provide your response using the loan template as initially requested.**

   <u>**ANSWER:**</u>      The reference to the "KEB" on page 67 of the Initial Questionnaire

Response ("IQR") was not a typo.  KEB refers to Korea Exchange Bank, which in recent years

merged with Hana Bank, and is referred to as KEB Hana Bank in Dongbu Incheon's financial

statements.  On page 67 of the IQR, KEB was used as a short reference for the KEB Hana Bank.

As previously stated, Dongbu Incheon did not use D/A financing from the KDB.

1

**Dongbu Steel's Debt Restructuring**

3.      **In your questionnaire response, you submitted the draft version of the "Investigation Report of Financial Status and Review of Projected Cash Flow" (Exhibit B-9).  Please submit the final version of this report.**

      **ANSWER:**    Although the PWC's Investigation Report indicated on each page of the Korean version that it was a draft, this draft became the final report as there were no revisions.

4.      **In your questionnaire response, you submitted the "Feasibility Review Report on Continuation of Workout Program and Compliance of Business Normalization Plan of Dongbu Steel" for December 2018 (Exhibit B-16).  Please submit the most recent version of this report.**

      **ANSWER:**    As explained on page 35 of the IQR, the Feasibility Review Report was prepared to evaluate whether continuation of the Workout Program was better than liquidation for recovering the creditors' outstanding loans, which resulted in an extension of the maturity of the outstanding loans until December 31, 2020.  Subsequently, the Dongbu Steel's Creditors Financial Institutions' Committee ("DBCFIC") decided to pursue an M&A for Dongbu Steel in 2019, so there was no need to prepare a new version of this report.

5.      **On page 39 of your IQR, you state that the KDB officially notified Dongbu Steel of their graduation from the Corporate Restructuring Promotion Act program by DBCFIC on September 6, 2019.  Explain whether there remains any creditor bank committee for the purpose of Dongbu Steel's debt restructuring.**

      **ANSWER:**    The Notice of Termination of the Workout Program provided in Exhibit B-32 states that the procedure for the joint management of Dongbu by the creditor financial institutions (*i.e.*, the workout program) was concluded on September 6, 2019.  With the conclusion of the workout program, the creditors' bank committee was dissolved.

6.      **On pages 39 and 40 of your IQR, you explain that Dongbu Steel and each creditor bank amended their loan agreements on September 6, 2019.  Please respond to the following questions:**

      a)      **Please identify the banks with which Dongbu Steel reached amended loan agreements and whether they were members of the Creditors' Committee,**

2

**report the terms of the amended loan agreements, and compare them to the terms existing prior to the agreement.**

   **ANSWER:**    The financial institutions that reached amended agreements for the

remaining balances of their loans and/or bonds on September 6, 2019 were [

]. All of these financial institutions were members of the

creditors' committee.  The terms of the amended loan agreements were:  (1) a change in the

interest rate to 2 percent, and (2) extension of the maturity date to December 31, 2025.

Previously, the interest rates on the loans were primarily 3 percent, but in a few instances there

were loans for which the interest rate was 1 percent; the interest rates on the bonds were

primarily 1 percent, but a few bonds had interest rates somewhat higher.  The loan templates in

Exhibit B-35 also show the interest rates on the loans and bonds prior to the amended terms as

well as the changes in terms following the September 6, 2019 agreement.

   **b)    Please also explain what financial reports or other financial information the banks relied on (*e.g.*, quarterly financial statements, auditor's reports, etc.) to amend their loan agreements.**

   **ANSWER:**    Based on the analysis provided in the PWC Report on Termination of

Joint Management (Exhibit B-29), the 7th Meeting of the DBCFIC adopted a number of measures

that included the amended terms of the loans and bonds.  *See* discussion on pages 38-39 of the

IQR and Exhibit B-30 (Minutes of the 7th DBCFIC Meeting) at Agenda item 3.2.

   **c)    Please provide complete translated and original copies of the finalized M&A Investment Agreement.**

   **ANSWER:**    As already described on pages 37-38 of the IQR as the "Contract Terms",

the major terms of M&A investment included the following:

- Acquisition of new shares by the KG Consortium in the amount of KRW 360 billion, resulting in 72 percent share ownership of Dongbu Steel.

3

- Debt-to-equity conversion by the creditor banks of KRW 605 billion.

- Credit term adjustments of the interest rates on long-term loans and bonds to 2 percent and an extension of the maturity dates to December 31, 2025.

- Restriction period for stock sales.

To enforce the above M&A terms, the DBCFIC, KG Consortium and Dongbu Steel entered into an M&A Investment Agreement which includes the following agreements:

- New Share Subscription Agreement (**Exhibit B-37**)

- Shareholders' Agreement (**Exhibit B-38**)

- Scheme of Arrangement (Debt Restructuring Agreement) (**Exhibit B-39**)

Fully translated and original copies of the above agreements are provided as noted above. It should be noted that all of the above agreements are an integral part of the M&A Investment Agreement.

**7.     In the "Minutes of June 12, 2019 Board of Directors Meeting" (Exhibit B-33), Agenda 2 refers to the "[                                        ]."  Please respond to the following questions:**

**a)     Please explain the decision by the [**

**].**

**ANSWER:**     According to Article 2(1) of the Scheme of Arrangement (**Exhibit B-39**), the DBCFIC and Dongbu Steel entered into and signed legal documents to enforce the debt restructuring which was approved by Agenda items 3 and 4 of the Minutes of the 7th DBCFIC Meeting as provided in Exhibit B-30 of the IQR.  Because Dongbu Steel is a limited liability company, the approval of the Scheme of Arrangement at a meeting of Dongbu Steel's Board of Directors was legally required to bind the debt restructuring agreement between Dongbu Steel and the DBCFIC.

4

**b)**  **Are the amended loan terms the result of the [                    ]?**

    **ANSWER:**   As explained above, the Scheme of Arrangement is the legal document to enforce compliance with the debt restructuring approved by the DBCFIC, which included the amended loan terms.  Accordingly, after approval of the terms of the debt restructuring by the DBCFIC, the Scheme of Arrangement was entered into to enforce compliance.

**8.**    **On page 45 of your IQR, you state, "Dongbu Steel determined a write-off of existing shares from 8.5 shares to 1 share for shares held by the DSCFIC members and from 3 shares to 1 share for shares held by other minority shareholders including treasury stock …."  Please explain why the write-off of shares for DSCFIC members differs from the share held by minority shareholders.  Please provide documentation supporting your response.**

    **ANSWER:**   The comparison table of shares before and after the write-off by the shareholders is as follows.

| Shareholder | Type of Shares | Number of Shares | |
|---|---|---|---|
| | | **Before Write-off** | **After Write-off** |
| DBCFIC | Common shares (8.5:1) | 24,428,582 | 2,873,950 |
| Minorities (*) | Common shares (3:1) | 2,804,842 | 934,947 |
| | Preferred shares (3:1) | 160,156 | 53,385 |
| Total | | 27,393,580 | 3,862,282 |

(*) Treasury shares:  Common (4,781 shares) and preferred (178 shares) are included.

    As shown above, Dongbu Steel listed on the Korea Stock Exchange ("KSEC") two different classes of shares, which are common shares and preferred shares.

<u>Preferred Shares</u>

    According to Article 64(1)3 of the KOSPI Market Listing Regulation ("KOSPI Regulation") as provided in **Exhibit B-40**, if the number of listed preferred shares is less than 50,000 as of the end of the semi-annual period, the KSEC shall designate the preferred shares as an administrative issue.  Then, in the case where the preferred shares are designated as an administrative issue due to the shortage of the listed shares, *i.e.*, if the number of the listed shares

5

as of the following semi-annual period continues to be less than 50,000, the KSEC shall delist the preferred shares immediately according to Article 65(1)3 of the KOSPI Regulation.

Thus, if Dongbu Steel had applied the 8.5 to 1 ratio to its preferred shares, the number of preferred shares would have decreased from 160,156 shares to 18,841shares and Dongbu Steel would have been delisted.  Accordingly, Dongbu Steel has no option but to apply the 3 to 1 ratio to its preferred shares to make sure that there were over 50,000 preferred shares and thus maintain its listing on the KSEC.

Common Shares Held by Minority Shareholders

According to Article 47(1)5 of the KOSPI Regulation as provided in **Exhibit B-40**, if the average monthly trading volume of the common shares for the relevant semi-annual period is less than 1/100 of the floating shares as of the end of the relevant semi-annual period and less than 20,000 shares, whichever is less, the Korea Stock Exchange shall designate the common shares as an administrative issue.  Then, in the case where the common shares are designated as an administrative issue due to the shortage of trading volume, if the average monthly trading volume of the listed common shares as of the following semi-annual period continues to be less than 1/100 of the floating shares and less than 20,000 shares, whichever is less, as of the end of the relevant semi-annual period, the KSEC shall delist the common stocks immediately according to Article 48(5)3 of the KOSPI Regulation.

Thus, if Dongbu Steel had applied the 8.5 to 1 ratio to the number of common shares held by the minority shareholders they would have decreased from 2,804,842 shares to 329,981shares and Dongbu Steel would have been delisted because Dongbu Steel may not meet the above minimum average monthly trading volume because of the relatively small number of shares held by minority shareholders who are actively involved in daily transactions in the KSEC market.

6

Since the DBCFIC consists of banks that are not involved in daily stock transactions, it will be apparent that Dongbu Steel could not meet the above minimum average monthly trade volume without applying the 3 to 1 ratio to minority shareholders.  Furthermore, the sale of the common shares held by the DBCFIC and the KG Group are restricted until December 31, 2025.

In addition, Dongbu Steel may have faced legal action from minority common shareholders if a different write-off ratio were applied to preferred and common shareholders.

**9.     You refer to "DBCBC" and DBCFIC" in your response on multiple pages, such as pages 31 and 32.  Please explain what names these acronyms stand for in your response.**

**ANSWER:**     DBCBC was the acronym for Dongbu Steel's Creditors Banks' Committee, which was the name of the creditors' committee under the Creditors Banks' Committee Agreement ("CBCA"), and DBCFIC was the acronym for Dongbu Steel's Creditors Financial Institutions' Committee, which was the name of the creditors' committee under the Corporate Restructuring Promotion Act ("CRPA").[1]

**10.     On pages 45 and 46 of your IQR, you report that the 4th debt restructuring involved selling 24.2 million shares to the DBCFIC at a price of KRW 25,000 and 72 million shares to the KG Consortium at par value, or KRW 5,000 per share.  Please confirm whether the shares sold to the DBCFIC were the same types of shares.  If not, please provide a detailed explanation of any distinctions and how they affected the prices of the two types of shares.  Please provide documentation supporting your response.**

**ANSWER:**     The shares sold to the DBCFIC through the debt-to-equity conversion and the newly-issued shares to the KG Consortium were the same class of common shares.  The pre-condition for the M&A investment of KRW 360 million by KG Consortium was that the DBCFIC should meet the following:

---

[1]  In a few instances, the DBCBA was incorrectly referred to as the DSCBA, and the DBCFIC was incorrectly referred to as the DSCFIC.

(a) Minimum shareholding ratio after debt-to-equity conversion and issuance of new shares: 72 percent

(b) Minimum debt-to-equity conversion: KRW 605 Billion.

As fully explained on pages 44-46 of the IQR, the DBCFIC accepted the above pre-conditions, because these terms resulted in a going-concern value (Scenario 3) that was the highest among the other alternatives and the DBCFIC would receive early repayment of KRW 120 billion of the outstanding debt, and remove the uncertainty of management risk and the need for additional financing to Dongbu Steel.  Although the DBCFIC received its new shares at KRW 25,000 per share, this occurred because instead of first issuing 121 million new shares at KRW 5,000 per share and then executing a 5 to 1 reverse split resulting in 24.2 million newly issued shares, Dongbu Steel approved the issuance of 24.2 million shares to the DBCFIC at KRW 25,000 per share.

**11.    According to Exhibit B-33 of your IQR, the [**

**].”  Please clarify whether this identifies [**

**].**

**ANSWER:**    The Korea Development Bank Main Branch Sales Division was the recipient of the payment from the KG Consortium for the new shares.

**12.    You report that Dongbu Steel sold 72 million shares at par value to the "KG Consortium," but the list of shareholders suggests that this includes shares issued to a company called Cactus Private Equity.  Please respond to the following questions.**

**a)    Please identify Cactus Private Equity, including its Korean name and Website URL.**

**ANSWER:**    The Korean name of Cactus Private Equity ("CPE") is "캑터스프라이빗에쿼티", and it was established in July 2018 as a private equity and asset management fund.  Because CPE is doing business as a closed private equity fund which does

8

not raised funds from public sources, it does not maintain a Website URL.  Accordingly, Dongbu

Steel provides CPE's company brochure in **Exhibit B-41**.

> **b)    Please also provide the company's ownership structure, explain its role in the KG Group acquisition, and detail any relationship between Cactus Private Equity and the KG Group, including by way of share ownership, shared management personnel, familial relationships, or other ties.**

**ANSWER:**    As shown in **Exhibit B-41**, CPE is owned [



].

CPE is an investment advisory company and [



], to participate in the KG Consortium to invest in Dongbu Steel.  With the advisory

services of CPE, [



] invested KRW 160,000

million to purchase 32 million shares of Dongbu Steel and KG Steel invested KRW 200,000

million to purchase 40 million shares.  Accordingly, [          ] is a financial investor in Dongbu

Steel and owns 31.98% of outstanding shares of Dongbu Steel.  As further explained below, the

role of CPE is limited to investment advisory services.

9

c)    **Please also explain why this company was not discussed in Dongbu's affiliated companies' response.**

**ANSWER:**    CPE is an investment advisor company and consists of **[**

**]** with deep investment experience in Korea.  Its total assets as of

December 2019 were **[                    ]**.  As described in **Exhibit B-41**, CPE is currently

managing **[**

**]**.  Each of these funds is **[**

**]**.

When investing in one of these funds, an investor usually receives offering documents

detailing material information about the investment and enters into various agreements as a

limited partner of the fund.  These offering documents and agreements should disclose and

govern the terms of the investor's investment throughout the fund's life, including the fees and

expenses to be incurred by the funds and their investors.  In the case of Dongbu Steel, share

ownership was acquired through the **[                    ]**.

In addition, the portfolio companies may also pay CPE for services such as managing and

monitoring the portfolio company.  Also, the funds may pay CPE for advisory services.

Accordingly, CPE, as an advisor, has a legal obligation to act in the best interests of each of the

funds it manages and must allocate expenses among itself, its funds and the funds' portfolio

companies in accordance with this fiduciary duty.  As fiduciaries, advisers must make full

10

disclosure of all conflicts of interest between themselves and the funds they manage in order to get informed consent.

Accordingly, even though CPE may have certain affiliations with Dongbu Steel because the owners of CPE are **[                                        ]**, it should be noted that the investors in the **[                            ]** who are the owners of the fund that invested in Dongbu Steel should not be considered as affiliated companies of Dongbu Steel.  Furthermore, they clearly do not have any reporting obligations as they are not cross-owned and do not meet any of the other criteria for having to respond as a cross-owned affiliate as Dongbu Steel did not purchase any inputs into its production processes from the investors in the **[**

**]** or any of the CPE portfolio companies.  It is for this reason that Dongbu Steel did not discuss them in its initial affiliation response.

**13.**     **On pages 42 through 44 of your IQR, you explain that outstanding shares were written off in three different debt to equity swaps.  Please provide an explanation for the share prices used for the write-off of existing shares in each of the three different debt-to-equity swaps.  Provide documentation to support your response.**

**ANSWER:**     First of all, it should be noted that the write-off of existing shares does not change the ownership ratio when the write-off ratio is the same among all shareholders; it only reduces the number of existing shares and the share price on execution date of the write off is not considered.  However, in situations where the write-off ratios are different by share type or by shareholder group, various factors other than share price are considered as explained below in the case of Dongbu Steel.

The following factors were taken into account for the application of different write-off ratios by each shareholder.

1) January 7, 2015 write-off

Because Dongbu Steel's financial difficulties were caused by mismanagement of the company, the DBCFIC decided to apply a penalty for the mismanagement. Because Dongbu Steel's major shareholders and their related parties exercised management control, a 100 to 1 write-off ratio was applied to them. For the other shareholders that could not exercise management control, a 4 to 1 write-off ratio was applied.

2) March 30, 2016 and February 27, 2018 write-offs

The same ratio (4 to 1 in 2016 and 2 to 1 in 2018) was applied to all existing shareholders without consideration of market share price.

4) July 30, 2019 write-off.

As explained in the response to Question 8 above, the 8.5 to 1 ratio for the DBCFIC and the 3 to 1 ratio for minority shareholders was applied to prevent a de-listing problem.

**Other Programs**

**14.    Please review the Government of Korea's (GOK's) initial questionnaire response[2] and identify any discrepancies between the responses of Dongbu Steel, Dongbu Incheon and the GOK. In addition, please provide a full response to the programs used by Dongbu Steel and Dongbu Incheon if the programs are reported as used by the GOK.**

**ANSWER:**    Dongbu has reviewed the GOK's IQR regarding discrepancies in the reporting of its use of various programs, as discussed below.

In Exhibit A-6 of Dongbu's IQR, Dongbu Steel reported all D/A transactions where there were outstanding balances at any time during the POR, which included **[     ]** export receivables (D/A) transactions with the KDB where funds were received and interest paid during the POR and **[     ]** D/A transactions where funds were received and interest paid in 2018, prior to the

---

[2]  *See* the GOK's initial questionnaire response, dated December 4, 2020.

12

POR, but which had outstanding principal balances that were paid during the POR.  Dongbu has no definitive explanation for any discrepancy between the number of these loans received during the POR reported in Exhibit A-6 and in the GOK's IQR at Appendix-2, page 3.  However, in prior reviews, differences have occurred because the GOK reported loans by the reference number and Dongbu Steel reports each transaction, and there can be more than one transaction under a particular reference number.

13

Barcode:4077220-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**Certain Corrosion-Resistant Steel Products from the Republic of Korea**

**Administrative Review**
**POR:  01/01/2019 – 12/31/2019**

**Dongbu's First Supplemental Questionnaire Response**

**Exhibit List**

| Exhibit No. | Description |
|---|---|
| **Dongbu's Debt Restructuring** | |
| B-37 | New Share Subscription Agreement |
| B-38 | Shareholders' Agreement |
| B-39 | Scheme of Arrangement (Debt Restructuring Agreement) |
| B-40 | KOSPI Market Listing Regulations |
| B-41 | Cactus Private Equity Company Brochure |

13116671–1

Barcode:4077220-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-37

# New Share Subscription Agreement

Barcode:4077220-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**This exhibit is not susceptible to public summarization.**

Barcode:4077220-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-38

# Shareholders' Agreement

Filed By: bmills@mmmlaw.com, Filed Date: 1/20/21 12:49 PM, Submission Status: Approved

**This exhibit is not susceptible to public summarization.**

Barcode:4077220-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-39

# Scheme of Arrangement (Debt Restructuring Agreement)

**This exhibit is not susceptible to public summarization.**

**Tab 6**

**CR Doc. 247-250**
**PR Doc. 158**

**Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Dongbu's Fourth Supplemental Questionnaire Response," (June 23, 2021).**

Barcode:4136320-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19



Donald B. Cameron, Jr.
202-216-4811
dcameron@mmmlaw.com

R. Will Planert
202-216-4819
wplanert@mmmlaw.com

Mary S. Hodgins
202-216-4111
mhodgins@mmmlaw.com

Julie C. Mendoza
202-216-4817
jmendoza@mmmlaw.com

Brady W. Mills
202-216-4116
bmills@mmmlaw.com

MORRIS,
MANNING &
MARTIN, LLP

June 24, 2021

**PUBLIC VERSION**
Case No.:  C-580-879
Total Pages:  19
Admin. Review:  (§751) 1/1/2019 – 12/31/2019
AD/CVD Operations, Office No. VIII
Proprietary Information Removed from Exhibits B-45 – B-49
**Document May Be Released Under APO**

<u>VIA ELECTRONIC FILING</u>

The Honorable Gina M. Raimondo
Secretary of Commerce
Attn:  Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
1401 Constitution Avenue, N.W.
Washington, D.C. 20230

Attn:   Robert Palmer
        Dennis McClure
        Joshua Simonidis

Re:   **Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879:  Dongbu's Fourth Supplemental Questionnaire Response**

Dear Madam Secretary:

On behalf of KG Dongbu Steel Co., Ltd. (formerly Dongbu Steel Co., Ltd.) ("Dongbu"),

we hereby provide Dongbu's response to the U.S. Department of Commerce's ("Department")

June 16, 2021 Fourth Supplemental Questionnaire in the above referenced countervailing duty

administrative review.  This filing contains factual information that is being submitted in

Filed By: bmills@mmmlaw.com, Filed Date: 6/24/21 10:41 AM, Submission Status: Approved

**Countervailing Duty Administrative Review**
**Certain Corrosion-Resistant Steel Products from the Republic of Korea**
**C-580-879**

**Fourth Supplemental Questionnaire**

**Dongbu Steel Co., Ltd. (Dongbu Steel)/**
**Dongbu Incheon Steel Co., Ltd. (Dongbu Incheon)**

**Fourth Debt Restructuring**

1.      **On page 39 of your December 2, 2020 initial questionnaire response (IQR), you report that there are five changes related to the restructuring of outstanding debts. One such change is the cancellation of unused new loans of KRW 50 billion. Please provide documentation to support your claim that there was a cancellation of KRW 50 billion in unused loans.**

    **ANSWER:**     In Agenda No. 3 of the Minutes of the 7th DBCFIC Meeting (Exhibit B-30), section 3. "Others" includes several items with (3) describing the cancellation of the remaining unused balance of KRW 50 billion of new loans (general loans) authorized as part of the 2014 debt restructuring. *See* **Exhibit B-45** at 10 and Dongbu's Initial Questionnaire Response at 28 and 41.

2.      **In Exhibit B-30 of your IQR, you provide the Minutes of the 7th DBCFIC Meeting and the Amended Agreement. Please provide the following:**

    a.      **Ensure that you provide a complete English translation of the Minutes of the 7th DBCFIC Meeting and the Amended Agreement, including a complete translation of each attachment.**

    b.      **For each of the tables in your English translation, please ensure that the tables are not left blank and include the information in the corresponding tables from the Korean version.**

    **ANSWER:**     As requested, Dongbu Steel has revised the English translations of Exhibit B-30 (Minutes of the 7th DBCFIC Meeting), and Exhibits B-37, B-38, and B-39 (Attachments 4, 5, and 6 of the Minutes of the 7th DBCFIC Meeting) to include information in various tables corresponding to the original Korean versions. *See* **Exhibits B-45**, **B-46**, **B-47** and **B-48**, respectively, which replace these earlier exhibits.

1

**3.    In Exhibit B-33 of your IQR, you provide the Minutes of June 12, 2019 Board of Directors Meeting.  For each of the tables in your English translation, please ensure that the tables are not left blank and include the information in the corresponding tables from the Korean version.**

**ANSWER:**    As requested, Dongbu Steel has revised the English translation of Exhibit

B-33 to include information in various tables corresponding to the original Korean version.  *See*

**Exhibit B-49**.

2

Barcode:4136320-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**Certain Corrosion-Resistant Steel Products from the Republic of Korea**

**Administrative Review**
**POR:  01/01/2019 – 12/31/2019**

**Dongbu's Fourth Supplemental Questionnaire Response**

**Exhibit List**

| Exhibit No. | Description |
|---|---|
| **Dongbu's Debt Restructuring** ||
| B-45 | Minutes of the 7th DBCFIC Meeting (Revised Exhibit B-30) |
| B-46 | New Share Subscription Agreement (Revised Exhibit B-37) |
| B-47 | Shareholders' Agreement (Revised Exhibit B-38) |
| B-48 | Scheme of Arrangement (Debt Restructuring Agreement) (Revised Exhibit B-39) |
| B-49 | Minutes of June 12, 2019 Board of Directors Meeting (Revised Exhibit B-33) |

13116671–1

Barcode:4136320-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-45

# Minutes of the 7th DBCFIC Meeting (Revised Exhibit B-30)

Filed By: bmills@mmmlaw.com, Filed Date: 6/24/21 10:41 AM, Submission Status: Approved

**This exhibit is not susceptible to public summarization.**

Barcode:4136320-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Exhibit B-46

# New Share Subscription Agreement (Revised Exhibit B-37)

**This exhibit is not susceptible to public summarization.**

**Tab 7**

**PR Doc. 173**

**Memorandum from James Maeder, Deputy Assistant Secretary for AD/CVD Operations to Christian Marsh, Acting Assistant Secretary for Enforcement and Compliance, "Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review; 2019: Certain Corrosion-Resistant Steel Products from the Republic of Korea" (July 12, 2021)**

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-580-879
Administrative Review
POR: 01/01/2019 - 12/31/2019
**Public Document**
E&C/OVIII: DM/JS

July 12, 2021

| | |
|---|---|
| **MEMORANDUM TO:** | Christian Marsh<br>Acting Assistant Secretary<br>  for Enforcement and Compliance |
| **FROM**: | James Maeder<br>Deputy Assistant Secretary<br>  for Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review; 2019: Certain Corrosion-Resistant Steel Products from the Republic of Korea |

# I.    SUMMARY

The Department of Commerce (Commerce) is conducting an administrative review of the countervailing duty (CVD) order on certain corrosion-resistant steel products (CORE) from the Republic of Korea (Korea) for the period of review (POR) January 1, 2019 through December 31, 2019. This review covers 39 producers/exporters of subject merchandise. Commerce selected Hyundai Steel Company (Hyundai Steel) and KG Dongbu Steel Co., Ltd. (KG Dongbu Steel) (formerly Dongbu Steel Co., Ltd.) (Dongbu Steel)/Dongbu Incheon Steel Co., Ltd. (Dongbu Incheon) (collectively, KG Dongbu) as mandatory respondents. We preliminarily determine that certain producers/exporters of subject merchandise received above *de minimis* countervailable subsidies. Hyundai Steel preliminarily received *de minimis* countervailable subsidies.

# II.    BACKGROUND

On July 25, 2016, Commerce published the *CORE Order* in the *Federal Register*.[1] On July 1, 2020, Commerce published a notice of opportunity to request an administrative review of the *CORE Order*.[2] On July 21, 2020, we received a timely request for administrative review from

---

[1] *See Certain Corrosion-Resistant Steel Products from India, Italy Republic of Korea and the People's Republic of China: Countervailing Duty Order*, 81 FR 48387 (July 25, 2016) (*CORE Order*).
[2] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 85 FR 39531 (July 1, 2020).

Hyundai Steel, on behalf of itself.[3]  On July 31, 2020, the petitioners[4] timely filed a request for review of the *CORE Order* for 39 firms and their subsidiaries or affiliates.[5]  Additionally, on July 31, 2019, we received timely requests for administrative review from POSCO and POSCO Coated & Color Steel Co., Ltd. (POSCO C&C), on behalf of themselves.[6]

On September 3, 2020, Commerce initiated a CVD review of 39 companies.[7]  In the *Initiation Notice*, we stated that, in the event that we limited the number of respondents selected for individual examination, we intended to select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports during the POR.  On September 8, 2020, Commerce released CBP entry data, and provided interested parties until September 15, 2020, to submit comments on the data.[8]  We received comments from Hyundai Steel requesting that we select it as a mandatory respondent in this review.[9]  On October 6, 2020, Commerce selected KG Dongbu Steel and Hyundai Steel as mandatory respondents in this administrative review.[10]

On October 6, 2020, Commerce issued the initial questionnaire to the Government of Korea (GOK), Hyundai Steel, and KG Dongbu.[11]  Hyundai Steel and KG Dongbu Steel submitted their affiliation questionnaire responses on October 27, 2020.[12]  On December 1, 2020, Hyundai Steel submitted its responses to Section III of Commerce's Initial Questionnaire.[13]  On December 2, 2020, KG Dongbu submitted its response to Section III of Commerce's Initial Questionnaire.[14]  On December 4, 2020, the GOK submitted its response to Commerce's Initial Questionnaire.[15]

On December 21, 2020, and January 17, 2021, the petitioners filed deficiency comments on KG Dongbu's questionnaire response and Hyundai Steel's questionnaire response, respectively.[16]  On January 7, 2021, the petitioners filed comments regarding KG Dongbu Steel's

---

[3] *See* Hyundai Steel's Letter, "Request for Administrative Review," dated July 21, 2020.

[4] The petitioners are AK Steel Corporation, California Steel Industries, Inc.; Steel Dynamics Inc.; ArcelorMittal USA LLC; Nucor Corporation (Nucor); and United States Steel Corporation (U.S. Steel).

[5] The petitioners did not identify the subsidiaries or affiliates.  The complete list for petitioners' requested companies can be found in Appendix I.  *See* Petitioners' Letter, "Request for Administrative Review," dated July 31, 2020.

[6] *See* POSCO's Letter, "Administrative Review Request," dated July 21, 2020; *see also* POSCO C&C's Letter, "Administrative Review Request," dated July 30, 2020.

[7] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 54983 (September 3, 2020) (*Initiation Notice*).

[8] *See* Memorandum, "Release of U.S. Customs Entry Data for Respondent Selection," dated September 8, 2020.

[9] *See* Hyundai Steel's Letter, "Comments on CBP Data and Respondent Selection," dated September 15, 2020

[10] *See* Memorandum, "Respondent Selection," dated October 6, 2020.

[11] *See* Commerce's Letter, "Countervailing Duty Questionnaire," dated October 6, 2020 (Commerce's Initial Questionnaire).

[12] *See* Hyundai Steel's Letter, "Affiliated Companies Response," dated October 27, 2020 (Hyundai Steel's Affiliation QR); *see also* KG Dongbu's Letter, "Affiliated Companies Response," dated October 27, 2020 (KG Dongbu's Affiliation QR).

[13] *See* Hyundai Steel's Letter, "Hyundai Steel's Initial Questionnaire Response," dated December 1, 2021 (Hyundai Steel's Initial QR).

[14] *See* KG Dongbu's Letter, "Initial Questionnaire Response," dated December 2, 2020 (KG Dongbu's Initial QR).

[15] *See* GOK's Letter, "Initial Questionnaire Response," dated December 4, 2020 (GOK's Initial QR).

[16] *See* Petitioners' Letters "Comments on Dongbu's Initial Questionnaire Response," dated December 21, 2020; and "Comments on Hyundai Steel's Affiliated Companies Questionnaire Response," dated January 17, 2021.

Barcode:4142769-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

creditworthiness and equityworthiness.[17]  We issued supplemental questionnaires to the GOK, Hyundai Steel, and KG Dongbu, and each party filed their responses timely.[18]  On January 29, 2021, the petitioners submitted comments on KG Dongbu's first supplemental questionnaire response.[19]

On January 4, 2021, the petitioners submitted a timely new subsidy allegation (NSA) that Korean CORE producers benefitted from subsidized electricity during the POR.[20]  On February 1, 2021, Commerce initiated a review of the NSA of electricity for less than adequate remuneration (LTAR).[21]  We issued our NSA questionnaire to the GOK, Hyundai Steel, and KG Dongbu, on February 2, 2021.[22]  On February 9, February 23, and February 24, 2021, KG Dongbu, the GOK, and Hyundai Steel, respectively, filed their NSA questionnaire responses.[23]  We issued supplemental NSA questionnaires to the GOK, Hyundai Steel, and KG Dongbu, and each party filed their responses timely.[24]

On March 4, 2021, and March 24, 2021, Commerce extended the deadline for the preliminary results of this review.[25]  On March 16, 2021, and April 22, 2021, U.S. Steel and Nucor, respectively, filed deficiency comments concerning KG Dongbu's NSA responses.[26]  On June

---

[17] *See* Petitioners' Letter, "Comments Regarding Dongbu's Creditworthiness and Equityworthiness," dated January 7, 2021.

[18] *See* GOK's Letters, "Supplemental {sic} Questionnaire Response," dated January 14, 2021 (GOK's Supplemental QR); "Supplemental Questionnaire Additional Response," dated January 21, 2021; "Response to Question 1 of First Supplemental Questionnaire," dated January 21, 2021; "GOK's Second Supplemental Questionnaire," dated July 1, 2021 (GOK's Second Supplemental QR); *see also* KG Dongbu's Letters, "Supplemental Affiliated Companies Response," dated December 8, 2020 (KG Dongbu's Supplemental Affiliation QR); "First Supplemental Questionnaire Response," dated January 19, 2021; "Second Supplemental Questionnaire Response," dated March 10, 2021; and "Third Supplemental Questionnaire Response," dated May 28, 2021 (KG Dongbu's Third Supplemental QR); and Hyundai Steel's Letters, "Supplemental Affiliated Companies Response," dated December 9, 2020; and "First Supplemental Questionnaire Response," dated January 4, 2021.

[19] *See* Petitioners' Letter, "Comments on Dongbu's First Supplemental Questionnaire Response.," dated January 29, 2021.

[20] *See* Petitioners' Letter, "New Subsidy Allegation," dated January 4, 2021.

[21] *See* Memorandum, "New Subsidy Allegation," dated February 1, 2021 (NSA Memorandum).

[22] *See* Commerce's Letter, "New Subsidy Allegation Questionnaire," dated February 2, 2021.

[23] *See* Dongbu's Letter, "New Subsidies Questionnaire Response," dated February 9, 2021 (KG Dongbu NSA QR); *see also* GOK's Letter, "New Subsidies Allegations Questionnaire Response," dated February 23, 2021 (GOK NSA QR); and Hyundai Steel's Letter, "New Subsidies Allegations Questionnaire Response," dated February 24, 2021 (Hyundai Steel NSA QR).

[24] *See* GOK's Letters, "GOK's New Subsidy Allegations Supplemental Questionnaire Response," dated March 11, 2021 (GOK NSAS1); "GOK's New Subsidy Allegations Second Supplemental Questionnaire Response," dated April 13, 2021 (GOK NSAS2); "GOK's New Subsidy Allegations Third Supplemental Questionnaire Response," dated April 28, 2021; "New Subsidy Allegations Fourth Supplemental Questionnaire Response," dated July 2, 2021; *see also* KG Dongbu's Letter, "NSA Supplemental Questionnaire Response," dated July 2, 2021; and Hyundai Steel's Letter, "Hyundai Steel's NSA Supplemental Questionnaire Response," dated July 2, 2021.

[25] *See* Memoranda, "Extension of Deadline for the Preliminary Results of the 2019 Countervailing Duty Administrative Review," dated March 4, 2021, and March 24, 2021, respectively.

[26] *See* U.S. Steel's Letter, "Deficiency Comments Concerning the GOK's NSA SQR and Rebuttal Factual Information," dated March 16, 2021; *see also* Nucor's Letter, "Comments on New Subsidy Allegation Questionnaire Responses," dated April 22, 2021.

29, 2021, Nucor file pre-preliminary comments concerning KG Dongbu Steel's creditworthiness and equityworthiness.[27]

We are conducting this review in accordance with section 751 of the Tariff Act of 1930, as amended (the Act).

## III.     PERIOD OF REVIEW

The POR is January 1, 2019, through December 31, 2019.

## IV.     SCOPE OF THE ORDER

The products covered by this order are certain flat-rolled steel products, either clad, plated, or coated with corrosion-resistant metals such as zinc, aluminum, or zinc-, aluminum-, nickel- or iron-based alloys, whether or not corrugated or painted, varnished, laminated, or coated with plastics or other non-metallic substances in addition to the metallic coating.  The products covered include coils that have a width of 12.7 mm or greater, regardless of form of coil (*e.g.*, in successively superimposed layers, spirally oscillating, *etc.*).  The products covered also include products not in coils (*e.g.*, in straight lengths) of a thickness less than 4.75 mm and a width that is 12.7 mm or greater and that measures at least 10 times the thickness.  The products covered also include products not in coils (*e.g.*, in straight lengths) of a thickness of 4.75 mm or more and a width exceeding 150 mm and measuring at least twice the thickness.  The products described above may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieved subsequent to the rolling process, *i.e.*, products which have been "worked after rolling" (*e.g.*, products which have been beveled or rounded at the edges).  For purposes of the width and thickness requirements referenced above:

> (1) where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above, and

> (2) where the width and thickness vary for a specific product (*e.g.*, the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, etc.), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this order are products in which:  (1) iron predominates, by weight, over each of the other contained elements; (2) the carbon content is 2 percent or less, by weight; and (3) none of the elements listed below exceeds the quantity, by weight, respectively indicated:

- 2.50 percent of manganese, or
- 3.30 percent of silicon, or

---

[27] *See* Nucor's Letter, "Comments in Advance of Preliminary Determination Regarding Dongbu," dated June 29, 2021.

- 1.50 percent of copper, or
- 1.50 percent of aluminum, or
- 1.25 percent of chromium, or
- 0.30 percent of cobalt, or
- 0.40 percent of lead, or
- 2.00 percent of nickel, or
- 0.30 percent of tungsten (also called wolfram), or
- 0.80 percent of molybdenum, or
- 0.10 percent of niobium (also called columbium), or
- 0.30 percent of vanadium, or
- 0.30 percent of zirconium

Unless specifically excluded, products are included in this scope regardless of levels of boron and titanium.

For example, specifically included in this scope are vacuum degassed, fully stabilized (commonly referred to as interstitial-free (IF)) steels and high strength low alloy (HSLA) steels. IF steels are recognized as low carbon steels with micro-alloying levels of elements such as titanium and/or niobium added to stabilize carbon and nitrogen elements. HSLA steels are recognized as steels with micro-alloying levels of elements such as chromium, copper, niobium, titanium, vanadium, and molybdenum.

Furthermore, this scope also includes Advanced High Strength Steels (AHSS) and Ultra High Strength Steels (UHSS), both of which are considered high tensile strength and high elongation steels.

Subject merchandise also includes corrosion-resistant steel that has been further processed in a third country, including but not limited to annealing, tempering painting, varnishing, trimming, cutting, punching and/or slitting or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the in-scope corrosion resistant steel.

All products that meet the written physical description, and in which the chemistry quantities do not exceed any one of the noted element levels listed above, are within the scope of this order unless specifically excluded. The following products are outside of and/or specifically excluded from the scope of this order:

- Flat-rolled steel products either plated or coated with tin, lead, chromium, chromium oxides, both tin and lead (terne plate), or both chromium and chromium oxides (tin free steel), whether or not painted, varnished or coated with plastics or other non-metallic substances in addition to the metallic coating;
- Clad products in straight lengths of 4.7625 mm or more in composite thickness and of a width which exceeds 150 mm and measures at least twice the thickness; and
- Certain clad stainless flat-rolled products, which are three-layered corrosion-resistant flat-rolled steel products less than 4.75 mm in composite thickness that

consist of a flat-rolled steel product clad on both sides with stainless steel in a 20%-60%-20% ratio.

The products subject to the order are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7210.30.0030, 7210.30.0060, 7210.41.0000, 7210.49.0030, 7210.49.0091, 7210.49.0095, 7210.61.0000, 7210.69.0000, 7210.70.6030, 7210.70.6060, 7210.70.6090, 7210.90.6000, 7210.90.9000, 7212.20.0000, 7212.30.1030, 7212.30.1090, 7212.30.3000, 7212.30.5000, 7212.40.1000, 7212.40.5000, 7212.50.0000, and 7212.60.0000.

The products subject to the order may also enter under the following HTSUS item numbers: 7210.90.1000, 7215.90.1000, 7215.90.3000, 7215.90.5000, 7217.20.1500, 7217.30.1530, 7217.30.1560, 7217.90.1000, 7217.90.5030, 7217.90.5060, 7217.90.5090, 7225.91.0000, 7225.92.0000, 7225.99.0090, 7226.99.0110, 7226.99.0130, 7226.99.0180, 7228.60.6000, 7228.60.8000, and 7229.90.1000.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the order is dispositive.

## V.     SUBSIDIES VALUATION INFORMATION

### A.     Allocation Period

For non-recurring subsidies, we applied the "0.5 percent test," as described in 19 CFR 351.524(b)(2). Under this test, we divide the amount of subsidies approved under a given program in a particular year by the relevant sales value (*e.g.*, total sales or export sales) for the same year. If the amount of the subsidies is less than 0.5 percent of the relevant sales value, then the benefits are allocated to the year of receipt rather than across the average useful life (AUL). In the instant review, we are relying on a 15-year AUL.[28]

### B.     Attribution of Subsidies

Commerce's regulations at 19 CFR 351.525(b)(6)(i) state that Commerce will normally attribute a subsidy to the products produced by the corporation that received the subsidy. However, 19 CFR 351.525(b)(6)(ii)-(v) provides that Commerce will attribute subsidies received by certain other companies to the combined sales of those companies when: (1) two or more corporations with cross-ownership produce the subject merchandise; (2) a firm that received a subsidy is a holding or parent company of the subject company; (3) there is cross-ownership between an input supplier and a downstream producer and production of the input is primarily dedicated to the production of the downstream product; or (4) a corporation producing non-subject merchandise received a subsidy and transferred the subsidy to a corporation with cross-ownership with the subject company.

---

[28] *See* U.S. Internal Revenue Service Publication 946, "How to Depreciate Property," at Table B-2, Asset Class 33.4: Table of Class Lives and Recovery Periods.

According to 19 CFR 351.525(b)(6)(vi), cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets. This regulation states that this standard will normally be met where there is a majority voting interest between two corporations or through common ownership of two (or more) corporations. The Court of International Trade (CIT) has upheld Commerce's authority to attribute subsidies based on whether a company could use or direct the subsidy benefits of another company in essentially the same way it could use its own subsidy benefits.[29]

*KG Dongbu Steel*

KG Dongbu reported that, during the POR, with the exception of Dongbu Incheon which is a producer of subject merchandise, none of its other affiliates produced subject merchandise or supplied an input product to KG Dongbu Steel or Dongbu Incheon for the production of the downstream product.[30] In addition, KG Dongbu responded on behalf of its parent company KG Steel. KG Dongbu explained, "On September 1, 2019, KG Steel Co., Ltd. ("KG Steel") became the major shareholder of Dongbu Steel. As a result, Dongbu Steel also became a member of the KG Group."[31] KG Dongbu also explained, "At Dongbu Steel's March 27, 2020 general shareholders' meeting, a name change for the newly-merged Dongbu Steel to KG Dongbu Steel Co., Ltd. was approved."[32]

KG Dongbu further explained that KG Steel was established in 2019 as part of the KG Group's acquisition of Dongbu Steel. KG Dongbu also stated that Dongbu Steel recognizes KG Steel as its parent company although KG Steel's ownership of Dongbu Steel is only 39.98 percent because KG Steel can have significant influence on Dongbu Steel.[33] Furthermore, we note that KG Steel was only established in 2019, as a financial services company, as part of the KG Group's acquisition of Dongbu Steel. At the end of 2019, we note that KG Steel had no revenue during the POR.[34] We also note that KG Steel did not receive any benefits from the GOK.[35] As stated in KG Dongbu's affiliated questionnaire response, KG Steel was created as an investment vehicle for purpose of acquiring Dongbu Steel.[36] Furthermore, we note that KG Dongbu did not request that any of the existing subsidies be extinguished due to the change in ownership.

In addition, KG Dongbu recognizes KG Chemical Corp. (KG Chemical) as the ultimate parent company of KG Dongbu Steel (formerly Dongbu Steel) because it is the lead company in the KG Group.[37] KG Dongbu also explained that KG Chemical owns only 19.5 percent of KG Steel's shares and does not meet the first criterion of a holding company under Korean Law.[38] More

---

[29] *See Fabrique de Fer de Charleroi v. United States*, 166 F. Supp. 2d 593, 600-604 (CIT 2001).
[30] *See* KG Dongbu's Affiliation QR at 7.
[31] *Id.* at 1.
[32] *Id.*
[33] *Id.* at 7.
[34] *Id.* at Exhibit 1.
[35] *See* KG Dongbu's Initial QR at 15.
[36] *See* KG Dongbu's Supplemental Affiliation QR at 2; *see also* KG Dongbu's Initial QR at 15.
[37] *Id.*
[38] *Id.* at 8.

relevantly, we note KG Chemical does not meet any of the criteria which Commerce considers in determining whether a company is cross-owned.

Therefore, pursuant to 19 CFR 351.525(b)(6)(ii), we attributed subsidies received by KG Dongbu Steel and/or Dongbu Incheon to the sales of both companies.  Regarding KG Steel, we note that KG Steel received no subsidies to attribute to KG Dongbu.

*Hyundai Steel*

Hyundai Steel reported that it is a publicly traded company engaged in the production and sale of steel products, including CORE.  Hyundai Steel reported that it is not a subsidiary of any other company and it has no parent or holding company.[39]  Hyundai Steel provided a full response on behalf of itself, and for companies acquired prior to the POR, Hyundai HYSCO, and SPP Yulchon Energy (SPP Yulchon).[40]  Both Hyundai HYSCO and SPP Yulchon ceased operations prior to the POR.[41]  In its response for these two companies, Hyundai Steel reported that neither company received subsidies during the AUL period that would be attributable to Hyundai Steel during the POR.[42]  Consistent with prior proceedings,[43] and pursuant to 19 CFR 351.525(b)(6)(i), we have attributed subsidies received by Hyundai Steel to the sales of Hyundai Steel for these preliminary results.

---

[39] *See* Hyundai Steel's Affiliation QR at 4.

[40] *See* Hyundai Steel's Affiliation QR at 20; *see also* Hyundai Steel's Initial QR.

[41] *See* Hyundai Steel's Letters "Hyundai HYSCO's Initial Questionnaire Response," dated November 30, 2020 (Hyundai HYSCO's IQR) at 1; and "SPP Yulchon Energy's Initial Questionnaire Response," dated November 30, 2020 (SPP's IQR) at 1.

[42] *See* Hyundai HYSCO's IQR at 4 and Exhibits HYSCO-12 and HYSCO-13; *see also* SPP's IQR at 24 and Exhibits SPP-12 and SPP-13.

[43] *See Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review, Rescission of Review, In Part, and Intent to Rescind, In Part; 2015-16*, 83 FR 39671 (August 10, 2018) (*CORE First Admin Review Prelim*), and accompanying Preliminary Decision Memorandum (PDM) at "Attribution of Subsidies," unchanged in *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2015–2016*, 84 FR 11749 (March 28, 2019) (*CORE First Admin Review Final*), and accompanying Issues and Decision Memorandum (IDM) at "Attribution of Subsidies"; *see also Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review, and Rescission of Review, in Part; 2017*, 84 FR 48107 (September 12, 2019), and accompanying PDM at "Attribution of Subsidies," unchanged in *Certain Corrosion-Resistant Steel Products from the Republic of  Korea:  Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 15112 (March 17, 2020) (*CORE Second Admin Review*), and accompanying IDM at "Attribution of Subsidies"; and *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2018*, 85 FR 74692 (November 23, 2020) (*CORE Third Admin Review Prelim*), and accompanying PDM at "Attribution of Subsidies," unchanged in *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 FR 29237 (June 1, 2021) (*CORE Third Admin Review Final*), and accompanying IDM at "Attribution of Subsidies."

## C.    Benchmarks and Discount Rates

### Short-Term U.S. Dollar and Korean Won (KRW)-Denominated Loans

Hyundai Steel reported receiving short-term import financing from the Korea Export-Import Bank (KEXIM) during the POR.[44]  KG Dongbu reported receiving short-term import financing in U.S. dollars from Korea Development Bank (KDB) for document against acceptance (D/A) financing, KRW denominated short-term import financing from KEXIM, and KRW denominated loans under the KDB short-term discounted loan program and debt restructuring program during the POR.[45]  The respondents provided information about short-term loans from commercial banks for consideration as comparable commercial loans for purposes of identifying an interest rate benchmark.[46]  For KG Dongbu Steel's short-term U.S. dollar D/A financing from KDB and for Hyundai Steel's short-term KRW borrowing from KEXIM, consistent with 19 CFR 351.505(a)(2), we preliminarily determine that KG Dongbu Steel and Hyundai Steel received comparable commercial loans, and it is appropriate to use these loans to calculate a weighted-average benchmark interest rate.[47]

For KG Dongbu's short-term loans in KRW from KEXIM and short-term loans from the KDB debt restructuring program, KG Dongbu did not have comparable KRW-denominated short-term loans from private commercial banks during the POR.  Therefore, consistent with CFR 351.505(a)(1) and 19 CFR 351.505(a)(3)(ii) and our past practice,[48] we are using data from the International Monetary Fund's (IMF) International Financial Statistics 2019 as a benchmark to measure the benefit received from KG Dongbu's short-term KRW-denominated loans from KEXIM and for the KDB restructured loan program.[49]

### Long-Term U.S. Dollar and KRW-Denominated Loans

During the POR, KG Dongbu Steel had outstanding countervailable long-term KRW-denominated loans from government-controlled banks.  As benchmarks for countervailable, KRW-denominated long-term loans and as discount rates, we used, where available, the company-specific interest rates on the company's comparable commercial, KRW-denominated loans.  If such loans were not available, we used, where available, the company-specific corporate bond rate on the company's public and private bonds, as we have determined that the

---

[44] See Hyundai Steel's Initial QR at 13.

[45] See KG Dongbu's Initial QR at 19, Exhibit A-6.

[46] See KG Dongbu's Initial QR at Exhibits A-6; see also Hyundai Steel's Initial QR at Exhibit A-2.

[47] See Memorandum, "Calculations for the Preliminary Results:  Hyundai Steel Company," dated concurrently with this memorandum (Hyundai Steel's Preliminary Calculation Memorandum); see also Memorandum, "Calculation for the Preliminary Results:  KG Dongbu Steel Co., Ltd./Dongbu Incheon Steel Co., Ltd.," dated concurrently with this memorandum (KG Dongbu's Preliminary Calculation Memorandum).

[48] See, e.g., Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination, 81 FR 63168 (September 14, 2016), and accompanying PDM at 15, unchanged in Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination, 82 FR 16341 (April 4, 2017).

[49] See KG Dongbu's Preliminary Calculation Memorandum.

GOK did not control the Korean domestic bond market after 1991.[50]  This is the approach
Commerce has taken in several prior CVD proceedings involving Korea.[51]  Specifically, in those
cases, we determined that, absent company-specific, commercial long-term loan interest rates,
the KRW-denominated corporate bond rate is the best indicator of the commercial long-term
borrowing rates for KRW-denominated loans in Korea, because it is widely accepted as the
market rate in Korea.[52]  Where company-specific rates were not available, we used the national
average of the yields on three-year, KRW-denominated corporate bonds, as reported by the Bank
of Korea.  This approach is consistent with 19 CFR 351.505(a)(3)(ii) and prior CVD proceedings
involving Korea.[53]  In accordance with 19 CFR 351.505(a)(2)(i), our benchmarks take into
consideration the structure of the government-provided loans.  For countervailable fixed-rate
loans, pursuant to 19 CFR 351.505(a)(2)(iii), we used benchmark rates issued in the same year
that the government loans were issued.  KG Dongbu Steel also had restructured long-term
debts/loans and received new long-term financing under the debt restructuring program.
Because we preliminarily find that KG Dongbu Steel was uncreditworthy during the POR, *as*
discussed below, we added a risk premium to the benchmark rate in accordance with 19 CFR
351.505(a)(3)(iii), to measure KG Dongbu Steel's countervailable long-term debts/loans during
the POR.

### D.    Creditworthiness

In the underlying investigation and the prior administrative reviews, we investigated KG Dongbu
Steel's (formerly Dongbu Steel's) Debt Restructuring Program and found this program to be
countervailable.[54]  We are again reviewing this debt restructuring program in this segment of the
proceeding.  Participation in this program allowed KG Dongbu Steel to restructure certain
existing loans, corporate bonds, and L/C Usance loans, and to convert certain of KG Dongbu
Steel's debt into equity.[55]

Commerce will consider a company to be uncreditworthy if it determines that, based on
information available at the time of the government-provided loan, the firm could not have
obtained long-term loans from conventional commercial sources.[56]  In the original investigation
and the prior administrative reviews, we found KG Dongbu Steel to be uncreditworthy from

---

[50] *See, e.g.*, *Final Negative Countervailing Duty Determination:  Stainless Steel Plate in Coils from the Republic of Korea*, 64 FR 15530, 15531 (March 31, 1999) (*SS Plate from Korea*).

[51] *See, e.g.*, *SS Plate from Korea*; *Final Affirmative Countervailing Duty Determination:  Structural Steel Beams from the Republic of Korea*, 65 FR 41051 (July 3, 2000), and accompanying IDM at "Benchmark Interest Rates and Discount Rates"; and *Final Affirmative Countervailing Duty Determination:  Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 FR 37122 (June 23, 2003), and accompanying IDM at "Discount Rates and Benchmark for Loans."

[52] *See Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations:  Certain Steel Products from Korea*, 58 FR at 37328, 37345-37346 (July 9, 1993).

[53] *See, e.g.*, *CORE First Admin* Review Prelim PDM at "Benchmark for Long Term Loans"; *see also CORE Second Admin Review* PDM at "Benchmark Interest Rates."

[54] *See Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination in Part*, 81 FR 35310 (June 2, 2016) (*CORE Investigation Final*), and accompanying IDM at "Debt Restructuring Program"; *see also CORE First Admin Review Final* IDM; and *CORE Second Admin Review* IDM.

[55] *See* KG Dongbu's Initial QR at 21-35.

[56] *See* 19 CFR 351.505(a)(4).

2014 to 2018.[57]

Because no new information has been submitted to cause Commerce to reevaluate its determinations with respect to KG Dongbu Steel's creditworthiness in the original investigation and the prior administrative reviews, we continue to find KG Dongbu Steel to have been uncreditworthy from 2014 to 2018. Additionally, Commerce has preliminarily determined that there is a reasonable basis to believe KG Dongbu Steel was uncreditworthy during the POR, pursuant to 19 CFR 351.505(a)(6). Similar to our findings during the original investigation and the prior administrative reviews, the record demonstrates that KG Dongbu Steel did not obtain any long-term loans from conventional commercial sources in 2019; KG Dongbu Steel's financial indicators, its past and present ability to meet its costs and fixed financial obligations with its cash flow, and KG Dongbu Steel's future financial position, have not changed since the period covered from the original investigation and the prior administrative reviews.[58] KG Dongbu Steel's current ratio and quick ratio have not improved and continue to be below Commerce's benchmark during the POR. KG Dongbu Steel's debt-to-equity ratio continues to be high and there is no evidence that KG Dongbu Steel's future financial position is likely to grow stronger.[59] Therefore, pursuant to 19 CFR 351.505(a)(4), we will continue to find KG Dongbu Steel to be uncreditworthy during the POR and countervail its restructured loans provided by the government policy banks during the POR using an uncreditworthiness benchmark with an added risk premium.

As described below, we preliminarily find the loans from the alleged private banks to KG Dongbu Steel cannot constitute "comparable commercial loans" under 19 CFR 351.505(a)(2) due to the substantial government influence and the fact that they were part of a government program; therefore, these loans were unsuitable for benchmark purposes. Commerce continues to find that when a company has been found uncreditworthy, Commerce calculates a benchmark pursuant to the formula found in 19 CFR 351.505(a)(3)(iii).

## E.     Equityworthiness and Existence of Private Investor Prices

19 CFR 351.507(a)(3) states that "{i}f actual private investor prices are not available under paragraph (a)(2) of this section, the Secretary will determine whether the firm funded by the government-provided equity was equityworthy or unequityworthy at the time of the equity infusion. If the Secretary determines that the firm was equityworthy, the Secretary will apply paragraph (a)(5) of this section to determine whether the equity infusion was inconsistent with the usual investment practice of private investors. A determination by the Secretary that the firm was unequityworthy will constitute a determination that the equity infusion was inconsistent with usual investment practice of private investors, and the Secretary will apply paragraph (a)(6) of this section to measure the benefit attributable to the equity infusion." In the Equity Infusions Analysis Memorandum, we stated that the private creditors on the creditors councils did not

---

[57] See CORE Investigation Final IDM at Comment 6; see also CORE First Admin Review Final; CORE Second Admin Review; and CORE Third Admin Review Prelim, unchanged in CORE Third Admin Review Final.
[58] See KG Dongbu's Third Supplemental QR at Exhibit B-43.
[59] See KG Dongbu's Initial QR at Exhibit 12-A, KG Dongbu's Financial Statements ending December 31, 2019, Independent Auditor's Report, "We conclude that there is significant uncertainty about the ability of the entity to continue as a going concern based on the appropriateness of the entity's continuing accounting used by the management and the audit evidence obtained."

evaluate the reasonableness of the rate of return on any equity they were considering investing in the company in each debt-to-equity conversion.[60]  Rather, they were considering how best to limit their losses and maximize the recovery.  We also described that the purchases of shares by the private creditors were not significant and that the GOK policy banks control the decisions relating to KG Dongbu Steel's debt restructuring.  After careful consideration of the record of this review and for the reasons described in the Equity Infusions Analysis Memorandum, we preliminarily find that while private creditors participated in the debt-to-equity conversions in the first, second, and third equity infusions, we cannot rely on the prices paid by the private creditors on the creditors councils for the purpose of determining a benchmark.  Furthermore, as explained in the Equity Infusions Analysis Memorandum, we determined that KG Dongbu Steel is unequityworthy at the time of the first, second, and third debt-to-equity conversions.  Therefore, we preliminarily find the entire amount of the equity infusions relating to the first, second, and third debt-to-equity conversion to be the benefit.[61]

However, at the time of the fourth debt-to-equity conversion, an additional private investor price existed because of the merger and acquisition (M&A).  In this particular circumstance, the share price to government-owned creditors in KG Dongbu Steel's Creditor Financial Institutions' Committee (DSCFIC) was KRW 25,000 per share resulting from the debt-to-equity conversion, whereas the share price to private investors for the M&A was KRW 5,000 per share, and the purchases of newly issued shares by private investors were significant.[62]  As described in the Equity Infusions Analysis Memorandum, we preliminarily find that the share price offered to private investors is reliable for determining a benchmark for purposes of the benefit calculation for the fourth equity infusion.  A detailed analysis concerning equityworthiness and private investor prices is provided in the Equity Infusions Analysis Memorandum.[63]

## F.    Denominators

When selecting an appropriate denominator for use in calculating the *ad valorem* subsidy rate, Commerce considers the basis for the respondent's receipt of benefits under each program.  As discussed in further detail below, where the program has been found to be countervailable as a domestic subsidy, we have used total sales as the denominator for our subsidy rate calculations for Hyundai Steel and KG Dongbu.  For KG Dongbu, because the short-term discounted loans for export receivables have been found to be countervailable as an export subsidy, we have used the recipient's export sales as the denominator.  In the section below, we describe the denominators we used to calculate the countervailable subsidy rates for the various subsidy programs.

---

[60] *See* Memorandum, "Preliminary Analysis Memorandum – Equity Infusions," dated concurrently with this memorandum (Equity Infusions Analysis Memorandum) at 9-13.
[61] *Id.* at 10.
[62] *Id.* at 8.
[63] *Id.* at 10-14.

## VII.    ANALYSIS OF PROGRAMS

### A.    Programs Preliminarily Determined to be Countervailable

#### 1.    KG Dongbu Steel's Debt Restructuring

The GOK and KG Dongbu Steel reported that among the nine creditor banks on the KG Dongbu Steel Creditor Banks Committee (Creditor Bank Committee) administering KG Dongbu Steel's debt restructuring, the KDB, Corporate Bond Stabilization Fund (CBSF), Korea Financial Corporation (KoFC), KEXIM, Woori Bank (Woori) and Industrial Bank of Korea (IBK) were government-controlled.[64]  The four remaining were private commercial banks (Nonghyup Bank, Shihan Bank, Hana Bank, Korea Exchange Bank).[65]  The KDB was the primary creditor bank of KG Dongbu Steel.[66]

The Creditor Bank Committee held a series of meetings during 2014 to resolve how to restructure KG Dongbu Steel's debt.  KG Dongbu reported that, on July 7, 2014, the first Creditor Bank Committee meeting was held which established the participation of the above-listed nine banks in KG Dongbu Steel's debt restructuring.[67]  At the second meeting held on July 21, 2014, the Creditor Bank Committee approved certain emergency operating loans for KG Dongbu Steel.[68]  The Creditor Bank Committee then approved a debt restructuring plan.

Three additional debt restructuring plans were approved by the DSCFIC under the Corporate Restructuring Promotion Act.  The restructuring plans involved the restructuring of certain existing loans, corporate bonds, and L/C Usance loans.  There were also four debt-to-equity conversions during the AUL and POR.  Additionally, the last debt restructuring plan involved an investment in KG Dongbu Steel through a M&A agreement.  Further details of the restructuring plans, as well as the pre-debt restructuring, are enumerated in the Equity Infusions Analysis Memorandum.[69]

*Financial Contribution and Specificity*

In the investigation and prior administrative reviews, Commerce found that the GOK-controlled banks of the Creditor Bank Committee are authorities under section 771(5)(B) of the Act and determined that under the debt restructuring the GOK-controlled policy banks provided a financial contribution to KG Dongbu Steel as defined under section 771(5)(D)(i) of the Act.[70]  Specifically, we found in the final determination of the investigation and the first administrative review that KDB, CBSF, KoFC, KEXIM, Woori, and IBK are majority government-owned

---

[64] The Creditor Bank Committee consists of KDB; KoFC; KEXIM; Woori; IBK; Nonghyup Bank; Shihan Bank, Hana Bank; and Korea Exchange Bank.  *See* KG Dongbu's Initial QR at 51-54.
[65] *Id.*
[66] *Id.*
[67] *See* KG Dongbu's Initial QR at 26.
[68] *Id.* at 24 and Exhibit A-14.
[69] *See* Equity Infusions Analysis Memorandum at 1-8.
[70] *See, e.g.*, *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Preliminary Affirmative Determination*, 80 FR 68842 (November 6, 2015), and accompanying PDM at 13-14, unchanged in *CORE Investigation Final*; and *CORE First Admin Review Prelim*, and accompanying PDM at 13.

policy banks.  Commerce also found that this program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act, as the recipients of this special financing from the Creditor Bank Committee are limited in number.[71]

No information has been provided on the record of the current review that would cause us to reach a different determination.[72]  Thus, we continue to find that the KDB, KoFC,[73] KEXIM, Woori, CBSF, and IBK are government-owned policy banks.[74]  As Commerce explained in *NOES from Korea* final determination, policy banks are created by a government in order to implement government industrial policies through the provision of financing to industries and enterprises; thus, a policy bank, by its very nature, is an authority under section 771(5)(B) of the Act.[75]  Because each of the six GOK-controlled banks (*i.e.*, KDB, CBSF, KoFC, KEXIM, Woori, and IBK) are policy banks, we preliminarily determine that they are authorities under section 771(5)(B) of the Act.  We also preliminarily determine that, through the debt restructuring program, these six authorities provided a financial contribution to KG Dongbu Steel, as defined under section 771(5)(D)(i) of the Act.[76]  Further, we found this program to be *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act.

*Benefit*

a.  Restructured Loans

In the investigation and the prior administrative reviews, we calculated the benefit from these restructured loans from GOK-controlled banks by comparing the interest actually paid on the loans during the period of investigation (POI) or POR to what the company would have paid on a comparable loan during the POI or POR.  Furthermore, as Commerce found KG Dongbu Steel to be uncreditworthy at the time when the loans were restructured, Commerce calculated and used an uncreditworthy benchmark pursuant to the formula found in 19 CFR 351.505(a)(3)(iii).[77]

Under section 771(5)(E)(ii) of the Act, there is a benefit with respect to the provision of a loan if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market.  While there were some private commercial banks involved in the debt restructuring of KG Dongbu Steel, the restructuring of KG Dongbu Steel's debt was not overseen by those private banks.[78]  Instead, KG Dongbu Steel's debt restructuring was controlled by the Creditor Bank Committee, which, in turn, was controlled by GOK policy banks, such as

---

[71] *Id.*

[72] *See Magnola Metallurgy, Inc. v. United States*, 508 F.3d 1349, 1354-56 (Fed. Cir. 2007) (affirming that in an administrative review, Commerce need not re-examine an affirmative finding of specificity that was made in a prior segment of the proceeding).  *See also* KG Dongbu's Initial QR at 51-54.

[73] KDB and KoFC merged on January 1, 2015.

[74] *See* KG Dongbu's Initial QR at 51-54.

[75] *See Non-Oriented Electrical Steel from the Republic of Korea:  Final Negative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 79 FR 61605 (October 14, 2014) (*NOES from Korea*), and accompanying IDM at Comment 7.

[76] *See CORE Investigation Final* IDM at 28.

[77] *See CORE First Admin Review Final* IDM; *see also CORE Second Admin Review* IDM at "Dongbu Debt Restructuring Program."

[78] *Id.*

the KDB.  Therefore, the record of this case does not warrant any change from prior reviews. Consistent with *Refrigerators from Korea* and prior reviews,[79] we preliminarily determine that the loans from private creditors on the Creditor Bank Committee cannot be construed to be "comparable commercial loans" and, thus, cannot be used as a commercial benchmark under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(2), because the Creditor Bank Committee is controlled by GOK-controlled policy and special purpose banks.

To determine the benefit conferred to KG Dongbu Steel from these loans and loan restructuring during the POR, in accordance with 19 CFR 351.505(c)(2), we calculated the benefit from these loans by comparing the interest actually paid on the loans during the POR to the benchmarks as described in the "Benchmarks and Discount Rates" section above, during the POR.  As explained in the "Creditworthiness" section of this memorandum, we preliminarily determine that KG Dongbu Steel was uncreditworthy at the time when these loans were restructured.  Therefore, we have adjusted the benchmark rate using the methodology set forth under 19 CFR 351.505(a)(3)(iii), by adding a risk premium to the discount rate.  We then applied this benchmark to both KG Dongbu Steel's restructured long-term loans and bonds it received during the POR.  On this basis, we determined a net countervailable subsidy rate of 5.38 percent *ad valorem* in 2019 for KG Dongbu.[80]

b.  Debt-to-Equity Conversion

KG Dongbu Steel and the GOK reported that KG Dongbu Steel's creditors committee had three debt-to-equity conversions during the AUL period and one debt-to-equity conversion in the POR.  The first debt-to-equity conversion of KWR 53 billion took place in February 2015.[81]  The second debt-to-equity conversion of KWR 200 billion took place on May 9, 2016.[82]  The third debt-to-equity conversion of KWR 200 billion took place on April 3, 2018.[83]  The fourth debt-to-equity conversion of KWR 605 billion took place on August 31, 2019.[84]

Generally, in case of a government equity infusion, "a benefit exists to the extent that the investment decision is inconsistent with the usual investment practice of private investors."[85] Commerce will consider a government equity infusion as being "inconsistent with usual investment practice if the price paid by the government for newly issued shares is greater than the price paid by private investors for the same (or similar form of) newly issued shares."[86]  If private investor prices are available, then Commerce will compare the price paid by the government for the newly issued shares to the prices paid by the private investors for the same (or similar) newly issued shares.  If private investor prices are unavailable, then Commerce may examine whether the respondent company was equityworthy at the time of the government-

---

[79] *See Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea:  Final Affirmative Countervailing Duty Determination*, 77 FR 17410 (March 16, 2012), and accompanying IDM at 111-14.  *See also CORE Third Admin Review Prelim* PDM at 14, unchanged in *CORE Third Admin Review Final*.
[80] *See* KG Dongbu's Preliminary Calculation Memorandum.
[81] *See* KG Dongbu's Initial QR at 28.
[82] *Id.* at 43.
[83] *Id.* at 44.
[84] *Id.* at 45-46.
[85] *See* 19 CFR 351.507(a)(1).
[86] *See* 19 CFR 351.507 (a)(2).

provided equity infusion.[87]

In previous reviews of CORE, we did not perform an analysis of KG Dongbu Steel's equityworthiness. Instead, we determined that KG Dongbu Steel did not receive a benefit because the share price was the same for GOK-controlled creditors as it was for the private creditors. Furthermore, we noted that the private creditors accounted for a significant percentage of the shares of debt that were converted to equity. However, we stated, "{w}hile we are not making an unequityworthiness finding and continue to find the equity infusions provided no benefit to Dongbu for the instant administrative review, we may re-examine this issue for the next administrative review if new record evidence requires such an examination."[88]

After further analysis of the facts on the record of this immediate review, we have determined not to rely on the private investor prices for the first, second, and third equity infusions, because they were not "significant" within the meaning of 19 CFR 351.507(a)(2)(ii) for the following reasons.[89] First, the private creditors did not evaluate the reasonableness of the rate of return on any equity they were considering investing in the company in the first, second and third equity infusions. Rather, they were considering how best to limit their losses and maximize the debt recovery. Furthermore, they were part of the existing group of creditors involved in the debt restructuring.[90] Second, the record demonstrates that the GOK-controlled creditors had control of the decision making within the Creditor Bank Committee and DSCFIC.[91] In addition, the purpose of the policy banks was to implement government industrial policies through the provision of financing to troubled industries and enterprises. Third, the KDB exercised considerable control over the debt restructuring.[92] For further analysis, please see the Equity Infusions Analysis Memorandum.

Therefore, because we did not find the private prices from creditors to be reliable for the first three debt-to-equity conversions, we performed an equityworthiness analysis pursuant to 19 CFR 351.507(a)(3), which states, "{i}f actual private investor prices are not available under paragraph (a)(2) of this section, the Secretary will determine whether the firm funded by the government-provided equity was equityworthy or unequityworthy at the time of the equity infusion." In addition, 19 CFR 351.507(a)(4) states that "the Secretary will consider a firm to have been equityworthy if the Secretary determines that, from the perspective of a reasonable private investor examining the firm at the time the government-provided equity infusion was made, the firm showed an ability to generate a reasonable rate of return within a reasonable period of time."

Furthermore, pursuant to 19 CFR 351.507(a)(4)(ii), we requested KG Dongbu to provide questionnaire responses concerning KG Dongbu Steel's financial well-being surrounding the debt restructuring and the three equity infusions. In addition, as instructed by *CVD Preamble* to our regulations, we performed an analysis of information sufficient to determine the expected

---

[87] *See* 19 CFR 351.507(a)(3).
[88] *See CORE Third Admin Review Final* IDM at Comment 7.
[89] *See* Equity Infusions Analysis Memorandum at 10-11.
[90] *Id.* at 13-21.
[91] *Id.* at 3-7.
[92] *Id.*

risk-adjusted return and how such a return compares to that of alternative investment opportunities of similar risk.[93]

In particular, we note that the creditors council commissioned Price Waterhouse Coopers (PWC) to prepare reports identifying the value of KG Dongbu Steel if the company was liquidated, or if KG Dongbu Steel continued as a going concern, during different stages of the debt restructuring.[94]  KG Dongbu Steel's creditors were interested in how best to maximize KG Dongbu Steel's value in order to recover debt financing investments, and they sought to determine whether KG Dongbu Steel as a whole was worth more as a going concern, or at liquidation value.  As they had already committed substantial debt capital to KG Dongbu Steel, the information on the record demonstrates that they were merely interested in how to recover the debt financing already invested in KG Dongbu Steel.  Also, KG Dongbu Steel was effectively under the control of its creditors.  This is inconsistent with the usual investment practice of private investors, which is to evaluate the potential risk versus the expected return.  Typically, private investors analyze information to determine the expected risk-adjusted return as well as how such a return compares to that of alternative investment opportunities of similar risk.  Therefore, we preliminarily determine that there was no analysis containing information typically examined by potential private investors as required under 351.507(a)(4)(ii).  Even if we are to assume that the PWC analysis meets the requirement under 351.507(a)(4)(ii), an examination of the factors under 351.507(a)(4)(i) shows that KG Dongbu Steel was unequityworthy at the time the government-provided equity infusion was made."[95]

Furthermore, based on our analysis of 19 CFR 351.507(a)(4)(i)(A), the PWC reports provide no indication that new equity shareholders could expect any return on investment.  The PWC reports indicate that proposed equity conversions might have been advantageous for KG Dongbu Steel's creditors' ability to recover as much as possible of their existing debt investments in the company, but they do not show that the proposed debt-to-equity conversions would be advantageous as equity investments in and of themselves.  Most relevant, the PWC reports and the subsequent analyses were never intended to evaluate the value of the equity investments or return on the equity infusions themselves.  The PWC reports and subsequent analyses' calculations of KG Dongbu Steel's value as a going concern do not account for creditors' claims on KG Dongbu Steel's free cash flows and non-business use assets.  Thus, the methodology used in the PWC reports and subsequent analyses calculated the value of KG Dongbu Steel as a whole (as a going concern or under liquidation).[96]

In addition, pursuant to 19 CFR 351.507(a)(4)(i)(B), we requested that KG Dongbu provide the following relevant financial information and ratios to help us determine the company's equityworthiness.  For the years 2012-2019, KG Dongbu Steel provided its current ratios, quick ratios, debt-to-equity ratios, net income, net profit margin, return on shareholder equity, interest coverage ratios, ratio of free cash flow over interest expense, ratio of operating cash flow over interest expense, ratio of free cash flow over shareholder equity, ratio of operating cash flow over shareholder equity, and ratio of leverage free cash flow over shareholder's equity.  Our

---

[93] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65378 (November 25, 1998) (*CVD Preamble*).
[94] *See, e.g.*, KG Dongbu's Initial QR at Exhibit B-7.
[95] *See* Equity Infusions Analysis Memorandum at 14-15.
[96] *Id.* at 15-16.

analysis in the Equity Infusions Analysis Memorandum indicates the company does not meet standards which would indicate it was equityworthy during the first, second and third debt-to-equity conversions.[97]  Furthermore, KG Dongbu Steel's current and past indicators of financial health show that KG Dongbu Steel was unequityworthy at the time of the first, second, and third debt-to-equity conversions.  Moreover, based on 19 CFR 351.507(a)(4)(i)(C), we reviewed rates of return on equity in the three years prior to the government equity infusion.  As explained in the Equity Infusions Analysis Memorandum, KG Dongbu Steel failed to make a profit from 2012 through 2018.  Thus, KG Dongbu Steel had no returns in the three years prior to any of the three debt-to-equity conversions.

Furthermore, pursuant to 19 CFR 351.507(a)(4)(i)(D), we reviewed the equity investments by private creditors in KG Dongbu Steel's debt-restructuring plan.  As noted above, the prices paid by the private members of the creditors committee are not reliable for purposes of determining a benchmark market price under 19 CFR 351.507(a)(2)(i).  Thus, they are also not usable for our equityworthiness analyses for the reasons explained above.

For the reasons explained above, we have determined that KG Dongbu Steel was not equityworthy at the time of either the February 16, 2015, May 9, 2016, or April 3, 2018 debt-to-equity conversions.  Because we preliminarily find KG Dongbu Steel to be unequityworthy at the time of each of the first, second, and third debt-to-equity conversions, we find the benefit to be the entire amount of the debt-to equity infusion made by GOK-owned or controlled financial institutions, in accordance with 19 CFR 351.507(a)(6).  In accordance with 19 CFR 351.507(a)(7)(c), we treated the benefit as a non-recurring subsidy and allocated the benefit over the AUL in accordance with 19 CFR 351.524(d).

Regarding the fourth equity infusion, as discussed above in the "Equityworthiness and Existence of Private Investor Prices" section as well as in Equity Infusions Analysis Memorandum,  we preliminarily determine the private investor share price meets our criteria for use of private investor share prices, and we preliminarily determine to use the private investor share price as our benchmark to determine the benefit.  Furthermore, in accordance with 19 CFR 351.507(a)(7)(c), we treated the benefit as a non-recurring subsidy and allocated the benefit over the AUL in accordance with 19 CFR 351.524(d).  In order to calculate the benefit, we multiplied the difference between the GOK financial institutions share price resulting from the debt-to-equity conversion and the private investor share price by the shares of common stock received by the GOK financial institutions from the debt-to-equity conversion.

We preliminarily determine the subsidy provided to KG Dongbu Steel by the GOK for all equity infusions to be 5.09 percent *ad valorem* during the POR.  For a complete discussion regarding the calculation of KG Dongbu's subsidy rate under this program, *see* KG Dongbu's Preliminary Calculation Memorandum, dated concurrently with this memorandum.

---

[97] *Id.* at 17-20.

2.     **KDB and Industrial Base Fund (IBF) Short-Term Discounted Loans for Export Receivables**

Commerce has previously determined that short-term export financing in the form of discounted D/A loans issued by the KDB and other GOK policy banks are countervailable.[98]  The GOK did not submit any evidence that would compel Commerce to revisit it previous decisions.  During the POR, KG Dongbu Steel received D/A financing from the KDB for its export of subject merchandise to the United States.[99]  As described above, KDB is an authority under section 771(5)(B) of the Act.[100]  Thus, Commerce preliminarily determines that the KDB operated as a wholly state-owned policy bank, and provided a financial contribution through a direct transfer of funds to the respondent under section 771(5)(D)(i) of the Act.  We also preliminarily determine that KDB lending is specific, in accordance with sections 771(5A)(A) and (B) of the Act, as the financing offered by the KDB is contingent upon export performance.  A benefit within the meaning of section 771(5)(E)(ii) of the Act is conferred on the recipient to the extent that the recipient pays a lower interest rate on the loans than it would pay on a comparable short-term commercial loan.

Only KG Dongbu reported using this program.  To calculate the benefit, we used the benchmarks described in the "Benchmarks and Discount Rates" section above, as well as the methodology described in 19 CFR 351.505(c) by taking the difference between the interest KG Dongbu Steel paid and the interest it would have paid on a comparable commercial loan during the POR, and dividing that benefit amount by KG Dongbu Steel's total export sales of the subject merchandise to the United States during the POR.  On this basis, we preliminarily determine that KG Dongbu received a countervailable subsidy rate of 0.01 percent *ad valorem*.[101]

3.     **Restriction of Special Location Taxation Act (RSLTA) - Local Tax Exemptions on Land Outside Metropolitan Areas - Article 78**

Hyundai Steel reported receiving tax exemptions under Article 78 of the RSLTA.[102]  The GOK administers the tax exemption program under Article 78 of the RSLTA to provide incentives for companies to relocate from populated areas in the Seoul metropolitan region to industrial sites in underdeveloped areas of the country.[103]  Under Article 78 of the RSLTA, any entity acquiring real estate in a designated industrial complex for the purpose of constructing new buildings or renovating existing ones shall be exempted from the acquisition tax.[104]  In addition, the entity located in these designated industrial complexes shall have the property tax reduced by 35 percent on the real estate for five years from the date the tax liability becomes effective.  The property tax exemption is increased to 60 percent of the relevant land, buildings, or facilities that are located in an industrial complex outside of the Seoul metropolitan area.  The program is

---

[98] *See Coated Free Sheet Paper from the Republic of Korea:  Notice of Final Affirmative Countervailing Duty Determination*, 72 FR 60639 (October 17, 2007), and the accompanying IDM at 17-18; *see also CORE Investigation Final*; and *CORE First Admin Review Final*.
[99] *See* KG Dongbu's Initial QR at 18-19.
[100] *See NOES from Korea* IDM at Comment 7.
[101] *See* KG Dongbu's Preliminary Calculation Memorandum.
[102] *See* Hyundai Steel's Initial QR at 21-22 and Exhibit D-1.
[103] *See* GOK IQR at 1 of Appendix-7.
[104] *Id*. at 6-10 of Appendix-7.

administered by the local tax officials of the county where the industrial complex is located.  The GOK reported there were no changes to this program during the POR.[105]  KG Dongbu reported it did not use this program during the POR.[106]

Based on the above facts, we preliminarily determine that the tax reductions constitute a financial contribution in the form of revenue forgone, as described under section 771(5)(D)(ii) of the Act, and confer a benefit pursuant to section 771(5)(E) of the Act, and 19 CFR 351.509(a).  We further preliminarily determine that the tax exemptions provided under this program are specific under section 771(5A)(D)(iv) of the Act, because the subsidies are limited to enterprises located within designated geographical regions.  Our findings regarding financial contribution and specificity are consistent with prior CVD proceedings involving Korea.[107]

The tax credits provided under this program are recurring benefits, because the taxes are due annually.  Thus, the benefit is expensed in the year in which it is received.[108]  Hyundai Steel reported its tax benefits including the required Special Rural Development Tax that must be paid in order to receive the acquisition tax benefit, claiming the payment of Special Rural Development Tax as an offset in their benefit calculations.[109]  However, we previously found that the "Special Rural Development Tax" does not meet the statutory requirement to be recognized as an offset.[110]  Specifically, we stated that:

> The application of the Special Rural Development Tax is a consequence of the exemption of acquisition or registration taxes; the Special Rural Development Tax obligation arises only when the exemption is granted.  It is not a prerequisite to the exemption the way an application fee might be.  Furthermore, as provided in 19 CFR 351.503(e), when calculating the amount of the benefit conferred from a countervailable subsidy program, the {Commerce} does not consider the tax consequences of the benefit.[111]

Accordingly, we calculated the tax benefits to Hyundai Steel without including the offset for the "Special Rural Development Tax."  To calculate the benefit, we subtracted the amount of taxes paid by Hyundai Steel from the amounts that would have been paid absent the program.  To

---

[105] *Id.*

[106] *See* KG Dongbu's Initial QR at 65.

[107] *See, e.g.*, *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; and Rescission of Review, in Part; Calendar Year 2017*, 84 FR 15182 (April 15, 2019), and accompanying PDM at 8, unchanged in *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; Calendar Year 2017*, 84 FR 42893 (August 19, 2019) (*CTL Plate from Korea 2017 Final*), and accompanying IDM at 4; and *Large Diameter Welded Pipe from the Republic of Korea:  Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 83 FR 30693 (June 29, 2018) (*LDWP from Korea Prelim*), and accompanying PDM at 21-22, unchanged in *Large Diameter Welded Pipe from the Republic of Korea:  Final Affirmative Countervailing Duty Determination*, 84 FR 6369 (February 27, 2019) (*LDWP from Korea Final*), and accompanying IDM at 14.

[108] *See* 19 CFR 351.524(a) and (c).

[109] *See* Hyundai Steel's Initial QR at 21 and Exhibits D-1 and D-3

[110] *See Large Residential Washers from the Republic of Korea: Final Affirmative Countervailing Duty Determination,* 77 FR 75975 (December 26, 2012), and accompanying IDM at 16 and Comment 10.

[111] *Id.*

calculate the net subsidy rate, we divided the total benefit by the total sales of the company. On this basis, we preliminarily determine the net subsidy rate under the Article 78 program for Hyundai Steel to be 0.01 percent *ad valorem* for 2019.[112]

## 4. Restriction of Special Taxation Act (RSTA) Article 25(1)(2), formerly RSTA Article 25(2)

Hyundai Steel reported receiving tax deductions under Article 25(1)(2).[113] KG Dongbu reported it did not use this program during the POR.[114] This program facilitates the enhancement of energy efficiency in business sectors through a deduction from income taxes payable. Commerce previously determined that this program was countervailable.[115] The GOK reported that the now former Article 25(2) of the RSTA was integrated into an amended Article 25 of the RSTA effective January 1, 2019.[116]

We preliminarily determine that this program results in a financial contribution from the GOK to recipients in the form of revenue forgone, as described in section 771(5)(D)(ii) of the Act. The benefit conferred on the recipient is the difference between the amount of taxes it paid and the amount of taxes that it would have paid in the absence of this program, in accordance with section 771(5)(E) of the Act and described in 19 CFR 351.509(a), effectively, the amount of the tax credit claimed. Regarding specificity, based on record evidence, we preliminarily determine there is no basis to find the program is limited, by law, to certain enterprises or industries under section 771(5A)(D)(i) of the Act. Therefore, we next examined whether the program is specific as a matter of fact under 771(5A)(D)(iii) of the Act. Information from the GOK indicates that there were 787,438 corporate tax returns filed in 2019, of which 802 claimed the Article 25(1)(2) tax deduction.[117] Accordingly, we preliminarily determine that this program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act, because the actual recipients of the subsidy are limited in number.

To calculate the net subsidy rate, we divided the amount of the tax savings received by Hyundai Steel by its total sales during the POR. On this basis, we preliminarily determine that Hyundai Steel received a countervailable subsidy rate of 0.06 percent *ad valorem* under this program.[118]

## 5. RSTA Article 25(1)(3), formerly RSTA Article 25(3)

Hyundai Steel reported receiving tax deductions under Article 25(1)(2).[119] KG Dongbu reported it did not use this program during the POR.[120] RSTA Article 25(1)(3) aims to motivate investments in facilities that are constructed for the purpose of preserving the environment.[121]

---

[112] *See* Hyundai Steel's Preliminary Calculation Memorandum.
[113] *See* Hyundai Steel's Initial QR at 17.
[114] *See* KG Dongbu's Initial QR at 63.
[115] *See CORE Investigation Final*; *see also CORE First Admin Review Final*.
[116] *See* GOK's Initial QR at 14 of Appendix-4; *see also* GOK's Supplemental QR at Exhibit SQR1-RSTA 25.
[117] *Id.* at 12 of Appendix-4; *see also* GOK's Second Supplemental QR at 2.
[118] *See* Hyundai Steel's Preliminary Calculation Memorandum.
[119] *See* Hyundai Steel's Initial QR at 17.
[120] *See* KG Dongbu's Initial QR at 63.
[121] *See* GOK's Initial QR at 1 of Appendix-5.

Barcode:4142769-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

Under RSTA Article 25(3), taxpayers may apply for a tax deduction from the income tax or corporate tax due. The GOK reported that the now former Article 25(3) of the RSTA was integrated into an amended Article 25 of the RSTA effective January 1, 2019.[122]

We preliminarily determine that the GOK provided a financial contribution to the recipients in the form of revenue forgone, as described in section 771(5)(D)(ii) of the Act. The benefit conferred on the recipient is the difference between the amount of taxes it paid and the amount of taxes that it would have paid in the absence of this program, as provided under section 771(5)(E) of the Act and described in 19 CFR 351.509(a), effectively, the amount of the tax credit claimed. We preliminarily determine that the provision of this tax benefit is specific, in fact, to an enterprise or industry or group thereof, pursuant to section 771(5A)(D)(iii) of the Act. The GOK reported that 439 companies were approved for assistance under this program.[123] Because only 439 companies benefitted from this program of a total of 740,215 corporate tax returns filed in 2019, we preliminarily determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, because the actual recipients of the subsidy are limited in number.

To calculate the net subsidy, we divided the amount of the tax savings received by Hyundai Steel by its total sales during the POR. On this basis, we preliminarily determine that Hyundai Steel received a countervailable subsidy rate of 0.11 percent *ad valorem* under this program.

## 6.    Tax Deduction Under RSTA Article 26

Under Article 26 of the RSTA, the GOK provides tax incentives to companies that make investments in their respective fields of business.[124] Under RSTA Article 26, taxpayers are permitted to apply for a tax deduction from the income tax or corporate tax of the qualifying investment.[125] The following categories of companies qualify for the tax incentives provided under the program: (1) a small- or medium-sized enterprise; and (2) a "middle-standing" company.[126] The GOK noted that there were no changes made to this program during the POR.[127] The relevant law authorizing the credit, RSTA Article 26, limits this program to enterprises or industries within a designated geographical region within the jurisdiction of the authority providing the subsidy, areas outside the Seoul Metropolitan Area.[128] Hyundai Steel claimed tax credits under this program on the tax return filed during the POR.[129] KG Dongbu reported it did not use this program during the POR.[130]

We preliminarily determine that the tax reductions under RSTA Article 26 constitute a financial contribution in the form of revenue forgone, as described under section 771(5)(D)(ii) of the Act, and confer a benefit pursuant to section 771(5)(E) of the Act and 19 CFR 351.509(a). We further preliminarily determine that the tax exemptions provided under this program are specific

---

[122] *Id*. at 17 of Appendix-5.
[123] *See* GOK's Second Supplemental QR at 4.
[124] *See* GOK's Initial QR at 1 of Appendix-6.
[125] *Id*. at 6-8 of Appendix-6.
[126] *Id*.
[127] *Id*. at 19 of Appendix-6.
[128] *Id*. at 6-8 of Appendix-6.
[129] *See* Hyundai Steel's Initial QR at 18.
[130] *See* KG Dongbu's Initial QR at 52.

Filed By: Joshua Simonidis, Filed Date: 7/19/21 12:22 PM, Submission Status: Approved

under section 771(5A)(D)(iv) of the Act, because benefits are limited to enterprises located within designated geographical regions.  Our findings in this regard are consistent with prior CVD proceedings involving Korea.[131]

To calculate the benefit for Hyundai Steel, we subtracted the amount of taxes paid by the firm from the amount that would have been paid absent the program.  To calculate the net subsidy rate, we divided the total benefit by the total sales of the company.  On this basis, we preliminarily determine the net subsidy rate under this program during the POR to be 0.18 percent *ad valorem* for Hyundai Steel.[132]

### 7.    Electricity Discounts under Trading of Demand Response Resources (DRR) Program

The DRR Program was developed in November 2014 to allow the Korea Power Exchange (KPX) to respond in a timely manner to any imbalance between supply and demand of electricity in the market, curb peak demand, optimize the construction of additional generators, and save the supply cost of electricity.[133]  The program contains two sub-programs, the DRR Program for Peak Curtailment and the DRR Program for Electricity Price Curtailment.[134]  The former program is designed to curtail load during peak electricity demand periods, and the latter is intended to minimize power generation costs through price competition.[135]  The KPX, which manages the DRR program, pays multiple private Demand Management Business Operators, also called "aggregators," which have direct, contractual relationships with end users of the program.[136]  End users receive cash payments from those aggregators.[137]  Prior to that exchange between the KPX and the aggregators, the Korea Electric Power Corporation (KEPCO) pays the KPX for the latter's role in demand curtailment under the program.[138]  KPX is majority-owned by KEPCO, which is, in turn, majority-owned by the GOK.[139]  This program is established and operated under Article 31 of the Electricity Business Law (EBL) and Chapter 12 of the Rules on Operation of Electricity Utility Market (ROEUM).[140]

Consistent with our prior findings and further explained below, we preliminarily find KEPCO and KPX to be "authorities" within the meaning of section 771(5)(B) of the Act.[141]  Therefore, we determine that a financial contribution in the form of a direct transfer of funds from KPX is provided to companies participating in this program, under section 771(5)(D)(i) of the Act, and a

---

[131] *See Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2018*, 85 FR 13136 (March 6, 2020) (*CTL Plate from Korea 2018 Prelim*), and accompanying PDM at 11, unchanged in *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; Calendar Year 2018*, 85 FR 84296 (December 28, 2020) (*CTL Plate from Korea 2018 Final*).
[132] *See* Hyundai Steel's Preliminary Calculation Memorandum.
[133] *See* GOK's Initial QR at 1-2 of Appendix-8.
[134] *Id*. at 1 of Appendix-8.
[135] *Id*.
[136] *Id*. at 2-3 of Appendix-8.
[137] *Id*. at 4 of Appendix-8.
[138] *Id*. at 7 of Appendix-8.
[139] *Id.* at 9 of Appendix-8.
[140] *Id.* at 7 of Appendix-8.
[141] *LDWP from Korea Prelim* PDM at 16, unchanged in *LDWP from Korea Final.*

benefit exists in the amount of the grant provided to KG Dongbu and Hyundai Steel, in accordance with 19 CFR 351.504(a). Our findings in this regard are consistent with prior CVD proceedings involving Korea.[142]

The GOK submits that a limited number of companies were approved for the assistance under this program in 2019,[143] though participation in it is available to "all entities" in Korea.[144] We, therefore, preliminarily determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients of the subsidy were limited in number. Our findings in this regard are consistent with Commerce's approach in prior CVD proceedings involving Korea.[145]

Because we found no evidence on the record indicating that subsidies under the DRR program were tied to export sales, we used the total sales of Hyundai Steel and KG Dongbu as denominators to determine the countervailable subsidy rates under this program during the POR. On this basis, we preliminarily determine the net subsidy rate that Hyundai Steel received under this program to be 0.07 percent *ad valorem* for 2019.[146] We also preliminarily determine that the net subsidy rate that KG Dongbu received under this program to be 0.03 percent *ad valorem* for 2019.[147]

## 8.    Reduction for Sewerage Fees

In the initial questionnaire responses, Hyundai Steel and Dongbu Incheon reported that they used this program.[148] This program provides a reduction in the water bill if a company can demonstrate that the amount of sewage water that was sent down the public sewerage system was less than the amount of clean water that it had consumed from the public water supply system.[149] Absent this program, the amount of sewage water that each user sends down into the public sewerage system is assumed to be the same as the amount of clean water that it consumed from the public water supply system. The user is then billed on that basis, regardless of how much sewage water is sent down to the public sewerage system.[150]

Under this program, the GOK bills companies and households for water consumption from the public water supply. If a user can show that the amount of sewage water that it has sent down the public sewerage system is less than the amount of clean water that it has consumed from the public water supply system, authorities will calculate the public sewerage system usage fee on the basis of the proven amount of the sewage water drained down the sewerage system.[151] A user can also use recycled water or install a "gray water system," which is an approved system

---

[142] *Id.*
[143] *See* GOK's Initial QR at 15 of Appendix-8; and *CTL Plate from Korea 2018 Prelim* PDM at 12, unchanged in *CTL Plate from Korea 2018 Final.*
[144] *See* GOK's Initial QR at 11-14 of Appendix-8.
[145] *See CTL Plate from Korea 2018 Prelim* PDM at 11-13, unchanged in *CTL Plate from Korea 2018 Final.*
[146] *See* Hyundai Steel's Preliminary Calculation Memorandum.
[147] *See* KG Dongbu's Preliminary Calculation Memorandum.
[148] *See* Hyundai Steel's Initial QR at 58-59 and Exhibit I-43; *see also* KG Dongbu's Initial QR at 83.
[149] *See* GOK's Initial QR at 1-2 of Appendix-25.
[150] *Id.* at 2 of Appendix-25.
[151] *Id.* at 1-2 of Appendix-25.

by the GOK that processes unclean water for recycling purposes without discharging the unclean water through the public sewerage system.  If recycled water is used or a gray water system is installed, the amount of the waste water that a user sends through the public sewerage system is considered to be less than the amount of clean water consumed from the public water supply system.[152]  The reasoning for this conclusion is that, based on the recycling mechanism of the gray water system, the amount of waste water would be much less than the amount of water that a company or any other entity actually consumes.[153]

The legal basis for the program is found under Article 65(1) of the Sewerage Act and Article 36(2) of the Enforcement Decree of the Sewerage Act.  For Incheon Metropolitan City, Article 14(1) and Article 21(1)(7) of the Incheon Metropolitan City Ordinance on Sewage System Usages, and Article 9 of the Enforcement Decree of the same ordinance stipulate the method by which the service fee and the usage of the public sewerage system is calculated.[154]  For Pohang City, the method used to calculate the usage fee is stipulated in Articles 14 and 27 of the Pohang City Ordinance on Sewerage System Use and Article 15 of the Enforcement Regulation of the same ordinance.[155]  To qualify for this program for Incheon Metropolitan City, companies or households must submit an application to their local government authority.  For Pohang City, there is no application process.  Although the program was introduced through the amendment of the Presidential Decree of the Sewerage Act by the Ministry of Environment, which is a central level of the Korean government, the authority to execute the program is delegated to regional level governments, which in this case was the Incheon Metropolitan City and Pohang City governments.[156]  Further, the Incheon Metropolitan City Government delegated the authority to execute this program to local level governments, which in this case was the Incheon Waterwork Authority.[157]

The Incheon Waterwork Authority maintains the application forms and notification letters, which report that a "gray water" system has been installed or show that the amount of water sent down the public sewerage system is less than the amount of clean water consumed from the public water supply system.[158]  The public sewerage system usage fees are calculated  on the basis of the sewage water actually used or deemed to have been used and not on the basis of the amount of clean water consumed from the public water supply system.[159]  The approval notifications are then sent to applicants.  The Incheon Waterwork Authority keeps a record as to the billing and collection of the public sewerage system usage fees.[160]

We preliminarily determine that the reduction in sewerage fees under this program results in a financial contribution from the GOK to the recipients in the form of revenue forgone, as described in section 771(5)(D)(ii) of the Act.  Record information does not indicate that the reduction in sewerage fees under this program is limited by law to certain enterprises or

---

[152] *Id.* at 2 of Appendix-25.
[153] *Id.*
[154] *Id.* at 5 of Appendix-25.
[155] *Id.* at 9 of Appendix-25.
[156] *Id.* at 3 of Appendix-25.
[157] *Id.* at 3-4 of Appendix-25.
[158] *Id.* at 5 of Appendix-25.
[159] *Id.* at 1-2 of Appendix-25.
[160] *Id.*

industries.[161]  For this reason, we preliminarily determine that this program does not meet the criteria to be considered *de jure* specific under section 771(5A)(D)(i) of the Act.  We then examined whether the program is specific as a matter of fact under section 771(5A)(D)(iii) of the Act.  Based on the total amount of revenue forgone by the GOK during the POR of which Hyundai Steel received a significant share, we preliminarily determine that this program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(II) of the Act because Hyundai Steel received a predominant amount of the benefit under the program.[162]

The benefit conferred on the recipient under this program is the difference between the amount of sewerage fees paid by each respondent and the amount of sewerage fees that it would have paid in the absence of this program, in accordance with section 771(5)(E) of the Act.  In effect, the benefit equals the amount of the sewerage fees waived if the company had paid the sewerage usage bill in full.  We treated the total amount of fees waived during the POR to Hyundai Steel and Dongbu Incheon as the benefit attributable to each company.

To calculate the net countervailable subsidy rate for the POR, we divided the total benefit amount by each respondent's total sales during the POR.  On this basis, we preliminarily determine a net subsidy rate of 0.01 percent *ad valorem* for Hyundai Steel.[163]  We also preliminarily determine a net subsidy rate of 0.01 percent for KG Dongbu.[164]

## 9.    Provision of Port Usage Rights at the Port of Incheon

The GOK submits that this program is part of a public-private partnership wherein the GOK entered into an arrangement to construct a wharf at the North Port of Incheon (Incheon Wharf), attracting investment from the private sector instead of using its own budget.[165]  The public-private partnership is a cooperative arrangement between two or more public and private partners, typically of a long-term nature, that work together to complete a project and/or to provide services to the population.[166]  The Incheon Wharf project is administered by the Ministry of Oceans and Fisheries, under the Private Participation in Social Infrastructure Act introduced in 1994, and the Basic Plan for the Public-Private Partnership Projects, which is a ministerial decree adopted by the Ministry of Economy and Finance.[167]  The details of the agreement on the Incheon Wharf project are contained in the North Incheon Wharf Private Investment Project Implementation Agreement (the Agreement) and maintained by the Ministry of Oceans and Fisheries.[168]  The construction of the Incheon Wharf started in 2003 and ended in 2006.[169]  The GOK bestowed the right to use the Incheon Wharf to the private partner for a specified period of time without paying port usage fees, as well as the right to collect certain usage fees from third-

---

[161] *Id.* at 11 -13 of Appendix-25.
[162] *Id.* at 13 of Appendix-25; *see also Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2018*, 86 FR 7063 (January 26, 2021), and accompanying PDM at 29-30.
[163] *See* Hyundai Steel's Preliminary Calculation Memorandum.
[164] *See* KG Dongbu's Preliminary Calculation Memorandum.
[165] *See* GOK's Initial QR at 27028.
[166] *Id.* at footnote 2.
[167] *Id.* at 1 of Appendix-23.
[168] *Id.* at 3 of Appendix-23 and Exhibit PPP-2.
[169] *Id.* at 28, Footnote 4.

Filed By: Joshua Simonidis, Filed Date: 7/13/21 12:22 PM, Submission Status: Approved

party users.[170]  Article 2 paragraph 54 of the Agreement states the types of fees that can be collected under the Harbor Act and the Harbor Transport Business Act.[171]

Hyundai Steel reported it entered into an agreement with the Ministry of Oceans and Fisheries regarding the construction of the wharf at North Incheon Harbor in August 2001, and entered into a revised agreement in April 2009.[172]  Hyundai Steel financed the construction of Incheon Wharf and, pursuant to Korean law, ownership of the port facility reverted to the GOK in 2007.[173]  Hyundai Steel received money from the GOK between 2004 and 2007 for some of the construction costs.[174]  The remaining construction costs are being amortized by Hyundai Steel over a specified period.[175]  Specifically, Hyundai Steel was granted the right to operate and use the port for its own operations freely, as well as collect fees from third-party users, for a specified time period.[176]  Thus, Hyundai Steel reported it collected berth occupancy charges (or berthing income) from shipping companies and reported these amounts for each of the years from 2007 through 2019.[177]

Hyundai Steel also reported that in connection with its own usage of the port, it had a service contract with an unaffiliated private terminal operating company.[178]  The specific harbor facility usage fees relating to the terminal operating company during the POR that Hyundai Steel reported are (1) apron usage fees, (2) land usage fees, and (3) open storage yard fees.[179]  Hyundai Steel's treatment of harbor facility usage fees contains business proprietary information and cannot be disclosed in this decision memorandum.[180]  For further analysis, see Hyundai Steel's Preliminary Calculation Memorandum.

We preliminarily determine that the program provides a financial contribution because the fees that the GOK gave Hyundai Steel the right to collect, which would otherwise have been collected by the GOK absent the agreement between the parties, represent revenue forgone by the GOK within the meaning of section 771(5)(D)(ii) of the Act.  The berthing income and the harbor facility usage fees are revenue forgone by the GOK, as Hyundai Steel did not pay the GOK the fees it collected.  Further, we preliminarily find the program to be specific under section 771(5A)(D)(iii)(I) of the Act because the actual recipients of the subsidy are limited in number.[181]  A benefit exists under section 771(5)(E) of the Act in the amount of the fees exempted as reported by Hyundai Steel.  Consistent with prior CVD proceedings involving Korea, we have treated this program as a recurring grant program.[182]  To calculate the benefit we

---

[170] *Id.* at 29.
[171] *Id.* at Exhibit PPP-2.
[172] *See* Hyundai Steel's Initial QR at 42.
[173] *Id.*
[174] *Id.* at 43.
[175] *Id.*
[176] *Id.*
[177] *Id.* at 43 and Exhibit I-23.
[178] *Id.* at 46.
[179] *Id.* at 6-8.
[180] *See* Hyundai Steel's Preliminary Calculation Memorandum.
[181] *See* GOK's Initial QR at 28-29; *see also* Hyundai Steel Preliminary Calculation Memorandum.
[182] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review*, 2017, 85 FR 64122 (October 9, 2020), and accompanying IDM at Comment 6;  *see also,*

summed up the berthing income and the harbor facility usage fees that Hyundai Steel benefitted from during the POR, and divided this amount by its total sales.  On this basis, we preliminarily determine a countervailable subsidy rate of 0.01 percent *ad valorem* for Hyundai Steel under this program.[183]  Our determination is consistent with that in the prior CORE review.[184]

## 10.    Research and Development (R&D) Grants Provided Under the Industrial Technology Innovation Promotion Act (ITIPA)

Funding for research and development projects under the ITIPA is designed to promote innovation of industrial technologies and develop a base for industrial technology innovation.[185]  The legal basis of this program is Article 11 of the ITIPA.[186]  Under Article 11, the Ministry of Trade, Industry and Energy (MOTIE) is authorized to regulate and operate this program, and the Korea Evaluation Institute of Industrial Technology (KEIT), the Korea Institute of Energy Technology Evaluation and Planning (KETEP), and the Korea Industrial Complex Corporation (KICOX) are authorized to administer this program.[187]  To implement this program, KEIT, KETEP, and KICOX prepare a basic plan each year for the development of industrial technology.[188]

The plan includes the technology R&D projects that KEIT, KETEP, and KICOX intend to pursue, and describes the application process and supporting documentation required from potential participants.  According to the GOK, any company seeking to participate in one of the projects then prepares a business plan that conforms to the requirements set forth in the basic plan, and submits that business plan to the Review Committee established by MOTIE.[189]  The Review Committee then evaluates the business plans submitted to verify their conformity with the terms and conditions set forth in the basic plan.  If the business plans conform with the basic plan, MOTIE and the applicants for the program sign a contract, after which the government will contribute to the companies' project costs.[190]  Regardless of the number of participants, per project, the GOK may contribute up to 75 percent of the total project costs if the participant is a small or medium size enterprise and 50 percent of the total project costs for all other companies.[191]

---

*e.g.*, *Notice of Final Results of Countervailing Duty Administrative Review:  Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 72 FR 38565 (July 13, 2007), and accompanying IDM at 6-7 and Comment 1; *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review*; 2011, 78 FR 55241 (September 10, 2013), and accompanying PDM at 11, unchanged in *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review*; 2011, 79 FR 5378 (January 31, 2014); and *Notice of Final Affirmative Countervailing Duty Determination:  Certain Cold-Rolled Carbon Steel Flat Products from the Republic of Korea*, 67 FR 62102 (October 3, 2002), and accompanying IDM at 20 and Comment 11.
[183] *See* Hyundai Steel Preliminary Calculation Memorandum.
[184] *See CORE Third Admin Review Prelim* at 24-25, unchanged in *CORE Third Admin Review Final*.
[185] *See* GOK's Initial QR at 1 of Appendix-9.
[186] *Id*. at 2 of Appendix-9.
[187] *Id*. at 1-2 of Appendix-9.
[188] *Id*. at ITIPA-3.
[189] *Id*. at 6-7 of Appendix-9.
[190] *Id*. at ITIPA-3.
[191] *Id*. at 6-7 of Appendix-9.

Consistent with prior CVD proceedings involving Korea, we preliminarily determine the ITIPA program to be *de jure* specific under section 771(5A)(D)(i) of the Act, because it is limited to projects in certain fields of industrial technology that MOTIE, or the administering authorities working on behalf of MOTIE, determine will support the development of industrial technologies in Korea.[192]

For the portion of the subsidy that does not have to be repaid, we preliminarily determine that a financial contribution was provided within the meaning of section 771(5)(D)(i) of the Act because the GOK's payments constitute a direct transfer of funds, and a benefit exists in the amount of the grant provided in accordance with section 771(5)(E) of the Act and 19 CFR 351.504(a).

KG Dongbu reported it did not participate in this program.[193]  During the POR, Hyundai Steel received various R&D grants pursuant to the ITIPA.[194]  The names of the R&D projects in which Hyundai Steel has participated are business proprietary and, thus, cannot be disclosed in this decision memorandum.[195]  We find no evidence on the record indicating that subsidies under the ITIPA program were tied to export sales.  Therefore, we divided the total grants received under ITIPA by the total sales of Hyundai Steel in order to determine whether this program conferred a countervailable benefit during the POR.[196]  Accordingly, we preliminarily determine that the net subsidy rate that Hyundai Steel received under this program during the POR is 0.01 percent *ad valorem*.

## 11.    Discount of Electricity Fee for Energy Storage System (ESS)

The electricity discounts under the ESS program is designed to reduce the maximum demand of electricity in Korea and is administered by KEPCO.[197]  Under this program, participants improve the power usage efficiency by storing the produced electricity in a storage device and supplying it when power is needed.

For the ESS program, KEPCO provides two types of electricity discounts to participants that operate qualifying systems:  (1) a basic fare discount; and (2) an electric power consumption price discount.  The basic fare discount is calculated by KEPCO by multiplying the average of the reduced electricity demand amount during the highest peak hours by the basic rate applied to the customer. The electric power consumption price discount provides a 50 percent discount from the energy charged to a representative customer that used electric energy in the lowest peak

---

[192] *See CTL Plate from Korea 2018* PDM from 21-22, unchanged in *CTL Plate from Korea 2018 Final*.

[193] *See* KG Dongbu's Initial QR at 66.

[194] *See* Hyundai Steel's Initial QR at 25.

[195] For a listing of the various R&D projects for which Hyundai Steel received grants, *see* Hyundai Steel Preliminary Calculation Memorandum

[196] *See Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; and Rescission of Review, in Part; Calendar Year 2016*, 83 FR 10661 (March 12, 2018), and accompanying PDM at 12, unchanged in *Certain Cut to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; and Rescission of Countervailing Duty Administrative Review, in Part*, 83 FR 32840 (July 26, 2018), and accompanying IDM at 5.

[197] *See* GOK's Initial QR at 1 of Appendix-26.

hours.[198]  During the POR, Hyundai Steel reported receiving reductions on its energy bill under this program.[199]  KG Dongbu did not report participating in this program.

As noted above, we preliminarily determine KEPCO to be an "authority" within the meaning of section 771(5)(B) of the Act. This program results in a financial contribution from the GOK to recipients in the form of revenue forgone, as described in section 771(5)(D)(ii) of the Act.  In its response, the GOK indicates that a small number of firms received benefits under the program during the POR.[200]  Based on this information, we preliminarily determine that the benefit recipients under the program are limited in number and, accordingly, the subsidy is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act.

The benefit conferred on the recipient is the amount of the energy charge/basic fare discounts during the POR.  To calculate the net countervailable subsidy rate, we divided the total benefit amount received by Hyundai Steel by its total sales during the POR.  On this basis, we preliminarily determine a net subsidy rate for Hyundai Steel of 0.02 percent *ad valorem*.

## B.    Programs Preliminarily Determined to Be Not Used or Not to Confer a Measurable Benefit

## 1.    Electricity for LTAR

### Overview of the Korean Electricity Market

In 2001, the GOK reformed its laws and introduced an electricity market with three distinct areas of operation:  electricity generation companies, electricity market operators, and the transmission/distribution/selling of electricity to end users.[201]

### *Electricity Generators*

The electricity generators of Korea consist of KEPCO's six wholly-owned subsidiary generators (GENCOs),[202] independent power generation companies, and community energy systems.[203]  The community energy systems are private generating companies that generate, transmit, and distribute electricity to small communities.[204]  These private generating companies charge KEPCO's tariff rates to its customers.[205]  Finally, KEPCO continues to generate electricity for remote and isolated islands for which there is no commercial generation company.[206]

---

[198] *Id.* at 7-8 of Appendix-26.
[199] *See* Hyundai Steel's Initial QR at 65.
[200] *Id.* at 15 of Appendix-26.
[201] *See* GOK NSA QR at 23 – 24.
[202] *Id.* at 3 (The six companies are:  Korea Hydro & Nuclear Power Co., Korea South-East Power Co., Korea Midland Power Co., Korea Western Power Co., Korea Southern Power Co., and Korea East-West Power Co.) and 4 (KEPCO's power generation department was spun off through the Promotion of the Restructuring of the Electricity Business Act in 2001.)
[203] *Id.* at 3-4.
[204] *Id.* at 4.
[205] *Id.*
[206] *Id.*

*Electricity Market Operator –KPX*

KPX was established under the Electricity Business Law and is responsible for setting the price of electricity, overseeing the electricity trading, and collecting relevant data for the electricity market in Korea.[207]  Except for the community energy systems and KEPCO's two long-term purchase agreements prior to 2001, all purchasing and selling of electricity is required to be done through KPX.[208]

The electricity market works on a cost-based pool system.  The system has two main components:  the marginal (representing the variable costs) and capacity (representing the fixed costs) prices.[209]  For the marginal price, electricity is sold on an hourly basis.  One day prior to trading, KPX will forecast the next day's hourly demand and projected supply based on the electricity generators' submitted bids for any given hour.  Under the merit order system, the lowest generator's bid will receive a purchase order for its supply of electricity and the purchase orders will be issued to the next lowest bid until the supply for the given hour is met.[210]  The price of the last bid will be the system marginal price and will be used to purchase all of the accepted electricity bids.  The electricity generators who submitted bids and exceeded the system marginal price for the hour will not receive purchase orders to supply electricity for the hour.[211]  For nuclear, coal-power, and GENCOs, an adjusted coefficient is also included in their KPX price for electricity.[212]  The purpose of the adjusted coefficient is two-fold:  to prevent over-payment to generators with low fuel costs (*e.g.*, nuclear and coal) and to maintain a differential between the expected rate of return between the GENCOs and KEPCO.[213]

The purpose of the capacity price is to compensate the generation companies' fixed costs of constructing generation facilities, provide incentives for construction of new generation units, and maintain reliability of the nationwide electricity transmission network.[214]  The capacity price is set based on a standardized generation unit output, but also factors in the year the generation unit started operations and the capacity reserve factor.[215]

*Transmission/Distribution/Selling of Electricity – KEPCO*

KEPCO is the exclusive supplier of electricity in Korea, except for the customers serviced by community energy services, as explained above.[216]  Moreover, under Article 31 of the Electricity Business Law, KEPCO can only purchase electricity through KPX, except for the two long-term purchase agreements noted above.[217]  Finally, the GOK submitted the underlying laws and

---

[207] *Id*. at 23.
[208] *Id*.
[209] *Id*. at 24.
[210] *Id*.
[211] *Id*. at 25.
[212] *Id*.
[213] *Id*. at 25-26
[214] *Id*. at 26.
[215] *Id*.
[216] *Id*. at 3-4.
[217] *Id*.

described the process for KEPCO to set the electricity tariff rates and provided the applicable tariff rates during the POR.[218]  The tariff rates were last updated in 2013 for industrial users.[219]

<u>Analysis</u>

The petitioner has alleged the provision of electricity for LTAR.[220]  KEPCO is the supplier of electricity to the respondents during the POR.[221]  KEPCO also wholly owns the six GENCOs and KPX.[222]  KEPCO is a statutory legal entity (separately incorporated) that is established and operated pursuant to the Korea Electric Power Corporation Act and its Enforcement Decree and the Electricity Business Law.[223]  Under Korean law, the GOK is required to own, directly or indirectly, at least fifty-one percent of KEPCO's capital, which allows the GOK to control the approval of corporate matters relating to KEPCO.[224]  The GOK also exercises significant control over KEPCO's business and operations.[225]  Moreover, the GOK exercises significant control over KEPCO and pursues government policy objectives through KEPCO's business and operations.[226]  Accordingly, we preliminarily find KEPCO to be an "authority" within the meaning of section 771(5)(B) of the Act, which provides producers of the subject merchandise a financial contribution in the form of the provision of a good or service under section 771(5)(D)(iii) of the Act.

Under 19 CFR 351.511(a)(2), Commerce determines whether electricity is provided for LTAR by comparing, in order of preference:  (i) the government price to a market determined price for actual transactions within the country such as electricity tariffs from private parties (referred to as a Tier 1 benchmark); (ii) the government price to a world market price where it would be reasonable to conclude that such a world market price is available to electricity consumers in the country in question (referred to as a Tier 2 benchmark); or (iii) if no world market price is available then Commerce will measure the adequacy of remuneration by assessing whether the government price is consistent with market principles (referred to as a Tier 3 benchmark).

KEPCO is an exclusive provider of electricity in Korea, and the GOK regulates the rates that KEPCO charges for electricity by approving KEPCO's application to change the electricity tariff rates.[227]  As noted above, electricity is supplied directly to consumers through community electricity systems, but they use KEPCO's tariff rates.[228]  However, if the government provider constitutes a majority, or in certain circumstances, a substantial portion of the market, as in this case, Commerce determines that prices within the country are distorted and cannot be used for

---

[218] *Id*. at 2-3 at Exhibit E-9.
[219] *Id*. at 3.
[220] *See* NSA Memorandum.
[221] *See* KG Dongbu NSA QR at 1; *see also* Hyundai Steel NSA QR at 1.
[222] *See* GOK NSA QR at F-82 and F-86 of Exhibit E-1.
[223] *Id*. at 4 of Appendix-1.
[224] *Id*. at 4-9 and 29 of Exhibit E-1.
[225] *Id*.
[226] *Id*.
[227] *Id*. at 5 – 7.
[228] *Id*. at 4.

benchmark purposes.  Therefore, we determine that a Tier 1 benchmark (a price within the country) is not available.[229]

The next alternative in the benchmark hierarchy is to use world market prices (Tier 2 benchmark).  However, under 19 CFR 351.511(a)(2)(ii), Commerce will only use world market prices if the good or service is actually available to the purchaser in the country under investigation or review.  With respect to electricity, Commerce has stated that electricity prices from countries in the world market are normally not available to purchasers in the country under investigation or review.[230]  The GOK has stated that there is no cross-border transmission or distribution of electricity in Korea;[231] therefore, we determine that we cannot rely on world market prices to determine whether electricity is provided for LTAR.

The final alternative in the benchmark hierarchy, set forth under 19 CFR 351.511(a)(2)(iii), is to determine whether the government price is consistent with market principles (Tier 3 benchmark).[232]  Because we are unable to use Tier 1 or Tier 2 benchmarks, we preliminarily determine to use a Tier 3 benchmark to examine whether the respondents have received a countervailable benefit from the provision by KEPCO of electricity for LTAR.  Under a Tier 3 benchmark analysis, Commerce will assess whether the prices charged by KEPCO are set in accordance with market principles through an analysis of factors such as KEPCO's price-setting philosophy and costs (including rates of return sufficient to ensure future operations).  In accordance with our past practice, we have not put these factors in any hierarchy and may rely on one or more of these factors in any particular case.[233]

---

[229] See CVD Preamble at 65377 (We normally do not intend to adjust such prices to account for government distortion of the market. While we recognize that government involvement in a market may have some impact on the price of the good or service in that market, such distortion will normally be minimal unless the government provider constitutes a majority or, in certain circumstances, a substantial portion of the market. Where it is reasonable to conclude that actual transaction prices are significantly distorted as a result of the government's involvement in the market, we will resort to the next alternative in the hierarchy.).

[230] Id. (Paragraph (a)(2)(ii) provides that, if there are no useable market-determined prices stemming from *actual* transactions, we will turn to world market prices that *would be available* to the purchaser.  We will consider whether the market conditions in the country are such that it is reasonable to conclude that the purchaser could obtain the good or service on the world market.  For example, a European price for electricity normally would not be an acceptable comparison price for electricity provided by a Latin American government, because electricity from Europe in all likelihood would not be available to consumers in Latin America.)

[231] See GOK NSA QR at 6.

[232] See CVD Preamble, 63 FR at 65378 (Paragraph (a)(2)(iii) provides that, in situations where the government is clearly the only source available to consumers in the country, we normally will assess whether the government price was established in accordance with market principles.  Where the government is the sole provider of a good or service, and there are no world market prices available or accessible to the purchaser, we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination.  We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case.  In our experience, these types of analyses may be necessary for such goods or services as electricity, land leases, or water, and the circumstances of each case vary widely.  *See, e.g.*, *Final Affirmative Countervailing Duty Determinations:  Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 30946, 30954 (July 13, 1992) and *Final Affirmative Countervailing Duty Determination:  Venezuelan Wire Rod*, 62 FR 55014, 55021-22 (October 22, 1997)).

[233] See CVD Preamble, 63 FR at 65378.

With regard to our Tier 3 benchmark analysis, the GOK stated the applicable tariff schedule during the POR came into effect in November 2013.[234]  Commerce has previously evaluated the process and underlying methodology to develop and approve the November 2013 tariff schedule and determined it was set according to market principles.[235]  In our determinations, we noted the GOK had a pricing methodology in place and that it considered costs and a return on investment.[236]  In this segment of the proceeding, the GOK has placed on the record application approval documents,[237] cost information,[238] and Commerce's electricity verification report from the *CORE from Korea Final Determination* associated with the November 2013 tariff schedule.[239]  Therefore, we preliminarily determine there are no changes from these prior findings for the 2013 tariff schedule and will examine these rates in the context of whether KEPCO recovered its cost (including rates of return sufficient to ensure future operations) for the POR.

*KPX Prices*

As noted above, KEPCO is required to purchase its electricity through KPX.[240]  These purchases of electricity are reflected in the company's operating costs and expenses.[241]  In recent U.S. Court of Appeals for the Federal Circuit (CAFC) decisions, the extent that KPX is a subsidiary of KEPCO and may provide a subsidy through its pricing to KEPCO has been reviewed and, in one instance, remanded.[242]  In recent administrative reviews, Commerce has examined KPX, in the context of an upstream subsidy allegation, to determine whether KPX's prices of the GENCOs' electricity to KEPCO is a provision of electricity for LTAR.[243]  Commerce evaluated the marginal and capacity price and the adjusted coefficient under a Tier 3 analysis and found there was no benefit.[244]  Moreover, in the *CORE Third Admin Review Final* and *2019 Seamless Pipe Investigation*, the GOK placed the six GENCOs' financial statements on the record and we

---

[234] *See* GOK NSA QR at 18-19.
[235] *See Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 82 FR 16341 (April 4, 2017), and accompanying Issues and Decision Memorandum (IDM) at Comment 2; *see also Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Affirmative Determination*, 81 FR 53439 (August 12, 2016), and accompanying IDM at Comment 2; *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Final Affirmative Determination*, 81 FR 4996 (July 29, 2016), and accompanying IDM at Comment 2; *CORE Investigation Final* and accompanying IDM at Comment 2; and *Welded Line Pipe from the Republic of Korea:  Final Negative Countervailing Duty Determination*, 80 FR 61365 (October 13, 2015,) and accompanying IDM at Comment 1.
[236] *Id.*
[237] *See* GOK NSA QR at Exhibits E-8, E-13-E-16.
[238] *Id.* at Exhibit E-18.
[239] *Id.* at Exhibit E-19.
[240] *Id*. at 23-24 (except for two long-term electricity contracts in place prior to 2001).
[241] *Id*. at 11-13.
[242] *See Nucor Corp. v United States* 927 F.3d 1243, 1259 - 60 (Fed. Cir. 2019); and *POSCO v. United States*, 977 F.3d 1369, 1378 (Fed. Cir. 2020).
[243] *See CORE Second Admin Review*, and accompanying IDM at Comment 1; *see also Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 38361 (June 26, 2020) and accompanying IDM at Comment 1; and *CTL Plate from Korea 2018 Final* IDM at Comment 7.
[244] *Id.*

determined that each generating company recovered its costs in 2018 and 2019.[245]  In this instant case, the GOK provided financial statements for the GENCOs and we continue to find preliminarily that each of the six GENCOs recovered its costs.[246]  With regard to a rate of return, as stated above, the calculation of the system marginal price includes consideration of the GENCOs' and KEPCO's rate of return.[247]  As such, the price paid by KEPCO through KPX is inclusive of a rate of return.  Thus, there is no information on this record that would have us revisit our prior findings concerning the price KEPCO pays for electricity through KPX.

*KEPCO's Reported 2019 Costs*

According to Article 6 of the Price Stabilization Act (PSA) and its Presidential Decree, all public utilities must be determined at the level that reconciles the aggregate costs for supplying such services.[248]  Moreover, Article 7 of the Enforcement Decree of the Electricity Business Law and Article 11 of the Notification on the Power Generating Business Approval Criteria, Electricity Tariff Calculation Standard, the Permitted Error of the Electric Consumption Measuring Instrument, and Scope of the Business Operations Related to Electricity (Notification), state the tariff rate for each class be set to cover the cost for the corresponding electricity class, which includes a reasonable amount of investment return.[249]  However, Article 14 of the Notification states the tariff rates can be adjusted after considering customers' economic circumstances and other societal factors.  Therefore, each year, KEPCO will submit its cost and sales data to MOTIE.[250]

When KEPCO submits its cost and sales data to MOTIE, it reflects the operating costs and return on investment through the follow steps:

> Step 1. Calculate the aggregate amount of the cost, which includes a reasonable amount of the investment return;
> Step 2. Distribute the aggregate amount of the cost into four categories; generation,[251] transmission, distribution and sales of electricity;
> Step 3. Divide the distribution cost into three categories; high voltage (over 22.9 kV), low voltage (less than 22.9 kV) and the customer management cost (CMC);
> Step 4. Divide the sales cost into two categories; the customer management fee and other costs;
> Step 5. Distribute each cost into fixed charge and variable charge;
> Step 6. Divide the cost into each class considering the load level, the electricity consumption pattern, and the amount of the electricity consumed;

---

[245] *See CORE Third Admin Review Final* and accompanying IDM at 9 – 10 and Comment 1, and *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea:  Final Affirmative Countervailing Duty Determination*, 86 FR 35267 (July 2, 2021) (*2019 Seamless Pipe Investigation*), and accompanying IDM at 9.
[246] *See* GOK's Letter, "GOK's New Subsidy Allegations Fourth Supplemental Questionnaire Response" dated July 2, 2021 (GOKNSASR4) at Exhibit E-33.
[247] *See* section "Electricity Market Operator –KPX" above; *see also* GOKNSASR4 at 1 – 2.
[248] *See* GOK NSA QR at 9.
[249] *Id.* at 9.
[250] *Id.* at 3 and 8.
[251] As noted above, KEPCO includes purchases of electricity in its operating costs and expenses.  *See* GOK NSA QR at 13.

Step 7. Distribute the cost according to the number of customers for each {class}; and

Step 8. Aggregate the cost for each electricity class: Σcost for each class (cost for the generation, transmission, distribution, sales of each class) ÷ sales volume for each class[252]

The submitted cost data are also audited through KEPCO's financial statements each year.[253]  For 2019, the GOK submitted KEPCO's audit of its 2019 financial statements and tied the audited numbers to Exhibit E-17.1 (submitted 2019 cost data) of the GOK NSAS1.[254]

For return on capital (rate of return), the GOK provided the relevant regulation, formula, and calculation, and tied each of the reported numbers in the formula to its financials or source documentation.[255]  As noted in the steps above, the rate of return is inclusive of its reported costs to MOTIE.[256]  We examined the above process and were able to trace the costs and the rate of return to KEPCO's submitted cost data through to its recovered costs for each tariff classification as stated in GOK NSAIQR at 9, 14 – 16 and Exhibit E-17.[257]

For 2019, KG Dongbu and Hyundai Steel provided electricity usage that included voltage, option, rates, and amount paid for the industrial classification.[258]  As noted above, KEPCO's cost data calculate a cost recovery rate based on the classifications set by the tariff schedule.  We, therefore, compared the companies' reported industrial tariff rates to KEPCO's cost data.  From this comparison, we noted that certain reported industrial rates recovered costs and a rate of return and certain rates did not recover costs and a rate of return.[259]  Therefore, we preliminarily determine that KEPCO does have a pricing mechanism in place that is based on market principles, but also that the industrial rates did not always recover costs and a rate of return under our Tier 3 analysis.

For those rates that did not recover costs and a rate of return, we determined a percentage amount that would enable cost recovery and a rate of return.  We then multiplied this percentage amount by the rates assigned to the applicable classification to determine the amount each rate would need to be increased to allow for cost recovery and a rate of return.  The applicable rate was then subtracted from this calculated rate to determine the benefit per-unit rate.  This per-unit rate was then multiplied by the electricity volume for each rate on a monthly basis and summed to

---

[252] *Id*. at 11 – 12.
[253] *Id.* at 9.
[254] *See* GOK NSAS1 at 1 and Exhibit E-20; *see also* GOK NSAS2 at 1 – 4.
[255] *See* GOK NSAS1 at 4-9; *see also* GOK NSAS2 at 3-5.
[256] *See* GOK NSA QR at 9, 11-13, and 14-16.
[257] *See* Hyundai Steel's Preliminary Calculation Memorandum; *see also* KG Dongbu's Preliminary Calculation Memorandum.
[258] *See* KG Dongbu NSA QR at 1; *see also* Hyundai Steel NSA QR at 1.
[259] *See* Hyundai Steel's Preliminary Calculation Memorandum; *see also* KG Dongbu's Preliminary Calculation Memorandum.

determine the benefit.  The benefit amount was then divided by the applicable sales value.  The above calculation resulted in a non-measurable benefit for KG Dongbu and Hyundai Steel.[260]

**B.     Programs Preliminarily Determined to be Not Used or Not to Confer a Measurable Benefit**

**Hyundai Steel**

1. Suncheon Harbor Port Usage Fee Exemptions
2. KEXIM Import Financing
3. KEXIM Short-Term Export Credits
4. KEXIM Export Factoring
5. KEXIM Export Loan Guarantees
6. KEXIM Loan Guarantees for Domestic Facility Loans
7. KEXIM Trade Bill Rediscounting Program
8. KEXIM Overseas Investment Credit Program
9. KDB and IBK Short-Term Discounted Loans for Export Receivables
10. Loans under the Industrial Base Fund
11. K-SURE Export Credit Guarantees
12. K-SURE Short-Term Export Credit Insurance
13. Long-Terms Loans from KORES and KNOC
14. Clean Coal Subsidies
15. GOK Subsidies for "Green Technology R&D" and its Commercialization
16. Support for SME "Green Partnerships"
17. RSTA Article 10(1)(1)
18. RSTA Article 10(1)(2)
19. RSTA Article 10(1)(3)
20. RSTA Article 11
21. RSTA Article 25(1)(4), formerly RSTA Article 94
22. RSTA Article 25(1)(5), formerly RSTA Article 25
23. RSTA Article 25(1)(6), formerly RSTA Article 24
24. RSLTA 57-2
25. RSTA 104(14)
26. RSLTA Articles 19, 31, 46, 84, 57-2, LTA 109, 112, and 137
27. Tax Reductions and Exemptions in Free Economic Zones
28. Grants and Financial Support in Free Economic Zones
29. Modal Shift Program
30. Sharing of Working Opportunities/Employment Creating Incentives
31. GOK Infrastructure Investment at Incheon North Harbor
32. Machinery & Equipment (KANIST R&D) Project
33. Grant for Purchase of Electrical Vehicle
34. Incentive for Early Scrapping of Old Diesel Vehicle
35. Provision of Liquefied Natural Gas (LNG) for LTAR
36. Energy Savings Programs

---

[260] *See* Hyundai Steel's Preliminary Calculation Memorandum; *see also* KG Dongbu's Preliminary Calculation Memorandum.

> Electricity Savings for Designated Period Program
> Electricity Savings through the Bidding Process Program
> Electricity Savings upon an Emergent Reduction Program
> Electricity Savings through General Management Program
> Management of the Electricity Load Factor Program

37. The GOK's Purchases of Electricity for MTAR
38. Incentives for Compounding and Prescription Cost Reduction
39. Incentives for Usage of Yeongil Harbor in Pohang City
40. VAT Exemptions on Imported Goods
41. Incentives for Usage of Gwangyang Port
42. Incentives for Natural Gas Facilities
43. Subsidies for Construction and Operation of Workplace Nursery
44. Subsidies for Hyundai Steel Red Angels Women's Football Club
45. Seoul Guarantee Insurance
46. Subsidies for Pohang Art Festival
47. Fast-Track Restructuring Program
48. Grants for LED Efficiency Improvement
49. Purchase of Land from Government Entities
50. Tax Credits for Electronic Returns
51. VAT Tax Deductions Due to Bad Debt
52. Port Usage Rights at the Port of Incheon
53. Other Transactions with Government Entities

**KG Dongbu**

1. KEXIM Import Financing
2. RSTA Article 25(1)(2): Tax Deductions for Investments in Energy Economizing Facilities
3. RSLTA Article 78: Acquisition and Property Tax Benefits to Companies Located in Industrial Complexes
4. RSTA Article 26: GOK Facilities Investment Support
5. Provision of LNG for LTAR
6. Energy Savings Programs
> Electricity Savings for Designated Period Program
> Electricity Savings through the Bidding Process Program
> Electricity Savings upon an Emergent Reduction Program
> Electricity Savings through General Management Program
> Management of the Electricity Load Factor Program
7. KEXIM Short-Term Export Credits
8. KEXIM Export Factoring
9. KEXIM Export Loan Guarantees
10. KEXIM Trade Bill Rediscounting Program
11. KEXIM Overseas Investment Credit Program
12. KDB and IBF Loans under the Industrial Base Fund
13. K-SURE Export Credit Guarantees
14. K-SURE Short-Term Export Credit Insurance

15. Long-Terms Loans from KORES and KNOC
16. Special Accounts for Energy and Resources (SAER) Loans
17. Clean Coal Subsidies
18. GOK Subsidies for "Green Technology R&D" and its Commercialization
19. Support for SME "Green Partnerships"
20. Daewoo International Corporation Debt Work Out
21. Research, Supply or Workforce Development Investment Tax Deduction for "New Growth Engines" under RSTA Article 10(1)(1)
23. Research, Supply, or Workforce Development Expense Tax Deductions for "Core Technologies" under RSTA Article 10(1)(2)
24. Tax Reduction for Research and Human Resources Development under RSTA Article 10(1)(3)
25. Tax Credit for Investment in Facilities for Research and Manpower under RSTA Article 11
26. Tax Deduction for Investment in Environmental and Safety Facilities under RSTA Article 25(1)(3)
27. Tax Program for Third-Party Logistics Operations under RSTA Article 104(14)
28. RSLTA Articles 46, 84
29. Tax Reductions and Exemptions in Free Economic Zones
30. Exemptions and Reductions of Lease fees in Free Economic Zones
31. Grants and Financial Support in Free Economic Zones
32. Modal Shift Program
33. Sharing of Working Opportunities/Employment Creating Incentives
34. R&D Grants Provided under ITIPA
35. GOK Infrastructure Investment at Inchon North Harbor
36. Machinery & Equipment (KANIST R&D) Project
37. Grant for the Purchase of an Electric Vehicle
38. The GOK's Purchases of Electricity from Corrosion-Resistant Steel Producers for MTAR
39. Land Purchase at Asan Bay
40. KG Dongbu's Exemptions from Payment of Harbor Fees
41. Grants from the Korea Agency for Infrastructure Technology Advancement
42. Port Usage Rights at the Port of Incheon

## VII.    RECOMMENDATION

Based on our analysis, we recommend adopting the above positions.  If this recommendation is accepted, we will publish the preliminary results of this review in the *Federal Register*.

☒                                    ☐

_____            _____
Agree                              Disagree

                                          7/12/2021

X _____

        Signed by: CHRISTIAN MARSH
_____
Christian Marsh
Acting Assistant Secretary
  for Enforcement and Compliance

Appendix I

Companies Requested for Review by Petitioners

1.  Ajin H & S Co., Ltd.
2.  AJU Steel Co. Ltd.
3.  B&N International
4.  CDS Global Logistics
5.  Dong A Hwa Sung Co., Ltd.
6.  Dongbu Incheon Steel., Co., Ltd.
7.  KG Dongbu Steel Co., Ltd. (formerly Dongbu Steel Co., Ltd.)
8.  Dongkuk International, Inc.
9.  Dongkuk Steel Mill Co., Ltd.
10. Hyundai Steel
11. Hyundai Steel Co.
12. Korea Clad Tech. Co., Ltd.
13. Pantos Logistics Co., Ltd.
14. PL Special Steel Co., Ltd.
15. POSCO
16. POSCO C&C
17. POSCO Daewoo Corp.
18. Samsung C&T Corporation
19. Samsung Electronics Co., Ltd.
20. Sanglim Steel Co., Ltd.
21. SeAH Coated Metal
22. SeAH Steel Corporation
23. Seajin St. Industry, Ltd.
24. Sejung Shipping Co., Ltd.
25. Seun Steel Co., Ltd.
26. Segye Chemical Industry Co., Ltd.
27. Shandongsheng Cao Xian Yalu Mftd.
28. Shengzhou Hanshine Import and Export Trade
29. Soon Hong Trading Co., Ltd.
30. Southern Steel Sheet Co., Ltd.
31. SSangyong Manufacturing
32. Sung A Steel Co., Ltd.
33. SW Co., Ltd.
34. SY Co., Ltd.
35. Syon
36. TCC Steel. Co., Ltd.
37. Young Steel Korea Co., Ltd.
38. Young Sun Steel Co.
39. Young Steel Co.

**Tab 8**

**CR Doc. 259**
**PR Doc. 176**

**Memorandum from Dennis McClure, International Trade Compliance Analyst, AD/CVD Operations, Office VIII to The File through Irene Darzenta Tzafolias, Director, AD/CVD Operations, Office VIII and Robert Palmer, Program Manager, AD/CVD Operations, Office VIII, " Countervailing Duty Administrative Review of Certain Corrosion- Resistant Steel Products from the Republic of Korea: Preliminary Analysis Memorandum –Equity Infusions," (July 12, 2021).**

Barcode:4142780-01 C-580-879 REV - Admin Review 2019 - 12/31/2019

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-580-879
Administrative Review
POR: 1/1/2019 - 12/31/2019
~~Business Proprietary Information~~
E&C/OVIII: DM
PUBLIC VERSION

July 12, 2021

MEMORANDUM TO:        The File

THROUGH:              Irene Darzenta Tzafolias
                      Director
                      AD/CVD Operations, Office VIII

                      Robert Palmer
                      Program Manager
                      AD/CVD Operations, Office VIII

FROM:                 Dennis McClure
                      International Trade Compliance Analyst
                      AD/CVD Operations, Office VIII

SUBJECT:              <u>Countervailing Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Preliminary Analysis Memorandum – Equity Infusions</u>

---

## Background

***Pre-Debt Restructuring*:**

Between 2012 and 2014, Dongbu Steel Co., Ltd.'s[1] (Dongbu Steel) financial position, in particular Dongbu Steel's profitability and liquidity, deteriorated.[2]  As a result, Dongbu Steel took several actions to improve its financial structure, including raising funds through corporate bond issues in 2013 and selling shares in Dongbu Life Insurance Co., Ltd. (Dongbu Life Insurance).[3]  However, as the credit market for companies with a credit rating lower than "A"[4] tightened, which made it very difficult for the issuance of bonds for companies having a credit

---

[1] We note that Dongbu Steel Co., Ltd. changed its name to KG Dongbu Steel Co., Ltd. on March 27, 2020.  *See* KG Dongbu Steel Co., Ltd./Dongbu Incheon Steel Co., Ltd.'s (collectively, Dongbu) letter, "Affiliated Companies Response," dated October 27, 2020.  We addressed the name change in the "Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review; 2019:  Certain Corrosion-Resistant Steel Products from the Republic of Korea (PDM)," dated July 13, 2021, at "Attribution of Subsidies" section.
[2] *See* Dongbu's letter, "Initial Questionnaire Response," dated December 2, 2020 (Dongbu IQR), Exhibit G-2 at 1-3.
[3] *See* Dongbu IQR at 21.
[4] All credit ratings mentioned in this memorandum are based on those issued by Korea Ratings, a subsidiary of Fitch Ratings.  *See* Dongbu IQR, Exhibit 21.

INTERNATIONAL
T R A D E
ADMINISTRATION

rating lower than "A," and as Dongbu Steel's credit rating wavered and eventually declined from "BBB Stable" to "BBB Negative" between April 2012 and April 2014, Dongbu Steel faced difficulty securing additional financing on commercial terms.[5] Therefore, Dongbu Steel took further steps to shore up its financial position, including attempting to spin off its Dangjin port management division into a new company, Dongbu Dangjin Port Terminal Co., Ltd. (DDPT).[6] Even though Dongbu Steel successfully raised Korean Won (KRW) 40 billion in unsecured public bonds, it was uncertain whether unfavorable financial market conditions would change or if its sale of DDPT would be completed in the near future.[7] Therefore, Dongbu Steel attempted to secure KRW [    ] billion in bridge loans to help the company through difficult financial times until the company becomes financially secure. The bridge loans were used to pay off maturing debts and to finance operating capital.[8] Dongbu Steel eventually secured bridge loans from the Korea Development Bank (KDB), a state-owned bank.[9]

KDB agreed to refinance a series of Dongbu Steel's corporate bonds with maturity dates in 2013 and 2014.[10] Dongbu Steel and KDB entered into a [                                    ].[11] Under the [                    ], to secure repayment of the bridge loans, Dongbu Steel agreed to sell DDPT, as well as its Incheon Plant (Dongbu Incheon) and Dongbu Steel's subsidiaries (Dongbu Hitek, Dongbu Metal, Dongbu Life Insurance, Dongbu Securities, Dongbu Capital, and Dongbu Specialty Steel).[12] Further, Dongbu Steel also agreed to comply with a 'self-help' plan on production and corporate management.[13]

On April 25, 2014, Dongbu Steel secured additional bridge loans.[14] The repayment was to be made from the proceeds received from the sale of shares of Dongbu Incheon.[15] On May 2, 2014, Dongbu Steel also issued 10,000,000 common shares at KRW 2,955 per share.[16] On May 27, 2014, to speed up its sale of DDPT, Dongbu Steel reduced its offer price and changed the deal structure from a sale of [                ] of DDPT's shares at KRW [    ] billion to a sale of [                    ] and issuance of convertible bonds for the remaining [                                    ].[17] On June 16, 2014, Dongbu Steel received additional bridge loans which were intended to be repaid from the sale of Dongbu Incheon.[18] Later, KDB tried to sell Dongbu Incheon and DDPT as a package deal to POSCO.[19] However, on June 24, 2014, POSCO withdrew from negotiations to purchase Dongbu Incheon and DDPT after its analysis of due diligence and valuation results, leaving Dongbu Steel with no other option but to apply for

---

[5] See Dongbu IQR at 22.
[6] Id.
[7] Id.
[8] Id.
[9] See Dongbu IQR at 23.
[10] Id.
[11] Id.
[12] See Dongbu IQR at 22.
[13] See Dongbu IQR, Exhibit B-2 at 2.
[14] See Dongbu IQR at 56.
[15] See Dongbu IQR at 23.
[16] See Dongbu IQR at 24.
[17] Id.
[18] Id.
[19] Id.

2

one of the GOK's financial restructuring programs.[20]  Dongbu Steel formally announced the failure if its plans to sell Dongbu Incheon and DDPT on June 27, 2014.[21]

### *Debt Restructuring under Creditor Banks' Committee Agreement (CBCA)*:

On June 30, 2014, Dongbu Steel applied for the voluntary corporate restructuring program under the CBCA.[22]  The establishment and the first meeting of the Dongbu Steel's Creditor Bank Committee occurred on July 7, 2014.[23]  On October 22, 2014, Dongbu Steel entered into an agreement for the Creditors Co-management Program ("agreement for the normalization of business with the Creditors' Association" or "Agreement for Compliance of Business Normalization Plan").[24]  Under the terms of the agreement, Dongbu Steel agreed that Dongbu Steel's creditor banks making up the Creditor Bank Committee would supervise the voluntary restructuring.[25]  The members of the Creditor Bank Committee include KDB, Korean Finance Cooperate (KoFC), Korea Export-Import Bank (KEXIM), Nonghyup Bank, Shihan Bank, Hana Bank, Woori Bank, Korea Exchange Bank (KEB), and Industrial Bank of Korea (IBK), with KDB as the principal creditor and the Korean state-owned banks together [

].[26]  With respect to the voting right on [

].[27]

Between July 21, 2014, and September 30, 2014, the Creditor Bank Committee approved [

].[28]  Regarding the debt-to-equity conversion, [

].[29]  [

].[30]  Thereafter, 53 billion KRW in liabilities would be converted to common shares at an issue price of 5,000 KRW per share (*i.e.*, 53 billion in liabilities would be converted to 10.6 million shares).[31]  Of the 53 billion KRW subjected to

---

[20] *Id.*

[21] *Id.*

[22] *See* Dongbu IQR at 26.

[23] *See* Dongbu IQR, Exhibit B-5.

[24] *See* Dongbu IQR at 29.

[25] *See* Dongbu IQR, Exhibit B-4 at 1.

[26] *See* GOK's Letter, "Initial Questionnaire Response," dated December 4, 2020 (GOK's Initial QR) at 16; Dongbu IQR, Exhibit B-10; *see also Certain Corrosion-Resistant Steel Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2018*, 85 FR 74692 (November 23, 2020) (*CORE 2018 Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 13-14 (unchanged in *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 FR 29237 (*CORE 2018 Final Results*)).  The Creditor Bank Committee was established as part of Dongbu Steel's involvement in the Corporate Voluntary Restructuring Program under the authority of the CBCA. Between July 7, 2014 and February 2015, the Creditor Bank Committee consisted of KDB, KEXIM, KoFC, Nonghyup Bank, Shihan Bank, Hana Bank, Woori Bank, KEB, and IBK. However, KoFC was merged into KDB in January 2015.  *See* Dongbu IQR at 47.

[27] *See* Dongbu IQR, Exhibit B-8 at Attachment 1.

[28] See Dongbu IQR, Exhibit B-6.

[29] *See* Dongbu IQR, Exhibit B-7 at 189.

[30] *See* Dongbu IQR, Exhibit B-7 at 193.

[31] *See* Dongbu IQR at 29.

3

debt-to-equity conversion, [                                        ].[32] Further, sales of the shares obtained through debt-to-equity conversion were restricted until December 31, 2018.[33]

Furthermore, Price Waterhouse Coopers (PWC) was hired to analyze Dongbu Steel's business performance and found that Dongbu Steel's hot rolling mill was the source of the main problems aggravating Dongbu Steel's overall profitability.[34] PWC concluded that the going-concern value of Dongbu Steel was significantly higher than the liquidation value.[35] Dongbu Steel entered into an agreement with the Creditor Bank Committee for the compliance of business normalization plan.[36] In addition to agreeing to another 'self-help' plan, Dongbu Steel also agreed to shut down its hot rolling mill to improve its overall financial performance.[37] On November 25, 2014, Dongbu Steel's board of directors decided to shut down Dongbu Steel's hot-rolling mill and present the proposed write-off of existing shares, pursuant to the proposed debt-to-equity conversion, to Dongbu Steel's shareholders.[38] On January 7, 2015, Dongbu Steel's shareholders meeting was held and Dongbu Steel's shareholders voted to approve the restructuring plan, including the write-off of existing shares and the sale of new shares.[39] On February 12, 2015, Dongbu Steel's Board of Directors authorized the issuance of new shares to Dongbu Steel's creditors through a debt-to-equity conversion under the restructuring plan.[40] On February 16, 2015, the debt-to-equity conversion was completed and KDB became Dongbu Steel's largest shareholder.[41]

### Debt Restructuring under Corporate Restructuring Promotion Act (CRPA):

Following the debt-to-equity conversion, Dongbu Steel's actual gross profits decreased by KRW [   ] billion because Dongbu Steel's sales revenue decreased by KRW [   ] billion and its production costs increased by KRW [   ] billion.[42] Dongbu Steel's actual gross profit was KRW [   ] billion lower than the original forecasted gross profit by PWC. Furthermore, Dongbu Steel's SG&A expenses increased by KRW [   ] billion due to loss compensation obligations arising from the violation of long-term contracts caused by the shut-down of the hot-rolled business. Dongbu Steel and the Creditor Bank Committee decided to change from the Corporate Voluntary Restructuring program under CBCA to the Corporate Workout Program under CRPA.

### 1st Debt Restructuring:

---

[32] See Dongbu IQR, Exhibit B-7 at 23.
[33] See Dongbu IQR at 32 and GOK IQR, Exhibit Debt Restructuring-9.
[34] See Dongbu IQR at 28; and GOK IQR, Exhibit Debt Restructuring-4 (Dongbu IQR, Exhibit B-7) (PWC Report) at 1.8, 4.1.1, and 6.1-6.4.
[35] Id. and GOK IQR Exhibit Debt Restructuring-4 (Dongbu IQR Exhibit B-7) (PWC Report) at 6.1-6.4.
[36] See Dongbu IQR at B-29.
[37] Id.
[38] See Dongbu IQR, at 28.
[39] See Dongbu IQR, at 29.
[40] See Dongbu IQR, at 42.
[41] See Dongbu IQR, at 33.
[42] See Dongbu IQR at 30.

On October 19, 2015, the first meeting of the Dongbu Steel's Creditor Financial Institutions' Committee (DSCFIC) was held.  Members included KDB, KEXIM, Woori, Nonghyup Bank, Shinhan, Hana, Korea Credit Guarantee Fund (KODIT), Corporate Bond Stabilization Fund (CBSF), and K Savings Bank (KSAVING), with KDB as the principal creditor bank and the state-owned entities [                                        ][43] [

                                    ][44]  The private entity members with secured bonds held the remainder of the voting rights.

KDB, which was [                              ], the other major creditors, and Dongbu Steel entered into a Succession Agreement of the Agreement for Compliance of Business Normalization Plan.[45]  Under the agreement, the DSCFIC took over the administration of Dongbu Steel's restructuring from the Creditor Bank Committee, and Dongbu Steel's creditor banks making up the DSCFIC assumed the responsibility for supervising the corporate workout.[46]  Specifically, the Agreement requires the KDB to periodically evaluate and inspect whether to continue the workout of Dongbu Steel, as well as the possibility for normalization of management.[47]

On March 14, 2016, the DSCFIC voted to execute a restructuring, including an additional KRW 200 billion debt-to-equity conversion and interest rate cut for the general loan which was approved during the third Creditor Bank Committee meeting.[48]  On March 30, 2016, Dongbu Steel's shareholders' meeting approved the restructuring.[49]  On May 9, 2016, Dongbu Steel's board of directors approved the restructuring.[50]  Under the terms of the restructuring, Dongbu Steel increased its capital by KRW 200 billion by a debt-to-equity conversion in relation to the debentures and borrowings from the creditors.[51]  Dongbu Steel also reduced its capital without refunds by reducing outstanding capital stock.[52]  Existing shareholders received share reductions at a ratio of 4:1.[53]  Thereafter, 200 billion KRW in liabilities were converted to common shares at an issue price of 10,000 KRW per share (*i.e.* 200 billion in liabilities were converted 20 million shares).[54]  Of the 200 billion KRW liabilities subjected to the conversion, [

        ].[55]

---

[43] *See* Dongbu IQR, Exhibit B-10.
[44] *Id.*  The DSCFIC is a committee established in October 2015 as part of Dongbu Steel's participation in the Corporate Workout Program under the authority of the CRPA.  *See* Dongbu IQR at 31.  As of October 19, 2015, the DSCFIC consisted of KDB, KEXIM, Nonghyup Bank, Shihan Bank, Hana Bank, Woori Bank, KODIT, CBSF, and KSAVING.  *See* Dongbu IQR at 31.
[45] *See* Dongbu IQR, Exhibit B-10.
[46] *See* Dongbu IQR at Exhibit 12-A, 2018 Financial Statements at Note 38, page 63 and 65.
[47] *See* Dongbu IQR at 33.
[48] *See* Dongbu IQR at 41.  *See also* GOK IQR at 8.
[49] *See* Dongbu IQR at 32.
[50] *Id.*
[51] *Id.,* and Dongbu IQR, Exhibit 12-A, 2018 Financial Statements at note 37, page 69-70.
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *See* Dongbu IQR, Exhibit Debt Restuucturing-9.

As of March 14, 2016, KDB was still Dongbu Steel's largest creditor with [    ] percent of the voting rights of the creditor's committee and because of CBSF's, KDB's, KEXIM's, KODIT's, and Woori Banks's interests, government-owned banks controlled [    ] percent of the voting rights of the creditor's committee.[56]  With respect to [

].[57]  As of March 30, 2016, KDB was still Dongbu Steel's largest shareholder with [    ] percent of Dongbu Steel's shares, and because of KDB's, KEXIM's, and Woori Banks's interests, government-owned banks owned [    ] percent of Dongbu Steel's shares.[58]

On August 22, 2016, because sales of Dongbu Steel's common shares acquired in the debt-to-equity conversions on February 16, 2015, and May 9, 2016, were restricted until December 31, 2018, the trading volume of Dongbu Steel's shares on the Korea Stock Exchange had decreased significantly.[59]  To increase the trade volume for share price stabilization, the DSCFIC approved the removal of the sales restriction of the shares that were issued by the debt-to-equity conversion on February 16, 2015.[60]  Sales were made on a consolidated negotiation basis by block sales rather than individual sales.[61]  [

].[62]

## 2nd Debt Restructuring:

Dongbu Steel was unable to find a company to buy its hot-rolled steel facility, which was the main problem aggravating its overall profitability.  Moreover, Dongbu Steel was faced with the possible de-listing of Dongbu Steel's shares from the Korea Stock Exchange in 2018 because at least 50 percent of Dongbu Steel's capital stock was impaired during two consecutive years.[63]  In order to help Dongbu Steel, it was deemed necessary to convert debt-to-equity through a second debt restructuring.[64]

On December 28, 2017, the creditor's committee approved another restructuring plan, including a third debt-to-equity conversion.[65]  The same day, Dongbu Steel's board of directors called for a shareholders' meeting to seek final approval.[66]  On February 27, 2018, Dongbu Steel's shareholders voted to accept the restructuring plan.[67]  On April 3, 2018, Dongbu Steel issued new common shares in accordance with the debt-to-equity conversion.  Under the plan, existing shareholders received share reductions at a ratio of 2:1.[68]  Thereafter, 200 billion KRW in

[56] *Id.*
[57] *See* Dongbu IQR, Exhibit B-10 at Attachment 1.
[58] *See* Dongbu IQR at 51.
[59] *See* Dongbu IQR, Exhibit B-11.
[60] *See* Dongbu IQR at 33.
[61] *Id.*
[62] *See* GOC IQR, Exhibit Debt Restructuring-9.
[63] *See* Dongbu IQR at 33-34.
[64] *See* Dongbu IQR at 34.
[65] *Id.*
[66] *See* Dongbu IQR, Exhibit 12-A, 2017 Financial Statements at note 39, page 88. *d.*
[67] *Id.*
[68] *See* Dongbu IQR at 34.

liabilities were converted to common shares at an issue price of 15,000 KRW per share (*i.e.*, 200 billion in liabilities were converted to 1.333333 million shares).[69]  In addition, [

                                                      ][70]  Of the 200 billion KRW subject to debt-to-equity conversion, [                                                      ][71]

As of December 31, 2017, KDB was still Dongbu Steel's largest shareholder, with [    ] percent of Dongbu Steel's shares, and because of KDB's and KEXIM's interests, government-owned banks collectively owned [        ] percent of Dongbu Steel's shares.[72]  On the [

                                        ].[73]

### 3rd Debt Restructuring:

Because of the upcoming maturity date and termination date of the extension period for repayment of the restructured loans of December 31, 2018, the KDB appointed PWC to evaluate and inspect whether Dongbu Steel could meet the workout graduation requirement by the maturity date.[74]  PWC concluded that Dongbu Steel could not meet the workout graduation requirement.  But the going-concern value of the company was significantly higher than the liquidation value.  The DSCFIC approved extension of loan maturity as well amended the Agreement for Compliance of Business Normalization Plan.[75]  No debt-to-equity conversion was included in this restructuring.

As of April 3. 2018, [                                                      ], with [    ] percent of the voting rights of the creditor's committee, and because of KDB's, KEXIM's, and Woori Banks's interests, [

                                        ].[76]

### 4th Debt Restructuring:

As part of the 4th debt restructuring, a merger and acquisition (M&A) transaction occurred between Dongbu Steel and the KG Consortium (the affiliates of the KG Group and Cactus Private Equity Ltd., Co. (CPE)).  Based on Article 3 of the Amended Agreement for Compliance of Business Normalization Plan and the sixth meeting of the DSCFIC, Dongbu Steel and DSCFIC agreed to proceed with the business normalization process through an M&A.[77]  The KDB and Dongbu Steel worked with co-financial advisors and decided to use an open bidding process.[78]  There were initially [    ] potential investors and three companies that submitted preliminary bids.  The [    ] potential investors included [

---

[69] *Id.*
[70] *See* Dongbu IQR at 32.
[71] *See* Dongbu IQR at 47.
[72] *See* Dongbu IQR at 52.
[73] See Dongbu IQR, Exhibit B-17.
[74] *See* Dongbu IQR at 35.
[75] *Id.*
[76] *See* Dongbu IQR at 53.
[77] *See* Dongbu IQR at 35.
[78] *Id.*

].[79]  The KG Consortium submitted a final bid after requesting that Ernst & Young perform the financial due diligence and prepare a feasibility study.  The KG Consortium initially proposed [

].[80]  The DSCFIC, Dongbu Steel, and the KG Consortium negotiated and agreed on final contract terms such as:  1) an equity infusion in the amount  of KRW 360 billion by the KG Consortium, at face value 5000 KRW per share; 2) the KG Consortium would acquire 72 percent of Dongbu Steel; 3) debt-to-equity-conversion of KRW 605 billion by the DSCFIC, at face value 25000 KRW per share; 4) an interest rate reduction of 2.0 percent of the existing loans by the DSCFIC; 5) the extension of maturity of debt to December 31, 2025, by the DSCFIC, and; 6) the restriction of stock sales by the KG Group and CPE until [          ].[81]  These terms were agreed to at the same time.[82]

Dongbu Steel further appointed PWC to evaluate the investment proposal explained above.  Four potential scenarios were considered after evaluating PWC's Report.[83]  Dongbu Steel decided to implement the scenario with the highest going concern valuation amount of [
].[84]  On June 4, 2019, the DSCFIC approved the KRW 360 billion M&A agreement from the KG Consortium, as well as the restructuring of outstanding debts (including the KRW 605 billion debt-to-equity conversion) and graduation from the CRPA program.[85]  The KDB officially notified Dongbu Steel of its graduation from the CRPA program on September 6, 2019.[86]

As of September 7, 2019, government-owned banks no longer held a majority interest in Dongbu Steel.  As of December 31, 2019, KG Steel Co. Ltd. (KG Steel) and CPE held a 72 percent ownership interest in Dongbu Steel.[87]  As a result of the M&A, KG Group established KG Steel to invest in Dongbu Steel.  Dongbu Steel also changed its name to KG Dongbu Steel.

## Initiation

On December 21, 2020, the petitioner (Nucor Corporation (Nucor)) filed deficiency comments on Dongbu Steel's initial questionnaire responses, which included specific comments concerning Dongbu Steel's debt-to equity conversion in the fourth debt restructuring occurring during the POR.[88]  On January 7, 2021, Nucor filed allegations that Dongbu Steel received government equity infusions related to Dongbu Steel's 2014, 2016, 2018, and 2019 reorganizations, and

---

[79] *See* Dongbu IQR, Exhibit B-22.
[80] *See* Dongbu IQR at 36, 37.
[81] *See* Dongbu IQR at 38, 39, 45, 46.
[82] *See* Dongbu IQR at 39.
[83] *See* Dongbu IQR at 38, and Exhibit B-29.
[84] *See* Dongbu IQR at 38.
[85] *See* Dongbu IQR at 39.
[86] *See* Dongbu IQR, Exhibit B-32.
[87] *See* Dongbu IQR, Exhibit 10-A.
[88] *See* Nucor's Letter, "Comments on Dongbu's Initial Questionnaire Response," dated December 21, 2020

further that Dongbu Steel was unequityworthy at the time of the government equity infusions.[89] Furthermore, in the 2018 administrative review of CORE from Korea, we also found that Dongbu Steel's debt restructuring allowed Dongbu Steel to convert certain of Dongbu Steel's debt into equity.[90]

19 CFR 351.507(a)(7) states that "{t}he Secretary will not investigate an equity infusion in a firm absent a specific allegation by the petitioner which is supported by information establishing a reasonable basis to believe or suspect that the firm received an equity infusion that provides a countervailable benefit."  Nucor pointed to record evidence indicating:  a) that Dongbu Steel participated in equity conversions as part of its reorganization from 2014 through 2019; b) that GOK-owned or controlled banks participated in such equity conversions; c) that these GOK-owned or controlled banks controlled the decisions of the creditor's councils; d) that GOK-owned or controlled banks influenced the decisions of Dongbu Steel's private creditors to make the equity infusions; e) that private participation in these debt-to-equity conversions was not significant; f) that no "objective analyses" were made, within the meaning of 19 CFR 351.507(a)(4)(i)(A); g) that Dongbu Steel's key financial performance indicators have remained significantly below Commerce's benchmarks; and (h) that no reasonable private investor would have concluded that Dongbu Steel was likely to generate a reasonable rate of return in a reasonable period of time.[91]  Accordingly, we find that Nucor's government equity infusions and unequityworthiness allegations constitute a sufficient basis to believe or suspect that the firm received an equity infusion that provides a countervailable benefit in accordance with 19 CFR 351.507(a)(7), and we have initiated an investigation of the government equity infusions related to Dongbu Steel's 2014-2019 debt-to-equity conversions.

**Analysis**

In this review, Commerce is analyzing four debt-to-equity conversions because the conversions are non-recurring and attributed to the average-useful-life (AUL) period:  1) one related to a February 16, 2015, debt-to-equity conversion conducted under the auspices of Dongbu Steel's first (2014-2015) reorganization; 2) one related to a May 9, 2016, debt-to-equity conversion conducted under the auspices of Dongbu Steel's second (2016) reorganization; 3) one related to an April 3, 2018, debt-to-equity conversion conducted under the auspices of Dongbu Steel's third (2017-2018) reorganization; and 4) one related to an August 30, 2019, debt-to-equity conversion conducted under the auspices of Dongbu Steel's fourth (2019) reorganization.

*Financial Contribution and Specificity*

As described in the PDM, we found that KDB, KEXIM, CBSF, KODIT, Woori Bank, and IBK are authorities within the meaning of section 771(5)(B) of the Act.  For the preliminary results, we find that each of the above-referenced debt-to-equity conversions constitutes a financial

---

[89] *See* Nucor's Letter, "Comments Regarding Dongbu's Creditworthiness and Equityworthiness," dated January 7, 2021 (Nucor's Comments Regarding Dongbu's Creditworthiness and Equityworthiness).
[90] *See CORE 2018 from Korea PDM* at 14, unchanged in *CORE 2018 Final Results*.
[91] *See* Comments Regarding Dongbu's Creditworthiness and Equityworthiness at 2-3 (citing Dongbu IQR at 21-40); Comments Regarding Dongbu's Creditworthiness and Equityworthiness at 9-10 (citing Dongbu IQR at 39-40, Exhibit 12-A); and Comments Regarding Dongbu's Creditworthiness and Equityworthiness at 10-11.  and

contribution that provides a direct transfer of funds under section 771(5)(D)(i) of the Act.[92]  With respect to specificity, as described in the PDM, Dongbu Steel's debt restructuring program is specific within the meaning of section 771(5A)(D)(iii)(I) of the Act.[93]

### Benefit

As described below, we preliminarily determine that Dongbu Steel was unequityworthy at the times of each of the three debt-to-equity conversions.  Therefore, we find the benefit for the 1st, 2nd, and 3rd restructuring plan to be the entire amount of the debt-to equity infusion made by GOK-owned or controlled financial institutions, in accordance with 19 CFR 351.507(a)(6).  For the 4th restructuring plan, we find the benefit to be the amount of the difference between the share price for the private investors involved in the M&A and the share price for the GOK-owned or controlled creditors in the debt-to-equity conversion, in accordance with 19 CFR 351.507(a)(1) and 19 CFR 351.507(a)(2)(i).  The subsidy rate calculations for each equity infusion are in Dongbu's Preliminary Results Calculation Memorandum.[94]

### Existence of Private Investor Prices

19 CFR 351.507(a)(1) states that "{i}n the case of a government-provided equity infusion, a benefit exists to the extent that the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made."  Furthermore, 19 CFR 351.507(a)(2)(i) states that "{t}he Secretary will consider an equity infusion as being inconsistent with usual investment practice…if the price paid by the government for newly issued shares is greater than the price paid by private investors for the same (or similar form of) newly issued shares."  19 CFR 351.507(a)(2)(iii) carves out an exception to 19 CFR 351.507(a)(2)(i), which is that "the Secretary will *not* use private investor prices under paragraph (a)(2)(i) of this section if the Secretary concludes that private investor purchases of newly issued shares are not significant."  After careful consideration of the record of this review and for the reasons described below, we preliminarily find that while private investors participated in the debt-to-equity conversions in the 1st, 2nd, and 3rd equity infusions, we cannot rely on the prices paid by the private creditors and private investors for purpose of determining a benchmark.  However, we preliminarily find that private investor prices exist for the 4th equity infusion and are relying on the prices paid by private investors in the benefit analysis for the 4th equity infusion.

### 1st, 2nd, and 3rd Equity Infusions

The record demonstrates that the private investors' debt-to-equity conversions were not significant within the meaning of 19 CFR 351.507(a)(2)(iii).  The debt-to-equity conversions were approved concurrently with the restructurings of loans by the same creditors' councils, the Creditor Bank Committee and DSCFIC.  As explained in the PDM, when assessing the

---

[92] *See* PDM at "KG Dongbu Steel's Debt Restructuring" section.
[93] *Id.*
[94] *See* Memorandum "Preliminary Results Calculation for KG Dongbu Steel Co., Ltd. and Dongbu Incheon Co., Ltd. (collectively, Dongbu)," dated concurrently with this memorandum (Preliminary Results Calculation Memorandum).

10

Barcode:4142780-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

restructuring of loans, we found that that each of the GOK-owned or GOK-controlled banks and other financial institutions (*i.e.*, CBSF, KODIT, KDB, KoFC, KEXIM, Woori Bank, and the IBK) are authorities under section 771(5)(B) of the Act.  The purpose of the policy banks was to implement government industrial policies through the provision of financing to industries and enterprises.

The KDB also exercised significant influence over the debt restructurings.  As described in the "Background" section above, prior to entering the debt restructurings, the KDB and Dongbu Steel entered into the [

].  This [                    ] allowed KDB to dictate how Dongbu Steel would manage its assets to repay its creditors.  The [                    ] also stipulated that [

].[95]  KDB did not simply act as a lender.  After the [                    ] was reached, the KDB tried to sell Dongbu Incheon and DDPT as a package deal to POSCO.  Because the deal was unsuccessful, Dongbu Steel had no other option but to apply for the GOK's debt restructuring programs.

As Dongbu Steel went through various debt restructuring programs, KDB continued to dictate how Dongbu Steel would use its assets and production of products to generate revenue, which allowed the KDB to dictate how Dongbu Steel would repay its creditors.  As indicated by the [

]."[96]  [

].[97] The [

].[98]  Under the [

].[99]

More importantly, as described above in the "Background" section, after the first debt-to-equity conversion under the CBCA restructuring, KDB became Dongbu Steel's largest shareholder. Subsequently, KDB, along with other government-owned policy banks owned over the majority of shares in Dongbu Steel.  With respect to [                    ], as described above, [

---

[95] *See* Dongbu IQR, Exhibit B-3 at Article 4.
[96] *See* GOK IQR, Exhibit Debt Restructuring-3 (Minutes of 1st Dongbu Steel's Voluntary Creditors Association) at Contents of Third Agenda.
[97] *See* GOK IQR, Exhibit Debt Restructuring-6 at 8.
[98] *Id.*
[99] *See* Dongbu IQR, Exhibit B-5.

Filed By: Dennis Mcclure, Filed Date: 7/13/21 12:37 PM, Submission Status: Approved

]. Therefore, we preliminarily find the private creditors had no alternative but to accept the terms imposed upon them by the KDB and other GOK-owned policy banks. As such, the prices paid by these private creditors are not significant for purposes of determining a benchmark.

Finally, as described above in the "Background" section, Dongbu Steel repeatedly failed to meet its required performance goals set in the restructuring agreements and required multiple restructurings of the loans as well as debt-to-equity conversions. In addition, Dongbu Steel's failure to meet its performance goals is not a reasonable standard for investing in a company. In particular, the private creditors did not evaluate the reasonableness of investing in a company. *See* the "Equityworthiness for 1st, 2nd, and 3rd Debt-to-Equity Infusions" section, below.

<u>4th Equity Infusion</u>

As described above, the DSCFIC decided to perform another debt-to-equity conversion of KRW 605 billion at face value 25,000 KRW per share during the POR. As stated in the PDM, the government-owned policy banks still controlled the creditors council. As noted above, after the first debt-to-equity conversion under the CBCA restructuring, KDB became Dongbu Steel's largest shareholder. Subsequently, KDB, along with other government-owned policy banks owned a majority of Dongbu Steel's shares. This was still the case at the time of 4th restructuring.[100] With respect to [                ], [

] at the time of the 4th restructuring. Therefore, we preliminarily find the private creditors who are part of the DSCFIC had no alternative but to accept the terms imposed upon them by the KDB and other GOK-owned policy banks. As such, the prices paid by these private creditors are also not significant, within the meaning of 19 CFR 351.507(a)(2)(ii), for purposes of determining a benchmark.

However, in the 4th debt restructuring, Dongbu Steel also searched for additional investors through an open bidding process. As a result of reviewing the offers it received and after analyzing its options, Dongbu Steel and DSCFIC selected the KG Consortium comprised of the KG Group and CPE.[101] As described above, [

]. In addition, we note that CPE is [

].[102] The remaining [           ] of CPE is owned by [

].[103] Therefore, we need to assess whether prices paid by the KG Consortium, a private investor, can be used as a benchmark under 19 CFR 351.507(a).

19 CFR 351.507(a)(1) states that "{i}n the case of a government-provided equity infusion, a benefit exists to the extent that the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the

---

[100] See Dongbu IQR, Exhibit 10-A.
[101] KG Group decided that KG Steel would ultimately represent the KG Group as the party investing in the M&A with Dongbu Steel. *See* Dongbu IQR, Exhibit B-30.
[102] *See* Dongbu's letter, "First Supplemental Questionnaire Response," dated January 19, 2021 (Dongbu SQR1) at 9.
[103] *Id.*

country in which the equity infusion is made." Furthermore, 19 CFR 351.507(a)(2)(i) states that "{t}he Secretary will consider an equity infusion as being inconsistent with usual investment practice…if the price paid by the government for newly issued shares is greater than the price paid by private investors for the same (or similar form of) newly issued shares." 19 CFR 351.507(a)(2)(ii) states that "in selecting a private investor price under paragraph (a)(2)(i), the Secretary will rely on sales of newly issued shares made reasonably concurrently with the newly issued shares purchased by the government." As described in the "Background" section, the new equity infusions by the KG Consortium and the DBCFIC were approved by Dongbu's Board of Directors at the same time.[104] The new shares sold to the DBCFIC through the debt-to- equity infusion and the newly-issued shares to the KG Consortium were the same class of common shares.[105]

Further, 19 CFR 351.507(a)(2)(iii) carves out an exception to 19 CFR 351.507(a)(2)(i), which is that "the Secretary will *not* use private investor prices under paragraph (a)(2)(i) of this section if the Secretary concludes that private investor purchases of newly issued shares are not significant." Unlike the previous equity infusions, in which the purchases by the private creditors were insignificant, the purchases by KG Consortium were significant. For the M&A investment of KRW 360 million by the KG Consortium, the KG Consortium, Dongbu Steel and DSCFIC agreed that the minimum shareholding ratio after the debt-to-equity conversion and issuance of new shares to the KG Consortium would be 72 percent, while the government-owned policy banks' shares would be [     ] percent after the debt-to-equity conversion at the end of 2019.[106] Further, an examination of DSCFIC's meeting minutes as well as the relevant underlying agreements do not indicate that either the GOK or the GOK-owned policy banks exercised influence over the KG Consortium. Therefore, we preliminarily determine that prices paid by the KG Consortium can be used as a benchmark. Moreover, we note that it is not necessary to perform an equityworthiness analysis for the 4th equity infusion because we preliminarily find that the share purchases by the KG Consortium can be used as benchmark.

Dongbu Steel issued 72,000,000 shares of stock to KG Steel and CPE at KRW 5,000 per share equal to KRW 360 billion, which is a 72 percent majority stake in ownership of Dongbu Steel. In this particular circumstance, the share price to government-owned creditors in the DSCFIC is KRW 25,000 per share resulting from the debt-to-equity conversion, whereas the share price to the private investors for the M&A is KRW 5,000 per share. In accordance with 19 CFR 351.507(a)(2)(i), we preliminarily find that the debt-to-equity infusion by the government-owned policy banks, KDB, KEXIM, KODIT, and CBSF, were inconsistent with the usual investment practice because the price paid by the government-owned policy banks for newly issued shares was greater than the price paid by private investors. On this basis, we determine the subsidy provided to Dongbu Steel by the GOK in the 4th equity infusion to be 2.96 percent *ad valorem* during the POR.

***Equityworthiness for 1st, 2nd, and 3rd Debt-to-Equity Infusions***

---

[104] *See* Dongbu IQR, Exhibit B-33.
[105] *See* Dongbu SQR1 at 7.
[106] *See* Dongbu IQR, Exhibit B-10.

19 CFR 351.507(a)(3) states that "{i}f actual private investor prices are not available under paragraph (a)(2) of this section, the Secretary will determine whether the firm funded by the government-provided equity was equityworthy or unequityworthy at the time of the equity infusion. If the Secretary determine that the firm was equityworthy, the Secretary will apply paragraph (a)(5) of this section to determine whether the equity infusion was inconsistent with the usual investment practice of private investors. A determination by the Secretary that the firm was unequityworthy will constitute a determination that the equity infusion was inconsistent with usual investment practice of private investors, and the Secretary will apply paragraph (a)(6) of this section to measure the benefit attributable to the equity infusion." As explained above, with respect to the 1st, 2nd and 3rd debt-to-equity infusions, actual significant private investor prices were not available. Therefore, we are assessing whether Dongbu Steel was equityworthy at the time of each infusion.

19 CFR 351.507(a)(4) states that "the Secretary will consider a firm to have been equityworthy if the Secretary determines that, from the perspective of a reasonable private investor examining the firm at the time the government-provided equity infusion was made, the firm showed an ability to generate a reasonable rate of return within a reasonable period of time. The Secretary may, in appropriate circumstances, focus its equityworthiness analysis on a project rather than the company as a whole." 19 CFR 351.507(a)(4) further states that "In making the equityworthiness determination, the Secretary may examine the following factors, among others: (A) Objective analyses of the future financial prospects of the recipient firm or the project as indicated by, *inter alia*, market studies, economic forecasts, and project or loan appraisals prepared prior to the government-provided equity infusion in question; (B) Current and past indicators of the recipient firm's financial health calculated from the firm's statements and accounts, adjusted, if appropriate, to conform to generally accepted accounting principles; (C) Rates of return on equity in the three years prior to the government equity infusion; and (D) Equity investment in the firm by private investors."

19 CFR 351.507(a)(4)(ii) further stipulates that Commerce will "normally require from the respondents the information and analysis completed prior to the infusion, upon which the government based its decision to provide the equity infusion." Absent an analysis containing information typically examined by potential private investors considering an equity investment, Commerce will normally determine that the equity infusion provides a countervailable benefit. This is because, before making a significant equity infusion, it is the usual investment practice of private investors to evaluate the potential risk versus the expected return, using the most objective criteria and information available to the investor. The *CVD Preamble* at 65373 further clarifies that the analysis includes an analysis of information sufficient to determine the expected risk-adjusted return and how such a return compares to that of alternative investment opportunities of similar risk.[107]

*19 CFR 351.507 (a)(4)(ii)*:

The creditors council commissioned PWC to prepare a report identifying the value of Dongbu Steel if the company was liquidated, if the company continued as an ongoing concern but shut-down its hot-rolling mill, and if the company continued as an ongoing concern with its hot-

---

[107] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65373 (November 25, 1998) (*CVD Preamble*).

14

rolling mill.[108]  Included in the 2014 report were prospective financial projections.[109]  PWC determined that Dongbu Steel was worth more to its shareholders and creditors as an ongoing concern provided that Dongbu Steel's hot-rolling mill was shut down.[110]  Prior to the 2015 debt-to-equity conversion, PWC judged the ongoing concern value of Dongbu Steel to be [    ] billion KRW, provided the hot-rolling mill was shut down, compared to a liquidation value of [    ] billion KRW, and a [    ] billion KRW value of Dongbu Steel as an ongoing concern if the hot-rolling mill were maintained.[111]  Because Dongbu Steel failed to achieve plan milestones, the creditor's committee commissioned PWC to perform an updated analysis in October 2015, prior to the May 9, 2016 debt-to-equity conversion.[112]  PWC determined that Dongbu Steel's value as an ongoing concern was [    ] billion KRW (with the hot-rolling mill shut down), compared to a [    ] billion KRW liquidation value.[113]  For the third debt-to-equity conversion, the creditor's committee commissioned PWC to perform a third analysis in December 2017, prior to the April 3, 2018 debt-to-equity conversion.[114]  PWC determined that Dongbu Steel's value as an ongoing concern was [    ] billion KRW (with the hot-rolling mill shut down), compared to a [    ] billion KRW liquidation value.[115]  For the fourth debt-to-equity conversion and M&A, the KDB commissioned PWC to perform a fourth analysis in May 2019, prior to the August 31, 2019 debt-to-equity conversion.[116]  PWC determined that Dongbu Steel's value as an ongoing concern was [    ] billion KRW (with the hot-rolling mill shut down), compared to a [    ] billion KRW liquidation value.[117]

While the creditor's committee performed these analyses to determine whether Dongbu Steel was worth more to its creditors than the liquidation value of its assets or to determine which restructuring scenario provided the most value, Dongbu Steel's creditor committee was not required to discount Dongbu Steel's value by the amount of its liabilities.  Dongbu Steel's creditors were interested in determining whether the company as a whole was worth more as an ongoing concern, or how best to maximize the company's value in order to recover debt financing investments.  As they had already committed substantial debt capital to the company, they were merely interested in how to recover the debt financing already invested in the company.  Also, the company was effectively under the control of its creditors.  This is different from the usual investment practice of private investors which is to evaluate the potential risk versus the expected return and would typically include an analysis of information sufficient to determine the expected risk-adjusted return and how such a return compares to that of alternative investment opportunities of similar risk.  Therefore, we preliminarily determine that there was no analysis containing information typically examined by potential private investors as required under 19 CFR 351.507(a)(4)(ii).  Even if we are to assume that the PWC analysis meets the requirement under 19 CFR 351.507(a)(4)(ii), an examination of the factors under 19 CFR

---

[108] *See* Dongbu IQR at 28.
[109] *See* Dongbu IQR, Exhibit B-7.
[110] *See* Dongbu IQR at 28.
[111] *See* Dongbu IQR at 28.
[112] *See* Dongbu IQR, at Exhibit B-10.
[113] *See* Dongbu IQR at 31.
[114] *See* Dongbu IQR at 33.
[115] *Id.*
[116] *See* Dongbu IQR at 38.
[117] *See* Dongbu IQR at 35, Exhibit B-16.

351.507(a)(4)(i) shows that Dongbu Steel was unequityworthy at the time the first, second and third government-provided equity infusions were made.

*19 CFR 351.507(a)(4)(i)(A) ("Objective analyses of the future financial prospects of the recipient firm"):*

As stated above, the creditors council commissioned PWC to prepare reports identifying the value of Dongbu Steel if the company was liquidated, if the company continued as an ongoing concern but shut-down its hot-rolling mill, and if the company continued as an ongoing concern with its hot-rolling mill. Nothing in the PWC reports nor the subsequent analyses indicate that new equity shareholders could expect any return on investment. The PWC Report released in September 2014, stated that the company was valued at [    ] billion KRW as an ongoing concern.[118] However, according to Dongbu Steel's 2013 financial statements, Dongbu Steel's liabilities were valued at [    ] billion KRW at the end of 2013.[119] Furthermore, by the end of 2014, subsequent to the issuance of the 2014 PWC Report, Dongbu Steel's operating [    ] had increased much more than expected,[120] and according to Dongbu Steel's 2014 financial statements, Dongbu Steel's liabilities were valued at [    ] billion KRW at the end of 2014.[121] After the first reorganization, Dongbu Steel's financial position continued to decline. Despite multiple debt write-offs and debt-to-equity conversions, Dongbu Steel continued to fail to meet the milestones envisioned in the PWC reports. The second PWC analysis conducted in October 2015 stated that the company was valued at [    ] billion KRW as an ongoing concern. However, according to Dongbu Steel's 2015 and 2016 financial statements, Dongbu Steel's liabilities were valued at [    ] billion KRW at the end of 2015 and [    ] billion KRW at the end of 2016.[122] The third PWC analysis conducted in December 2017 stated that the company was valued at [    ] billion KRW as an ongoing concern. The fourth PWC analysis conducted in May 2019 stated that the highest going-concern value out of three scenarios was [    ] billion KRW. However, according to Dongbu Steel's 2016, 2017, 2018, and 2019 financial statements, Dongbu Steel's liabilities were valued at [    ] billion KRW at the end of 2016, [    ] billion KRW at the end of 2017, [    ] billion KRW at the end of 2018, and [    ] billion KRW at the end of 2019.[123]

Despite indicating that Dongbu Steel could do a better job of recouping its creditors' debt investments if the company followed the reorganization plans by disposing of its hot-rolling mill, Dongbu Incheon, and DDPT, the PWC reports and subsequent analyses did not indicate, nor were they intended to indicate, a positive value of the equity investments or an adequate return

---

[118] *See* Dongbu IQR, Exhibit B-7.

[119] *See* Dongbu IQR, Exhibit 12-A, Dongbu Steel's 2013 Separate Financial Statements at "Separate Statements of Financial Position."

[120] *See* Dongbu IQR, Exhibit 12-A, Dongbu Steel's 2014 Separate Financial Statements at "Separate Statements of Financial Position."

[121] *Id.*

[122] *See* Dongbu IQR, Exhibit 12-A, Dongbu Steel's 2015 Separate Financial Statements at "Separate Financial Statements,"Dongbu Steel's 2016 Separate Financial Statements at "Separate Statements of Financial Position."

[123] *See* Dongbu IQR, Exhibit 12-A, Dongbu Steel's 2016 Separate Financial Statements at "Separate Statements of Financial Position," Dongbu Steel's 2017 Separate Financial Statements at "Separate Statements of Financial Position," Dongbu Steel's 2018 Separate Financial Statements at "Separate Statements of Financial Position," and Dongbu Steel's 2019 Separate Financial Statements at "Separate Statements of Financial Position."

on the equity investments.  In fact, there is a clear indication that, in PWC's view, the present value of the company's non-business use assets and future free cash flows were projected to be [          ] than its liabilities, even under the most favorable scenario where Dongbu Steel was able to efficiently shut down its hot-rolling mill, sell Dongbu Incheon and DDPT, and continue as an ongoing concern.[124]  This implies that, in PWC's estimate, the (discounted[125]) present value of Dongbu Steel's future free cash flows did not match the book value of its liabilities, meaning that if the company eventually retired all of its debt at a cost equal to the book value of Dongbu Steel's liabilities prevailing at the time, the company's shares would have negative present value, under PWC's methodology.  The PWC reports indicate that proposed equity conversions might have been advantageous for Dongbu Steel's creditors' ability to recover as much as possible of their existing debt investments in the company, but the PWC reports did not show that the proposed debt-to-equity conversions would be advantageous as equity investments in and of themselves.  Most relevant, the PWC reports and the subsequent analyses were never intended to evaluate the value of the equity investments or return on the equity infusions themselves.  The PWC reports and subsequent analyses' calculations of the company's value as a going concern do not account for creditors' claims on Dongbu Steel's free cash flows and non-business use assets.  Thus, the methodology used in the PWC reports and subsequent analyses calculated the value of the company as a whole (as a going concern or under liquidation) and not the risk or return from the equity investments themselves.

*19 CFR 351.507(a)(4)(i)(B) ("Current and past indicators of the recipient firm's financial health, calculated from the firm's statements and accounts")*:

We also have considered the following to be ordinary financial standards for the purposes of evaluating Dongbu Steel's equityworthiness at the time of each equity infusion:[126]

1) current ratios over 2;
2) quick ratios over 1;
3) debt-to-equity ratios under 1;
4) positive net income, net profit margin, and return on shareholder equity;
5) interest coverage ratios over 2.5;
6) ratio of free cash flow over interest expense over 2.5;
7) ratio of operating cash flow over interest expense over 2.5;
8) positive ratio of free cash flow over shareholder equity;[127]

---

[124] *See* Dongbu IQR, Exhibit B-7, at Part 6.4, section "Calculate Result of Going Concern Value:  Scenario 2."

[125] PWC's analysis is based on the future value of Dongbu's free cash flows, discounted on a risk and required return adjusted basis.  For example, the 2014 PWC Report used an 8.6 percent weighted-average cost of capital as a discount rate.

[126] Dongbu calculated and labeled the ratios according to our instructions.  We have used the reported ratios in our analysis but have used their correct names here.  We have not considered it necessary for a firm to satisfy all of these financial ratio standards to be considered equityworthy.  However, a firm failing to meet a majority or significant minority of these standards for a majority or significant majority of the years in question, or certain key ratios being particularly poor could be considered an indication of unequityworthiness.

[127] The ratios of free cash flows and operating cash flows over interest expenses are similar to the interest coverage ratio.  Accordingly, we have used a ratio of 2.5 as the standard by which to evaluate these ratios, consistent with the interest coverage ratio.  We have also considered positive return on equity and positive ratios of free cash flows and operating cash flows over shareholder's equity to be adequate for the purpose of serving to indicate equityworthiness, consistent with positive net income.

17

9)  positive ratio of operating cash flow over shareholder equity; and
10) positive ratio of levered free cash flow over shareholder's equity.[128]

Dongbu Steel's responses show the company had the following financial ratios during 2012-2018, calculated from their separate financial statements for each year:[129]

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|
| Quick Ratio | [ | | | | | | ] |
| Current Ratio | [ | | | | | | ] |
| Debt-to-equity | [ | | | | | | ] |
| Return on Equity | [ | | | | | | ] |
| Net Profit Margin | [ | | | | | | ] |
| Ratio of Operating Cash Flow over Interest Expense | [ | | | | | | ] |
| Ratio of Free Cash Flow over Interest Expense | [ | | | | | | ] |
| Ratio of Operating Cash Flow over Shareholders' Equity | [ | | | | | | ] |
| Ratio of Free Cash Flow over Shareholders' Equity | [ | | | | | | ] |
| Interest Coverage Ratio | [ | | | | | | ] |
| Levered Free Cash Flow Over Shareholder's Equity | [ | | | | | | ] |

---

[128] We note that the ratio of levered free cash flow over equity is more similar to return on equity compared to the ratio of free cash flow over equity because both return on equity and levered free cash flow over equity account for debt service obligations (such as interest expense), while free cash flow does not.  Levered free cash flow is free cash flow less debt service payments, such as interest and principal payments.
[129] *See* Dongbu's letter, "Third Supplemental Questionnaire Response," dated May 28, 2021, Exhibit G-34.

18

February 16, 2015 Debt-To-Equity Conversion:

As shown above, at the end of 2015 and the preceding three years, prior to Dongbu Steel's first debt-to-equity conversion, Dongbu Steel's current ratio never exceeded [    ] and Dongbu Steel's quick ratio never exceeded [    ], both below ordinary financial standards, demonstrating that Dongbu Steel's liquidity was poor.  Dongbu Steel'debt-to-equity ratios at the end of 2015 and the preceding three years were never below [    ], and Dongbu Steel's debt-to-equity ratio was [    ] at the end of 2014 and [    ] at the end of 2015.  Dongbu Steel's net profit was [        ] during 2015 and during the preceding three years.  Accordingly, Dongbu Steel's net profit margin and return on equity ratios were also [        ].  Dongbu Steel's interest coverage ratio (*i.e.*, earnings before interest and taxes (EBIT) over interest expense) never exceeded [    ] and was [    ] in 2014.  Dongbu Steel's ratio of operating cash flow over interest expense was never higher than [    ] and Dongbu Steel's operating cash flow over interest expense was also [    ] in 2013.  Dongbu Steel's ratio of free cash flow (*i.e.*, operating cash flow net of capital expenditures) over interest expense was never higher than [    ] and was [    ] in 2013 and [    ] in 2014.  Dongbu Steel's free cash flow over interest expense was also [        ] in 2015.  These ratios indicate that Dongbu Steel's cash flow was very low compared to its interest expenses and capital expenditures.  Dongbu Steel's ratios of operating cash flow and free cash flow to shareholder's equity were positive in 2012, 2013, and 2014.  However, this is offset by the fact that Dongbu Steel's ratios of operating cash flow and free cash flow over interest expense were [        ] in 2012, and were [        ] in 2013 and 2014 that Dongbu Steel [        ] in those years.  Also, Dongbu Steel's ratios of operating cash flow and free cash flow over shareholder's equity were both [        ] in 2015.  Finally, Dongbu Steel's levered free cash flow over shareholder's equity was [        ] in 2012, 2013, 2014, and 2015.  Accordingly, Dongbu Steel's current and past indicators of financial health show that Dongbu Steel was unequityworthy at the time of the February 16, 2015 debt to equity conversion.

May 9, 2016 Debt-To-Equity Conversion:

As shown above, at the end of 2016 and the preceding three years, prior to Dongbu Steel's second debt-to-equity conversion, Dongbu Steel's current ratio never exceeded [    ] and Dongbu Steel's quick ratio never exceeded [    ], both below ordinary financial standards, demonstrating that Dongbu Steel's liquidity was poor.  Dongbu Steel's debt-to-equity ratios at the end of 2016 and the preceding three years were never below [    ], and Dongbu Steel's debt-to-equity ratio was [    ] at the end of 2014, [    ] at the end of 2015, and [    ] at the end of 2016.  Dongbu Steel's net profit was [        ] during 2016 and during the preceding three years.  Accordingly, Dongbu Steel's net profit margin and return on equity ratios were also [        ].  Dongbu Steel's interest coverage ratio never exceeded [    ] and was [    ] in 2014.  Dongbu Steel's operating cash flow over interest expense was never higher than [    ] and was [    ] in 2013 and [    ] in 2014.  Dongbu Steel's operating cash flow over interest expense was also [        ] in 2015.  Dongbu Steel's free cash flow over interest expense was never higher than [    ] and was [    ] in 2013 and [    ] in 2014.  Dongbu Steel's free cash flow over interest expense was also [        ] in 2015.  These ratios indicate that Dongbu Steel's cash flow was very low compared to its interest expenses and capital expenditures.  Dongbu Steel's ratios of

operating cash flow and free cash flow to shareholder's equity were positive in 2013, 2014, and 2016. However, this is more than offset by the fact that Dongbu Steel's operating cash flow and free cash flow over interest expense were inadequate in 2016 and were [      ] in 2013 and 2014 that Dongbu Steel [

]. Also, Dongbu Steel's

ratios of operating cash flow and free cash flow over shareholder's equity were both [             ] in 2015. Finally, Dongbu Steel's levered free cash flow over shareholder's equity was [        ] in 2013, 2014, 2015, and 2016. Accordingly, Dongbu Steel's current and past indicators of financial health show that Dongbu Steel was unequityworthy at the time of the May 9, 2016 debt-to-equity conversion.

April 3, 2018 Debt-To-Equity Conversion:

As shown above, at the end of 2018 and the preceding three years, prior to Dongbu Steel's third debt-to-equity conversion, Dongbu Steel's current ratio never exceeded [     ] and Dongbu Steel's quick ratio never exceeded [     ], both below ordinary financial standards, demonstrating that Dongbu Steel's liquidity was poor. Dongbu Steel's debt-to-equity ratios at the end of 2018 and the preceding three years were never below [     ], and Dongbu Steel's debt-to-equity ratio was [     ] at the end of 2015, [     ] at the end of 2016, [     ] at the end of 2017, and [     ] at the end of 2018. Dongbu Steel's net profit was [        ] during 2018 and during the preceding three years. Accordingly, Dongbu Steel's net profit margin and return on equity ratios were also [        ]. Dongbu Steel's interest coverage ratio never exceeded [     ] and was [     ] in 2016, [     ] in 2017, and [     ] in 2018. Dongbu Steel's operating cash flow over interest expense was never higher than [     ] and was [     ] in 2017. Dongbu Steel's operating cash flow over interest expense was also [        ] in 2015 and 2018. Dongbu Steel's ratio of free cash flow over interest expense was never higher than [     ] and was [     ] in 2017. Dongbu Steel's free cash flow over interest expense was also [        ] in 2015 and 2018. These ratios indicate that Dongbu Steel's cash flow was very low compared to its interest expenses and capital expenditures. Dongbu Steel's ratios of operating cash flow and free cash flow over shareholder's equity were positive in 2016 and 2017. However, this is offset by the fact that Dongbu Steel's ratios of operating cash flow over interest expense and Dongbu Steel's ratios of free cash flow over interest expense were inadequate in 2016 and were [        ] in 2017 that Dongbu Steel [

], and [

]. Finally, Dongbu Steel's ratios of operating cash flow and free cash flow over shareholder's equity were both [        ] in 2015 and 2018. Also, Dongbu Steel's levered free cash flow over shareholder's equity was [        ] in 2015, 2016, 2017, and 2018. Accordingly, Dongbu Steel's current and past indicators of financial health show that Dongbu Steel was unequityworthy at the time of the April 3, 2018 debt-to-equity conversion.

*19 CFR 351.507(a)(4)(i)(C) ("Rates of return on equity in the three years prior to the government equity infusion")*:

As explained above, Dongbu Steel failed to make a profit from 2012 through 2018. Thus, Dongbu Steel had no returns in the three years prior to any of the three debt-to-equity conversions.

*19 CFR 351.507(a)(4)(i)(D) ("Equity Investments in the firm by private investors")*:

As explained above, the private investor participation in the debt-to-equity conversions was not "significant" within the meaning of 19 CFR 351.507(a)(2)(iii). Thus, the private prices are also not usable for our equityworthiness analyses for the reasons explained above.

For the reasons explained above, we have determined that Dongbu Steel was not equityworthy at the time of either the February 16, 2015, May 9, 2016, or April 3, 2018 debt-to-equity conversion. Because we preliminarily find Dongbu Steel to be unequityworthy at the time of each of the first, second, and third debt-to-equity conversions, we find the benefit to be the entire amount of the debt-to equity infusion made by GOK-owned or controlled financial institutions, in accordance with 19 CFR 351.507(a)(6). In accordance with 19 CFR 351.507(a)(7)(c), we treated the benefit as a non-recurring subsidy and allocated the benefit over the AUL in accordance with 19 CFR 351.524(d). Based on the unequityworthiness of the first, second, and third debt-to-equity conversions and based on private investor share prices for the last equity infusion, we preliminarily determine the subsidy provided to Dongbu Steel by the GOK for the equity infusions to be 5.09 percent *ad valorem* during the POR. For a complete discussion regarding the calculation of Dongbu Steel's subsidy rate under this program, *see* Preliminary Results Calculation Memorandum.

## II.    Recommendation

We recommend that you approve the positions presented above.

☒                          ☐
‾‾‾‾‾‾‾‾                    ‾‾‾‾‾‾‾‾
Agree                      Disagree


‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Irene Darzenta Tzafolias
Director, Office VIII
Antidumping and Countervailing Duty Operations

**Tab 9**

**CR Doc. 260**
**PR Doc. 177**

**Memorandum from Dennis McClure, Int'l Trade Compliance Analyst, Office VIII, AD/CVD Operations to Robert Palmer, Program Manager, Office VIII, AD/CVD Operations, "Countervailing Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Preliminary Results Calculation for KG Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd. (collectively, Dongbu)," (July 12, 2021).**

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-580-879
Administrative Review
POR: 01/01/19 – 12/31/19
E&C VIII: DM
***Business Proprietary Document***
**PUBLIC VERSION**

DATE:                July 12, 2021

MEMORANDUM TO:      Robert Palmer
                    Program Manager, Office VIII
                    AD/CVD Operations

FROM:               Dennis McClure DM
                    International Trade Compliance Analyst, Office VIII
                    AD/CVD Operations

RE:                 Countervailing Duty Administrative Review of Certain Corrosion-
                    Resistant Steel Products from the Republic of Korea

SUBJECT:            Preliminary Results Calculation for KG Dongbu Steel Co., Ltd.
                    and Dongbu Incheon Steel Co., Ltd. (collectively, Dongbu)

_____

The following is an explanation of the calculation methodology used by the Department of Commerce (Commerce) in the preliminary countervailing duty (CVD) administrative review of certain corrosion-resistant steel products (corrosion-resistant steel) from the Republic of Korea. The period of review (POR) is January 1, 2019, through December 31, 2019. We are also attaching the calculations for the above-referenced preliminary results for Dongbu. A summary of the calculated countervailable subsidy rates can be found at Attachment I; Attachment IV contains the detailed calculations.

Preliminary Results Subsidy Rate: 10.52 percent

## I.    General

A.    Exchange Rate

We made currency conversions for the POR based on the exchange rates reported by the Federal Reserve at https://www.federalreserve.gov/releases/g5/default.htm.[1]

_____

[1] *See* Attachment IV.



B.     <u>Sales Value/Denominator</u>

In their initial questionnaire response, KG Dongbu Steel Co., Ltd. (Dongbu Steel) and its wholly owned subsidiary, Dongbu Incheon Steel Co., Ltd. (Dongbu Incheon), reported their total sales, export sales, and subject merchandise sales on "free on board" (FOB) terms, after adjustment for marine transportation, insurance (for export sales), and inland freight (for domestic sales) from their respective net book value.[2]  As explained in the PDM, Dongbu Steel and Dongbu Incheon are both producers of the subject merchandise, (*i.e.*, corrosion-resistant steel); pursuant to 19 CFR 351.525(b)(6)(ii), we attributed subsidies received by Dongbu Steel and/or Dongbu Incheon to the sales of both companies.[3]

For Korea Development Bank (KDB) short-term discounted loans for export receivables program, as the benefit was only calculated on subject merchandise sales to the United States, we have used the subject merchandise export sales to the United States reported by Dongbu Steel and Dongbu Incheon as the sales denominator, consistent with 19 CFR 351.525(b)(4) and (5).

## II.     Loan Benchmarks

A.     <u>Short-term Loans</u>

For programs requiring the application of a benchmark interest rate, 19 CFR 351.505(a)(1) states a preference for using an interest rate that the company would have paid on a comparable commercial loan on the market.  In addition, 19 CFR 351.505(a)(3)(i) stipulates that when selecting a comparable commercial loan that the recipient "could actually obtain on the market," Commerce will normally rely on actual short-term obtained by the firm.  Therefore, for Dongbu's KDB short-term discounted loans for export receivables program during the POR, we used Dongbu's outstanding short-term interest rates from reported comparable commercial bank loans in U.S. dollars for the D/A financing during the POR, as Dongbu's short-term loan benchmark for this program.  Specifically, we used the 4.91 percent interest rate for the POR.[4]

We are using rates from the International Monetary Fund's (IMF) International Financial Statistics 2019 as a benchmark to measure the benefit received from Dongbu's short-term KRW-denominated loans for Dongbu's Korea Export Import Bank (KEXIM) import financing and restructured loan program because there was no short-term borrowing in Korean Won for these two programs.  The IMF's 2019 short-term Korean Won (KRW)-denominated loan rate is 3.45 percent.[5]  As a result, the *ad valorem* subsidy rate is zero for the short-term KRW-denominated KEXIM import financing and 0.01 percent for the restructured loans.[6]

---

[2] *See See* Dongbu's Letter, "Initial Questionnaire Response," dated December 2, 2020 (Dongbu's Initial QR). (IQR) at Exhibits 15-A and 15-B.
[3] *See* Commerce's Memorandum, "Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review," dated concurrently with this memorandum (PDM).
[4] *See* Dongbu IQR at Exhibit A-6.
[5] *See* IMF IFS data https://data.imf.org/?sk=4c514d48-b6ba-49ed-8ab9-52b0c1a0179b&sId=1390030341854.
[6] *See* Attachment IV.

B.    Long-term Loans and Corporate Bonds

For long-term loans and corporate bonds that originated in the year in which we determined
Dongbu to be uncreditworthy (FY 2019),[7] we used the formula described in 19 CFR
351.505(a)(3)(iii) to determine the risk premium to be added to the benchmark.  For the
probability of default by an uncreditworthy company, we used the average default rates reported
for the Caa- to C rated category of companies as published in Moody's Investors Service,
"Corporate Default and Recovery Rates, 1920-2010" (February 2011) at Exhibit 33:  Average
Cumulative Issuer-Weighted Global Default Rates, 1920-2010.  For the probability of default by
a creditworthy company, we used the average default rates for Aaa through Baa.[8]  *See*
Attachment III.  We then added this risk premium to the creditworthy benchmark, which is based
on the three-year corporate bond rate of 2.02 percent for 2019 from Bank of Korea during the
POR.[9]

## III.    Calculation of *Ad Valorem* Rates for Countervailable Programs

A.    KEXIM Import Financing

Dongbu Incheon reported outstanding financing during the POR.  To calculate the benefit from
this KEXIM import financing program, we chose the appropriate loan benchmark as described
above and performed the following calculations.

For each of these loans:

1.    We first multiplied the loan principal by the corresponding benchmark interest rate and
      the number of days the interest payment covers, as reported by the respondent, and
      divided by 360 days to obtain a benchmark interest payment (in original currency).
2.    Next, we compared the calculated benchmark interest payment with the actual interest
      paid by the company during the POR (in original currency) to derive the benefit for each
      loan.  For loans for which we calculated a negative benefit, *i.e.*, the interest payment was
      higher than Commerce's benchmark, we set the benefit to zero.

As the benchmark interest payments are all lower than the actual interest respondent paid, we
preliminarily found there is no benefit and a countervailable subsidy of 0.00 percent *ad valorem*
for this program for FY 2019.

B.    Korea Development Bank (KDB) and Industrial Base Fund (IBF) Short-Term Discounted
      Loans for Export Receivables

Dongbu reported outstanding KDB D/A financing loan during the POR.  To calculate the benefit
from this program, we chose the appropriate loan benchmark as described above and performed
the following calculations.

---

[7] *See* PDM at Dongbu's Creditworthiness Section.
[8] *See* Attachment II.
[9] *See* Attachment III.

3

For each of these loans:

1. We first multiplied the loan principal by the corresponding benchmark interest rate and the number of days the interest payment covers, as reported by the respondents, and divided by 360 days to obtain a benchmark interest payment (in original currency).
2. Next, we compared the calculated benchmark interest payment with the actual interest paid by the company during the POR (in original currency) to derive the benefit for each loan. For loans for which we calculated a negative benefit, *i.e.*, the interest payment was higher than Commerce's benchmark, we set the benefit to zero.
3. Finally, we summed all benefits for each of these loans to arrive at the total program benefit for that company. We converted all benefits to KRW using the POR average exchange rate.

In accordance with the attribution analysis above, we divided Dongbu's 2019 benefits by Dongbu Steel's and Dongbu Incheon's U.S. sales of subject merchandise during 2019, to derive the subsidy rate. We preliminarily found a countervailable subsidy of 0.01 percent *ad valorem* for the POR.

C.  Dongbu's Debt Restructuring

As explained in the PDM, we preliminarily determined that Dongbu received countervailable subsidy from the debt restructuring program during the POR, through the restructured short-term and long-term loans, and corporate bonds, that Dongbu received from the Government of Korea (GOK)-controlled banks (*i.e.*, CBSF, KDB, KoFC, KEXIM, Woori, and the IBK).[10]  We also preliminarily determined that Dongbu Steel was uncreditworthy in FY 2019 and calculated a long-term loans and corporate bonds benchmark. To calculate the benefit from the reported restructured loans received during the POR that had outstanding balances, we chose the appropriate loan benchmark as described above and performed the following calculations.

For each of these loans:

1. We first multiplied the loan principal by the corresponding benchmark interest rate and the number of days the interest payment covers, as reported by the respondents, and divided by 360 days to obtain a benchmark interest payment (in original currency).
2. Next, we compared the calculated benchmark interest payment with the actual interest paid by the company during the POR (in original currency) to derive the benefit for each loan. For loans for which we calculated a negative benefit, *i.e.*, the interest payment was higher than the Department's benchmark, we set the benefit to zero.
3. Finally, we summed all benefits for each of these loans to arrive at the total program benefit for Dongbu Steel during the POR.

In accordance with the attribution analysis above, we divided Dongbu Steel's benefits by its total combined sales in 2019 to derive the subsidy rate for the POR. We preliminarily found a countervailable subsidy of 5.38 percent *ad valorem* for the POR.

---

[10] *See* PDM at Dongbu's Debt Restructuring Section.

D.  Energy Savings Program Subsidies – Trading of Demand Response Resources (DRR)

Dongbu Steel reported it received energy savings subsidy under the Trading of Demand Response Resources program during the POR.  We divided the benefit amount by the total sales in 2019.  We preliminarily found a countervailable subsidy of 0.03 percent *ad valorem*.  *See* Attachment IV.

E.  Reduction for Sewerage Fees

To calculate the net countervailable subsidy rate for the POR, we divided the total benefit amount reported by Dongbu Incheon by the total combined sales during the POR.  On this basis, we preliminarily determine a net subsidy rate of 0.01 percent *ad valorem*.  *See* Attachment IV.

F.  Electricity Purchased for Less Than Adequate Remuneration

As noted in the Electricity for LTAR section of the PDM, we examined KEPCO's submitted process for allocating cost and compared it to Exhibit E-17.1 of GOK NSAIQR.[11]  This process coincides with the cost data submitted.

> Step 1. Calculate the aggregate amount of the cost, which includes a reasonable amount of the investment return;[12]
> Step 2. Distribute the aggregate amount of the cost into four categories; generation, transmission, distribution and sales of electricity;[13]
> Step 3. Divide the distribution cost into three categories; high voltage (over 22.9 kV), low voltage (less than 22.9 kV) and the customer management cost ("CMC");[14]
> Step 4. Divide the sales cost into two categories; the customer management fee and other costs;[15]
> Step 5. Distribute each cost into fixed charge and variable charge;[16]
> Step 6. Divide the cost into each class considering the load level, the electricity consumption pattern, and the amount of the electricity consumed;[17]
> Step 7. Distribute the cost according to the number of customers for each classes;[18] and

---

[11] *See* GOK Letter, "New Subsidy Allegations Supplemental Questionnaire Response," dated March 11, 2021 (GOK NSAS1); *see also,* PDM at Electricity for LTAR Section.
[12] *See* GOK NSAS1, Exhibit E-17.1 at [          ].
[13] *See* GOK NSAS1, Exhibit E-17.1 at [          ].
[14] *See* GOK NSAS1, Exhibit E-17.1 at [                                    ]; *see also* GOK Letter. "New Subsidy Allegations Questionnaire Response," dated February 23, 2021 (GOK NSAS1), Exhibit E-19 at 12 – 13.
[15] *See* GOK NSAS1, Exhibit E-17.1 at [                              ]; *see also*, GOK NSAIQR, Exhibit E-19 at 12 – 13.
[16] *See* GOK NSAS1, Exhibit E-17.1 at [                              ]; *see also*, GOK NSAS1 at 13 and GOK NSAIQR, Exhibit E-19 at page 15.
[17] *See* GOK NSAS1, Exhibit E-17.1 at [                                    ];  *see also,* GOK NSAIQR, Exhibit E-19 at 15 – 17.
[18] *See* GOK NSAS1, Exhibit E-17.1 at [                    ]; *see also* GOK NSAIQR, Exhibit E-19 at 15 – 17.

5

Step 8. Aggregate the cost for each electricity class: Σcost for each class (cost for the generation, transmission, distribution, sales of each class) ÷ sales volume for each class[19]

At the end of this process, in the **[          ] {GOK BPI}** tab in Exhibit E-17.1 of GOK NSASQ1, KEPCO listed the cost recovery for the company and tariff classifications. We noted KEPCO had an overall cost recovery of **[      ] {GOK BPI}**.[20] For the industrial tariff classification, however, KEPCO had a cost recovery of **[          ] {GOK BPI}**.[21] Dongbu reported their electricity groups within the Industrial classification.[22] This electricity was for [          ] and the cost recovery for this **[          ] {GOK BPI}** overall and the **[          ] {GOK BPI}**.[23] In addition, Dongbu reported using electricity at [          ].[24] The cost recovery for **[                    ] {GOK BPI}**.[25]

With regard to the **[                              ] {GOK BPI}**, we preliminarily find that KEPCO accounted for the costs and demonstrated the company recovered costs and included a rate of return that comports with our market principles analysis. For the **[          ] {GOK BPI}**, the information on the record demonstrates the company did not recover costs. We note that the use of [                    ] electricity relates to non-production purposes (*i.e.*, dormitories). However, when we calculate a potential benefit for each respondent, [                                        ], the result is a non-measurable benefit.[26]

## G. Equity Infusions

In the PDM, we indicate that we have determined that Dongbu Steel received government equity infusions as a result of debt-equity conversions made under its 2014, 2015-2016, 2017-2018, and 2019 debt reorganizations.[27] We further explain that Dongbu Steel was unequityworthy at the time of the 2014, 2015-2016, and 2017-2018 equity infusions. 19 CFR 351.507(a)(6) provides that if Commerce "determines that the firm or project was unequityworthy {within the meaning of with 19 CFR 351.507(a)(4)}, a benefit to the firm exists in the amount of the equity infusion." Accordingly, we have calculated benefits under the Dongbu Steel Government Equity Infusions Program according to the entire amount of the equity infusions made by GOK owned or controlled financial institutions, in accordance with 19 CFR 351.507(a)(6) for the 2014, 2015-2016, and 2017-2018 equity infusions. For the 2019 equity infusion, we used private investor prices and determined the benefit pursuant to 19 CFR 351.507(a)(1) and 19 CFR 351.507(a)(2)(i). We have calculated the benefit for the 2019 equity infusion based on the difference between the share price relating to the debt-to-equity conversion for the government-

---

[19] *See* GOK NSAS1, Exhibit E-17.1 at [                                        ]; *see also* GOK NSAIQR, Exhibit E-19 at 18.
[20] *See* GOK NSAS1, Exhibit E-17.1 at [          ].
[21] *Id.*
[22] *See* Dongbu's Letter, "New Subsidy Allegations Response," dated February 9, 2021 (Dongbu NSAIQR) at 2.
[23] *See* GOK NSASQ1, Exhibit E-17.1 at [          ].
[24] *See* Dongbu NSAIQR at 3.
[25] *See* GOK NSAS1, Exhibit E-17.1 tab [          ].
[26] *See* Attachment 1.
[27] *See* PDM at Dongbu's Debt Restructuring Section.

6

controlled creditors involved in the debt restructuring and the private investor share price relating to the investors involved in the merger and acquisition.

We have determined that the years of receipt of benefit of these equity infusions were 2015, 2016, 2018, and 2019, in accordance with 19 CFR 351.507(b), and have allocated the benefits received over the 15-year average useful life (AUL), in accordance with 19 CFR 351.507(c) and 19 CFR 351.524(b).  We have determined the years of award for the first, second, third, and fourth equity infusions to be the years in which the Creditors Committees approved each equity infusion as part of the respective restructuring plans:  2014 for the first equity infusion, 2016 for the second equity infusion, 2017 for the third equity infusion, and 2019 for the fourth equity infusion.[28]  We used the year of award to perform the "0.5%" test, in accordance with 19 CFR 351.524(b)(2).[29]  We have determined the year of receipt to be the same year as the equity infusions took effect:  2015 for the first equity infusion, 2016 for the second equity infusion, 2018 for the third equity infusion, and 2019 for the fourth equity infusion, and we used the year of receipt to allocate each benefit, in accordance with 19 CFR 351.524(b)(2).[30]  Because we preliminarily found Dongbu Steel to be uncreditworthy from 2014 through 2018, we have used uncreditworthy discount rates for 2015, 2016, 2018, and 2019 to allocate benefits for each equity infusion, calculated using 2014, 2016, 2017, and 2019 interest rates for AA- rated corporate bonds published by the Bank of Korea.[31]  To calculate the *ad valorem* rates for each equity infusion, we divided the POR benefit amount by Dongbu Steel's and Dongbu Incheon's combined 2019 FOB sales.[32]  Finally, to calculate the total benefit under the program, we summed the *ad valorem* rates for each equity infusion.[33]  On this basis, we preliminarily found a countervailable subsidy under this program of 5.09 percent, *ad valorem*, for the POR.


**ATTACHMENTS**

Attachment I:       Summary of Preliminary Subsidy Rates (Public)
Attachment II:      Average Cumulative Issuer-Weighted Global Default Rates, 1920-2010 (Public)
Attachment III      Benchmark: Bank of Korea's 3-Year Corporate Bond Rate (Public)
Attachment IV:      Detailed Preliminary Benefit Calculations (Excel Data Spreadsheet, Business Proprietary and Not Subject to Public Summarization)

---

[28] *See* PDM at Dongbu's Debt Restructuring Section.
[29] *See* Attachment IV at worksheet "Equity Infusions."
[30] *Id.*
[31] *See* Attachments II, III and Attachment IV at worksheets "KWS, UCW BM" and "Equity Infusions;" *see also* PDM at Dongbu's Creditworthiness Section
[32] *See* Attachment IV at worksheets "Sales," and "Equity Infusions."
[33] *See* Attachment I and Attachment IV at worksheets "Summary" and "Equity Infusions."

Barcode:4142967-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Attachment I

Summary of Preliminary Subsidy Rates (Public)

Barcode:4142967-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**C-580-879**
**Countervailing Duty Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea**
**Preliminary Results**
**Dongbu Steel Co., Ltd./Dongbu Incheon Steel Co., Ltd.**

**Benefit Calculations**

2019

| Program Name | Rate |
|---|---|
| LTAR for Electricity | 0.00% |
| Fee Reduction for Sewer Usage | 0.01% |
| Demand Response Energy Savings Program | 0.03% |
| KEXIM Import Financing | 0.00% |
| Korea Development Bank (KDB) and Industrial Base Fund (IBF) Loans | 0.01% |
| Dongbu's Debt Restructuring | 5.38% |
| Equity Infusions under the 2014-2015, 2016, 2017-2018, and 2019 Dongbu's Debt Restructuring | 5.09% |
| **Total Rate** | **10.52%** |

Barcode:4142967-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Attachment II

Average Cumulative Issuer-Weighted Global Default Rates, 1920-2010 (Public)

Barcode:4142967-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

# Attachment III

Benchmark: Bank of Korea's 3-Year Corporate Bond Rate (Public)



# Attachment IV

(Excel Data Spreadsheet, Business Proprietary and Not Subject to Public Summarization)

**Tab 10**

**PR Doc. 213**

**Memorandum from James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations to Lisa W. Wang, Assistant Secretary for Enforcement and Compliance, "Issues and Decision Memorandum for the Final Results and Partial Rescission of the 2019 Administrative Review of the Countervailing Duty Order on Certain Corrosion Resistant Steel Products from the Republic of Korea," (Jan. 12, 2022).**

Case 1:22-cv-00047-JCG    Document 71    Filed 01/23/24    Page 420 of 526

Barcode:4200434-02 C-580-879 REV - Admin Review of AD or CVD Orde...

UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

C-580-879
Administrative Review
POR: 01/01/2019-12/31/2019
**Public Document**
E&C/OVIII: JS/DM

January 12, 2022

**MEMORANDUM TO:**      Lisa W. Wang
                        Assistant Secretary
                          for Enforcement and Compliance

**FROM:**               James Maeder
                        Deputy Assistant Secretary
                          for Antidumping and Countervailing Duty Operations

**SUBJECT:**            Issues and Decision Memorandum for the Final Results and Partial
                        Rescission of the 2019 Administrative Review of the
                        Countervailing Duty Order on Certain Corrosion-Resistant Steel
                        Products from the Republic of Korea

---

## I.    SUMMARY

The Department of Commerce (Commerce) analyzed the case and rebuttal briefs submitted by interested parties in the administrative review of the countervailing duty (CVD) order on certain corrosion-resistant steel products (CORE) from the Republic of Korea (Korea) covering the period of review (POR) January 1, 2019, through December 31, 2019.  As a result of this analysis, we made certain changes to the *Preliminary Results*.[1]  We recommend that you approve the positions described in the "Discussion of Comments" section of this memorandum.

Below is a complete list of the issues in this review for which we received comments from parties:

|            |                                                                                       |
|------------|---------------------------------------------------------------------------------------|
| Comment 1: | Whether Electricity Is Subsidized by the Government of the Republic of Korea (GOK)     |
| Comment 2: | Whether Commerce's Determination that Port Usage Rights Provide a Countervailable Benefit Is Unsupported by Evidence and Contrary to Law |
| Comment 3: | Whether Commerce Incorrectly Countervailed the Reduction for Sewerage Usage Fees      |
| Comment 4: | Whether the Restructuring of KG Dongbu Steel's Existing Loans by GOK-Controlled Financial Institutions Constitutes a Financial Contribution and a Benefit to KG Dongbu Steel |

---

[1] *See Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86 FR 37740 (July 16, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).


INTERNATIONAL
T R A D E
ADMINISTRATION

Comment 5:    Whether the Restructured Loans Provided to KG Dongbu Steel Were Specific

Comment 6:    Whether Commerce Should Use the Interest Rates from Loans Provided by Private Banks Participating in the Creditor Bank Committee as Benchmarks

Comment 7:    Whether Dongbu Steel is Equityworthy and the 2015-2018 Debt-to-Equity Swaps Should Be Countervailed

Comment 8:    Whether Subsidies Prior to Dongbu Steel's Change in Ownership Pass Through to KG Dongbu Steel

Comment 9:    Whether Commerce Incorrectly Calculated the Uncreditworthy Discount Rate Used for Allocating the Benefits from Long-Term Loans, Bonds, and Equity Infusions

Comment 10:   Whether Commerce Incorrectly Calculated the Discount Rate for the 2019 Government Equity Infusion

## II.     BACKGROUND

On July 16, 2021, Commerce published the *Preliminary Results* of this review.[2]  On August 26, 2021, Nucor Corporation (Nucor), one of the petitioners,[3] timely filed its case brief.[4]  In addition, KG Dongbu Steel Co., Ltd. (KG Dongbu Steel) (formerly Dongbu Steel Co., Ltd. (Dongbu Steel))[5] and its wholly-owned subsidiary Dongbu Incheon Steel Co., Ltd. (Dongbu Incheon) (collectively, KG Dongbu) and Hyundai Steel Company (Hyundai Steel) also timely filed case briefs.[6]  On August 26, 2021, Dongkuk Steel Mill Co., Ltd. (Dongkuk) filed a letter in lieu of a case brief.[7]  On September 7, 2021, the petitioners, Hyundai Steel, KG Dongbu, and the GOK each timely filed rebuttal briefs.[8]

On October 21, 2021, Commerce postponed the final results of the review until December 10, 2021.[9]  On November 30, 2021, Commerce further postponed the final results of the review until January 12, 2022.[10]

We are conducting this review in accordance with section 751 of the Tariff Act of 1930, as amended (the Act).

---

[2] *See Preliminary Results.*

[3] The petitioners are AK Steel Corporation, California Steel Industries, Inc.; Steel Dynamics Inc.; ArcelorMittal USA LLC; Nucor Corporation (Nucor); and United States Steel Corporation.

[4] *See* Nucor's Letter, "Case Brief," dated August 26, 2021 (Nucor's Case Brief).

[5] *See Preliminary Results* PDM at 7.

[6] *See* KG Dongbu's Letter, "Dongbu's Case Brief," dated August 26, 2021 (KG Dongbu's Case Brief); *see also* Hyundai Steel's Letter, "Hyundai Steel's Case Brief," dated August 26, 2021 (Hyundai Steel's Case Brief).

[7] *See* Dongkuk's Letter, "Letter in Lieu of Case Brief," dated August 26, 2021.

[8] *See* Nucor's Letters, "Nucor's Rebuttal Brief regarding KG Dongbu Steel," dated May 11, 2021 (Nucor's Rebuttal Brief re KG Dongbu); and "Nucor's Rebuttal Brief regarding Hyundai Steel," dated May 11, 2021 (Nucor's Rebuttal Brief re Hyundai Steel); *see also* Hyundai Steel and KG Dongbu's Letter, "Respondents' Rebuttal Brief," dated September 7, 2021 (Respondents' Rebuttal Brief); and GOK's Letter, "GOK's Rebuttal Brief," dated September 7, 2021 (GOK's Rebuttal Brief).

[9] *See* Memorandum, "Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Extension of Deadline for Final Results of 2019 Countervailing Duty Administrative Review," dated May 14, 2021.

[10] *See* Memorandum, "Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Second Extension of Deadline for Final Results of 2019 Countervailing Duty Administrative Review," dated November 30, 2021.

## III.    CHANGES SINCE THE *PRELIMINARY RESULTS*

The "Discussion of Comments" section contains summaries of the comments and Commerce's positions on the issues raised in the briefs.  As a result of our analysis, we no longer find the "Reduction for Sewerage Fees" countervailable.  *See* Comment 3 for discussion.

## IV.    SCOPE OF THE ORDER

The products covered by this order are certain flat-rolled steel products, either clad, plated, or coated with corrosion-resistant metals such as zinc, aluminum, or zinc-, aluminum-, nickel – or iron-based alloys, whether or not corrugated or painted, varnished, laminated, or coated with plastics or other non-metallic substances in addition to the metallic coating.  The products covered include coils that have a width of 12.7 mm or greater, regardless of form of coil (*e.g.*, in successively superimposed layers, spirally oscillating, *etc.*).  The products covered also include products not in coils (*e.g.*, in straight lengths) of a thickness less than 4.75 mm and a width that is 12.7 mm or greater and that measures at least 10 times the thickness.  The products covered also include products not in coils (*e.g.*, in straight lengths) of a thickness of 4.75 mm or more and a width exceeding 150 mm and measuring at least twice the thickness.  The products described above may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieved subsequent to the rolling process, *i.e.*, products which have been "worked after rolling" (*e.g.*, products which have been beveled or rounded at the edges).  For purposes of the width and thickness requirements referenced above:

> (1) where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above, and

> (2) where the width and thickness vary for a specific product (*e.g.*, the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this order are products in which:  (1) iron predominates, by weight, over each of the other contained elements; (2) the carbon content is 2 percent or less, by weight; and (3) none of the elements listed below exceeds the quantity, by weight, respectively indicated:

- 2.50 percent of manganese, or
- 3.30 percent of silicon, or
- 1.50 percent of copper, or
- 1.50 percent of aluminum, or
- 1.25 percent of chromium, or
- 0.30 percent of cobalt, or
- 0.40 percent of lead, or
- 2.00 percent of nickel, or

- 0.30 percent of tungsten (also called wolfram), or
- 0.80 percent of molybdenum, or
- 0.10 percent of niobium (also called columbium), or
- 0.30 percent of vanadium, or
- 0.30 percent of zirconium

Unless specifically excluded, products are included in this scope regardless of levels of boron and titanium.

For example, specifically included in this scope are vacuum degassed, fully stabilized (commonly referred to as interstitial-free ("IF")) steels and high strength low alloy ("HSLA") steels. IF steels are recognized as low carbon steels with micro-alloying levels of elements such as titanium and/or niobium added to stabilize carbon and nitrogen elements. HSLA steels are recognized as steels with micro-alloying levels of elements such as chromium, copper, niobium, titanium, vanadium, and molybdenum.

Furthermore, this scope also includes Advanced High Strength Steels ("AHSS") and Ultra High Strength Steels ("UHSS"), both of which are considered high tensile strength and high elongation steels.

Subject merchandise also includes corrosion-resistant steel that has been further processed in a third country, including but not limited to annealing, tempering painting, varnishing, trimming, cutting, punching and/or slitting or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the in-scope corrosion resistant steel.

All products that meet the written physical description, and in which the chemistry quantities do not exceed any one of the noted element levels listed above, are within the scope of this order unless specifically excluded. The following products are outside of and/or specifically excluded from the scope of this order:

- Flat-rolled steel products either plated or coated with tin, lead, chromium, chromium oxides, both tin and lead ("terne plate"), or both chromium and chromium oxides ("tin free steel"), whether or not painted, varnished or coated with plastics or other non-metallic substances in addition to the metallic coating;
- Clad products in straight lengths of 4.7625 mm or more in composite thickness and of a width which exceeds 150 mm and measures at least twice the thickness; and
- Certain clad stainless flat-rolled products, which are three-layered corrosion-resistant flat-rolled steel products less than 4.75 mm in composite thickness that consist of a flat-rolled steel product clad on both sides with stainless steel in a 20%-60%-20% ratio.

The products subject to the order are currently classified in the Harmonized Tariff Schedule of the United States ("HTSUS") under item numbers: 7210.30.0030, 7210.30.0060, 7210.41.0000, 7210.49.0030, 7210.49.0040, 7210.49.0045, 7210.49.0091, 7210.49.0095, 7210.61.0000,

7210.69.0000, 7210.70.6030, 7210.70.6060, 7210.70.6090, 7210.90.6000, 7210.90.9000, 7212.20.0000, 7212.30.1030, 7212.30.1090, 7212.30.3000, 7212.30.5000, 7212.40.1000, 7212.40.5000, 7212.50.0000, and 7212.60.0000.[11]

The products subject to the order may also enter under the following HTSUS item numbers: 7210.90.1000, 7215.90.1000, 7215.90.3000, 7215.90.5000, 7217.20.1500, 7217.30.1530, 7217.30.1560, 7217.90.1000, 7217.90.5030, 7217.90.5060, 7217.90.5090, 7225.91.0000, 7225.92.0000, 7225.99.0090, 7226.99.0110, 7226.99.0130, 7226.99.0180, 7228.60.6000, 7228.60.8000, and 7229.90.1000.

The HTSUS subheadings above are provided for convenience and customs purposes only.  The written description of the scope of the order is dispositive.

## V.      RESCISSION OF ADMINISTRATIVE REVIEW, IN PART

Commerce initiated a review of 39 companies in this segment of the proceeding.[12]  In the *Preliminary Results*, we inadvertently included Dongkuk as a respondent in this administrative review.[13]  However, Dongkuk is not subject to the CVD order on CORE from Korea.[14]  Accordingly, we are rescinding the review with respect to Dongkuk.

## VI.     PERIOD OF REVIEW

The POR is January 1, 2019, through December 31, 2019.

## VII.    SUBSIDIES VALUATION INFORMATION

### A.      Allocation Period

We made no changes to the allocation period and the allocation methodology used in the *Preliminary Results.*  No issues were raised by interested parties in case briefs that would lead us to reconsider our preliminary finding regarding the allocation period or the allocation methodology for the respondent companies.  For a description of the allocation period and the methodology used for these final results, *see* the *Preliminary Results* PDM at 6.

### B.      Attribution of Subsidies

Commerce made no changes to the methodologies used in the *Preliminary Results* for attributing subsidies.  No issues were raised by interested parties in case briefs that would lead us to

---

[11] *See* Memorandum, "Request from Customs and Border Protection to Update the ACE AD Case Reference File," dated July 26, 2021 (explaining the addition of two HTSUS numbers:  7210.49.0040 and 7210.49.0045).
[12] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 54983 (September 3, 2020).
[13] *See Preliminary Results* PDM at Appendix 1.  We also initiated on "Hyundai Steel" and "Hyundai Steel Co.," which, in actuality, refer to the same company.  Accordingly, there are 37 companies still under review.
[14] *See Certain Corrosion-Resistant Steel Products from India, Italy, the People's Republic of China, the Republic of Korea and Taiwan:  Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders*, 81 FR 48390 (July 25, 2016).

reconsider our preliminary finding regarding the attribution of subsidies.  For a description of the methodologies used for these final results, *see* the *Preliminary Results* PDM at 6-8.

### C.     Benchmark Interest Rates

Commerce made no changes to the benchmarks or discount rates used in the *Preliminary Results*.  We addressed the comments raised by interested parties at Comments 6, 9, and 10.  For a description of the benchmarks and discount rates used for these final results, *see* the *Preliminary Results* PDM at 9-10.

### D.     Creditworthiness

In accordance with 19 CFR 351.505(a)(4), Commerce continues to find that KG Dongbu was uncreditworthy during the POR and the year(s) in which KG Dongbu had received restructured long-term loans from the government policy banks and restructured long-term debt held by government policy banks.  Parties did not comment on this issue since the issuance of the *Preliminary Results*.  For a description of our analysis for the final results, *see* the *Preliminary Results* PDM at 10-11.

### E.     Equityworthiness and Existence of Private Investor Prices

In the *Preliminary Results*, we found that Dongbu Steel was not equityworthy at the time of each debt-to-equity conversion for Dongbu Steel's first, second, and third equity infusions.  We made no changes to this finding in the final results.  For a description of our analysis, *see* the *Preliminary Results* PDM at 11-12.  Parties have raised comments regarding this issue; see Comment 7.  For the final results, we continue to find that KG Dongbu received countervailable benefits for all equity infusions.

### F.     Denominators

Commerce has made no changes to the denominators used in the *Preliminary Results*.  No issues were raised by interested parties in case briefs that would lead us to reconsider our preliminary finding regarding the appropriate denominators.  For a description of the denominators used for these final results, *see* the *Preliminary Results* PDM at 12.

## VIII.   ANALYSIS OF PROGRAMS

### A.  Programs Determined to Be Countervailable

### 1.  KG Dongbu's Debt Restructuring

Commerce made no changes to the *Preliminary Results* regarding this program.  *See* Comments 4-6.

KG Dongbu:            5.38 percent *ad valorem*

Case 1:22-cv-00047-JCG    Document 71    Filed 01/23/24    Page 426 of 526

Barcode:4200434-02 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

2. **KG Dongbu's Equity Infusions**

   Commerce made no changes to the *Preliminary Results* regarding this program.  *See* Comments 7-10.

   KG Dongbu:                5.09 percent *ad valorem*

3. **Korea Development Bank (KDB) and Industrial Base Fund (IBF) Short-Term Discounted Loans for Export Receivables**

   Commerce made no changes to the *Preliminary Results* regarding this program.

   KG Dongbu:                0.01 percent *ad valorem*
   Hyundai Steel:            Not used

4. **Restriction of Special Location Taxation Act (RSLTA) – Local Tax Exemptions on Land Outside Metropolitan Areas – Article 78**

   Commerce made no changes to the *Preliminary Results* regarding this program.

   KG Dongbu:                Not used
   Hyundai Steel:            0.01 percent *ad valorem*

5. **Restriction of Special Taxation Act (RSTA) Article 25 (1)(2), formerly RSTA Article 25(2)**

   Commerce made no changes to the *Preliminary Results* regarding this program.

   KG Dongbu:                Not used
   Hyundai Steel:            0.06 percent *ad valorem*

6. **Tax Credit for Investment in Environmental and Safety Facilities under RSTA Article 25(1)(3), formerly RSTA Article 25(3)**

   Commerce made no changes to the *Preliminary Results* regarding this program.

   KG Dongbu:                Not used
   Hyundai Steel:            0.11 percent *ad valorem*

7. **Tax Deduction Under Restriction of Special Taxation Act (RSTA) Article 26**

   Commerce made no changes to the *Preliminary Results* regarding this program.

   KG Dongbu:                Not used
   Hyundai Steel:            0.18 percent *ad valorem*

**8. Electricity Discounts under Trading of Demand Response Resources (DRR) Program**

Commerce made no changes to the *Preliminary Results* regarding this program.

| KG Dongbu: | 0.03 percent *ad valorem* |
| Hyundai Steel: | 0.07 percent *ad valorem* |

**9. Discount of Electricity Fee for Energy Storage System (ESS)**

Commerce made no changes to the *Preliminary Results* regarding this program.

| KG Dongbu: | Not used |
| Hyundai Steel: | 0.02 percent *ad valorem* |

**10. Research and Development (R&D) Grants Provided Under the Industrial Technology Innovation Promotion Act (ITIPA)**

Commerce made no changes to the *Preliminary Results* regarding this program.

| KG Dongbu: | Not used |
| Hyundai Steel: | 0.01 percent *ad valorem* |

**11. Provision of Port Usage Rights at the Port of Incheon**

Commerce made no changes to the *Preliminary Results* regarding this program. *See* Comment 2. In Comment 2, we clarify and continue to find that a benefit was conferred under 19 CFR 351.503(b).

| KG Dongbu: | Not used |
| Hyundai Steel: | 0.01 percent *ad valorem* |

**B. Programs Determined to Be Not Used or Not to Confer a Measurable Benefit During the POR**

**Hyundai Steel**

1. Suncheon Harbor Port Usage Fee Exemptions
2. KEXIM Import Financing
3. KEXIM Short-Term Export Credits
4. KEXIM Export Factoring
5. KEXIM Export Loan Guarantees
6. KEXIM Loan Guarantees for Domestic Facility Loans
7. KEXIM Trade Bill Rediscounting Program
8. KEXIM Overseas Investment Credit Program
9. KDB and IBK Short-Term Discounted Loans for Export Receivables

10. Loans under the Industrial Base Fund
11. K-SURE Export Credit Guarantees
12. K-SURE Short-Term Export Credit Insurance
13. Long-Terms Loans from KORES and KNOC
14. Clean Coal Subsidies
15. GOK Subsidies for "Green Technology R&D" and its Commercialization
16. Support for SME "Green Partnerships"
17. RSTA Article 10(1)(1)
18. RSTA Article 10(1)(2)
19. RSTA Article 10(1)(3)
20. RSTA Article 11
21. RSTA Article 25(1)(4), formerly RSTA Article 94
22. RSTA Article 25(1)(5), formerly RSTA Article 25
23. RSTA Article 25(1)(6), formerly RSTA Article 24
24. RSLTA 57-2
25. RSTA 104(14)
26. RSLTA Articles 19, 31, 46, 84, 57-2, LTA 109, 112, and 137
27. Tax Reductions and Exemptions in Free Economic Zones
28. Grants and Financial Support in Free Economic Zones
29. Modal Shift Program
30. Sharing of Working Opportunities/Employment Creating Incentives
31. GOK Infrastructure Investment at Incheon North Harbor
32. Machinery & Equipment (KANIST R&D) Project
33. Grant for Purchase of Electrical Vehicle
34. Incentive for Early Scrapping of Old Diesel Vehicle
35. Provision of Liquefied Natural Gas (LNG) for Less Than Adequate Remuneration (LTAR)
36. Energy Savings Programs
        Electricity Savings for Designated Period Program
        Electricity Savings through the Bidding Process Program
        Electricity Savings upon an Emergent Reduction Program
        Electricity Savings through General Management Program
        Management of the Electricity Load Factor Program
37. The GOK's Purchases of Electricity for MTAR
38. Incentives for Compounding and Prescription Cost Reduction
39. Incentives for Usage of Yeongil Harbor in Pohang City
40. VAT Exemptions on Imported Goods
41. Incentives for Usage of Gwangyang Port
42. Incentives for Natural Gas Facilities
43. Subsidies for Construction and Operation of Workplace Nursery
44. Subsidies for Hyundai Steel Red Angels Women's Football Club
45. Seoul Guarantee Insurance
46. Subsidies for Pohang Art Festival
47. Fast-Track Restructuring Program
48. Grants for LED Efficiency Improvement
49. Purchase of Land from Government Entities

50. Tax Credits for Electronic Returns
51. VAT Tax Deductions Due to Bad Debt
52. Port Usage Rights at the Port of Incheon
53. Other Transactions with Government Entities
54. Reduction for Sewerage Fees

**KG Dongbu**

1. KEXIM Import Financing
2. RSTA Article 25(1)(2): Tax Deductions for Investments in Energy Economizing Facilities, formerly RSTA Article 25(2)
3. RSLTA Article 78: Acquisition and Property Tax Benefits to Companies Located in Industrial Complexes
4. RSTA Article 26: GOK Facilities Investment Support
5. Provision of LNG for LTAR
6. Energy Savings Programs
   Electricity Savings for Designated Period Program
   Electricity Savings through the Bidding Process Program
   Electricity Savings upon an Emergent Reduction Program
   Electricity Savings through General Management Program
   Management of the Electricity Load Factor Program
7. KEXIM Short-Term Export Credits
8. KEXIM Export Factoring
9. KEXIM Export Loan Guarantees
10. KEXIM Trade Bill Rediscounting Program
11. KEXIM Overseas Investment Credit Program
12. KDB and IBF Loans under the Industrial Base Fund
13. K-SURE Export Credit Guarantees
14. K-SURE Short-Term Export Credit Insurance
15. Long-Terms Loans from KORES and KNOC
16. Special Accounts for Energy and Resources (SAER) Loans
17. Clean Coal Subsidies
18. GOK Subsidies for "Green Technology R&D" and its Commercialization
19. Support for SME "Green Partnerships"
20. Daewoo International Corporation Debt Work Out
21. Research, Supply or Workforce Development Investment Tax Deduction for "New Growth Engines" under RSTA Article 10(1)(1)
23. Research, Supply, or Workforce Development Expense Tax Deductions for "Core Technologies" under RSTA Article 10(1)(2)
24. Tax Reduction for Research and Human Resources Development under RSTA Article 10(1)(3)
25. Tax Credit for Investment in Facilities for Research and Manpower under RSTA Article 11
26. Tax Deduction for Investment in Environmental and Safety Facilities under RSTA Article 25(1)(3), formerly Article 25(3)
27. Tax Program for Third-Party Logistics Operations under RSTA Article 104(14)

28. RSLTA Articles 46, 84
29. Tax Reductions and Exemptions in Free Economic Zones
30. Exemptions and Reductions of Lease fees in Free Economic Zones
31. Grants and Financial Support in Free Economic Zones
32. Modal Shift Program
33. Sharing of Working Opportunities/Employment Creating Incentives
34. R&D Grants Provided under ITIPA
35. GOK Infrastructure Investment at Inchon North Harbor
36. Machinery & Equipment (KANIST R&D) Project
37. Grant for the Purchase of an Electric Vehicle
38. The GOK's Purchases of Electricity from Corrosion-Resistant Steel Producers for MTAR
39. Land Purchase at Asan Bay
40. KG Dongbu Steel's Exemptions from Payment of Harbor Fees
41. Grants from the Korea Agency for Infrastructure Technology Advancement
42. Port Usage Rights at the Port of Incheon
43. Reduction for Sewerage Fees

## IX.    DISCUSSION OF COMMENTS

## Comment 1:   Whether Electricity Is Subsidized by the GOK

*Nucor's Case Brief*

- The approach in the *Preliminary Results* is contrary to CVD law and practice because, rather than comparing the Korea Electric Power Corporation (KEPCO) benchmark price to the price paid by Hyundai Steel, Commerce first determined whether a benefit was conferred by evaluating KEPCO's overall financial performance and whether it fully recovered its costs. It was only if the cost recovery, plus a profit rate, was not fully recouped that Commerce then calculated a benefit; this approach is inconsistent with the statute, which requires that Commerce calculate an individual countervailing subsidy rate.
- KEPCO and its subsidiaries are not allowed to set their prices as independent companies, with the GOK's control on pricing limiting these entities' ability to pass on cost increases or to raise equity capital.
- While the prices paid by KEPCO include pricing and an adjustment coefficient that are intended to ensure fuel costs are accounted for in the pricing, KEPCO and the generators do not set these and, therefore, the cost data provided by the GOK do not reflect actual electricity generation costs.
- Commerce is required by law to evaluate both the wholesale and retail markets and test whether prices paid by the users of electricity reflect fair market value.  The U.S. Court of Appeals for the Federal Circuit (CAFC or Federal Circuit) has held that when a tier-three analysis is conducted, Commerce must determine whether the government's price reflects the full value for the input.[15]  In POSCO Remand Results, Commerce explained on remand that a tier-three analysis requires consideration of cost recovery plus a return on investment or

---

[15] *See* Nucor's Case Brief at 4 (citing *Nucor Corp. v. United States*, 927 F.3d 1243, 1253 (Fed. Cir. 2019) (*Nucor*))

profit and, where a respondent does not cover this cost plus a profit amount, then a respondent has received a countervailable benefit.[16]

- Commerce has failed to evaluate in this review, and in past cases, whether the electricity prices paid by a respondent are sufficient to cover KEPCO's full cost of generation and supply plus an amount for profit, instead unlawfully focusing on KEPCO's general financial performance. Commerce has previously stated in *Circular Welded Pipe* that the profitability of a producer is not relevant to the determination of whether the good was provided for at LTAR.[17] Moreover, the Court of International Trade (CIT) has rejected arguments that an LTAR analysis turns on the financial performance of a government supplier.[18]

- Commerce stated in *Carbon and Alloy CTL Plate from Korea 2018* that the average price KEPCO pays across all hours would be a suitable benchmark for electricity paid across all hours.[19] Thus, Commerce should use KEPCO's cost of supplying industrial electricity, combined with a profit rate for publicly-traded utilities, to determine a benchmark to evaluate whether KEPCO provided electricity to KG Dongbu and Hyundai Steel at LTAR. When applying the suggested benchmark, the respondents paid below KEPCO's cost of supply, which demonstrates that the electricity prices paid by KG Dongbu and Hyundai Steel were not consistent with market principles.

- The methodology used by Commerce to calculate the benefit for certain electricity tariff classes where KEPCO did not fully recover its costs plus profit understates the amount of benefit conferred. Specifically, the price that would be necessary to cover KEPCO's costs for the tariff classes in question is higher than what was used in the *Preliminary Results*.

- Instead, to conduct these calculations, Commerce should use KEPCO's reported data, along with a profit ratio from publicly-traded utility companies, to calculate the benchmark price that is compared to the price paid by KG Dongbu and Hyundai Steel.

*Respondents' Rebuttal Brief*

- Commerce has examined the financial performance of the electrical generation companies and determined that they recovered their costs. This analysis was conducted in accordance with Commerce's past practice and the CVD law, and does not require that Commerce do anything further.

---

[16] *Id.* at 5 (citing *Redetermination Pursuant to Court Remand Order, POSCO v. United States*, Consol. Ct. No. 17 00137 at 27 and 30 (CIT July 6, 2021) (POSCO Remand Results), available at https://access.trade.gov/resources/remands/17-00137.pdf).

[17] *Id.* at 11 (citing *Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances: Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 73 FR 31966 (June 5, 2008) (*Circular Welded Pipe from China*), and accompanying Issues and Decision Memorandum (IDM) at 65).

[18] *Id.* (citing *U.S. Steel Corp. v. United States*, 33 CIT 1935, 1944 n.10 (CIT 2009) (*U.S. Steel*)).

[19] *Id.* at 9 (citing *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2018*, 86 FR 15184 (March 22, 2021) (*Carbon and Alloy CTL Plate from Korea 2018*), and accompanying IDM at Comment 1; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 FR 34828 (July 13, 2018) (*Solar Cells from China*), and accompanying IDM; and *Supercalendered Paper from Canada: Final Results of Countervailing Duty Expedited Review*, 82 FR 18896 (April 24, 2017), and accompanying IDM).

Barcode:4200434-02 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

- In *Nucor*, the CAFC explained that Commerce has a great variety of methodologies at its disposal, including the evaluation of costs, to determine whether a tier-three price is based on market factors. Commerce's analysis in the *Preliminary Results*, which was based on a cost and profit recovery analysis, was in accordance with this ruling.

- Nucor's contention that Commerce did not collect information on certain costs such that it was unable to conduct the correct analysis is untrue. Commerce collected information from the generating companies and analyzed this information, along with the cost information provided for KEPCO.

- *POSCO* does not require that Commerce examine whether government-controlled entities subsidize each other as part of its analysis, but rather it faulted Commerce for not considering the Korea Power Exchange's (KPX) impact on KEPCO pricing and the Korean electricity market. In the instant review, the record clearly demonstrates that generation costs were covered, and a rate of return was included as part of the prices.[20] As such, Commerce has satisfied the requirements established under *POSCO* in the instant review, and it should reject Nucor's arguments.

- The discussion that Nucor points to in *Carbon and Alloy CTL Plate from Korea 2018* is unrelated to the program at hand and, additionally, Commerce indicated in that case that an average electricity price would not be a suitable benchmark because it does not account for the tariff differences between the peak, mid-peak, and off-peak electricity prices. In fact, Nucor's proposed benchmark suffers from this same flaw as it does not differ based on the time-of-use prices. Moreover, the proposed benchmark makes no differentiation for the various electricity tariff classes, which would mean it would not be possible to conduct an apples-to-apples comparison.

- The world utility rate of return that Nucor suggests should be added to the proposed benchmark essentially changes the already problematic benchmark into a tier-two benchmark. Additionally, Commerce has already determined that it cannot rely on world prices to determine whether electricity is provided for LTAR and, therefore, the proposed rate of return is not relevant to Commerce's tier-three analysis.

- Cost recovery analysis does not mean that Commerce should take the average cost for all industrial users and compare that to actual prices paid. Instead, Commerce has correctly found that KEPCO has a pricing mechanism in place that is based on market principles (*i.e.*, covers costs and a rate of return). Nucor has failed to demonstrate how its proposed benchmark would be more accurate.

- Despite Nucor's arguments that the *Preliminary Results* and other recent decisions are an unlawful application of the analysis methodology, Commerce is well within its authority to conduct a cost recovery analysis, and Nucor's arguments based on *Circular Welded Pipe from China* and *U.S. Steel*, where tier-one and tier-two analyses were conducted, do not apply to the tier-three analysis conducted in this case.

- Commerce's *CVD Preamble* provides for the sort of analysis that the agency conducted in the *Preliminary Results*; this same methodology has been applied in numerous other Korean cases and has been upheld on appeal.[21]

---

[20] *See* Respondents' Rebuttal Brief at 5 (citing *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020) (*POSCO*) at 1377).

[21] *Id*. at 12 (citing *Countervailing Duties,* 63 FR 65348, 65378 (November 25, 1998) (*CVD Preamble*)).

- Nucor's arguments to analyze total revenues and aggregate financial performance ignore the fact that Commerce analyzed industrial electricity tariffs, which are relevant to the respondent and seem to contradict a respondent-based analysis that Nucor advocates.

*GOK's Rebuttal Brief*

- Unlike what Nucor argues, the GOK does not arbitrarily set the price of electricity in Korea, nor do the electricity mechanisms mean that KEPCO cannot recover its costs through the electricity prices it charges.
- Information on the record clearly supports Commerce's finding that the wholesale and retail electricity prices are determined based on electricity-setting mechanisms intended to allow the generation companies, independent power producers, private companies, and KEPCO to recover their costs, along with an appropriate amount of investment return. Additionally, the CAFC found in *Nucor* that the retail electricity prices set through the established mechanisms are based on market principles.[22]
- Nucor mischaracterizes KEPCO's 20-F form, which indicates that while KEPCO may not be able to pass on cost increases to customers immediately, the electricity rate mechanisms allow for KEPCO to recover its costs and investment returns over time. Additionally, the information submitted by the GOK shows that KEPCO's reported cost data include not only KEPCO's costs but also a reasonable rate of return.
- The rate of return that Nucor suggests should be used in a revised calculation of the cost and profit recovery is based on a U.S. rate, rather than on information from Korea, and relying on it would result in an inapposite comparison.
- No benchmark needs to be established as part of a tier-three analysis; benchmarks are typically considered when conducting tier-one and tier-two analyses, not when conducting a tier-three analysis. Nucor's arguments concerning *Circular Welded Pipe from China* and *U.S. Steel* do not apply to this situation, as they were based on tier-two and tier-one analyses, respectively, rather than the tier-three analysis used in the instant review.
- Nucor's suggestion that the tier-three analysis employed by Commerce should be modified to develop a benchmark that is compared to respondent-specific electricity prices should be rejected.
- Despite Nucor's claims that Commerce should calculate an electricity benchmark and then conduct a comparison to what KG Dongbu and Hyundai Steel paid, that is not the standard for a tier-three analysis. Specifically, the tier-three analysis simply requires that Commerce determine whether the electricity prices are in accordance with market principles; no benchmark or benefit calculation is required.
- What Nucor suggests as the benefit analysis appears to equate this analysis to something akin to the zeroing methodology in antidumping calculations, something that is inapposite to a tier-three analysis.
- The proposed benchmark fails to account for the fact that KEPCO charges different types of rates (*i.e.*, off-peak, mid-peak, and on-peak), which result in different prices at different times of the day. Using the proposed methodology from Nucor would result in applying a single average price to each of these categories, meaning that there would always be a benefit because some portion of the prices paid by the respondent will be below the average price.

---

[22] *See* GOK's Rebuttal Brief at 6 (citing *Nucor*, 927 F.3d at 1243).

**Commerce's Position:**  We find that it is appropriate to continue to rely on our well-established tier-three methodology to analyze this program.  Based on this tier-three analysis, we continue to find that either:  (1) KEPCO fully recovered costs and, by extension, did not confer a benefit; or (2) the prices for electricity resulted in a non-measurable benefit during the POR.  As an initial matter, 19 CFR 351.511(a)(2)(iii) details Commerce's tier-three benchmark methodology stating that "{i}f there is no world market price available to purchasers in the country in question, the Secretary will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles."  Moreover, section 771(5)(E)(iv) of the Act states that the adequacy of remuneration is determined in relation to prevailing market conditions in the country where the good or service is provided, which include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.  There is no specific hierarchy under which Commerce examines these conditions.[23]

As Commerce explained in the *Preliminary Results*, our tier-three analysis for electricity in Korea assesses whether the electricity prices charged by KEPCO are consistent with market principles by evaluating the electricity prices to see if they allow for the recovery of costs, plus a rate of recovery or profit.[24]  This well-established approach has been relied upon by Commerce in many cases and upheld by the CAFC in both *Nucor* and *POSCO*.[25]  To the extent that we determine that the electricity prices are in line with market principles, then we determine that no benefit is conferred.  In those instances where the pricing is not in line with market principles, we determine a benchmark that would be in line with market principles (*i.e.*, a price that covers costs plus a rate of recovery or profit), with the difference between the price paid and the benchmark being the benefit conferred.[26]  In the instant review, we determined that some electricity prices were in line with market principles while others were not and, as such, for those categories that did not cover costs plus a rate of recovery, we calculated a benefit amount.[27]  Furthermore, KG Dongbu and Hyundai Steel reported paying electricity prices that are listed on KEPCO's electricity rate schedule, and supporting documentation indicated that KG Dongbu and Hyundai Steel's operations were classified under the correct electricity consumption categories.[28]

Nucor argues that, rather than relying on our well-established tier-three approach for electricity in Korea, we should instead apply a standard whereby we directly compare the electricity prices paid by a respondent to the cost plus profit rate of KEPCO to determine whether a benefit exists.[29]  To make this argument, Nucor takes the discussion from our recent POSCO Remand Results out of context.  In the remand, Commerce explained that:

---

[23] *See CVD Preamble*, 63 FR at 65378.
[24] *See Preliminary Results* PDM at 36.
[25] *See Nucor*; *see also POSCO*.
[26] *See Preliminary Results* PDM at 36-37.
[27] *Id*.
[28] *See* GOK's Letter, "New Subsidies Allegations Questionnaire Response," dated February 23, 2021 (GOK NSA QR) at Exhibit E-9; *see also* KG Dongbu's Letter, "New Subsidies Allegations Questionnaire Response," dated February 9, 2021 at Exhibits NSA-2 to NSA-3; and Hyundai Steel's Letter, "New Subsidies Allegations Questionnaire Response," dated February 23, 2021 at Exhibits NSA-2 to NSA-3.
[29] *See* Nucor's Case Brief at 5.

"…when the rate charged is consistent with the standard pricing mechanism (in this case, the electricity tariffs charged to the respondent covers cost plus a return) and the respondent is treated no differently than other companies that purchase comparable amounts of electricity (in this case, the rate charged to the respondent is from the correct tariff classification based on its contract demand for electricity and voltage for that electricity consumption, as this is a market condition for the provision of electricity in Korea), there is no benefit within the meaning of section 771(5)(E) of the Act.  In other words, if the tariff charged to the respondent does not cover 'cost of production' plus 'a profitable return on the investment,' which is the same standard set forth in KEPCO's standard pricing methodology, then the respondent has received a countervailable benefit under section 771(5)(E) of the Act.  Moreover, even in the event that the tariff charged to the respondent covers 'costs of production' plus 'a profitable return on the investment,' there is still a countervailable benefit conferred under the statute if KEPCO charges the respondent less than what it should be charged under its designated tariff classification."[30]

When reviewed in context, the POSCO Remand Results discussion is, in fact, consistent with our electricity analysis in the *Preliminary Results*, as our tier-three analysis in the *Preliminary Results* also reviewed whether KEPCO's electricity tariffs covered both cost recovery and a rate of return.  Further, the methodology applied in the *Preliminary Results* is consistent with what Commerce has done in other cases.[31]

Nucor further argues that our statements in the POSCO Remand Results demonstrate that Commerce's tier-three methodology used in this and previous cases is unlawful because our analysis incorrectly focuses on the financial performance of KEPCO, rather than the prices actually paid by the respondent.  To make this point, Nucor refers to *Circular Welded Pipe from China* and *U.S. Steel*, which both include decisions to discard the financial performance of a government supplier as part of any benchmark analysis.[32]  These cases cited by Nucor are inapposite to a tier-three analysis; both were discussions related to a decision to disregard government supplier prices in tier-one or tier-two analyses rather than as part of a tier-three market principles analysis.[33]  However, under 19 CFR 351.511(a)(2)(iii), we are required to assess the extent to which the price charged by the government is consistent with market principles.  We note that an evaluation of a government supplier's income and costs and whether the income covers costs and profit, which Nucor equates to an evaluation of an entity's financial position, has consistently been part of our analysis when assessing whether KEPCO's pricing is consistent with market principles and has been found to be within the bounds of what 19 CFR 351.511(a)(2)(iii) proposes.[34]

Additionally, Nucor contends that Commerce's analysis is unlawful because it looks at the government supplier's total revenue, rather than prices paid by KG Dongbu and Hyundai Steel.

---

[30] *See* POSCO Remand Results at 30.
[31] *See, e.g.*, *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 38361(June 26, 2020), and accompanying IDM at Comment 1.
[32] *See* Nucor's Case Brief at 11.
[33] *See Circular Welded Pipe from China* IDM at 65; *see also U.S. Steel*, 33 CIT at 1944-1945.
[34] *See, e.g.*, *Nucor*, 927 F.3d 1243.

We note that our analysis is not based on KEPCO's total revenue but, instead, KEPCO's methodology for determining the adequacy of its pricing through cost and revenue data.[35]  As such, our analysis only relates to financial performance to the extent income from prices charged for each electricity consumption category covers KEPCO's costs, plus profit.[36]  Because, as stated above, KG Dongbu and Hyundai Steel paid electricity prices that are charged to all companies in the corresponding electricity consumption classifications, our analysis does, in fact, account for whether the prices KG Dongbu and Hyundai Steel paid were covering KEPCO's costs.  While Nucor appears to argue that we should disregard a market analysis of KEPCO's pricing and simply focus on the price charged to the respondents, 19 CFR 351.511(a)(2)(iii) necessarily requires that we evaluate whether KEPCO's pricing is consistent with market principles, which the record demonstrates.[37]  Furthermore, Nucor has not presented an adequate explanation for why Commerce should not conduct a tier-three analysis as required by the regulations.  Accordingly, because Nucor cannot provide a compelling rationale for why Commerce should focus only on the prices charged to the respondents, we find that there is no basis in this instance not to examine whether KEPCO's pricing is consistent with market principles under the tier-three analysis that we conducted in the *Preliminary Results*.

In presenting its arguments, Nucor also asserts that the cost data provided by the GOK do not reflect actual costs of electricity generation and supply because KPX and the GOK determine the prices paid to the generators, rather than allowing the electricity generators to determine these prices themselves.  We note that our analysis in the *Preliminary Results* is guided by the CAFC's decision in *POSCO*, which states that "Commerce's failure to investigate and include KPX's generation costs in its analysis renders its final determination unsupported by substantial evidence."[38]  Our discussion in the *Preliminary Results* explains KPX's standardized pricing system that applies to all electricity generators in Korea, including the independent generators along with KEPCO and its six wholly-owned subsidiary generators (GENCOs).[39]  Under this system, the electricity price contains a marginal and capacity price component and an adjusted coefficient for certain fuel types and the GENCOs.[40]  We further explained that, "{t}he purpose of the adjusted coefficient is two-fold:  to prevent over-payment to generators with low fuel-costs (*e.g.*, nuclear and coal); and to maintain a differential between the expected rate of return between the GENCOs and KEPCO."[41]  This pricing system includes fixed and variable costs and, for the GENCOs and KEPCO, ensures the expected rate of return is suitably allocated between the GENCOs and KEPCO.  KEPCO is obligated to pay the GENCOs for the total cost of generating electricity, including interest on loans, even if KEPCO is not profitable.[42]  Moreover, our prior analysis of the prices paid by KEPCO through KPX have determined that they are inclusive of a rate of return, as well as the costs associated with generation.[43]  Therefore, although Nucor argues that the GOK exercises near complete control over the price-setting mechanism, which means that KEPCO and other entities in the electricity sector cannot recoup

---

[35] *See Preliminary Results* PDM at 36.
[36] *Id.*
[37] *See Preliminary Results* PDM at 36-37.
[38] *See POSCO* at 1378.
[39] *See Preliminary Results* PDM at 31.
[40] *Id.*
[41] *Id.*
[42] *See* GOK NSA QR at 27.
[43] *See Preliminary Results* PDM at 35.

their costs, we agree with the GOK that the wholesale and retail pricing is based on price-setting methodologies that aim to ensure companies in the chain are able to cover their costs, as well as a rate of profit.[44]  As such, Commerce's prior evaluation of KPX's electricity prices and record information demonstrate that there is a pricing mechanism in place for KEPCO to acquire electricity that does not confer a benefit.  Accordingly, we find that the prices reported by the GOK do, in fact, reflect the costs of electricity generation and supply and should continue to be the basis of our analysis.

Based on the arguments above, Nucor then submits that Commerce should instead rely on a benchmark price plus an average profit rate from publicly-traded utilities to determine whether KG Dongbu and Hyundai Steel received a benefit under this program for all industrial electricity expenses.  However, as noted above, our tier-three methodology has been to first determine whether the prices are market-based.  Where prices are set in accordance with market principles and, thus, are at fair value, we determine no benefit is conferred; where they are not market-based (*i.e.*, they have not recovered costs plus profit), we determine a price that would be market-based and compare that to what was actually paid using a benchmark.[45]  Nucor's arguments have failed to demonstrate that our tier-three analysis is inconsistent with our statutory and regulatory obligations for determining whether KEPCO's pricing is based on market principles.  Likewise, Nucor has not demonstrated that its proposed benchmark is superior to the market principles analysis such that it would justify discarding the analysis and instead relying on a benchmark, as Nucor proposes we do.  As such, while the identification of a separate benchmark is not part of our analysis for this program, we do highlight a few points with respect to the arguments raised by Nucor.

Nucor contends that Commerce explained in *Carbon and Alloy CTL Plate from Korea 2018* that an average electricity cost is a sufficient benchmark.  However, Nucor mischaracterizes the discussion.  *Carbon and Alloy CTL Plate from Korea 2018* evaluated whether it was appropriate to use an average cost as a benchmark to compare to off-peak electricity prices and did not address Commerce's decision not to conduct a tier-three analysis as we are doing here.[46]  Separately, Nucor contends that we should apply the average profit rate for publicly-traded utility companies in the United States.  However, the GOK provided a detailed explanation and supporting documentation of how KEPCO's profit rate was calculated and how it is based on KEPCO's operations.[47]  Despite the fact that we have already determined that it is not appropriate to rely on world benchmarks, Nucor's argument that we should not rely on KEPCO's profit rate simply because it is different from a world average is unpersuasive, particularly as there is no support on the record that disqualifies or raises questions as to how KEPCO determines its rate of return.

Further, while Nucor contends that our tier-three approach is unlawful, we disagree.  Nucor appears to argue that our market principles analysis requirement established under 19 CFR 351.511(a)(2)(iii) is inconsistent with section 777A(e)(1) of the Act, because conducting a

---

[44] *Id*. at 30-37.
[45] *Id*. at 36-37.
[46] *See Carbon and Alloy CTL Plate from Korea 2018* IDM at Comment 1.
[47] *See* GOK's Letter, "GOK's New Subsidy Allegations Second Supplemental Questionnaire Response," dated April 13, 2021 at 7-8.

market principles analysis of the government supplier's pricing fails to result in an individual countervailable subsidy rate for each respondent. However, this is a mischaracterization of our regulations. The tier-three analysis is intended as a residual means of determining whether a benefit exists for a respondent by evaluating the government supplier prices when we find that no market price is available or appropriate.[48] Put another way, when tier-one and tier-two prices are not available, the tier-three analysis is a means of testing whether the government supplier price is consistent with market principles. If it is, no benefit is conferred. Alternatively, if it is not consistent with market principles, we then measure to what extent a benefit is being conferred from the government supplier price.[49] As such, the tier-three analysis examines the government supplier price and, if necessary, to what extent a benefit is conferred. Therefore, our tier-three analysis methodology under 19 CFR 351.511(a)(2)(iii) is simply one of our methodologies for determining whether a benefit exists in order to determine individual countervailable subsidy rates within the meaning of section 777A(e)(1) of the Act.

Moreover, with respect to Nucor's argument that our tier-three market principles analysis is unlawful because it allows the GOK to subsidize certain customers while recouping losses through charging higher prices to other companies such that any subsidization is masked, there is no basis to conclude that this is taking place or that it somehow renders our tier-three analysis unlawful. As discussed above, the record demonstrates that the prices paid by KG Dongbu Hyundai Steel are those set by KEPCO's electricity rate schedules.[50] Our analysis is not to conduct a preferentiality or discrimination analysis but, rather, to understand the methodology used to develop the electricity rate schedule and whether the rates that are charged in the electricity classifications reported by the respondents are consistent with market principles.

**Comment 2:    Whether Commerce's Determination that Port Usage Rights Provide a Countervailable Benefit Is Unsupported by Evidence and Contrary to Law**

*Hyundai Steel's Case Brief*

- Commerce's *Preliminary Results* are devoid of any discussion regarding how the GOK's provision of usage rights to Hyundai Steel for a period long enough to recover its port construction costs provides a benefit, other than vague references to prior decisions.[51]
- To the extent Commerce relies on prior determinations, it must describe how those determinations apply, and not merely cite to them.
- The cases cited by Commerce to support its decision that the program is a "recurring grant program" actually reveal that these cases stand for the proposition that repayments for the construction of the port facilities are only countervailable to the extent they are excessive. and Commerce has offered no support that port usage rights provided to Hyundai Steel were excessive. In fact, Hyundai Steel was granted port usage rights for the Incheon Harbor

---

[48] *See Nucor*, 927 F.3d 1243 at 1247.
[49] *See, e.g.*, *Supercalendered Paper from Canada: Final Affirmative Countervailing Duty Determination*, 80 FR 63535 (October 20, 2015) (*Supercalendered Paper from Canada Investigation*), and accompanying IDM at 41-48.
[50] *See* GOK NSA QR at Exhibit E-9.
[51] *See* Hyundai Steel's Case Brief at 4.

facility for 41 years and eight months, which is well short of even the IRS average useful life (AUL) period.[52]

- The GOK has explained in detail the port usage rights period, and its very structure is set up to avoid excessive reimbursements to Hyundai Steel.  Accordingly, compared to prior cases, this period is not excessive.

- The port usage rights were provided as a payment of a debt owed by the GOK, which is not a countervailable benefit.  Further, Commerce has not explained under which provision of section 771(5)(E) of the Act the benefit is conferred, and under the "catch-all" provision, the CIT has understood that what the company receives should exceed what the company paid or should have paid.  In this case, there is no benefit to Hyundai Steel.

- The port usage rights the GOK provided are part of Hyundai Steel's just compensation, similar to the 5th Amendment of the U.S. Constitution that requires the government to provide just compensation prior to obtaining ownership of private property intended for public use.

- In *GOSL*, the CIT found that repayment of a debt is distinct from payments through grants, loans, or equity infusions.  In this case, the court concluded that the reimbursement program at issue "did not constitute a gift-like transfer, but rather the interest-free repayment of a debt."  The court also noted that Commerce was "not authorize{d}… to ignore clear, readily available and already-verified record evidence that a transfer of funds constituted repayment of a debt."  These principles make clear that port usage rights in repayment for construction are similarly not countervailable.[53]

- In *HR Korea 2017*, Commerce characterized the essence of the program as "the GOK help{ing} Hyundai Steel build a port for its own use for a very long time," without support in the record of its assertion, as is also the case in this review, ignoring the record evidence that Hyundai Steel paid huge sums and incurred all direct costs to build the port.[54]

- The GOK agreement described the formula and details for Hyundai Steel to fully recoup its costs within a period of 41 years and eight months, and there was nothing excessive about the repayment of this debt; accordingly, Commerce's finding should be reversed in the final results.

- Even if Commerce erroneously countervails the fees Hyundai Steel could have collected, but did not collect, then it should subtract the amount of the amortized wharf usage rights applicable to the 2019 POR.

---

[52] *Id*. at 5-7 (citing *Notice of Final Affirmative Countervailing Duty Determination:  Certain Cold-Rolled Carbon Steel Flat Products from the Republic of Korea*, 67 FR 62102 (October 3, 2002) (*CRS from Korea Investigation*); *Notice of Final Results of Countervailing Duty Administrative Review:  Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 72 FR 38565 (July 13, 2007) (*CTL Plate from Korea 2005*); and *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2011*, 78 FR 55241 (September 10, 2013) (*CORE from Korea Prelim 2011*)).

[53] *Id*. at 13 (citing *Government of Sri Lanka v. United States*, 308 F. Supp. 3d 1373, 1381 (CIT 2018) (*GOSL*)).

[54] *Id*. at 14-15 (citing *Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review, 2017*, 85 FR 64122 (October 9, 2020) (*HR Korea 2017*), and accompanying IDM at 30-31).

*Nucor's Rebuttal Brief re:  Hyundai Steel*

- Commerce should follow its practice in the previous administrative review of the order and find this program countervailable as it has done in other cases.[55]
- In *CORE from Korea 2018*, concerning the same respondent, Hyundai Steel, Commerce concluded that the income was revenue forgone and a benefit was received.[56]  Similarly, in *CRS from Korea 2018*, Commerce countervailed both the berthing income and harbor facility usage fees as revenue forgone by the GOK, as Hyundai Steel did not pay the fees it collected from other parties.[57]  Commerce noted in the previous administrative review that it has consistently countervailed programs which lower the cost of production for a company.[58]  Consistent with these findings, Commerce should continue to countervail the berthing income and harbor facility usage fees as revenue forgone by the GOK.
- Hyundai Steel argues that this program is a repayment of debt and, thus, does not provide a countervailable benefit, and reports that the only benefit it received were berthing fees.  However, it also notes that it entered into a service contract with an unaffiliated private harbor business operator for which it could have collected harbor exclusive usage fees but chose not to.  Therefore, this business decision not to collect these fees is not merely a repayment of debt because if it were, Hyundai Steel would not be declining payment.  Accordingly, Commerce should continue to factor this uncollected income into its benefit calculations.
- Hyundai Steel ignores the fact that it was in a position to collect fees because it acquired the right from the GOK to operate and use the port.  By choosing to use the port solely for its own shipments, Hyundai is choosing not to collect fee payments from third parties, but it can only do so because it is exempt from paying fees to the GOK.
- Regardless of whether Hyundai Steel actually collected these fees, this income constitutes revenue forgone by the GOK and, thus, should continue to be accounted for in Commerce's benefit calculations.

**Commerce's Position:**  In the *Preliminary Results*, Commerce determined that this program provided a financial contribution, because the fees that the GOK gave Hyundai Steel the right to collect, which would otherwise have been collected by the GOK absent the agreement between the parties, represented revenue forgone by the GOK within the meaning of section 771(5)(D)(ii) of the Act.  Specifically, the berthing income and the harbor facility usage fees are revenue forgone by the GOK because Hyundai Steel did not pay the GOK the fees it collected from other third parties.  Further, Commerce found the program to be specific under section 771(5A)(D)(iii)(I) of the Act because the actual recipients of the subsidy were limited in

---

[55] *See* Nucor's Rebuttal Brief re Hyundai Steel at 2-3 (citing *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review*; 2018, 86 FR 29237 (*CORE from Korea 2018*), and accompanying IDM at "21-25"; *HR Korea 2017*, 85 FR 64122 (October 9, 2020), and accompanying IDM at 29-32; and *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2018*, 86 FR 40465 (July 28, 2021) (*CRS from Korea 2018*), and accompanying IDM at 26-30).
[56] *Id*. at 3-4 (citing *CORE from Korea 2018* IDM at 23-24).
[57] *Id*. at 4 (citing *CRS from Korea 2018* IDM at 26, 29).
[58] *Id*. at 4 (citing *CORE from Korea 2018* IDM at 27).

number,[59] and a benefit existed under section 771(5)(E) of the Act in the amount of the fees exempted that were reported by Hyundai Steel. Consistent with prior proceedings, we have treated this program as a recurring subsidy program.[60] We continue to find this program countervailable for the reasons explained below.

Hyundai Steel does not deny that the reason for receiving the right to collect fees for about 41 years was because it had incurred construction costs for building the port.[61] The record is also clear that Hyundai Steel uses the port to transport raw materials for steel production.[62] In other words, Hyundai Steel agreed to build the port, and once the port was built, Hyundai Steel used the port to transport inputs free of charge. Further, Hyundai Steel had the right to collect port usage fees to compensate for the costs it incurred. Hyundai Steel's argument that this program is not countervailable is an argument of form over substance. Commerce has consistently countervailed these types of programs which lower the cost of production for a company. In *Supercalendered Paper from Canada Investigation*, Commerce countervailed the total amount of benefit conferred, without any offsets, under the Federal Pulp and Paper Green Transformation Program, as well as the Ontario Forest Sector Prosperity Fund program, because both programs involved the government provision of funds to respondent companies against costs incurred for capital investment.[63] In *Quartz Surface Products from Turkey*, Commerce countervailed the total amount of benefit conferred, without any offsets, under the Foreign Fair Support program, which involved the government provision of reimbursements for expenses incurred related to the respondent's participation in international fairs.[64] In both cases, the mandatory respondents received reimbursements from the relevant governments for performing production activities. Commerce countervailed the total amount of benefit conferred without any offsets. Similarly, here, Hyundai Steel built a port for its steel production activities and the GOK reimbursed Hyundai Steel for building the port for Hyundai Steel's own benefit.

Hyundai Steel argues that port usage rights are received as repayment of a debt from the GOK because harbors and related infrastructure must be controlled and owned by the GOK and that the GOK was simply repaying Hyundai Steel for creating the facilities over which it is required

---

[59] *See* GOK's Letter, "Initial Questionnaire Response," dated December 4, 2020 at 28-29 (GOK IQR); *see also* Memorandum, "Calculations for the Preliminary Results: Hyundai Steel Company," dated July 16, 2021.

[60] *See HR Steel Korea 2017* IDM at Comment 6; *see also Notice of Final Results of Countervailing Duty Administrative Review: Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 72 FR 38565 (July 13, 2007) (*CTL Plate Korea 2005*) and accompanying IDM at 6-7 and Comment 1; *CORE Korea 2011 Prelim* PDM at 11, unchanged in *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review*; 2011, 79 FR 5378 (January 31, 2014); and *CRS from Korea Investigation* IDM at 20 and Comment 11.

[61] *See* Hyundai Steel's Case Brief at 7-8; *see also* Hyundai Steel's Letter, "Hyundai Steel's Initial Questionnaire Response," dated November 30, 2020 (Hyundai Steel IQR) at 42-45.

[62] *See* Hyundai Steel IQR at Exhibit I-22.

[63] *See Supercalendered Paper from Canada: Preliminary Affirmative Countervailing Duty Determination*, 80 FR 45952 and accompanying PDM at 25, unchanged in *Supercalendered Paper from Canada Investigation* IDM at 26 and 28.

[64] *See Certain Quartz Surface Products from the Republic of Turkey: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 84 FR 54841 (October 11, 2019) (*Quartz Surface Products from Turkey*), and accompanying PDM at 10-11, unchanged in *Certain Quartz Surface Products from the Republic of Turkey: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, In Part*, 85 FR 25400 (May 1, 2020).

to exercise control and ownership.[65] Hyundai Steel's argument that this program does not confer a countervailable benefit is not supported by the record. The record indicates that the GOK is not collecting fees that it is entitled to collect,[66] and the record does not demonstrate that the main purpose of building the port was for the public good or any governmental functions.[67] Instead, the record shows Hyundai Steel has the right to use the port for free for about 41 years. Once again, Hyundai Steel's argument is an argument of form over substance. We do not see a difference in substance between the program at issue and a program in which a government directly provides funding to a company to build a port for the company's benefit. In both situations, a company is able to receive assistance for building a port for its own use. Further, the record shows that the GOK agreed to provide various forms of support for the port construction.[68]

In fact, when faced with a similar issue, the CAFC previously upheld Commerce's determination to treat the exemption from dockyard fees as a countervailable benefit under a similar program.[69] In *AK Steel*, Commerce determined that a countervailable benefit was conferred on POSCO by the exemption from dockyard fees regardless of whether the port berths used by POSCO were built by the GOK or by POSCO. In doing so, Commerce rejected similar arguments that the exemptions granted by the GOK to POSCO were a form of reimbursement for building and paying for the port berths that POSCO was required to cede back to the GOK.[70] The CAFC agreed and upheld Commerce's determination that the exemption provided POSCO a countervailable benefit.[71] In that case, we stated that, "even if we viewed the non-payment of dockyard fees as repayment by the government for POSCO's assumption of the costs of constructing the berths, we should still find the exemption to be countervailable."[72] We find *AK Steel* directly applicable to Hyundai Steel's argument that the non-payment of port usage fees is repayment for the cost of construction of the port, which Hyundai Steel was required to cede back to the GOK by law. Hence, consistent with that determination, as upheld by the CAFC, we continue to find that non-payment of port usage fees constitutes a countervailable benefit.

Hyundai Steel contends that the *Preliminary Results* are devoid of any discussion of how the usage rights provide a benefit. Hyundai Steel contends that it is entitled to be repaid for its investment in the port as long as the repayment is not excessive and cites to three instances where Commerce countervailed excessive repayments in contrast to what it contends are non-excessive payments in the instant review.[73] In *CTL Plate Korea 2005*,[74] we cited to the GOK Infrastructure Investment at Incheon Harbor program under which the respondent, DSM, in a similar arrangement received the right to collect fees from other users for a period of 50 years. Commerce found "that the 50-year duration of the lease of the pier facility is so long that it

---

[65] *See* Hyundai Steel's Case Brief at 10-11.
[66] *See* GOK IQR at Exhibit PPP-2.
[67] *See* Hyundai Steel IQR at Exhibit I-21.
[68] *Id*. at Exhibit I-21, Article 48 to Article 54.
[69] *See AK Steel Corp. v. United States*, 192 F.3d 1367, 1379 (CAFC 1999) (*AK Steel*)
[70] *Id*., 192 F.3d 1367 at 1382.
[71] *Id*.
[72] *See Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations: Certain Steel Products from Korea*, 58 FR 37338 (July 9, 1993) (*Certain Steel Products from Korea Final*), and accompanying IDM at 16.
[73] *See* Hyundai Steel's Case Brief at 7.
[74] *See CTL Plate Korea 2005* IDM at 7.

Filed By: Dennis Mcclure, Filed Date: 1/13/22 9:55 AM, Submission Status: Approved

effectively renders DSM the owner of the facility." In *CORE from Korea 2011*,[75] we cited to the Exemption of Port Fees under the Harbor Act program, in which the respondent was provided the right to collect fees from other users of the facility, in addition to exemptions the respondent received for a period of 70 years, which Commerce determined to be excessive. Similarly, in *CRS from Korea Investigation*, Commerce found the Exemption of Port Fees under the Harbor Act to be an excessive period.[76] Further, in *HR Steel Korea 2017*, Commerce treated the benefits received from the berthing income and harbor facility usage fees as a recurring subsidy.[77] Thus, in the *Preliminary Results*, we provided numerous instances of how Commerce has treated similar programs in prior proceedings, determining that the fees collected from third parties were treated as recurring subsidies. These programs are relevant to the instant case because, here, too, the GOK provided free usage of the port and the right to the collection of fees for a period of 41 years and eight months,[78] similar to the extended periods of 50 to 70 years in the above-referenced cases, which we determine to be excessive and, thus, provide a benefit. Further, our determination in the instant review is consistent with our determinations in these prior proceedings.

Further, with regard to Hyundai Steel's argument that Commerce has not explained under which provision of section 771(5)(E) of the Act the benefit is conferred, Hyundai Steel itself notes the examples outlined under section 771(5)(E) of the Act are not meant to be exhaustive.[79] However, Commerce did explain under which statutory section it determined a benefit: section 771(5)(E), which states that "a benefit shall normally be treated as conferred where there is a *benefit to the recipient*." Commerce has explained that Hyundai Steel receives a benefit in the form of the fees that it is able to retain from third parties, rather than turning them over to the GOK. Commerce does not have to select only from the subsections of section 771(5)(E) when explaining what it has determined the benefit to be. Indeed, the language in section 771(5)(E) prior to the subsections states "…benefit to the recipient, *including –*". The term "including" indicates that the subsections stated below are not an exhaustive list of the types of benefits that exist under the Act. Further, 19 CFR 351.503(b) states that "For other government programs, the Secretary normally will consider a benefit to be conferred where a firm pays less for its inputs (*e.g.*, money, a good, or a service) than it otherwise would pay in the absence of the government program, or receives more revenues than it otherwise would earn." Here, Hyundai Steel was able to collect berthing fees and other fees and was not required to transmit those fees to the GOK. Thus, a benefit was conferred under 19 CFR 351.503(b) under this program.

We disagree with Hyundai Steel that Commerce should compute the benefit based only on the income to Hyundai Steel which exceeded the cost incurred by Hyundai Steel in constructing the

---

[75] *See Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2011*, 78 FR 55241 (September 10, 2013), and accompanying PDM at 10-11, unchanged in *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2011*, 79 FR 5378 (January 1, 2014) (*CORE from Korea 2011*).

[76] *See Notice of Final Affirmative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products from the Republic of Korea*, 67 FR 62102 (October 3, 2002), and accompanying IDM at 20 and Comment 11.

[77] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2017*, 85 FR 64122 (October 9, 2020) (*HR Steel Korea 2017*), and accompanying IDM at Comment 6.

[78] *See* Hyundai Steel's Case Brief at 12.

[79] *Id*. at 9.

port of North Incheon.  For the reasons we have provided in past cases, Commerce has consistently not included an offset for the cost of constructing the port in its benefit analysis.[80]  As noted in *HR Steel Korea 2017*, we continue to find that the essence of this program is that the GOK helped Hyundai Steel build a port for its own use for an extended period of time.[81]  The GOK provided the benefit for this program through reimbursements as well as forgoing revenue that the GOK was otherwise entitled to collect, such as berthing fees and other user fees.[82]  Therefore, consistent with past cases, no offsets to Hyundai Steel's benefit calculation for this program are warranted.  Further, we note that the statute allows Commerce to offset a subsidy rate only under very limited circumstances, which are clearly not applicable here.[83]

We also disagree with Hyundai Steel that *GOSL* is applicable here.  In *GOSL*, the CIT characterized payments under the Guaranteed Price Scheme for Rubber (GPS) program as an interest-free repayment of a debt, rather than "a direct transfer of funds," and it held that the payments constituted reimbursement of an interest-free debt that did not benefit the tire producer.[84]  In *Tires Sri Lanka Final*,[85] we determined that the government's payments to the respondent were direct transfers of funds and countervailable in their full amount (treating the respondent's earlier payment of the "guaranteed price" to its producer as irrelevant).[86]  However, the CIT found that we had erroneously assessed the reimbursements in isolation from the GPS program because the tire producer was required to provide the government an interest-free loan by paying an above-market price for which it was later reimbursed.  The CIT concluded that Commerce ignored record evidence that the respondent received payment corresponding exactly to the above-market portion of its payment to the small-scale farmer, paid on behalf of the government.[87]

We find that the Harbor Act program in this review is not comparable to the GPS program that the CIT analyzed in *GOSL*.  In *GOSL*, the program at issue, the Rubber Guarantee Price Scheme, was implemented to support small-scale rubber farmers.  The Government of Sri Lanka (GOS) stated that it used buyers of natural rubber, such as respondent Camso, to facilitate payments to these small-scale rubber farmers.  The Rubber Guarantee Price Scheme was set up with the specific purposes of benefiting the small-scale farmers rather than respondent Camso.  In this review, neither Hyundai Steel nor the GOK argued that the program at issue in this case was implemented for the purpose of supporting other beneficiaries.  In *GOSL*, the CIT characterized the transaction at issue as resulting in a detriment, rather than a benefit, to the respondent in that case.[88]  In this review, as explained above, the transaction at issue is not a detriment to Hyundai Steel.  A key feature of the Guarantee Price Scheme was that the GOS *required* Camso to pay a guarantee rubber price for natural rubber when

---

[80] *See, e.g., Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2019*, 87 FR 79 (January 1, 2022).
[81] *See HR Steel Korea 2017* IDM at 30.
[82] *Id.*; *see also* Hyundai Steel's February 6, 2020 Initial QR at 45.
[83] *See* section 771(6) of the Act.
[84] *See GOSL* at 1381.
[85] *See Certain New Pneumatic Off-the-Road Tires from Sri Lanka:  Final Affirmative Countervailing Duty Determination, and Final Determination of Critical Circumstances*, 82 FR 2949, 2950 (January 10, 2017) (*Tires Sri Lanka Final*), and accompanying IDM at Comment 4.
[86] *Id.*
[87] *See GOSL* at 1380-83.
[88] *Id.* at 1382.

purchasing natural rubber from small farmers.  Because Camso was required to buy natural rubber at a guarantee price for the benefit of the small farmers, the GOS reimbursed Camso for the difference between the guarantee price Camso paid and the average rubber price.  Such a feature does not exist in the program at issue for this case.  The GOK did not require Hyundai Steel to build a port at a certain cost, nor did the GOK require Hyundai Steel to build a port in order to benefit other recipients.  Rather, Hyundai Steel benefitted from building the port.  Therefore, Hyundai Steel's reliance on *GOSL* is inapposite and does not support its request that Commerce provide offsets to its benefit calculations.

Lastly, Hyundai Steel contends that the benefit with regard to the berthing income and harbor usage fees should be recalculated to subtract the amount of amortization attributable to the wharf usage rights for the North Incheon Harbor.  For the reasons explained above and, consistent with our practice, we have not subtracted/offset the amortized wharf usage applicable to the 2019 POR from the benefit.

**Comment 3:   Whether Commerce Incorrectly Countervailed the Reduction for Sewerage Usage Fees**

*Hyundai Steel's Case Brief*

- The *Preliminary Results* are based on a fundamental misunderstanding of how the program actually operated with respect to Hyundai Steel.  When the facts are fully considered, it is clear that Hyundai Steel received no financial contribution or benefit from this program, because it fully paid its sewerage fees based on its actual usage and, thus, there was no reduction or waiver by the GOK.[89]
- Sewage fees are calculated on the basis of the amount and type of the sewage water drained down the system.  In cases where there are no meters to measure the amount of sewage water, billing charges are based on the clean water supplied, as it is assumed the amount of water sent through the sewerage system is the same as the amount of clean water consumed.[90]
- Hyundai Steel demonstrated that the volume of wastewater sent through the system was much lower than the volume of clean water consumed, based on which a reduced sewage usage rate was calculated and applied to Hyundai Steel.  Thus, it is clear that the reduction is based on actual water and sewerage usage and directly related to the lower volume of wastewater that needs to be purified and cannot be considered a benefit.[91]
- Hyundai Steel pays sewerage usage fees based on its proven sewerage usage volume and does not receive reductions in the amount of sewerage fees, nor are any fees waived.  Thus, there is no revenue forgone, and no benefit conferred to Hyundai Steel.[92]
- Pursuant to section 771(5)(D)(ii) of the Act, "financial contribution" means "forgoing or not collecting revenue that is otherwise due."  In Hyundai Steel's case, the sewerage usage fee was based on demonstrated usage of the water system and, thus no discount was provided;

---

[89] *See* Hyundai Steel's Case Brief at 18-19.
[90] *Id*. at 19.
[91] *Id*. at 19-22.
[92] *Id*. at 22-23.

and Commerce's preliminary finding is inconsistent with the statute, as there are no fees that would have "otherwise" been due and no financial contribution.[93]

- There is also no benefit conferred in accordance with section 771(5)(E) of the Act, as Hyundai Steel did not owe the government any more fees than the fees that it paid.[94]
- Even if Commerce erroneously continues to treat the program as countervailable, it should find the subsidy is tied to non-subject merchandise.[95]
- The CIT has stated "as a matter of practice, Commerce determines whether a subsidy is tied by evaluating the purpose of the subsidy based on information available at the time of bestowal." The record is clear that sewerage fee reductions could only be attributed to production at the Incheon facility, while subject merchandise is produced at the Dangjin and Suncheon facilities. Commerce's attribution of sewerage fees was improper under its tying regulation and should be reversed for the final results.[96]

*Nucor's Rebuttal Brief re Hyundai Steel*

- The *Preliminary Results* are consistent with *CTL Plate from Korea 2018*, where Commerce found this program countervailable.[97]
- Commerce has recognized that Article 65(1) of the Sewerage Act, Article 36(2) of the Enforcement Decree of the Sewerage Act, and Article 14(1) and Article 21(1)(7) of the Incheon ordinance do not prescribe for the situation under which Hyundai Steel qualified for its sewerage reduction fee, or the amount of reduction received by Hyundai Steel; rather, the fee reduction received by Hyundai Steel was significantly higher than the rate adjustments specified in the ordinance and the GOK provisions do not explicitly provide that entities can claim a reduction in their overall water bill based on the amount of sewage water discharged.[98]
- While Hyundai Steel claims that there are special reasons for its reduction, none of the adjustment criteria listed in Article 21 apply to Hyundai Steel. As such, Commerce should continue to find that this program represents a financial contribution in the form of revenue forgone.
- With regard to Hyundai Steel's contention that Commerce is attributing benefits to a facility that does not produce subject merchandise, Hyundai Steel incorrectly interprets and misunderstands Commerce's regulation. Pursuant to 19 CFR 351.525(b)(5)(i), if a subsidy is tied to the production or sale of a particular product, Commerce will attribute the subsidy to only that product. That is, the subsidy attribution "depends upon the type of subsidy and whether it is tied to a particular market or product," and not to whether the subsidy in question was used by the respondent to produce subject or non-subject merchandise.[99]
- In *Jindal Poly Films Ltd.*, the CIT explained that the government license providing the benefit did not restrict the merchandise to which an exporter could apply the credit, even

---

[93] *Id*. at 23-24.
[94] *Id*. at 24-25.
[95] *Id*. at 25-26.
[96] *Id*. at 26-27 (citing *Jindal Poly Films Ltd. of India v. United States*, 439 F. Supp. 3d 1354, 1360 (CIT 2020) (*Jindal Poly Films Ltd.*)).
[97] *See* Nucor's Rebuttal Brief re Hyundai Steel at 8.
[98] *Id*. at 9-10.
[99] *Id*. at 11-12.

though the respondent could identify which credits were used for subject and non-subject merchandise, stating "Commerce's practice is not to post hoc 'trace the use of subsidies' through records."[100]

- Likewise, this program is not tied to a particular product, as the user of the program only needs to show that the amount of sewage water sent down the public sewerage system is less than the amount of clean water consumed. Commerce did not err in the *Preliminary Results* and should continue to allocate the benefit to subject and non-subject merchandise.[101]

**Commerce's Position:** For the reasons explained below, we determine that the reduction in sewerage fees does not result in a financial contribution from the GOK to Hyundai Steel or KG Dongbu in the form of revenue forgone, as described in section 771(5)(D)(ii) of the Act, contrary to our finding in the *Preliminary Results*. Accordingly, we no longer find this program to be countervailable.

We found this program measurable with respect to Hyundai Steel for the first time in the prior administrative review of this proceeding. Based on the record evidence and our understanding of the program in that review, Commerce found the program countervailable[102] and confirmed that finding in subsequent administrative reviews pertaining to other Korean orders.[103] While the operation of the program remains the same as in the previous review (*CORE from Korea 2018*), the record in this review contains further explanation and additional information that alters Commerce's understanding of the program from the previous review.

For the POR, Hyundai Steel reported that its facilities in Incheon and Pohang received sewerage usage fee reductions under this program during the POR.[104] There are both federal and municipal level laws and regulations governing this program. At the federal level, the legal basis for the collection of sewerage fees is found under Article 65(1) of the Sewerage Act and Article 36(2) of the Enforcement Decree of the Sewerage Act.[105] Article 65(1) of the Sewerage Act stipulates that regional or local governments shall set how the usage fees are calculated in their ordinances.[106]

Article 36(2) of the Enforcement Decree of the Sewerage Act states:

> When the public sewerage management authority determines the amount of the usage fee pursuant to Article 65 (1) of the Act, it shall do so based upon the amount of sewage that relevant users send down through the public sewerage system and the quality and usage pattern of the sewage within the aggregate amount of the maintenance expense for the relevant public sewerage system,

---

[100] *Id*. at 12-13.
[101] *Id*. at 13.
[102] *See CORE from Korea 2018* IDM at Comment 3.
[103] *See CRS from Korea 2018* IDM at Comment 3; *see also Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2018*, 86 FR 47621 (August 26, 2021), and accompanying IDM at Comment 3.
[104] *See* Hyundai Steel IQR at 58-59 and Exhibit I-43; *see also* KG Dongbu's Letter, "Initial Questionnaire Response," dated December 2, 2020 (KG Dongbu IQR) at 83.
[105] *See* GOK IQR at 5 of Appendix-25 and Exhibit SEWER-1.
[106] *Id*. at Exhibit SEWER-1.

depreciation costs, interest on borrowings for relevant facilities, and other expenses that incur to continue the business.[107]

In Incheon, Articles 12, 14 and 21 of the Incheon Metropolitan City Ordinance on Sewage System Usages stipulate the method for calculating the sewerage fee and any reductions or exemptions by which the usage fee of the public sewerage system is calculated.[108] Article 9 of the Enforcement Regulation on the Incheon Metropolitan City Ordinance on Sewerage System Use covers the process under which companies apply for a reduction to their sewerage fees.[109] To qualify for this program in Incheon, companies or households must submit an application to their local government authority.[110]

Article 14(1) of the Incheon Metropolitan City Ordinance on Sewage System Usages states that fees for sewerage disposed will be calculated based on the amount of water supplied to the user.[111] The GOK explains that this calculation methodology is used because users "normally do not have gauging meters installed for measuring the amount of sewerage that they have sent down through the public sewerage system, but only have gauging meters installed for measuring the supply of clean water that they receive from the public water supply system."[112]

Hyundai Steel reported that it received a reduction of its sewerage fees in Incheon under Article 21(1)(7) of the Incheon Metropolitan City Ordinance on Sewage System Usages by submitting an application for a reduction according to Article 9 of the Enforcement Decree Regulation of the same ordinance.[113] Hyundai Steel's application was accompanied by a report that determined that Hyundai Steel's discharge into the sewerage system was less than the water supplied to Hyundai Steel. Specifically, this report determined the amount of water that is vaporized when used to cool machinery and merchandise during Hyundai Steel's production process and, thus, is not discharged into the sewerage system.[114]

Upon review of the record in this review, and the further explanation of the program provided by the GOK and Hyundai Steel, we are revisiting our understanding of the program from the prior review, *CORE from Korea 2018*. Specifically, in the previous review in which we found the program countervailable, Commerce stated "the legal provisions of the Incheon Metropolitan City Ordinance on Sewerage System Usages, do not explicitly provide that entities may claim a reduction in their overall water bill with regard to the amount of sewage water discharged."[115] However, upon further reflection, we find that both federal and municipal law and regulation state that sewerage fees *shall* be based on the volume of sewage discharged into the public sewage system. As detailed above, at the federal level, Article 36(2) of the Enforcement Decree of the Sewerage Act states that, when a public sewerage management authority determines the sewerage usage fee, "it shall do so based upon the amount of sewage that relevant users send

---

[107] *Id*.
[108] *Id*.
[109] *Id*.
[110] *Id*. at 8-9 of Appendix-25.
[111] *Id*. at Exhibit SEWER-1.
[112] *Id*. at 2 of Appendix-25.
[113] *See* Hyundai Steel IQR at 1 of Exhibit I-43.
[114] *Id*. at 59 and I-45.
[115] *See CORE from Korea 2018* IDM at Comment 3.

down through the public sewerage system."[116]  The Incheon Metropolitan City Ordinance on Sewerage System Usages contains very similar language; Article 12(2) stipulates that the "public sewerage system fee shall be imposed and collected…based on the volume of sewerage discharged into the public sewerage system and the industry."[117]  Because it is not possible for municipalities to accurately measure the amount of sewage discharged into the public sewerage system due to the lack of gauges as discussed above, the municipalities have attempted to estimate the amount of water discharged into the sewerage systems by tying that amount to the amount supplied to the user.

In *CTL Plate from Korea 2018*, we determined that the laws and regulations "do not prescribe for the situation under which Hyundai Steel qualified for its sewerage fee reduction, or the amount of the reduction received by Hyundai Steel" and that "Article 21, or any other legal provisions cited by the GOK, do not explicitly provide that entities may claim a reduction in their overall water bill with regard to the amount of sewage water discharged."[118]  However, both in *CTL Plate from Korea 2018* and in this instant review, Hyundai Steel applied for the reduction in Incheon under Article 21(1)(7) of the Incheon Metropolitan City Ordinance on Sewage System Usages.[119]  While subparagraphs 1 through 6 of Article 21(1) reference specific circumstances under which users can qualify for a reduction, Article 21(1)(7) is a catch-all clause that states that a reduction can be granted in "{o}ther instances where the public sewerage management authority acknowledges public interest or any other special conditions."[120]  Further, while Article 21 does not explicitly mention a reduction based on water discharged, it appears that such a reduction would not be excluded under the broadly defined language of Article 21(1)(7).

Additionally, in *CTL Plate from Korea 2018*, we reasoned that "the amount of the fee reduction that Hyundai Steel received on its overall water bill significantly exceeds the rate adjustments that are specified in the ordinance, with the exception of certain special conditions, such as being located in a disaster area."[121]  The rate adjustments referenced above refer to adjustment rates specified in Appendix 4 of the Incheon Metropolitan City Ordinance on Sewage System Usages. There are four different adjustment rates in this appendix, one for residential users, one for users in disaster areas, and one each for users that have installed a grey water system or utilize reused water from the public sewerage system.[122]  The disaster area adjustment rate is 100 percent, while the gray water system and reuse water adjustments are both 20 percent.[123]  Article 21(2) stipulates that the adjustment rates in Appendix 4 apply to subparagraphs 1-6 of Article 21(1); thus, Appendix 4 does not apply to reductions, like the one received by Hyundai Steel, granted under Article 21(1)(7).[124]  Specifically, in the case of Hyundai Steel, the reduction is based on the percentage of water from a study it submitted, demonstrating that a percentage of water was not discharged into the public sewage system, which the government accepted.  This reduction

---

[116] *See* GOK IQR at Exhibit SEWER-1.
[117] *Id.*
[118] *See CTL Plate from Korea 2018* IDM at 20.
[119] *Id.* at 19-20; *see also* Hyundai Steel IQR at 1 of Exhibit I-43.
[120] *See* GOK IQR at Exhibit SEWER-1.
[121] *See CTL Plate from Korea 2018* IDM at 20.
[122] *See* GOK IQR at Exhibit SEWER-1.
[123] *Id.*
[124] *Id.*

percentage reflects the intent of the federal and municipal regulations that Hyundai Steel be billed on the amount of water discharged into the sewage system. The reductions specified in Appendix 4 are for very specific categories of users, whether for users located in a disaster zone or those that utilize reuse water, that are not attempting to demonstrate that the amount of water discharged into the sewage system is different that the amount of water supplied. Accordingly, it is logical that Appendix 4 only applies to the narrow categories stipulated in Articles 21(1)(1-6) and not 21(1)(7). Finally, in *CTL Plate from Korea 2018*, Commerce determined that "the basis under which Hyundai Steel received a sewerage fee reduction during the POR is an arrangement unique to the respondent and not otherwise contemplated under the provisions of Korean law on our record."[125] However, as stated previously, according to our further examination of Article 21(1)(7), we find that Hyundai Steel's sewerage fee reduction was not an arrangement that was unique to Hyundai Steel, as Article 21(1)(7) prescribes reduction based on "special conditions" such as usage of a study to demonstrate the amount of water discharged into the public sewage system.

Further, we also do not find that the process used by Hyundai Steel to qualify for this reduction was an *ad hoc* arrangement. Article 9 of the Enforcement Regulation on the Incheon Metropolitan City Ordinance on Sewerage System Use details the government's evaluation of applications submitted for a reduction under Article 21 of the Incheon Metropolitan City Ordinance on Sewerage System Use.[126] In accordance with Article 9 of the enforcement regulation, Hyundai Steel submitted an application using the appropriate form with the required supporting documentation, and the government conducted a factual investigation of that application and granted its approval.

After a review of the record in the instant review, we find that the record does not support a determination that this program is countervailable. Specifically, we determine that the record does not support a finding that the reduction in Hyundai Steel's sewerage fee in Incheon represents revenue forgone under section 771(5)(D)(ii) of the Act. As discussed above, both federal and municipal regulations stipulate that sewerage fees shall be set according to the amount of sewerage a user discharges into the public sewerage system. Hyundai Steel qualified for a reduction in its sewerage bill in the amount that it demonstrated to the government that it could not have discharged into the public sewerage system. Hyundai Steel complied with the municipal regulations by submitting an application for a reduction, citing to a subparagraph of the ordinance that does not exclude such a reduction, and providing supporting evidence, which was reviewed and accepted by the government, demonstrating that it could not have discharged certain amounts of water into the sewerage system. There is no revenue forgone to the government because Hyundai Steel is simply being billed for the service which it has used according to the regulations that govern the fees for such service.

For Pohang, the reduction used in the calculation of the usage fee is stipulated in Article 27 of the Pohang City Ordinance on Sewerage System Use and in Article 15 of the Enforcement Regulation of the same ordinance.[127] There is no application process for a reduction in

---

[125] *See CTL Plate from Korea 2018* IDM at 20.
[126] *See* GOK IQR at Exhibit SEWER-1.
[127] *See* Hyundai Steel IQR at 1-2 of Exhibit I-43.

Pohang.[128]  As the provision under which Hyundai Steel's Pohang facility received its reduction in sewerage fee is prescribed in the appropriate regulation, we similarly find no revenue forgone to the government for Hyundai Steel's Pohang facility.

KG Dongbu also reported that Dongbu Incheon installed a recycled wastewater system and, accordingly, received a sewerage fee reduction during the POR.[129]  As this reduction falls under the prescribed circumstances of Article 21(1)(3), we also find that there was no revenue forgone for KG Dongbu under this program.

As we no longer find that this program is countervailable, the arguments by both Hyundai Steel and Nucor in regard to the applicability of the subsidy to both subject and non-subject merchandise are moot.

**Comment 4:  Whether the Restructuring of KG Dongbu Steel's Existing Loans by GOK-controlled Banks Provided a Financial Contribution and Benefit to KG Dongbu Steel**

*KG Dongbu's Case Brief*

- Commerce erred in countervailing bonds and loans (existing financing) that were issued prior to the Voluntary Restructuring in July 2014.  The existing financing was provided based on ordinary commercial consideration.  Dongbu Steel's creditors also acted in a commercially reasonable manner in agreeing to restructure the existing financing and this decision was consistent with the goal of seeking to minimize their losses and maximize their recovery.[130]
- Commerce normally will rely on the actual experience of the firm in question to determine whether a benefit exists.[131]  The GOK and private banks agreed to restructure these existing loans on the same terms.
- In a World Trade Organization (WTO) panel, the panel found that restructuring was commercially reasonable when "the going concern value of {the respondent} exceeded its liquidation value."[132]  Likewise, it is commercially reasonable for Dongbu Steel to restructure its loans.
- The restructuring of existing financing by Dongbu Steel's creditors in 2014 provided neither a new financial contribution nor a benefit to KG Dongbu.  The fact that the terms of the existing financing were modified in the context of the Voluntary Restructuring does not result in a new financial contribution.  Moreover, the original loans from both the GOK and private banks were provided on ordinary commercial terms.[133]

---

[128] *Id.* at 3 of Exhibit I-43.
[129] *See* KG Dongbu IQR at 83.
[130] *See* KG Dongbu's Case Brief at 31-34.
[131] *Id.* at 32 (citing 19 CFR 351.505(a)(3)(i)).
[132] *Id.* (citing Panel Report, *Korea-Measures Affecting Trade in Commercial Vessels*, WTO Doc. WT/DS273/R (adopted April 11, 2005) (*Korea Commercial Vessels*)).
[133] *Id.*

*Nucor's Rebuttal Brief re KG Dongbu*

- Commerce's established practice is to treat revisions to the terms of existing loans as new financial contributions.  Consistent with its practice, Commerce should continue to find that the restructuring of existing loans in Dongbu Steel's debt restructuring program constitute new loans and thus new financial contributions.[134]
- Whether a financial contribution was provided in the first place does not turn on the intent of the entity providing the financial contribution to confer a benefit pursuant to section 771(5)(D) of the Act.[135]
- The WTO panel's decision in *Korean Commercial Vessels* is inapplicable because WTO disputes are not binding on U.S. agencies and the portion of the panel report cited by KG Dongbu addresses whether a benefit was conferred and not to whether a financial contribution was provided.[136]
- Consistent with its determinations in the original investigation and in each subsequent administrative review, Commerce correctly preliminarily determined that Dongbu Steel was not creditworthy during the POR.[137]  Commerce's rules provide a methodology that must be used to calculate the benefit for uncreditworthy companies.[138]
- Commerce has recently explained that its regulations do not allow the agency to apply the standard benchmarking methodology to uncreditworthy companies.[139]  Commerce may not use comparable commercial loans to determine the benefit, even if such loans existed.
- Limited participation by commercial banks in a restructuring program dominated by government policy banks in no way supports a determination that the government policy banks' financial contributions did not confer a benefit.[140]
- Commerce properly determined loans provided by commercial banks participating in Dongbu Steel's debt restructuring, *i.e.*, the very subsidy program under investigation, could not be used for benchmarking purposes.
- Dongbu Steel's debt restructuring committees are the vehicle for the government program under review.  They are not "the market."[141]

**Commerce's Position:**  We note that KG Dongbu made identical arguments concerning this issue in the underlying investigation and prior administrative reviews.[142]  Further, Commerce's

---

[134] *See* Nucor's Rebuttal Brief re KG Dongbu at 22.

[135] *Id.* at 23.

[136] *Id.* at 24 (citing Dongbu's Case Brief at 32-33).

[137] *Id.* (citing PDM at 10-11).

[138] *Id.* (citing 19 CFR 351.505(a)(3)(iii)).

[139] *Id.* at 25 (citing Final Results of Redetermination Pursuant to Court Remand, *Nucor Corp. v. United States*, Consol. Court No. 19-00042(CIT Sept. 30, 2020), ECF No. 89 at 3-4 (sustained in *Nucor Corp. v. United States*, 494 F. Supp. 3d 1377 (CIT 2021) (*Nucor Corp. CIT 2021*)).

[140] *Id.* at 26.

[141] *Id.*

[142] *See Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 FR 35310 (June 2, 2016), and accompanying IDM (*CORE from Korea Investigation*) at "Debt Restructuring Program"; *see also Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review, Rescission of Review, In Part, and Intent to Rescind, In Part; 2015-16*, 83 FR 39671 (August 10, 2018), and accompanying PDM, unchanged in *Certain Corrosion-Resistant Steel*

determination countervailing this program was sustained by the CIT in *Nucor Corporation v. United States*.[143]  For these final results, we continue to determine that the loans made by GOK-controlled banks through this program are countervailable.  KG Dongbu's argument that the original financing was arranged on commercial terms is not relevant, as we are examining the restructuring of "existing financing" as new loans containing new terms.[144]

As an initial matter, we continue to find that the GOK-controlled policy banks (*i.e.*, the KDB, Korea Export-Import Bank (KEXIM), Woori Bank (Woori), Industrial Bank of Korea (IBK), Corporate Bond Stabilization Fund (CBSF), and Korea Financial Corporation (KoFC)) are authorities within the meaning of section 771(5)(B) of the Act.[145]  We note that the new terms of the loans provided by the GOK-controlled banks did not just include the extension of repayment terms and early settlement, but also included a reduction of the interest rates charged by the banks.[146]  With respect to benefit, the *CVD Preamble* states that "when a firm receives a financial package including loans **from both commercial banks and from the government**, we intend to examine the package closely to determine whether the commercial bank loans should in fact be viewed as 'commercial' for benchmark purposes.  In particular, we look to whether there are any special features of the package that would lead the commercial lender to offer lower, more favorable terms than would be offered absent the government/commercial package" (emphasis added).[147]  We continue to find that the benefit exists where the government-controlled policy banks provided lower interest rates for the restructured loans than a private commercial bank that is outside of the creditor committee would offer.  For further analysis on benefit, see Comment 6 below.

Regarding KG Dongbu's cite to the WTO panel finding in *Korean Commercial Vessels*, the WTO panel finding is not binding on Commerce.  As noted by the Court, "WTO decisions are not self-executing under U.S. law; they can only be implemented through a prescribed statutory procedure."[148]  In addition, the WTO panel finding is not relevant to Commerce's finding of financial contribution and it is not reflective of the evidence on the record of this specific case.  Instead, the reference in WTO panel finding in *Korean Commercial Vessels* by KG Dongbu relates to whether a benefit exists.

---

*Products from the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2015–2016*, 84 FR 11749 (March 28, 2019) (*CORE from Korea 2015-16*); *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review, and Rescission of Review, in Part; 2017*, 84 FR 48107 (September 12, 2019), and accompanying PDM, unchanged in *Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 15112 (March 17, 2020) (*CORE from Korea 2017*), and accompanying IDM; and *CORE from Korea 2018* IDM.
[143] *See Nucor Corp. v. United States*, 484 F. Supp. 3d 1337 (Ct. Int'l Trade 2021) (*Nucor Corp. CIT 2021*).
[144] *See CORE from Korea Investigation* at Comment 5; *see also CFS Paper from Korea* IDM at 38; and *Final Affirmative Countervailing Duty Determination:  Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 FR 37122 (June 23, 2003) (*DRAMs from Korea*), and accompanying IDM at 20-21.
[145] *See CORE from Korea Investigation*; *see also CORE from Korea 2015-16*; *CORE from Korea 2017*; and *CORE from Korea 2018*.
[146] *See* KG Dongbu IQR at 49.
[147] *See CVD Preamble* at 65364.
[148] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act (SAA), H.R. Doc. 103-316, vol. 1 (1994) at 656, 659.

Thus, following our regulations, Commerce examined the record evidence concerning the debt restructuring.[149]  Consistent with past segments of this proceeding, we continue to find that these restructured loans are new financial contributions because they involved new terms including interest rate reduction.[150]  Also consistent with past segments of this proceeding, we continue to find that under this debt restructuring the six GOK-controlled banking authorities specified above provided a financial contribution to KG Dongbu, as defined under section 771(5)(D)(i) of the Act.[151]

**Comment 5:  Whether the Restructured Loans Provided to KG Dongbu Steel Were Specific**

*KG Dongbu's Case Brief*

- There is no basis to find the financing provided as part of Dongbu Steel's debt restructuring under the workout program to be specific and countervailable because the debt restructuring plans under the Corporate Restructuring Promotion Act (CRPA) operate in a similar manner to formal bankruptcy proceedings.[152]  It is well settled that Commerce does not treat concessions made by creditors in the context of a formal bankruptcy as specific and countervailable.

- Furthermore, Commerce's *de facto* specificity finding based on the limited number of recipients of financing pursuant to restructurings by creditors' committees is unlawful and not based on substantial evidence.

- There are three available options to reorganize companies that face financial difficulties in Korea: (1) corporate reorganization; (2) corporate workout; and (3) voluntary restructuring. Corporate reorganization is largely similar to Chapter 11 of the United States Bankruptcy Act.[153]

- Dongbu Steel applied for a Corporate Voluntary Restructuring Program under the Creditor Banks' Committee Agreement (CBCA) on June 30, 2014, and then in October 2015 switched over to a Corporate Workout Program under the CRPA.[154]

- Dongbu Steel's decision to go through a voluntary restructuring, as opposed to a formal bankruptcy or corporate workout procedure, was not motivated or influenced by the GOK, but was based on commercial considerations and the recommendations of an independent auditor.  There was no GOK program that was specific to Dongbu Steel or to the steel industry.[155]

- The voluntary restructuring is generally available to a wide array of debtors from all industries.[156]

- While banks with GOK ownership such as the KDB participated in the Voluntary Restructuring and Corporate Workout, they did so because they had been large creditors of

---

[149] *See* 19 CFR 351.505(a).
[150] *See CORE from Korea Investigation* IDM at Comment 5; *CFS Paper from Korea* IDM at 38; and *DRAMs from Korea* IDM at 20-21.
[151] *See CORE from Korea Investigation*; *see also CORE from Korea 2015-16*; and *CORE from Korea 2017*.
[152] *See* KG Dongbu's Case Brief at 41-51.
[153] *Id.* at 43 (citing KG Dongbu IQR at 25-26).
[154] *Id.* at 43 (citing KG Dongbu IQR at 26, 31).
[155] *Id*. at 45.
[156] *Id*.

Dongbu Steel for a long time before Dongbu Steel entered into the Voluntary Restructuring in June 2014.[157]

- Commerce's interpretation of section 771(5A)(D)(iii)(I) of the Act is much too broad and results in any voluntary restructuring being found to be specific because the number of distressed companies that would be availing themselves of any of the three types of corporate restructuring in Korea is necessarily going to be limited in number.[158]  The purpose of the specificity requirement is "to differentiate between those subsidies that distort trade by aiding a specific company or industry, and those that benefit society generally... and thus minimally distort trade, if at all."[159]

- Commerce's specificity finding is inconsistent with its specificity analysis as applied in the bankruptcy context and is unlawful.[160]

- There is no actual evidence that Dongbu Steel's creditors' committee provided any preferences to Dongbu Steel or that the GOK-controlled banks acted differently from Dongbu Steel's private creditors or did anything other than try to provide concessions to assist Dongbu Steel in its recovery so they could maximize the return on their loans.[161]

- Further, voluntary restructuring or corporate workouts under the CRPA are designed to assist financially troubled debtors similar to a bankruptcy proceeding.[162]

- Absent evidence that the manner in which a voluntary restructuring was carried out was to provide specific recipients with access to its benefits, there is no reasonable basis for treating concessions made by creditors in the context of a bankruptcy proceeding differently than when such concessions are made in the context of a voluntary restructuring.[163]

*Nucor's Rebuttal Brief re KG Dongbu*

- Commerce has consistently found that the debt restructuring program is *de facto* specific because the actual recipients of the subsidies under the program are limited in number, and the same is true in this review as well.[164]

- KG Dongbu's comparisons to Commerce's analyses of bankruptcy proceedings are inapplicable because the debt restructuring program is not and does not resemble a formal bankruptcy proceeding.[165]

- Commerce's determinations concerning bankruptcy have emphasized that they are supervised by courts and subject to oversight by court-appointed bankruptcy trustees.[166]

---

[157] *Id.* at 46 (citing KG Dongbu IQR at Exhibit 10-A).

[158] *Id.* at 47.

[159] *Id.* at 48 (citing *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1349 (CIT 2016) (quoting *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1152, n.12 (CIT 2000))).

[160] *Id.* at 48-49 (citing, *e.g.*, *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Final Results of the Countervailing Duty Administrative Review; 2010*, 78 FR 19210 (March 29, 2013), and accompanying IDM at 21, and *Al Tech Specialty Steel Corp. v. United States*, 661 F. Supp. 1206, 1212 (CIT 1987)).

[161] *Id.* at 50.

[162] *Id.* at 50 (citing *Al Tech v. United States* at 1212).

[163] *Id.* at 50-51.

[164] *See* Nucor's Rebuttal Brief re KG Dongbu at 2.

[165] *Id.* at 29.

[166] *Id.* at 29-31 (citing *e.g.*, *Final Results of Countervailing Duty Administrative Review:  Stainless Steel Sheet and Strip in Coils from the Republic of Korea*, 69 FR 2113 (January 14, 2004), and accompanying IDM at 26; and *CORE from Korea 2018* IDM at 37-38).

- Neither KG Dongbu nor the GOK made any comparison between the eligibility for actual bankruptcy proceedings and the eligibility for and use of the *ad hoc* restructurings under review.
- The statute explicitly provides that subsidies should be deemed specific where they are widely "available" in theory, but in practice are used by only a limited number of companies or industries.[167]
- Further, Commerce has rejected identical arguments regarding the debt restructuring program in the *CORE from Korea Investigation*.[168]
- Neither KG Dongbu nor the GOK have provided any information (*e.g.*, the total number of "distressed companies" in Korea relative to the number using the same debt restructuring procedures as KG Dongbu over the last three years) to support the assertion that "the number of distressed companies . . . is necessarily going to be limited in number" barring "a complete collapse of a country's economy."[169]

**Commerce's Position:**  We note that KG Dongbu made identical arguments with respect to this issue in the underlying investigation and prior administrative reviews.[170]  Commerce does not revisit a specificity determination made in an earlier segment of the same proceeding for a subsidy program, absent new evidence being presented in the current administrative review.[171]  Because no new evidence was presented in this administrative review to cause Commerce to revisit the specificity finding, Commerce continues to find Dongbu Steel's restructuring is *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act.

Further, the CIT affirmed Commerce's specificity finding for this program in *Nucor Corp. v. United States*, which was litigation stemming from the first administrative review.[172]  KG Dongbu has presented no new evidence or reason why we should depart from this finding. Nonetheless, we repeat our original basis for finding specificity below.

As we stated in the original investigation, Dongbu Steel was one of a very limited number of companies that went through such a government-assisted restructuring program.[173]  This debt restructuring program remains specific to KG Dongbu as the actual recipients of financing pursuant to restructurings by creditors' councils are limited in number, making this subsidy specific within the meaning of section 771(5A)(D)(iii)(I) of the Act.[174]  Dongbu Steel's debt restructuring could not be compared to a bankruptcy proceeding, as Dongbu Steel did not operate in a manner similar to that of a company subject to bankruptcy proceeding, nor did Dongbu Steel go through a formal bankruptcy proceeding over the debt restructuring and corporate debt workout.  The restructuring of KG Dongbu Steel's debt was not overseen by an independent

---

[167] *Id.* at 31 (citing section 771(5A)(D)(iii) and SAA at 931-32).
[168] *Id.* at 32 (citing *CORE from Korea Investigation* IDM at 28).
[169] *Id.* at 32-33 (citing KG Dongbu Case Brief at 47).
[170] *See CORE from Korea Investigation*; *see also CORE from Korea 2015-16*; *CORE from Korea 2017*; and *CORE from Korea 2018*.
[171] *See Magnola Metallurgy, Inc. v. United States*, 508 F. 3d 1349 (Fed. Cir. 2007).
[172] *See generally Nucor Corp. CIT 2021*.
[173] *See CORE from Korea Investigation* IDM at Comment 4.
[174] *Id.*

party.[175]  Instead, Dongbu Steel's debt restructuring was controlled by the Creditor Bank Committee (CBC), which in turn was controlled by GOK policy banks such as the KDB.  The CIT also affirmed that Dongbu Steel's restructuring was a specific subsidy that did not operate as a bankruptcy proceeding.[176]  Accordingly, we continue to find that because the actual recipients of financing pursuant to restructurings by creditors' councils are limited in number, this subsidy is specific within the meaning of section 771(5A)(D)(iii)(I) of the Act.[177]

**Comment 6:  Whether Commerce Should Use the Interest Rates from Loans Provided by the Private Banks Participating in the Creditor Bank Committee as Benchmarks**

*KG Dongbu's Case Brief*

- Commerce erroneously disregarded Dongbu Steel's loans from private creditors as "comparable commercial loans" for purposes of a benchmark under 19 CFR 351.505(c)(2) on the grounds that these loans were made by banks that were part of the CBC that was controlled by the GOK-controlled banks.  However, there is nothing in the statute or regulations to prevent loans from private banks from meeting the "comparable commercial loans" standard for use as a benchmark.[178]
- Commerce's reference to *Refrigerator-Freezers from Korea* in the *Preliminary Results* does not support Commerce's exclusion of these loans from private creditors as a benchmark because GOK-owned creditors accounted for just over 75 percent of the voting rights of the creditors' committee.[179]
- In addition, the statute does not support Commerce's decision to exclude loans from private creditors as a benchmark.[180]
- Commerce's regulations describe a comparable loan based on similarities in the structure of the loan, the maturity of the loan, and the currency in which the loans are denominated.[181]
- Commerce's regulations provide that "{i}n selecting a comparable commercial loan that the recipient 'could actually obtain on the market,' the Secretary normally will rely on the actual experience of the firm in question in obtaining comparable commercial loans for both short-term and long-term loans."[182]

---

[175] *See Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2010*, 78 FR 19210, 19212 (March 29, 2013) (Commerce distinguished between a bankruptcy proceeding, which Commerce characterized as "essentially a liquidation process," and other types of "debt workouts" in Korean CVD proceedings that "involved out-of-court corporate restructuring agreements implemented by a body of creditors dominated by government-owned or controlled entities.").
[176] *See Nucor Corp. CIT 2021* at 1383.
[177] *See CORE from Korea Investigation*; *see also CORE from Korea 2015-16*; *CORE from Korea* 2017; and *CORE from Korea 2018*.
[178] *See* KG Dongbu's Case Brief at 34.
[179] *Id*. at 35.
[180] *Id.* at 35 (citing section 771(5)(E)(ii) of the Act).
[181] *Id.* (citing 19 CFR 51.505(a)(2)(i)).
[182] *Id.* at 36 (citing 19 CFR 351.505(a)(3)(i)).

- The GOK and private banks agreed to restructure these existing loans on the same material terms.[183]  Moreover, the private creditors had the option of selling their credits to the other creditors if they wanted to opt out of the workout program.[184]
- Commerce's cite to *Refrigerator-Freezers from Korea* refers to non-performing loans (NPLs).  In contrast, there is no involvement by a government financial institution involved in the purchase and sale of NPLs.[185]
- Commerce cannot deviate from the plain language of the statute and regulations; it must point to facts that support the conclusion that otherwise comparable commercial loans are not useable as a commercial benchmark.  Commerce cannot simply apply a *per se* rule that is based on a 75 percent rule.
- Moreover, *Refrigerator-Freezers from Korea*, which, in turn, references *DRAMs from Korea*, did not establish some bright line rule that, in any case in which GOK-owned banks account for 75 percent or more of the votes on the creditors' committee, the loans provided by private creditors do not constitute comparable commercial loans.
- To the contrary, Commerce also specifically considered how much of the company's shares these GOK-owned creditors owned.[186]  In this review, GOK-owned banks were not among Dongbu Steel's largest shareholders in 2014.[187]
- As in *CFS Paper from Korea*, there is no basis to exclude the loans that Dongbu Steel received from private creditor banks as comparable commercial loans.[188]  There is no lawful basis for Commerce's rejection of the interest rates from these private loans as benchmarks.  These loans constitute comparable commercial loans that Dongbu Steel actually received from private banks and should be used as the benchmark for measuring any benefit in the final results.[189]
- In this case, as in *CFS Paper from Korea*, the loans from the private creditors to Dongbu Steel were not insignificant, the private creditors provided loans on the same terms as GOK-owned financial institutions, and there is no evidence that the GOK-owned creditors influenced or dictated the participation of the private creditors.[190]

*Nucor's Rebuttal Brief re KG Dongbu*

- Commerce should find that all restructured loans, including those provided by commercial banks, are countervailable financial contributions; at the very least, it should reject the argument that the loans from non-government banks on the government-controlled creditors' committee may serve as comparable commercial loans for benchmarking purposes.[191]

---

[183] *Id.* at 36.
[184] *Id.* at 37 (citing GOK IQR at Exhibit Debt Restructuring-15 (CRPA, Article 20)).
[185] *Id.* at 38 (citing *Refrigerators-Freezers from Korea* IDM 108).
[186] *Id.* at 39 (citing *Dynamic Random Access Memory Semiconductors from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review*, 71 FR 14174 (March 21, 2022), and accompanying IDM at 41 (noting that GOK-owned banks owned over 60 percent of Hynix)).
[187] *Id.* at 39 (citing KG Dongbu IQR at Exhibit 10-A).
[188] *Id*. at 40 (citing *Coated Free Sheet Paper from the Republic of Korea:  Notice of Final Affirmative Countervailing Duty Determination*, 72 FR 60639 (October 25, 2007) (*CFS Paper from Korea*).
[189] *Id.*
[190] *Id.*
[191] *See* Nucor's Rebuttal Brief re KG Dongbu at 9-15.

- Private creditors were not acting as "actual private investors" as that term is used in the regulations. Instead, the private creditors were "part of the existing group of creditors involved in the debt restructuring" and "did not evaluate the reasonableness of the rate of return on any equity they were considering investing in {KG Dongbu} . . . ."[192]

- Commerce determined that the GOK-controlled creditors had control of the decision making within the CBC and Dongbu Steel's Creditor Financial Institutions' Committee (DSCFIC).[193] The non-government members of the creditor committees "had no alternative but to accept the terms imposed upon them by the KDB and other GOK-owned policy banks."[194]

- It is inaccurate to argue that private creditors acted voluntarily and therefore Commerce should use rates from private creditors as the benchmark. The government banks were "inconsistent with the usual investment practice of private investors."[195]

- Furthermore, the general rule for determining the benefit conferred by a government financial contribution is whether the government price is consistent with what the recipient could obtain "in the absence of the government program."[196]

- Commerce's decision is consistent with *Refrigerator-Freezers from Korea* because the Korean government controlled a 75 percent supermajority of the creditor committee voting rights and was able to impose its decisions on the private creditors.[197]

- Private creditor participation is not significant and does not establish that the government banks participated on market-based terms. As in *Refrigerator-Freezers from Korea*, "the private creditors' representation and participation in the Creditors' Council was not significant enough to prevent the government-controlled supermajority from imposing the terms of the . . . debt-to-equity conversions."[198]

- Even if the participation by private creditors was voluntary, the private creditors were seeking to minimize losses on existing loans and were not actual private investors seeking reasonable returns that can be used for benchmark purposes.[199]

- The banks on the creditor committees could expect to recover their initial loan amounts and nothing more.[200]

- Because the non-GOK creditors had no means of influencing the terms of the restructuring and there is no evidence that they, in fact, influenced those terms, the record shows that the non-GOK creditors participated on the government's terms, voluntarily or otherwise, and not vice versa. The same argument by KG Dongbu Steel was recently addressed in *CRS from Korea 2018*.[201]

---

[192] *Id.* at 9 (citing *Preliminary Results* PDM at 16).

[193] *Id.* at 10 (citing *Preliminary Results* PDM at 16).

[194] *Id.* (citing Memorandum, "Preliminary Analysis Memorandum – Equity Infusions," dated July 12, 2021 (Equity Infusions Memorandum) at 11-12).

[195] *Id.* at 11 (citing 19 CFR 351.507(a)(1); *see also CVD Preamble* at 65372 (final rule) ("{T}he initial step in analyzing an equity infusion is to determine whether, at the time of the infusion, there was a *market price* for newly issued equity." (emphasis added)).

[196] *Id.* at 11 (citing 19 CFR 351.503(b)).

[197] *Id.* at 12 (citing *Refrigerator-Freezers from Korea* IDM at 100).

[198] *Id.* at 13 (citing *Refrigerator-Freezers from Korea* IDM at 104).

[199] *Id.* at 14 (citing *Refrigerator-Freezers from Korea* IDM at 106).

[200] *Id.* (citing Nucor's letter, "Comments in Advance of the Preliminary Determination Regarding Dongbu," dated June 29, 2021 (Petitioner's Pre-Prelim Comments), at 17-18).

[201] *Id.* at 14-15 (citing *CRS from Korea 2018* IDM at 45).

- KG Dongbu's reference to *Nucor Corp. v. United States* mischaracterizes the CIT's opinion, which held only that Nucor failed to exhaust administrative remedies and did not reach the merits of the equityworthiness issue.[202]
- Regarding KG Dongbu's reference to *CFS Paper from Korea*, in two of the three phases of the restructuring, the banks in that case held less than a supermajority of the voting rights.[203] In this review the creditor committees were controlled by GOK policy banks such as the KDB.
- Commerce should continue to find that actual private investor prices are unavailable and insignificant.

**Commerce's Position:** We note that KG Dongbu made identical arguments with respect to this issue in the underlying investigation and prior administrative reviews.[204] In the underlying investigation and the three prior administrative reviews, we did not use restructured loans provided by private banks on the CBC as benchmarks. In *Nucor Corp. CIT 2021*, the CIT affirmed our determination in the first administrative review not to use the restructured loans provided by private banks as benchmarks.[205] In this review, we continue to follow our prior determinations, as affirmed by the CIT.

The record demonstrates that Dongbu Steel did not obtain any new long-term loans from conventional commercial sources in 2019 other than the restructured loans from Dongbu Steel's existing government and commercial banks. Similar to our findings in the underlying investigation and the three previous administrative reviews, we have not used restructured loans provided by commercial banks on the CBC either as benchmarks or as dispositive evidence of creditworthiness, as we found that these private banks' decisions and interest rates were influenced by the GOK-controlled banks, and that these private loans do not reflect credit that would have been available to Dongbu Steel in the marketplace.[206]

Furthermore, 19 CFR 351.505(a)(3)(iii) states that when an uncreditworthy firm receives government-provided long-term loans, Commerce normally will calculate the interest rate by using an uncreditworthy benchmark. This regulation is applicable here, as Commerce continues to find KG Dongbu Steel to be uncreditworthy during the POR, pursuant to 19 CFR 351.505(a)(4). Commerce's regulation does not say that Commerce will calculate the benefit for an uncreditworthy company by using comparable commercial loans. Therefore, Commerce used an uncreditworthiness benchmark with an added risk premium, in accordance with 19 CFR 351.505(a)(3)(iii), to measure KG Dongbu's countervailable long-term debts/loans during the POR.

Because Dongbu Steel was uncreditworthy, we disagree that it was commercially reasonable for Dongbu Steel's creditors to restructure their loans with the company in 2014. Commerce regulation 19 CFR 351.505(a)(3)(i) does not apply to an uncreditworthy company, for which we

---

[202] *Id.* at 15 (citing *Nucor Corp. v. United States*, 461 F. Supp. 3d 1374, 1378 (CIT 2020) (*Nucor Corp. CIT 2020*)).
[203] *Id.* at 15-16 (citing *CFS Paper from Korea* IDM at 43).
[204] *See CORE from Korea Investigation*; *see also CORE from Korea 2015-16*; *CORE from Korea 2017*; and *CORE from Korea 2018*.
[205] *See Nucor Corp. CIT 2021* at 1381-82.
[206] *Id.*

are not selecting a comparable commercial loan, but rather using the methodology in 19 CFR 351.505(a)(3)(iii) to determine the benefit.

Even if Dongbu Steel were creditworthy, its loans from private banks could not be used as benchmarks. These loans were part of the financial package offered by the KDB, provided for under the government's debt restructuring program, and thus unsuitable for benchmark purposes. These loans from the alleged private banks to Dongbu Steel cannot constitute "comparable commercial loans" under 19 CFR 351.505(a)(2) due to the substantial government influence and the fact that they were part of a government program.[207]

The facts on the record of this review differ from the facts in *CFS Paper from Korea*. In *CFS Paper from Korea*, Commerce did not find evidence of the GOK's influence over the decision-making ability of the Korean respondent's Creditors' Council at issue.[208] Here, we found Dongbu Steel's CBC was dominated by GOK-controlled policy banks, which are authorities under section 771(5)(B) of the Act. There is no basis on this record to find that the GOK-controlled and private banks on the CBC acted in a "commercially reasonable" manner (*i.e.*, seeking to maximize interest income) on the restructured loans without comparing the terms of the renegotiated loans to those of a similar loan provided by a commercial bank.[209]

**Comment 7:    Whether Dongbu Steel is Equityworthy and the 2015-2018 Debt-to-Equity Swaps Should Be Countervailed**

*KG Dongbu's Case Brief*

- Absent new information on the record of this review, Commerce acted inconsistently with its practice and improperly reexamined its prior findings with respect to Debt-to-Equity Conversions.[210]
- The facts do not support the conclusion that the debt-to-equity swaps provided a countervailable benefit to KG Dongbu.[211]
- Commerce's preliminary finding that KG Dongbu received countervailable benefits from the debt-to-equity swaps that occurred as part of its debt restructuring workout program is entirely inconsistent with Commerce's latest reaffirmation that these debt-to equity swaps were not countervailable, where the facts are essentially the same and where for the third consecutive administrative review, Commerce found that the debt-to-equity swaps by Dongbu Steel's creditors do not provide a countervailable benefit to KG Dongbu.[212]
- Commerce did not acknowledge this contradiction, make an effort to distinguish its new position from prior case precedent, nor cite to any reasoning or precedent for finding the debt-equity swaps countervailable.[213]

---

[207] *See Preliminary Results* PDM at 11.

[208] *See CFS Paper from Korea* IDM at 43.

[209] *See CORE from Korea Investigation*; *see also CORE from Korea 2015-16*; *CORE from Korea 2017*; and *CORE from Korea 2018*.

[210] *See KG Dongbu's Case Brief* at 5-21.

[211] *Id.*

[212] *Id.* at 5 (citing *CORE from Korea 2018* IDM at Comment 7).

[213] *See KG Dongbu's Case Brief* at 8-12.

- The fact that the KDB was Dongbu Steel's lead bank does not mean that the KDB, in particular, and other GOK-owned banks, collectively, dictated the terms of the various restructurings that have occurred under the workout program.  All of the creditors, including the GOK-owned banks and private banks, agreed to the restructuring measures on the same terms.[214]

- The CRPA provides that any creditor can opt out of the restructuring program and request other creditors in the committee to purchase its credits.[215]

- The facts in this review are different from those in *Refrigerator-Freezers from Korea*.  In *Refrigerator-Freezers from Korea*, the GOK arranged for the buyout of opposing creditors to ensure that the debt-to-equity conversions took place.[216]

- Commerce's reference to the high percentage of the GOK-owned banks' secured debt is misleading because voting rights are determined on the basis of total outstanding debt.  Moreover, the GOK-owned banks' percentage of total debt is greater than the GOK-owned banks' percentage of secured debt.

- The debt-to-equity conversions only included unsecured debt and resulted in conversion ratios of debt that were higher for the private creditors than the GOK-owned creditors in relation to the share of voting rights.[217]

- The record evidence demonstrates that debt-to-equity conversions meet the threshold to determine that private creditors' participation is significant in the debt-to-equity conversions.[218]  Only if no private investor prices are available as a benchmark will Commerce conduct an equityworthiness analysis.[219]

- The equity infusions were consistent with the usual investment practice of private investors.  Commerce should have used the private investor prices as the benchmark and concluded that the debt-to-equity conversions were consistent with the usual investment practice of private investors.

- The record evidence demonstrates that the private financial institutions paid the same per-share price as the GOK-controlled policy banks and the new shares were issued at the same time.

- In *CORE from Korea 2018*, Commerce supported its decision that the private creditors' participation was significant by citing to *Refrigerator-Freezers from Korea*.  In *Refrigerator-Freezers from Korea*, fewer than half the private investors had voted for the debt-to-equity conversions.  In this review, there is no evidence that any private investors voted against the debt-to-equity conversions.[220]

- Commerce's preliminary determination that prices paid by minority private creditors cannot serve as "private investor prices" is not supported by Commerce's past practice.  In *CFS Paper from Korea*, Commerce found in the context of a voluntary restructuring proceeding similar to the one at issue in this review, that even though the government financial institutions on the creditors' committee accounted for more than 75 percent of the voting

---

[214] *Id.* at 13 (citing KG Dongbu IQR at 28-35).

[215] *Id.* at 14 (citing GOK IQR at Exhibit Debt-Restructuring-15 (CRPA, Article 20).

[216] *Id.* at 14 (citing *Refrigerator-Freezers from Korea* IDM at 100 and 108).

[217] *Id.* at 15-16.

[218] *Id.* at 16 (citing *Nucor Corp. CIT 2020*, 461 F. Supp. 3d at 1378).

[219] *Id.* at 17 (citing 19 CFR 351.507(a)(3)).

[220] *Id.* at 19-20 (citing *Refrigerator-Freezers from Korea* IDM at 111-114).

rights, the debt-to-equity swaps and loans provided by the private creditors could serve as benchmarks.[221]

*Nucor's Rebuttal Brief re KG Dongbu*

- Commerce properly determined that KG Dongbu Steel was not equityworthy and that the debt-to-equity swaps conferred countervailable benefits.[222]
- Each of Commerce's proceedings is *sui generis* and the agency is free to reconsider previous analyses of similar issues as long as its determinations are adequately explained; and Commerce's preliminary analysis of Dongbu Steel's debt-to-equity swaps in this review is thoroughly explained, and in far greater depth and detail than the cursory analysis in *CORE from Korea 2018*.[223]
- In this review, Commerce found that there is a GOK supermajority on the committee and the private investors were not able to influence the terms of their participation, whereas in *Refrigerator-Freezers from Korea* there is no discussion of the percentage of shares acquired by the non-government banks.[224]
- Further, the debt-to-equity conversions were approved concurrently with the restructuring of loans by the same creditors' council and the creditor committees were dominated by GOK policy banks whose purpose "was to implement government industrial policies through the provision of financing to industries and enterprises."[225]
- Commerce also explained the origins and extent of the KDB's control and influence over the debt restructuring process.[226]
- Additionally, the private investors were considering how best to limit their losses and maximize the debt recovery as part of the existing group of creditors involved in the debt restructuring.[227]
- As mentioned in the petitioner's pre-preliminary comments, the GOK's financial support began in 2013 and 2014 when a private investor declined to acquire a controlling stake in Dongbu Steel. Furthermore, Dongbu Steel remained in a workout plan for five years, while its value as a going concern and in liquidation plummeted over time.[228]
- A new Price Waterhouse Coopers (PWC) report was not on the record in previous reviews, as well as information concerning the KG Consortium's acquisition of Dongbu Steel, which also establishes that the creditor committees were acting to support Dongbu Steel as a matter of industrial policy and not as private investors seeking reasonable returns. Even after a final round of loan restructurings and debt-to-equity conversions, the investment proceeded only with the eleventh-hour assistance of a GOK investor.
- KG Dongbu does not challenge Commerce's analysis of Dongbu Steel's actual financial indicators as evidence that it was not equityworthy. Instead, it focuses solely on whether

---

[221] *Id.* at 20 (citing *CFS Paper from Korea* IDM at 43; and 19 CFR 351.507(a)(2)(i)).
[222] *See* Nucor's Rebuttal Brief re KG Dongbu at 3-9.
[223] *Id.* at 5 (citing *CORE from Korea 2018* IDM at 37-38).
[224] *Id.* at 6 (citing *Refrigerator-Freezers from Korea* IDM at 100)
[225] *Id.* at 6 (citing Equity Infusions Memorandum at 10-11).
[226] *Id.* at 6-7 (citing Equity Infusions Memorandum at 11-12).
[227] *Id.* at 7 (citing Equity Infusions Memorandum at 16).
[228] *Id.* at 7-8 (citing Equity Infusions Memorandum at 2, 2-5, and 15-16).

"actual private investor prices" were available and "significant" for the purpose of use as a benchmark.[229]

- Commerce explained that the non-government banks on the creditor committees are not "actual private investors" at all as that term is used in the regulations. Rather, they were "part of the existing group of creditors involved in the debt restructuring" and "did not evaluate the reasonableness of the rate of return on any equity they were considering investing in {KG Dongbu} . . . ."[230]

- Because the KDB and other Korean government banks effectively controlled the actions of the creditor committees through their supermajority voting position, Commerce concluded that the creditor committees "had no alternative but to accept the terms imposed upon them by the KDB and other GOK-owned policy banks."[231]

- Whether the non-government banks participated "voluntarily" is irrelevant to the benchmark issue. The question is not whether the non-government banks were entrusted or directed to participate in any aspect of the restructuring. It is whether the actions of the government banks were "inconsistent with the usual investment practice of private investors." However, because the Korean government banks held a veto-proof supermajority of the creditors' committees voting rights at each stage of the process, the non-government banks had no way to influence the terms on which they participated.[232]

- Commerce's determination is consistent with prior proceedings, such as *Refrigerator-Freezers from Korea* wherein Commerce stated, "{t}he GOK controlled the decisions of the Creditors' Council, and was therefore able to impose its decisions on the private creditors . . . Therefore . . . private investor participation is not significant."[233]

- As in *Refrigerator-Freezers from Korea*, "the private creditors' representation and participation in the Creditors' Council was not significant enough to prevent the government-controlled supermajority from imposing the terms of the . . . debt-to-equity conversions."[234]

- Commerce has determined that parties seeking to minimize losses on existing loans are not "actual private investors" seeking reasonable returns that can be used for benchmark purposes.[235]

- Even under the best assumptions presented by the PWC reports, each of which was materially inaccurate in Dongbu Steel's favor, the banks on the creditor committees could expect to recover their initial loan amounts and nothing more.[236]

- In *CRS from Korea*, Commerce addressed and rejected KG Dongbu's same arguments explaining, "Commerce merely found that GOK-controlled financial institution creditors controlled the decisions of the creditors' committees."[237] The question is whether the non-government banks participated in a manner that establishes that the GOK banks' actions were consistent with the usual practice of private investors.

---

[229] *Id.* at 9-16.
[230] *Id.* at 9 (citing *Preliminary Results* PDM at 16).
[231] *Id.* at 10 (citing Equity Infusions Memorandum at 10-11).
[232] *Id.* at 11 (citing 19 CFR 351.507(a)(1)).
[233] *Id.* at 12 (citing *Refrigerator-Freezers from Korea* IDM at 100).
[234] *Id.* at 13 (citing *Refrigerator-Freezers from Korea* IDM at 100).
[235] *Id.* at 13-14 (citing *Refrigerator-Freezers from Korea* IDM at 106).
[236] *Id.* at 14 (Petitioner's Pre-Prelim Comments at 17-18).
[237] *Id.* at 14 (citing *CRS from Korea 2018* IDM at 45).

- KG Dongbu mischaracterizes the Court's opinion in *Nucor Corp. CIT 2020*. Instead, the CIT determined that Nucor failed to exhaust administrative remedies and did not reach the merits of the equityworthiness issue.[238]
- Commerce's determination in *CFS Paper from Korea* is inapplicable. In *CFS Paper from Korea*, Commerce considered the supermajority position of "creditors with GOK ownership levels of at least 25 percent" during a single phase of a multi-phase debt restructuring, while in two of the three phases of the restructuring, those banks held less than a supermajority of the voting rights. Here, in contrast, creditors that were majority-owned and thus controlled by the GOK held a supermajority of the voting rights in each phase of Dongbu Steel's debt restructuring.[239]

**Commerce's Position:** We continue to find that the equity infusion program provided a financial contribution to KG Dongbu and we have not revised our preliminary benefit methodology with respect to the Dongbu Steel equity infusions. With respect to KG Dongbu's argument that our finding here is not consistent with *CORE from Korea 2018*, Commerce's benefit determinations in each segment of a proceeding stand on their own and are made on a fact-specific basis.[240] In a CVD proceeding, Commerce normally will not re-examine findings of financial contribution and specificity made in a prior segment of the same proceeding, absent new evidence.[241] However, given that the purpose of an administrative review is to "review and determine the *amount* of any net countervailable subsidy," it is necessary for Commerce to re-examine benefit in each successive administrative review.[242] Further, in *CORE from Korea 2018*, we stated:

> We also note that the facts on the instant review differ from the facts in *Cold-Rolled Steel from Korea*, which is an ongoing administrative review that covers the same POR. While we are not making an unequityworthiness finding and continue to find the equity infusions provided no benefit to Dongbu for the instant administrative review, we may re-examine this issue for the next administrative review if new record evidence requires such an examination.[243]

In the *Preliminary Results*, Commerce preliminarily found that the debt-to-equity conversion program conferred a benefit to KG Dongbu and that Dongbu Steel was unequityworthy between 2014 and 2018. In the *Preliminary Results*, we stated:

> In previous reviews of CORE, we did not perform an analysis of KG Dongbu Steel's equityworthiness. Instead, we determined that KG Dongbu Steel did not receive a benefit because the share price was the same for GOK-controlled

---

[238] *Id.* at 15 (citing *Nucor Corp. CIT 2020* at 1378).
[239] *Id.* at 23-24 (citing *CFS Paper from Korea* IDM at 43).
[240] *See Hyundai Steel Co. v. United States,* 319 F. Supp. 3d 1327, 1342 n.13 (CIT 2018) (citing *Yama Ribbons & Bows Co. v. United States,* 865 F. Supp. 2d 1294, 1298 (CIT 2012) ("Commerce must base its decisions on the record before it in each individual investigation.").
[241] *See Magnola Metallurgy, Inc. v. United States,* 508 F. 3d 1349, 1354-56 (Fed. Cir. 2007) (affirming that Commerce need not reach a *de novo* specificity determination in a subsequent segment of the same CVD proceeding); *see also PPG Industries, Inc. v. United States,* 978 F.2d 1232 (Fed. Cir. 1992).
[242] *See* section 751(a)(1)(A) of the Act (emphasis added).
[243] *See CORE from Korea 2018* IDM at 38.

creditors as it was for the private creditors. Furthermore, we noted that the private creditors accounted for a significant percentage of the shares of debt that were converted to equity. However, we stated, "{w}hile we are not making an unequityworthiness finding and continue to find the equity infusions provided no benefit to Dongbu for the instant administrative review, we may re-examine this issue for the next administrative review if new record evidence requires such an examination." After further analysis of the facts on the record of this immediate review, we have determined not to rely on the private investor prices for the first, second, and third equity infusions, because they were not "significant" within the meaning of 19 CFR 351.507(a)(2){iii}.[244]

While the record evidence shows that private creditors accounted for the same debt-to-equity conversion amounts as in the prior reviews, we cannot rely on this fact alone to assess whether KG Dongbu was equityworthy between 2014 and 2018.[245] This is because in the instant review, unlike in the prior reviews, there were private investors independent from the creditors' committee involved in the fourth equity infusion during the 2019 POR.[246] This inclusion of private investors was a factual change from prior reviews that led us to reconsider the role KDB played in its control of the creditors' committee. As explained in detail in the Equity Infusions Memorandum, a comprehensive review of the totality of the evidence, including the underlying Agreements and the ownership of Dongbu Steel, indicates that GOK-controlled entities, in particular the KDB, exercised significant influence over the debt restructurings which included the debt-to-equity conversions.[247] Therefore, the participation of KG Dongbu's private creditors in the first, second, and third equity infusions was not significant.

KG Dongbu argued that there is no evidence that decisions by Dongbu Steel's private creditors were subject to GOK control as a result of the dominant position of the GOK-owned creditors on the creditors' committee.[248] First, Commerce never made any preliminary findings that the position of the GOK with respect to the private creditors is one of direct control. Commerce merely found that GOK-controlled financial institution creditors controlled the decisions of the creditors' committees.[249] Thus, the private creditors had no decision-making control over the creditors' committees and had no choice but to comply with the terms set by the KDB and other GOK-owned banks.

The debt-to-equity conversions were approved concurrently with the restructurings of loans by the same creditors' councils, the CBC and DSCFIC.[250] As discussed above, the CIT in *Nucor Corp. v. United States* sustained Commerce's finding that creditor councils were controlled by the GOK.[251] Because the same creditors councils simultaneously approved the restructurings of loans and the debt-to-equity conversions for Dongbu Steel, it would be unreasonable for us to

---

[244] *See Preliminary Results* PDM at 16.
[245] *Id.*
[246] *See* KG Dongbu IQR at 44.
[247] *See* Equity Infusions Memorandum at 11.
[248] *See* Dongbu's Case Brief at 13-17.
[249] *See* Equity Infusions Memorandum at 9.
[250] *Id*. at 4-7.
[251] *See Nucor Corp. CIT 2021.*

Filed By: Dennis Mcclure, Filed Date: 1/13/22 9:55 AM, Submission Status: Approved

find that the KDB exercised significant influence over the loans, but not the debt-to-equity conversions.

Specifically, as explained in detail in the Equity Infusions Memorandum, the terms of the CBCA and the Succession Agreement of the Agreement for Compliance of Business Normalization Plan gave KDB significant influence over the debt restructurings.[252]  As Dongbu Steel went through the various debt restructuring programs, the KDB continued to dictate how Dongbu Steel would use its assets and manage its production to generate revenue, by which the KDB also was able to dictate how Dongbu Steel would repay its creditors.[253]  Also as explained in the Equity Infusions Memorandum, private creditors had no alternative but to accept the terms imposed by the KDB and the other GOK-owned policy banks.[254]

Moreover, the KDB exercised significant influence over the debt restructuring.  The government banks controlled a majority of Dongbu Steel's shares after the first debt-to-equity conversion and a majority of the voting rights on both creditors' committees.  Moreover, the KDB alone controlled the largest share of debt, equity, and voting rights on both creditors' committees, and enjoyed significant influence over the debt restructurings under the terms of the CBCA and the Succession Agreement of the Agreement for Compliance of Business Normalization Plan.[255]

While the position which KDB held before the CBCA changed, KDB continued to have the largest voting right as the largest creditor, and KDB and other government-controlled financial institution creditors held a majority of the voting rights on both the Dongbu Steel CBC and the successor DSCFIC.  Furthermore, as explained above, the terms of the CBCA and the Succession Agreement of the Agreement for Compliance of Business Normalization Plan gave KDB significant influence over the debt restructurings.[256]  KG Dongbu argues that Commerce erroneously concluded that the private investors had no alternative but to accept the terms imposed by KDB and other GOK policy banks and that the private investors' purchases of Dongbu Steel's shares were significant within the meaning of 19 CFR 35I.507(a)(2)(iii).  However, in the Equity Infusions Memorandum, Commerce reasonably summarized the situation from the time Dongbu Steel entered into the Special Agreement with KDB through the subsequent three debt-to-equity conversions.  Prior to the first restructuring, the Special Agreement left KDB with significant control over the company's decisions.  The record clearly shows that the Special Agreement[257] to repay its creditors, which included the KDB CBCA and the Succession Agreement of the Agreement for Compliance of Business Normalization Plan, gave KDB significant influence over the debt restructurings themselves.[258]  Finally, as explained in the Equity Infusions Memorandum, the majority government creditors on the creditors' committees, which after the first debt-to-equity conversion were also Dongbu Steel's majority

---

[252] *See* Equity Infusions Memorandum at 11 (citing GOK IQR at Exhibit Debt Restructuring-3 and Exhibit Debt Restructuring-6 at 8.).
[253] *Id.*
[254] *Id.* at 12.
[255] *Id.* at 11 and 13.
[256] *Id.*
[257] *Id.* at 11 (citing KG Dongbu IQR at Exhibit B-3 at Article 4).
[258] *Id.*

shareholders, controlled the decisions of the creditors' committees by virtue of their majority voting rights on the committees.[259]

Regarding KG Dongbu's argument that the Special Agreement was irrelevant and Commerce's reliance on it is misplaced, Commerce' reliance on the Special Agreement relates to the role KDB had, through the Special Agreement, in the company's assets and decisions regarding payment of debt, among other provisions, from the time that Dongbu Steel entered into the Special Agreement, through the June 2014 CBCA and the three subsequent debt-to-equity conversions.[260]  The Special Agreement was succeeded by the June 2014 CBCA, which was, in turn, superseded by the October 2014 Creditors' Co-Management Program Agreement with Creditor's Association.[261]  However, Commerce's conclusion that "{o}nce Dongbu Steel {entered} restructuring, the terms of the Special Agreement allowed the KDB to dictate how Dongbu Steel would manage its assets to repay its creditors" is accurate.[262]  As explained above, the terms of the CBCA and the Succession Agreement of the Agreement for Compliance of Business Normalization Plan also gave KDB significant influence over the debt restructurings, including the three debt-to-equity conversions.  As Commerce went on to explain in detail in the Equity Infusions Memorandum, these facts also speak to the role of KDB in the entire process leading up the first debt restructuring and indeed through all three debt-to-equity conversions. As explained in the Equity Infusions Memorandum, "KDB did not simply act as a lender throughout this process.  After the Special Agreement was reached, the KDB tried to sell Dongbu Incheon and DDPT as a package deal to POSCO.  Because the deal was unsuccessful, Dongbu Steel had no other option but to apply for the GOK's debt restructuring programs."[263]

Subsequent to the Special Agreement, Dongbu Steel entered into the first restructuring which included the first debt-to-equity conversion.  Under this first restructuring, rather than wresting control of the company from KDB's influence under the Special Agreement, the company was largely sold to its creditors, and a majority of its shares were sold to government-controlled financial institutions, including KDB, meaning Dongbu Steel's existing shareholders' ownership share and control of the company were almost completely diluted.[264]  Further, the record shows that government banks, through their voting rights alone, controlled the creditors' committees.[265] Moreover, as explained above, KG Dongbu's private creditors held a minority of the voting

---

[259] *Id.* at 11 and 12 (citing GOK IQR at 16;  KG Dongbu IQR, Exhibit B-10; *see also Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2018*, 85 FR 74692 (November 23, 2020), and accompanying PDM at 13-14, unchanged in *CORE from Korea 2018* and accompanying IDM).  The CBC was established as part of Dongbu Steel's involvement in the Corporate Voluntary Restructuring Program under the authority of the CBCA.  Between July 7, 2014 and February 2015, the CBC consisted of KDB, KEXIM, KoFC, Nonghyup Bank, Shihan Bank, Hana Bank, Woori Bank, KEB, and IBK. However, KoFC was merged into KDB in January 2015.  *See* KG Dongbu IQR at 47.

[260] *Id.* at 2, 11 (citing KG Dongbu IQR at 12 and Exhibit B-3 at Article 4)

[261] *Id.* at 3 (citing KG Dongbu IQR at 26).

[262] *Id.* at 11.

[263] *Id.* at 11 (citing KG Dongbu IQR at 24 and 29).

[264] *Id.* at 10-12.

[265] *Id.* at 3 ("The members of DSCBC include KDB, Korean Finance Corporation (KoFC), the Export-Import Bank of Korea (KEXIM), Nonghyup Bank, Shihan Bank, Hana Bank, Woori Bank, Korea Exchange Bank (KEB), and Industrial Bank of Korea (IBK), with KDB as the principal creditor and the Korean state-owned banks together holding the largest share of the of the voting rights."); *see also Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 FR 35310 (June 2, 2016), and accompanying IDM at 13-14.

rights and a minority of Dongbu Steel's shares and were not in any position to vote to prevent the creditors' committees from accepting the terms of the debt-to-equity conversions or to prevent Dongbu Steel from accepting the terms of the three debt-to-equity conversions dictated by the majority government creditors on the creditors' committees. Rather, the government-controlled financial institutions and creditors on the creditors' bank committees, principally KDB, gained control over Dongbu Steel under the Special Agreement and the three subsequent debt restructurings and were able to dictate terms to Dongbu Steel' minority creditors.

Finally, KG Dongbu's reliance on *CFS Paper from Korea* is misplaced. Commerce has countervailed debt restructuring programs conducted under the CRPA in past cases.[266] Each debt restructuring is unique and distinct because the terms of debt restructuring are company-specific, depend on the composition of the creditors, and vary with the financial situation of each company. In *DRAMs from Korea*[267] and *Refrigerator-Freezers from Korea*,[268] Commerce analyzed the facts on the debt restructurings in detail and found the GOK-owned banks had the ability to influence the creditors council on the debt restructurings at issue. In *CFS Paper from Korea*, after analyzing the facts on that case record, Commerce found that the GOK-owned banks did not have the ability to exercise influence over the creditors' council on the respondent Shinho's debt restructurings. In each case, Commerce analyzed the facts for each debt restructuring in detail and made a case-specific decision on whether the GOK-owned banks had the ability to influence the creditors' council. As explained above and in our Equity Infusions Memorandum, we analyzed the facts on KG Dongbu's debt restructuring and continued to determine the GOK-owned banks had the ability to influence the creditors' council.

Further, in contrast to *CFS Paper from Korea*, the question of whether these private creditors are entrusted or directed to provide benefits to Dongbu Steel is not at issue here. Thus, Commerce continues to find that the GOK-controlled creditor financial institutions (which were in most cases also Dongbu Steel's majority shareholders) controlled the creditors' council, and thus, controlled share prices arising from the decisions of the creditors' council and negotiations between the creditors' council and Dongbu Steel, and thus the share prices established through this process do not constitute "private investor prices," within the meaning of 19 CFR 351.507(a)(2)(i).

Therefore, as detailed in the Equity Infusions Memorandum, after examining the totality of evidence on the record, Commerce properly concluded that the participation of private investors in the first, second, and third debt-to-equity conversions was insignificant. As provided in 19 CFR 351.507(a)(2)(iii), Commerce will not use private investor purchase prices in determining the benefit from an equity infusion if the private investor purchases are not "significant." Thus, because the private purchases were not significant, actual private investor prices were not available for the first, second, and third debt-to-equity conversions within the meaning of 19 CFR 351.507(a). 19 CFR 351.507(a)(3) states that "{i}f actual private investor prices are not available under paragraph (a)(2) of this section, the Secretary will determine whether the firm funded by the government-provided equity was equityworthy or unequityworthy at the time of the equity infusion. If the Secretary determines that the firm was equityworthy, the Secretary

---

[266] *See, e.g.*, *DRAMs from Korea* IDM at 19-22; and *Refrigerator-Freezers from Korea* IDM at Comment 25.
[267] *See DRAMs from Korea* IDM at 21-22.
[268] *See Refrigerator-Freezers* IDM at Comment 25.

will apply paragraph (a)(5) of this section to determine whether the equity infusion was inconsistent with the usual investment practice of private investors. A determination by the Secretary that the firm was unequityworthy will constitute a determination that the equity infusion was inconsistent with usual investment practice of private investors, and the Secretary will apply paragraph (a)(6) of this section to measure the benefit attributable to the equity infusion." As explained above, with respect to the first, second, and third debt-to-equity infusions, actual significant private investor prices were not available. Therefore, we assessed whether Dongbu Steel was equityworthy at the time of each infusion. As explained in detail in the Equity Infusions Memorandum, Dongbu was not equityworthy and we found the entire amounts of the debt-to-equity infusions made by the GOK-owned or controlled financial institutions to be countervailable in accordance with 19 CFR 351.507(a)(6).[269]

**Comment 8:   Whether Subsidies Prior to Dongbu Steel's Change in Ownership Pass Through to KG Dongbu Steel**

*KG Dongbu's Case Brief*

- KG Dongbu contends that Commerce has not determined whether KG Dongbu Steel is the successor-in-interest to Dongbu Steel, and whether the benefits from Dongbu Steel's first, second, and third debt-to-equity conversions, which were found to be countervailable for the first time in the *Preliminary Results* of this review, passed through to KG Dongbu Steel.
- On April 13, 2020, KG Dongbu informed Commerce that it officially changed its name to KG Dongbu Steel on March 27, 2020, and requested a changed circumstances review (CCR).[270]
- Commerce determined,

  that there is evidence of significant changes in ownership during the ''look-back window'' that could have affected the nature and extent of the countervailable subsidies attributable to the successor entity vs. the predecessor entity. These changes in management and ownership would likely have affected subsidization of the companies. An examination of the actual amount and rate of countervailable subsidies attributable to KG Dongbu Steel, therefore, would be more appropriate in the context of an administrative review.[271]

---

[269] *See* Equity Infusions Memorandum at 21.

[270] *See* KG Dongbu's Case Brief at 22 (citing *Certain Cold-Rolled Steel Flat Products and Certain Corrosion-Resistant Steel Products from the Republic of Korea: Initiation of Antidumping Duty and Countervailing Duty Changed Circumstances Reviews*, 85 FR 34413 (June 4, 2020)).

[271] *See* KG Dongbu's Case Brief at 22-23 (citing *Certain Cold-Rolled Steel Flat Products and Certain Corrosion-Resistant Steel Products From the Republic of Korea: Preliminary Results of Antidumping Duty and Countervailing Duty Changed Circumstances Reviews*, 86 FR 287 (January 5, 2021), and accompanying PDM; and affirmed in *Certain Cold-Rolled Steel Flat Products and Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results of Antidumping Duty and Countervailing Duty Changed Circumstances Reviews*, 86 FR 10922, 10923 (February 23, 2021)).

Barcode:4200434-02 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

- When the final results of the CCR were issued, Commerce had found all of the subsidies in prior reviews with respect to Dongbu Steel were from programs that provided recurring subsidies and there was no issue concerning non-recurring benefits.[272]
- Commerce made no examination concerning non-recurring subsidies within the context of the change in ownership and requested no additional information in the instant review to demonstrate that the benefits from the first, second, and third debt-to-equity conversions were not extinguished with the acquisition of Dongbu Steel by the KG Consortium.
- The record evidence in this current proceeding supports the conclusion that there was no pass-through of non-recurring subsidies to KG Dongbu Steel.
- The amounts of these debt-to-equity conversions and their impact on Dongbu Steel's current financial condition would have necessarily been incorporated into a bidder's analysis and calculation of an appropriate bid.[273]
- KG Dongbu provided a detailed explanation and supporting documentation regarding the open bidding process through which the KG Consortium offered the highest price among the bidders and thus acquired control of Dongbu Steel through an arm's-length transaction at a market-determined price.[274]
- The creditors' committee appointed Credit Suisse Securities (Europe) Limited, Seoul Branch, and the KDB Merger and Acquisition (M&A) Consulting Team as co-financial advisors for the M&A.  The advisors chose to issue an investment attraction announcement for an open bidding process providing equal access and free competition for all interested parties.[275]
- While all potential investors had access to information concerning Dongbu Steel's financial condition which reflected the first, second, and third debt-to-equity conversions, only the KG Consortium submitted a final bid.
- Based on the information provided, the KG Consortium prepared its business restructuring plan and submitted its final bidding proposal on March 4, 2019.[276]
- The final contract terms were determined through further negotiation after consideration of the results of financial and legal due diligence, including Dongbu Steel's contract with PWC to evaluate the possible alternatives to Dongbu Steel and its creditors for maximizing the company value and debt recovery ratio.[277]
- On June 24, 2019, the creditors' committee chose the M&A agreement for an investment of 360 billion Korean won (KRW) and various measures for restructuring of outstanding debt, among which was the fourth debt-to-equity conversion of KRW 605 billion.[278]
- On September 6, 2019, the creditors' committee was dissolved, and the resulting new shares accounted for 96.15 percent of Dongbu Steel's outstanding shares.[279]

---

[272] *Id.* at 24.

[273] *Id.* at 26 (citing *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 FR 37125, 37137 (June 23, 2003) (*Notice of Final Modification*) (a subsidy is fully extinguished in the fair market value of an arm's-length transaction if the nature and value of the subsidy was fully transparent to all potential bidders and was bestowed prior to the sale)).

[274] *Id.* at 26-27.

[275] *Id.* at 27.

[276] *Id.* at 28 (citing KG Dongbu IQR at Exhibit B-26).

[277] *Id.* at 28-29.

[278] *Id.* at 29.

[279] *Id.* at 30.

- Besides the KG Consortium providing the highest bid in an open bidding process, the transaction involved private, unrelated parties that through their representatives negotiated the final contract terms of an arm's-length price at fair market value.
- The KG Consortium did not ask for or receive any legal or fiscal incentives such as special tax benefits or government policy waivers, nor did the creditors' committee impose any market distortive measures.[280]
- Commerce should determine in the final results that any subsidy that Dongbu Steel received from the first, second, and third debt-to-equity conversions was extinguished through this transaction and thus no benefit passed through to KG Dongbu Steel.

*Nucor's Rebuttal Brief re KG Dongbu*

- Commerce's baseline presumption is that any non-recurring subsidies to the acquired firm pass through and continue to benefit the acquiring firm.[281]
- In *Supercalendered Paper from Canada*, Commerce stated, "a sale at arm's length and for fair market value does not *automatically* extinguish subsidies provided prior to the sale (or the establishment of the price) . . . except when the Department's established criteria have been satisfied."[282]
- Furthermore, the baseline presumption may be rebutted if an interested party "demonstrate{s} that the broader market conditions were severely distorted by the government and that the transaction price was meaningfully different from what it would otherwise have been absent the distortive government action."[283]
- Commerce's questionnaire instructed KG Dongbu to respond to the Change-in-Ownership Appendix of the questionnaire if it wanted to challenge "Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period."[284]
- In addition, Commerce's questionnaire states, "If your company does not wish to challenge Commerce's baseline presumption that nonrecurring subsidies continue to benefit the recipient over the allocation period, please so state and you do not need to provide a response to {the Change-in-Ownership Appendix}."[285]
- In KG Dongbu's response, KG Dongbu stated:

  Dongbu has not been privatized . . . merged with another company, or devolved another company/companies from its corporate structure in whole or in part, during the AUL period. . . . Dongbu does not wish to challenge the Department's

---

[280] *Id.* at 30-31 (citing KG Dongbu's Letters, "Dongbu's Fourth Supplemental Questionnaire Response," dated June 23, 2021, at Exhibits B-46, B-47, B-48; and "Dongbu's First Supplemental Questionnaire Response," dated January 19, 2021, at 4).

[281] *See* Nucor's Rebuttal Brief at 17 (citing *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 FR 37125, 37127 (June 23, 2003) (*Notification of Final Modification*)).

[282] *Id.* at 16-17 (citing *Supercalendered Paper from Canada: Final Affirmative Countervailing Duty Determination*, 80 FR 63535 (October 20, 2015), and accompanying IDM at 86).

[283] *Id.* at 17 (citing *Notification of Final Modification* at 37127).

[284] *Id.* at 18 (citing KG Dongbu's Letter, "Dongbu's Affiliated Companies Response," dated October 27, 2020, at 12 (KG Dongbu's ACR)).

[285] *Id.*

baseline presumption and thus understands that no response to the Change-in-Ownership Appendix is required involving change in ownership.[286]

- Additionally, KG Dongbu noted that the change in ownership did not require further reporting obligations because companies in the KG Group do not meet any of the four criteria of cross-ownership.[287]
- KG Dongbu has previously conceded issues in its questionnaire responses in prior reviews, only to raise the issue in a case brief or on appeal.[288] Such tactics are wasteful and unfair for Commerce and interested parties in the proceeding.
- KG Dongbu's argument, shifting blame on Commerce, is without merit. It is not Commerce's responsibility to remedy KG Dongbu's mistaken presumption that no such reconsideration of the countervailability of the first three debt-to-equity swaps might occur.
- Considering the merits of KG Dongbu's belated extinguishment argument would also cause undue prejudice because Nucor was not permitted an opportunity to rebut KG Dongbu's argument that "pre-sale subsidies . . . {are} extinguished in their entirety and, therefore, non-countervailable."[289]
- Therefore, it is procedurally impossible for Commerce to determine whether subsidies are extinguished prior to the sale, in accordance with its practice, as articulated in the *Notification of Final Modification*.
- Regardless, Commerce requires that a respondent company sell all or substantially all of the company or its assets, retaining no control of the company or its assets. In this case, the KG Group only acquired 39.98 percent interest in Dongbu Steel.[290]
- Commerce should continue to countervail the pre-sale debt-to-equity conversions.

**Commerce's Position:** We disagree with KG Dongbu's argument concerning the extinguishment of Dongbu Steel's first, second, and third debt-to-equity conversions. As an initial matter, analyzing whether prior subsidies were extinguished requires extensive analysis based on a respondent's complete responses to the Change-in-Ownership Appendix.[291] Because KG Dongbu failed to provide any response to our Change-in-Ownership Appendix, Commerce was prevented from conducting a complete analysis on whether the acquisition of Dongbu Steel extinguished prior subsidies. KG Dongbu argued that we did not request any *additional* information necessary for the analysis, and the issue of whether the first through third debt-to-equity conversions were extinguished was not raised until after the *Preliminary Results.* However, the debate over the countervailability of Dongbu Steel's equity infusions has been significant in all prior reviews; thus, KG Dongbu was on notice of the issue.[292] Further, our

---

[286] *Id.*

[287] *Id.*

[288] *Id.* at 19.

[289] *Id.* at 20 (citing *Notification of Final Modification* at 37127).

[290] *Id.* at 20-21 (citing *Notification of Final Modification* at 37127).

[291] *See Certain Uncoated Groundwood Paper from Canada: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 83 FR 2133 (January 16, 2018), and accompanying PDM at 57, unchanged in *Certain Uncoated Groundwood Paper from Canada: Final Affirmative Countervailing Duty Determination*, 83 FR 39414 (August 9, 2018), and accompanying IDM; *see also* Commerce's Letter, "Countervailing Duty Questionnaire," dated October 6, 2021 (Commerce Questionnaire), at Change-in-Ownership Appendix.

[292] *See Saarstahl AG v. United States*, 949 F. Supp. 863, 867 (CIT 1996).

questionnaire indicated that KG Dongbu had the burden of challenging the baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period. Our questionnaire stated that:

> "Commerce allocates the benefits received from certain types of subsidies over time (*e.g.*, *equity infusions*, non-recurring grants, debt forgiveness, import duty or value-added tax exemptions or reductions on capital equipment, *etc.*). *See* 19 CFR 351.524 and subsection C of the "General Questions" section below for a complete explanation.

> Thus, in addition to investigating alleged subsidies that your company may have received during the POI, Commerce is also investigating alleged allocable, non-recurring subsidies that your company may have received during the AUL period. Because of this, if your company obtained all or substantially all the assets of another company during the AUL period, and that company still exists as an ongoing entity, or its assets continue to operate as part of your company, we require a complete questionnaire response for such company. *If your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please coordinate with your government to answer the questions in the Change-in-Ownership Appendix. If your company does not wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please so state and you do not need to provide a response to the Change-in-Ownership Appendix."*[293] (Emphasis added).

Furthermore, although KG Dongbu was aware that the petitioners have been arguing for Commerce to countervail the debt-to-equity infusions since the first administrative review of this proceeding and that an acquisition had occurred[294] and, therefore, that non-recurring subsidy pass through could be an issue in this review, KG Dongbu's response stated that "Dongbu does not wish to challenge the Department's baseline presumption and thus understands that no response to the Change-in-Ownership Appendix is required."[295] Based on this response, Commerce determined it was not necessary to ask additional questions. Therefore, Commerce did not further examine the change in ownership of Dongbu Steel.

With respect to KG Dongbu's arguments regarding the CVD CCR, we disagree that we concluded in the CVD CCR that we would have to examine further the change in ownership of Dongbu Steel to determine whether non-recurring subsidies found with respect to Dongbu Steel would be attributable to KG Dongbu Steel.[296] KG Dongbu misunderstood Commerce's CVD CCR findings. The analytical standard for CVD successor-in-interest determinations is set forth in *Pasta from Turkey*.[297] In that case, we stated that significant changes in the respondent's

---

[293] *See* Commerce Questionnaire at III-4.
[294] *See* Petitioner's Rebuttal Brief at 19.
[295] *See* KG Dongbu's ACR at 12.
[296] See KG Dongbu's Case Brief at 64.
[297] *See Certain Pasta from Turkey: Preliminary Results of Countervailing Duty Changed Circumstances Review*, 74 FR 47225, 47226 (September 15, 2009), unchanged in *Certain Pasta from Turkey: Final Results of Countervailing Duty Changed Circumstances Review*, 74 FR 54022 (October 21, 2009).

ownership could potentially affect the nature and extent of the company's subsidization.[298] Therefore, in the face of such changes, it normally would be inappropriate for Commerce to affirm a cash deposit rate that had been calculated during a previous time period based on a significantly different factual pattern. Therefore, we stated that an administrative review, not a CCR, is a more appropriate venue because an administrative review allows Commerce to fully examine the extent of subsidization passed on to the new entity, *i.e.* KG Dongbu in this case. Our findings in the CVD CCR did not dictate that we were *required* to make this determination, but rather that an administrative review was a more appropriate venue for making such determinations in general.

Therefore, once KG Dongbu was selected as a mandatory respondent in an administrative review, KG Dongbu had the responsibility to answer Commerce's questionnaires and supplemental questionnaires to allow Commerce to fully examine potential subsidies received by KG Dongbu. Our questionnaire in this review had instructions indicating that KG Dongbu could provide information with respect to any changes in ownership. KG Dongbu had the burden to challenge our baseline presumption, yet it chose not to do so. Based on KG Dongbu's response that it did not wish to challenge the baseline presumption, Commerce continued its base-line presumption that non-recurring subsidies (*i.e.,* the debt-to-equity swaps prior to the acquisition of Dongbu Steel) continue to benefit KG Dongbu over the allocation period.

KG Dongbu argued that the KG Consortium acquired control of Dongbu Steel in an arm's-length transaction and at fair market value. However, the record does not support its argument. As explained above, KG Dongbu did not challenge our baseline presumption and did not respond to the Change-in-Ownership Appendix. Therefore, Commerce is prevented from conducting a complete analysis as to whether prior subsidies were extinguished by the acquisition. As a result, the record of this review suggests that the KG Consortium's acquisition of Dongbu Steel was likely not for fair market value. The *Notice of Final Modification* states "in analyzing whether the transaction was for fair market value, the basic question is whether the full amount that the company or its assets (including the value of any subsidy benefits) were actually worth under the prevailing market conditions were paid, and paid through monetary or equivalent compensation. *A primary consideration in this regard normally will be whether the government failed to maximize its return on what it sold, indicating that the purchaser paid less for the company or assets than it otherwise would have had the government acted in a manner consistent with the normal sales practices of private, commercial sellers in that country*".[299]

While the KG Consortium bought Dongbu Steel through an open bidding process as the highest bidder, one of the conditions for KG Consortium to acquire Dongbu Steel is that the KDB-led Creditors Council would agree to extend existing loans and reduce the interest rates.[300] The PWC's evaluation of the acquisition was mainly focused on how much money the creditors can recover from this acquisition.[301] Further, as a condition for the sale, the KDB-led Creditors Council also agreed to another round of debt-to-equity swaps, at a price of 25,000 KRW per share. As indicated in the Equity Infusions Memorandum, the price per share paid by the

---

[298] *See, e.g.*, Petitioner's Pre-Prelim Comments.
[299] *See Notice of Final Modification* at 37127.
[300] *See* GOK IQR at 16.
[301] *Id.*

Creditors Council was higher than the price per share paid by the KG Consortium. Therefore, the KDB-led Creditors Council likely did not maximize its return when selling Dongbu Steel.[302] Rather, the KDB and the Creditors Council were trying to get Dongbu Steel out of the voluntary restructuring program. It is unlikely the KDB-led Creditors Council acted in a manner consistent with the normal sales practices of private, commercial sellers in Korea.

Furthermore, we have also determined that KG Dongbu benefitted from the restructuring of long-term loans as part of KG Dongbu's debt restructuring plan as reflected in the "Programs Determined to Be Countervailable" section, above. However, KG Dongbu did not argue that Commerce should extinguish the benefits associated with the restructuring of the long-term loans, although the restructured loans relate to the voluntary debt restructuring which began before the KG Group acquisition. Moreover, the first, second, and third debt-to-equity conversions were also made before the KG Group acquisition, similar to the restructuring of KG Dongbu's long-term loans. If the KG Consortium paid a fair market value for Dongbu Steel, in theory, the fair market value could extinguish all prior subsidies that could continue to benefit KG Dongbu Steel during the POR. However, as stated above, the evidence on the record suggests that it is unlikely that the KG Consortium paid a fair market value. In any event, because KG Dongbu failed to provide a complete response to the Change-in-Ownership Appendix, Commerce is prevented from conducting a thorough analysis of the change in ownership.

**Comment 9:   Whether Commerce Incorrectly Calculated the Uncreditworthy Discount Rate Used for Allocating the Benefits from Long-Term Loans, Bonds, and Equity Infusions**

*KG Dongbu's Case Brief*

- With respect to Dongbu Steel's restructured long-term loans, bonds, and equity infusions from GOK-controlled banks during the POR, Commerce incorrectly applied the formula for calculating the uncreditworthy benchmark rate.[303]
- In particular, Commerce selected a long-term creditworthy rate for 2019 based on the national average yield on three-year, KRW-denominated AA-rated corporate bonds published by the Bank of Korea.[304]
- Furthermore, Commerce incorrectly used a three-year creditworthy and uncreditworthy default rate.[305]
- Although Commerce has used the three-year KRW-denominated AA-rated corporate bonds published by the Bank of Korea in certain Korean proceedings, Commerce should consider the loan terms when selecting a default rate.
- In this proceeding, Commerce should use a six-year default rate because the term of the long-term loans and bonds is six years.

---

[302] *See* Equity Infusions Memorandum at 13.
[303] *See* KG Dongbu's Case Brief at 52-55.
[304] *Id.* at 52 (citing KG Dongbu's Preliminary Calculation Memorandum at Attachment IV, tab "UCW BM", "LT (2019)", and "Bonds (2019)").
[305] *Id.*

Filed By: Dennis Mcclure, Filed Date: 1/13/22 9:55 AM, Submission Status: Approved

- Therefore, Commerce should revise the uncreditworthy benchmark calculation using the six-year default rates for creditworthy and uncreditworthy companies.
- In addition, the uncreditworthy benchmark rate for equity infusions should be tied to the length of the AUL, similar to tying the default rates for long-term loans and bonds to the loan terms.
- Specifically, Commerce should revise the calculation of the unequityworthy discount rates by using the 15-year default rates from Moody's Investors Service.[306]

*Nucor's Rebuttal Brief re KG Dongbu*

- Commerce recently rejected the same argument in *CRS from Korea 2018*, partially because the information was not on the record.[307]

**Commerce's Position:**  We are not changing the calculation of the discount rate for these final results of review.  As stated above, we continue to find KG Dongbu to be uncreditworthy.  Under 19 CFR 351.351.507(c), the benefit conferred by an equity infusion shall be allocated over the same period as a non-recurring subsidy; 19 CFR 351.524(d) describes how Commerce should allocate a non-recurring subsidy and 19 CFR 351.351.524(d)(3) describes selection of a discount rate when allocating a non-recurring subsidy.  Specifically, 19 CFR 351.524(d)(3)(ii) contains an exception for uncreditworthy firms and states that Commerce will use as a discount rate the interest rate described in 19 CFR 351.505(a)(3)(iii), which is the formula for calculating the uncreditworthy interest rate.

The uncreditworthy interest rate formula has four variables: 1) the term of the loan in question ($n$); 2) the long-term interest rate paid by a creditworthy company; 3) the probability of default of a creditworthy company in $n$ years; and 4) the probability of default of an uncreditworthy company in $n$ years.  In the *Preliminary Results*, Commerce used a three-year AA-rated KRW interest rate as the long-term interest rate paid by a creditworthy company because it was the only long-term interest rate on the record.  This three-year AA-interest rate is published by the Bank of Korea.  No other long-term KRW interest rates were provided on the record by parties in this review.  Therefore, to be consistent, Commerce used three years for the term of the loan variable and the three-year creditworthy default and uncreditworthy default rates.  Thus, the calculation Commerce used is the correct calculation for a three-year uncreditworthy discount rate, based on the formula specified by 19 CFR 351.505(a)(3)(iii).

It is not possible to calculate a 15-year uncreditworthy interest rate based on the regulatory formula, because there is no information regarding a 15-year creditworthy interest rate available on the record.  KG Dongbu argues that we should simply use 15 years for the "term of the loan in question" variable, as well as 15-year creditworthy and uncreditworthy default rates, in combination with the three-year interest rate used in the *Preliminary Results*.  However, this change would not result in a 15-year uncreditworthy discount rate.  It would instead be an inconsistent mixing of three-year and 15-year variables, including the three-year creditworthy benchmark interest rate, default rates from 15-year creditworthy and uncreditworthy bonds and loans, and a 15-year loan term variable.  Thus, KG Dongbu's proposed modification does not

---

[306] *Id.* at 55.
[307] *See* Nucor's Rebuttal Brief re KG Dongbu at 33 (citing *CRS from Korea 2018* IDM at Comment 8).

result in a more accurate uncreditworthy discount rate. For this reason, we have continued to use the same uncreditworthy discount rate as that used in the *Preliminary Results* to calculate the benefits for the equity infusions in the final results.

Following the same reasoning, it is not possible to calculate a six-year uncreditworthy interest rate based on the regulatory formula, because there is no information regarding a six-year creditworthy interest rate available on the record. Therefore, we have also continued to use the same uncreditworthy discount rate as that used in the *Preliminary Results* for the long-term loans and bonds benefit calculations in the final results

### Comment 10: Whether Commerce Incorrectly Calculated the Discount Rate for the 2019 Government Equity Infusion

*KG Dongbu's Case Brief*

- Commerce should use a creditworthy discount rate to calculate the benefit for the fourth equity infusion, because Commerce did not determine that Dongbu Steel was unequityworthy at the time of the fourth equity infusion.
- For the discount rate, Commerce should use the three-year corporate bond rate of 2.02 percent for 2019 from the Bank of Korea.[308]

*Nucor's Rebuttal Brief re KG Dongbu*

- Because Dongbu Steel was uncreditworthy at the time of the debt-to-equity conversions, Commerce properly used the uncreditworthy discount rate in allocating benefits from the fourth equity infusion over the AUL period.
- Commerce makes an exception to the discount rate used for uncreditworthy companies.[309]

**Commerce's Position:** We disagree with KG Dongbu. In accordance with 19 CFR 351.507(c), the benefit conferred by an equity infusion shall be allocated over the same period as a non-recurring subsidy. Sections 351.524(d)(1) and (d)(3)(ii) of our regulations provide that, in the case of a firm considered to be uncreditworthy, the Secretary will use as a discount rate the interest rate described in 190CFR 351.505(a)(3)(iii), which is an exception for uncreditworthy company. As explained in our PDM, we found KG Dongbu to be uncreditworthy in 2019.[310] There is no evidence on the record that would cause us to change this finding for the final results. Therefore, in accordance with 19 CFR 351.505(a)(3)(iii), we have continued to use a discount rate for uncreditworthy companies in the final results. Also, as explained in Comment 9 above, we are not changing the calculation of this discount rate for the final results.

---

[308] *See* KG Dongbu's Case Brief at 56.
[309] *See* Petitioner's Rebuttal Brief re KG Dongbu at 34 (citing 19 CFR 351.524(d)(3)(ii)).
[310] *See Preliminary Results* PDM at 10-11.

## X.    RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting the above positions.
If accepted, we will publish the final results in the *Federal Register*.

⊠                              ☐
_____                    _____
Agree                          Disagree

                               1/12/2022

X 

Signed by: Lisa Wang

_____
Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

**Tab 11**

**CR Doc. 270-271**
**PR Doc. 214**

**Data from Josh Simonidis, Int'l Trade Compliance Analyst, AD/CVD Operations, Office VIII, to Bob Palmer, Program Manager, AD/CVD Operations, Office VIII, "Countervailing Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results Calculations for KG Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd.," (Jan. 12, 2022).**

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-580-879
Administrative Review
POR:  01/01/2019 – 12/31/2019
~~Proprietary Document~~
**PUBLIC VERSION**
E&C/OVIII:  JS

**DATE:** January 12, 2022

**MEMORANDUM TO:** The File

**THROUGH:** Bob Palmer
Program Manager
 AD/CVD Operations, Office VIII

**FROM:** Josh Simonidis
International Trade Compliance Analyst
 AD/CVD Operations, Office VIII

**SUBJECT:** Countervailing Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea

**RE:** Final Results Calculations for KG Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd.

---

In this countervailing duty (CVD) administrative review, the Department of Commerce (Commerce) has examined the subsidies provided to KG Dongbu Steel Co., Ltd. (KG Dongbu Steel) and Dongbu Incheon Steel Co., Ltd. (collectively, Dongbu).  As stated in the Issues and Decision Memorandum (IDM),[1] we have made changes to the preliminary calculations based on our final results as described below.

For the period of review, we calculated, using Dongbu's data, the following *ad valorem* rate:

Total Subsidy Rate:      10.51% *ad valorem*.[2]

### A.      Programs Found Not Countervailable

- Reduction for Sewerage Fees

Commerce has determined in the final results that the Reduction for Sewerage Fees program is not countervailable.  For a complete discussion of this decision *see* IDM at Comment 3.

---

[1] *See* Memorandum, "Issues and Decision Memorandum for the Final Results and Partial Rescission of the 2019 Administrative Review of the Countervailing Duty Order on Certain Corrosion-Resistant Steel Products from the Republic of Korea," dated January 12, 2022 (IDM).
[2] *See* Attachment I.



**B.    Programs Not Changed from the Preliminary Results**

- Dongbu's Debt Restructuring
- Dongbu's Equity Infusions
- Energy Savings:  Trading of Demand Response Resources
- Korean Development Bank (KDB) and Industrial Bank of Korea (IBK) Short-Term Discounted Loans for Export Receivables

**C.    Programs Determined to Be Not Used by Dongbu**

1. Korea Export-Import Bank (KEXIM) Import Financing
2. Restriction of Special Taxation Act (RSTA) Article 25(1)(2):  Tax Deductions for Investments in Energy Economizing Facilities, formerly RSTA Article 25(2)
3. Restriction of Special Location Taxation Act (RSLTA) Article 78:  Acquisition and Property Tax Benefits to Companies Located in Industrial Complexes
4. RSTA Article 26:  Government of the Republic of Korea Facilities Investment Support
5. Provision of Liquefied Natural Gas for Less Than Adequate Remuneration (LTAR)
6. Energy Savings Programs
7. Electricity Savings for Designated Period Program
8. Electricity Savings through the Bidding Process Program
9. Electricity Savings upon an Emergent Reduction Program
10. Electricity Savings through General Management Program
11. Management of the Electricity Load Factor Program
12. KEXIM Short-Term Export Credits
13. KEXIM Export Factoring
14. KEXIM Export Loan Guarantees
15. KEXIM Trade Bill Rediscounting Program
16. KEXIM Overseas Investment Credit Program
17. KDB and Industrial Base Fund (IBF) Loans under the Industrial Base Fund
18. K-SURE Export Credit Guarantees
19. K-SURE Short-Term Export Credit Insurance
20. Long-Terms Loans from KORES and KNOC
21. Special Accounts for Energy and Resources (SAER) Loans
22. Clean Coal Subsidies
23. GOK Subsidies for "Green Technology Research and Development (R&D)" and its Commercialization
24. Support for SME "Green Partnerships"
25. Daewoo International Corporation Debt Work Out
26. Research, Supply or Workforce Development Investment Tax Deduction for
27. "New Growth Engines" under RSTA Article 10(1)(1)
28. 23. Research, Supply, or Workforce Development Expense Tax Deductions for
29. "Core Technologies" under RSTA Article 10(1)(2)
30. Tax Reduction for Research and Human Resources Development under RSTA Article
31. 10(1)(3)
32. Tax Credit for Investment in Facilities for Research and Manpower under RSTA

2

Barcode:4200442-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

33. Article 11
34. Tax Deduction for Investment in Environmental and Safety Facilities under
35. RSTA Article 25(1)(3), formerly Article 25(3)
36. Tax Program for Third-Party Logistics Operations under RSTA Article 104(14)
37. RSLTA Articles 46, 84
38. Tax Reductions and Exemptions in Free Economic Zones
39. Exemptions and Reductions of Lease fees in Free Economic Zones
40. Grants and Financial Support in Free Economic Zones
41. Modal Shift Program
42. Sharing of Working Opportunities/Employment Creating Incentives
43. R&D Grants Provided under ITIPA
44. GOK Infrastructure Investment at Inchon North Harbor
45. Machinery & Equipment (KANIST R&D) Project
46. Grant for the Purchase of an Electric Vehicle
47. The GOK's Purchases of Electricity from Corrosion-Resistant Steel Producers for MTAR
48. Land Purchase at Asan Bay
49. KG Dongbu Steel's Exemptions from Payment of Harbor Fees
50. Grants from the Korea Agency for Infrastructure Technology Advancement
51. Port Usage Rights at the Port of Incheon

   **D.    Programs Determined to Be Not Used or Confer a Measurable Benefit**

52. Electricity for LTAR

Filed By: Joshua Simonidis, Filed Date: 1/13/22 9:58 AM, Submission Status: Approved

**Attachment 1:**    **Public Information**
- Program Rates and Total *Ad Valorem* Subsidy Rate

**Attachment 2:**    **Business Proprietary Information (BPI)**
- Subsidy Benefit Calculations

4

# ATTACHMENT 1

# FINAL CALCULATIONS

# PUBLIC INFORMATION

## Rate Summary

| Program Name | Ad Valorem Rate |
|---|---|
| Dongbu's Debt Restructuring | 5.38% |
| Dongbu's Equity Infusions | 5.09% |
| Energy Savings:  Trading of Demand Response Resources | 0.03% |
| Korean Development Bank (KDB) and Industrial Bank of Korea (IBK) Short-Term Discounted Loans for Export Receivables | 0.01% |
| Total *Ad Valorem* Subsidy Rate | 10.51% |

5

Barcode:4200442-01 C-580-879 REV - Admin Review 1/1/19 - 12/31/19

**ATTACHMENT 2**

**FINAL CALCULATIONS**

**BUSINESS PROPRIETARY INFORMATION**

**(NOT SUBJECT TO PUBLIC SUMMARIZATION)**

Filed By: Joshua Simonidis, Filed Date: 1/13/22 9:58 AM, Submission Status: Approved

**Tab 12**

**PR Doc. 216**

*Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019,* **87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022).**

developing, installing, equipping, and maintaining community scale distributive energy resources

The information solicited from applications by this NOFO is required to (1) determine whether participants meet the eligibility requirements to be a recipient of grant funds; (2) evaluate project eligibility; (3) determine technical and financial viability; (4) calculate priority scores and rank in order to compete the applications for funding. Lack of adequate information for these purposes could result in the improper administration and appropriation of Federal grant funds.

*Estimate of Burden:* Public reporting burden for this collection of information is estimated to average 11 hours per response.

*Estimated Number of Respondents:* 25.

*Estimated Total Annual Responses:* 325.

*Estimated Total Recordkeeping Hours:* 15.

*Estimated Total Burden Hours:* 3,462.

*Estimated Total Annual Burden (including recordkeeping) on Respondents:* 3,477 hours.

Copies of this information collection can be obtained from MaryPat Daskal, Regulatory Division Team 2, Rural Development Innovation Center, U.S. Department of Agriculture, 1400 Independence Ave. SW, Washington, DC 20250. Phone: 202–690–4492. All responses to this information collection and recordkeeping Notice will be summarized and included in the request for OMB approval. All comments will also become a matter of public record.

### B. Nondiscrimination Statement

In accordance with Federal civil rights laws and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Mission Areas, agencies, staff offices, employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Program information may be made available in languages other than English. Persons with disabilities who require alternative means of

communication to obtain program information (*e.g.,* Braille, large print, audiotape, American Sign Language) should contact the responsible Mission Area, agency, or staff office; the USDA TARGET Center at (202) 720–2600 (voice and TTY); or the Federal Relay Service at (800) 877–8339.

To file a program discrimination complaint, a complainant should complete a Form AD–3027, USDA Program Discrimination Complaint Form, which can be obtained online at *https://www.ocio.usda.gov/document/ ad-3027,* from any USDA office, by calling (866) 632–9992, or by writing a letter addressed to USDA. The letter must contain the complainant's name, address, telephone number, and a written description of the alleged discriminatory action in sufficient detail to inform the Assistant Secretary for Civil Rights (ASCR) about the nature and date of an alleged civil rights violation. The completed AD–3027 form or letter must be submitted to USDA by:

(1) *Mail:* U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410; or

(2) *Fax:* (833) 256–1665 or (202) 690– 7442; or

(3) *Email: program.intake@usda.gov.*

USDA is an equal opportunity provider, employer, and lender.

**Karama Neal,**

*Administrator, Rural Business-Cooperative Service.*

[FR Doc. 2022–00943 Filed 1–18–22; 8:45 am]

**BILLING CODE 3410–XY–P**

---

## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

### Information Systems Technical Advisory Committee; Notice of Partially Closed Meeting

The Information Systems Technical Advisory Committee (ISTAC) will meet on February 2, 2022, at 1:00 p.m., Eastern Standard Time. The meetings will be available via teleconference. The Committee advises the Office of the Assistant Secretary for Export Administration on technical questions that affect the level of export controls applicable to information systems equipment and technology.

### Wednesday, February 2

*Open Session*

1. Welcome and Announcements
2. Working Group Reports
3. Industry Presentation

*Closed Session*

4. Discussion of matters determined to be exempt from the provisions relating to public meetings found in 5 U.S.C. app. 10(a)(1) and 10(a)(3).

The open session will be accessible via teleconference. To join the conference, submit inquiries to Ms. Yvette Springer at *Yvette.Springer@ bis.doc.gov,* no later than January 26, 2022.

To the extent time permits, members of the public may present oral statements to the Committee. The public may submit written statements at any time before or after the meeting. However, to facilitate distribution of public presentation materials to Committee members, the Committee suggests that public presentation materials or comments be forwarded before the meeting to Ms. Springer.

The Assistant Secretary for Administration, with the concurrence of the delegate of the General Counsel, formally determined on January 7, 2022, pursuant to Section 10(d) of the Federal Advisory Committee Act, as amended (5 U.S.C. app. (l0)(d))), that the portion of the meeting concerning trade secrets and commercial or financial information deemed privileged or confidential as described in 5 U.S.C. 552b(c)(4) and the portion of the meeting concerning matters the disclosure of which would be likely to frustrate significantly implementation of an agency action as described in 5 U.S.C. 552b(c)(9)(B) shall be exempt from the provisions relating to public meetings found in 5 U.S.C. app. 10(a)(1) and l0(a)(3). The remaining portions of the meeting will be open to the public.

For more information, contact Yvette Springer via email.

**Yvette Springer,**

*Committee Liaison Officer.*

[FR Doc. 2022–00885 Filed 1–18–22; 8:45 am]

**BILLING CODE 3510–JT–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[C–580–879]

### Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that

countervailable subsidies are being provided to producers and exporters of certain corrosion-resistant steel products from the Republic of Korea. The period of review (POR) is January 1, 2019, through December 31, 2019. Commerce is also rescinding the review with respect to Dongkuk Steel Mill Co., Ltd. (Dongkuk).

**DATES:** Applicable January 19, 2022.

**FOR FURTHER INFORMATION CONTACT:** Joshua Simondis or Dennis McClure, AD/CVD Operations, Office VIII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0608 or (202) 482–5973, respectively.

**SUPPLEMENTARY INFORMATION:**

## Background

Commerce published the *Preliminary Results* of this review on July 16, 2021.[1] For a description of the events that occurred since the *Preliminary Results, see* the Issues and Decision Memorandum.[2]

## Scope of the Order

The products covered by this order are certain corrosion-resistant steel products. For a complete description of the scope of this order, *see* the Issues and Decision Memorandum.

## Analysis of Comments Received

All issues raised in interested parties' case briefs are addressed in the Issues and Decision Memorandum accompanying this notice. A list of the issued raised by parties, and to which Commerce responded in the Issues and Decision Memorandum, is provided in Appendix I to this notice. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http:// access.trade.gov*. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly

at *https://access.trade.gov/public/ FRNoticesListLayout.aspx.*

## Changes Since the Preliminary Results

Based on a review of the record and comments received from interested parties, and for the reasons explained in the Issues and Decision Memorandum, we made changes to the *Preliminary Results.*

## Methodology

Commerce conducted this review in accordance with section 751(a)(1)(A) of the Tariff Act of 1930, as amended (the Act). For each of the subsidy programs found countervailable, we find that there is a subsidy, *i.e.,* a government-provided financial contribution that gives rise to a benefit to the recipient, and that the subsidy is specific.[3] For a description of the methodology underlying all of Commerce's conclusions, *see* the Issues and Decision Memorandum.

## Rescission of Administrative Review, in Part

As noted in the Issues and Decision Memorandum, Commerce inadvertently included Dongkuk as a respondent company in this administrative review. Accordingly, we are rescinding the review with respect to Dongkuk. For further discussion, *see* "Rescission of Administrative Review, in Part" section in the Issues and Decision Memorandum.

## Companies Not Selected for Individual Review

There are 35 companies for which a review was requested, but which were not selected as mandatory respondents or found to be cross-owned with a mandatory respondent. For these 35 companies, we applied the subsidy rate calculated for KG Dongbu Steel Co., Ltd. (KG Dongbu Steel) (formerly Dongbu Steel Co., Ltd.) and its cross-owned affiliate, Dongbu Incheon Steel Co., Ltd., as the only rate calculated for a mandatory respondent that was above *de minimis* and not based entirely on facts available. This methodology for establishing the subsidy rate for the non-selected companies is consistent with our practice and with section 705(c)(5)(A) of the Act.

## Final Results of Administrative Review

We determine that, for the period January 1, 2019, through December 31, 2019, the following total estimated net countervailable subsidy rates exist:

| Company | Subsidy rate (percent ad valorem) |
|---|---|
| KG Dongbu Steel Co., Ltd. (formerly Dongbu Steel Co., Ltd.) [4]/ Dongbu Incheon Steel Co., Ltd ... | 10.51 |
| Hyundai Steel Company ................. | * 0.47 |
| Non-Selected Companies Under Review [5] ....................................... | 10.51 |

* (*de minimis*).

## Assessment Rate

Pursuant to 19 CFR 351.212(b)(2), Commerce will determine, and U.S. Customs and Border Protection (CBP) shall assess, countervailing duties on all appropriate entries of subject merchandise in accordance with the final results of this review, for the above-listed companies at the applicable *ad valorem* assessment rates listed. Commerce intends to issue assessment instructions to CBP no earlier than 35 days after the date of publication of the final results of this review in the **Federal Register**. If a timely summons is filed at the U.S. Court of International Trade, the assessment instructions will direct CBP not to liquidate relevant entries until the time for parties to file a request for a statutory injunction has expired (*i.e.,* within 90 days of publication).

## Cash Deposit Rates

In accordance with section 751(a)(1) of the Act, Commerce intends to instruct CBP to collect cash deposits of estimated countervailing duties in the amounts shown for each of the respective companies listed above. For all non-reviewed firms, we will instruct CBP to continue to collect cash deposits of estimated countervailing duties at the most recent company-specific or all-others rate applicable to the company, as appropriate. These cash deposits, when imposed, shall remain in effect until further notice.

## Administrative Protective Order

This notice also serves as a final reminder to parties subject to administrative protective order (APO) of their responsibility concerning the return or destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a sanctionable violation.

---

[1] *See Certain Corrosion-Resistant Steel Products from the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2019,* 86 FR 37740 (July 16, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, "Issues and Decision Memorandum for the Final Results and Partial Rescission of the 2019 Administrative Review of the Countervailing Duty Order on Certain Corrosion-Resistant Steel Products from the Republic of Korea," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[3] *See* sections 771(5)(B) and (D) of the Act regarding financial contribution; section 771(5)(E) of the Act regarding benefit; and section 771(5A) of the Act regarding specificity.

[4] Dongbu Steel Co., Ltd. changed its name to KG Dongbu Steel Co., Ltd. in 2020.

[5] *See* Appendix II.

## Disclosure

Commerce intends to disclose the calculations performed for these final results of review within five days of the date of publication of this notice in the **Federal Register**, in accordance with 19 CFR 351.224(b).

## Notification to Interested Parties

These final results are issued and published in accordance with sections 751(a)(1) and 777(i)(1) of the Act, and 19 CFR 351.221(b)(5).

Dated: January 12, 2022.

**Lisa W. Wang,**

*Assistant Secretary for Enforcement and Compliance.*

## Appendix I

List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Changes Since the Preliminary Results
IV. Scope of the Order
V. Period of Review
VI. Rescission of Administrative Review, in Part
VII. Subsidies Valuation Information
VIII. Analysis of Programs
IX. Discussion of Comments
  Comment 1: Whether Electricity Is Subsidized by the Government of the Republic of Korea (GOK)
  Comment 2: Whether Commerce's Determination that Port Usage Rights Provide a Countervailable Benefit Is Unsupported by Evidence and Contrary to Law
  Comment 3: Whether Commerce Incorrectly Countervailed the Reduction for Sewerage Usage Fees
  Comment 4: Whether the Restructuring of KG Dongbu Steel's Existing Loans by GOK-Controlled Financial Institutions Constitutes a Financial Contribution and a Benefit to KG Dongbu Steel
  Comment 5: Whether the Restructured Loans Provided to KG Dongbu Were Specific
  Comment 6: Whether Commerce Should Use the Interest Rates From Loans Provided by Private Banks Participating in the Creditor Bank Committee as Benchmarks
  Comment 7: Whether KG Dongbu Steel Is Equityworthy and the 2015–2018 Debt-to-Equity Swaps Should Be Countervailed
  Comment 8: Whether Subsidies Prior to Dongbu Steel's Change in Ownership Pass Through to KG Dongbu Steel
  Comment 9: Whether Commerce Incorrectly Calculated the Uncreditworthy Discount Rate Used for Allocating the Benefits From Long-Term Loans, Bonds, and Equity Infusions
  Comment 10: Whether Commerce Incorrectly Calculated the Discount Rate for the 2019 Government Equity Infusion
XI. Recommendation

## Appendix II

List of Non-Selected Companies

1. Ajin H & S Co., Ltd.
2. AJU Steel Co., Ltd.
3. B&N International
4. CDS Global Logistics
5. Dong A Hwa Sung Co., Ltd.
6. Dongkuk International, Inc.
7. Korea Clad Tech. Co., Ltd.
8. Pantos Logistics Co., Ltd.
9. PL Special Steel Co., Ltd.
10. POSCO
11. POSCO C&C
12. POSCO Coated & Color Steel Co., Ltd.
13. POSCO Daewoo Corp.
14. Samsung C&T Corporation
15. Samsung Electronics Co., Ltd.
16. Sanglim Steel Co., Ltd.
17. SeAH Coated Metal
18. SeAH Steel Corporation
19. Seajin St. Industry, Ltd.
20. Sejung Shipping Co., Ltd.
21. Seun Steel Co., Ltd.
22. Segye Chemical Industry Co., Ltd.
23. Shandongsheng Cao Xian Yalu Mftd.
24. Shengzhou Hanshine Import and Export Trade
25. Soon Hong Trading Co., Ltd.
26. Southern Steel Sheet Co., Ltd.
27. SSangyong Manufacturing
28. Sung A Steel Co., Ltd.
29. SW Co., Ltd.
30. SY Co., Ltd.
31. Syon
32. TCC Steel. Co., Ltd.
33. Young Steel Korea Co., Ltd.
34. Young Sun Steel Co.
35. Young Steel Co.

[FR Doc. 2022–00939 Filed 1–18–22; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

**International Trade Administration**

**[C–533–884]**

### Glycine From India: Final Results of Countervailing Duty Administrative Review; 2018–2019

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and exporters of glycine from India during the period of review (POR), September 4, 2018, through December 31, 2019.

**DATES:** Applicable January 19, 2022.

**FOR FURTHER INFORMATION CONTACT:** Davina Friedmann, AD/CVD Operations, Office VI, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0698.

**SUPPLEMENTARY INFORMATION:**

## Background

On July 16, 2021, Commerce published the *Preliminary Results* of this administrative review in the **Federal Register**.[1] On October 21, 2021, Commerce extended the final results of review by 60 days, until January 12, 2022.[2] On November 16, 2021, Commerce issued a post-preliminary decision.[3] We invited parties to comment on the *Preliminary Results* and on the Post-Preliminary Decision. On November 29 and 30, 2021, case briefs were timely filed by GEO Specialty Chemicals, Inc. (the petitioner), Avid Organics Private Limited (Avid), and Kumar Industries, India (Kumar).[4] On December 6, 2021, timely rebuttal briefs were submitted to Commerce by the petitioner, Avid, Kumar and Paras Intermediates Private Limited (Paras).[5] For a full description of the events that occurred since the *Preliminary Results, see* the Issues and Decision Memorandum.[6]

## Scope of the Order

The merchandise covered by the order is glycine from India. For the complete description of the scope of the order, *see* the Issues and Decision Memorandum.

## Analysis of Comments Received

All issues raised in interested parties' briefs are addressed in the Issues and Decision Memorandum. A list of the issues raised by interested parties, and

---

[1] *See Glycine from India: Preliminary Results of the Countervailing Duty Administrative Review; 2018–2019,* 86 FR 37738 (July 16, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, "Glycine from India: Extension of Time Limit for Final Results of Countervailing Duty Administrative Review," dated October 21, 2021.

[3] *See* Memorandum, "Countervailing Duty Administrative Review of Glycine from India, 2018–2019: Post-Preliminary Decision," dated November 16, 2021 (Post-Preliminary Decision).

[4] *See* Petitioner's Letter, "Glycine from India: GEO Specialty Chemical's Case Brief," dated November 29, 2021; Avid's Letter, "Glycine from India: Case Brief—Avid Organic's Pvt. Ltd.," dated November 29, 2021; and Kumar's Letter, "Certain Glycine from India (C–533–884) Kumar Industries—Case Brief," dated November 30, 2021.

[5] *See* Petitioner's Letter, "Glycine from India: GEO Specialty Chemicals' Rebuttal Brief," dated December 6, 2021; Avid's Letter, "Glycine from India: Rebuttal Brief—Avid Organics Pvt. Ltd.," dated December 6, 2021; Kumar's Letter, "Certain Glycine from India (C–533–884) Kumar Industries—Rebuttal Brief," dated December 6, 2021; and Paras' Letter, "Paras Intermediates Private Limited ("Paras") Administrative Rebuttal Brief: Countervailing Duty Investigation on Glycine from India," dated December 6, 2021.

[6] *See* Memorandum, "Glycine from India: Issues and Decision Memorandum for the Final Results of Countervailing Duty Administrative Review; 2018–2019," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

**Tab 13**

**CRR Doc. 3**
**PRR Doc. 3**

**Final Results of Redetermination Pursuant to Court Remand, *KG Dongbu Steel Co., Ltd. v. United States*, Court No. 22-00047, Slip Op. 23-98 (Court Int'l Trade Oct. 5, 2023).**

C-580-879
Remand
Slip Op 23-98, Court No. 22-00047
POR:  01/01/2019 – 12/31/2019
~~Business Proprietary Document~~
E&C/OVIII:  TEAM
PUBLIC VERSION

***KG Dongbu Steel Co., Ltd. v. United States*,**
**Court No.  22-00047, Slip Op. 23-98 (CIT July 7, 2023)**
**Certain Corrosion-Resistant Steel Products from the Republic of Korea**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the Court of International Trade (Court or CIT)

in *Nucor Corporation v. United States*, Consol. Court No.  22-00047, Slip Op. 23-98 (July 7,

2023) (*Remand Opinion and Order*).  These final results of redetermination concern *Certain*

*Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results and Partial*

*Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 2759 (January 19, 2022)

(*AR 2019 Final Results*), and accompanying Issues and Decision Memorandum (IDM).  In the

*Remand Opinion and Order*, the Court ordered Commerce to reconsider or further explain:  (1)

its determination that the first through third debt-to-equity restructurings provided a

countervailable benefit; (2) its determination that the benefits from the debt-to-equity

restructurings passed through from Dongbu Steel Co., Ltd. (Dongbu Steel) to KG Dongbu Steel

Co., Ltd. (KG Dongbu Steel) despite the change in ownership; (3) whether Commerce's

calculations of the uncreditworthy benchmark rate are supported by substantial evidence; and (4)

whether Commerce's calculations of the unequityworthy discount rate are supported by

substantial evidence.

Barcode:4442089-01 C-580-879 REM - Remand  -  Slip Op. 23-98

As discussed below, pursuant to the Court's *Remand Opinion and Order*, Commerce has further explained its rationale for determining that the first through third debt-to-equity restructurings provided a countervailable benefit, that a benefit passed through to the new ownership, and that the uncreditworthy benchmark rate and unequityworthy discount rate are supported by substantial evidence.

## II.    BACKGROUND

On September 3, 2020, Commerce initiated an administrative review of certain corrosion-resistant steel products (CORE) from the Republic of Korea (Korea) for 39 producers and exporters of subject merchandise for the period January 1, 2019, through December 31, 2019.[1] On October 6, 2020, Commerce selected KG Dongbu Steel and Hyundai Steel Company (Hyundai Steel) as the mandatory respondents in this administrative review.[2]

We issued the *Preliminary Results* of the administrative review on July 16, 2021, and preliminarily found that KG Dongbu Steel received a 10.52 percent subsidy rate.[3] On August 26, 2021, Nucor, KG Dongbu Steel, and Hyundai Steel all filed timely case briefs.[4] On August 26, 2021, Dongkuk Steel Mill Co., Ltd. (Dongkuk) filed a letter in lieu of a case brief.[5] On September 7, 2021, Nucor, Hyundai Steel, KG Dongbu Steel, and the Government of Korea (GOK) each timely filed rebuttal briefs.[6]

---

[1] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 54983 (September 3, 2020).
[2] *See* Memorandum, "Respondent Selection," dated October 6, 2020.
[3] *See Certain Corrosion-Resistant Steel Products from the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86 FR 37740 (July 16, 2021) (*AR 2019 Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[4] *See* KG Dongbu Steel's Letter, "Dongbu's Case Brief," dated August 26, 2021; *see also* Hyundai Steel's Letter, "Hyundai Steel's Case Brief," dated August 26, 2021.
[5] *See* Dongkuk's Letter, "Letter in Lieu of Case Brief," dated August 26, 2021.
[6] *See* Nucor's Letters, "Nucor's Rebuttal Brief regarding KG Dongbu Steel," dated May 11, 2021; and "Nucor's Rebuttal Brief regarding Hyundai Steel," dated May 11, 2021; *see also* Hyundai Steel and KG Dongbu's Letter, "Respondents' Rebuttal Brief," dated September 7, 2021; and GOK's Letter, "GOK's Rebuttal Brief," dated September 7, 2021.

2

Commerce published its *AR 2019 Final Results* on January 19, 2022.  In the *AR 2019 Final Results*, Commerce calculated a 10.51 percent subsidy rate for KG Dongbu Steel, which was also assigned to the non-selected companies.  In Comment 7 of the IDM, Commerce addressed the parties' arguments regarding whether KG Dongbu Steel was equityworthy and whether the 2015-2018 debt-to equity swaps should be countervailed.  Commerce continued to find that the entire amounts of the debt-to-equity infusions were made by GOK-owned or controlled financial institutions and that KG Dongbu Steel was not equityworthy at the time of these infusions.

In Comment 8 of the IDM, Commerce explained that it continued to find that benefits to Dongbu Steel would have passed through to KG Dongbu Steel when the ownership changed.  KG Dongbu Steel was given an opportunity to rebut Commerce's presumption that benefits would pass through to the new owners but declined to respond to the *Change-in-Ownership Appendix*.  Without a response to the questions in that appendix, we followed our standard practice and found that any benefit to Dongbu Steel would pass through to KG Dongbu Steel.

In Comment 9 of the IDM, Commerce explained that it continued to find that the use of three-year Korean won (KRW)-denominated AA-rate corporate bonds published by the Bank of Korea for the calculation of the uncreditworthy interest rate was appropriate for the long-term loans and bonds benefit calculation.  Commerce rejected the argument that we should use a six-year creditworthy interest rate because there was no six-year rate on the record.  The only six-year rate available is from the creditors committee, which we found to be GOK-owned or controlled.

In Comment 10 of the IDM, Commerce explained that it continued to find that the use of a discount rate for uncreditworthy companies, calculated using three-year KRW-denominated

3

AA-rate corporate bonds published by the Bank of Korea, was appropriate for the allocation of the benefit conferred by the fourth equity infusion.

## III.    REMAND OPINION AND ORDER

In the *Remand Opinion and Order*, the Court found that Commerce did not sufficiently explain or cite new information on the record of this review, in departing from Commerce's prior decisions in the preceding segments of this proceeding.[7]  Specifically, the Court noted that in the instant review, Commerce found that the first through third debt-to-equity restructurings provided a countervailable subsidy, although it reviewed the same debt-to-equity restructurings in prior reviews and found them not countervailable.[8]  The Court found that Commerce's departure from its prior practice was arbitrary and not in accordance with the law, because Commerce failed to provide an adequate explanation for its decision to deviate from its prior determinations.  The Court, therefore, ordered Commerce to reconsider or further explain its decision that the first through third debt-to-equity restructurings provided a countervailable subsidy to KG Dongbu Steel, finding that "the record evidence cited by Commerce as justification for its deviation from its past practice does not deal directly with the first through third debt-to-equity restructurings and is not a sufficient explanation to justify departing from its standard practice."[9]

Therefore, as ordered, Commerce is providing further explanation regarding its rationale for departing from its previous findings that the first three debt-to-equity restructurings provided no countervailable subsidy, and how the information found on the record in the instant administrative review supports a deviation from the prior determinations.

---

[7] *See Remand Opinion and Order* at 8.
[8] *Id.*
[9] *Id.* at 12.

Secondly, in the *Remand Opinion and Order*, the Court ordered Commerce to reconsider or further explain its decision regarding whether the debt-to-equity restructuring benefits "passed through" upon the change in ownership from Dongbu Steel to KG Dongbu Steel.[10]  The Court noted that, as the Court remanded Commerce's determination that the first through third debt-to-equity-restructurings provided a countervailable subsidy to Dongbu Steel, on remand, Commerce may reconsider the record with respect to whether KG Dongbu Steel received any countervailable subsidies.[11]  Therefore, the Court ordered Commerce to reconsider whether substantial evidence supports a determination that any change in ownership occurred at arm's length and for fair market value and extinguished any alleged subsidies from the first through third debt-to-equity restructurings to KG Dongbu Steel.[12]

Third, in the *Remand Opinion and Order*, the Court found that Commerce's application of the loan benchmark calculation formula for uncreditworthy companies and subsequent determination to use a three-year loan term was not supported by substantial evidence because Commerce should consider the potentially contrary evidence presented by KG Dongbu Steel, Dongbu Steel, and Dongbu Incheon Steel Co., Ltd. (collectively, Plaintiffs).[13]  The Court noted that, despite Commerce's assertion that there was no information on the record regarding any six-year interest rate, the Plaintiffs cited potentially contrary record evidence indicating that the "{r}epayment date of outstanding loans was extended from December 31, 2020, to December 31, 2025{.}"[14]  Thus, the Court ordered Commerce to reconsider record evidence and further substantiate the loan term used to calculate the uncreditworthy benchmark interest rate.

---

[10] *Id.* at 14-15.
[11] *Id.* at 15.
[12] *Id.*
[13] *Id.* at 17.
[14] *Id.* (citing KG Dongbu Steel's Letter, "Initial Questionnaire Response," dated December 2, 2020 (KG Dongbu Steel's IQR) at 45).

5

Specifically, regarding Commerce's determination to use the three-year interest rate on the record to calculate the benchmark interest rate to measure the countervailable loans and bonds, the Court observed that the record evidence indicates that the loan term might be closer to six years, and that Commerce should reconsider the record evidence.[15]

Lastly, in the *Remand Opinion and Order*, the Court noted that as it remanded Commerce to reconsider whether the record evidence establishes a loan term of six years or three years, the Court also remanded Commerce's calculation of discount rates in determining the amount of benefit in each year of the fifteen-year allocation period for the average useful life (AUL) of the relevant assets based on Commerce's reconsideration of the record evidence.[16]

Therefore, as ordered, we have addressed each of the above-described issues in our analysis below and provided further explanation regarding Commerce's analysis of the record evidence.

## IV.    REMANDED ISSUES

### A.    Commerce's Determination that the First Through Third Debt-to-Equity Restructurings Provide a Countervailable Subsidy

As requested by the Court, we further explain our determination that a countervailable subsidy was conferred to KG Dongbu Steel through the first to third debt-to-equity restructurings.[17]  First, we explain our rationale for departing from our previous finding that the first three debt-to-equity restructurings provided no countervailable benefit.  Our departure from the prior determination in this instance is consistent with Commerce's practice.  While it is true that Commerce's initial questionnaire indicates that in administrative reviews, absent new information, we do not usually re-evaluate prior determinations regarding the countervailability

---

[15] *Id.*
[16] *Id.* at 18.
[17] *Id.* at 8-13.

Filed By: Jinny Ahn, Filed Date: 10/5/23 5:14 PM, Submission Status: Approved

of a program, we clarify that this normally means that we do not revisit our prior financial

contribution and specificity determinations absent new information.  This is consistent with the

decisions of the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) in *Magnola*

*Metallurgy, Inc.*[18] and *PPG Industries, Inc.*,[19] in which the Federal Circuit affirmed that prior

decisions of specificity (whether negative or affirmative) need not be revisited in a later segment

of the same proceeding absent new evidence.  Consistent with this practice and the Federal

Circuit decisions, we stated in the *Preliminary Results* of this review that in the investigation and

prior administrative reviews, we had already determined that KG Dongbu Steel's debt

restructurings, including the debt-to-equity infusions, constituted financial contributions, were

specific, and, therefore, we were not revisiting these findings.[20]

However, for benefit, we normally require respondents to report benefit information for

the relevant period of review (POR) and re-evaluate the benefit information and recalculate the

benefits conferred for that POR.  The rationale behind our practice is that a government normally

does not change the structure of a subsidy program frequently.  However, the amount of benefit

conferred to a company could vary between PORs.[21]  This practice is consistent with section

751(a)(1)(A) of the Tariff Act of 1930, as amended (the Act), which states that a CVD

administrative review is conducted to "review and determine the *amount* of any net

countervailable subsidy" (emphasis added), not to review and determine whether any previously

found subsidies continue to exist.  Determining the "amount" of a subsidy fundamentally

involves an analysis of benefit under section 771(5)(E) of the Act.  This is evident by our

---

[18] *See Magnola Metallurgy, Inc. v. United States*, 508 F.3d 1349 (Fed. Cir. 2007) (*Magnola Metallurgy, Inc.*).
[19] *See PPG Industries, Inc. v. United States*, 978 F. 2d 1232 (Fed. Cir. 1992) (*PPG Industries, Inc.*).
[20] *See AR 2019 Preliminary Results* PDM at 13-14.
[21] *See Certain Hot-Rolled Carbon Steel Flat Products from India:  Final Results of Countervailing Duty Administrative Review*, July 26, 2010 (75 FR 43488), and accompanying IDM at Comment 5.

7

determination in this case.[22]  This is also evident by our questionnaires for each program.  As clearly stated in our initial questionnaire:

> "Please answer all questions in the *Standard Questions Appendix* and *Usage Appendix*.  If there were no changes to the program during the POR, please so state; you do not need to provide a response to the *Standard Questions Appendix* if there were no changes to the program."[23]

It is important to point out that we did not state that respondents did not need to respond to the *Usage Appendix*, which is where Commerce normally finds benefit information.  In the 2019 administrative review (AR 2019), we further asked for specific information about the debt-to-equity restructuring to allow Commerce to re-evaluate benefit.  In AR 2019, consistent with our practice, we did not re-evaluate the financial contribution and specificity already found to exist; rather, we re-evaluated benefit conferred by the debt-to-equity restructuring.[24]

When we re-evaluated the benefit conferred under the debt-to-equity restructuring, we realized that we had made a mistake in the prior review.  In AR 2019, given that there was a new, fourth debt-to-equity infusion, we had to re-evaluate the total benefit conferred under the four debt-to-equity infusions in order to calculate a single subsidy rate for the program.[25]  As part of the re-evaluation, we realized that our prior finding that no benefit was conferred by the first three debt-to-equity restructurings was inconsistent with 19 CFR 351.507.  As explained below, we evaluated the AR 2019 record and made our determination in accordance with 19 CFR 351.507.

---

[22] *See AR2019 Final Results* IDM at Comment 7.

[23] *See* Commerce's Letter, "Countervailing Duty Questionnaire," dated October 6, 2020 (Initial Questionnaire), at pdf page 28.

[24] *See AR 2019 Preliminary Results* PDM at 13-14, unchanged in *AR 2019 Final Results* IDM.

[25] Specifically, we note that the record in the instant review, unlike that in the prior reviews, indicates there were private investors independent from the creditors' committee involved in the fourth equity infusion during the 2019 POR.

Barcode:4442089-01 C-580-879 REM - Remand  -  Slip Op. 23-98

Further, after the CIT affirmed our *Final Redetermination*[26] in *Nucor 2021*, in which we continued to find that Dongbu Steel's private bank loans would be inappropriate to use as a loan benchmark, as these loans were provided as part of a government loan program,[27] we determined that it would be inconsistent with our regulations and *Nucor 2021* if we use KG Dongbu Steel's private bank loans as a benchmark for the debt-to-equity infusions. As explained extensively in our *Final Redetermination*, all of the creditor banks, including the private banks, were obligated to participate in the debt restructuring, which provided the GOK-owned and controlled banks with the ability to establish the financial terms of the debt restructurings, which include both the loan restructuring and debt-to-equity restructuring.[28] We explained that the private banks which provided loans to Dongbu Steel were under significant government influence and, therefore, we could not rely on Dongbu Steel's private banks as a loan benchmark.[29] Similarly, the record of this review shows that both the loan restructuring and the debt-to-equity infusions were approved by the same creditor banks and the terms of the loan restructuring and the debt-to-equity infusions were agreed to at the same time.[30] It would be inconsistent for Commerce to find on the one hand that the GOK-controlled policy banks have significant influence over the loan portion of the debt restructuring, and on the other hand that the same banks did not have such influence over the debt-to-equity portion of the debt restructuring. Therefore, we had to re-evaluate our prior determination of the benefit under the debt-to-equity infusions.

---

[26] *See Final Results of Redetermination Pursuant to Court Remand, Nucor Corporation v. United States*, 461 F.Supp.3d 1374, dated September 30, 2020 (*Final Redetermination*), available at https://access.trade.gov/Resources/remands/20-92.pdf.

[27] *See Nucor Corporation v. United States*, 494 F.Supp.3d 1377, 1381 (CIT 2021) (*Nucor 2021*).

[28] *See Final Redetermination* at 5-7.

[29] *Id.*

[30] *See* Memorandum, "Preliminary Analysis Memorandum – Equity Infusions," dated July 12, 2021 (Equity Infusions Analysis Memorandum), at 5.

Filed By: Jinny Ahn, Filed Date: 10/5/23 5:14 PM, Submission Status: Approved

Second, we explain that our determination is supported by substantial evidence. Commerce's regulation at 19 CFR 351.507(a) states that "{i}n the case of a government-provided equity infusion, a benefit exists to the extent that the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made." Commerce considers an equity infusion to be inconsistent with usual investment practice if the price paid by the government for newly issued shares is greater than the price paid by private investors for the same (or similar form of) newly issued shares.[31] Commerce does not consider private sector investor prices if Commerce concludes that private investor purchases of newly issued shares are not significant.[32] As outlined in the Equity Infusions Analysis Memorandum, as well as the preliminary and final decision memoranda, a comprehensive review of the totality of the evidence, including the underlying Agreements and the ownership of Dongbu Steel, indicates that GOK-controlled policy banks, in particular the Korea Development Bank (KDB), exercised significant influence over the debt restructurings, which included the debt-to-equity conversions.[33] Private creditors on the creditors councils did not evaluate the reasonableness of the rate of return on any equity they were considering investing in the company in each debt-to-equity conversion.[34] Rather, they were considering how best to limit their losses. However, as

---

[31] *See* 19 CFR 351.507(a)(2)(i).
[32] *Id.*; *see also* 19 CFR 351.507(a)(2)(iii).
[33] *See* Equity Infusions Analysis Memorandum at 1-21; *see also AR 2019 Preliminary Results* PDM at 15-18; and *AR 2019 Final Results* IDM at 42-51.
[34] *See* Equity Infusions Analysis Memorandum at 9-13.

affirmed by the Court in *British Steel Corp.*[35] and *Hynix Semiconductor, Inc.*,[36] Commerce's practice in analyzing the significance of private investor participation is to conduct the analysis from the perspective of an outside investor, and not an existing investor that is simply trying to minimize its losses. Further, in terms of the percentage of shares held by GOK-controlled creditors compared to private creditors, our determination that the private participation was not significant is in line with our practice.[37] Therefore, the participation of KG Dongbu Steel's private creditors in the first, second, and third equity infusions was not significant. Accordingly, we cannot rely on the prices paid by the private creditors on the creditors councils for the purpose of determining a benchmark.

Section 351.507(a)(3) of Commerce's regulations states that "{i}f actual private investor prices are not available under paragraph (a)(2) of this section, the Secretary will determine whether the firm funded by the government-provided equity was equityworthy or unequityworthy at the time of the equity infusion. If {Commerce} determines that the firm was equityworthy, {Commerce} will apply paragraph (a)(5) of this section to determine whether the equity infusion was inconsistent with the usual investment practice of private investors. A determination by {Commerce} that the firm was unequityworthy will constitute a determination that the equity infusion was inconsistent with usual investment practice of private investors, and

---

[35] *See British Steel Corp. v. United States*, 632 F. Supp. 59, 65 (CIT 1986) (*British Steel Corp.*) (stating that "{s}imply put, it would be unrealistic to expect a private investor to supply operating funds to a loss-incurring firm merely to permit the firm to continue operations to minimize its losses" and that "it would not be commercially reasonable for an investor to provide funds for that purpose without adequate assurance of the future profitability of the enterprise and a return on his investment within a reasonable time").

[36] *See Hynix Semiconductor, Inc. v. United States*, 425 F. Supp. 2d 1287, 1313 (CIT 2006) (*Hynix Semiconductor*) (affirming Commerce's approach that "the existence and status of previous investments in a company are extraneous considerations when weighing new investment in the same company").

[37] *See Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 FR 17410 (March 26, 2012) (*Refrigerators from Korea*), and accompanying IDM at Comment 26.

11

{Commerce} will apply paragraph (a)(6) of this section to measure the benefit attributable to the equity infusion."[38]

As explained in the Equity Infusions Analysis Memorandum, we continue to determine that KG Dongbu Steel was unequityworthy at the time of the first, second, and third debt-to-equity conversions. Therefore, we continue to find the equity infusions were inconsistent with usual investment practice of private investors and the entire amount of the equity infusions relating to the first, second, and third debt-to-equity conversions to be the benefit.[39]

**B.    Commerce's Determination that the Benefits of the Debt-to-Equity Restructurings Provided a Countervailable Benefit during the POR**

As requested by the Court, we further explain our determination that countervailable subsidies "passed through" to KG Dongbu Steel after ownership of the company changed.[40]

In Commerce's initial questionnaire issued to the respondents on October 6, 2020, we explained that the respondents would need to answer certain questions if ownership of the company changed during the AUL period:

> When a company has been privatized or has changed ownership, in whole or part, during the AUL period, Commerce has a baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period. If a company wishes to challenge the baseline presumption, please coordinate with the company to answer the questions in the *Change-in-Ownership Appendix*.[41]

Included in the appendices of this questionnaire is the above-mentioned *Change-in-Ownership Appendix*, which affords the respondents an opportunity to provide us with the information necessary to determine whether any possible subsidies during the AUL period pass through to the new owners or were extinguished during the sale. The *Change-in-Ownership Appendix*

---

[38] *See* 19 CFR 351.507(a)(3).
[39] *See* AR 2019 *Preliminary Results* PDM, unchanged in *AR 2019 Final Results* IDM.
[40] *See* Remand Opinion and Order at 14-15.
[41] *See* Initial Questionnaire at Section II, Change-in-Ownership Appendix.

12

implements section 771(5)(F) of the Act, as well as Commerce's *Final Modification*.[42]  Under

section 771(5)(F) of the Act, a change in ownership of all or part of a foreign enterprise "does

not by itself" require a determination by Commerce that a past countervailable subsidy received

by the enterprise no longer continues to be countervailable, even if the change in ownership is

accomplished through an arm's-length transaction.  Under the *Final Modification*, Commerce's

baseline presumption is that non-recurring subsidies can benefit the recipient over a period of

time (*i.e.*, allocation period) normally corresponding to the AUL of the recipient's assets.[43]

However, an interested party may rebut this baseline presumption by demonstrating that, during

the allocation period, a change in ownership of all or substantially all of a company or its assets

occurred, and that the sale was an arm's-length transaction for fair market value.[44]  Without a

response to the questions contained in the *Change-in-Ownership Appendix*, for the *AR 2019

Final Results*, we followed our practice to presume that any benefit to the company will also pass

through as a benefit to the new owners.

     Furthermore, in addition to soliciting this information in the questionnaire, Commerce

also asks respondents to state if they do not intend to rebut this presumption.  In section III part

D of Commerce's questionnaire, regarding any changes in ownership we state, "if your company

does not wish to challenge Commerce's baseline presumption that non-recurring subsidies

continue to benefit the recipient over the allocation period, please so state and you do not need to

provide a response to this appendix."[45]  In its initial affiliation questionnaire response dated

---

[42] *See Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 FR 37125 (June 23, 2003) (*Final Modification*).
[43] *Id.* at 37127.
[44] *Id.* The *Final Modification* originally applied only to government privatizations.  However, Commerce extended the analysis in the *Final Modification* to private-to-private changes in ownership in *Certain Pasta from Italy:  Final Results of Seventh Countervailing Duty Administrative Review*, 69 FR 70657 (December 7, 2004), and accompanying IDM at 2-5.
[45] *Id*. at Section III, Part I, Question D.

13

October 27, 2020, KG Dongbu Steel declined to rebut Commerce's presumption.[46]  Specifically,

on pages 10 through 12, responding to Section III part D. of Commerce's questionnaire about

any changes in ownership, the company reported that:

> Dongbu had not been privatized, changed ownership, merged with another
> company, or devolved another company/companies from its corporate structure in
> whole or in part, during the AUL period… Dongbu does not wish to challenge the
> Department's baseline presumption and thus understands that no response to the
> Change-in-Ownership Appendix is required.[47]

KG Dongbu Steel explicitly declined to rebut Commerce's presumption that any possible

subsidies would have been extinguished.[48]  We note that once KG Dongbu Steel was selected as

a mandatory respondent in an administrative review, KG Dongbu Steel had the responsibility to

answer Commerce's questionnaires and supplemental questionnaires.  As stated above, our

questionnaire in this review had instructions indicating that KG Dongbu Steel could provide

information with respect to any changes in ownership.  KG Dongbu Steel had the burden to

challenge our baseline presumption, yet it chose not to do so.[49]  Based on KG Dongbu Steel's

response that it did not wish to challenge the baseline presumption, Commerce continued its

baseline presumption that non-recurring subsidies (*i.e.*, the debt-to-equity swaps prior to the

acquisition of Dongbu Steel) continue to benefit KG Dongbu Steel over the allocation period.

Therefore, consistent with our practice, we properly presumed that any non-recurring benefit

would pass through to the new owners.

---

[46] *See* KG Dongbu Steels's Letter, "Dongbu's Affiliated Companies Response," dated October 27, 2020 (KG Dongbu Steel's Affiliation Response), at 11-12.

[47] *Id.*

[48] *Id.*

[49] *See Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production should belong to the party in possession of the necessary information."); and *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("the burden of creating an adequate record lies with interested parties.") (internal quotation marks, alterations, and citation omitted).

14

Barcode:4442089-01 C-580-879 REM - Remand  -  Slip Op. 23-98

### C.    Commerce's Calculations of the Uncreditworthy Benchmark

As requested by the Court, we further explain our determination to use a three-year loan term interest rate to calculate the uncreditworthy benchmark rate.[50]

The Plaintiffs assert that KG Dongbu Steel's outstanding long-term loans and bonds were restructured during the POR, thus creating "new" loans and bonds with a term of six years. The Plaintiffs argue, however, that Commerce's calculation of the benefit from the "new" loans that were restructured during the POR used an incorrect three-year loan term interest rate to measure the countervailable loans and bonds.

Under 19 CFR 351.507(c), the benefit conferred by an equity infusion shall be allocated over the same period as a non-recurring subsidy; 19 CFR 351.524(d) describes how Commerce should allocate a non-recurring subsidy and 19 CFR 351.351.524(d)(3) describes selection of a discount rate when allocating a non-recurring subsidy. Specifically, 19 CFR 351.524(d)(3)(ii) contains an exception for uncreditworthy firms and states that Commerce will use as a discount rate the interest rate described in 19 CFR 351.505(a)(3)(iii), which is the formula for calculating the uncreditworthy interest rate.

The uncreditworthy interest rate formula has four variables: (1) the term of the loan in question ($n$); (2) the long-term interest rate paid by a creditworthy company; (3) the probability of default of a creditworthy company in $n$ years; and (4) the probability of default of an uncreditworthy company in $n$ years.[51]

In *AR 2019 Final Results*, Commerce determined that while there were some private commercial banks involved in the debt restructuring of KG Dongbu Steel, the restructuring of

---

[50] *See Remand Opinion and Order* at 15-17.
[51] *See* 19 CFR 351.505(a)(3)(iii).

Filed By: Jinny Ahn, Filed Date: 10/5/23 5:14 PM, Submission Status: Approved

KG Dongbu Steel's debt was not overseen by those private banks.[52]  Instead, KG Dongbu Steel's

debt restructuring was controlled by the Creditor Bank Committee (CBC), which, in turn, was

controlled by GOK policy banks, such as the KDB.[53]  Therefore, Commerce determined that the

record of this case does not warrant any change from prior reviews.  Specifically, Commerce

found that the loans from private creditors on the CBC cannot be construed as "comparable

commercial loans," and thus, cannot be used as a commercial benchmark under section

771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(2), because the CBC is controlled by GOK-

controlled policy and special purpose banks.[54]  Therefore, Commerce used a three-year AA-rated

KRW interest rate, published by the Bank of Korea, as the long-term interest rate paid by a

creditworthy company because it was the only long-term interest rate available on the record.

No other long-term KRW interest rates were provided on the record by interested parties in this

review.

       The Plaintiffs cite allegedly contrary record evidence indicating that the "{r}epayment

date of outstanding loans was extended from December 31, 2020 to December 31, 2025."[55]  The

loan template that the Plaintiffs cite (*i.e.*, KG Dongbu Steel's IQR at Exhibit B-35), demonstrates

that the loans in question were provided by [                                    ],[56] and [                ], all of

which were member banks of the Dongbu Steel's Creditor Financial Institutions' Committee,

which took over the administration of Dongbu Steel's restructuring from the CBC, which in turn

---

[52] *See AR 2019 Preliminary Results* PDM at 14-15 (citing *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2015–2016*, 84 FR 11749 (March 28, 2019), and accompanying IDM)); *see also Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review*; 2017, 85 FR 15112 (March 17, 2020), and accompanying IDM at "Dongbu Debt Restructuring Program," unchanged in *AR 2019 Final Results*.
[53] *See AR 2019 Preliminary Results* PDM at 14-15, unchanged in *AR 2019 Final Results* IDM.
[54] *Id.*
[55] *See Remand Opinion and Order* at 17 (KG Dongbu Steel's IQR at 45).
[56] *See* KG Dongbu Steel's IQR at 48 (KG Dongbu states, "WHB represents [                                    ], a private entity that became a Dongbu Steel creditor by the acquisition of convertible bonds owned by Woori Bank.").

16

was controlled by GOK policy banks.[57]  Therefore, we continue to find that there is no

information on the record regarding a six-year interest rate for a comparable commercial loan.

Moreover, we find that the loans from the alleged private banks to KG Dongbu Steel cannot

constitute "comparable commercial loans" under 19 CFR 351.505(a)(2) due to the substantial

government influence and the fact that they were part of a government program; therefore, these

loans are unsuitable for purposes of the benchmark calculation.[58]

Therefore, with respect to the uncreditworthy interest rate formula, because there are no

useable six-year loans available, Commerce continues to use three years for the term of the loan

variable and the three-year creditworthy default and uncreditworthy default rates.  This is

consistent with the *Preamble*, which states that using "a default rate that is directly linked to the

term of the loan is a better reflection of the risk associated with the long-term lending to

uncreditworthy borrowers."[59]  Thus, the calculation Commerce used is the correct calculation for

a three-year uncreditworthy discount rate, based on the formula specified by 19 CFR

351.505(a)(3)(iii), and information available on the record.  For further discussion, *see* Issue 3

below.

## D.    Commerce's Calculations of the Unequityworthy Discount Rate

As requested by the Court, we further explain our calculation of the discount rate in

determining the amount of the benefit in each year of the 15-year allocation period for the

average useful life of the relevant assets based our reconsideration of the record evidence.[60]

---

[57] *See* KG Dongbu Steel's IQR at 31.
[58] *See Nucor 2021*, 494 F.Supp.3d at 1381 ("{t}he court concludes that Commerce determined properly that Dongbu's loans could not be used for calculating a benchmark interest rate because the loans provided under the government program were non-commercial.  The court notes that the relevant statute and regulations do not require Commerce to use every loan received by a company as a benchmark.").
[59] *See Countervailing Duties*, 63 FR 65348, 65365, (November 25, 1998) (*Preamble*).
[60] *See Remand Opinion and Order* at 18.

17

Barcode:4442089-01 C-580-879 REM - Remand  -  Slip Op. 23-98

Section 351.507(c) of Commerce's regulations dictates that the benefit conferred by an equity infusion shall be allocated over the same period as a non-recurring subsidy.  Sections 351.524(d)(1) and (d)(3)(ii) of our regulations provide that, in the case of a firm considered to be uncreditworthy, Commerce will use as a discount rate the interest rate described in 19 CFR 351.505(a)(3)(iii), which is an exception for uncreditworthy company.  Therefore, as explained above, as Commerce continues to find that the use of an uncreditworthy benchmark rate, calculated using three-year KRW-denominated AA-rate corporate bonds published by Bank of Korea is supported by substantial evidence and is appropriate, we continue to find that the use of the same discount rate, calculated using three-year KRW-denominated AA-rate corporate bonds published by Bank of Korea, is appropriate for the allocation of the benefit conferred by the equity infusions.

## V.    SUMMARY AND ANALYSIS OF PLAINTIFFS' COMMENTS ON DRAFT REMAND RESULTS

Commerce released the Draft Remand Results to parties for comments on September 12, 2023.[61]  The Plaintiffs filed comments on the Draft Remand Results on September 19, 2023.[62]  As explained below, we continue to reach the same conclusions that we reached in the Draft Remand Results.  We address each of the Plaintiffs' comments and provide our analysis in turn.  No other interested parties commented on the Draft Remand Results.

**Issue 1:  Commerce's Determination that the First Through Third Debt-to-Equity Restructurings Provide a Countervailable Subsidy**

*Plaintiffs' Comments*

- The CIT instructed Commerce to reconsider or further explain its deviation from Commerce's established practice of not reviewing the countervailability of a program in the absence of new information, and from Commerce's consistent finding in all prior

---

[61] *See* Draft Remand Results.
[62] *See* Plaintiffs' Letter, "Dongbu's Comments on Draft Remand Redetermination" dated September 19, 2023 (Plaintiffs' Comments).

administrative reviews that no benefit was conferred to KG Dongbu Steel from the first three debt-to-equity swaps.[63]

- In the Draft Remand Results, Commerce fails to take the Court's remand instructions seriously, and did not point to any new information on the record.  Instead, Commerce just expounds on previous arguments that have been considered and rejected.[64]

- First, for its questionnaire instructions that formed part of the basis for the Court's remand and which provide that "{a}bsent new information warranting a program reexamination, {Commerce} will not reevaluate prior determinations regarding the countervailability of programs," Commerce seeks to distance itself and states, that this practice of not re-examining prior subsidy decisions only applies to the financial contribution and specificity aspects, and not to the benefit aspect, and seeks to bolster that claim by citing two inapposite Federal Circuit decisions.[65]

- However, these cases broadly speaking stand for the proposition that Commerce does not have to revisit specificity determinations absent new evidence.  This proposition is a far cry from saying that Commerce's practice of not reexamining the countervailability of a program absent new evidence is limited to financial contribution and specificity.

- The Court's finding in *PPG Industries, Inc.* undercuts Commerce's attempt to limit its non-reexamination practice to financial contribution and specificity.  In that case, the Court stated that:  "{a}dditionally, ITA has a longstanding administrative practice of not reinvestigating a program determined not to be countervailable unless the petitioner presents new evidence justifying reconsideration of a prior finding."  No distinction is made between the particular elements of the non-countervailable determination.[66]

- Benefit is one of the three elements needed for a countervailable subsidy to exist.  This formulation of Commerce's agency practice is also consistent with its questionnaire instructions that make no distinction about the basis for the previous non-countervailable determination.[67]  Accordingly, Commerce's attempt to demonstrate that its established agency practice does not apply to benefit determinations is unpersuasive.[68]

- Commerce next attempts to explain why it needs to "re-evaluate the benefit information and recalculate the benefits conferred" in each separate administrative review.  Commerce's explanation is inapposite to this case, because the need to recalculate the amount of benefit in each review is only necessary in cases where Commerce has previously found the program to be countervailable.[69]

- In this instant case, Commerce had consistently found that the first three debt-to-equity swaps did not provide a countervailable subsidy, therefore, there was no need to recalculate any benefit because there was none.[70]

---

[63] *Id.* at 2.
[64] *Id.*
[65] *Id.* at 3 (citing *PPG Industries, Inc.*, 978 F. 2d at 1242; and *Magnola Metallurgy, Inc.*, 508 F.3d 1232).
[66] *Id.*
[67] *Id.* at 4 (citing *Remand Opinion and Order* at 10).
[68] *Id.*
[69] *Id.*
[70] *Id.*

- Further, the concept of needing to recalculate a benefit amount for each review is inapplicable for this particular program.  Commerce determined in all prior reviews that the first three debt-to-equity restructurings did not confer a benefit to KG Dongbu Steel.[71]

- Unlike determining the amount of a benefit under a subsidy program that changes year to year, the benefit determination here was the equivalent of a non-countervailability determination.  It had nothing to do with the amount of benefit to be calculated for a particular time period.  Even if it did, when Commerce finds a non-recurring subsidy like the debt-to-equity restructurings in this case, it employs a declining-balance methodology that allocates at the time of its subsidy determination the whole subsidy amount received by calculating the benefit amount for each year of the average useful life allocation period.  No new calculation is required for determining the benefit (*i.e.*, numerator) in each subsequent review.  In such reviews, the only necessary information to calculate the subsidy rate from the program is the sales value (*i.e.*, denominator).

- Furthermore, in the immediately preceding segment of this review (*i.e.*, *AR 2018 Final Results*), Commerce specifically tied the possible re-examination of the benefit issue to the presence of new record evidence, and there was no such new evidence here to warrant a re-examination.[72]

- In the instant case, the facts did not change and thus there was no basis for Commerce to make an entirely new benefit determination under its own stated practice.  Although Commerce points out in a footnote that there was a factual change with the fourth debt-to-equity swap because unlike in prior reviews there were private creditors independent from the creditors' committee in the fourth equity infusion, this argument is just a rehash of Commerce's prior justification that was specifically found wanting by the Court.[73] The Court has already found that the record evidence cited by Commerce as justification for its deviation from its past practice does not deal directly with the first three debt-to-equity restructurings and is not a sufficient explanation to justify the departure from Commerce's standard practice.[74]

- Commerce tries to make something of the fact that its questionnaire instructions only instructed KG Dongbu Steel not to provide a response to the *Standard Questions Appendix* if there were no changes to the program but did not also say not to submit the *Usage Appendix*.[75]  Commerce's logic is that the *Usage Appendix* is relevant to benefit and so by not excusing KG Dongbu Steel from providing one even if there were no changes, Commerce was still reconsidering its benefit determination.  This is a thin reed to cling to as it ignores the fact that its main questionnaire instruction makes no such distinction between the elements of the subsidy determination,[76] and Commerce's logic requires an inference that this omission of a reference to the *Usage Appendix* means that Commerce was still reevaluating its benefit determination.[77]

---

[71] *Id.* (citing Draft Remand Results at 10).
[72] *Id.* at 5 (citing *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 FR 29237, 29238 (June 1, 2021) (*AR 2018 Final Results*), and accompanying IDM at 38 (emphasis added by the Plaintiffs).
[73] *Id.* at 7.
[74] *Id.*
[75] *Id.* at 6 (citing Draft Remand Results at 8).
[76] *Id.* (citing *Remand Opinion and Order* at 10).
[77] *Id.*

20

- Although Commerce has failed to explain why it was justified in re-evaluating its benefit determination even though there was no new evidence, it goes on to claim that upon reexamination of the benefit determination it realized it made a mistake in the prior review.  The alleged "mistake" is twofold:  Commerce first relies on the Court's finding in *Nucor 2021* to argue that KG Dongbu Steel's private bank loans are unusable for purposes of the benchmark because they were provided as a government loan program, thus were subject to government influence.  However, the Court has already rejected Commerce's reliance on *Nucor 2021* to bolster its determination to deviate from its prior determination and found that Commerce had "failed to provide an adequate explanation for its decision to deviate from its prior determinations."[78]

- The second problem is that the entire discussion in *Nucor 2021* was related to whether the "loans" provided by the private banks on the Creditors Committee constituted "comparable commercial loans" for purposes of 19 CFR 351.505(a)(2), not whether private investor participation was "significant" under 19 CFR 351.505(a)(2)(iii) for equity infusions.  Thus, Commerce's reconsideration of the loan benchmark issue in *Nucor 2021* does not reasonably explain Commerce's abandonment of its established practice of treating private investor participation as significant for purposes of the debt-to-equity swaps.

- Commerce next claims that its prior finding of no benefit was inconsistent with 19 CFR 351.507, because "Commerce's practice in analyzing the significance of private investor participation is to conduct the analysis from the perspective of an outside investor, and not an existing investor that is simply trying to minimize its losses."[79]  As support for this practice Commerce cites to *British Steel Corp.* and *Hynix Semiconductor, Inc.*  These cases are inapposite.

- In *British Steel Corp.*, Commerce was analyzing whether the British Government's equity infusion into British Steel Company was "inconsistent with commercial considerations" within the meaning of section 771(5) of the Act.  This was under the pre-URAA statute, and also was not specifically dealing with Commerce's practice with regard to whether private investor participation was "significant" under 19 CFR 351.507.[80]

- In *Hynix Semiconductor, Inc.*, Commerce had applied an "expected utility model" and used the results as the basis to reject the existence of a debt-to-equity conversion as evidence of equityworthiness.[81]  Again, that case did not deal with Commerce's practice with regard to whether private investor participation was "significant" under 19 CFR 351.507.

- Furthermore, even if these cases were on point, they do not establish any consistent agency "practice" for how Commerce evaluates whether private investor participation is significant under its regulations.

- Therefore, there is no legitimate basis for Commerce to claim that its use of existing private creditor participation was a "mistake" that justified its reconsideration of its decisions in all prior reviews that private investor participation was significant and thus there was no benefit from the first three debt-to-equity swaps.

---

[78] *Id.* at 8.
[79] *Id.* (citing Draft Remand Results at 11).
[80] *Id.* (citing *British Steel Corp.*, 632 F. Supp. at 65).
[81] *Id.* (citing *Hynix Semiconductor*, 425 F. Supp. 2d at 1313).

21

**Commerce's Position:**  Commerce disagrees with the Plaintiffs' contention that it failed to take the Court's remand instructions seriously and failed to point to any new information on the record, and that it merely repeated its prior justification that was specifically found wanting by the Court.

In the Draft Remand Results, we explained our rationale for departing from our previous findings that the first three debt-to-equity restructurings provided no benefit.[82]  We explained that we normally do not revisit our prior financial contribution and specificity determinations absent new information.  However, we normally require respondents to report information for the relevant POR and re-evaluate the benefit information and recalculate the benefits conferred in that POR.[83]  In AR 2019, given there was a new fourth debt-to-equity infusion, we had to re-evaluate the total benefit conferred under the four debt-to-equity infusions in order to calculate a single subsidy rate for the debt-to-equity infusion program.  As part of the reevaluation, we realized that our prior finding that no benefit was conferred by the first three debt-to-equity restructurings was inconsistent with our regulation, 19 CFR 351.507.[84]  Further, after the CIT affirmed our *Final Redetermination* in *Nucor 2021*, in which we continued to find that Dongbu Steel's private bank loans would be inappropriate to use as a loan benchmark because these loans were provided as part of a government loan program, we determined that it would be inconsistent with our regulations and *Nucor 2021*, if we use the Plaintiffs' private bank loans as a benchmark for the debt-to-equity infusions.  Therefore, contrary to the Plaintiffs' claims, because of these new circumstances, we re-evaluated the benefit conferred under the first three debt-to-equity infusions and found the debt-to-equity infusion program to be countervailable.

---

[82] *See* Draft Remand Results at 6-7.
[83] *Id.*
[84] *Id.* at 8.

22

We also disagree with the Plaintiffs' argument that the Court's finding in *PPG Industries, Inc.* undercuts Commerce's attempt to limit its non-reexamination practice to financial contribution and specificity. In fact, it is exactly the opposite. The case supports the fact that Commerce does not revisit its prior specificity findings, absent new information. The case does not support that Commerce is not allowed to re-evaluate benefit information for each POR. As explained in the Draft Remand Results, the amount of benefit conferred to a company could vary between PORs.[85] This practice is consistent with section 751(a)(1)(A) of the Act, which states that a CVD administrative review is conducted to "review and determine the *amount* of any net countervailable subsidy," (emphasis added) not to review and determine whether any previously found subsidies continue to exist. Determining the "amount" of a subsidy fundamentally involves an analysis of benefit under section 771(5)(E) of the Act. Commerce's questionnaire, as explained in our draft remand results, follows our practice and this statutory requirement.

The Plaintiffs argued that there was no need to recalculate any benefit because there was none and the reevaluation of the amount of benefit in each review is only necessary in cases where Commerce has previously found the program to be countervailable. We disagree with these arguments. In AR 2019, we were required to calculate a single benefit rate for the entire debt-to-equity infusion program. To simply state that Commerce does not need to recalculate any benefit when there was none ignores the fact that our benefit calculation for AR 2019 is a single rate which includes benefits conferred for all four of the equity infusions. As part of calculating a single new rate, Commerce re-examined the benefits conferred under the three prior equity infusions, taking into consideration the regulation under 19 CFR 351.507 and *Nucor 2021*. As a result, we revised our prior findings.

---

[85] *Id.* at 7.

23

With respect to the Plaintiffs' argument on *Nucor 2021*, as explained in the Draft Remand Results, all the creditor banks, including the private banks, were obligated to participate in the debt restructuring, which provided the GOK-owned and controlled banks with the ability to establish the financial terms of the debt restructurings, which include both the loan restructuring and debt-to-equity restructuring. We explained that the private banks which provided loans to Dongbu Steel were under significant government influence and therefore, we could not rely on Dongbu Steel's private banks as a loan benchmark. Similarly, the record of this review shows that both the loan restructuring and the debt-to-equity infusions were approved by the same creditor banks and the terms of the loan restructuring and the debt-to-equity infusions were agreed to at the same time. It would be inconsistent for Commerce to find on the one hand that the GOK-controlled policy banks have significant influence over the loan portion of the debt restructuring, and on the other hand that the same banks did not have such influence over the debt-to-equity portion of the debt restructuring.

With respect to whether our finding in the Draft Remand Results was consistent with our practice under 19 CFR 351.507, we reiterate, contrary to the Plaintiffs' claim, that Commerce's longstanding practice in determining whether private investment is "significant" is to consider outside private investment, not the investment of existing shareholders. This goes back at least to 1986. In *Stainless Steel Plate from the United Kingdom*, Commerce stated that "{w}hen deciding whether to invest, a private investor will assess the current financial position of the firm and consider its past performance {and} will look upon any past investments, including his own, as sunk costs, irrelevant to his analysis of whether to make additional investments."[86] Likewise, in *Certain Fresh Atlantic Groundfish from Canada*, Commerce stated that the participation of a

---

[86] *See Stainless Steel Plate from the United Kingdom; Final Results of Countervailing Duty Administrative Review*, 51 FR 44656 (December 11, 1986) (*Stainless Steel Plate from the United Kingdom*).

24

private investor in an equity infusion was not "an appropriate gauge by which to measure the reasonableness of the government's infusion because at the time it seems that the one private investor's only chance for recouping the money it had already loaned to {the company at issue} was to help it reorganize."[87]  More recently, in *Refrigerators from Korea*, Commerce found that participation by existing private investors in an equity infusion was not an appropriate benchmark because "{t}here were no *new* equity infusions into the company…."[88]  As explained above, this practice was upheld in *British Steel Corp.* and *Hynix Semiconductor*.

Accordingly, we continue to find that Commerce properly revisited, and countervailed, the debt-to-equity restructurings at issue in this administrative review.

## Issue 2:  Commerce's Determination that the Benefits of the Debt-to-Equity Restructurings Provided a Countervailable Benefit during the POR

- In the Draft Remand Results, Commerce did not adhere to the Court's directive to reconsider whether substantial evidence supports a determination that any change in ownership occurred at arm's length and for fair market value such that it extinguished any alleged subsidies from the first through third debt-to-equity restructurings to KG Dongbu Steel.[89]
- Instead, Commerce just repeats its position that KG Dongbu Steel's failure to submit the *Change-in-Ownership Appendix* was determinative in continuing Commerce's baseline presumption that non-recurring subsidies (*i.e.*, the debt-to-equity swaps prior to the acquisition of Dongbu Steel) continue to benefit KG Dongbu Steel over the allocation period.
- According to Commerce, without a response to the questions in the *Change-in-Ownership Appendix*, Commerce's practice is to presume that any benefits to the company will also pass through as a benefit to the new owners.[90]  The problem with this explanation is that it ignores the fact that at the time that Commerce issued this questionnaire, and at the time that KG Dongbu Steel responded to this questionnaire and all subsequent supplemental questionnaires, all of the subsidies Commerce had found in prior reviews with respect to the Plaintiffs were from programs that provided recurring

---

[87] *See Final Affirmative Countervailing Duty Determination; Certain Fresh Atlantic Groundfish from Canada*, 51 FR 10041, 10047 (March 24, 1986).
[88] *See Refrigerators from Korea* IDM at Comment 26.
[89] *See* Plaintiffs' Comments at 10.
[90] *Id.* at 11 (citing Draft Remand Results at 13).

Filed By: Jinny Ahn, Filed Date: 10/5/23 5:14 PM, Submission Status: Approved

subsidies.  In *AR 2017 Final Results* and the *AR 2018 Preliminary Results*,[91] Commerce had not found benefits from any programs where the benefit was calculated based on the allocation of a non-recurring subsidy received in the AUL period to current and future reviews.  Thus, even though the Dongbu Steel had been acquired by the KG Consortium, whether there were any programs that provided non-recurring benefits that may have passed through to KG Dongbu Steel was simply not yet an issue at the time of the questionnaire responses.[92]

- It was not until Commerce's finding in the *AR 2019 Preliminary Results* that the first through third debt-to-equity swaps were found to have conferred non-recurring benefits that the issue of whether benefits from these programs that preceded the acquisition of Dongbu Steel by the KG Consortium passed through to KG Dongbu Steel became ripe.

- Therefore, KG Dongbu Steel had no reason to submit the *Change-in-Ownership Appendix* to challenge Commerce's baseline presumption regarding non-recurring subsidies.

- Commerce next points to the question in its initial questionnaire that asks respondents to state if they do not intend to rebut the baseline presumption that non-recurring subsidies continue to benefit the recipient over the AUL period.  According to Commerce, because KG Dongbu Steel stated that it did not wish to challenge the baseline presumption and did not provide a response to the *Change-in-Ownership Appendix*, this refusal to provide a response to the *Change-in-Ownership Appendix* relieved Commerce of the obligation to consider the record evidence that showed that the alleged non-recurring subsidies from the first three debt-to-equity swaps were extinguished.

- Commerce's claim that it "properly presumed that any non-recurring benefit would pass through to the new owners"[93] because KG Dongbu Steel did not initially challenge the baseline presumption and submit a *Change-in-Ownership Appendix* elevates form over substance.

- The *Change-in-Ownership Appendix* is just a series of questions drafted by Commerce designed to elicit the information needed to conduct an analysis on whether any change in ownership occurred at arm's length and for fair market value that extinguished any non-recurring subsidy benefits.  This information can be provided in other formats, and Commerce cannot ignore the information on the record just because it is not provided for in the *Change-in-Ownership Appendix*.  This information is on the record, but it only became relevant after Commerce reversed its consistent practice of not finding the first three debt-to-equity swaps countervailable in the *Preliminary Results*.  The Plaintiffs were not required to predict that Commerce would change its mind.[94]

- In the *Final Modification*, Commerce listed four factors that it would analyze when determining whether the transaction price in an acquisition was arm's length and for fair market value.  These factors include:  (1) whether an objective analysis was performed in

---

[91] *Id.* (citing *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 15112, 15113 (March 17, 2020) (*AR 2017 Final Results*), and accompanying IDM at 5, and *Certain Corrosion-Resistant Steel Products from the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2018*, 85 FR 74692 (November 23, 2020) (*AR 2018 Preliminary Results*), and accompanying PDM.

[92] *Id.* at 12.

[93] *Id.* at 14 (citing Draft Remand Results at 14).

[94] *Id.* at 13.

determining the appropriate sales price; (2) whether any artificial barriers to entry were imposed on potential purchasers that could artificially suppress demand for, or the purchase of, the company; (3) whether the highest bid was accepted; and (4) whether there were committed investment requirements that could serve as a barrier to entry or distort the value that bidders were willing to pay.[95]

- Record evidence demonstrates that all of these elements are met.
- First, record evidence demonstrates that PricewaterhouseCoopers independently analyzed the acquisition proposal from the KG Consortium, including the [                    ] acquisition price in Scenario 3, and compared the proposal with alternative scenarios. Based on its analysis, PricewaterhouseCoopers concluded that the KG Consortium's proposal had the highest value to the Creditors Council of the available alternative scenarios and [                                        ].[96]  This was thus an objective analysis.
- Second, an investment attraction announcement for an open bidding process that provided equal access and free competition for all interested parties was published in a newspaper on January 7, 2019.[97]  Therefore, there were no artificial barriers to entry.
- Third, of the bids from [     ] potential investors who showed interest by signing confidentiality agreements and were allowed access of the Plaintiffs' confidential information, only the KG Consortium, which submitted [          ], submitted a final bid.  Therefore, it can be said that the highest bid was accepted in this bidding process.[98]
- Fourth, there were no committed investment requirements that could serve as a barrier to entry or distort the value that bidders were willing to pay.
- In consideration of the above-identified record evidence, in the Final Remand, Commerce should reverse its determination that any non-recurring benefits received by Dongbu Steel were passed through to KG Dongbu Steel.[99]

**Commerce's Position:**  Commerce disagrees with the Plaintiffs' arguments.  The Plaintiffs

argue that Commerce ignores the fact tha,t at the time that Commerce issued its Change-in-

Ownership questionnaire, KG Dongbu found there was no need to provide a Change-in-

Ownership response.  We disagree.  As explained in the Draft Remand Results, our

questionnaire was absolutely clear that Commerce has a baseline presumption that non-

recurring subsidies continue to benefit the recipient over the allocation period.[100]  It is KG

---

[95] *Id.* at 15 (citing *Final Modification*, 68 FR at 37127).
[96] *Id.* at 16 (citing KG Dongbu Steel's IQR at 40-41 and Exhibit B-29).
[97] *Id.* (citing KG Dongbu Steel's IQR at Exhibits B-19, 20, and 21).
[98] *Id.* (citing KG Dongbu Steel's IQR at Exhibits B-22, 23, and 24).
[99] *Id.* at 18.
[100] *See* Draft Remand Results at 13-14.

27

Dongbu's burden to challenge the baseline presumptions, not Commerce's.[101]  Dongbu explicitly stated in its response that:

> "Dongbu had not been privatized, changed ownership, merged with another company, or devolved another company/companies from its corporate structure in whole or in part, during the AUL period…. Dongbu does not wish to challenge the Department's baseline presumption and thus understands that no response to the Change-in-Ownership Appendix is required."[102]

These are clear statements.  These statements did not imply because Commerce found Dongbu's debt-to-equity infusions to confer no benefit, therefore, there was no baseline presumption to rebut.  KG Dongbu Steel had the responsibility to answer Commerce's questionnaires and supplemental questionnaires, and retains the burden to challenge our baseline presumption.[103]  However, KG Dongbu Steel chose not to challenge the baseline presumption. Thus, when facing such clear statements, Commerce cannot interpret them to actually mean something different.  Accordingly, Plaintiff's arguments are without merit.

Further, KG Dongbu Steel was aware that the petitioners have been arguing for Commerce to countervail the debt-to-equity conversions since the first administrative review of this proceeding and that an acquisition had occurred and, therefore, that non-recurring subsidy pass-through could be an issue in this review.  Despite having this awareness, KG Dongbu Steel stated that "Dongbu does not wish to challenge the Department's baseline presumption and thus understands that no response to the *Change-in-Ownership Appendix* is required."[104]  Therefore,

---

[101] *Id.*
[102] *See* KG Dongbu Steel's Affiliation Response at 11-12.
[103] *See Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production should belong to the party in possession of the necessary information."); and *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("the burden of creating an adequate record lies with interested parties.") (internal quotation marks, alterations, and citation omitted).
[104] *Id.*

28

based on KG Dongbu Steel's response that it did not wish to challenge the baseline presumption, Commerce properly continued its baseline presumption that non-recurring subsidies (*i.e.*, the debt-to-equity swaps prior to the acquisition of Dongbu Steel) continue to benefit KG Dongbu Steel over the allocation period.

With respect to the Plaintiffs' contention that the information already on the record suffices for Commerce to conclude that a change in ownership occurred at arm's length and for fair market value that extinguished any subsidies from the first through third debt-to-equity restructurings to KG Dongbu Steel. As Commerce stated in *AR 2019 Final Results*, analyzing whether prior subsidies were extinguished requires extensive analysis based on a respondent's complete responses to the *Change-in-Ownership Appendix*.[105]  The Plaintiffs contend that the *Change-in-Ownership Appendix* is just a series of questions drafted by Commerce designed to elicit the information needed to conduct an analysis on whether any change in ownership occurred at arm's length and for fair market value. The Plaintiffs further contend that the information Commerce sought from KG Dongbu Steel with the *Change-in-Ownership Appendix* is already on the record.  The Plaintiffs then point to the *Final Modification*, and state that in *Final Modification*, Commerce listed four factors that it would analyze when determining whether the transaction price in an acquisition was arm's length and for fair market value, and then argues that the four factors that Commerce can consider are already on the record.  It is important to re-emphasize that Commerce's questionnaires are extremely clear.  Commerce

---

[105] *See Certain Uncoated Groundwood Paper from Canada:  Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 83 FR 2133 (January 16, 2018), and accompanying PDM at 57, unchanged in *Certain Uncoated Groundwood Paper from Canada:  Final Affirmative Countervailing Duty Determination*, 83 FR 39414 (August 9, 2018), and accompanying IDM.

29

relies on answers to the *Change-in-Ownership Appendix* to assess non-recurring subsidy pass-through.

Further, in *Final Modification*, Commerce specifically stated, "… in determining whether the evidence presented, including, *inter alia*, information on any comparable benchmark prices as well as information on the process through which the sale was made, demonstrates that the transaction price was fair market value, the following *non-exhaustive list* {emphasis added} of factors might be considered."[106] Then Commerce provides four factors (*i.e.*, objective analysis, artificial barriers to entry, highest bid, and committed investment) that Commerce "might" consider in evaluating whether a transaction price was fair market value.  Commerce specifically stated that this is a non-exhaustive list of factors that might be considered.[107]  As stated in the Draft Remand Results, the *Change-in-Ownership Appendix* implements section 771(5)(F) of the Act as well as Commerce's *Final Modification*.[108]  The *Change-in-Ownership Appendix* is comprised of 18 questions and multiple sub-questions.  The 18 questions are sub-parts of three main sections of this questionnaire, namely, "General Questions," Sales Process," and "Post-Sales Effect on Company."  The "General Questions" section of this questionnaire requires the respondent company to provide an overview of the whole sales process, such as the information on the involvement in the sale of the assets or shares by any government, government officials, or agencies or institutions that are owned/controlled by the government.  It also requires the respondent company to discuss the purpose and expectation of the asset or share sale, and it also asks if the sale was a part of a larger change-in-ownership plan organized by the government or a corporate parent.  It also asks the respondent company to provide financial statements for the

---

[106] *See Final Modification*, 68 FR at 37127.
[107] *Id.*
[108] *See* Draft Remand Results at 12.

company whose assets or shares were sold for the two years prior to the sale, the year of the sale, and for two years after the sale.  It also asks if the company explicitly paid back any previously received government assistance prior to the change in ownership of the company.  The "Post-Sales Effect on Company" section asks the respondent company to describe the impact of the sale of share or assets on the legal and corporate structure of the business producing subject merchandise.  Contrary to the Plaintiffs' assertion that the information Commerce sought from KG Dongbu Steel with the *Change-in-Ownership Appendix* is already on the record, the answers to these many other questions in the *Change-in-Ownership Appendix* are, in fact, not on the record.  Commerce requires a full response to this questionnaire in order to conduct a complete analysis of whether a change in ownership occurred at arm's length and for fair market value that extinguished any subsidy benefits.

Further, in the general instruction section of the *Change-in-Ownership Appendix*, which implements Commerce's *Final Modification*, Commerce specifically states,"{s}ome of the questions may require input from both the government as well as the respondent company. Therefore, the government and the respondent company should coordinate their responses to these questions.  However, be sure to clearly identify in the response to each of the change-in-ownership questions the party (*e.g.*, the government, the company) providing the response to that question."[109]  Therefore, in order for a respondent company to provide a complete response to the questions contained in the *Change-in-Ownership Appendix*, the government and the respondent company may have to coordinate their responses.  In short, the information Commerce seeks of the respondent company with the *Change-in-Ownership Appendix*, exceeds the four factors listed as non-exhaustive factors that Commerce might consider in analyzing

---

[109] *See* Initial Questionnaire at Section II; *Id.* at Section III, Change-in-Ownership Appendix at III-7.

31

whether the transaction price was at arm's length and for fair market value, provided in *Final*

*Modification*.

## Issue 3:  Commerce's Calculations of the Uncreditworthy Benchmark Rate and the Unequityworthy Discount Rate

- In the *Remand Opinion and Order*, the Court concluded that Commerce's application of a 3-year term loan variable for the formula for calculating the uncreditworthy benchmark and unequityworthy discount rate was not supported by substantial evidence.  The Court reasoned that the repayment date on KG Dongbu Steel's loans was extended to December 31, 2025, amounting in a six-year loan term, and that the AUL of the equity infusions was 15 years, which contradicted Commerce's assertion in *AR 2019 Final Results*.[110]
- In the Draft Remand Results, Commerce continued to use 3 years for the term of the loan variable in utilizing the formula for calculating the uncreditworthy benchmark and unequityworthy discount rate because there is allegedly no information on the record regarding a six-year interest rate for a comparable commercial loan, and the loans that KG Dongbu Steel received cannot constitute "comparable commercial loans" under 19 CFR 351.505(a)(2), due to alleged government influence and "the fact that they were part of a government program."[111]
- However, Commerce's redetermination to use 3 years for the term of the loan in variable *n*, and the length of time within which creditworthy and uncreditworthy companies may default for variables $p_n$ and $q_n$, is contrary to the evidence on the record and the plain language of its regulations.[112]
- Section 351.505(a)(3)(iii) of Commerce's regulations provides:
  If {Commerce} finds that a firm that received a government-provided long-term loan was uncreditworthy, as defined in paragraph (a)(4) of this section, the Secretary normally will calculate the interest rate to be used in making the comparison called for by paragraph (a)(1) of this section according to the following formula:

  $$ib=((1-qn)(1+if)n/(1-pn))1/n-1,$$

  where:
  n = the term of the loan;
  ib = the benchmark interest rate for uncreditworthy companies;
  if = the long-term interest rate that would be paid by a creditworthy company;
  pn = the probability of default by an uncreditworthy company within n years; and
  qn = the probability of default by a creditworthy company within n years.
- KG Dongbu Steel does not argue that Commerce used the incorrect interest rate for "the long-term interest rate that would be paid by a creditworthy company" as variable $i_f$.  Nor does KG Dongbu Steel argue that its own loans from private banks are "comparable commercial loans."[113]

---

[110] *See* Plaintiffs' Comments at 19 (citing Remand Opinion and Order at 17-18).
[111] *Id.* at 21.
[112] *Id.* at 19.
[113] *Id.* at 22.

- Rather, KG Dongbu Steel argues that, because the "term of the loan" for KG Dongbu Steel's "government provided long-term loan" is 6 years and the AUL period for the equity infusions is 15 years, Commerce should calculate the benchmark interest rate using 6 year and 15 year terms as the term of the loan for variable $n$ and it should use the probabilities of default by creditworthy and uncreditworthy companies within six and 15 years for variables $p_n$ and $q_n$.[114]

- Commerce has on the record (a) the 6 year term of KG Dongbu Steel's loans and the 15 year AUL period for variable $n$, (b) a long-term interest rate that would be paid by a creditworthy company (*i.e.*, the three-year AA-rated KRW interest rate published by the Bank of Korea) for variable $i_f$, and (c) the probability of default by creditworthy and uncreditworthy companies within six and 15 years for variables $p_n$ and $q_n$. Commerce does not require an interest rate from a six or 15 year long-term loan to "calculate the interest rate to be used in making the comparison" with KG Dongbu Steel's restructured loans pursuant to the plain language of 19 CFR 351.505(a)(3)(iii), or to calculate the discount rate that "{Commerce} will use" when allocating the equity infusions pursuant to 19 CFR 351.524(d)(3)(ii).

- Therefore, for the final remand results, Commerce should use six years for variable $p_n$, and 15 years for variable $q_n$ for its uncreditworthy benchmark rate, unequityworthy discount rate calculations.

**Commerce's Position:** Commerce disagrees with the Plaintiffs' contention that Commerce has incorrectly applied the uncreditworthy interest rate benchmark formula, and the unequityworthy discount rate formula.

The *Preamble* to Commerce's regulations clarifies Commerce's intention in providing a formula to calculate the benchmark interest rate for an uncreditworthy company.[115]  The *Preamble* states, "{o}ur formula for calculating the benchmark interest rate for an uncreditworthy company is based upon the assumption that a lender's expected return on all loans should be equal.  Under this assumption, the interest rate differential on loans charged to creditworthy and uncreditworthy companies is such that the lender's expected (total) return on a loan to an uncreditworthy company equals the expected (total) return on a loan to a creditworthy company, after accounting for differences in the risk of default."  The *Preamble* further clarifies

---

[114] *Id.*
[115] *See Preamble* at 65347, 65365.

that "using a default rate that is directly linked to the term of the loan is a better reflection of the risk associated with the long-term lending to uncreditworthy borrowers.[116]

Therefore, the plain language of the *Preamble* dictates that Commerce use the term of the benchmark (in this case, 3 years, from the 3-year KRW AA-Corporate Bond Rate from Bank of Korea)[117] to identify both the probability of default by a creditworthy company, and the probability of default by an uncreditworthy company from the Moody's "Average Cumulative Issuer-Weighted Global Default Rates, 1920-2010"[118] table.  Otherwise, if Commerce used the probability of default by an uncreditworthy company within six years for variables $p_n$ and $q_n$ respectively, as the Plaintiffs suggests, the variables would not be on the same basis as the term of the baseline benchmark used for variable $i_f$ (*i.e.*, 3 years).  This would be contrary to Commerce's intention in providing a formula to calculate the benchmark interest rate for an uncreditworthy company, as set out in the *Preamble*.

Therefore, for both the probability of default by a creditworthy company and the probability of default by an uncreditworthy company, the probability of default within 3 years from the Moody's "Average Cumulative Issuer-Weighted Global Default Rates, 1920-2010"[119] table should be used, for consistency with the term of the benchmark used (*i.e.*, the 3-year KRW AA-Corporate Bond Rate from Bank of Korea), in calculating the benchmark interest rate for uncreditworthy companies.

Further, as stated in the Draft Remand Results, 19 CFR 351.507(c) dictates that the benefit conferred by an equity infusion shall be allocated over the same period as a non-recurring

---

[116] *Id.* at 65365.
[117] *See* Memorandum, "Preliminary Results Calculation for KG Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd.," dated July 12, 2021, at Attachment II.
[118] *Id.*
[119] *Id.*

34

Barcode:4442089-01 C-580-879 REM - Remand - Slip Op. 23-98

subsidy. Sections 351.524(d)(1) and (d)(3)(ii) of Commerce's regulations provide that, in the case of a firm considered to be uncreditworthy, Commerce will use as a discount rate the interest rate described in 19 CFR 351.505(a)(3)(iii), which is an exception for uncreditworthy company.[120] Therefore, pursuant to 19 CFR 351.507(c), 351.524(d)(1) and (d)(3)(ii), to calculate the benefit for debt-to-equity infusions, we continue to use as a discount rate the same benchmark interest rate for uncreditworthy companies, calculated using the aforementioned probability of default rates.

## VI.     RESULTS OF FINAL REMAND REDETERMINATION

Consistent with the *Remand Opinion and Order*, we have re-examined and further substantiated our determination that the first through third debt-to-equity restructurings provided countervailable benefits, which passed through to KG Dongbu Steel because KG Dongbu Steel did not rebut the baseline presumption under our change-in-ownership methodology. Further, we have reconsidered the record evidence and further substantiated the loan term used to calculate the uncreditworthy benchmark interest rate and the unequityworthy discount rate. Based on the forgoing explanations, we have made no changes to the *AR 2019 Final Results*.

10/5/2023

X 

Signed by: LISA WANG

_____
Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[120] *See* Draft Remand Results at 17-18.

35