Slip Op. 24-38

## UNITED STATES COURT OF INTERNATIONAL TRADE

KG DONGBU STEEL CO., LTD.,
DONGBU STEEL CO., LTD., and
DONGBU INCHEON STEEL CO.,
LTD.,

        Plaintiffs,

v.

UNITED STATES,

        Defendant,

        and

NUCOR CORPORATION and
STEEL DYNAMICS, INC.,

        Defendant-Intervenors.

Before:  Jennifer Choe-Groves, Judge

Court No. 22-00047

## OPINION

[Remanding the U.S. Department of Commerce's Final Results of Redetermination Pursuant to Court Order in the countervailing duty review of certain corrosion-resistant steel products from the Republic of Korea.]

Dated:  April 3, 2024

Brady W. Mills, Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Mary S. Hodgins, Eugene Degnan, Jordan L. Fleischer, Nicholas C. Duffey, and Stephen Morrison, Morris, Manning & Martin, LLP, of Washington, D.C., for Plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd., and Dongbu Incheon Steel Co., Ltd.

Claudia Burke, Assistant Director, and Elizabeth Speck, Senior Trial Counsel,
Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of
Washington, D.C., for Defendant United States.   With them on the brief were
Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M.
McCarthy, Director.   Of Counsel was Ashlande Gelin, Attorney, Office of the
Chief Counsel for Trade Enforcement & Compliance, U.S. Department of
Commerce, of Washington, D.C.

Alan H. Price, Christopher B. Weld, Tessa V. Capeloto, and Adam M. Teslik,
Wiley Rein LLP, of Washington, D.C., for Defendant-Intervenor Nucor
Corporation.  Derick G. Holt, Enbar Toledano, Maureen Elizabeth Thorson, Paul A.
Devamithran, Robert Edward DeFrancesco, III, and Theodore P. Brackemyre also
appeared.

Roger B. Schagrin, Christopher T. Cloutier, Elizabeth Jackson Drake, Jeffrey D.
Gerrish, Luke A. Meisner, Michelle R. Avrutin, Nicholas J. Birch, Saad Y.
Chalchal, and William A. Fennell, Schagrin Associates, of Washington, D.C., for
Defendant-Intervenor Steel Dynamics, Inc.

Choe-Groves, Judge:  Plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel

Co., Ltd., and Dongbu Incheon Steel Co., Ltd. (collectively "KG Dongbu" or

"Plaintiffs") filed this action challenging the U.S. Department of Commerce's

("Commerce") fourth administrative review of Certain Corrosion-Resistant Steel

Products from the Republic of Korea ("Final Results"), 87 Fed. Reg. 2759 (Dep't

of Commerce Jan. 19, 2022) (final results and partial rescission of countervailing

duty administrative review; 2019), and the accompanying Issues and Decision

Memorandum for the Final Results and Partial Rescission of the 2019

Administrative Review of the Countervailing Duty Order on Certain Corrosion-

Resistant Steel Products from the Republic of Korea ("IDM"), PR 213.[1]  The Court

remanded the case to Commerce for reconsideration.  KG Dongbu Steel Co., Ltd.

v. United States ("KG Dongbu I"), 47 CIT __, 648 F. Supp. 3d 1353 (2023).  Now

before the Court are Commerce's Final Results of Redetermination Pursuant to

Court Remand ("Remand Redetermination"), ECF Nos. 57-1, 58-1.  For the

following reasons, the Court remands the Remand Redetermination.

## ISSUES PRESENTED

The Court reviews the following issues:

1.    Whether Commerce's determination on remand that the first

three debt-to-equity restructurings provided a countervailable

subsidy to KG Dongbu was supported by substantial evidence

and in accordance with law;

2.    Whether Commerce's remand determination that the benefits

from the first three debt-to-equity restructurings passed through

to KG Dongbu despite the change in ownership was supported

by substantial evidence and in accordance with law;

3.    Whether Commerce's calculation of the uncreditworthiness

---

[1]  Citations to the administrative record reflect the public record ("PR") and public
remand record (PRR) numbers filed in this case, ECF Nos. 44, 71.

benchmark for purposes of measuring the benefit from KG

Dongbu's debt-to-equity restructuring was supported by

substantial evidence; and

4.      Whether Commerce's calculation of the uncreditworthy

discount rate for purposes of measuring the benefits from the

debt-to-equity restructurings was supported by substantial

evidence.

## BACKGROUND

The Court presumes familiarity with the underlying procedural history of

this case as set forth in KG Dongbu Steel Co., Ltd. v. United States ("KG Dongbu

I"), 47 CIT __, __, 648 F. Supp. 3d 1353, 1356 (2023).

Commerce published its countervailing duty order on July 25, 2016.  Certain

Corrosion-Resistant Steel Products from India, Italy, Republic of Korea, and the

People's Republic of China, 81 Fed. Reg. 48,387 (Dep't of Commerce July 25,

2016) (countervailing duty order).  Commerce initiated an administrative review of

the countervailing duty order on certain corrosion-resistant steel products from the

Republic of Korea ("Korea") for the period of January 1, 2019 to December 31,

2019, and selected KG Dongbu and Hyundai Steel Company as mandatory

respondents.  Initiation of Antidumping and Countervailing Duty Administrative

Reviews, 85 Fed. Reg. 54,983, 54,990–91 (Dep't of Commerce Sep. 3, 2020);

Final Results, 87 Fed. Reg. at 2760.

Commerce issued the preliminary results of the administrative review, in which Commerce calculated a 10.52% subsidy rate for KG Dongbu.  Certain Corrosion-Resistant Steel Products from the Republic of Korea ("Preliminary Results"), 86 Fed. Reg. 37,740 (Dep't of Commerce July 15, 2021) (preliminary results of countervailing duty administrative review; 2019); Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review; 2019: Certain Corrosion-Resistant Steel Products from the Republic of Korea ("PDM"), PR 173.  Commerce issued the Final Results of the administrative review, in which Commerce calculated a 10.51% subsidy rate for KG Dongbu and assigned the same rate to non-selected companies.  Final Results, 87 Fed. Reg. at 2760.

On appeal, Plaintiffs challenged: (1) Commerce's determination that the first through third debt-to-equity restructurings provided a countervailable subsidy; (2) Commerce's determination that the sale of Dongbu Steel Co., Ltd. ("Dongbu Steel") was not arm's length for fair market value; (3) Commerce's calculation of the uncreditworthiness benchmark for purposes of measuring the benefit from KG Dongbu's restructured long term loans and bonds; and (4) Commerce's calculation of the unequityworthy discount rate for purposes of measuring the benefits from the equity infusions from government-controlled creditors.  Pls.' Mot. J. Agency

R., ECF Nos. 33, 34; Pls.' Opening Br., ECF Nos. 33-2, 34-2; Reply Br. Pls.'

