# United States Court of Appeals for the Federal Circuit

---

**KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., DONGBU INCHEON STEEL CO., LTD.,**
*Plaintiffs-Appellees*

**v.**

**NUCOR CORPORATION,**
*Defendant-Appellant*

**UNITED STATES, STEEL DYNAMICS, INC.,**
*Defendants*

---

2025-1411

---

Appeal from the United States Court of International Trade in No. 1:22-cv-00047-JCG, Judge Jennifer Choe-Groves.

---

Decided: July 16, 2026

---

BRADY MILLS, Taft Stettinius & Hollister LLP, Washington, DC, argued for plaintiffs-appellees. Also represented by DONALD B. CAMERON, JR., NICHOLAS DUFFEY, JORDAN FLEISCHER, MARY HODGINS, JULIE MENDOZA, R. WILL PLANERT, EDWARD JOHN THOMAS, III.

ADAM MILAN TESLIK, Wiley Rein, LLP, Washington, DC, argued for defendant-appellant. Also represented by

TESSA V. CAPELOTO, ALAN H. PRICE, ENBAR TOLEDANO, CHRISTOPHER B. WELD.

---

Before LOURIE, LINN, and HUGHES, *Circuit Judges*.

HUGHES, *Circuit Judge*.

Appellant Nucor Corporation appeals from a final judgment of the United States Court of International Trade. The trial court sustained the Department of Commerce's determination, submitted under protest and after two remands, that three debt-to-equity conversions performed by Appellee Dongbu Steel Co., Ltd. conferred no countervailable benefit. For the reasons explained below, we reverse the trial court's judgment and remand with instructions for the trial court to reinstate Commerce's original determinations.

I

This case concerns the method by which the Department of Commerce imposes countervailing duties in response to equity infusions, a particular type of government-provided financial subsidy. We begin by outlining the statutory scheme governing such countervailing duties before turning to the equity infusions at issue in the instant case. We then explain Commerce's determinations regarding these equity infusions before detailing subsequent appeals to, and remands from, the trial court based on how the determinations were reached.

A

Under the Tariff Act of 1930 (the Act), Commerce is empowered to impose countervailing duties on imported merchandise for which it determines that a foreign government has provided "a countervailable subsidy with respect to . . . manufacture, production, or export." 19 U.S.C. § 1671(a)(1). Countervailable subsidies, in turn, are defined by the Act to include instances where the foreign

government "provides a financial contribution . . . to a person and a benefit is thereby conferred." *Id.* § 1677(5)(B). Said differently, if a foreign government overprovides financial support in bringing domestic merchandise to the international market, creating an unfair competitive advantage, that merchandise is liable to face balancing, countervailing duties upon importation. Such financial support includes the "direct transfer of funds" like equity infusions. *See id.* § 1677(5)(D)(i). When an equity infusion takes place in the context of a debt-to-equity conversion, pertinent regulation provides that the conversion is treated as a standard equity infusion for the purpose of evaluating benefit. 19 C.F.R. § 351.508(a). An equity infusion confers a countervailable benefit within the meaning of the Act if "the investment decision is inconsistent with the usual investment practice of private investors . . . in the country in which the equity infusion is made." 19 U.S.C. § 1677(5)(E)(i); *see also* 19 C.F.R. § 351.507(a)(1).

Commerce follows one of two paths to determine whether an investment decision is consistent with the usual practice of private investors—one where there are private investor prices available, and one where such prices are unavailable. *See* 19 C.F.R. § 351.507(a)(2)–(3). For private investor prices to be considered available, private investor purchases of new shares must be "significant." *Id.* § 351.507(a)(2)(iii). Where private investor prices are available, if the price paid by the government is greater than the private price paid for the same newly issued shares, the equity infusion is inconsistent with the usual practices of a private investor. *Id.* § 351.507(a)(2)(i).