Supp. Mot. J. Agency R., ECF Nos. 40, 41.  Defendant United States

("Defendant") and Defendant-Intervenor Nucor Corporation ("Defendant-

Intervenor" or "Nucor") argued that the Court should sustain the Final Results.

Def.'s Resp. Pls.' Mot. J. Agency R., ECF Nos. 35, 36; Def.-Interv.'s Resp. Mot. J.

Agency R., ECF Nos. 37, 38, 39.

    The Court observed that Commerce had considered the first through third

debt-to-equity restructurings in each of the first three administrative reviews of the

countervailing duty order.  KG Dongbu I, 47 CIT at __, 648 F. Supp. 3d at 1358.

In each of the three prior administrative reviews, Commerce had determined that

the debt-to-equity restructurings did not provide a countervailable benefit to KG

Dongbu because private creditors had participated in those debt-to-equity

restructurings and had agreed to swap debt for equity on the same terms as the

government creditors.  See Certain Corrosion-Resistant Steel Products from the

Republic of Korea, 84 Fed. Reg. 11,749 (Dep't of Commerce Mar. 28, 2019) (final

results and partial rescission of countervailing duty administrative review; 2015-

2016) and accompanying Issues and Decision Memorandum; Certain Corrosion-

Resistant Steel Products from the Republic of Korea, 85 Fed. Reg. 15,112 (Dep't

of Commerce Mar. 17, 2020) (final results of countervailing duty administrative

review; 2017) and accompanying Issues and Decision Memorandum; Certain

<u>Corrosion-Resistant Steel Products from the Republic of Korea</u>, 86 Fed. Reg. 29,237 (Dep't of Commerce June 1, 2021) (final results and partial rescission of countervailing duty administrative review; 2018) and accompanying Issues and Decision Memorandum.  Commerce did not conduct an unequityworthiness analysis in any of those first three administrative reviews.

The fourth administrative review also involved a fourth debt-to-equity restructuring.  <u>See</u> IDM at 15.  Commerce determined that the evidence showed that private banks had (1) participated in the three debt-to-equity restructurings at issue, (2) paid the same per share price as the government-controlled policy banks, and (3) purchased a significant percentage of the shares of debt that were converted to equity.  <u>See generally</u> Countervailing Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Preliminary Analysis Memorandum—Equity Infusions ("Equity Infusions Analysis Memorandum" or "Equity Infusions Analysis Mem."), P.R. 176; <u>see also</u> PDM at 11–12.  Commerce thus determined that, pursuant to 19 C.F.R. § 351.507(a)(2)(i), the equity infusions in the fourth debt-to-equity restructuring were inconsistent with usual investment practices of private investors.  Equity Infusions Analysis Mem. at 13.

During the fourth administrative review, Commerce also re-examined the first three debt-to-equity restructurings, found that KG Dongbu was

unequityworthy at their respective placements, and determined that the

restructurings had in fact provided a benefit each time to KG Dongbu, as detailed

in the Equity Infusions Analysis Memorandum. Id. at 10–13. Commerce

determined that the benefits of the first through third debt-to-equity restructurings

were countervailable because Commerce had previously determined that those debt

restructurings satisfied the specificity requirement of countervailability. IDM at

46–47; see 19 U.S.C. § 1677(5A).

Upon consideration of Plaintiffs' appeal, this Court concluded that

Commerce had a standard practice of not reexamining the countervailability of a

respondent's equity infusions absent new information and had not provided a

reasonable explanation for departing from that practice, and the Court remanded

the Final Results for reconsideration or further explanation. KG Dongbu I, 47 CIT

at __, 648 F. Supp. 3d at 1357–59. This Court reasoned that all the information

cited by Commerce regarding the first through third debt-to-equity restructurings

were based on existing record evidence that had been thoroughly considered in the

previous reviews, and that no new information impacted the facts surrounding the

fourth debt-to-equity restructuring. Specifically, "the record evidence cited by

Commerce as justification for its deviation from its past practice does not deal

directly with the first through third debt-to-equity restructurings and is not a

sufficient explanation to justify departing from its standard practice." Id. at __,

648 F. Supp. 3d at 1359.  The fourth administrative review was based on the same record as the first through third reviews, and thus Commerce did not provide a sufficient explanation or cite new substantial evidence to justify departing from the prior three reviews in the fourth administrative review.

The Court remanded for Commerce to reconsider or further explain: (1) its determination that the first through third debt-to-equity restructurings provided a countervailable benefit; (2) its determination that the benefits from the debt-to-equity restructurings "passed through" to Plaintiffs despite the change in ownership; (3) whether Commerce's calculations of the uncreditworthy benchmark rate are supported by substantial evidence; and (4) whether Commerce's calculations of the unequityworthy discount rate are supported by substantial evidence.  Id. at __, 648 F. Supp. 3d at 1357–61.

Commerce filed its Remand Redetermination maintaining that all of its original determinations were correct.  In summary, Commerce reiterated on remand that Commerce was attempting to fix in the fourth administrative review a "mistake" that it had made in the three prior administrative reviews, but Commerce again failed to cite substantial record evidence or provide an adequate explanation for departing from its prior determinations that the first three debt-to-equity restructurings did not provide countervailable benefits.  In addition, Commerce explained on remand that it would assess countervailable benefits as a pass through

for the prior three years of review (despite its prior determinations that Commerce would not countervail benefits in the first three years of review), plus would assess countervailable benefits for the fourth year of review, without citing substantial record evidence or providing an adequate explanation for this change in practice.

Plaintiffs challenged Commerce's <u>Remand Redetermination</u> in Plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd., and Dongbu Incheon Steel Co., Ltd.'s Comments on Commerce's Redetermination Pursuant to Court Remand. Pls.' Cmts. Commerce's Redetermination Pursuant Court Remand ("KG Dongbu's Cmts."), ECF Nos. 60, 61.  Defendant defended Commerce's <u>Remand Redetermination</u> in Defendant's Response to Plaintiffs' Comments on Commerce's Remand Redetermination.  Def.'s Resp. Pls.' Cmts. Commerce's Remand Redetermination ("Def.'s Resp."), ECF Nos. 65, 66.  Nucor filed Comments in Support of Remand Redetermination.  Nucor's Cmts. Supp. Remand Redetermination ("Nucor's Cmts."), ECF Nos. 67–69.