Where private investor prices are unavailable, the determination of whether an equity infusion is consistent with usual private investor practices turns on whether the firm was equityworthy at the time of the infusion. *Id.* § 351.507(a)(3). A firm is considered equityworthy if Commerce determines that, "from the perspective of a reasonable private investor . . . at the time the government-

provided equity infusion was made, the firm showed an ability to generate a reasonable rate of return within a reasonable amount of time." *Id.* § 351.507(a)(4)(i). If the firm is equityworthy, the terms of the equity are examined to see if they are consistent with the usual investment practices of private investors. *See id.* § 351.507(a)(5). If the firm is not equityworthy, a countervailable benefit exists in the amount of the equity infusion. *Id.* § 351.507(a)(6).

Separately, Commerce generally treats equity infusions as non-recurring subsidies. *Id.* § 351.524(c)(1). This means that the benefit of any equity infusion is allocated to a firm over a number of years "corresponding to [its] average useful life ('AUL')." *Id.* § 351.524(b)(1). If a recipient of a non-recurring subsidy is acquired during the subsidy's AUL, Commerce applies a "baseline presumption" that the benefit associated with this subsidy passed through to the post-acquisition entity. *See Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125, 37,127 (Dep't of Com. June 23, 2003). This presumption can be rebutted by demonstrating that a change in ownership occurred where the former owner of a firm sold all or substantially all its assets, and that this sale was an arm's length transaction for fair market value. *See id.*

B

Appellee Dongbu Steel Co., Ltd. (Dongbu)[1] is a Korean steel manufacturer that, by late 2013, was in a dire financial situation due to the lingering impacts of the Eurozone

---

[1] After a March 2020 merger with Appellee Dongbu Incheon Steel Co., Ltd., and subsequent acquisition by KG Consortium, Dongbu Steel Co., Ltd. was renamed KG Dongbu Steel Co., Ltd. For ease of reference, this opinion refers to both the pre- and post-merger-and-acquisition entity as Dongbu.

sovereign debt crisis. To procure capital, Dongbu applied for bridge loans and entered into a business relationship with Korea Development Bank (KDB), a Korean government-controlled financial institution, to refinance corporate bonds. Dongbu also attempted to sell one of its facilities in Incheon, Korea, along with a separate port management arm, as a package deal, but this deal fell through after financial due diligence. Thereafter, Dongbu applied for voluntary corporate restructuring.

During the corporate restructuring process, Dongbu underwent four debt-to-equity conversions. The first conversion, valued at 53 billion Korean Won (KRW), began in 2014 and continued through 2015; the second, valued at 200 billion KRW, occurred in 2016; and the third, also valued at 200 billion KRW, began in 2017 and continued through 2018. These three conversions were conducted by Dongbu's Creditor Banks Committee (Creditors' Committee), of which KDB was a part, to maximize recovery of outstanding debts.

The fourth debt-to-equity conversion, however, was different. Recognizing certain inefficiencies associated with Creditors' Committee involvement in the firm's debt restructuring, Dongbu and the Creditor's Committee opened the fourth conversion to a public bidding process. The last bid standing in this process was that of KG Consortium, who negotiated terms for their planned equity infusion including a reduction in interest rates and an extension of maturities for prior debts. The fourth round of equity infusions took place in 2019 on these agreed terms.

C

In July 2016, Commerce published a countervailing duty order covering steel products from South Korea. *Certain Corrosion-Resistant Steel Products From India, Italy, Republic of Korea and the People's Republic of China: Countervailing Duty Order*, 81 Fed. Reg. 48,387 (Dep't of Com. July 25, 2016). Pursuant to 19 U.S.C. § 1675(a)(1)

and 19 C.F.R. § 351.213(b), Commerce then conducted three administrative reviews of this order for the periods 2015–16, 2017, and 2018. In these three reviews, Commerce determined that Dongbu's first three debt-to-equity conversions provided no countervailable benefit. These reviews also included findings that private investor participation in the first three infusions was significant because of private involvement in the decisions of the Creditors' Committee, and that these private investors had paid the same share price as the government.