## JURISDICTION AND STANDARD OF REVIEW

The U.S. Court of International Trade has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final results of an administrative review of a countervailing duty order.  The Court will hold unlawful any determination found to be unsupported by substantial record evidence or otherwise not in accordance

with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  The Court reviews determinations made

on remand for compliance with the Court's remand order.  <u>Ad Hoc Shrimp Trade</u>

<u>Action Comm. v. United States</u>, 38 CIT 727, 730, 992 F. Supp. 2d 1285, 1290

(2014), <u>aff'd</u>, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I.    Countervailable Subsidy Overview

A countervailable subsidy exists when a foreign government provides a

financial contribution to a specific industry that confers a benefit upon a recipient

within the industry.  19 U.S.C. § 1677(5); <u>see also</u> <u>Fine Furniture (Shanghai) Ltd.</u>

<u>v. United States</u>, 748 F.3d 1365, 1369 (Fed. Cir. 2014).  For equity infusions, a

benefit is conferred if "the investment decision is inconsistent with the usual

investment practice of private investors, including the practice regarding the

provision of risk capital, in the country in which the equity infusion is made."  19

U.S.C. § 1677(5)(E)(i); <u>see also</u> 19 C.F.R. § 351.507(a)(1) (defining a benefit for

equity infusions).

Commerce considers an equity infusion to be inconsistent with usual

investment practice if the price paid by the foreign government for newly issued

shares is greater than the price paid by private investors for the same (or similar

form of) newly issued shares.  19 C.F.R. § 351.507(a)(2)(i).  Commerce does not

consider private sector investor prices if Commerce concludes that private investor

purchases of newly issued shares are not significant.  Id. § 351.507(a)(2)(iii).

When significant private sector participation does not exist, Commerce determines

whether the firm funded by the foreign government-provided equity is

equityworthy or unequityworthy at the time of the equity infusion.  Id.

§ 351.507(a)(3).  A determination that the firm is unequityworthy constitutes a

determination that the equity infusion is inconsistent with the usual investment

practice of private investors, and therefore, that a benefit to the firm exists in the

amount of the equity infusion.  Id.; see also id. § 351.507(a)(6).

Commerce considers a firm to be equityworthy if Commerce determines

that, from the perspective of a reasonable private investor examining the firm at the

time the foreign government-provided equity infusion took place, the firm showed

an ability to generate a reasonable rate of return within a reasonable period of time.

Id. § 351.507(a)(4)(i).  In making this determination, Commerce considers the

following factors: (A) an objective analysis of the future financial prospects of the

recipient firm; (B) current and past indicators of the recipient firm's financial

health; (C) rates of return on equity in the three years prior to the foreign

government equity infusion; and (D) private investor equity investment into the

recipient firm.  Id. § 351.507(a)(4)(i)(A)–(D).  Commerce may focus on the

equityworthyness of a specific project, in appropriate circumstances, rather than

the company as a whole.  Id. § 305.507(a)(4)(i).

## II.    First Through Third Debt-to-Equity Restructurings

Commerce's Remand Redetermination attempted to explain the rationale for
departing from its previous findings that the first three debt-to-equity restructurings
provided no countervailable subsidy.

Commerce explained that absent new information, Commerce does not
usually re-evaluate prior determinations on countervailability—by which
Commerce means it will not normally revisit prior financial contribution and
specificity determinations absent new information.  Remand Redetermination at 6–
7 (citing Magnola Metallurgy, Inc. v. United States, 508 F.3d 1349 (Fed. Cir.
2007) and PPG Industries, Inc. v. United States, 978 F.2d 1232 (Fed. Cir. 1992)).
Commerce had previously determined that KG Dongbu's first three debt-to-equity
restructurings, including the debt-to-equity infusions, constituted financial
contributions and were specific; therefore, Commerce was not revisiting those
determinations consistent with its practice.  Id. at 7.  Because the "amount" of any
benefit conferred to a company can vary between periods of review, Commerce
claimed that it was necessary to examine the "amount" of such benefit in each
period of review, consistent with 19 U.S.C. § 1675(a)(1)(A) and 19 U.S.C.
§ 1677(5)(E).  Id.

The Remand Redetermination explained that during the fourth
administrative review, the new fourth debt-to-equity infusion caused Commerce to

reevaluate the "total benefit" conferred under the four debt-to-equity restructurings

in order to calculate a single subsidy rate for the debt-to-equity infusion program.

Id. at 22.  Commerce claimed that when it re-examined the benefit conferred from

the fourth equity infusion during the period of review, it realized that it "had made

a mistake in the prior review," specifically that the "prior finding that no benefit

was conferred by the first three debt-to-equity restructurings was inconsistent

with" 19 C.F.R. § 351.507.  Id. at 8.  In addition, Commerce relied on Nucor

Corporation v. United States ("Nucor"), 45 CIT __, 494 F. Supp. 3d 1377 (2021),

which sustained Commerce's determination in the 2015–2016 administrative

review not to use KG Dongbu's private bank loans as a loan benchmark because

these loans had been provided as part of a government loan program.  Id. at 9

(citing Nucor, 45 CIT at __, 494 F. Supp. 3d at 1381).  Commerce determined that

using KG Dongbu's private bank loans as a benchmark for the debt-to-equity

infusions in this administrative review would be inconsistent with its regulations as

well as Nucor.  Id.  Therefore, Commerce determined in the Remand

Redetermination that Commerce had to reevaluate its "prior determination of the

benefit under the debt-to-equity infusions."  Id.

Regarding the Court's remand instruction to explain how Commerce's

determination in this review is supported by substantial evidence, the Remand

Redetermination stated that "Commerce considers an equity infusion to be

inconsistent with usual investment practice if the price paid by the foreign

government for newly issued shares is greater than the price paid by private

investors for the same (or similar form of) newly issued shares," and it does not

consider private sector investor prices if Commerce concludes that private investor

purchases of newly issued shares are "not significant." Id. at 10 (citing 19 C.F.R.

§ 351.507(a)(2)(i), (iii)).  The Remand Redetermination referred to the Equity

Infusions Analysis Memorandum, which concluded that evidence such as the

underlying agreements and the ownership of KG Dongbu indicated that the Korea

Development Bank, as a government-controlled policy bank, exercised significant

influence over the debt-to-equity restructurings.  Id. (citing Equity Infusions

Analysis Mem.).