Commerce then conducted a fourth administrative review for the 2019 period of review (POR), publishing its preliminary results in July 2021. *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, 2019*, 86 Fed. Reg. 37,740 (Dep't of Com. July 16, 2021) (*Preliminary Results*). In the *Preliminary Results* and accompanying memoranda, Commerce determined that private participation in the fourth debt-to-equity conversion was significant due to the involvement of KG Consortium and that KG Consortium's pricing could be used to determine whether government investors had paid more than private investors. Based on a comparison of these prices, Commerce then determined that the fourth equity infusion was countervailable. And, though the POR covered 2019, Commerce also reviewed the continuing countervailability of the first three equity infusions in the *Preliminary Results* because the average useful life for the industry was set at 15 years, which necessarily encompassed the earlier infusions.

In re-examining these first three equity infusions, Commerce determined that private investor participation was, in fact, not significant. This was because Commerce determined that, during the first three transactions: (1) private creditors did not evaluate the reasonableness of their returns but instead were trying to limit their losses; (2) government-controlled creditors had control of

decision-making within the Creditors' Committee; and (3) KDB exerted considerable control over Dongbu's debt restructuring. Since private investment during these first three transactions was not significant, Commerce concluded that it needed to do an equityworthiness determination for Dongbu at the times of these three infusions. After performing an equityworthiness determination based on the factors listed at 19 C.F.R. § 351.507(a)(4)(i), Commerce determined that Dongbu was unequityworthy during the first three debt-to-equity conversions. This meant that the first three equity infusions were treated as providing countervailable benefit in full.[2]

Commerce published its final results for the 2019 administrative review in January 2022. *Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results and Partial Recission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 2,759 (Dep't of Com. Jan. 19, 2022) (*Final Results*). In the *Final Results* and accompanying issues and decision memorandum, Commerce adhered to the logic of the *Preliminary Results* and further justified its analysis of the first three equity infusions. Specifically, Commerce noted that the "inclusion of private investors" in the fourth equity infusion "was a factual change from prior reviews that led [the agency] to reconsider the role KDB played in its control of the creditors' committee." J.A. 8773. Commerce also determined that the benefit from the first three equity infusions was not extinguished upon Dongbu's acquisition by KG

---

[2] As Nucor correctly points out, while reconsideration of Dongbu's first three equity infusions meant they would be treated as providing countervailable benefit for the 2019 POR, this change in agency position did not modify or reverse the results of administrative reviews for any of the three previous PORs, which had already become final. Appellant Br. 38 & n.6.

Consortium. This was for two reasons. First, Dongbu did not provide any response to Commerce's Change-in-Ownership Appendix, which normally provides the agency with information it needs to analyze the impact of acquisition and potentially rebut the "baseline presumption" of benefit pass-through. Second, Commerce determined that the record did not support the argument that Dongbu was acquired in an arm's length transaction for fair market value based on the terms of KG Consortium's purchase and the different share prices paid by private and public investors during the final debt-to-equity conversion.

D

After Commerce published the *Final Results*, Dongbu sought review in the Court of International Trade, alleging that Commerce unlawfully deviated from its prior practices by reevaluating the countervailability of Dongbu's first three debt restructurings. *See KG Dongbu Steel Co. v. United States*, 648 F. Supp. 3d 1353 (Ct. Int'l Trade 2023) (*First Remand Order*).