According to Commerce, this meant that private creditors on the creditors

councils were considering how best to limit their losses instead of evaluating the

reasonableness of the rate of return on any equity they were considering investing

in the company in each debt-to-equity restructuring.  Id.  Commerce claimed that

its practice of analyzing the significance of private investor participation focused

on the perspective of an outside investor, not an existing investor that was simply

trying to minimize its losses.  Id. at 11.  Because of the percentage of shares owned

by government-controlled creditors compared to private creditors, Commerce

determined that the participation of KG Dongbu's private creditors in the first,

second, and third equity infusions was not significant.  Id.  Accordingly,

Commerce determined that it could not "rely on the prices paid by the private

creditors on the creditors councils for the purpose of determining a benchmark."

Id.

An administrative agency generally has authority to reconsider its decisions

if there is no specific statutory limitation to do so.  Tokyo Kikai Seisakusho, Ltd. v.

United States, 529 F.3d 1352, 1360 (Fed. Cir. 2008) ("[C]ourts have uniformly

concluded that administrative agencies possess inherent authority to reconsider

their decisions, subject to certain limitations, regardless of whether they possess

explicit statutory authority to do so." (citations omitted)).  Commerce must still

provide a reasonable explanation for treating similar situations differently, in this

instance based on its own standard.  See SKF USA Inc. v. United States ("SKF

USA"), 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("[A]n agency action is arbitrary

when the agency offer[s] insufficient reasons for treating similar situations

differently." (quoting Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C.

Cir. 1996) (alteration in original))).  Commerce's Remand Redetermination does

not satisfy that standard.

The only reason for Commerce to re-examine the countervailability of the

prior debt-to-equity restructurings is "new information," according to its own

statements.  See, e.g., Administrative Review of Certain Corrosion-Resistant Steel
Products from the Republic of Korea: Countervailing Duty Questionnaire ("Initial
Questionnaire"), Section III at III-1, PR 22–23 ("Absent new information
warranting a program reexamination, we will not reevaluate prior determinations
regarding the countervailability of programs.  This includes determinations that
previously examined programs are or are not countervailable.").  Commerce on
remand points to no new information on the record that it has not already
considered in its prior final determinations that there were no countervailable
benefits in KG Dongbu's first three debt-to-equity restructurings.

       The Court observes that Commerce has failed twice, in the Final Results and
the Remand Redetermination, to cite any new information or provide a reasonable
explanation for its attempted reversal of its prior determinations in three completed
administrative reviews in which Commerce determined before that the same debt-
to-equity restructurings currently under review provided no countervailable
benefits.  Without citing any new record evidence or providing a reasonable
explanation, Commerce simply states that it "made a mistake" and now determines
that countervailable benefits were conferred during the past three administrative
reviews.  Commerce's determination is not supported by substantial evidence
because it does not satisfy the standard in SKF USA (requiring Commerce to
provide a reasonable explanation for treating similar situations differently).  SKF

USA, 263 F.3d at 1382.  The Court holds that Commerce's determination that the

same debt-to-equity restructurings in the prior three administrative reviews are

now countervailable is arbitrary and not supported by substantial evidence.

     In addition, Commerce determined here that the debt-to-equity restructurings

in the first through fourth administrative reviews were countervailable and the

financial benefits would be "passed through" and allocated across all four years of

the administrative reviews.  See Remand Redetermination at 22.  The Equity

Infusions Analysis Memorandum analyzed the first through third debt-to-equity

restructurings as integral financial parts from the past that are tied to the fourth

debt-to-equity swap, such that there is a single subsidy program.  See Equity

Infusions Analysis Mem. at 9 ("In this review, Commerce is analyzing four debt-

to-equity conversions because the conversions are non-recurring and attributed to

the average-useful-life (AUL) period.").  Commerce has already determined,

however, that the first three debt-to-equity restructurings of that "program"

provided no benefit for KG Dongbu.  There are therefore no benefits from those

first three debt-to-equity restructurings to be included, or re-examined, in

Commerce's calculations of the fourth debt-to-equity restructuring.  The Court

concludes that Commerce's determination to pass through or allocate financial

benefits to years one through four of the administrative reviews is arbitrary and not

supported by substantial evidence, given Commerce's prior completed

administrative reviews determining that no countervailable benefits were conferred during years one through three.

The statute requires Commerce to "review and determine the amount of any net countervailable subsidy." 19 U.S.C. § 1675(a)(1)(A). If Commerce determines in a prior administrative review that there has been no benefit (*i.e.*, no "amount"), and no new information is presented in a subsequent administrative review, such as fraud or mistake of fact, that would call into question that prior determination, then the prior determination equates to a determination of no countervailable subsidy. Whether or not Commerce made a mistake in its prior analyses, the facts of the prior reviews remain the same in this administrative review. In other words, regardless of whether Commerce had to calculate "a single subsidy rate for the debt-to-equity infusion program," those prior final determinations of "no benefit" based on record evidence were carried over into Commerce's calculus for the fourth administrative review in the absence of new information relating to those prior determinations. KG Dongbu explains this more succinctly:

> The need to recalculate the amount of benefit in each review is only necessary in cases where Commerce has previously found the program to be countervailable. Only then is Commerce calculating a new benefit "amount" in each review. However, in cases such as this one where Commerce had consistently found that the first three [debt-to-equity restructurings] did not provide a countervailable subsidy there was no need to recalculate any benefit because there was none.

KG Dongbu's Cmts. at 4.

Defendant argues that Commerce had "good cause" to re-examine the first through third debt-to-equity restructurings because it "needed to correct a mistake that it had realized that it made in a prior review." Def.'s Resp. at 7. Commerce claimed that it did not analyze the first through third debt-to-equity restructurings correctly from the perspective of what a private investor would pay for shares consistent with 19 C.F.R. § 351.507(a)(2)(i). See Remand Redetermination at 8–12. The Court concludes that Commerce did not adequately articulate the nature of its alleged mistake. Commerce simply and summarily determined (without citing substantial evidence) in this fourth administrative review that "[p]rivate creditors on the creditors councils did not evaluate the reasonableness of the rate of return on any equity they were considering investing in the company in each debt-to-equity conversion," but the private creditors were rather "considering how best to limit their losses." Id. at 10. Their participation in the first through third debt-to-equity restructurings, therefore, was "not significant," resulting in Commerce undertaking an equityworthiness analysis. Id. at 11. The Court concludes that Commerce failed to provide a reasonable explanation and failed to cite new information or a mistake of fact regarding the first three administrative reviews

that would warrant reversing Commerce's prior final determinations that the first three debt-to-equity restructurings resulted in no countervailable benefits.

Any need to recalculate a benefit amount for each review is inapplicable for this particular program. Unlike determining the amount of a benefit under a subsidy program that changes year to year, the benefit determination to be calculated here for the fourth administrative review had nothing to do with the amounts of benefits from the first three debt-to-equity restructurings that had been calculated for past administrative reviews. Commerce usually allocates a non-recurring benefit, such as the debt-to-equity restructurings in this case, over a number of years that correspond to the average useful life allocation period. 19 C.F.R. § 351.524(b).