The trial court agreed. It first found that Commerce had a routine practice of not re-examining the countervailability of Dongbu's equity infusions "absent new information." *Id.* at 1358. Second, citing *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001), the trial court held that to depart from this routine practice, Commerce "must provide a reasonable explanation." *First Remand Order*, 648 F. Supp. 3d at 1358. Because Commerce "neither provided a sufficient explanation nor cited new information on the record" to justify this deviation, however, the trial court concluded that Commerce's final determinations regarding the first three equity infusions were "arbitrary and not in accordance with the law." *Id.* at 1358–59. The trial court rejected Commerce's proffered evidence that private investor participation in the fourth equity infusion was a material change that could justify reevaluation of the first three infusions because this evidence

"does not deal directly with the first through third debt-to-equity restructurings." *Id.* at 1359. The trial court therefore remanded to Commerce for reconsideration. The trial court also summarily remanded for reconsideration on the issues of (1) whether Commerce's countervailability determinations were supported by substantial evidence and (2) whether substantial evidence supported a determination that the presumption of benefit pass-through in Dongbu's acquisition had been rebutted.

On remand, Commerce provided additional information in compliance with the trial court's opinion. *See* J.A. 9037–50 (*First Remand Redetermination*). Commerce noted, for instance, that its departure from previous determinations was consistent with both its standard practice and its statutory mandate under the Act to re-evaluate benefit for each POR. Commerce further described its previous three determinations as a "mistake" that it had the legal authority to go back and correct. Commerce also continued to defend the conclusions on benefit and pass-through it had reached in the *Final Results*.

The trial court again remanded to the agency for further consideration. *See KG Dongbu Steel Co. v. United States*, 695 F. Supp. 3d 1338, 1356 (Ct. Int'l Trade 2024) (*Second Remand Order*). This opinion largely mirrored the *First Remand Order*, with the trial court explaining that Commerce needed to cite to "new information" to justify changing its position on a countervailability determination. *Id.* at 1347. Absent citations to such information, the trial court held, even Commerce's statement that it "made a mistake" could not save its determinations from arbitrariness or a lack of substantial evidentiary support. *See id.* at 1347–48. The trial court also reiterated its belief in the lack of connection between the countervailable benefit determination in the fourth restructuring and the first three equity infusions. *See id.* at 1349. Ultimately, the trial court also went further than in the *First Remand Order*, holding that "Commerce may not attempt to reverse the

countervailability determinations on the first three administrative reviews in this case absent new information to address fraud or mistake of fact." *Id.* at 1350.

The *Second Remand Order* also re-addressed the issue of pass-through. The trial court determined that Commerce had not reviewed the record evidence and again directed the agency to examine the record and determine whether an arm's length transaction occurred for fair market value in Dongbu's acquisition.

After the *Second Remand Order*, Commerce reconsidered its analysis. *See* J.A. 9209–25 (*Second Remand Redetermination*). Under "respectful protest," Commerce determined in this remand that it found "no other basis on the record to conclude that a benefit was conferred on Dongbu Steel's first through third equity infusions." J.A 9214. The agency then determined that, since there was no countervailable benefit from the first three debt-to-equity conversions, any pass-through determination was moot.

The trial court sustained the *Second Remand Redetermination*. *See KG Dongbu Steel Co. v. United States*, 756 F. Supp. 3d 1326, 1337 (Ct. Int'l Trade 2025) (*Final Opinion*). Finding that Commerce had permissibly "examine[d] the full record and change[d] its position," the trial court determined that Commerce's *Second Remand Redetermination* was "in accordance with law, supported by substantial evidence, and in accordance with the remand instructions." *Id.* at 1335. The trial court also sustained Commerce's determination on remand that the issue of pass-through was moot because no benefit was conferred by the first through third debt-to-equity conversions. *Id.* at 1336.

Nucor, who had intervened in proceedings below as a defendant, timely filed the present appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## II

We review final decisions of the Court of International Trade de novo, reviewing Commerce's countervailing duty determinations under the same standard applied by the trial court. *Mosaic Co. v. United States*, 160 F.4th 1340, 1346 (Fed. Cir. 2025). Under the applicable standard, we "must uphold Commerce's determinations unless they are 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308 (Fed. Cir. 2020) (en banc) (quoting *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015)); *see also* 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (quoting *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1071 (Fed. Cir. 2001)). "[T]he agency's findings 'may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence.'" *Worldwide Door Components, Inc. v. United States*, 119 F.4th 959, 968 (Fed. Cir. 2024) (quoting *Ad Hoc Shrimp*, 802 F.3d at 1348).