Commerce's attempt to rely on the existence of the fourth debt-to-equity restructuring as the basis for why it had to reconsider the benefit element for the first three debt-to-equity restructurings is unpersuasive. More specifically, Commerce argues that it was required to calculate a benefit for the entire debt-to-equity restructuring program and that its "benefit calculation for [the 2019 administrative review] is a single rate which includes benefits conferred for all four of the equity infusions." Remand Redetermination at 23. The fact that Commerce added up the benefit amounts for each of the four debt-to-equity restructurings to arrive at a total benefit from the debt-to-equity restructuring program, however, did

not change the fact that separate benefit amounts were calculated for each debt-to-

equity restructuring, as detailed in Commerce's final calculations data.  See Final

Results Calculation for KG Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co.,

Ltd. ("Final Calculations Mem."), PR 214.  Commerce did not need to revisit its

prior determinations that there were no benefits from the first three debt-to-equity

restructurings just because Commerce found that there was a benefit from the

fourth debt-to-equity restructuring.

Commerce's reliance on Nucor is also unpersuasive.  Nucor concerned

whether the loans by the private commercial banks on the creditors committee

constituted "comparable commercial loans" for purposes of 19 C.F.R.

§ 351.505(a)(2).  Nucor, 45 CIT __, 494 F. Supp. 3d at 1380.  Nucor's remand was

not concerned with whether private investor participation was significant for

purposes of equity infusions considered under 19 C.F.R. § 351.507(a)(2)(iii),

which is a separate regulation and separate consideration.  In the Nucor litigation,

Commerce defended its determination that private investor participation was

significant and thus there were no countervailable benefits from the first three

debt-to-equity restructurings.  See Nucor Corp. v. United States, Consol. Court No.

19-00042, Def.'s Mem. Opp'n Pl.'s Consol. Pls.' R. 56.2 Mot. J. Agency at 19–22,

ECF Nos. 59, 60.  The Court is not convinced that Commerce's prior

determinations of no countervailable benefits in three administrative reviews were

"mistakes." It appears that Commerce's purported "mistakes" are excuses for

Commerce's abrupt change in agency practice here in the fourth administrative

review.

As for Commerce's determination that the private investor participation was

not "significant" in the first three debt-to-equity restructurings, Commerce claimed

that its practice "is to conduct the analysis from the perspective of an outside

investor, and not an existing investor that is simply trying to minimize its losses."

Remand Redetermination at 11. Further:

> If [Commerce] determines that the firm was equityworthy, [Commerce]
> will apply paragraph (a)(5) of [19 C.F.R. § 351.507] to determine
> whether the equity infusion was inconsistent with the usual investment
> practice of private investors. A determination by [Commerce] that the
> firm was unequityworthy will constitute a determination that the equity
> infusion was inconsistent with usual investment practice of private
> investors . . . .

Id. (quoting 19 C.F.R. § 351.507(a)(3)).

Here, however, Commerce determined that the debt-to-equity infusion was

inconsistent with the usual investment practice of private investors in order to

determine that KG Dongbu was unequityworthy. Commerce's regulation provides

that it "will not use private investor prices . . . if [it] concludes that private investor

purchases of newly issued shares are not significant." 19 C.F.R.

§ 351.507(a)(2)(iii). Commerce created this "significant investment" standard

when promulgating 19 C.F.R. § 351.507(a)(2)(iii) by stating that it was keeping its

practice of considering "the volume of a firm's traded shares to be so low as to preclude the use of [private investor] shares as a benchmark." <u>Countervailing Duties</u>, 62 Fed. Reg. 8818, 8832 (Dep't of Commerce Feb. 26, 1997) (notice of proposed rulemaking and request for public comments).

Substantial evidence does not support Commerce's remand determination that private investor participation in the first three debt-to-equity restructurings was not significant.  Based on the same record evidence, Commerce determined in the prior administrative reviews that the private creditors in the debt-to-equity swaps were significant.  Equity Infusions Analysis Mem. at 4–8.  Commerce also reached the same conclusion in a separate proceeding that involved comparable private investor participation.  <u>See</u> <u>Coated Free Sheet Paper from the Republic of Korea</u>, 72 Fed. Reg. 60,639 (Dep't of Commerce Oct. 25, 2007) (notice of final affirmative countervailing duty determination) and accompanying Issues and Decision Memorandum at 47.

The Court notes that the first three administrative reviews are complete, and it is arbitrary for Commerce to revisit and attempt to reverse the determinations in those completed administrative reviews retroactively without citing new evidence. Commerce may address any relevant evidence in the fourth administrative review before the Court, and any determinations made with respect to the fourth administrative review must be supported by substantial evidence and in accordance

with law.  Commerce may not attempt to reverse the countervailability

determinations on the first three administrative reviews in this case absent new

information to address fraud or mistake of fact.  In addition, Commerce may not

pass through the purportedly countervailable benefits to the first three years

without substantial new evidence to justify such calculations.

The Court holds that Commerce's remand redetermination with respect to

the countervailability of the debt-to-equity restructurings is unsupported by

substantial evidence and is remanded for further consideration in accordance with

this Opinion.

### III.   Pass-Through of Benefits from First Three Debt Restructurings

The Court also remanded the issue of whether substantial evidence supports

Commerce's determination that a change in ownership extinguished any alleged

subsidies from the first through third debt-to-equity restructurings to KG Dongbu.

KG Dongbu I, 47 CIT at __, 648 F. Supp. 3d at 1360.

In its Remand Redetermination, Commerce repeated its position that KG

Dongbu's failure to submit the Change-in-Ownership Appendix ("CIO Appendix")

was fatal.  Remand Redetermination at 12–13.  Commerce cited to its instructions

in the Initial Questionnaire requesting the submission of a CIO Appendix if the

respondent wanted to challenge the baseline presumption that non-recurring

subsidies continued to benefit the recipient even after a change in ownership.  Id. at

12.  Without a response to the questions in the CIO Appendix, Commerce

purported to follow its "practice to presume that any benefits to the company will

also pass through as a benefit to the new owners."  Id. at 13.  Further, Commerce

argued that because KG Dongbu stated that it did not wish to challenge the

baseline presumption and did not provide a response to the CIO Appendix, KG

Dongbu's response relieved Commerce of the obligation to consider the record

evidence showing that the alleged non-recurring subsidies from the first three debt-

to-equity restructurings were extinguished.  Id. at 13–14.  The Court concludes that

Commerce's explanation is not reasonable and is not responsive to the prior

remand Order.