## III

On appeal, Nucor argues: (1) Commerce's re-evaluation of the first three debt-to-equity conversions in the *Preliminary Results* and *Final Results* accorded with law; (2) that the agency's original finding of countervailable benefit was supported by substantial evidence; and (3) that Commerce's original finding of benefit pass-through to Dongbu post-acquisition was supported by substantial evidence. We address each argument in turn.

A

We first consider whether the trial court erred in the *First Remand Order* by remanding as contrary to law Commerce's *Final Results*.

i

At the outset, the parties contest the relevant legal standard applicable when an agency changes its policies or practices between actions.

Generally, "an agency may deviate from a past practice when 'the new policy is permissible under the statute, . . . there are good reasons for it, and . . . the agency *believes* it to be better, which the conscious change of course adequately indicates.'" *Huvis Corp. v. United States*, 570 F.3d 1347, 1353 (Fed. Cir. 2009) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). That is, there is nothing in the Administrative Procedure Act or Supreme Court precedent that requires all agency change to be subjected to heightened review, requiring something over and above the justification needed for the agency action in the first instance. *See Fox*, 556 U.S. at 514. However, where an agency's changed position "rests upon factual findings that contradict those which underlay its prior policy" or "has engendered serious reliance interests that must be taken into account," a more detailed "reasoned explanation" is required. *Id.* at 515–16.

While Nucor defends Commerce's change in position under *Fox*, Dongbu contests the applicability of *Fox* and its progeny to Commerce's re-examination of Dongbu's first three equity infusions, instead arguing that the *SKF* standard cited by the trial court supplies the relevant criterion for agency changes in position: "an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently." Appellee Br. 30 (quoting *SKF*, 263 F.3d at 1382); *see id.* at 28–34. Under the *SKF* standard, Dongbu argues, Commerce's change in

position was arbitrary because it had previously determined thrice that no countervailable benefit was provided by Dongbu's equity infusions yet pivoted in a fourth administrative review based on no new record evidence.

We agree with Nucor that *Fox* describes the applicable legal standard. First, while Dongbu attempts to argue that *Fox* is only applicable to a narrow range of agency actions resting on different facts, *Fox*, by its own terms, is not so narrow. Indeed, as noted above, *Fox* speaks in terms of broader "agency change" when setting forth its reasoning. 556 U.S. at 514. And we agree with Nucor's argument on reply that *Fox* and *SKF* set forth a single standard for agency changes—*i.e.*, where an agency shifts its position between successive actions, it must only articulate a reasonable explanation for having done so. *Fox*, 556 U.S. at 515–16; *see SKF*, 263 F.3d at 1382–83. Indeed, this approach accords with much of our own case law on agency change post-*Fox* and *SKF*. *See, e.g.*, *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014) ("Commerce may change its conclusions from one review to the next based on new information and arguments, as long as it does not act arbitrarily and it *articulates a reasonable basis* for the change." (emphasis added)). We therefore examine Commerce's change in position regarding the first three equity infusions under the foregoing standards supplied by *Fox*.

ii

Reviewing the *Preliminary Results* and the *Final Results* anew, Commerce undoubtedly complied with these standards. First, in memoranda accompanying the *Preliminary Results*, Commerce acknowledged that, in previous reviews, it found Dongbu's first three equity infusions provided no countervailable benefit based on a comparison of private and public share prices before going on to explain three reasons, rooted in record evidence, that it no longer believed private investor participation in these

transactions was significant. *See, e.g.*, J.A. 8512 (preliminary decision memorandum recognizing the change and providing reasoning); J.A. 8548–49 (equity infusions memorandum describing KDB's dominance during debt restructuring process and lack of reasonable return that investors could expect out of Dongbu). And, as noted, in a memorandum accompanying the *Final Results*, Commerce explained that the reason it chose to re-evaluate these equity infusions and consider the cited record evidence in a new light was because, "unlike in prior reviews," the presence of "private investors independent from the creditors' committee" during the fourth equity infusion "led [Commerce] to reconsider the role KDB played in its control of the creditors' committee." J.A. 8773. In reaching the *Final Results*, Commerce therefore met its "obligation to display awareness of the change and provide a reasonable justification for the new approach." *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 541 (Fed. Cir. 2019); *see Fox*, 556 U.S. at 515–16.