KG Dongbu contends that, first, at the time that it responded to Commerce's

Initial Questionnaire and subsequent supplemental questionnaires, all of the

subsidies that Commerce had found in prior reviews with respect to KG Dongbu

were from other programs that provided recurring subsidies.  See KG Dongbu's

Cmts. at 11.  KG Dongbu argues that Commerce had not found benefits from any

programs in which the benefit was calculated based on the allocation of a non-

recurring subsidy received in the average useful life period to current and future

reviews.  Id.  KG Dongbu also asserts that this necessarily means that even though

Dongbu Steel had been acquired by the KG Consortium, the question of whether

there were any programs that provided non-recurring benefits that may have passed

through to KG Dongbu was not an issue at the time of the questionnaire response

process.  Id. at 11–12.  KG Dongbu asserts further that it was not required to

predict that Commerce would change its mind in the 2019 administrative review

and would determine retroactively that the first through third debt-to-equity

restructurings conferred non-recurring benefits to KG Dongbu.  Id. at 12.  The

Court agrees with KG Dongbu's argument that KG Dongbu had no reason to

submit the CIO Appendix to challenge Commerce's baseline presumption

regarding non-recurring subsidies based on unforeseeable actions that Commerce

would take in the future to attempt to reverse prior concluded administrative

reviews.

      Second, KG Dongbu argues that for Commerce to claim that it "properly

presumed that any non-recurring benefit would pass through to the new owners"

because KG Dongbu did not initially challenge the baseline presumption by

submitting a CIO Appendix is to elevate form over substance.  KG Dongbu's

Cmts. at 13.  The fact that KG Dongbu did not submit a CIO Appendix does not

necessarily mean that there was no other record evidence to challenge Commerce's

baseline presumption.  Id.  If the record reflects that an arm's length transaction

took place at fair market value, the baseline presumption is rebutted, regardless of

the absence of a CIO Appendix.  Id. at 13–14.

Pursuant to 19 U.S.C. § 1677(5)(F), Commerce presumes that a non-recurring subsidy will benefit a recipient over the average useful life of the relevant assets and Commerce thus allocates the subsidy over that allocation.  19 U.S.C. § 1677(5)(F); Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act ("Final Modification"), 68 Fed. Reg. 37,125, 37,127 (Dep't of Commerce June 23, 2003).  A respondent may rebut the presumption, however, by demonstrating that a change in ownership occurred in which the former owner sold all or substantially all of a company or its assets, and that the sale was an arm's length transaction for fair market value.  Final Modification, 68 Fed. Reg. at 37,127.  In such situations, the subsidy is reflected in the fair market price of the arm's length transaction and the pre-sale subsidy is extinguished (i.e., does not pass through) as to the new owner.  In the Final Modification, Commerce listed four factors that it would analyze when determining whether the transaction price in an acquisition was arm's length and for fair market value: (1) whether an objective analysis was performed in determining the appropriate sales price; (2) whether any artificial barriers to entry were imposed on potential purchasers that could artificially suppress demand for, or the purchase of, the company; (3) whether the highest bid was accepted; and (4) whether there were committed investment requirements that could serve as a barrier to entry or distort the value that bidders were willing to pay.  Id.

KG Dongbu claims that record evidence demonstrates that all of these elements are met, and that Commerce failed to consider the record evidence.  Id. at 15–17.  First, regarding the objective analysis factor, KG Dongbu claims that: (1) PricewaterhouseCoopers independently analyzed the acquisition proposal from the KG Consortium, including the acquisition price in Scenario 3; (2) PricewaterhouseCoopers compared the proposal with alternative scenarios that assumed the creditors council either made no changes to Dongbu Steel's pre-acquisition structure or liquidated Dongbu Steel; and (3) based on its analysis, PricewaterhouseCoopers concluded that the KG Consortium's proposal had the highest value to the creditors council of the available alternative scenarios and posed less risk than liquidating Dongbu Steel.  Id. at 15 (citations omitted).  KG Dongbu claims that this was an objective analysis.

Second, KG Dongbu claims that there were no artificial barriers to entry because: (1) there was a publication in a newspaper on January 7, 2019, publicizing an investment attraction announcement for an open bidding process that provided equal access and free competition for all interested parties; (2) the purpose of the transaction was the acquisition by a third party of newly issued common stock that would result in the transfer of corporate management rights; and (3) potential investors that submitted the confidentiality agreement form and revealed an intention to bid received a Preliminary Bidding Guide and a Teaser

Memorandum containing private and confidential information of Dongbu Steel to assist the recipient in making a decision on whether to pursue a further analysis of Dongbu Steel and submit a preliminary bidding proposal. Id. at 14–15 (citations omitted).

Third, KG Dongbu also claims that (1) the highest bid was accepted in this bidding process; (2) potential investors showed interest by signing confidentiality agreements and were allowed access to Dongbu Steel's confidential information; (3) Dongbu Steel's financial and business information was provided for the valuation and to determine a reasonable investment amount to take over Dongbu Steel; and (4) because the financial information covered the period through September 2018, it fully reflected Dongbu Steel's financial condition after the first three debt-to-equity restructurings. Id. at 16–17. KG Dongbu explains the bidding and selection process that led to its assumption of Dongbu Steel, including the evaluation of proposed investment amounts, financial and business plans, and capacity to close the deal as well as the KG Consortium's appointment of an independent accounting firm to analyze Dongbu Steel's financial situation before the KG Consortium's preparation of its business restructuring plan and submission of its final bidding proposal on March 4, 2019. Id. KG Dongbu argues that the KG Consortium paid in full for the new shares before it assumed control of Dongbu Steel. Id. at 17.

Fourth, KG Dongbu argues that there were no committed investment requirements that could serve as a barrier to entry or distort the value that bidders were willing to pay.  Id.

Commerce has not reviewed this record evidence and made any determinations.  Commerce has yet to determine whether this amounts to substantial evidence of an arm's length transaction of Dongbu Steel's assets sold to the KG Consortium.  The Court remands this issue for further explanation or reconsideration in accordance with this Opinion.

## IV.   Calculation of the Uncreditworthiness Benchmark

KG Dongbu challenges Commerce's calculation of the uncreditworthy benchmark rate.  KG Dongbu's Cmts. at 17–21; see 19 C.F.R. § 351.505(a)(3)(iii); 19 C.F.R. § 351.524(d).  Familiarity with the formula, as transcribed in the prior Opinion,[2] is presumed.  See KG Dongbu I, 47 CIT at __, 648 F. Supp. 3d at 1361.