The trial court's contrary reasoning and conclusions were error. In the *First Remand Order*, after concluding that Commerce had a standard practice of not re-examining Dongbu's equity infusions "absent new information," the trial court determined that the presence of private investors in the fourth equity infusion was an insufficient rationale for re-examining the first three infusions because it did "not deal directly with the first through third debt-to-equity restructurings." 648 F. Supp. 3d at 1358–59. Accordingly, the trial court noted, and Dongbu reiterates on appeal, that Commerce's change in position was arbitrary because it was not supported by citations to "new evidence" concerning the first through third equity infusions. *Id.* at 1359.

Even assuming the trial court's findings on Commerce's standard practices are correct, as Nucor points out, neither the trial court nor Dongbu on appeal points to any case law, statute, or Commerce regulation requiring such

a narrow view of permissible new evidence. If facts arise during a later POR that shed additional light on a government subsidy program analyzed in an earlier POR, so long as re-examination of the earlier subsidy program is proper considering the relevant AUL, we see no reason that these facts may not be considered new evidence justifying a change in agency position. To hold otherwise, as the trial court did, would impose a heightened burden on Commerce's ability to reconsider that our case law proscribes.

We therefore conclude that reconsideration of the first three equity infusions in Commerce's *Final Results* was not contrary to law and that the trial court's reasoning in the *First Remand Order* was error. To the extent that the *Second Remand Order* repeated this error and imposed an even higher standard for Commerce to re-examine the first three equity infusions—*i.e.*, that Commerce may only do so "to address fraud or mistake of fact," 695 F. Supp. 3d at 1350—it, too, cannot stand. The same is true for the *Final Opinion*, which restated this heightened burden and affirmed the results Commerce reached after the flawed *Second Remand Order*. *See* 756 F. Supp. 3d at 1333, 1335.

B

Having found that Commerce's change in position in the *Final Results* accorded with applicable law, we next evaluate whether Commerce's finding of countervailable benefit was supported by substantial evidence. We conclude that it was.

In memoranda accompanying the *Preliminary Results* and the *Final Results*, Commerce cited and analyzed voluminous record evidence that led it to revisit its conclusions about government dominance of the Creditors' Committee, including the terms of various agreements and business relationships giving KDB great influence over Dongbu's debt restructuring proceedings. *See* J.A. 8547–49 (memorandum on equity infusions accompanying *Preliminary Results*); J.A. 8774–76 (issues and decision memorandum

accompanying *Final Results*). This evidence and reasoning were adequate to support Commerce's determination that private investor participation was insignificant, which in turn led to a supportable finding of benefit after Commerce conducted an equityworthiness analysis that, as Nucor notes, is unchallenged on appeal. *See* J.A. 8550–58; J.A. 8776–77. That Commerce previously reached a different conclusion about private investor significance on largely similar evidence does not weaken the substantial evidence underpinning the agency's findings of government domination, insignificant private participation, and ultimate countervailable benefit in the *Final Results*. *See Worldwide Door*, 119 F.4th at 968.