---

[2] "
$$i_b = \left[\frac{(1-q_n)(1+i_f)^n}{(1-p_n)}\right]^{1/n} - 1$$
where:

$n$ = the term of the loan;
$i_b$ = the benchmark interest rate for uncreditworthy companies;
$i_f$ = the long-term interest rate that would be paid by a creditworthy company;
$p_n$ = the probability of default by an uncreditworthy company within n years; and
$q_n$ = the probability of default by a creditworthy company within n years."

This Court previously noted that the extension of the repayment date on KG

Dongbu's loans was to December 31, 2025, and that the fifteen-year average useful

life of the equity infusions contradicted Commerce's <u>Final Results</u>.  <u>Id.</u>

　　　In its <u>Remand Redetermination</u>, Commerce continued to use three years for

the term of the loan variable and the creditworthy and uncreditworthy default rates

because there was allegedly no information on the record regarding a six-year

interest rate for a comparable commercial loan and the loans that KG Dongbu

received cannot constitute "comparable commercial loans" pursuant to 19 C.F.R.

§ 351.505(a)(2).  <u>Remand Redetermination</u> at 17.  Specifically, Commerce

reiterated on remand that in its <u>Final Results</u>, it determined that while there were

some private commercial banks involved in the debt restructuring of KG Dongbu,

the restructuring of its debt was not overseen by those private banks.  <u>Id.</u> at 15–16.

Instead, the debt restructuring was controlled by the Creditor Bank Committee

("CBC"), which in turn was controlled by Korean government policy banks such

as the Korea Development Bank.  <u>Id.</u> at 16.  Therefore, Commerce determined that

---

<u>See</u> 19 C.F.R. § 351.505(a)(3)(iii).  This uncreditworthy interest rate formula thus
has four variables: (1) the term of the loan in question ("$n$"); (2) the long-term
interest rate paid by a creditworthy company; (3) the probability of default of a
creditworthy company in "$n$" years; and (4) the probability of default of an
uncreditworthy company in "$n$" years.

the record of this case did not warrant any change from prior administrative

reviews.  Id.

More specifically, Commerce determined that the loans from private

creditors on the CBC could not be construed as "comparable commercial loans"

and used as a commercial benchmark under 19 U.S.C. § 1677(5)(E)(ii) and 19

C.F.R. § 351.505(a)(2), because the CBC was controlled by government policy and

special purpose banks.  Id.  Commerce used a three-year AA-rated Korean Won

interest rate, published by the Bank of Korea as the long-term interest rate paid by

a creditworthy company because it was the only long-term interest rate available

on the record.  Id.  Commerce alleged that no other long-term Korean Won interest

rates were provided on the record by interested parties in this review.  Id.

Furthermore, Commerce explained that:

> [T]he plain language of the [Preamble to Commerce's regulation]
> dictates that Commerce use the term of the benchmark (in this case,
> [three] years, from the [three]-year [Korean Won] AA-Corporate Bond
> Rate from Bank of Korea) to identify both the probability of default by
> a creditworthy company, and the probability of default by an
> uncreditworthy company from the Moody's "Average Cumulative
> Issuer-Weighted Global Default Rates, 1920-2010" table.  Otherwise,
> if Commerce used the probability of default by an uncreditworthy
> company within six years for variables $p_n$ and $q_n$ respectively, as the
> Plaintiffs suggests, the variables would not be on the same basis as the
> term of the baseline benchmark used for variable if (*i.e.*, [three] years).
> This would be contrary to Commerce's intention in providing a formula
> to calculate the benchmark interest rate for an uncreditworthy company,
> as set out in the Preamble.

Id. at 34 (citing Countervailing Duties, 63 Fed. Reg. 65,348, 65,365 (Dep't of

Commerce Nov. 25, 1998)).

      The Court concludes that Commerce's explanation is arbitrary.  Commerce's

determination on remand to use three years for the term of the loan in variable "$n$"

and the length of time within which creditworthy and uncreditworthy companies

may default for variables "$p_n$" and "$q_n$" is contrary to the plain language of its

regulations.  See 19 C.F.R. § 351.505(a)(3)(iii).  Commerce's explanation does not

justify ignoring the plain language of its own regulations, and there is no rational

basis for ignoring the actual evidence on the record regarding the term of the loan

(i.e., six years) and substituting a pretend term for the sake of consistency.  See,

e.g., Ereğli Demir ve Çelik Fabrikalari T.A.Ş. v. United States ("Ereğli Demir"),

43 CIT __, __, 415 F. Supp. 3d 1216, 1230 (2019) ("Commerce's determination in

the remand proceeding is inconsistent with the plain language of the regulation

and, thus, merits no deference."); Guangzhou Jangho Curtain Wall Sys. Eng'g Co.

v. United States, 40 CIT __, __, 181 F. Supp. 3d 1265, 1280 (2016) ("Commerce's

per se restriction of its scope ruling to a particular interested party rather than to a

particular product is contrary to the plain language of the regulation."); Thomas

Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) ("The agency's interpretation

must be given controlling weight unless it is plainly erroneous or inconsistent with

the regulation." (quotations omitted)).

Commerce's regulation specifies that if it finds that a firm that received a government provided long-term loan was uncreditworthy, it will "normally" calculate the interest rate "where: $n$ = the term of the loan." 19 C.F.R. § 351.505(a)(3)(iii). The final countervailing duty regulations specify the selection of the default rates used in calculating an uncreditworthy benchmark, explaining that Commerce:

> . . . will use the average cumulative default rate for the number of years corresponding to the length of the loan, as reported in Moody's study of historical corporate bond default rates. In other words, we would use a five-year default rate for a five-year loan, as a [fifteen]-year default rate for a [fifteen]-year loan, and so forth. We believe that <u>using a default rate that is directly linked to the term of the loan</u> is a better reflection of the risk associated with long- term lending to uncreditworthy borrowers.

<u>Countervailing Duties</u>, 63 Fed. Reg. at 65,365 (emphasis added). In other words, it is the rate that is to be linked to the term of the loan. It is not the other way around.

Commerce's rule addresses that the default rate is a measurement of risk and the level of risk for a company to default within "$n$" years, which can only be properly calculated using the actual term of the new loan at issue, in this case for KG Dongbu, six years. <u>See</u> <u>id.</u> However, Commerce introduced abnormality into the equation by imposing, through unnecessary substitution, a condition that was directly at odds with clear evidence of record. Commerce has not articulated a rational basis to ignore an actual data point in favor of a three-year term unrelated

to the term of the actual loan.  Its calculation thus contradicts the plain language of

its own regulations as to the appropriate period for the applicable default rates.