Dongbu makes several arguments against the substantiality of this evidence. Dongbu first argues that private ownership of Dongbu shares was considerable during the first three equity infusions, which counsels against finding government domination. Dongbu also argues that certain agency precedent cited by Commerce in the *Final Results* is distinguishable, citing their own precedent that the behavior of private investors on creditors' committees may still be used as benchmarks even where the government owns more than 75% of the creditors' committee voting rights. *See Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Dep't of Com. Oct. 25, 2007) (*CFS Paper from Korea*); Appellee Br. 45. Dongbu further contends that private investor participation in the first three equity infusions was substantial based on a benchmark of 18.3% private participation found significant in a separate Commerce case. *See Final Affirmative Countervailing Duty Determination: Small Diameter Circular Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe ("Seamless Pipe") from Italy*, 60 Fed. Reg. 31,992, 31,997 (Dep't of Com. June 19, 1995) (*Seamless Pipe from Italy*). Finally, Dongbu argues that parallels between the loan and equity portions of Dongbu's debt restructuring,

which Commerce cited to in the *Final Results* and used to justify its finding of government domination of the equity infusions, are irrelevant because each portion is evaluated under a separate statutory and regulatory scheme using different considerations.

Dongbu's attempts to detract from the substantial evidence on which Commerce relied are unpersuasive. First, as to Dongbu's arguments regarding *CFS Paper from Korea*, Commerce in the *Final Results* considered the case and dismissed it as irrelevant because "the terms of debt restructuring are company-specific, depend on the composition of the creditors, and vary with the financial situation of each company." J.A. 8776. We agree that what amounts to significant government control will differ greatly between cases. This undermines the value of strict comparisons of government-owned voting rights to determine whether private investor participation is significant. And here, Commerce did not just rely on government control of Creditors' Committee voting authority to find government dominance: instead, the agency looked at the qualitative terms of the equity infusions and found that KDB exercised extensive control and influence. J.A. 8774–76.

A similar argument addresses Dongbu's reliance on *Seamless Pipe from Italy* and its 18.3% benchmark for significant private investor participation. The question in a countervailing duty review is not a quantitative one about whether a certain threshold of private investment is met, but rather a qualitative one about whether these private investor prices are "actual" within the meaning of 19 C.F.R. § 351.507(a)(3)—that is, whether they may stand in for "the usual investment practice of private investors . . . in the country in which the equity infusion is made." 19 U.S.C. § 1677(5)(E)(i). We therefore agree with Nucor that mechanically applying a bright-line rule for investor significance, as Dongbu would have Commerce do, would be inconsistent with Commerce's statutory and regulatory mandates. *See* Appellant Reply Br. 20–21.

Finally, we find adequate support for Commerce's conclusion in the *Final Results* that "it would be unreasonable for [the agency] to find that the KDB exercised significant influence over the loans, but not the debt-to-equity conversions." J.A. 8773–74. While Dongbu is correct that the standards for determining countervailability of loans set out in 19 U.S.C. § 1677(5)(E)(ii) and 19 C.F.R. § 351.505 differ from those used to evaluate equity infusions under 19 U.S.C. § 1677(5)(E)(i) and 19 C.F.R.§ 351.507, *see* Appellee Br. 50–51, Dongbu does not explain why these different standards bear materially on Commerce's ability to draw parallels between Dongbu's loan and equity infusions. As Nucor argues on reply, both standards are directed "at the same basic objective—identifying a market-based benchmark to determine whether a government loan or equity infusion conferred a benefit." Appellant Reply Br. 23. In the case of loans, this basis for the benefit benchmark is explicitly enshrined in regulation, *see* 19 C.F.R. § 351.505(a) (referring to "comparable commercial loan(s) that the firm could actually obtain on the market"), and in the case of equity infusions, this stems from the above-referenced requirement that private investor prices be "actual," *id.* § 351.507(a)(3).

We therefore conclude that Commerce's finding of countervailable benefit associated with the first three equity infusions is supported by substantial evidence. To the extent that the *First Remand Order* held differently by summarily remanding the matter for further consideration, it must be reversed. And to the extent that the *Second Remand Order* and *Final Opinion* elaborated further on the substantial evidence prong and reached contrary conclusions, they must also be reversed.