In the absence of substantial evidence to the contrary, the term of the

restructured long-term loans and bonds is six years, and the term of the loan

(variable "$n$") and default rates ("$p_n$" and "$q_n$") used in the calculation must match

the actual six-year term of KG Dongbu's loans and bonds.  Commerce's decision

to ignore the plain requirements of its regulation renders its decision not in

accordance with law.  See Ereğli Demir, 43 CIT at __, 415 F. Supp. 3d at 1230.

Apart from the rate (variable "$i_f$") that Commerce concluded is proper, on

remand, if Commerce reaches this issue again, it must either revise the calculation

of the uncreditworthy benchmark rate (quotient "$i_b$") by using the six-year term and

default rates on the record for variables "$n$," "$p_n$," and "$q_n$" as set out in the plain

language of its regulations, or provide cogent reasoning for adopting any other

alternative calculation.

## V.    Calculation of the Unequityworthy Discount Rate

KG Dongbu challenges Commerce's calculation of the uncreditworthy

benchmark rate.  KG Dongbu's Cmts. at 17–20.

After Commerce determines that a company receives a benefit through an

equity infusion and that the firm is unequityworthy, it will calculate the amount of

the benefit as equal to the amount of the equity infusion.  19 C.F.R.

§ 351.507(a)(4), (6).  Commerce's regulation specifies that Commerce will then

allocate the benefit amount conferred by an equity infusion (a non-recurring

subsidy) over the same time period as the non-recurring subsidy, in accordance

with 19 C.F.R. § 351.524(d).  See 19 C.F.R. § 351.507(c) ("The benefit conferred

by an equity infusion shall be allocated over the same time period as a non-

recurring subsidy.").

     19 C.F.R. § 351.524(d)(1) sets out the formula to be used for allocating non-

recurring benefits over time:

$$A_k = \frac{\frac{y}{n} + \left[ y - \left(\frac{y}{n}\right)(k-1) \right] d}{1 + d}$$

     Where:
$A_k$ = the amount of the benefit allocated to year $k$,
$y$ = the face value of the subsidy,
$n$ = the [average useful life] . . . ,
$d$ = the discount rate . . . , and
$k$ = the year of allocation, where the year of receipt = 1 and $1 \leq k \leq n$.

19 C.F.R. § 351.524(d)(1).

     19 C.F.R. § 351.524(d)(3)(ii) then sets out an exception for selecting the

discount rate for uncreditworthy firms.  For such firms, Commerce "will use as a

discount rate the interest rate described in 19 C.F.R. § 351.505(a)(3)(iii)" (i.e., it

will use the same formula for the calculation of the uncreditworthy benchmark

interest rate described above in section III of this Opinion).  19 C.F.R.

§ 351.524(d)(3)(ii).  In other words, the regulations require that Commerce

calculate the unequityworthy discount rate (listed as variable "*d*" in 19 C.F.R.

§ 351.524(d)(1)) using the formula from 19 C.F.R. § 351.505(a)(3)(iii), but it must

use the average useful life period as variable "*n*" as specified in 19 C.F.R.

§ 351.524(d).

When the creditor's committee met and approved the restructuring of KG

Dongbu's loans, the maturity date of the loans was extended until 2025.  See KG

Dongbu's Cmts. at 19.  The term of KG Dongbu's restructured loans is six years,

from the 2019 extension until the loans mature in 2025.  The term of average

useful life allocation period for non-recurring subsidies is fifteen years.  Id.  The

probabilities of default by creditworthy and uncreditworthy companies on six-year

and fifteen-year loans are on the record.  Id.  The Court also agrees that the

information necessary to calculate the uncreditworthy benchmark rate and

unequityworthy discount rate pursuant to the plain language of 19 C.F.R.

§ 351.505(a)(3)(iii)—the six-year term of KG Dongbu's restructured loans, the

fifteen-year average useful life of the equity infusions, and the probabilities of

default by creditworthy and uncreditworthy companies for six- and fifteen-year

periods—is on the record.

Because the average useful life period in this case is fifteen years,

Commerce allocated the amounts of the 2015, 2016, 2018, and 2019 government

equity infusions on that basis pursuant to 19 C.F.R. § 351.507(c) and 19 C.F.R.

§ 351.524(b) and (d)(1).  Equity Infusions Analysis Mem. at 21.  However, in

determining the amount of the benefit in each year of the fifteen-year allocation

period, Commerce calculated the discount rates (variable "$d$" in Commerce's

equation) based on a three-year period, and in so doing it applied the formula from

19 C.F.R. § 351.505(a)(3)(iii) incorrectly, as discussed above for the

uncreditworthy benchmark interest rate.  See IDM at 41–42, 59.  Commerce's

regulation and preamble to Commerce's regulations are clear that the default rates

should be tied to the term of the loan or, in the case of an equity benefit, to the

same period as a non-recurring subsidy, *i.e.*, the fifteen-year average useful life

period.  See 19 C.F.R. § 351.524(d)(2); 19 C.F.R. § 351.507(c) ("The benefit

conferred by an equity infusion shall be allocated over the same time period as a

non-recurring subsidy.").

Thus, the "$n$" variable (number of years) in the formula for calculating the

unequityworthy discount rates should match the fifteen-year allocation period, just

as the "$n$" variable for calculating an uncreditworthy benchmark interest rate must

match the term of the uncreditworthy loan.  Because Commerce's Remand

Redetermination contradicts the plain language of Commerce's regulations,

Commerce's determination is not in accordance with law.  See Ereğli Demir, 43

CIT at __, 415 F. Supp. 3d at 1230.  On further remand, Commerce must either

revise the calculation of the unequityworthy discount rates by using the fifteen-year average useful life period and default rates for variables "$n$," "$p_n$," and "$q_n$" as set forth in the regulations, or provide cogent reasoning for adopting any alternative calculation.

## CONCLUSION

Accordingly, it is hereby

**ORDERED** that Commerce's amended Final Results of Redetermination Pursuant to Court Remand, ECF Nos. 57, 58, are remanded to Commerce for reconsideration consistent with this Opinion; and it is further

**ORDERED** that this case shall proceed according to the following schedule:

(1) Commerce shall file the remand determination on or before July 3, 2024;

(2) Commerce shall file the administrative record on or before July 17, 2024;

(3) Comments in opposition to the remand determination shall be filed on or before September 6, 2024;

(4) Comments in support of the remand determination shall be filed on or before October 7, 2024; and

(5) The joint appendix shall be filed on or before October 22, 2024.

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated:    April 3, 2024
New York, New York