C

Having concluded that Commerce's findings of countervailable benefit in Dongbu's first three equity infusions were in accordance with law and supported by substantial

evidence, we must now determine whether Commerce adequately found in the *Final Results* that this benefit was not extinguished by KG Consortium's acquisition of Dongbu. Again, we conclude that Commerce's determinations were supported by substantial evidence.

First as Commerce noted in the *Final Results*, Dongbu opted not to submit any information in response to the Change-in-Ownership Appendix, stating that "Dongbu does not wish to challenge the Department's baseline presumption and thus understands that no response to the Change-in-Ownership Appendix is required." J.A. 8779–80. Since it was Dongbu's burden to challenge the "baseline presumption" of pass-through, and since Dongbu waived the opportunity to submit additional information to the agency, we cannot say that Commerce's determination of pass-through based on the established presumption was error. Even if the presumption were considered an insufficient basis for Commerce's ultimate finding, as Nucor points out, Commerce also cited substantial record evidence justifying its conclusion that KG Consortium's acquisition of Dongbu was not an arm's length transaction for fair market value. For instance, Commerce cited to outside evaluations of the acquisition, which were focused on how much money could be recovered, as well as certain terms of the acquisition, including another round of debt-to-equity swaps and higher share prices paid by the Creditors' Committee. J.A. 8782–83. This evidence was sufficient to support Commerce's conclusion in the *Final Results* that "it is unlikely that the KG Consortium paid a fair market value." J.A. 8783.

Dongbu nonetheless challenges Commerce's findings, arguing first that it had no reason to submit a response to the Change-in-Ownership Appendix because Commerce had not previously found that any countervailable benefit was provided by the first three equity infusions, and thus "whether there were any programs that provided non-recurring benefits that may have passed through to KG

Dongbu was simply not yet an issue at the time of the questionnaire response." Appellee Br. 21. Dongbu additionally argues that the facts of the open bidding process that led to KG Consortium's acquisition and the terms of KG Consortium's purchase demonstrate an increased fair market value for Dongbu that rebuts the "baseline presumption" of pass-through.

Again, we find Dongbu's arguments unpersuasive. First, although Commerce had previously not found any countervailable benefit associated with the first three equity infusions, as Commerce noted in the *Final Results*, "the debate over the countervailability of Dongbu Steel's equity infusions has been significant in all prior reviews; thus, KG Dongbu was on notice of the issue." J.A. 8780. Indeed, in Commerce's 2018 administrative review of the countervailing duty order, the agency explicitly told Dongbu that it "may re-examine [the issue of whether the equity infusions provided benefit to Dongbu] for the next administrative review if new record evidence requires such an examination." *See* J.A. 8772. We therefore conclude that Dongbu was squarely on notice of the potential that benefit would be found in the fourth administrative review, necessitating a pass-through determination, and Dongbu's refusal to submit a response to the Change-in-Ownership Appendix was therefore unjustified if it wished to rebut the "baseline presumption." Second, while Dongbu offers a contrary gloss on the record evidence to suggest that KG Consortium's acquisition occurred at arm's length and for fair market value, such an alternate interpretation does not discredit the substantial evidence on which Commerce relied to reach a contrary conclusion. *See Worldwide Door*, 119 F.4th at 968.

In sum, we conclude that Commerce's reconsideration of the benefit provided by Dongbu's first three equity infusions was not contrary to law; that its finding of countervailable benefit in these transactions was supported by substantial evidence; and that its determination that this

benefit passed through upon acquisition by KG Consortium was supported by substantial evidence. Accordingly, the trial court's *First Remand Order* and subsequent orders holding otherwise were erroneous and must be reversed.

## IV

We have considered the parties' remaining arguments and find them unpersuasive. For the reasons explained above, we reverse the final judgment of the trial court and remand for the trial court to reinstate the original determinations from Commerce's *Final Results*. To the extent the trial court's interim orders and opinions reach a contrary conclusion to the one we reach here, they are also reversed.

**REVERSED AND REMANDED**

COSTS

Costs to Appellant.